WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer
Jacqueline Marcus

*Attorneys for Syncora Guarantee Inc.*
*and Assured Guaranty Municipal Corp.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x
|                                          | :  |                            |
|------------------------------------------|----|----------------------------|
| In re:                                   | :  | Chapter 11                 |
|                                          | :  |                            |
| GSC Group, Inc., <u>et al</u>.           | :  | Case No. 10-14653 (AJG)    |
|                                          | :  |                            |
|                     Debtors.             | :  | (Jointly Administered)     |
|                                          | :  |                            |

-----------------------------------------------------------------x

**LIMITED OBJECTION OF SYNCORA GUARANTEE**
**INC. AND ASSURED GUARANTY MUNICIPAL CORP. TO**
**DEBTORS' MOTION FOR ENTRY OF (I) ORDER APPROVING (A)**
**BIDDING PROCEDURES, (B) FORM AND MANNER OF NOTICE OF**
**SALE AND (C) PROCEDURES FOR DETERMINING CURE AMOUNTS AND (II)**
**ORDER AUTHORIZING (A) SALE OF ASSETS FREE AND CLEAR OF ALL LIENS**
**CLAIMS, ENBUMBRANCES, AND OTHER INTERESTS AND (B) ASSUMPTION**
<u>**AND ASSIGNMENT OF EXECUTORY CONTRACTS TO SUCCESSFUL BIDDER(S)**</u>

TO THE HONORABLE ARTHUR J. GONZALEZ,
UNITED STATES BANKRUPTCY JUDGE:

        Syncora Guarantee Inc. ("<u>Syncora</u>") and Assured Guaranty Municipal Corp.

(formerly known as Financial Security Assurance Inc.) ("<u>Assured</u>", and together with Syncora,

the "<u>Insurers</u>"), respectfully submit this objection (the "<u>Objection</u>") to the Debtors' Motion for

Entry of (I) Order Approving (A) Bidding Procedures, (B) Form and Manner of Notice of Sale

and (C) Procedures for Determining Cure Amounts and (II) Order Authorizing (A) Sale of

Assets Free and Clear of All Liens Claims, Encumbrances and Other Interests and (B)

Assumption and Assignment of Executory Contracts to Successful Bidder(s), dated September 1, 2010 (Docket No. 24) (the "Motion"),[1] and respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      The Debtors have asked this Court to approve Bidding Procedures to sell substantially all of their assets, which include certain collateral management agreements. One feature of their proposed Bidding Procedures effectively violates a key provision of the Investment Advisers Act of 1940 (the "Investment Advisers Act"),[2] a federal statute which requires investment advisory agreements of registered investment advisers to contain a provision prohibiting assignment of such agreements without consent of the counterparty to the contract. Syncora and Assured, as financial guarantors of certain securities issued by special purpose entities for which the Debtors manage assets, are the parties with the economic interests to be protected under the Investment Advisers Act and have agreements in place which obligate the Debtors to obtain their consent to replace the manager of the assets. Section 365(c) of the Bankruptcy Code prohibits the assignment of executory contracts by a debtor if "applicable law" requires the consent of the non-debtor party and such party does not consent. The Investment Advisers Act qualifies as "applicable law." The Insurers do not object to the proposed sale of the Debtors' assets so long as the Debtors comply with the provisions of the contracts and the Investment Advisers Act.

2.      The Insurers have discussed the Bidding Procedures with the Issuers (as defined below) and understand that the Issuers will be submitting a limited objection to the

---

[1] Capitalized terms used but not defined herein shall have the meanings set forth in the Motion.

[2] The Investment Advisers Act of 1940, Pub. L. No. 111-203, § 205, 124 Stat 1376 (amends 15 U.S.C. 80b-5, effective July 22, 2010).

Bidding Procedures on similar grounds to those set forth herein. As a result, both (a) the Issuers, the contract parties to the Management Agreements and (b) the Insurers, the ultimate economic beneficiaries of the Management Agreement, object to the Bidding Procedures.

3.     Although technically the Insurers are not required to assert an objection until just before the Sale Hearing, the Insurers file this limited objection to apprise the Court, the Debtors and all potential bidders and other parties in interest of their position. Ideally, potential bidders should approach the Insurers and provide their credentials to the Insurers prior to the Bid Deadline to avoid any disruption of an otherwise acceptable transaction.

## **BACKGROUND**

4.     The Debtors serve as investment adviser for various entities and are party to various management agreements, including certain collateral management agreements (the "<u>Management Agreements</u>") identified on Exhibit "A" annexed hereto, pursuant to which a Debtor (in such capacity, the "<u>Manager</u>") serves as a fiduciary for, and manages certain loans and securities (the "<u>Collateral</u>") held by special purpose entities (the "<u>Issuers</u>").

5.     The Management Agreements provide that the Manager will, *inter alia*, (i) monitor the Collateral, (ii) enforce the rights of the Issuers as holders of the Collateral, (iii) take actions to collect on the Collateral, (iv) under certain circumstances market and sell defaulted or other distressed Collateral, and (v) provide periodic reporting of the performance of the Collateral. The Collateral generates the revenues necessary for the Issuers to make payments on the securities, and, therefore, the ability of the Issuers to meet their obligations is directly correlated to the performance of the Manager.

6.     The Management Agreements expressly and clearly provide that the Manager shall not assign the Management Agreements without, (i) in the case of the Management Agreement with an Issuer for which Syncora has provided insurance (the "<u>Syncora</u>

Transaction Management Agreement"), the affirmative written consent of, among others, the Issuer and Syncora, and (ii) in the case of the Management Agreements with Issuers for which Assured has provided insurance (the "Assured Transaction Management Agreements"), the Issuer and a majority of each class of securities issued by the Issuer.[3] Assured's consent is required for any assignment by the Manager of the Assured Transaction Management Agreements because Assured has the right to direct the holders of the securities it insures to consent or withhold consent to an assignment.[4]

### A. The Syncora Insurance Policy

7.       In 2002, Syncora issued a financial guaranty insurance policy guaranteeing the payment by one Issuer of certain interest and principal amounts to the holders of certain securities, as set forth on Exhibit "A" annexed hereto.  The financial guaranty insurance policy provides that if the Issuer does not have enough funds to make certain scheduled payments due on the securities, Syncora will make a payment to the indenture trustee in the amount of such shortfall.  As a consequence of Syncora's insurance policy, even though third-parties are the record holders of certain classes of securities issued by the Issuers, Syncora holds the true economic interest in such securities and the risk of non-payment or default by the Issuer.  The indenture, the Syncora Transaction Management Agreement and other operative documents pursuant to which the applicable Issuer issued securities expressly contemplate Syncora's role as insurer and provide various rights and remedies to Syncora.  The Syncora

---

[3] One of the Assured transactions is substantively similar to the Syncora transaction, whereby Assured has rights and remedies expressly included in the Issuer's transaction documents.

[4] In respect of the Management Agreements for the Issuers GSC Partners Gemini Fund Limited and GSC Partners CDO Fund IV, Limited, currently, the consent rights are held by Syncora and Ambac Assurance Inc., respectively.

Transaction Management Agreement expressly provides that assignment of the Management Agreement by the Manager requires the consent of both the Issuer and Syncora.

8.     On August 26, 2010, Syncora sent a letter to the applicable Issuer and the indenture trustee for the applicable Issuer invoking its right under section 14 of the Syncora Transaction Management Agreement to direct the removal of the Manager for cause.  On August 31, 2010 (the "Commencement Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  On the Commencement Date, the indenture trustee delivered a notice to the Manager that Syncora had invoked its right to remove and replace the Manager.  On September 1, 2010, the Debtors filed a motion seeking to enforce the automatic stay and prohibit Syncora from "taking any actions in furtherance of the removal of NJLP as Collateral Monitor."  (Docket No. 16).  Following discussions between Syncora and the Debtors, a modified version of the order was unopposed by Syncora and entered by the Court on September 2, 2010.  (Docket No. 28).

### B. The Assured Insurance Policies

9.     From 2001 to 2007, upon or after acquiring securities issued by Issuers, certain holders of such securities acquired credit protection from Assured, as set forth on Exhibit "A" attached hereto.  Such credit protection was provided through the following methods:[5]

       a.    A trust established by Assured entered into a credit default swap with the security holders which provides that upon the failure by the applicable Issuer to make certain scheduled payments of interest or principal due on the securities, the trust will pay such

---

[5] In the case of securities issued by GSC Partners Gemini Fund Limited and GSC Partners CDO IV, Limited, Syncora and Ambac Assurance Corp. ("Ambac"), respectively, have provided a financial guaranty insurance policy with respect to the same securities as Assured.  Assured's insurance policy provides that Assured is only obligated to make a payment in respect of such securities if (i) the Issuer is unable to make certain specified payments and (ii) a request is made for payment by Syncora or Ambac, as applicable, and Syncora or Ambac does not make the payment required under its financial guaranty insurance policy.

security holder any shortfall. Assured, through a financial guaranty insurance policy, guarantees the obligations of the trust under the credit default swap, with the security holder being the beneficiary. Under the policy, Assured will make payments to the security holder if the trust is required to make a payment to the security holder pursuant to the credit default swap.

b.  The security holder deposited its security with a custodian. Assured deposited its financial guaranty insurance policy insuring certain scheduled interest and principal payments due on such security with the same custodian, who is the beneficiary of the policy. The custodian issued a custodial receipt to the security holder entitling such holder to both (i) the payments received by the custodian on such security and (ii) the payments received by the custodian from Assured in respect of the insurance policy.

c.  Assured issued a financial guaranty insurance policy guaranteeing an Issuer's payment of certain interest and principal amounts to holders of certain securities. The financial guaranty insurance policy provides that if the Issuer does not have enough funds to make certain scheduled interest and principal payments due on the securities, Assured will make a payment to the indenture trustee in an amount of such shortfall.

Since security holders that are the beneficiaries of Assured's policies are made whole by Assured, even if the Issuer defaults on its obligations, Assured holds the risk of non-payment or default by the Issuer and is the true economic interest holder in the securities that it insures. Certain Management Agreements relating to the policies described in paragraphs (a) and (b) above expressly provide that the assignment of the Management Agreement by the Manager requires the consent of the Issuer and a certain percentage of securities holders (Assured has the right to direct holders of the insured securities as to how to vote).

