Gregory M. Petrick
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, New York 10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666

- and-

Mark C. Ellenberg (*pro hac vice* pending)
CADWALADER, WICKERSHAM & TAFT LLP
700 Sixth Street, NW
Washington, DC 20001
Telephone: (202) 862-2200
Facsimile: (202) 862-2400

Attorneys for Polygon Global Opportunities Master Fund

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| GSC Group, Inc., et al.,[1] | Case No. 10-14653 (AJG) |
| Debtors. | Jointly Administered |

**OBJECTION OF POLYGON GLOBAL OPPORTUNITIES MASTER FUND
TO DEBTORS' MOTION FOR ENTRY OF (I) AN ORDER APPROVING
(A) BIDDING PROCEDURES, (B) FORM AND MANNER OF NOTICE
OF SALE, AND (C) PROCEDURES FOR DETERMINING
CURE AMOUNTS, AND (II) AN ORDER AUTHORIZING (A)
SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES, AND OTHER INTERESTS, AND (B) ASSUMPTION AND
ASSIGNMENT OF EXECUTORY CONTRACTS TO SUCCESSFUL BIDDER(S)**

Polygon Global Opportunities Master Fund ("Polygon"), a creditor in the above-captioned chapter 11 cases, hereby objects (the "Objection") to the Motion filed by GSC Group,

---

[1] The Debtors along with the last four digits of each Debtor's federal tax identification number are GSC Group, Inc. (6382), GSCP, LLC (6520), GSC Active Partners, Inc. (4896), GSCP (NJ), Inc. (3944), GSCP (NJ) Holdings, L.P. (0940), GSCP (NJ), L.P. (0785), and GSC Secondary Interest Fund, LLC (6477).

Inc. and each of its affiliated debtors (collectively, the "Debtors") for Entry of (I) an Order Approving (A) Bidding Procedures, (B) Form and Manner of Notice of Sale, and (C) Procedures for Determining Cure Amounts, and (II) an Order Authorizing (A) Sale of Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, and (B) Assumption and Assignment of Executory Contracts to Successful Bidder(s), filed on September 3, 2010 (the "Motion") [Docket No. 24].

Although Polygon does not oppose the establishment of a uniform set of bidding procedures to manage the sale of the Debtors' assets, the procedures proposed by the Debtors are fundamentally flawed, deficient, or ambiguous in various respects, and should not be approved by this Court in their current form. In particular, the Debtors' proposed bidding procedures (a) present significant and irreconcilable conflicts of interest by and among (i) the Debtors' senior officers, (ii) Black Diamond Capital Management L.L.C. ("Black Diamond"), the holders of a majority of the principal amount due and owing under the Debtors' Existing Credit Agreement,[2] and (iii) Black Diamond Commercial Finance L.L.C., the agent for the Existing Credit Agreement ("Agent") and affiliate of Black Diamond; and (b) implicitly permit the Debtors to assign their fiduciary duties to a third party without investor client consent in violation of the policies underlying the Investment Advisers Act of 1940, 15 U.S.C.A. §§ 80b-1 *et seq*. (the "Advisers Act") and the Debtors' contractual obligations.

If the Debtors want to pursue a competitive sale process and conduct a fair auction intended to find the highest and best offer for the Assets, the Bidding Procedures should be modified so as to be as transparent and flexible as possible. Accordingly, Polygon requests that the Bidding Procedures be modified to: (a) provide that the selection of the Successful Bidder be

---

[2] Capitalized terms not otherwise defined herein shall have the meaning set forth in the Motion.

subject to the review of the Court; (b) reflect the deletion of the Debtors' ability to unilaterally modify the Bidding Procedures and designate the bids of the Agent and the Lenders as Qualified Bids; and (c) provide that the Successful Bidder shall not be permitted to assume investment management contracts without the consent of investor clients pursuant to the terms of applicable management agreements.

In support of this Objection, Polygon respectfully states as follows:

## BACKGROUND

1. Polygon is the beneficial owner of seven thousand (7,000) Preferred Shares (representing approximately 9% of the Preferred Shares outstanding) of GSC Partners CDO Fund V, Limited ("CDO V"). Debtor GSCP (NJ), L.P. ("NJLP") serves as the "Collateral Manager" of CDO V pursuant a Collateral Management Agreement, dated as of December 15, 2004, by and between NJLP and CDO V, as amended, supplemented, amended and restated or otherwise modified (the "CDO V Management Agreement").

2. NJLP is registered as an investment adviser under the Advisers Act.

3. On September 2, 2010 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, commencing chapter 11 cases which are jointly administered under case number 09-10023 in the United States Bankruptcy Court for the Southern District of New York (the "Court").

