WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
(212) 819-8200
Andrew Hammond
Abraham L. Zylberberg

ATTORNEYS FOR THE
NON-CONTROLLING LENDER GROUP

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| GSC GROUP, INC., <u>et al.</u>,[1] | ) Case No. 10-14653-AJG |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) |

**OBJECTION OF NON-CONTROLLING LENDER GROUP TO DEBTORS' MOTION FOR ENTRY OF (I) AN ORDER APPROVING (A) BIDDING PROCEDURES, (B) FORM AND MANNER OF NOTICE OF SALE, AND (C) PROCEDURES FOR DETERMINING CURE AMOUNTS, AND (II) AN ORDER AUTHORIZING (A) SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, AND (B) ASSUMPTION AND ASSIGNMENT OF EXECUTORY <u>CONTRACTS TO SUCCESSFUL BIDDER(S)</u>**

TO THE HONORABLE ARTHUR J. GONZALEZ,
UNITED STATES BANKRUPTCY JUDGE:

The Non-Controlling Lender Group[2], by and through their undersigned counsel, hereby

file this objection (the "<u>Objection</u>") to the motion (the "<u>Motion</u>")[3] of GSC Group, Inc. ("<u>GSC</u>

<u>Group</u>") and certain of its direct or indirect subsidiaries and affiliates (together with GSC Group,

the "<u>Debtors</u>") for entry of orders (i) approving (a) bidding procedures, (b) the form and notice

---

[1] The Debtors, along with the last four digits of each Debtor's federal tax identification number, are: GSC Group, Inc. (6382), GSCP, LLC (6520), GSC Active Partners, Inc. (4896), GSCP (NJ), Inc. (3944), GSCP (NJ) Holdings, L.P. (0940), GSCP (NJ), L.P. (0785), and GSC Secondary Interest Fund, LLC (6477).
[2] The Non-Controlling Lender Group consists of the Lenders under the Credit Agreement (as defined below) identified on the list attached hereto as <u>Exhibit A</u> (the "<u>Non-Controlling Lenders</u>").
[3] Terms not defined herein are defined in the Motion.

of sale, and (c) procedures for determining cure amounts (the "Bidding Procedures Order"), and (ii) authorizing (A) the sale of assets free and clear of all liens, claims, encumbrances, and other interests, and (B) the assumption and assignment of executory contracts to the successful bidder(s) (the "Sale Order").

The Lenders hold, through the Agent, a senior perfected security interest in the bulk of the assets to be sold pursuant to the Motion. The Non-Controlling Lender Group holds collectively approximately 37% in principal amount of the Loans outstanding under the Credit Agreement and approximately 40% in principal amount of the indebtedness secured by the Assets.[4] Black Diamond holds approximately 51.1% in principal amount of the Loan outstanding and so are "Majority Lenders" under the Credit Agreement. Significantly, the Non-Controlling Lender Group includes all but one of the Lenders under the Credit Agreement that is not a Black Diamond entity or whose claim is not controlled by a Black Diamond entity.

In support of their Objection, the Non-Controlling Lender Group respectfully states and represents as follows.

## PRELIMINARY STATEMENT

The Motion seeks approval of unfair bidding procedures (the "Bidding Procedures") and a rushed "marketing" and sale schedule (together with the Bidding Procedures, the "Sale Process") that will chill competitive bidding for substantially all of Debtors' assets (the "Assets") and permit Black Diamond Capital Management L.L.C. or its affiliates (collectively, "Black Diamond") to acquire the business and asset of the Debtors at a bargain basement price, to the detriment of the Debtors, the Non-Controlling Lender Group and other creditors of the Debtors.

---

[4] The indebtedness secured by the Assets includes a claim in excess of $10 million held by one of the Non-Controlling Lenders in connection with the termination of a swap transaction between one of the Debtors and such Non-Controlling Lender. Such claim is not entitled to voting rights under the Credit Agreement.

While "loan-to-own" strategies are not unusual in today's distressed asset market, Black Diamond has stretched the strategy beyond recognition. Since Black Diamond Capital Management became the majority lender under the Credit Agreement and subsequently appointed its affiliate, Black Diamond Commercial Finance, L.L.C., as Administrative Agent under the Credit Agreement and Collateral Agent under the Security Agreement (as defined below), Black Diamond has exercised an inordinate amount of control over the Debtors' day-to-day business operations and has sought to use this influence to preordain Black Diamond's acquisition of the Debtors' assets for a price well below their fair market value. The Debtors' chapter 11 cases (the "Chapter 11 Cases") and the rushed Sale Process are among the final steps in this scheme.