10.  The credit protection described in paragraphs 9(a) and (b) above was acquired after the issuance of the securities by the Issuer, or was otherwise not specifically included in the transaction documents pursuant to which the Issuer issued the securities. Therefore, Assured's rights to direct the security holders and custodial receipt holders that are the beneficiaries of its policies as to how to vote their securities or whether to provide or refuse

consents are contained in the agreements between Assured and the relevant trust or security holders, as applicable. The Management Agreement relating to the policy described in paragraph (c) expressly provides that assignment of the Management Agreement by the Manager requires the consent of both the Issuer and Assured. The documents requiring Assured's consent to the assignment of the Management Agreements with each of the Issuers whose securities Assured has insured are referred to collectively herein as the "Assured Transaction Documents." In sum, Assured's consent to the assignment of certain of the Assured Transaction Management Agreements is required. In fact, the credit default swap described in paragraph 9(a) above issued by Assured and the policy issued in connection with the custodial receipts described in paragraph 9(b) above each provide that, if the holder of the securities does not follow Assured's direction with respect to an assignment, then such credit default swap or policy, as applicable, is cancelled and such security holder no longer has the benefit of Assured's credit protection.[6]

### C. The Motion

11.     On September 2, 2010, the Debtors filed the Motion, seeking approval of Bidding Procedures pursuant to which they may sell all or substantially all of their assets. (Docket No. 24). The Bidding Procedures recognize that affirmative consent by certain parties is required prior to any assignment of certain executory contracts, including the Management Agreements. The Debtors have proposed that the "Consent Parties[7] will be deemed to have

---

[6] In respect of the Management Agreements for the Issuers GSC Partners Gemini Fund Limited and GSC Partners CDO Fund IV, Limited, currently, the consent rights are held by Syncora and Ambac Assurance Inc., respectively.

[7] The "Consent Parties" are defined in the Motion to include parties whose consent is required under the operative agreements or applicable law. The Asset Purchase Agreement referred to in the Motion includes a definition of "Consent" which states, "with respect to any collateralized debt obligation or collateralized loan vehicle that is managed by any Seller or any Affiliate of any Seller under a Management Agreement . . . [any] consent required in respect of any assignment."

consented to the transfer or assignment [of a Management Agreement] if the requisite number of

Consent Parties fail to object before the earlier to occur of (i) fifteen (15) days following service

of the notice [of such assignment], or (ii) two (2) business days prior to the Sale Hearing,

notwithstanding any terms in the operative agreements requiring an affirmative consent from the

Consent Parties." *See* Bidding Procedures ¶ 13 and Proposed Order ¶ 8.  Moreover, in the

proposed order, the Debtors seek to have the Court make a finding that the Bidding Procedures

"affords the…Consent Parties sufficient opportunity to object to such assumption and

assignment." Proposed Order ¶ F.

## **OBJECTION**

### **Section 365(c) Prohibits the Debtors From**
### **Assigning the Management Agreements Without the Consent of the Applicable Insurer**

*A.     Restrictions on Assignment Under Section 365 of the Bankruptcy Code*

12.     A debtor's right to assume and assign an executory contract is not

absolute.  Specifically, debtors are prohibited from assuming and assigning certain executory

contracts pursuant to section 356(c) of the Bankruptcy Code.  Section 365(c) provides in

pertinent part:

> The trustee may not assume or assign any executory contract or
> unexpired lease of the debtor, whether or not such contract or lease
> prohibits or restricts assignment of rights or delegation of duties,
> if—
>
> (1)(A) applicable law excuses a party, other than the debtor, to
> such contract or lease from accepting performance from or
> rendering performance to an entity other than the debtor or the
> debtor in possession, whether or not such contract or lease
> prohibits or restricts assignment of rights or delegation of duties;
> and
>
> (B) such party does not consent to such assignment . . . .

13.     Section 365(c) of the Bankruptcy Code protects parties from non-consensual assignment where the identity of the contract counterparty is important to the benefit of the bargain.  The court in *In re Shick* summarized the doctrine this way

> [S]ection 365(c)(1) is concerned with non-assignable rights and non-delegable duties under non-bankruptcy law. . . . Generally, a right is not assignable if assignment would materially change the duty of the obligor, increase his burden or risk or impair the chance of receiving a return performance or reduce its value. . . . A duty is not delegable if the obligee has relied on the obligor's 'personality' (*i.e.* honesty, skill, reputation, character, ability, wisdom, or taste), the duty is based upon a close relationship or the obligor has promised to act in good faith or use best efforts.

*In re Shick*, 235 B.R. 318, 323 (Bankr. S.D.N.Y. 1999) (internal citations omitted).  The *Shick* court held that "[f]aced with a state law restricting assignment (contractual restrictions are immaterial under § 365(c)), a court must inquire into its rationale and uphold the restriction under section 365(c) if the identity of the contracting party is material to the agreement."  In the *Shick* case, the court refused to allow assignment of a partnership interest absent consent from the other partners because it concluded that state partnership law barred non-consensual assignment of partnership interests based upon the principal of *delectus personarum*, or the principle that the identity of the partner was material to the other partners.

14.     Courts have interpreted section 365(c) to apply to contracts that are not personal services contracts as well.  For example, in *In re Adelphia Commc'n Corp.*, the court held that "generally applicable laws which restrict or prohibit transfer of rights or duties under contracts (thereby excusing performance for the non-transferring party) independent of any restriction contained within the contract itself, are covered by the provisions of § 365(c)(1)."  *See In re Adelphia Commc'n Corp.*, 359 B.R. 65, 77 (Bankr. S.D.N.Y. 2007).  In *Adelphia*, the court upheld restrictions on assignment contained in local cable ordinances to the extent that the

ordinances imposed generally applicable prohibitions or restrictions on assignment or transfer

independent of restrictions contained in contracts with cable operators. *See id.* Similarly, in *In

re Nitec Paper Corp.*, the court found certain rights to purchase power at below-market rates

were non-assignable because under state and federal laws, the "the right to receive 'replacement

power' and the duty to pay for it are certainly non-delegable." *In re Nitec Paper Corp.*, 43 B.R.

497-498 (S.D.N.Y. 1984); s*ee also In re Braniff Airways, Inc.*, 700 F.2d 935, 943 (5th Cir. 1983)

(holding that an assignment of a lease for airport space, absent content of the Federal Aviation

Authority, as part of a sale of substantially all of the debtors' assets, was prohibited by applicable

law, and reversing an order of the District Court approving the sale transaction).

**B.**     ***Applicable Law Restricts Assignment of the Management Agreements***

15.     Section 205(a)(2) of the Investment Advisers Act is applicable federal law

that prohibits nonconsensual assignment of investment advisory contracts such as the

Management Agreements because of the fiduciary nature of the obligations of the investment

advisor under such contracts. The statute provides in pertinent part:

> No investment adviser registered or required to be registered with the
> Commission shall enter into, extend, or renew any investment advisory contract,
> or in any way perform any investment advisory contract entered into, extended, or
> renewed on or after the effective date of this title, if such contract . . . [f]ails to
> provide, in substance, that no assignment of such contract shall be made by the
> investment adviser without the consent of the other party to the contract.

16.     The Investment Advisers Act was established in recognition of the

"personalized character of the services of investment advisers" and "especial care [was] taken in

the drafting of the [Investment Advisers Act] to respect th[e] relationship between investment

advisers and their clients." H.R. Rep. No. 2639 at 10 (1940).

17.     The Debtor party to the Management Agreements, GSCP (NJ), L.P. is

registered as an investment adviser with the Securities and Exchange Commission, as indicated

on its "Uniform Application for Investment Adviser Registration on Form ADV," attached hereto as Exhibit "B," and therefore is subject to Section 205 of the Investment Advisers Act. Section 205(d) of the Investment Advisers Act provides that "'investment advisory contract' means any contract or agreement whereby a person agrees to act as investment adviser or to manage any investment or trading account of another person other than an investment company registered under Title I of this Act." The Management Agreements are contracts to manage the Collateral in which the Issuers have invested, and are therefore "investment advisory contracts" within the meaning of the Investment Advisers Act. Therefore, as required by the Investment Advisers Act, each of the Management Agreements must have the provision requiring the Issuer's consent to an assignment. Excerpts of these consent requirement provisions for the Management Agreements are attached hereto as Exhibit "C."[8]

18. The prohibition on non-consensual assignment under the Investment Advisers Act is the type of legal restriction on assignment that is subject to section 365(c) of the Bankruptcy Code, both because (i) it is a mandatory legal restriction on assignment, and (ii) the purpose of the restriction is to protect parties to contracts that are personal in nature. The Investment Advisers Act does not simply recognize contractual anti-assignment provisions negotiated by the parties, but rather, it prohibits registered investment advisers from entering into or performing under investment advisory contracts unless those contracts prohibit non-consensual assignment. By so doing, the Investment Advisers Act prohibits non-consensual assignment of all investment advisory contracts, including the Management Agreements.

---

[8] The Management Agreements are voluminous so they are not attached in full here. Copies of the Management Agreements will be provided upon request.

19.     The prohibition on non-consensual assignment contained in the Investment Advisers Act is motivated by the personal nature of the services of registered investment advisers.  In the words of the *Shick* court, the Manager's "'personality' (*i.e.* honesty, skill, reputation, character, ability, wisdom, or taste)" is material to the selection of the Manager and entry into the Management Agreements.  The Collateral comprises the assets of the Issuers, and the stream of income from the Collateral is what enables the Issuers to meet their obligations.  The Manager selects the Collateral at the creation of the Issuer, and then manages the Collateral for the duration of the existence of the Issuer unless the Manager or the Management Agreement is terminated.  Management responsibilities include (i) monitoring the Collateral, (ii) enforcing the rights of the Issuer as the holder of the Collateral, (iii) taking actions to collect on the Collateral, (iv) under certain circumstances, marketing and selling the Collateral, and (v) providing periodic reporting on the performance of the Collateral, rendering both the management skills and the investing acumen of the Manager essential to the continued performance of the Issuer.  The Manager therefore has a high degree of influence over returns realized on the Collateral and the risk of loss to which the security holders or, in this case, the Insurers are exposed.  In the performance of its duties, the Manager is a fiduciary for the Issuer and is expected to exercise skill, diligence and judgment in pursuing the interests of the Issuer.  Thus, the identity of the Manager is highly material to Management Agreements, and the Management Agreements are personal in nature.  For these reasons section 205 of the Investment Advisers Act has codified a prohibition on non-consensual assignment for these types of agreements.  Accordingly, section 365(c) of the Bankruptcy Code and the Investment Advisers Act prohibit assignment of the Management Agreements absent the consent of the non-debtor parties to those contracts.