## ARGUMENT

4. The bidding procedures and other proposed relief in the Motion (the "Bidding Procedures") should not be approved, for two reasons. First, significant and irreconcilable conflicts of interest involving the Debtors' senior officers, Black Diamond, and Agent under the Debtors' Existing Credit Agreement make it impossible for the bidding procedures, as currently

proposed, to result in a fair, transparent, and open sale process in the best interest of the Debtors' estates and their creditors. Second, the proposed procedures would allow the Debtors to assign investment management contracts to third parties absent the consent of the investor client and in violation of the policies underlying the Advisers Act and the terms of the CDO V Management Agreement.

**I.    The Bidding Procedures are Patently Unfair, Lack Transparency, and Chill Bidding**

5. The design of the Debtors' proposed Bidding Procedures fails to achieve the ultimate goal of a sale in a bankruptcy proceeding, to achieve the maximum possible value for the debtor's creditors. Instead, the Bidding Procedures are fraught with irreconcilable conflicts that permit the Debtors' insiders to unfairly control and manipulate the bidding process, thereby chilling the entire sale process. The Bidding Procedures at their core are skewed to benefit certain of the Debtors' insiders, and should not be approved by this Court without modification.

**A.    The Bidding Procedures Should be Subject to Heightened Scrutiny**

6. The sale of a debtor's assets to a fiduciary in chapter 11, while not *per se* prohibited, is "subjected to a heightened scrutiny because they are rife with the possibility of abuse." In re Bidermann Indus. U.S.A., Inc., 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997) (denying approval of sale in light of, among other things, the conflicts of interest and self-dealing of the debtors' chief executive officer); see also In re Rickel & Assoc., Inc., 272 B.R. 74, 100 (Bankr. S.D.N.Y. 2002) ("[S]ales to insiders of the debtor are subject to heightened scrutiny." (citing C&J Clark America, Inc. v. Carol Ruth, Inc. (In re Wingspread Corp.), 92 B.R. 87, 93 (Bankr. S.D.N.Y. 1988))); In re Blixseth, Case No. 09-60452-7, 2010 WL 716198, *10 (Bankr. D. Mont. Feb. 23, 2010) ("Where as here, the proposed bidding procedures propose a sale to an entity with very close ties to the Debtor and the property at issue, before the Trustee engaged an

experienced broker and intensively explored non-insider proposals, and where the bidding procedures provide . . . terms aimed at cutting off other competing bids, the business judgment rule simply does not apply."); In re Yellowstone Mountain Club, LLC, Case No. 08-61570-11, 2009 WL 982233, at 5* (Bankr. D. Mont. Feb. 18, 2009) (finding that the debtor's proposed bidding procedures did not encourage third-party bids, but rather, were drafted to ensure that the DIP lender would be the successful purchaser). When a debtor proposes to transfer its assets to an insider, the debtor must fully disclose to the Court and its creditors the relationship between the buyer and seller, the circumstances under which the negotiations have taken place, any marketing efforts, and the factual basis upon which the debtor determined that price was reasonable or adequate. U.S. Small Bus. Admin. v. Xact Telesolutions, Inc. (In re Xact Telesolutions, Inc.), Case No. Civ. A. DKC 2005-1230, 2006 WL 66665, at *6-7 (D. Md. Jan. 10, 2006); In re Wilde Horse Enters, Inc., 136 B.R. 830, 842 (Bankr. C.D. Cal. 1991).

7. The facts and outcome of Bidermann are instructive with respect to the facts here. In Bidermann, the Court denied the debtors' request to enter into a letter agreement by which the debtors would be acquired by a buyer comprised of an outside investor and a firm affiliated with the debtors' existing chief executive officer. At the time of the proposed buyout, the debtors' chief executive officer, Bryan Marsal, was a principal of one of the proposed buyers, and pursuant to a consulting agreement, Mr. Marsal would be appointed as chief executive officer and chairman of the board of the new owner. In re Bidermann, 203 B.R. at 549. After determining that the actions of the debtors' CEO were "imbued with fiduciary obligations", the Court found that the CEO had a conflict of interest and that "the proposed transaction [did] not reveal the effective exercise of business judgment, but rather the 'illicit manipulation of a board's deliberate process by self-interested fiduciaries.'" Id. at 551 ("That Mr. Marsal has a

conflict of interest almost goes without saying. On the one hand he was hired to enhance the value of the debtors' businesses . . . . On the other hand, by virtue as his role as an equity participant, Mr. Marsal either was, or has to have been perceived as being, motivated to secure for himself and Vestar the lowest sale price reasonably attainable."). Lastly, the Court in Bidermann issued an order to show cause why an examiner with expanded powers should not be appointed as the Court's "confidence in management and the debtors' counsel [had] been shaken by the manner in which they sought to pursue [the] transaction." Id. at 554.