To ensure its acquisition of the Assets during these Chapter 11 Cases, Black Diamond insisted and required the Debtors to pursue a rushed sale of the Assets built on the false premise that the Debtors' business operations are a melting ice cube. Black Diamond was clearly involved in crafting the rushed Sale Process, which provides bidders less than three weeks from the hearing on the proposed Bidding Procedures to submit a bid, even though the Debtors concede that the assets were not marketed prior to the filing of the Petition and Black Diamond has been negotiating to obtain such assets for months. (Declaration of Mark Koneval ¶¶ 7(l), 8(b); Motion ¶ 14) The rushed process puts prospective bidders at a substantial disadvantage to Black Diamond given the amount of diligence that is required to bid on the Assets. There is no indication that such an expedited process is warranted here, and the Debtors have put forth no evidence that would support such a conclusion.

While it agrees that the Debtors' asset management business should be sold at auction, the Non-Controlling Lender Group submits that such business is not so fragile that there would

be a significant erosion of asset value if a more orderly and deliberate process were established. In fact, a mere three-week extension of the timetable would help combat the perception in the market that the sale process has been "rigged," encourage a greater number of potential bidders to invest the time and resources necessary to participate in the process, and likely result in substantially higher purchase price for the assets. (Declaration of Ted J. Gooden ¶¶ 7-19) Further, as more fully discussed below, the Non-Controlling Lender Group does not believe that there is any demonstrable need to sell the Debtors' illiquid and hard to value equity investment assets at this time.

As further indication of the efforts to rig the mechanics of the Bidding Procedures in favor of Black Diamond and to chill competitive bidding, the Debtors have publicly stated in their pleadings that Black Diamond has made a credit bid for the Assets. See Declaration of Peter R. Frank ¶ 27 [Doc. No. 9] ("The Debtor received a bid from the Agent [Black Diamond] the terms of which are being negotiated."). This statement has been picked up in a number of press reports, which have noted that Black Diamond will likely be the winner in the auction. See, e.g., *Graveyard shift*, Private Equity Online Friday Letter, September 3, 2010 (attached hereto as Exhibit C) ("senior management [of the Debtors] has also been working hard to map a future for themselves with another asset manager, with Black Diamond Capital Management appearing the likely winning bidder."); Bill Rochelle, *Old GM, GSC Group, Innkeepers, Tronox, Tribune, Circuit City: Bankruptcy*, Bloomberg News, September 1, 2010 (attached hereto as Exhibit D) ("There is already an offer from the agent for secured lenders owed $206.6 million"). Although Black Diamond described the statement as a "mistake," no corrective press release was issued by either the Debtors or Black Diamond. The suggestion that Black Diamond has an

inside track to acquire assets being sold in a rushed process is likely to chill prospective bidders desire to devote the time and resources necessary to submit their highest and best bid.

Moreover, the Bidding Procedures contain a provision that would allow for Black Diamond, in either its capacity as agent or lender, to submit a credit bid.  (Bidding Procedures § 6)  Although credit bidding can discourage "low ball" bids where assets are likely to be sold for less than the claims of the secured creditors, it can also create a disincentive for potential bidders concerned that the credit bidder can outbid them with "play money."  In light of the information already present in the market regarding a credit bid by Black Diamond's and Black Diamond's conflict of interests as (1) Administrative Agent under the Credit Agreement and Collateral Agent under the Security Agreement, (2) Lender under the Credit Agreement, and (3) prospective bidder for the Assets, the Non-Controlling Lender Group is concerned that permitting Black Diamond to control in any way any credit bidding (as it is currently able to do because of its controlling interest under the Credit agreement) creates a substantial risk that Black Diamond will use the threat of a credit bid improperly to chill bidding and to ensure that it can acquire the Assets for itself with a very low cash bid.  Accordingly, in order to insure that the maximum value is realized from the sale of the Assets, the Non-Controlling Lender Group submits that the Court should require the Agent to act solely at the direction of a majority of the Non-Controlling Lender Group (excluding any Non-Controlling Lender which directly or through an affiliate submits bids for the Asset) in exercising the right to credit bid.

Allowing individual lenders to credit bid would violate the terms of the Security Agreement, which vests in the Agent the sole right to credit bid.  The Bidding Procedures should be clear that no Lender can, directly or indirectly, individually credit bid its own Loan.

Finally, to protect the interests of the Non-Controlling Lender Group as secured creditors of the Debtors, and to assure the transparency and integrity of the Sale Process, a representative of the Non-Controlling Lender Group should be permitted to be present at the Auction and review all bids. The Debtors should be required to consult with the representative of the Non-Controlling Lender Group before selecting any bid as a Successful Bid. The Non-Controlling Lender Group requests additional changes to the Bidding Procedures, as set forth in the blackline attached hereto as <u>Exhibit B</u>.

In sum, the sale process proposed by the Debtors (at the direction of Black Diamond) will chill rather than foster a robust bidding process and would permit Black Diamond to acquire the Assets at well below their fair value. The Court should not allow this to occur. The Non-Controlling Lender Group is not seeking to derail a sale process – only to ensure its integrity and to maximize the sale price of the Debtors' assets. Accordingly, the Motion should be denied or the Bidding Procedures substantially modified before the Debtors are permitted to move forward with the contemplated sale.