**The Proposed Bidding Procedures Should Be Modified
To Require the Debtors to Obtain the Consent of the Parties, As
Required By the Management Agreements, Prior to Any Assignment Thereof**

**A.**     *The Bidding Procedures Alter the Consent Requirements Under the Management Agreements*

20.     Each Management Agreement expressly provides that the Manager may not assign its rights and obligations under such Management Agreement without the affirmative consent of certain specified parties which, either directly or indirectly, includes the Insurers. The relevant provisions of each of the Management Agreements are included on Exhibit C attached hereto.

21.     The Bidding Procedures seek to turn this consent requirement on its head by providing that in lieu of obtaining the affirmative written consent, negative notice is sufficient. If the Issuer, the Insurers and the security holders, as applicable, do not object to the assignment within a short period of time, consent is deemed to have been provided. The Debtors do not provide any rationale or legal support in the Motion for their request that the Court effectively rewrite the terms of the Management Agreements. This proposal should be rejected by the Court, and the negative notice provisions of the Bidding Procedures relating to assignment of executory contracts deleted and replaced with a provision that expressly requires the Debtors to comply with the terms of the Management Agreements.

**B.**     *The Bidding Procedures Permit a Transaction to Close Even if the Consent Parties Refuse Consent*

22.     Even more egregious, the Motion implies that even if there are objections to the assignment of a contract, the Debtors may "proceed with the transaction in accordance with the terms of the applicable Purchase Agreements with the Successful Bidders(s)." *See* Bidding Procedures ¶ 13. This provision completely overrides the required consent provisions of the Management Agreements and appears to seek permission to assign the Management

Agreements over the objection of the Insurers and others with consent rights in violation of the express terms of the Management Agreements, the Investment Advisers Act and section 365(c) of the Bankruptcy Code. Again, the Motion provides no justification or support for this provision. Notwithstanding any other portions of the Bidding Procedures, this provision must be deleted, and replaced with clear language that if any party that is required to consent to the assignment of the Management Agreements under the terms of the Management Agreements does not provide its affirmative consent to the assignment proposed by the Debtors, then the Debtors will exclude the Management Agreements for which consent was not obtained from any transaction.

**C.     *The Notice Period in the Bidding Procedures is Not Calculated to Provide Sufficient Notice for the Insurers to Exercise Their Consent Rights***

23.     The length of time for the Insurers to object to the assignment of the Management Agreements is unreasonably short. The Bidding Procedures provide that parties whose consent to assignment is required will be deemed to consent to assignment of the Management Agreements if they fail to object to such assignment "before the earlier to occur of (i) fifteen (15) days following service of the notice, or (ii) two (2) business days prior to the Sale Hearing." *See* Bidding Procedures ¶ 11. This period is unacceptable for multiple reasons.

24.     *First*, the period of time amounts to only thirteen days given the schedule for the Sale Hearing set forth in the Motion. Thirteen days is an insufficient amount of time for the Insurers to evaluate a potential assignee and the effects of the assignment on the Insurers' interest in the securities issued by the Issuers. Typically, when the Insurers select a collateral manager, *inter alia*, they perform a thorough examination of (i) the historical performance of the collateral manager, (ii) the key personnel at the manager that will be responsible for the particular transaction, (iii) whether the manager has similar assets under management and

expertise in managing certain asset classes, and (iv) a manager's systems and controls in place for monitoring of the assets.  This type of examination cannot be completed in 13 days.  Similarly, pursuant to section 365(b)(1)(C) of the Bankruptcy Code, the Debtor assigning the Management Agreements must provide adequate assurance of future performance.  The Debtors cannot do so, and the Insurers cannot evaluate such adequate assurance, before the identity of the assignee is known and the assignee's ability to perform under the contract is reviewed.

25.     *Second*, there is nothing in the Bidding Procedures that prevents the Debtors from seeking a Sale Hearing at a time prior to October 22, 2010, which would make an already short objection period, even shorter.  If the Court permits the Debtors to proceed with negative notice, then the Bidding Procedures must provide an absolute minimum length of time between the delivery of notice of a proposed assignment of a Management Agreement and the deadline for objections to such assignment.  Such minimum length of time should be at least 20 business days.

26.     *Third,* in the case of the Assured Transactions (other than the one Assured Transaction for which an insurance policy was issued directly to the applicable trustee), consent or a refusal of consent cannot be provided in the allotted time because of the process by which notices are delivered to Assured, and actions are taken by the insured security holder at Assured's direction.  With respect to Assured, the Management Agreements do not require notices provided thereunder to be delivered directly to Assured.  Instead, the insured security holders provided certain rights to Assured, including the right to consent to assignment of the Assured Transaction Management Agreements.  Any notices provided by the Debtors to the security holders are provided to the holder of the securities on the records of The Depository Trust Company ("DTC").  Such record holder may or may not be the beneficial holder of such

security that entered into a transaction with Assured. Only certain financial institutions are participants and able to hold securities on the records of DTC. If the beneficial holder is not the record holder of the security on the records of DTC, the record holder would then forward the notice to the beneficial holder who would then forward the notice of proposed assignment to Assured. Some of the noteholder beneficiaries of Assured's credit protection are large financial institutions that have thousands of employees in numerous offices around the world. It will take time for the notices to be received, processed and forwarded to Assured. It would be virtually impossible for Assured to receive the notice of a proposed assignment of a Management Agreement, evaluate the proposed successor manager and then, if necessary, draft and direct the security holder to file an objection to such assignment in the time allotted in the Motion and the Bidding Procedures. Even if this process runs smoothly, these added steps reduce the time that Assured would have to evaluate the proposed collateral manager and determine the appropriate action. In all circumstances, the notice of any proposed assignment should be delivered directly to the Insurers in addition to the other parties required under the Management Agreements.

27. Finally, to the extent that the Bidding Procedures modify the rights of the Insurers, the notice procedures in the Bidding Procedures violate due process. Due process requires notice that is reasonably calculated to reach all interested parties, reasonably conveys all required information and, permits a reasonable amount of time for response. *In re Robintech, Inc.* 863 F.2d 393, 396 (5th Cir. 1989) (citing *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). Due to the complex nature of these financial transactions, the timeframe for notice of a proposed assignment of the Management Agreements is not "reasonably calculated" to provide meaningful notice to the Insurers. The Debtors must provide enough advance notice to permit DTC to send notices to its record holders, for such record

holders to send notice to the beneficial holders, for such beneficial holders to send notice to Assured, for Assured to evaluate the proposed assignment and direct the noteholders, and for the noteholders to act.

28.     As discussed above, the Insurers bear the economic risk related to the securities they insured.  They agreed to insure the payments on securities issued by the Issuers based in part on their evaluation of the skill of the Manager for each Issuer, and relied on the fact that they had an absolute consent right to any assignment of a Management Agreement to another Manager.  They should be entitled to the benefit of their bargain, as reflected in the express provisions of the Management Agreements.

29.     The Insurers are not opposed to an assignment of the Management Agreements.  In fact, as evidenced by Syncora's attempt to remove and replace the Manager under the Syncora Transaction Management Agreement, Syncora welcomes an assignment of the Syncora Transaction Management Agreement.  However, as the economic interest holders of certain securities issued by the Issuers, the Insurers are financially exposed to the decisions and skill of the assignee of the Management Agreements and, therefore, seek to enforce their consent rights until an acceptable assignee is identified.  The Insurers have a common objective with the Debtors in identifying a successor collateral manager, or managers, expeditiously.  However, as provided in the Management Agreements and the Investment Advisers Act, any successor must be acceptable to the Insurers.  At this time, the Insurers do not consent to the assignment of the Management Agreements.

## CONCLUSION

30.     The Bidding Procedures should be modified to provide that the Debtors may only assign the Management Agreements with the affirmative written consent of the

Insurers, or, in the case of the Assured Transaction Management Agreements, the requisite security holders, in accordance with the express terms of the Management Agreements.

31.     In addition, the Debtors should be required to provide adequate notice of the proposed assignment of any Management Agreement in the manner described in paragraph 25 above to the applicable Insurer identified on Exhibit A attached hereto.

## RESERVATION OF RIGHTS

32.     In the event that the Court determines to grant the relief requested in the Motion, the Insurers reserve all of their rights to object to the proposed assignee at or in advance of the Sale Hearing.

WHEREFORE the Insurers respectfully request that the Court modify the Bidding Procedures and the proposed order consistent with the foregoing and grant the Insurers such other and further relief as is just and proper.

Dated: September 13, 2010
         New York, New York

/s/ Jacqueline Marcus
Gary T. Holtzer
Jacqueline Marcus
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Syncora Guarantee Inc.
and Assured Guaranty Municipal Corp.

# Exhibit A

## Management Agreements

| Management Agreements | Issuer | Manager | Insured Securities | Insurer |
|---|---|---|---|---|
| Collateral Monitoring Agreement, dated as of August 29, 2002, between GSCP (NJ), L.P., GSC Partners Gemini Fund Limited, GSCP GF I Limited and GSCP GF II Limited (as amended, supplemented, amended and restated or otherwise modified through the date hereof) | GSC PARTNERS GEMINI FUND LIMITED | GSCP (NJ), L.P. | Class A | Syncora and Assured |
| Collateral Management Agreement, dated as of December 16, 2003, between GSCP (NJ), L.P. and GSC Partners CDO Fund IV, Limited (as amended, supplemented, amended and restated or otherwise modified through the date hereof) | GSC PARTNERS CDO FUND IV, LIMITED | GSCP (NJ), L.P. | Class A-1 | Ambac and Assured |
| Collateral Management Agreement, dated as of January 18, 2006, between GSCP (NJ), L.P. and GSC Capital Corp. Loan Funding 2005-1 (as amended, supplemented, amended and restated or otherwise modified through the date hereof) | GSC CAPITAL CORP LOAN FUNDING 2005-1 | GSCP (NJ), L.P. | Class A-1 and Class A-2 | Assured |
| Collateral Management Agreement, dated as of October 20, 2005, between GSCP (NJ), L.P. and GSC Partners CDO Fund VI, Limited (as amended, supplemented, amended and restated or otherwise modified through the date hereof) | GSC PARTNERS CDO FUND VI, LIMITED | GSCP (NJ), L.P. | Class A-1 | Assured |
| Collateral Management Agreement, dated as of March 27, 2007, between GSCP (NJ), L.P. and GSC Partners CDO Fund VIII, Limited (as amended, supplemented, amended and restated or otherwise modified through the date hereof) | GSC PARTNERS CDO FUND VIII, LIMITED | GSCP (NJ), L.P. | Class A-1 | Assured |
| Collateral Management Agreement, dated as of March 27, 2001, between GSCP (NJ), L.P. and GSC Partners CDO Fund II, Limited (as amended, supplemented, amended and restated or otherwise modified through the date hereof) | GSC PARTNERS CDO FUND II, LIMITED | GSCP (NJ) | Class A | Assured |

## <u>Exhibit B</u>

## Uniform Application for Investment Advisor Registration

# FORM ADV

OMB: 3235-0049

## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| **Primary Business Name:** GSC GROUP | **IARD/CRD Number:** 109877 |
|---|---|

Rev. 02/2005

---

**WARNING:** Complete this form truthfully. False statements or omissions may result in denial of your application, revocation of your registration, or criminal prosecution. You must keep this form updated by filing periodic amendments. See Form ADV General Instruction 3.