8. As in Bidermann, the Debtors' have an obvious conflict of interest. As described in the Motion, the Debtors' Chief Executive Officer, Alfred C. Eckert III, has negotiated a consulting agreement and the Debtors' Senior Managing Director, Peter R. Frank, has negotiated an employment agreement with Black Diamond. See Motion ¶17(c). By entering into such agreements, the Debtors' management will benefit directly if Black Diamond is selected as the successful bidder. In addition, Black Diamond is an affiliate of the Agent and an affiliate of the Prepetition Lenders. Further, affiliates or funds managed by Black Diamond hold a majority of the principal amount due and owing under the Existing Credit Agreement.

9. A debtor whose principals are also participants in the bidding process cannot be allowed to retain control over the most critical decisions in the sale process. Otherwise, the overwhelming conflicts of interest will taint the integrity of the bidding process and disadvantage non-insider third party bidders.'

**B.    The Bidding Procedures Are Designed to Skew the Process in Favor of Black Diamond, and Discourage Third-Party Bidders**

10. Several of the provisions in the Bidding Procedures specifically bias the bidding process in favor of Black Diamond while discouraging third-party bidders.

    **a.    The Biased Bid Evaluations**

11. Pursuant to the Bidding Procedures, the Debtors have the exclusive right to select the Successful Bidder. Bidding Procedures ¶ 11. Moreover, the Debtors can reject at any time prior to the Court's approval of a bid, without liability, any bid that the Debtors deem to be inadequate or insufficient, not in conformity with the requirements of the Bidding Procedures, or contrary to the best interests of the Debtors or their estates. Id. Having the Debtors act as the sole evaluator of the bids, especially in the context of insider bids, is highly detrimental to the bidding process. The mere presence of the Debtors' insiders in any aspect of the sale process will chill bids, as buyers will be concerned that the bidding process is skewed in the insiders' favor.

### b. The Debtors' Reservation of Rights to Unilaterally Change the Bidding Procedures

12. The Debtors have built several "escape clauses" into the Bidding Procedures that do nothing more than chill bidding and ensure that Black Diamond is the Successful Bidder. As an initial matter, the Debtors with the consent of the Agent can at any time add or remove assets from the list of Assets for sale. Bidding Procedures ¶ 1. Moreover, the Debtors, in their sole discretion, can modify the Bidding Procedures or impose at any time additional customary terms and conditions on the sale of the Assets. Lastly, as described above, the Debtors, in their sole discretion, can prevent a Qualified Bid from becoming a Successful Bid. These reservations of rights allow the Debtors and the Agent to maintain absolute control over the bidding process. With such control, the Debtors and the Agent can manipulate the bidding process without Court intervention and can safeguard Black Diamond against the possibility that a successful third-party bid will stifle Black Diamond's ability to obtain the Debtors' assets at rock-bottom prices. While the Bidding Procedures may appear to provide for a competitive Court-approved bidding process, by including these "escape clauses" the Debtors

are enabled with the power to circumvent those procedures at any time. Accordingly, the Debtors' reservations of rights should be struck from the Bidding Procedures.

### c. The Automatic Designation of Insiders' Bids as Qualified Bids

13. Finally, the Bidding Procedures provide that, notwithstanding anything in the Bidding Procedures, the Bid Procedures Order, or the Sale Order, a credit bid or cash bid from the Agent or any Lender shall be a "Qualified Bid". Consequently, affiliates of the Debtor, including the Agent, will be able to submit bids at any time, and may potentially come into possession of bid information prior to submission of such bids. Additionally, it is unclear whether such bidders are required to submit a bid deposit. Instead of creating a competitive sale process and having the Agent or one of the Lenders act as a stalking horse bidder, the Debtors have created a process that lacks transparency and will only serve to chill bidding by third-parties.

14. The affiliations between the Debtors and their directors, and Black Diamond, coupled with the fact that the Debtors have the unqualified right to select the Successful Bidder, and the Agent or any Lender may submit a bid not in compliance with the Bidding Procedures, present clear conflicts of interest. Any sale process in which the Debtors' fiduciaries are involved on both sides of the transaction and retain such a great degree of discretion to make and direct unilateral decisions that will shape the outcome of this proceeding must be modified in order to ensure that a truly impartial and independent arbiter is involved. The Debtors have failed to provide any justifiable reason as to why they should have such overly broad and unfettered control over the bidding process. Accordingly, under the heightened scrutiny that is compelled by the sale of a debtor's assets to an insider, the Bidding Procedures should not be approved without modification.

## II. The Proposed Procedures Permit the Debtors to Violate the Policies Underlying the Adviser Act and the Terms of the CDO V Management Agreement

15. Section 365(c) of the Bankruptcy Code provides that

> [a debtor in possession] may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties if – (1)(A) applicable law excuses a party other than the debtor, to such contract or lease from accepting performance from or rendering service performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment or rights or delegation of duties; and (B) such party does not consent to such assumption or assignment...