## BACKGROUND[5]

1.      On August 31, 2010 (the "<u>Petition Date</u>"), each of the Debtors filed petitions for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), thereby commencing their Chapter 11 Cases. The Debtors are operating their business as debtors and debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. The Chapter 11 Cases are being jointly administered for procedural purposes only.

2.      No committee of unsecured creditors has been appointed in the Chapter 11 Cases.

---

[5] The factual background set forth in the Declaration of Mark Koneval is incorporated herein by reference.

3.     Debtor GSCP (NJ), L.P., as borrower, and certain affiliate guarantors[6] entered into that Fourth Amended and Restated Credit Agreement, dated as of February 28, 2007 (as amended or supplemented, the "Credit Agreement") with the lending institutions party thereto (the "Lenders") who are owed approximately $208.5 million in principal amount thereunder plus interest and certain other amounts (the "Senior Debt").  (Declaration of Peter R. Frank ¶ 20)  The obligations of the Debtors under the Credit Agreement are secured by senior perfected liens and security interests on substantially all of the Debtors' U.S. assets pursuant to a Second Amended and Restated Pledge and Security Agreement, dated as of February 15, 2006 (the "Security Agreement").  (Id. at ¶ 21)  Black Diamond Commercial Finance is the successor Administrative Agent under the Credit Agreement and the successor Collateral Agent under the Security Agreement.  Black Diamond Capital Management, together with certain of its affiliates, is a Lender under the Credit Agreement and holds approximately 51.1% in outstanding principal amount of the Loans thereunder and approximately 48.7% of the indebtedness secured by the Security Agreement.  As noted above, the reason for this discrepancy is that one member of the Non-Controlling Lender Group holds a claim for termination of a swap agreement that is secured by the assets under the Security Agreement, but which is not considered a Loan entitled to voting rights under the Credit Agreement and is accordingly not attributed voting rights.

4.     On September 1, 2010, the Debtors filed the Motion, seeking entry of the Bidding Procedures Order and Sale Order.

---

[6] The guarantors were Debtors GSC Group, GSCP (NJ), Inc., GSCP (NJ) Holdings, L.P., and GSCP, LLC and non-Debtor GSC Group Ltd.

## OBJECTION

**I.**     **The Bidding Procedures Are Defective and Should Be Revised so as to Induce an Open and Fair Public Sale that Maximizes Value for the Estates.**

5.     Bidding procedures should facilitate a fair sale of a chapter 11 debtor's assets through a process that maximizes the value of the estate.  See, e.g., Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 659 (Bankr. S.D.N.Y. 1992) (such procedures "encourage bidding and maximize the value of the debtor's assets"); Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.), 107 F.3d 558, 564 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); In re E-Z Serve Convenience Stores, Inc., 289 B.R. 45, 54 (Bankr. M.D.N.C. 2003) (denying approval of a sale that was not in the best interest of the estate and auction procedures that were "patently unfair and inequitable"); In re Edwards, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) (finding that the purpose of bid procedures is "to facilitate an open and fair public sale . . . ."); In re President Casinos, Inc., 314 B.R. 784, 786 (Bankr. E.D. Mo. 2004) (authorizing debtor to conduct asset sale but refusing to approve bid procedures that could have chilled bidder interest).

6.     To that end, courts have recognized that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, are appropriate in the context of bankruptcy sales.  See Integrated Res., 147 B.R. at 659; In re Fin. News Network, Inc., 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers , and [should] provide for a fair and efficient resolution of bankrupt estates"); Wintz v. Am. Freightways, Inc. (In re Wintz Cos.), 230 B.R. 840, 846 (B.A.P. 8th Cir. 1999), aff'd, 219 F.3d 807 (8th Cir. 2000).  "Structured bid procedures should provide a vehicle to enhance the bid

process and should not be a mechanism to chill prospective bidders' interests." <u>President Casinos</u>, 314 B.R. at 786.  Bidding procedures "must not chill the receipt of higher and better offers and must be consistent with the seller's fiduciary duties." <u>In re Adoption of Guidelines for the Conduct of Asset Sales</u>, General Order M-331 at p. 3 (Bankr. S.D.N.Y. Sept. 5, 2006). Courts must therefore require "an active marketing and auction process." <u>Crown Village Farm, LLC v. Arl, L.L.C. (In re Crown Village Farm, LLC)</u>, 415 B.R. 86, 93 n.4 (Bankr. D. Del. 2009); <u>cf. Christie v. First State Bank of Stratford (In re Keener)</u>, 268 B.R. 912, 922 (Bankr. N.D. Tex. 2001) (in the context of a foreclosure sale, "any act of . . . the party selling, or of third parties as purchasers which prevents a fair, free and open sale, or which diminishes competition and stifles or chills the sale, is contrary to public policy and vitiates the sale." (internal citations and quotations omitted)).  In short, bidding procedures should not be approved if they would chill bidding and otherwise discourage competitive bidding.