## Item 1 Identifying Information

Responses to this Item tell us who you are, where you are doing business, and how we can contact you.

A.  Your full legal name (if you are a sole proprietor, your last, first, and middle names):
GSCP (NJ), L.P.

B.  Name under which you primarily conduct your advisory business, if different from Item 1.A.
GSC GROUP
*List on Section 1.B. of Schedule D any additional names under which you conduct your advisory business.*

C.  If this filing is reporting a change in your legal name (Item 1.A.) or primary business name (Item 1.B.), enter the new name and specify whether the name change is of ☐ your legal name or ☐ your primary business name:

D.  If you are registered with the SEC as an investment adviser, your SEC file number: 801-60038

E.  If you have a number ("CRD Number") assigned by *FINRA's CRD* system or by the IARD system, your *CRD* number: 109877

*If your firm does not have a CRD number, skip this Item 1.E. Do not provide the CRD number of one of your officers, employees, or affiliates.*

F.  *Principal Office and Place of Business*

(1) Address (do not use a P.O. Box):

| Number and Street 1: | Number and Street 2: | |
|---|---|---|
| 500 CAMPUS DRIVE | SUITE 220 | |
| City: | State: | Country: | ZIP+4/Postal Code: |
| FLORHAM PARK | NJ | UNITED STATES | 07932 |

If this address is a private residence, check this box: ☐
*List on Section 1.F. of Schedule D any office, other than your principal office and place of business, at which you conduct investment advisory business. If you are applying for registration, or are registered, with one or more state securities authorities, you must list all of your offices in the state or states to which you are applying for registration or with whom you are registered. If you are applying for registration, or are registered only, with the SEC, list the largest five offices in terms of numbers of employees.*

(2) Days of week that you normally conduct business at your *principal office and place of business*:
◉ Monday-Friday  ○ Other:

Normal business hours at this location:
9 A.M. - 5:30 P.M.

(3) Telephone number at this location:
973-437-1000

(4) Facsimile number at this location:
   973-437-1037

G. Mailing address, if different from your *principal office and place of business* address:
   Number and Street 1:                    Number and Street 2:

   City:              State:               Country:        ZIP+4/Postal Code:

   If this address is a private residence, check this box:  ☐

H. If you are a sole proprietor, state your full residence address, if different from your *principal office and place of business* address in Item 1.F.:
   Number and Street 1:                    Number and Street 2:
   City:              State:               Country:        ZIP+4/Postal Code:

                                                                    YES NO

I. Do you have World Wide Web site addresses?                       ◉  ○
   *If "yes," list these addresses on Section 1.I. of Schedule D. If a web address serves as a portal through which to access other information you have published on the World Wide Web, you may list the portal without listing addresses for all of the other information. Some advisers may need to list more than one portal address. Do not provide individual electronic mail addresses in response to this Item.*

J. Contact *Employee*:
   Name:                                   Title:
   Telephone Number:                       Facsimile Number:
   Number and Street 1:                    Number and Street 2:
   City:              State:               Country:        ZIP+4/Postal Code:
   Electronic mail (e-mail) address, if contact *employee* has one:
   *The contact employee should be an employee whom you have authorized to receive information and respond to questions about this Form ADV.*

                                                                    YES NO

K. Do you maintain some or all of the books and records you are required to keep under   ◉  ○
   Section 204 of the Advisers Act, or similar state law, somewhere other than your *principal office and place of business*?
   *If "yes," complete Section 1.K. of Schedule D.*

                                                                    YES NO

L. Are you registered with a *foreign financial regulatory authority*?                ○  ◉
   *Answer "no" if you are not registered with a foreign financial regulatory authority, even if you have an affiliate that is registered with a foreign financial regulatory authority. If "yes", complete Section 1.L. of Schedule D.*

# Exhibit C

## Management Agreement Assignment Provisions

COLLATERAL MONITORING AGREEMENT

dated as of August 29, 2002

by and among

GSC PARTNERS GEMINI FUND LIMITED,
as Issuer,

GSCP GF I LIMITED,
as a Gemini Subsidiary,

GSCP GF II LIMITED,
as a Gemini Subsidiary

and

GSCP (NJ), L.P.
as Collateral Monitor

Insurer (so long as the Class A Note Insurer is the Controlling Class) shall appoint the successor collateral monitor, which appointment shall not require the consent of, nor be subject to the disapproval of, the Issuer, any Holder of Notes or Preference Shares or the resigning or removed Collateral Monitor.

(i)     Any fee payable to any successor collateral monitor from payments on the Collateral shall not be greater than that paid to the Collateral Monitor without the prior written consent of the Holders of a Majority of the Preference Shares and the Class A Note Insurer (so long as the Class A Note Insurer is the Controlling Class).

(j)     If this Agreement is terminated pursuant to this Section 12, such termination shall be without any further liability or obligation of either party to the other, except as provided in clauses (k) and (l) below and in Sections 10 and 15.

(k)     In the event of removal or resignation of the Collateral Monitor pursuant to this Agreement, the Issuer shall have all of the rights and remedies available with respect thereto at law or equity. Upon the later to occur of (i) expiration of the applicable notice period with respect to a removal or resignation specified in this Section 12 or Section 14, as applicable, and (ii) acceptance of its appointment by the successor collateral monitor, all authority and power of the Collateral Monitor under this Agreement, whether with respect to the Collateral or otherwise, shall automatically and without further action by any Person or entity pass to and be vested in the successor collateral monitor.

(l)     Sections 6, 8, 10, 17, 21 through 26 shall survive any termination of this Agreement pursuant to this Section 12 or Section 14.

Section 13.     <u>Assignments</u>

(a)     Any assignment of this Agreement to any Person, in whole or in part, by the Collateral Monitor shall be deemed null and void unless (a) at the time of such assignment the Moody's Rating Condition and the S&P Rating Condition are satisfied in respect of such assignment, and (b) such assignment is consented to in writing by the Issuer, the Holders of a Majority of the Preference Shares and the Class A Note Insurer (so long as the Class A Note Insurer is the Controlling Class); <u>provided</u>, <u>however</u>, that, notwithstanding the foregoing, the Collateral Monitor shall be permitted, without the consent of the Issuer or any Holders of the Securities, but with the prior written consent of the Class A Note Insurer (so long as the Class A Note Insurer is the Controlling Class), to assign any or all of its rights and delegate any or all of its obligations under this Agreement to (i) an affiliate so long as such an assignment does not constitute an "assignment" for purposes of Section 205(a)(2) of the Advisers Act, and such affiliate (A) has demonstrated an ability to professionally and competently perform duties similar to those imposed upon the Collateral Monitor under this Agreement, (B) is legally qualified and has the capacity to act as Collateral Monitor under this Agreement and (C) immediately after the assignment, employs principal personnel performing the duties required under this Agreement who are the same individuals who would have performed such duties had the assignment not occurred, and (ii) any wholly owned subsidiary of any affiliate; provided that such subsidiary meets the criteria in subclauses (A), (B) and (C) of clause (i). Any assignee under this Agreement shall, before such assignment becomes effective, execute and deliver to the Issuer

and the Trustee a counterpart of this Agreement naming such assignee as Collateral Monitor. Upon the execution and delivery of such a counterpart by the assignee, the Collateral Monitor shall be released from further obligations pursuant to this Agreement, except with respect to its obligations and agreements arising under Sections 6, 10, 17, 21 through 26 prior to such assignment and except with respect to its obligations under Sections 6 and 15 after such assignment.

(b)    This Agreement shall not be assigned by the Issuer without the prior written consent of the Collateral Monitor, the Trustee, the Holders of a Majority of the outstanding Class A Notes, a Majority of the outstanding Class B Notes and a Majority of the outstanding Class C Notes, except in the case of assignment by the Issuer (i) to an entity which is a successor to the Issuer permitted under the Indenture, in which case such successor organization shall be bound hereunder and by the terms of said assignment in the same manner as the Issuer is bound thereunder or (ii) to the Trustee as contemplated by the Granting clauses of the Indenture. The Issuer may assign its rights, title and interest in (but not its obligations under) this Agreement to the Trustee pursuant to the Indenture; and the Collateral Monitor by its signature below agrees to, and acknowledges, such assignment. In the event of any assignment by the Issuer, the Issuer shall use reasonable efforts to cause such assignee or to execute and deliver to the Collateral Monitor such documents as the Collateral Monitor shall consider reasonably necessary to effect fully such assignment.

Section 14.    <u>Removal for Cause</u>

The Collateral Monitor may be removed for Cause upon ten days' prior written notice to the Collateral Monitor (the "Removal Notice") by the Issuer or Trustee at the direction of the Holders of more than 50% of the Preference Shares and the Notes, voting collectively (determined (x) in the case of the Notes, with respect to the Outstanding principal amount of the Notes (and assuming for the purpose of this paragraph, the Class A Note Insurer is the Holder of 100% of the Class A Notes so long as the Class A Note Insurer is the Controlling Class), and (y) in the case of the Preference Shares, subject to Section 12(f) and on the basis of a notional amount equal to $1,000 per share); provided, that so long as the Class A Note Insurer is the Controlling Class, the Class A Note Insurer shall have the sole right to direct the removal of the Collateral Monitor for the Cause events described in clauses (a), (d), (f), (g) or (h) below; provided, further that no removal shall be effective until notice of such removal shall have been given to the Holders of each Class of Securities. For purposes of this Agreement, "Cause" means:

(a)    willful violation or willful breach by the Collateral Monitor of any provision of this Agreement or the Indenture applicable to the Collateral Monitor;

(b)    violation by the Collateral Monitor in any material respect of any provision of this Agreement or the Indenture applicable to it which violation, if capable of being cured, is not cured within 30 days of the Collateral Monitor becoming aware of, or its receipt of notice from, the Issuer or the Trustee of, such violation;

(c)    the failure of any representation, warranty, certification or statement made or delivered by the Collateral Monitor in or pursuant to this Agreement or the Indenture to be

## COLLATERAL MANAGEMENT AGREEMENT

This Agreement, dated as of December 16, 2003 is entered into by and between GSC Partners CDO Fund IV, Limited, a company incorporated under the laws of the Cayman Islands, with its principal office located at P.O. Box 1093 GT, George Town, Grand Cayman, Cayman Islands, British West Indies (together with successors and assigns permitted hereunder, the "Issuer"), and GSCP (NJ), L.P., a Delaware limited partnership, with its principal offices located at 500 Campus Drive, Building B, 2nd Floor, Florham Park, New Jersey 07932, as collateral manager (in such capacity, the "Collateral Manager").