11 U.S.C. § 365(c).

16. Section 205(a)(2) of the Advisers Act provides that an investment adviser shall not enter into "any investment advisory contract...if such contract fails to provide, in substance, that no assignment of such contract shall be made by the investment adviser without the consent of the other party to the contract." Advisers Act, § 205(a)(2). Section 205(a)(2) of the Advisers Act is an important statutory protection afforded to clients of investment advisors. A client who has retained the services of a particular investment advisor should not be obligated to accept the provision of such services by an investment advisor not selected by the client. Moreover, an investment advisor has fiduciary duty to its clients and should not be permitted to assign such duty to a third party without the client's consent.

17. The legislative history makes Congress's intent to protect investor clients from nonconsensual assignments clear. In a Senate Subcommittee statement on the effect of the assignment provisions under section 205(a)(2), an SEC official testified that the provisions are designed to protect the fiduciary relationship by guaranteeing that "the management contract is personal, that it cannot assigned, and that you cannot turn over the management of other people's money to someone else." <u>Hearings on S. 3580 Before a Subcomm. of the Senate Comm. on</u>

Banking and Currency, 76th Cong., 3d Sess. 253 (1940) (statement of David Schenker, Chief Counsel of the Commission study that led to the enactment of the Advisers Act).

18.  The CDO V Management Agreement contains provisions requiring Polygon's consent prior to the assignment of the management agreement to a third party. The CDO V Management Agreement provides that NJLP may not assign its rights and obligations thereunder without (i) the prior written consent of CDO V, (ii) the prior written consent of holders of a majority in outstanding principal amount of each class of notes of CDO V and holders of a majority in number of the outstanding preferred shares of CDO V and (ii) receiving "Rating Agency Confirmation" (as defined in the CDO V Management Agreement). CDO V Management Agreement, § 15(a).

19.  The consent rights set forth in the CDO V Management Agreement are intended to afford the holders of CDO V securities with the protections under the Advisers Act and to prevent the holders of those securities from being subject to a manager not of their choosing and as to whom they have not had the ability to conduct due diligence. The offering memoranda pursuant to which the securities of CDO V were offered and sold each contain a lengthy description of NJLP and its business and personnel. Holders of securities of CDO V purchased those securities, in part, in reliance on the expertise of NJLP. While the CDO Management Agreement and the Debtors' other similar investment advisory contracts may provide for lucrative fees, these fees are premised on the notion that that a qualified and experience asset management firm will serve as a fiduciary and manage the underlying assets in the best interests of the holders of the securities. Permitting the Debtors to assign these investment advisory agreements without the required consent undermine these important interests.

20. The process set forth in the proposed bidding procedures for obtaining the consent of the Consent Parties clearly contradicts the terms of the CDO V Management Agreement set forth above and the intended purpose of the Advisers Act. Holders of CDO V securities will not have a realistic opportunity to conduct due diligence on the bidders for the CDO Management Agreement. Furthermore, because of the inherent conflicts of interest created by the proposed procedures (as described above), conducting such due diligence on potential bidders is likely to prove useless.

21. The proposed bidding procedures provide that even if timely objections are received from Consent Parties, such that the actual, deemed, or negative consent of other Consent Parties would be insufficient to permit transfer of such agreement, the Debtors may, at their discretion but with the Successful Bidder(s)' consent, either (a) proceed with the transaction in accordance with the terms of the applicable Purchase Agreements with the Successful Bidder(s), or (b) proceed with a modified transaction, excluding the contract which is the subject of the objection. Permitting the Debtors to exercise such broad discretion without regard for the valid concerns of the Consent Parties directly contradicts the express language of the CMO Management Agreement and stands in stark contrast to Congress' intent under the Advisers Act to protect investor clients from such abuses.

## RESERVATION OF RIGHTS

22. Polygon reserves all rights to amend, supplement, or otherwise modify the Objection as necessary or proper, and to raise such other and further objections to the Motion, and to assert all of their rights and claims at the Bidding Procedures Hearing.

## CONCLUSION

23. For the foregoing reasons, Polygon respectfully requests that the Bidding Procedures proposed by the Motion be modified consistent with the arguments and requests set forth above, or that the Motion be denied.

Dated: September 13, 2010
    New York, New York

CADWALADER, WICKERSHAM & TAFT LLP

*/s/ Gregory M. Petrick*
Gregory M. Petrick
One World Financial Center
New York, New York 10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666
Gregory.Petrick@cwt.com

- and -

Mark C. Ellenberg
700 Sixth Street, N.W.
Washington, DC 20001
Telephone: (202) 862-2200
Facsimile: (202) 862-2400
Mark.Ellenberg@cwt.com

Attorneys for Polygon Global Opportunities Master Fund