7.    At lease one court, <u>In re Am. W. Airlines, Inc.</u>, has held that bidding procedures would not be approved merely because they were thought to be in the good business judgment of the debtor.  166 B.R. 908, 911 (Bankr. D. Ariz. 1994).  The bankruptcy court there explained that the one "[a]cquisition of an ongoing business which is in bankruptcy is fundamentally different from that of an acquisition involving parties not in bankruptcy.  These differences effectively undercut any wholesale adoption of non-bankruptcy procedures in the bankruptcy context." <u>Id.</u> Accordingly, the bankruptcy court concluded that the bidding procedures there proposed would only be approved if they would "further the diverse interests of the debtor, the creditors and equity holders." <u>Id.</u> at 912.  That is, the bidding procedures and protections should be carefully scrutinized to insure that the debtor's estate is not unduly burdened and that the relative rights of

the parties in interest are protected.  Id.; see also In re APP Plus, Inc., 223 B.R. 870, 875 (Bankr. E.D.N.Y. 1998) (applying Am. W. Airlines, Inc. test to proposed economic bidding protection).

8.      Moreover, the debtor's business judgment can be scrutinized more rigorously under certain unique circumstances, including with regard to matters that may benefit insiders. See OHC Liquidation Trust v. Credit Suisse First Boston (In re Oakwood Homes Corp., 389 B.R. 357, 366 (D. Del. 2008).  Courts will analyze dealings between a debtor and its insider to determine whether the insider has "not only . . . prove[n] the good faith of a transaction but also to show[n] the inherent fairness from the viewpoint of the corporation and those with interests therein."  Citicorp Venture Capital, LTD. v. Comm. of Creditors Holding Unsecured Claims (In re Papercraft Corp.), 211 B.R. 813, 823 (W.D. Pa. 1997);  see also Capitol Bank & Trust Co. v. 604 Columbus Ave. Realty Trust (In re 604 Columbus Ave. Realty Trust), 968 F.2d 1332, 1360 (1st Cir. 1992).

9.      Although the Non-Controlling Lender Group does not believe that it is necessary at this time to determine the extent of Black Diamond's domination and control of the Debtors, the Non-Controlling Lender Group submits that there is sufficient evidence in the record to merit heightened scrutiny of the relief requested in the Motion.

10.      Here there appears to be much more than a typical debtor-creditor relationship between Black Diamond and the Debtors.  Black Diamond in its dealing with the Debtors was not merely a creditor enforcing its rights.  As noted in the Declaration of Mark Koneval, Black Diamond controlled such day-to-day operations of the Debtors by, among other things, directing the firing of specific officers and employees of the Debtors and directing the Debtors to dishonor severance arrangements with terminated officers and employees.  Black Diamond precipitated the termination of a senior officer in the Debtor's finance department and installed in her place the

brother of a senior officer of Black Diamond.  On the eve of the Debtor's bankruptcy filing, Black

Diamond compelled the Debtors to dissipate funds needed for the post-petition operations by

causing the Debtors to pay in excess of $1.5 million to two law firms representing Black

Diamond. These actions not only adversely affected the Debtors, but also the Non-Controlling

Lenders, who were kept completely in the dark regarding Black Diamond's actions.

11.     In the lead up to these Chapter 11 cases, Black Diamond exercised substantial

control over the management of the Debtors and day-to-day operations of the Debtors.  It had "a

stranglehold over the debtor" including over personnel decisions and payment of accounts

payable.  See CPY Co. v. Ameriscribe Corp. (In re Chas. P. Young Co.), 145 B.R. 131, 136-37

(Bankr. S.D.N.Y. 1992).

12.     The Bidding Procedures are designed to chill bidding for the Assets rather than

provide for a "fair, free and open sale process."  If given effect, the Bidding Procedures will not

result in a credible determination of the Assets' fair values.  The Bidding Procedures were not

designed by the Debtors in the free exercise of their good business judgment.  Instead, they

appear to be influenced by undue pressure from Black Diamond, who seeks to acquire the Assets

on the cheap by forcing the Debtors to pursue a rushed sale process that will discourage bidders

rather than foster a robust bidding process.

**A.  The Time Periods Specified In The Bidding**
   **Procedure To Effect A Sale Are Far Too Short.**

13.     A debtor may only sell property of the estate outside the ordinary course of

business after "notice and a hearing." See 11 U.S.C. § 363(b).  Notice must be "appropriate in the

particular circumstances." 11 U.S.C. § 102(1).  Notwithstanding their own admissions that the

Assets have not been extensively marketed prior to the Petition Date (Motion ¶ 14), the Debtors

request the Court to authorize a Sale Process that will be conducted at lightning speed.  The

timing of the Sale Process coupled with the un-rebutted press reports indicating that Black

Diamond is the heavy favorite to prevail in the process compromises the Bidding Procedures.