## WITNESSETH:

WHEREAS, pursuant to the Memorandum and Articles of Association of the Issuer (the "Issuer Charter") and a Shares Paying Agency Agreement (the "Shares Paying Agency Agreement") among the Issuer, Maples Finance Limited, as Share Registrar and Wachovia Bank, National Association ("Wachovia"), as Shares Paying Agent (together with its permitted successors and assigns in such capacity, the "Shares Paying Agent") and Transfer Agent, the Issuer has issued 100,000 Preferred Shares, par value $0.10 per share, with a liquidation preference of $1,000 per share (the "Preferred Shares");

WHEREAS, Issuer and GSC Partners CDO Fund IV, Corp. (the "Co-Issuer" and, together with the Issuer, the "Co-Issuers"), will, pursuant to an indenture (the "Indenture") dated as of the date hereof, among the Co-Issuers, Ambac Assurance Corporation, as insurer (the "Insurer"), and Wachovia, as trustee (together with any successor trustee permitted under the Indenture, the "Trustee"), custodian (the "Custodian") and securities intermediary (the "Securities Intermediary"), issue the Class A-1 Floating Rate Notes due 2015 (the "Class A-1 Notes"), the Class A-2 Guaranteed Floating Rate Notes due 2015 (the "Class A-2 Notes"), the Class A-3 Guaranteed Floating Rate Notes due 2015 (the "Class A-3 Notes" and, together with the Class A-1 Notes and the Class A-2 Notes, the "Class A Notes") and the Class B Deferrable Floating Rate Notes due 2015 (the "Class B Notes" and, together with the Class A Notes, the "Notes" and, together with the Preferred Shares, the "Securities");

WHEREAS, it is contemplated that on the date that the Notes are issued (the "Closing Date") the Issuer will pledge certain Collateral Debt Securities, Eligible Investments, Equity Securities and Cash (all as defined in the Indenture) and certain other assets (all as set forth in the Indenture) (collectively, the "Collateral"), to the Trustee as security for the Notes and certain other obligations of the Issuer;

WHEREAS, the Issuer wishes to enter into this Collateral Management Agreement, pursuant to which the Collateral Manager agrees to perform, on behalf of the Issuer, certain duties on and after the Closing Date, with respect to the Collateral and any other Assets (as defined in the Indenture), in the manner and on the terms set forth herein and to perform such additional duties as are consistent with the terms of this Agreement, the Indenture, and any other applicable agreements, as the Issuer and the Collateral Manager may from time to time agree in writing; and

Notes and the Holders of a Majority by number of the outstanding Preferred Shares (excluding, at the time of such vote, such Notes or Preferred Shares held by the Collateral Manager or its affiliates, but only to the extent that the voting rights relating to such Securities are controlled by the Collateral Manager or one or more of its affiliates), voting separately. The Issuer, the Trustee and the successor Collateral Manager shall take such action (or cause the outgoing Collateral Manager to take such action) consistent with this Agreement and the terms of the Indenture applicable to the Collateral Manager, as shall be necessary to effectuate any such succession.

(h)     In the event of removal of the Collateral Manager pursuant to this Agreement by the Issuer or, to the extent so provided in the Indenture, by the Trustee, the Issuer shall have all of the rights and remedies available with respect thereto at law or equity, and, without limiting the foregoing, the Issuer or, to the extent so provided in the Indenture, the Trustee may by notice in writing to the Collateral Manager as provided under this Agreement terminate all the rights and obligations of the Collateral Manager under this Agreement (except those that survive termination pursuant to Section 12(f) above). Upon the later of (i) the expiration of the applicable notice period with respect to termination specified in this Section 12 or Section 14 of this Agreement, as applicable, and (ii) the time that the successor Collateral Manager has otherwise been appointed and is willing to assume the rights and obligations of the Collateral Manager hereunder, all authority and power of the Collateral Manager under this Agreement, whether with respect to the Assets or otherwise, shall automatically and without further action by any person or entity pass to and be vested in the successor Collateral Manager. Nevertheless, the Collateral Manager shall take such steps as may be reasonably necessary to transfer such authority and power.

13.     Delegation; Assignments. Except with respect to those responsibilities set forth in the Collateral Administration Agreement, the responsibilities of the Collateral Manager under this Agreement shall not be delegated by the Collateral Manager, in whole or in part, unless such delegation is consented to in writing by the Issuer and the Insurer (so long as it is the Directing Party) or, if the Insurer is no longer the Directing Party, the Holders of a Majority of the Aggregate Outstanding Amount of each Class of Notes, voting separately and a Majority by number of the outstanding Preferred Shares (excluding, at the time of such vote, such Notes and Preferred Shares held by the Collateral Manager or its affiliates, but only to the extent that the voting rights relating to such Securities are controlled by the Collateral Manager or one or more of its affiliates) and unless Rating Agency Confirmation (from Moody's only) is received with respect to such delegation, and, notwithstanding any such consent or Rating Agency Confirmation, no delegation of duties by the Collateral Manager shall relieve it from any liability hereunder. Any assignment of this Agreement to any Person, in whole or in part, by the Collateral Manager shall be deemed null and void unless such assignment is consented to in writing by the Issuer and the Insurer (so long as it is the Directing Party) or, if the Insurer is no longer the Directing Party, the Holders of a Majority of the Aggregate Outstanding Amount of each Class of Notes, voting separately and a Majority by number of the outstanding Preferred Shares (excluding, at the time of such vote, such Notes and Preferred Shares held by the Collateral Manager or its affiliates, but only to the extent that the voting rights relating to such Securities are controlled by the Collateral Manager or one or more of its affiliates) and unless Rating Agency Confirmation (from Moody's only) is received with respect to such assignment. Any assignment consented to by the Issuer and the Insurer or the Holders of the Outstanding

Securities, as the case may be, and in respect of which Rating Agency Confirmation is received shall bind the assignee hereunder in the same manner as the Collateral Manager is bound. In addition, the assignee shall execute and deliver to the Issuer, the Insurer (so long as it is the Directing Party) and the Trustee a counterpart of an appropriate agreement naming such assignee as a Collateral Manager. Upon the execution and delivery of such a counterpart by the assignee, the Collateral Manager shall be released from further obligations pursuant to this Agreement, except with respect to its obligations under Section 10 of this Agreement arising prior to such assignment and except with respect to its obligations under Sections 2(i)(i) and 15 hereof. This Agreement shall not be assigned by the Issuer without the prior written consent of the Collateral Manager, the Insurer (so long as it is the Directing Party) and the Trustee and prior written notice to S&P, except in the case of assignment by the Issuer to (i) an entity that is a successor to the Issuer permitted under the Indenture, in which case such successor organization shall be bound hereunder and by the terms of said assignment in the same manner as the Issuer is bound thereunder or (ii) the Trustee as contemplated by the Granting clauses and Section 15.1 of the Indenture. In the event of any assignment by the Issuer, the Issuer shall use its best efforts to cause its successor to execute and deliver to the Collateral Manager such documents as the Collateral Manager shall consider reasonably necessary to effect fully such assignment.

14.     Termination by the Issuer for Cause.

Subject to Section 12(g) of this Agreement, this Agreement may be terminated, and the Collateral Manager may be removed, by the Issuer, at the direction of (i) the Holders of a Majority of the Notes and Preferred Shares, voting collectively (determined with respect to the Aggregate Outstanding Amount in the case of the Notes and on the basis of a notional amount equal to $1,000 per share in the case of the Preferred Shares) or (ii) the Insurer (so long as it is the Directing Party), except where the sole cause for such removal is as set forth in clause (ii) or (iv) of the definition of "cause" below or (iii) the Insurer (so long as it is the Directing Party), where the cause of such removal is as set forth in clause (iv) of the definition of "cause" below, if in respect of an Event of Default specified in clause (a), (b), (d) or (e) of the definition of "Event of Default" in the Indenture or in respect of an Insurance Agreement Default Event specified in clauses (i) and (ii) thereof, in each case for cause upon 10 Business Days' prior written notice to the Collateral Manager (with a copy to the Insurer so long as the Class A-2 Notes or the Class A-3 Notes are Outstanding) and upon written notice to the Holders of the Securities as set forth below; provided, that in determining whether the Holders of the requisite Aggregate Outstanding Amount of Notes or number of Preferred Shares have given such demand, authorization or direction, Notes and Preferred Shares owned by the Collateral Manager or any affiliate thereof shall be disregarded and deemed not to be outstanding, but only to the extent that the voting rights relating to such Securities are controlled by the Collateral Manager or one or more of its affiliates. For purposes of determining "cause" with respect to termination of this Agreement pursuant to this section, such term shall mean any one of the following events:

(i)         the Collateral Manager willfully violated any provision of this Agreement or the Indenture applicable to it, or willfully directed the Issuer or the Co-Issuer (including any action willfully taken by the Collateral Manager on behalf of the Issuer) to violate any representation, warranty or covenant specified in clause (f) of the definition of "Event of Default" in the Indenture;

21

## COLLATERAL MANAGEMENT AGREEMENT

This Collateral Management Agreement, dated as of January 18, 2006 (as the same may be amended from time to time, the "Agreement"), is entered into by and between GSC Capital Corp. Loan Funding 2005-1, an exempted limited liability company incorporated under the laws of the Cayman Islands, with its registered office located at c/o Maples Finance Limited at P.O. Box 1093 GT, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands, as issuer (together with its successors and assigns permitted hereunder, the "Issuer") and GSCP (NJ), L.P., a limited partnership organized under the laws of Delaware ("GSCP"), with offices located at 500 Campus Drive, Building B, 2nd Floor, Florham Park, New Jersey 07932, as collateral manager (together with its permitted successors and assigns, the "Collateral Manager").