14.    The Debtors propose that:

-    Bidders place their bids by October 5, 2010, only twenty-three (23) business days
     after the filing of the Bidding Procedures Motion, fourteen (14) business days after
     the scheduled hearing on the Motion and as few as eleven (11) business days after the
     proposed publication of the Bidding Procedures (time period are effectively shortened
     by the intervening Labor Day holiday and the Jewish holidays during which some
     potential bidders or their counsel will be unavailable for necessary due diligence)
     (Bidding Procedures § 5, Bidding Procedures Order ¶ 6(b));

-    By October 11, 2010, the Debtors would provide notice of the proposed sale to the
     Successful Bidder(s) and seek consent from the Consent Parties to the transfer of the
     Debtors' rights under the relevant agreements and the continuation of such
     agreements (Bidding Procedures Order ¶ 7);

-    By October 20, 2010, the Consent Parties must either inform the Debtors whether
     they object to the assignment of the applicable management contracts to the
     Successful Bidding (Bidding Procedures Order ¶ 8);

-    A sale hearing be held on October 22, 2010, only eleven business days after the
     auction(Bidding Procedures Order ¶ 10); and

-    The closing of the sale occur by October 25, 2010 (Bidding Procedures § 6(a)(vi)).

15.    This timing is patently inadequate for at least four reasons.  <u>First</u>, Black Diamond

has had the benefit of negotiating and conducting due diligence on the Debtors for months prior

to the Petition Date and has been substantially involved in the Debtors' day-to-day operations.

Other interested parties should also be given reasonable opportunity to evaluate the Assets in

order to ensure that there is a more level playing field, thereby maximizing interest in the Assets.

16.    <u>Second</u>, an investment banker with substantial experience in marketing asset

management businesses, including as investment banker to the sellers in the only sale of

comparable assets in 2010, has stated that the potential bidders should be afforded at least three

additional weeks to submit a bid to conduct due diligence and allow the Debtors financial

advisors to dispel the negative information in the marketplace concerning the process and that any

shorter timeframe cannot result in an effective Sale Process.  (Declaration of Ted J. Gooden ¶¶ 5-19)

17.    <u>Third</u>, the Assets are not rapidly melting ice cubes.  While the Non-Controlling Lender Group agrees that the Debtors' asset management business should be marketed and sold now pursuant to section 363 of the Bankruptcy Code, there is no need to sell the asset management business under such an accelerated timetable.  The rushed timetable proposed by the Debtors and Black Diamond will likely discourage potential bidders and result in a substantial reduction in the price that could be obtained for the asset management business assets in a more orderly process.  In light of the asset management business's positive recent performance, the Debtors and their estates would be better served by a slight delay in the Sale Process that ensures that the asset management business assets are sold at fair market value pursuant to a fair process.

18.    Moreover, the Lender Group submits that there is no demonstrable need to sell the Debtor's other assets (primarily hard to value equity interests in the funds managed or otherwise serviced by the Debtors) at this time pursuant to section 363 of the Bankruptcy Code. The Assets are performing well (Declaration of Mark Koneval ¶ 8(a)), and in none of the Debtors' pleadings has it been convincingly suggested that the Debtors' are anticipating further business declines during the pendency of these Chapter 11 Cases.  Indeed, the Debtors' cash collateral budget actually projects that the Debtors' cash balance will increase by more than $8 million from the Petition Date through to the proposed closing date of October 25, 2010.  (Interim Order on Cash Collateral, Ex. A [Doc. No. 33])  Thus, the Debtors' estates will benefit if the Sale Process is not rushed.  While the current cash collateral order only permits the use of cash collateral by the Debtors through September 30, 2010 (an example of Black Diamond's effort to frustrate a meaningful auction), the Court can extend the duration of the cash collateral order on a non-

consensual basis, if necessary.  The Non-Controlling Lender Group will support such extension

for a reasonable period necessary to achieve a robust and meaningful auction of the Assets.