### WITNESSETH:

WHEREAS, the Issuer desires to engage the Collateral Manager to provide the services described herein and the Collateral Manager desires to provide such services;

WHEREAS, the Issuer intends to issue the Class A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes and the Class F Notes (collectively, the "Notes") pursuant to an indenture, dated as of January 18, 2006 (as amended, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, the "Indenture"), among the Issuer, GSC Loan Funding 2005-1 Corp., as co-issuer (the "Co-Issuer"), and Wachovia Bank, National Association, as trustee, custodian and securities intermediary (together with any successor trustee permitted under the Indenture, the "Trustee");

WHEREAS, the Issuer will also issue Preferred Shares (the "Preferred Shares," and together with the Notes, the "Securities") under its Amended and Restated Memorandum and Articles of Association and will enter into a Shares Paying Agency Agreement dated as of January 18, 2006 (as amended, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "Shares Paying Agency Agreement") with Wachovia Bank, National Association, as shares paying agent (together with any successor shares paying agent permitted under the Shares Paying Agency Agreement, the "Shares Paying Agent"), and Maples Finance Limited, as share registrar;

WHEREAS, the Issuer intends to pledge the Collateral to the Trustee for the benefit of the Secured Parties to secure the Secured Obligations;

WHEREAS, Section 7.12 of the Indenture authorizes the Issuer to enter into this Agreement, pursuant to which the Collateral Manager agrees to perform, on behalf of the Issuer, certain duties with respect to the Collateral securing the Notes in the manner and on the terms set forth herein and in the Indenture and to provide such additional duties as are consistent with the terms of this Agreement, the Indenture, and any other applicable agreements, as the Issuer and the Collateral Manager may from time to time agree in writing; and

(i) deliver to the Issuer all property and documents of the Trustee or the Issuer or otherwise relating to the Pledged Securities then in the custody of the Collateral Manager (although the Collateral Manager may keep copies of such documents for its records); and

(ii) deliver to the Trustee or the successor Collateral Manager appointed pursuant to Section 12(e) its books and records with respect to the Collateral Debt Securities (although the Collateral Manager may keep copies of such documents for its records).

Notwithstanding such termination, (i) the Collateral Manager shall remain liable for (a) its acts or omissions hereunder described in Section 10 arising prior to termination (subject to the limitations in Section 10) and (b) any expenses, losses, damages, liabilities, demands, charges and claims of any nature whatsoever (including reasonable attorneys' fees) in respect of or arising out of a breach of the representations and warranties made by the Collateral Manager in Section 16(b) or from any failure of the Collateral Manager to comply with the provisions of this Section 14 and (ii) the Issuer shall remain liable for its obligations under Sections 7, 8 and 10.

(b) The Collateral Manager agrees, that notwithstanding any termination, it shall (i) reasonably cooperate, at the expense of the Issuer, in any Proceeding arising in connection with this Agreement, the Indenture or any of the Collateral (excluding any such proceeding in which claims are or may be asserted against the Collateral Manager or any Collateral Manager Affiliate) relating to the period of time during which this Agreement was in effect with respect to the Collateral Manager, so long as the Collateral Manager and, as applicable, each such Collateral Manager Affiliate, shall have been provided such indemnity, security or other provision as is reasonably satisfactory to the Collateral Manager against all costs, expenses and liabilities that might be incurred in connection therewith and (ii) reasonably cooperate, at the expense of the Issuer (with respect to the Collateral Manager's out-of-pocket expenses only) with any duly approved and appointed successor Collateral Manager hereunder in order to facilitate the succession by such successor Collateral Manager.

15. Assignment.

(a) The rights and obligations of the Collateral Manager under this Agreement shall not be assigned by the Collateral Manager without (i) the prior written consent of the Issuer, (ii) the prior written consent of a Majority of each Class of Notes, voting separately, and a Majority of the Preferred Shares (in each case, excluding any Collateral Manager Securities) and (iii) receiving Rating Agency Confirmation with respect to such assignment; provided, however, that the Collateral Manager may assign its obligations under this Agreement to an Affiliate of the Collateral Manager without obtaining the consents specified in the preceding clauses (i) and (ii), so long as such assignment does not constitute an "assignment" under the Advisers Act and such Affiliate has the ability and capacity to perform professionally and competently duties similar to those imposed upon the Collateral Manager hereunder. Upon any such assignment, the assignee shall execute and deliver to the Issuer and the Trustee a counterpart of this Agreement naming such assignee as Collateral Manager. Upon the execution and delivery of such a counterpart by the assignee, the Collateral Manager shall be released from

24

further obligation pursuant to this Agreement, except with respect to its obligations arising under Section 7 of this Agreement prior to such assignment and except with respect to its obligations specified in Section 14 hereof as surviving such a termination. No assignment of obligations or duties by the Collateral Manager, other than an assignment described in the first sentence of this Section 15, shall (1) relieve the Collateral Manager from any liability under this Agreement or (2) cause any third party to be a third party beneficiary under this Agreement or any other document to which the Collateral Manager is a party.

(b) This Agreement shall not be assigned by the Issuer without the prior written consent of the Collateral Manager and the Trustee and prior written notice to S&P, except in the case of assignment by the Issuer (i) to an entity which is a successor to the Issuer permitted under the Indenture, in which case such successor organization shall be bound under this Agreement and by the terms of said assignment in the same manner as the Issuer is bound under the Indenture or (ii) to the Trustee as contemplated by the Indenture. In the event of any assignment by the Issuer, the Issuer shall use its best efforts to cause its successor to execute and deliver to the Collateral Manager such documents as the Collateral Manager shall consider reasonably necessary to effect fully such assignment.

(c) Any corporation, partnership or limited liability company into which the Collateral Manager may be merged or converted or with which it may be consolidated, or any corporation, partnership or limited liability company resulting from any merger, corporation, partnership or limited liability company succeeding to all or substantially all of the collateral management business of the Collateral Manager, shall be the successor to the Collateral Manager without any further action by the Collateral Manager, the Issuer, the Trustee, the Noteholders, the Holders of the Preferred Shares or any other Person; provided that (i) to the extent legally required, the Issuer consents to such action and (ii) the resulting entity has the ability and capacity to perform professionally and competently duties similar to those imposed upon the Collateral Manager hereunder.

16. Representations, Warranties and Covenants.

(a) The Issuer hereby represents and warrants to the Collateral Manager as follows as of the date hereof:

(i) The Issuer has been duly incorporated and is validly existing under the laws of the Cayman Islands, has the full corporate power and authority to own its assets and the obligations proposed to be owned by it and included in the Collateral and to transact the business in which it is presently and proposed to be engaged and is duly qualified under the laws of each jurisdiction where its ownership or lease of property or the conduct of its business requires, or the performance of its obligations under the Operative Documents would require, such qualification, except for failures to be so qualified, authorized or licensed that would not in the aggregate have a material adverse effect on the business, operations, assets or financial condition of the Issuer.

(ii) The Issuer has full corporate power and authority to execute, deliver and perform the Operative Documents and all obligations required under the Operative Documents and has taken all necessary action to authorize the Operative Documents

25

# COLLATERAL MANAGEMENT AGREEMENT

This Collateral Management Agreement, dated as of October 20, 2005 (as the same may be amended from time to time, the "Agreement"), is entered into by and between GSC Partners CDO Fund VI, Limited, an exempted limited liability company incorporated under the laws of the Cayman Islands, with its registered office located at c/o Maples Finance Limited at P.O. Box 1093 GT, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands, as issuer (together with its successors and assigns permitted hereunder, the "Issuer") and GSCP (NJ), L.P., a limited partnership organized under the laws of Delaware ("GSCP"), with offices located at 500 Campus Drive, Building B, 2nd Floor, Florham Park, New Jersey 07932, as collateral manager (together with its permitted successors and assigns, the "Collateral Manager").

## WITNESSETH:

WHEREAS, the Issuer desires to engage the Collateral Manager to provide the services described herein and the Collateral Manager desires to provide such services;

WHEREAS, the Issuer intends to issue the Class A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C-1 Notes, the Class C-2 Notes and the Class D Notes (collectively, the "Notes") and the Class 1 Combination Securities (the "Combination Securities") pursuant to an indenture, dated as of October 20, 2005 (as amended, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, the "Indenture"), among the Issuer, GSC Partners CDO Fund VI, Corp., as co-issuer (the "Co-Issuer"), and Wachovia Bank, National Association, as trustee, custodian and securities intermediary (together with any successor trustee permitted under the Indenture, the "Trustee");

WHEREAS, the Issuer will also issue Preferred Shares (the "Preferred Shares," and together with the Notes and the Combination Securities, the "Securities") under its Amended and Restated Memorandum and Articles of Association and will enter into a Shares Paying Agency Agreement dated as of October 20, 2005 (as amended, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "Shares Paying Agency Agreement") with Wachovia Bank, National Association, as shares paying agent (together with any successor shares paying agent permitted under the Shares Paying Agency Agreement, the "Shares Paying Agent"), and Maples Finance Limited, as share registrar;

WHEREAS, the Issuer intends to pledge the Collateral to the Trustee for the benefit of the Secured Parties to secure the Secured Obligations;

WHEREAS, Section 7.12 of the Indenture authorizes the Issuer to enter into this Agreement, pursuant to which the Collateral Manager agrees to perform, on behalf of the Issuer, certain duties with respect to the Collateral securing the Notes (including the Components of the Combination Securities in respect of the Related Notes) in the manner and on the terms set forth herein and in the Indenture and to provide such additional duties as are consistent with the terms of this Agreement, the Indenture, and any other applicable agreements, as the Issuer and the Collateral Manager may from time to time agree in writing; and

14.     Action Upon Termination.

(a)     From and after the effective date of termination of this Agreement, the Collateral Manager shall not be entitled to compensation and reimbursement for further services hereunder, but shall be paid all compensation and reimbursement accrued to the effective date of termination, as provided in Section 8 and shall be entitled to receive any amounts owing under Sections 7, 8(b) and 10.  Upon such termination, the Collateral Manager shall as soon as practicable:

(i)     deliver to the Issuer all property and documents of the Trustee or the Issuer or otherwise relating to the Pledged Securities then in the custody of the Collateral Manager (although the Collateral Manager may keep copies of such documents for its records); and

(ii)     deliver to the Trustee or the successor Collateral Manager appointed pursuant to Section 12(e) its books and records with respect to the Collateral Debt Securities (although the Collateral Manager may keep copies of such documents for its records).