19.     <u>Fourth</u>, the time period provided for obtaining consent from the Consent Parties

(generally the Debtors' client, whose consent is required for the assignment of the Debtors'

management contracts, the most valuable assets of the Debtors) is far too short.  The Debtors

propose that the Consent Parties be deemed to have consented to the assignment if they fail to

object before the earlier to occur of (i) fifteen (15) days following service of the notice of the

proposed sale, or (ii) two (2) business days prior to the sale hearing (currently scheduled for

October 22, 2010).  (Bidding Procedures § 13)  Such limitations on consent rights may impact the

value that a bidder is willing to pay as they may not be comfortable with the negative notice

provision contained in the bidding procedures.  Prospective bidders may be concerned that even if

the negative notice is effective, investors may later seek to terminate the agreement if the

agreement contained termination provisions.  Prospective bidders should be permitted to set the

relevant time frame for obtaining consents after reviewing the relevant documents including

leaving in place the existing consent provisions in the relevant agreements.  Such flexibility will

likely enhance the price of the Assets.  For example, in a bankruptcy case where the Debtors'

business was truly a melting ice cube, this Court gave the successful bidders forty-five (45) days

to receive the consent of clients whose investment advisory agreement contracts would be

assigned.  <u>See</u> <u>In re Lehman Brothers Holds. Inc.</u>, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y.

Dec. 22, 2008) [Docket No. 2350, Ex. A at § 7.13].

**B.  <u>Credit Bidding By Black Diamond Should be Restricted</u>.**

20.     Section 6.1 of the Security Agreement provides as follows:

> By accepting the benefits hereof, the Secured Parties agree that this Agreement
> may be enforced only by the action of the Collateral Agent . . . and that no other
> Secured Creditor shall have any rights individually to seek to enforce this

Agreement or to realize upon the security to be granted hereby . . it being understood and agreed that that such rights and remedies may be exercised by the Collateral Agent . . . for the benefit of the Secured Creditors upon the terms of this Agreement.

21. In In re Electroglas, Inc., No. 09-12416 (PJW), Ruling on Credit Bids, (Doc. No. 263) (Bankr. D. Del. Sept. 23, 2009), the bankruptcy court in Delaware held that the following language, which is substantially similar to the language in the Security Agreement quoted above, barred holders of secured notes issued under an indenture from individually credit bidding and vested such right exclusively in the indenture trustee:

[I]t being understood and intended, and being expressly covenanted by the taker and holder of every Note with every other taker and holder and the Trustee, that no one or more holders of Notes shall have any rights in any manner whatever by virtue of or by availing of any provision of this Indenture to affect, disturb or prejudice the rights of any other holders of Notes, or to obtain or seek to obtain priority over or preference to any other such holder, or to enforce any right under this Indenture, except in the manner herein provided and for the equal, ratable and common benefit of all holders of Notes . . . .

Id. at 2.

22. Judge Walsh explained that

Section 7.4 of the Indenture provides that Noteholders do not have 'any right by virtue of or by availing of any provision of this Indenture to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Indenture,' unless they make a written request of the Trustee to take a certain action and then the Trustee does not take the requested action 60 or more days after receipt of that written request. This section makes clear that Noteholders may not step into the shoes of the Trustee and simply credit bid the Notes themselves, as doing so would constitute an action with respect to the Indenture.

Id. at 4.

23. The Bidding Procedure Motion contains language which could be construed as giving any Lender the right to credit bid. The Bidding Procedures should state explicitly that only the Collateral Agent may submit credit bids.

24. It should be noted that "there is no absolute entitlement to credit bid." In re Theroux, 169 B.R. 498, 499 n.3 (Bankr. D.R.I. 1994). In fact, the right of secured creditors with

allowed claims to credit bid their claims may be limited if the court "for cause" so orders.  See 11 U.S.C. § 363(k).  Section 363(k) does not define "cause," but courts have explained that it is "intended to be a flexible concept enabling a court to fashion an appropriate remedy on a case-by-case basis."  In re NJ Affordable Homes Corp., No. 05-60442 (DHS), 2006 WL 2128624, at *16 (Bankr. D.N.J. June 29, 2006).

25.     Several courts have recognized that "cause" exists where a dominating creditor wishes to credit bid and such credit bid is unfair and likely to chill bidding. See, e.g., In re Antaeus Tech. Servs., 345 B.R. 556, 564 (Bankr. W.D. Va. 2005) (noting that § 363(k) "cannot alter the economic realities that an auction sale in which one bidder is an existing lender who does not have to put up new money . . . is not a sale in which the bidders are on a level playing field"); In re Moonraker Assocs. Ltd., 200 B.R. 950, 955 (Bankr. N.D. Ga. 1996) ("A dominant creditor could submit a bid over and above a 'reasonable' assessment of the value . . . . Such a bid could effectively displace all other bids and any benefit to be achieved through such competitive bidding . . . would be virtually nonexistent."); In re Theroux, 169 B.R. at 499 (finding "cause" where the credit bidder was colluding with the trustee, was the subject of conflicts of interests, and the process would yield an inadequate sale price).

26.     Because Black Diamond's right as Collateral Agent to credit bid, in conjunction with its status as a bidder in its individual capacity, may adversely affect the realization of the Assets' fair value at an auction, cause exists to restrict credit bidding.  As noted above, Black Diamond's conflict of interests as both a potential cash bidder in an individual capacity and a credit bidder in its capacity as Collateral Agent makes it likely that Black Diamond will use the threat of a credit bid to ensure that it can acquire the Assets for a below market cash bid while failing to use it to block a low cash bid by Black Diamond.