Notwithstanding such termination, (i) the Collateral Manager shall remain liable for (a) its acts or omissions hereunder described in Section 10 arising prior to termination (subject to the limitations in Section 10) and (b) any expenses, losses, damages, liabilities, demands, charges and claims of any nature whatsoever (including reasonable attorneys' fees) in respect of or arising out of a breach of the representations and warranties made by the Collateral Manager in Section 16(b) or from any failure of the Collateral Manager to comply with the provisions of this Section 14 and (ii) the Issuer shall remain liable for its obligations under Sections 7, 8 and 10.

(b)     The Collateral Manager agrees, that notwithstanding any termination, it shall (i) reasonably cooperate, at the expense of the Issuer, in any Proceeding arising in connection with this Agreement, the Indenture or any of the Collateral (excluding any such proceeding in which claims are or may be asserted against the Collateral Manager or any Collateral Manager Affiliate) relating to the period of time during which this Agreement was in effect with respect to the Collateral Manager, so long as the Collateral Manager and, as applicable, each such Collateral Manager Affiliate, shall have been provided such indemnity, security or other provision as is satisfactory to the Collateral Manager against all costs, expenses and liabilities that might be incurred in connection therewith and (ii) reasonably cooperate, at the expense of the Issuer (with respect to the Collateral Manager's out-of-pocket expenses only) with any duly approved and appointed successor Collateral Manager hereunder in order to facilitate the succession by such successor Collateral Manager.

15.     Assignment.

(a)     The rights and obligations of the Collateral Manager under this Agreement shall not be assigned by the Collateral Manager without (i) the prior written consent of the Issuer, (ii) the prior written consent of a Majority of each Class of Notes, voting separately, and a Majority of the Preferred Shares (in each case, excluding any Collateral Manager Securities) and (iii) receiving Rating Agency Confirmation with respect to such

24

assignment; provided, however, that the Collateral Manager may assign its obligations under this Agreement to an Affiliate of the Collateral Manager without obtaining the consents specified in the preceding clauses (i) and (ii), so long as such assignment does not constitute an "assignment" under the Advisers Act. Upon any such assignment, the assignee shall execute and deliver to the Issuer and the Trustee a counterpart of this Agreement naming such assignee as Collateral Manager. Upon the execution and delivery of such a counterpart by the assignee, the Collateral Manager shall be released from further obligation pursuant to this Agreement, except with respect to its obligations arising under <u>Section 7</u> of this Agreement prior to such assignment and except with respect to its obligations specified in <u>Section 14</u> hereof as surviving such a termination. No assignment of obligations or duties by the Collateral Manager, other than an assignment described in the first sentence of this <u>Section 15</u>, shall (1) relieve the Collateral Manager from any liability under this Agreement or (2) cause any third party to be a third party beneficiary under this Agreement or any other document to which the Collateral Manager is a party.

(b)      This Agreement shall not be assigned by the Issuer without the prior written consent of the Collateral Manager and the Trustee and prior written notice to S&P, except in the case of assignment by the Issuer (i) to an entity which is a successor to the Issuer permitted under the Indenture, in which case such successor organization shall be bound under this Agreement and by the terms of said assignment in the same manner as the Issuer is bound under the Indenture or (ii) to the Trustee as contemplated by the Indenture. In the event of any assignment by the Issuer, the Issuer shall use its best efforts to cause its successor to execute and deliver to the Collateral Manager such documents as the Collateral Manager shall consider reasonably necessary to effect fully such assignment.

(c)      Any corporation, partnership or limited liability company into which the Collateral Manager may be merged or converted or with which it may be consolidated, or any corporation, partnership or limited liability company resulting from any merger, corporation, partnership or limited liability company succeeding to all or substantially all of the collateral management business of the Collateral Manager, shall be the successor to the Collateral Manager without any further action by the Collateral Manager, the Issuer, the Trustee, the Noteholders, the Holders of the Combination Securities, the Holders of the Preferred Shares or any other Person; provided that (i) to the extent legally required, the Issuer consents to such action and (ii) the resulting entity has the ability and capacity to perform professionally and competently duties similar to those imposed upon the Collateral Manager hereunder.

16.      <u>Representations, Warranties and Covenants.</u>

(a)      The Issuer hereby represents and warrants to the Collateral Manager as follows as of the date hereof:

(i)      The Issuer has been duly incorporated and is validly existing under the laws of the Cayman Islands, has the full corporate power and authority to own its assets and the obligations proposed to be owned by it and included in the Collateral and to transact the business in which it is presently and proposed to be engaged and is duly qualified under the laws of each jurisdiction where its ownership or lease of property or the conduct of its

**COLLATERAL MANAGEMENT AGREEMENT**

This Collateral Management Agreement, dated as of March 27, 2007 (as the same may be amended from time to time, the "Agreement"), is entered into by and between GSC Group CDO Fund VIII, Limited, an exempted company with limited liability incorporated under the laws of the Cayman Islands, with its registered office located at c/o Maples Finance Limited at P.O. Box 1093 GT, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands, as issuer (together with its successors and assigns permitted hereunder, the "Issuer") and GSCP (NJ), L.P., a limited partnership organized under the laws of Delaware ("GSCP"), with offices located at 500 Campus Drive, Building B, 2nd Floor, Florham Park, New Jersey 07932, as collateral manager (together with its permitted successors and assigns, the "Collateral Manager").

**WITNESSETH:**

WHEREAS, the Issuer desires to engage the Collateral Manager to provide the services described herein and the Collateral Manager desires to provide such services;

WHEREAS, the Issuer intends to issue the Class A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C Notes and Class D Notes (collectively, the "Notes") pursuant to an indenture, dated as of March 27, 2007 (as amended, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, the "Indenture"), among the Issuer, GSC Group CDO Fund VIII, Corp., as co-issuer (the "Co-Issuer"), and U.S. Bank National Association, as trustee, custodian and securities intermediary (together with any successor trustee permitted under the Indenture, the "Trustee");

WHEREAS, the Issuer will also issue Subordinated Notes (the "Subordinated Notes," and together with the Notes, the "Securities") under its Memorandum and Articles of Association and will enter into a Subordinated Note Paying Agency Agreement dated as of March 27, 2007 (as amended, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "Subordinated Note Paying Agency Agreement") with U.S. Bank National Association, as subordinated note paying agent (together with any successor subordinated note paying agent permitted under the Subordinated Note Paying Agency Agreement, the "Subordinated Note Paying Agent");

WHEREAS, the Issuer intends to pledge the Collateral to the Trustee for the benefit of the Secured Parties to secure the Secured Obligations;

WHEREAS, Section 7.12 of the Indenture authorizes the Issuer to enter into this Agreement, pursuant to which the Collateral Manager agrees to perform, on behalf of the Issuer, certain duties with respect to the Collateral securing the Notes in the manner and on the terms set forth herein and in the Indenture and to provide such additional duties as are consistent with the terms of this Agreement, the Indenture, and any other applicable agreements, as the Issuer and the Collateral Manager may from time to time agree in writing; and

WHEREAS, the Collateral Manager has the capacity to provide the services required hereby and is prepared to perform such services upon the terms and conditions set forth herein.

such proceeding in which claims are or may be asserted against the Collateral Manager or any Collateral Manager Affiliate) relating to the period of time during which this Agreement was in effect with respect to the Collateral Manager, so long as the Collateral Manager and, as applicable, each such Collateral Manager Affiliate, shall have been provided such indemnity, security or other provision as is satisfactory to the Collateral Manager against all costs, expenses and liabilities that might be incurred in connection therewith and (ii) reasonably cooperate, at the expense of the Issuer (with respect to the Collateral Manager's out-of-pocket expenses only) with any duly approved and appointed successor Collateral Manager hereunder in order to facilitate the succession by such successor Collateral Manager.

15.    Assignment.

(a)    The rights and obligations of the Collateral Manager under this Agreement shall not be assigned by the Collateral Manager without (i) the prior written consent of the Issuer, (ii) the prior written consent of a Majority of each Class of Notes, voting separately, and a Majority of the Subordinated Notes (in each case excluding Collateral Manager Securities) and (iii) receiving Rating Agency Confirmation with respect to such assignment; provided, however, that the Collateral Manager may assign its obligations under this Agreement to an Affiliate of the Collateral Manager without obtaining the consents specified in the preceding clauses (i) and (ii), so long as such assignment does not constitute an "assignment" under the Advisers Act. Upon any such assignment, the assignee shall execute and deliver to the Issuer and the Trustee a counterpart of this Agreement naming such assignee as Collateral Manager. Upon the execution and delivery of such a counterpart by the assignee, the Collateral Manager shall be released from further obligation pursuant to this Agreement, except with respect to its obligations arising under Section 7 of this Agreement prior to such assignment and except with respect to its obligations specified in Section 14 hereof as surviving such a termination. No assignment of obligations or duties by the Collateral Manager, other than an assignment described in the first sentence of this Section 15, shall (1) relieve the Collateral Manager from any liability under this Agreement or (2) cause any third party to be a third party beneficiary under this Agreement or any other document to which the Collateral Manager is a party.

(b)    This Agreement shall not be assigned by the Issuer without the prior written consent of the Collateral Manager and the Trustee and prior written notice to S&P, except in the case of assignment by the Issuer (i) to an entity which is a successor to the Issuer permitted under the Indenture, in which case such successor organization shall be bound under this Agreement and by the terms of said assignment in the same manner as the Issuer is bound under the Indenture or (ii) to the Trustee as contemplated by the Indenture. In the event of any assignment by the Issuer, the Issuer shall use commercially reasonable efforts to cause its successor to execute and deliver to the Collateral Manager such documents as the Collateral Manager shall consider reasonably necessary to effect fully such assignment.

(c)    Any corporation, partnership or limited liability company into which the Collateral Manager may be merged or converted or with which it may be consolidated, or any corporation, partnership or limited liability company resulting from any merger, corporation, partnership or limited liability company succeeding to all or substantially all of the

24

collateral management business of the Collateral Manager, shall be the successor to the Collateral Manager without any further action by the Collateral Manager, the Issuer, the Trustee, the Noteholders, the Holders of the Subordinated Notes or any other Person; provided that (i) to the extent legally required, the Issuer consents to such action and (ii) the resulting entity has the ability and capacity to perform professionally and competently duties similar to those imposed upon the Collateral Manager hereunder.