27.     As noted above, Mr. Frank's first day declaration contained a statement suggesting that Black Diamond has already made a credit bid for the Assets.  (Declaration of Peter R. Frank ¶ 27)   The statement was picked up by the trade press (and perhaps brought to its attention by Black Diamond) resulting in many publications reporting that Black Diamond intended to acquire the Debtors' business with a credit bid or otherwise.  See also *Black Diamond Offers $207M for GSC*, Euromoney Institutional Investor Online Portal, September 2, 2010 (attached hereto as <u>Exhibit E</u>) ("Black Diamond has offered $206.6 million for the asset."); Christopher Witkowsky, *Battered GSC crumbles into bankruptcy*, Private Equity Online, September 2, 2010 (attached hereto as <u>Exhibit F</u>) ("The firm has received interest from a number of bidders, including Black Diamond Capital Management, Frank said."); *Black Diamond may buy GSC Group*, Daily Herald, September 2, 2010 (attached hereto as <u>Exhibit G</u>) ("There is already an offer from the agent for secured lenders owed $206.6 million.").  Such reports could only have a chilling effect on the bidding.

28.     The Debtors and Black Diamond advised the Non-Controlling Lender Group that the statement in Mr. Frank's declaration regarding a possible credit bid by Black Diamond was a "mistake."  (Declaration of Mark Koneval ¶ 6)  Nevertheless, no press release was issued by either the Debtors or Black Diamond to correct the "mistake" and neutralize the chilling effect of the reported credit bid by Black Diamond.  This "mistake" and the continuing failure to remedy it demonstrate that the risk of Black Diamond abusing their power to credit bid is not speculative.

29.     Indeed, the Bidding Procedures themselves specifically contemplate the notion that Black Diamond would submit a credit bid and that they would be automatically deemed a Qualified Bidder.  In this respect, the Bidding Procedures provide that

> the right of the Agent or any lender under the Existing Credit Agreement (each, a "<u>Lender</u>") to make a cash or credit bid for any Assets, including any Lot or

combination of Lots, is fully preserved.  Notwithstanding anything in these Bid Procedures, the Bid Procedures Order, or the Sale Order, a credit bid or cash bid from the Agent or any Lender shall be a Qualified Bid.

(Bidding Procedures § 6)

30.     In light of the foregoing, the Court should impose certain restrictions on Black Diamond's right as Collateral Agent to credit bid.  Specifically, the Non-Controlling Lender Group requests that Non-Controlling Lenders holding a majority in principal amount of the Obligations (as defined in the Security Agreement) (excluding any such Lender that is, or whose affiliate is, a bidder in the Auction and all Obligations held by such Lender) should have sole authority to direct Black Diamond, as Collateral Agent, whether or not to credit bid.  Such restriction would signal to the market that, notwithstanding the misinformation regarding Black Diamond's intent to credit bid, Black Diamond is not in fact the "likely winning bidder." See *Graveyard shift*, Private Equity Online Friday Letter, September 3, 2010.

### C.   Eckert and Frank Consulting and Employment Contracts With Black Diamond.

31.     The Debtors' senior officers – Alfred Eckert III and Peter R. Frank – have both entered into employment or consulting agreements with Black Diamond.  (Declaration of Peter R. Frank ¶ 28)  Although the Debtors have not filed any information regarding these employment agreements with the Court, the Non-Controlling Lender Group has independently learned that:

- Mr. Eckert has signed a three year consulting agreement that provides for a payment of $1 million per year.  (Declaration of Mark Koneval ¶ 7(p)); and

- Mr. Frank has signed a two year employment agreement that provides for a $1 million signing bonus plus minimum compensation of $1.2 million per year.   Mr. Frank's employment agreement is contingent upon Black Diamond being the successful bidder for the Debtors' private equity business at the auction.  (Declaration of Mark Koneval ¶ 7(o)).

More information regarding those agreements should be made available to the Qualified Bidders so that they could independently determine whether the agreements with Black Diamond are an impediment to a bid (and if they are, Messrs. Eckert and Frank, as fiduciaries of the Debtors'

estates should be required to modify them to eliminate such impediment). Such disclosure is necessary to permit potential bidders to assess whether Black Diamond has managed to "lock up" the Debtors' business.

**D. <u>Terms of Capstone's Engagement Letter</u>.**

32.     Capstone's engagement letter provides for payments to Capstone based solely on hours worked, without any provision for a success fee. (Declaration of Mark Koneval ¶ 7(q)) The lack of a success fee, consistent with the provisions of the Bidding Procedures noted above, is likely to inhibit the vigor with which Capstone markets the Assets. If the intent was to have a robust auction and to minimize the cash drain on the Debtors pending the completion of the Auction and sale of the Assets, the engagement letter with Capstone should have provided for low hourly rates for Capstone, coupled with a success fee.