16.     Representations, Warranties and Covenants.

(a)     The Issuer hereby represents and warrants to the Collateral Manager as follows as of the date hereof:

(i)     The Issuer has been duly incorporated and is validly existing under the laws of the Cayman Islands, has the full corporate power and authority to own its assets and the obligations proposed to be owned by it and included in the Collateral and to transact the business in which it is presently and proposed to be engaged and is duly qualified under the laws of each jurisdiction where its ownership or lease of property or the conduct of its business requires, or the performance of its obligations under the Operative Documents would require, such qualification, except for failures to be so qualified, authorized or licensed that would not in the aggregate have a material adverse effect on the business, operations, assets or financial condition of the Issuer.

(ii)     The Issuer has full corporate power and authority to execute, deliver and perform the Operative Documents and all obligations required under the Operative Documents and has taken all necessary action to authorize the Operative Documents on the terms and conditions hereof and thereof and the execution, delivery and performance of Operative Documents and the performance of all obligations imposed upon it hereunder and thereunder. No consent of any other person including, without limitation, shareholders and creditors of the Issuer, and no license, permit, approval or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority is required by the Issuer in connection with the Operative Documents or the execution, delivery, performance, validity or enforceability of the Operative Documents or the obligations imposed upon it hereunder or thereunder. Each Operative Document to which the Issuer is a party has been executed and delivered by the Issuer (by its duly authorized director or attorney) and, following execution of all parties thereto, constitutes the valid and legally binding obligation of the Issuer enforceable against the Issuer in accordance with its terms, subject, as to enforcement, to (a) the effect of bankruptcy, insolvency or similar laws affecting generally the enforcement of creditors' rights, as such laws would apply in the event of any bankruptcy, receivership, insolvency or similar event applicable to the Issuer and (b) general equitable principles (whether enforceability of such principles is considered in a proceeding at law or in equity).

(iii)     The execution, delivery and performance of this Agreement, the other Operative Documents and the documents and instruments required hereunder and thereunder will not violate any provision of any existing law or regulation binding on the Issuer, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on the Issuer, or the Governing Instruments of, or any securities issued by, the

25

## COLLATERAL MANAGEMENT AGREEMENT

This Agreement, dated as of March 27, 2001, is entered into by and between GSC Partners CDO Fund II, Limited, a company incorporated under the laws of the Cayman Islands, with its principal office located at P.O. Box 1984 GT, Elizabethan Square, George Town, Grand Cayman, Cayman Islands, British West Indies (together with successors and assigns permitted hereunder, the "Issuer"), and GSCP (NJ), L.P., a Delaware limited partnership, with its principal offices located at 500 Campus Drive, Building B, 2nd Floor, Florham Park, New Jersey 07932, as collateral manager (in such capacity, the "Collateral Manager").

### WITNESSETH:

WHEREAS, the Issuer and GSC Partners CDO Fund II, Corp. (the "Co-Issuer") intend to issue the Class A Guaranteed Floating Rate Senior Notes due 2013 (the "Class A Notes") and the Issuer intends to issue the Class B Floating Rate Subordinated Notes due 2013 (the "Class B Notes" and together with the Class A Notes, the "Notes") pursuant to an indenture (the "Indenture") to be dated on or about the date of issuance of the Securities (as defined below), among the Co-Issuers, Financial Security Assurance Inc., as insurer (the "Insurer"), Bankers Trust Company, as trustee (together with any successor trustee permitted under the Indenture, the "Trustee") and First Union National Bank, as Custodian and Securities Intermediary ("FUNB");

WHEREAS, the Issuer intends to issue the Preferred Shares Series A (the "Series A Shares") and the Preferred Shares Series B (the "Series B Shares" and together with the Series A Shares, the "Preferred Shares" and together with the Notes, the "Securities") pursuant to its Articles of Association;

WHEREAS, the Issuer intends to acquire certain securities and obligations prior to the Closing Date and, on the Closing Date intends to pledge certain Collateral Debt Securities, Eligible Investments and Cash (all as defined in the Indenture) and certain other assets (all as set forth in the Indenture) (collectively, the "Collateral") to the Trustee as security for the Notes;

WHEREAS, the Issuer wishes to enter into this Collateral Management Agreement, pursuant to which the Collateral Manager agrees to perform, on behalf of the Issuer, certain duties with respect to the Collateral securing the Notes in the manner and on the terms set forth herein and to perform such additional duties as are consistent with the terms of this Agreement and the Indenture as the Issuer and the Collateral Manager may from time to time agree in writing; and

WHEREAS, the Collateral Manager has the capacity to provide the services required hereby and is prepared to perform such services upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual agreements herein set forth, the parties hereto agree as follows:

Holders of a Majority of the aggregate outstanding Notional Amount of the Preferred Shares (excluding, at the time of such vote, such Notes held by the Collateral Manager or its affiliate and such Preferred Shares held indirectly through affiliates of the Collateral Manager by principals, investment professionals and members of the Advisory Board of the Collateral Manager). The Issuer, the Trustee and the successor Collateral Manager shall take such action (or cause the outgoing Collateral Manager to take such action) consistent with this Agreement and the terms of the Indenture applicable to the Collateral Manager, as shall be necessary to effectuate any such succession.

(h)     In the event of removal of the Collateral Manager pursuant to this Agreement by the Issuer or, to the extent so provided in the Indenture, by the Trustee, the Issuer shall have all of the rights and remedies available with respect thereto at law or equity, and, without limiting the foregoing, the Issuer or, to the extent so provided in the Indenture, the Trustee may by notice in writing to the Collateral Manager as provided under this Agreement terminate all the rights and obligations of the Collateral Manager under this Agreement (except those that survive termination pursuant to Section 12(f) above). Upon expiration of the applicable notice period with respect to termination specified in this Section 12 or Section 14 of this Agreement, as applicable, all authority and power of the Collateral Manager under this Agreement, whether with respect to the Collateral or otherwise, shall automatically and without further action by any person or entity pass to and be vested in the successor Collateral Manager upon the appointment thereof. Nevertheless, the Collateral Manager shall take such steps as may be reasonably necessary to transfer such authority and power.

13.     Delegation; Assignments.

Except with respect to those responsibilities set forth in the Collateral Administration Agreement, the responsibilities of the Collateral Manager under this Agreement shall not be delegated by the Collateral Manager, in whole or in part, without the prior written consent of the Issuer and the Insurer (so long as it is the Controlling Party) or, if the Insurer is no longer the Controlling Party, the Holders of a Majority of the Aggregate Outstanding Amount of each Class of Notes, and without receiving Rating Agency Confirmation and, notwithstanding any such consent or Rating Agency Confirmation, no delegation of duties by the Collateral Manager shall relieve it from any liability hereunder. Any assignment of this Agreement to any Person, in whole or in part, by the Collateral Manager shall be deemed null and void unless such assignment is consented to in writing by the Issuer and the Insurer (so long as it is the Controlling Party) or, if the Insurer is no longer the Controlling Party, the Holders of a Majority of the Aggregate Outstanding Amount of each Class of Notes and a Majority of the outstanding Notional Amount of Preferred Shares (excluding, at the time of such vote, such Notes held by the Collateral Manager or its affiliates and such Preferred Shares held indirectly through affiliates of the Collateral Manager by principals, investment professional and members of the Advisory Board of the Collateral Manager), and unless Rating Agency Confirmation is received with respect to such assignment. Any assignment consented to by the Issuer and the Insurer or such Noteholders and in respect of which Rating Agency Confirmation is received shall bind the assignee hereunder in the same manner as the Collateral Manager is bound. In addition, the assignee shall execute and deliver to the Issuer, the Insurer (so long as it is the Controlling Party) and the Trustee an appropriate agreement naming such assignee as a Collateral Manager. Upon the execution and delivery of such a counterpart by the assignee, the Collateral Manager shall be

released from further obligations pursuant to this Agreement, except with respect to its obligations under Section 10 of this Agreement arising prior to such assignment and except with respect to its obligations under Sections 2(g)(i) and 15 hereof. This Agreement shall not be assigned by the Issuer without the prior written consent of the Collateral Manager, the Insurer (so long as it is the Controlling Party) and the Trustee, except in the case of assignment by the Issuer to (i) an entity which is a successor to the Issuer permitted under the Indenture, in which case such successor organization shall be bound hereunder and by the terms of said assignment in the same manner as the Issuer is bound thereunder or (ii) the Trustee as contemplated by the Granting clauses and Section 15.1 of the Indenture. In the event of any assignment by the Issuer, the Issuer shall use its best efforts to cause its successor to execute and deliver to the Collateral Manager such documents as the Collateral Manager shall consider reasonably necessary to effect fully such assignment.

14.     Termination by the Issuer for Cause.

This Agreement may be terminated, and the Collateral Manager may be removed, by the Issuer, at the direction of the Holders of at least a Majority of the Aggregate Outstanding Amount of all Notes, voting collectively, for cause upon 10 Business Days' prior written notice to the Collateral Manager and upon written notice to the Noteholders as set forth below; provided, that in determining whether the Holders of the requisite Aggregate Outstanding Amount have given such demand, authorization or direction, Notes owned by the Collateral Manager or any Affiliate thereof shall be disregarded and deemed not to be Outstanding. No such termination or removal shall be effective (i) until the date as of which a successor Collateral Manager shall have agreed in writing to assume all of the Collateral Manager's duties pursuant to this Agreement and (ii) so long as any Notes and Preferred Shares shall be Outstanding, unless written notice of the appointment of such successor shall have been given to the Holders of the Securities stating that such appointment shall be effective unless rejected in writing within 20 days after the date of such notice by the Holders of more than 33 1/3% of the Aggregate Outstanding Amount of the Class A Notes (collectively), the Holders of more than 33 1/3% of the Aggregate Outstanding Amount of the Class B Notes or the Holders of more than 33 1/3% of the outstanding Notional Amount of the Preferred Shares (which rejection shall not be unreasonable). For purposes of the preceding sentence, in determining whether the Holders of the requisite Aggregate Outstanding Amount of Notes or outstanding Notional Amount of Preferred Shares have given such demand, authorization or direction, Securities owned by the Collateral Manager or any Affiliate thereof shall not be disregarded and shall be deemed to be Outstanding. For purposes of determining "cause" with respect to termination of this Agreement pursuant to this section, such term shall mean any one of the following events:

(a)     the Collateral Manager willfully violated any provision of this Agreement or the Indenture applicable to it;

(b)     the Collateral Manager violated any material provision of this Agreement or any terms of the Indenture applicable to it and failed to cure such violation (if such violation is capable of being cured) within 15 days after becoming aware of, or its receiving notice from the Trustee or the Insurer (so long as it is the Controlling Party) of, such violation;