**E. <u>Inclusion of Specified Asset In Sale</u>.**

33.     While the Non-Controlling Lender Group concedes that the asset management business of the Debtor should be sold in a Section 363 sale, rather than being dealt with in a plan, it is less clear that other assets of the Debtors require such prompt disposition. Such other assets (the "<u>Specified Assets</u>") consist primarily of passive equity interest in funds managed or otherwise serviced by the Debtors plus approximately $50 million in life insurance policies. These Specified Assets are by no means "melting ice cubes" or a drain on the Debtors' resources. They are also in many cases illiquid and difficult to value, as Mr. Frank acknowledges in his declaration. (Declaration of Peter R. Frank ¶ 24) The Debtors have not made any showing why such asset cannot be dealt with in a plan of reorganization or liquidation. A greater return may ultimately be realized on the Specified Assets if they are placed in a vehicle managed by an

independent third party to be held until market conditions improve and their value can be better ascertained.

**F. Good Faith Determination.**

34. The Debtors state in the Motion that they intend to seek a finding from the Court that each Successful Bidder is a "good faith purchaser" entitled to the benefits of Section 363(m) of the Bankruptcy Code. The Non-Controlling Lender Group believes that any such finding is not appropriate with respect to Black Diamond or any of its affiliates, if it is a Successful Bidder, until the Court has before it a full record of Black Diamond's actions and role in structuring the Sale Process.

35. As the Motion itself notes, in order to be entitled to a "good faith" finding a purchaser must establish that there was no "fraud, collusion between the purchaser and other bidders, or the [debtors], or an attempt to take grossly unfair advantage of other bidders." Licensing by Paolo, Inc. v. Sinatra (in re Gucci), 126 F.3d 380, 390 (2d Cir. 1997). Indeed, the court is "required to make a finding with respect to the 'good faith' of the purchaser." Ginther v. Ginther Trusts (In re Ginther Trusts), 238 F.3d 686, 689 (5th Cir.), *cert. denied*, 534 U.S. 814 (2001). The conduct of Black Diamond points to an absence of good faith on the part of Black Diamond and an attempt to take unfair advantage of other bidders. A "good faith" determination should await a full airing of the extent of Black Diamond's control and domination of the Debtors and its use of such control to tilt the bidding process in its favor.

**G. Transparency of Sale Process.**

36. The bidding procedures should assure the transparency of the bidding process. Because Black Diamond will likely be a bidder and because of Black Diamond's influence over the Debtors and the lack of a creditors' committee in these cases, the decision as to which bid is the Successful Bid should not be made by the Debtors "in its sole discretion" (as provided in

paragraph 11 of the Bidding Procedures), but only after consultation with a representative of the Non-Controlling Lender Group. Furthermore, a representative of the Non-Controlling Lender Group, and its professional advisers, should be permitted to attend the Auction, and should be permitted to review all bids submitted at the Auction.

**H. <u>Waiver of Stay Periods</u>.**

37.    In the Motion the Debtors request that the Sale Order contain a waiver of the stay imposed by Bankruptcy Rules 6006(d) and 6004(h). Because of possible improprieties by Black Diamond in connection with the Sale Process, the Non-Controlling Lender Group objects to any such waiver with respect to a sale to Black Diamond. The Non-Controlling Lenders and other creditors should be afforded an opportunity to appeal any sale order approving a sale to Black Diamond before such sale is consummated and the appeal possibly rendered moot.

**I. <u>Other Modifications</u>.**

38.    There are a number of other defects in the Bidding Procedures that have the effect of favoring Black Diamond or chilling bidding. The blackline to the proposed Bidding Procedures and Bidding Procedures Order attached hereto as Exhibit B addresses the concerns expressed above and such other defects.

<u>**CONCLUSION**</u>

39.    As a condition to approval of the Motion, the Bidding Procedures should be modified as requested herein. Rather than facilitate an open, fair and robust public sale that would maximize value to the estates, the Bidding Procedures favor one potential bidder, Black Diamond, will chill the interest of other potential bidders, will prevent a full, fair and open Sale Process, and will prevent the Debtors' creditors from exploring alternative transactions. All this

will permit Black Diamond to benefit from its domination of the Debtors and acquire the Debtors'

Assets at far below their fair market value.

40.     For the foregoing reasons, the Non-Controlling Lender Group respectfully

requests that the Court condition its approval of the Motion on the modification the Bidding

Procedures as requested herein.

Dated: September 14, 2010
       New York, New York

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Andrew Hammond
Abraham L. Zylberberg

By: */s/ Abraham L. Zylberberg*

Attorneys for the
Non-Controlling Lender Group