------------------------------------------------------x
                      :

In re                     :         Chapter 11
                      :

GSC GROUP, INC., *et al.*,     :         Case No. 10-14653 (AJG)
                      :

                      :         (Jointly Administered)

             Debtors.   :
                      :

------------------------------------------------------x

## OBJECTION OF THE UNITED STATES TRUSTEE TO
## MOTION OF DEBTORS FOR AN ORDER AUTHORIZING
## THE IMPLEMENTATION AND CONTINUATION OF
## EMPLOYEE INCENTIVE COMPENSATION PLAN

TO:     THE HONORABLE ARTHUR J. GONZALEZ,
        CHIEF UNITED STATES BANKRUPTCY JUDGE:

Tracy Hope Davis, the United States Trustee for Region 2 (the "United States Trustee"), hereby submits this objection (the "Objection") to the motion (the "Bonus Motion") of GSC Group, Inc. and certain of its direct or indirect subsidiaries and affiliates (collectively, the "Debtors"), seeking an order authorizing the Debtors to implement and continue an employee incentive compensation plan. (ECF Doc. No. 21). In support thereof, the United States Trustee respectfully states as follows:

## I. INTRODUCTION

The United States Trustee objects to the Bonus Motion on the grounds that the Debtors have failed to meet their evidentiary burden of proof to show that certain of the proposed bonus payments comply with Section 503(c)(1) of the Bankruptcy Code. By the Bonus Motion, the Debtors seek the Court's approval to pay more than $860,000, of a proposed approximate $1 million bonus pool, to 9 (out of the 27 eligible employees) that appear to be insiders of the Debtors for the purpose of inducing them to remain with the

Debtors through the Sale of their assets. Although the Debtors style their motion as a request to "continue" an "employee incentive compensation plan," the facts belie these characterizations. Rather, the facts and circumstances of these cases demonstrate that the primary purpose of the Bonus Plan is retentive, not incentive. Thus, because the Debtors have failed to make the requisite evidentiary showing under Section 503(c)(1) of the Bankruptcy Code with respect to the proposed payments to the Debtors' insiders, the Court should deny the Bonus Motion with respect to these payments.

## II. FACTS

### A. The Chapter 11 Filing

1.      On August 31, 2010 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11, United States Code (the "Bankruptcy Code").

2.      The Debtors, together with their non-debtor affiliates (collectively, "GSC"), provide debt-focused investment management of alternative assets with a full spectrum of complementary investment product offerings. Declaration of Peter R. Frank in Support of First Day Motions and Applications in Compliance with Local Rule 1007-2 dated August 31, 2010 ("Frank First Day Declaration") at ¶ 9. (ECF Dkt. No. 9).

3.      GSC (initially established as Greenwich Capital Partners, Inc.) was founded in 1994, by Alfred C. Eckert III ("Mr. Eckert"), the Debtors' Chairman and CEO, as a subsidiary of Travelers Group Inc. to invest in private equity transactions. Id. at ¶ 8. In 1998, following the merger of Travelers Group Inc. and Citicorp, GSC became independent from Citigroup and is now a diversified alternative asset manager. Id.

4.     GSC is privately owned and, as of the Petition Date, had approximately 31 full-time employees.  Id.  As of March 31, 2010, GSC had approximately $8.4 billion of assets under management in approximately 28 separately managed investment funds.  Id.

5.     Since the Petition Date, the Debtors have operated their business and managed their properties as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

6.     On September 2, 2010, the United States Trustee, pursuant to Section 1102 of the Bankruptcy Code, solicited creditors for an Official Committee of Unsecured Creditors ("Creditors' Committee").  Due to an insufficient response, the United States Trustee was unable to form a Creditors' Committee in these cases.

7.     No trustee or examiner has been appointed in the Debtors' bankruptcy cases.

**B.     The Schedules**

8.     On September 15, 2010, the Debtors filed their schedules of assets and liabilities, and their statements of financial affairs (the "SOFAs," and together with the schedules, the "Schedules").  (ECF Dkt. Nos. 86-99).  The Schedules were executed by Eric Snyder ("Snyder"), as Managing Director, Controller.[1]

---

[1] At the 341(a) Meeting (defined below), Mr. Eckert testified that Mr. Snyder is also the Debtors' Acting Chief Financial Officer.  In addition, Messrs. Eckert and Frank testified that Mr. Snyder prepared, reviewed and authorized the filing of the Schedules.  The 341(a) Meeting was held on October 15, 2010, and concluded at approximately 4:00 p.m. That day, counsel to the United States Trustee ordered a written transcript of the 341(a) Meeting.  Although the transcript is not yet available, counsel to the United States Trustee expects to receive the transcript by the close of business on October 20, 2010.  At that time, copies will be delivered promptly to the Court as well as to the Debtors' counsel.

9.      The Debtors include the following individuals, among others, in at least one (and in some circumstances more than one) of the Debtors' seven SOFAs in response to Section 21(b), which requires a corporate debtor to list all officers and directors of the corporation, and each stockholder who directly or indirectly owns, controls, or holds 5 percent or more of the voting or equity securities of the corporation:

1.      Alex Wright, Senior Managing Director
2.      David Browne, Managing Director
3.      Eric Snyder, Managing Director
4.      Harvey Siegel, Managing Director
5.      Seth Katzenstein, Senior Managing Director
6.      Martin Ward, Vice President
7.      Nick Petrusic, Senior Managing Director
8.      Peter Firth, Managing Director
9.      Peter Ziganek, Vice President

See ECF Dkt. Nos. 86-99).  None of these individuals are listed as stockholders of the Debtors.  Id.

**B.      The Sale Motion**

10.     On or about September 2, 2010, the Debtors filed a motion (the "Sale Motion") seeking entry of an Order authorizing the sale (the "Sale") of all or substantially all of the Debtors' assets.  Sale Motion at ¶ 8.

11.     On September 3, 2010, the Debtors filed certain supplements to the Sale Motion, including the proposed form of asset purchase agreement (the "APA").  (ECF Dkt. No. 37).  The APA provides, among other things, that the purchaser is under no obligation to offer employment to any of the Debtors' employees in existence as of the closing.  APA at Art. 7.1, at 35.

12.     By Order dated September 23, 2010, the Court (i) approved the Debtors' proposed bidding procedures, (ii) scheduled an auction to be held on October 26, 2010, at

10:00 a.m. and (iii) scheduled a hearing (the "Sale Hearing") on any proposed sale for December 6, 2010, at 10:00 a.m.  (ECF Dkt. No. 134).

**C.      The Bonus Motion**

13.      On September 1, 2010, the Debtors filed the Bonus Motion seeking court approval of a bonus plan (the "Bonus Plan") pursuant to which the Debtors seek to pay bonuses in the amount of approximately $1 million to 22 of the Debtors' U.S. employees, and 5 employees of GSC Group Limited ("GSC UK"), the Debtors' U.K. affiliate.  (ECF Dkt. No. 21).  Subsequent to filing the Bonus Motion, the Debtors modified the Bonus Motion, as set forth below.  As modified, as of the date hereof, the Bonus Plan includes 22 U.S. employees, and 5 U.K. employees.

(i)      <u>Past Bonus Plans</u>

14.      The Bonus Motion states generally that "[h]istorically, in the ordinary course of business, the Debtors implemented annual incentive plans that were designed to motivate and reward employees by giving them the opportunity to increase their compensation if the organization achieved or exceeded certain goals."  Bonus Motion at ¶ 8.  The Bonus Motion states that the Debtors' bonus programs "represented a material component of such employees' total compensation package."  <u>Id.</u>

15.      Neither the Bonus Motion nor the Declaration of Peter R. Frank dated August 31, 2010 (the "Frank Declaration I"), provides detailed information concerning (i) the Debtors' past practices for paying bonuses, (ii) the salaries of the bonus recipients, or (iii) the identities of the eligible employees.  The Bonus Motion and the attendant declarations provide only general information for the years 2008, 2009 and 2010.

16.     For the year 2008, the Bonus Motion provides that the Debtors implemented an annual incentive bonus that ranged from approximately 10 percent to 240 percent of an employee's annual base salary, excluding bonuses paid to Mr. Eckert and Mr. Frank, for which the Bonus Motion is silent.  Id.  For the year 2009, the Debtors did not pay bonuses for work performed that year due to economic conditions.  Id.

17.     In April 2010, the Debtors implemented a "one-time incentive bonus for a 75-day retention commitment to remain employed by the Debtors through July 15, 2010." Id. at ¶ 9.  The April 2010 bonuses were approximately $1.2 million in the aggregate, which represented approximately 3 percent to 50 percent of an employee's annual base salary.  Id.

(ii)     Proposed Bonus Plan

18.     In July 2010, Mr. Eckert and Mr. Frank approved the Bonus Plan.  Frank Declaration I at ¶ 4.  Mr. Frank represents generally that he and Mr. Eckert evaluated the Debtors' existing compensation structure to create a fair, objective and incentive-based compensation structure for certain of the Debtor's key employees.  Id.  It appears that the Debtors lost approximately 40 employees during the time period from August 31, 2009, through August 31, 2010.  See Frank Declaration I at ¶ 4.  Mr. Frank represents that the Debtors "[could] not afford to lose any more employees, and that their remaining employees were being "stretched as far as possible."  Id.  Mr. Frank also represents that the employees to whom the Debtors propose to pay bonuses are "key employees who are focused on, among other things, supporting the Debtors' efforts to sell substantially all of the Debtors' assets."  Id. at ¶ 5.

19.     The Bonus Motion provides that the Bonus Plan includes 22 of the Debtors' 31 full-time employees.  Id. at ¶ 5.  In a footnote, however, the Debtors also seek authority to make certain "intercompany transactions" with GSC UK, in the amount of $287,500, that "may ultimately result in payments of incentive bonuses to 6 [GSC UK] employees."[2]  Bonus Motion at ¶ 11, n.3.

20.     To effectuate the Bonus Program, the Debtors entered into certain letter agreements (the "Letter Agreements") with the proposed Bonus Plan recipients.  Id. at ¶ 11.  The Bonus Motion provides that, in accordance with the Letter Agreements, each Bonus Plan recipient has received one-half of his or her bonuses on or about the date of the Letter Agreement was executed.  Id.  The Bonus Motion does not provide information concerning the date(s) or terms of these Letter Agreements.  In addition, copies of the Letter Agreements are not annexed to the Bonus Motion and have not otherwise been filed with the Court.  Upon information and belief, based upon testimony offered by Mr. Frank and Mr. Eckert at the 341(a) Meeting, the Debtors did not previously enter into letter agreements with their employees in connection with the Debtors' payment of bonuses to their employees.

21.     The Letter Agreements provide that the recipients would be eligible to receive cash bonuses upon the satisfaction of the earliest of certain objectives, including: (i) a closing of the sale of substantially all of the assets of the Debtors to one or more buyers, (ii) the successful emergence of the Debtors from chapter 11 or (iii) December 31, 2010.  Id. at ¶ 12.  The Bonus Motion further provides that, after consultation with the Debtors' financial advisor, Capstone Advisory Group LLC ("Capstone"), the Debtors

_____

[2] As discussed below, the Debtors now seek to pay 5 GSC UK employees, and transfer approximately $250,000 to GSC UK for this purpose.

modified the objectives of the Letter Agreements so that the bonuses may be paid only upon the sale of substantially all of the Debtors' assets that constitute a majority of the economic value of the Debtors.[3] Id. The Bonus Motion does not provide a definition or explanation concerning what is meant by "a majority of the economic value of the Debtors," or whether any written amendments or modifications to the Letter Agreements were executed.

22.     The Bonus Motion provides that the proposed bonuses represent approximately 50 percent of each recipients' annual salary. Id. at ¶ 13. The Bonus Motion further represents that the aggregate amount of the bonuses is approximately $700,000. Id. This amount does not appear to include the approximate $250,000 of the Debtors' funds for which the Debtors seek authorization to pay as bonuses to the GSC UK employees.

23.     The Bonus Motion provides that the bonuses range from $5,000 to $125,000, and a majority of the bonuses are $10,000 or less. Id. Based upon a schedule of the proposed bonus payments provided to the United States Trustee on October 13, 2010, however, the maximum proposed bonus payment appears to be $175,000, not $125,000. In addition, when the proposed U.K. recipients are included in the overall plan, the majority of bonuses proposed to be paid are $12,500 or less.

24.     By his declaration, Mr. Frank states that, "[t]he commencement of these chapter 11 causes has caused uncertainty and concern among the Debtors' employees." Frank Declaration I at ¶ 9. Mr. Frank further states that "[o]f particular note, the

---

[3] In support of the Bonus Motion, the Debtors filed the Declaration of Robert Manzo dated August 31, 2010 (the "Manzo Declaration"). (ECF Dkt. No. 21). All of the information contained in the Manzo Declaration also is included in the Frank Declarations I and II.

employees likely realize that the eventual sale of substantially all of the Debtors' assets will result in the elimination of jobs." Id. Mr. Frank acknowledges that the Bonus Plan "is intended to address these challenges and to provide a reasonable incentive to employees to help the Debtors reach their goals," i.e., sell substantially all of the Debtors' assets. Id.

       (iii)    <u>Revised Bonus Plan</u>

      25.    Following extensive discussions with the United States Trustee wherein the United States Trustee expressed concerns about the lack of information contained in the Bonus Motion, the Debtors, on October 14, 2010, filed a supplemental declaration (the "Frank Declaration II"). (ECF Dkt. No. 157). In the Frank Declaration II, the Debtors not only supplemented the Bonus Motion with additional information, but modified the proposed Bonus Plan. Specifically, the Frank Declaration II provides that:

    (a)    The revised program proposes to pay incentive bonuses to 24 of 30 of the Debtors' employees and 5 of 7 non-debtor UK employees, reflecting the removal of one employee, the Senior Managing Director in London, who is bonus eligible but no longer included in this request because he signed an employment agreement with Black Diamond contingent upon its purchase of the Debtors' mezzanine loan funds; and

    (b)    The revised program changes the triggers for payment – bonuses are now payable (i) upon commencement of the Sale Hearing and (ii) approval of Capstone, which will determine, in its sole discretion, whether the employee made his or her expected contribution to the sale process by, among other things, responding to or facilitating due diligence and preserving the value of the Debtors' business pending the auction.

Frank Declaration II at ¶ 13.

      26.    The Frank Declaration II also provides that the Bonus Plan was modified to include bonus payments to Mr. Frank and Mr. Eckert. Id. at ¶¶ 14 – 17. Counsel to

the Debtors has advised the United States Trustee that the Debtors no longer intend to include Mr. Frank and Mr. Eckert in the Bonus Plan, but rather will seek court approval of bonuses to these employees by separate motion. In addition, the Debtors now seek to re-include Senior Managing Director Nick Petrusic ("Mr. Petrusic") in the Bonus Program.

27. By his supplemental declaration, Mr. Frank represents that in the month prior to the Petition Date, the Debtors lost six key employees, and since the Petition Date, the Debtors lost an additional three key employees. Frank Declaration II at ¶ 7. Mr. Frank further states that "the Debtors' hold on [the] employees [covered by the Bonus Plan] is tenuous because most either have job offers or would be absorbed readily in the marketplace if they were to quit their positions with the Debtors." Id.

28. Mr. Frank represents that he believes that "failure [of the Court] to approve the revised program will result in the immediate departure of critical employees, with more likely to follow." Id. at ¶ 9. Mr. Frank states that "[t]he result of the loss of even a few employees would significantly impair the value of the Debtors' business, diminish the sale prospects and, ultimately, render the Debtors unable to operate as a going concern." Id. Mr. Frank further represents that "[t]he reality is that the key employees maintain interpersonal relationships with investors and other parties that will be crucial for the Debtors to successfully consummate a sale." Id. at ¶ 11.

29. The Frank Declaration II also provides that the amounts of the proposed bonuses have been increased since the filing of the Bonus Motion. Specifically, Mr. Frank states that the aggregate amount of the bonuses has been increased from $700,000 to approximately $807,500 (or approximately $1,060,000 including non-Debtor UK

employees.) Id. at ¶ 14. Mr. Frank further represents that the bonus range was increased from $5,000 to $175,000, and a majority of bonuses are $10,000 or less. Id. As stated above at paragraph 23, the spreadsheet provided to counsel to the United States Trustee shows that the majority of bonuses are $12,500 or less.

30. Mr. Frank also states that the proposed payments (excluding himself and Mr. Eckert) "represent 40 percent of employees' total compensation in 2010." Id. at ¶ 19. Mr. Frank further represents that "[f]or comparison's sake, in 2008, the last full year in which bonus payments were made, the total bonuses paid represented 45% of the employees' total compensation." Id. at ¶ 21.

31. Mr. Frank represents that none of the proposed recipients under the Bonus Program are "insiders" of the Debtors as he "read[s] the definition in Section 101(31) of the Bankruptcy Code." Id. at ¶ 24. In a chart attached to the Frank Declaration II, Mr. Frank represents that none of the eligible employees under the Bonus Plan are "officers" or "directors" of the Debtors. Id. Notwithstanding, Mr. Frank acknowledges that the Debtors propose to pay bonuses to two "Vice-Presidents," four "Managing Directors" and three "Senior Managing Directors." Frank Declaration II at ¶¶ 24 – 34. Mr. Frank also acknowledges that some of the eligible employees have responsibility over day-to-day trading and investment decisions and strategy. Id. at ¶ 35.

32. At paragraphs 33 and 34 of the Frank Declaration II, Mr. Frank discloses generally the roles of the Debtors' Vice-Presidents, Managing Directors and Senior Managing Directors. Id. at ¶¶ 32-34. These individuals are responsible for the following services provided by the Debtors:

    (a)    Martin Ward – (GSC-UK) Mr. Ward handles the sourcing, evaluation and
           execution related to the Debtors' European structured products investments;

(b)     <u>Peter Ziganek</u> – (GSC-UK) Mr. Ziganek handles the sourcing, evaluation and execution related to the Debtors' European mezzanine lending investments;

(c)     <u>Eric Snyder</u> – Mr. Snyder is the Controller[4] and is responsible for the Debtors' accounting and financial records, budgeting, forecasting and internal auditing;

(d)     <u>David Browne</u> – Mr. Browne is a Portfolio Manager and responsible for monitoring the Debtors' positions in U.S.-based private equity funds, serving as a board member on behalf of the Debtors for a number of portfolio companies and preparing financial reporting for the Debtors' funds;

(e)     <u>Harvey Siegel</u> – Mr. Siegel is a workout professional for the Debtors' CLO/CDO portfolio and is responsible for the workout and restructuring of troubled credits within the CLO/CDO portfolios;

(f)     <u>Peter Firth</u> – (GSC UK) Mr. Firth handles the sourcing, evaluation and execution related to the Debtors' structured products investments;

(g)     <u>Alex Wright</u> – Mr. Wright is a Portfolio Manager and is responsible for the management of a portion of the Debtors' CLO/CDO portfolios;[5]

(h)     <u>Seth Katzenstein</u> – Mr. Katzenstein is a Portfolio Manager and is responsible for the management of a portion of the Debtors' CLO/CDO portfolios and he is in charge of the Debtors' trading activities; and

(g)     <u>Nick Petrusic</u> (GSC UK) Mr. Petrusic is responsible for day-to-day management of the UK office, including without limitation, compliance, corporate governance, portfolio management of the European mezzanine funds, fund reporting and investor relations.

<u>Id.</u>

---

[4] As stated above at paragraph 8, n.2, Mr. Snyder is apparently the Debtors' Acting CFO.

[5] With respect to Alex Wright ("Mr. Wright"), the Debtors state in a footnote that Mr. Wright is the Debtors' former Chief Accounting Officer and Chief Financial Officer.  <u>Id.</u> at ¶ 24, n.3.  Prior to the Petition Date, Mr. Wright had resigned, but at the Debtors' request, never left the Debtors' employ.  <u>Id.</u>  Mr. Wright has accepted a job offer from a third party but delayed his start date until January 2011, to assist the Debtors with the sale process.  <u>Id.</u>  Mr. Frank states that Mr. Wright's job responsibilities have changed considerably, in that he no longer exercises control over personnel or managerial decisions or participates in the corporate decision-making.  <u>Id.</u>  Mr. Frank further states that Mr. Wright's primary role is to assist with management of the portfolios for the CLOs/CDOs.  <u>Id.</u>  Mr. Frank does not provide information concerning when Mr. Wright resigned, when his job responsibilities were changed or whether Mr. Wright's compensation was decreased (or increased) as a result of his decision to stay on with the Debtors.

33.     Notwithstanding the above, Mr. Frank represents that all of the employees eligible under the Bonus Plan, including the above Vice Presidents, Managing Directors and Senior Managing Directors "(a) have no control over personnel or management decisions, (b) do not dictate corporate policy or the disposition of corporate assets, (c) are generally not authorized signatories on the Debtors' documents, agreements and instruments, and (d) are not in control of the Debtors' financial and business operations, including authority over such things as fundraising, fund creation and/or wind-down contracts." Id.

34.     Lastly, Mr. Frank represents that the Debtors' request to transfer $250,000 to GSC UK to pay bonuses "as it determines are necessary to incentivize its employees to facilitate a sale and protect the value of the UK operations pending that sale, is an appropriate investment by the Debtors that protects the value of the Debtors' total enterprise." Id. at ¶ 37. Mr. Frank adds that "[i]f that amount is not funded, [GSC UK] may lose key employees, and with only seven employees, the loss of even one employee at this sensitive juncture could significantly impair value." Id.

**The 341(a) Meeting**

35.     On October 15, 2010, the United States Trustee convened a meeting of creditors of the Debtors pursuant to Section 341(a) of the Bankruptcy Code (the "341(a) Meeting"). At the 341(a) Meeting, both Mr. Eckert and Mr. Frank, in their capacities as the Debtors' CEO and President, respectively, answered questions under oath about the Debtors.

36.     At the 341(a) Meeting, the United States Trustee asked Mr. Eckert and Mr. Frank various questions concerning, among other things, the Debtors' corporate

governance (including GSC UK), the Debtors' history of paying bonuses and the roles and responsibilities of certain of the eligible employees under the Bonus Plan.

37.     Upon information and belief, based upon testimony offered at the 341(a) Meeting by Mr. Eckert and Mr. Frank, Mr. Snyder, the Debtors' Controller and Acting CFO, prepared the Schedules and executed them.  Upon information and belief, neither Mr. Eckert nor Mr. Frank approved or "signed off" on the Schedules, but rather, each relied upon Mr. Snyder to discharge the Debtors' duties in this regard.  Accordingly, the 341(a) Meeting was adjourned sine die to permit the United States Trustee to continue the examination with Mr. Snyder available to testify with respect to information contained in the Debtors' Schedules.

38.     Upon information and belief, based upon testimony offered at the 341(a) Meeting by Mr. Eckert, Mr. Eckert has been historically the person responsible for setting the compensation for the Debtors' employees.  Upon information and belief, Mr. Eckert would on occasion respond to questions from members of the Board of Directors regarding compensation, and then ultimately propose the annual compensation to the Board of Directors for approval.  Upon information and belief, based upon his testimony at the 341(a) Meeting, Mr. Eckert acknowledged that he views the bonuses proposed under the Bonus Plan as retention bonuses, and that such bonuses are only appropriate when a company is in serious trouble.

39.     Upon information and belief, based upon testimony offered at the 341(a) Meeting provided by Mr. Eckert and Mr. Frank, the Debtors' investment decisions are determined by investment committees for the Debtors' three business units, namely, (a) the distressed debt business, (b) the CLO business and (c) the European mezzanine

business.  Upon further information and belief, these investment committees make the ultimate decisions as to what investments the Debtors are going to make, and which investments the Debtors are going to sell.  Upon further information and belief, the decisions rendered by these committees are major decisions of the Debtors and are critical to the Debtors' financial viability.  Thus, the membership of these committees is very important for the Debtors.

40.     Upon information and belief, at least four of the eligible employees under the Bonus Plan are members of one or more of these investment committees, including: Managing Director David Browne ("Mr. Browne"), Senior Managing Director Seth Katzenstein ("Mr. Katzenstein"), Senior Managing Director Wright, and Senior Managing Director Petrusic.  Upon further information and belief, (i) Mr. Browne manages the Debtors' distressed debt business unit, (ii) Mr. Katzenstein manages the CLO business unit, and (iii) Mr. Petrusic manages the European mezzanine business unit.

41.     Upon information and belief, based upon testimony offered at the 341(a) Meeting by Mr. Eckert, GSC UK is controlled by U.S. management.  Although Senior Managing Director Petrusic is the local manager, Mr. Petrusic reports to Mr. Frank.  Upon further information and belief, compensation for the GSC UK employees currently is set by Mr. Frank, with approval from Mr. Eckert.

### III. OBJECTION

**A.     The Governing Law**

42.     Section 503 of the Bankruptcy Code governs the allowance of administrative expenses "for actual, necessary costs and expenses of preserving a debtor's bankruptcy estate."  11 U.S.C. § 503(b)(1)(A).  The two general overriding

policies of Section 503 of the Bankruptcy Code are: (i) to preserve the value of the estate

for the benefit of its creditors and (ii) to prevent the unjust enrichment of the estate at the

expense of its creditors. In re Journal Register Co., 407 B.R. 520, 535 (Bankr. S.D.N.Y.

2009) (citing Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc., 789 F.2d 98. 101

(2d Cir. 1960)) (additional citations omitted).

43.     Section 503(c)(1) of the Bankruptcy Code prohibits any transfer:

made to, or an obligation incurred for the benefit of, an insider of the
debtor for the purpose of inducing such person to remain with the debtors'
business, absent a finding by the court based on evidence in the record that

(A)     the transfer or obligation is essential to retention of the person
because the individual has a bona fide job offer from another
business at the same or greater rate of compensation;

(B)     the services provided by the person are essential to the survival of
the business; and

(C)     either –

(i)     the amount of the transfer made to, or obligation incurred
for the benefit of, the person is not greater than an amount
equal to 10 times the amount of the mean transfer or
obligation of a similar kind given to nonmanagement
employees for any purpose during the calendar year in
which the transfer is made or the obligation is incurred; or

(ii)    if no such similar transfers were made to, or obligations
were incurred for the benefit of, such nonmanagement
employees during such calendar year, the amount of the
transfer or obligation is not greater than an amount equal to
25 percent of the amount of any similar transfer or
obligation made to or incurred for the benefit of such
insider for any purpose during the calendar year before the
year in which such transfer is made or obligation is
incurred;

11 U.S.C. § 503(c)(1).

44.     A transfer to an insider to induce the insider to remain with the debtor's business must satisfy the requirements under subdivisions (A), (B), and (C) of Section 503(c)(1) of the Bankruptcy Code to be subject to this subdivision's exception.  4 Collier on Bankruptcy ¶ 503.17 (15th ed. rev. 2007); see also, In re Dana Corp., 358 B.R. 567, 575 (Bankr. S.D.N.Y. 2007) ("Dana II") (summarizing the requirements under Section 503(c)(1) of the Bankruptcy Code).  Attempts to characterize what are essentially prohibited retention programs as "incentive" programs to bypass the requirements of Section 503(c)(1) of the Bankruptcy Code are looked upon with disfavor, as the courts consider the circumstances under which particular proposals are made, along with the structure of the compensation packages, when determining whether the compensation programs are subject to section 503(c)(1) of the Bankruptcy Code.  See In re Mesa Air Group, Inc., No. 10-10018, 2010 WL 3810899, at *2 (Bankr. S.D.N.Y. Sept. 24, 2010) (citing In re Dana Corp., 351 B.R. 96, 102 n.3 (Bankr. S.D.N.Y. 2006) ("Dana I") (stating that if a bonus proposal "walks like a duck (KERP), and quacks like a duck (KERP), it's a duck (KERP).").

45.     Section 503(c)(3) of the Bankruptcy Code also prohibits "other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers or consultants hired after the date of the filing of the petition."  11 U.S.C. § 503(c)(3).

46.     Section 503(c) of the Bankruptcy Code, added in 2005 as part of the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA"), was intended to curtail payments of retention incentives or severance to insiders, including bonuses

granted to other employees without factual and circumstantial justification.  See Journal Register; 407 B.R. at 535; see also, In re Pilgrim's Pride Corp., 401 B.R. 229, 234 (Bankr. N.D. Tex. 2009) ("Section 503(c) was enacted to limit a debtor's ability to favor powerful insiders economically and at estate expenses during a chapter 11 case.") (citing In re Airway Indus., Inc., 354 B.R. 82, 87 n.12 (Bankr. W.D. Pa. 2006)) (additional citations omitted); In re Global Home Prods., LLC, 369 B.R. 778, 783-84 (Bankr. D. Del. 2007) (the amendments were added to "eradicate the notion that executives were entitled to bonuses simply for staying with the Company through the bankruptcy process.")

47.     This section establishes specific evidentiary standards that must be met before a bankruptcy court may authorize payments made to an insider for the purpose of inducing such person to remain with a debtor's business or payments made on account of severance.  Dana I, 351 B.R. at 100; 11 U.S.C. § 503(c)(1).  These amendments make it abundantly clear that if a proposed transfer falls within Section 503(c)(1) or (c)(2) (governing severance payments), then the business judgment rule does not apply, irrespective of whether a sound business purpose may actually exist.  Id.  The effect of Section 503(c) of the Bankruptcy Code was to put in place "a set of challenging standards" and "high hurdles" for debtors to overcome before retention bonuses could be paid.  Mesa Air Group, 2010 WL 3810899, at *2 (citing Global Home Prods., 369 B.R. at 785).

**B.** **The Court Should Not Approve Bonus Payments to Nine Employees Because The Debtors Have Not Satisfied Their Evidentiary Burden Under Section 503(c)(1) of the Bankruptcy Code.**

(i)     <u>The Bonus Plan Is Primarily A Retention Plan</u>

48.     Although the Debtors have styled the Bonus Motion as a request to implement and "continue" an "employee incentive compensation plan," the facts and circumstances of these cases reveal that the Bonus Plan is neither (a) a "continuation," nor (b) "an employee incentive compensation plan."  Rather, the Bonus Motion mischaracterizes the Bonus Plan as an "incentive plan," which more appropriately should be characterized as a "retention plan."

49.     As stated above at paragraph 14, the Bonus Motion provides only limited information concerning annual bonuses that the Debtors claim that they have paid "historically."  <u>See</u> Bonus Motion at ¶ 8.  Notwithstanding that the Debtors were formed in 1994, and that Mr. Eckert, a founder, currently remains as the CEO, the Debtors put forth no declaration from Mr. Eckert or any other person concerning purported annual incentive bonuses paid prior to 2008.  Rather, the only declarations that the Debtors have produced are from Mr. Frank, who appears to not have been an employee of the Debtors until 2005 or 2006.

50.     Of the limited information disclosed, it appears that the Debtors only paid what may possibly be characterized as "incentive bonuses" for work performed in 2008.  <u>Id.</u>  The Debtors expressly acknowledge that they paid no bonuses in 2009, and that the bonuses paid in 2010, were "one-time 75-day retention" payments that required the recipients to remain with the Debtors through July 15, 2010.  <u>Id.</u>  Thus, the only comparative information that the Debtors have provided is for the year 2008.

51.     In this regard, the Debtors state that the bonuses paid for the year 2008 ranged from 10 percent to 240 percent of an employee's annual base salary.  Bonus Motion at ¶ 8.  Mr. Frank states that the total bonuses paid for 2008 represented 45 percent of the employees' total compensation."  Frank Declaration II at ¶ 21.  Mr. Frank also represents that "for comparison's sake," the bonuses proposed under the Bonus Plan represent 40 percent of the eligible employees' total compensation in 2010.  Id.  Although these two isolated facts may appear to indicate that the aggregate proposed bonuses under the Bonus Plan are slightly lower than the aggregate bonuses paid in 2008, it does not appear, based upon this information alone, that the Court can determine whether, in fact, the Bonus Plan is consistent with the Debtors' historical compensation programs.  Specifically, the Debtors have failed to provide information concerning: (i) bonus payments in years prior to 2008, (ii) the number of employees eligible for bonuses in 2008, (iii) which employees were paid bonuses in 2008, (iv) how much they were paid, (v) what the targets were and (v) how much the Debtors propose to pay each eligible employee under the Bonus Plan.  Accordingly, without this information, the Debtors have failed to establish that the proposed bonuses truly are consistent with the Debtors' past bonus payment programs.  Compare Dana II, 358 B.R. at 579-81 (approving a short-term incentive program for employees after it was demonstrated that the 2006 plan was a revision of a plan used by debtor in the year prior to bankruptcy).

52.     Further, the plain facts and circumstances of these cases demonstrate that the proposed Bonus Plan is primarily a retention plan, and not an incentive plan, for several reasons.  First, the Bonus Plan was not devised until July 2010, the month prior to the Petition Date.  Frank Declaration I at ¶ 4.  Second, as stated above at ¶ 20, upon

information and belief, the Debtors never before entered into letter agreements with their employees concerning proposed bonus payments.  Third, as stated above at ¶ 38, upon information and belief, based upon testimony offered by Mr. Eckert at the 341(a) Meeting, Mr. Eckert has been the person that primarily responsible for setting the compensation of the Debtors' employees.  Indeed, upon information and belief, based upon testimony provided by Mr. Eckert at the 341(a) Meeting, Mr. Eckert, the Debtors' CEO views the proposed bonuses as "retention" bonuses, and appropriate only when a company is in serious trouble.

53.     Fourth, by the Sale Motion, the Debtors are seeking to liquidate all or substantially all of their assets.  The Debtors put forth no information that they intend to continue operating after the Sale, and the contrary appears to the be true.  See Frank Declaration II at ¶ 12 ("if the employees perform up to expectations they will in effect be eliminating their own jobs by facilitating a sale of the business.").  In addition, as noted above at paragraph 11, the APA provides that the purchaser is under no obligation to employee the Debtors' employees.  See APA at Art. 7.1, at 35.  In filing the Bonus Motion, the Debtors proffer that the primary reason for paying the proposed bonuses is to induce the employees to remain with the Debtors until the assets are sold.  Plainly, this is the reason why the Debtors have proposed that the bonus payments will not be paid until the commencement of the Sale Hearing.  Frank Declaration II at ¶ 13.

54.     Fifth, the representations of Mr. Frank support that the Bonus Plan is a retention plan.  By way of example, Mr. Frank states that in the year prior to the Petition Date, the Debtors lost 40 employees, and that the Debtors "cannot afford to lose any more employees."  Frank Declaration I at ¶ 4.  Mr. Frank further states that the

employees to whom the proposed bonuses will be paid are "key employees who are focused on, among other things, supporting the Debtors' efforts to sell substantially all of the Debtors' assets." Id. Mr. Frank also represents that "the employees likely realize that the eventual sale of substantially all of the Debtors' assets will result in the elimination of jobs," and that the Bonus Plan "is intended to provide a reasonable incentive to keep these employees so that the Debtors may reach their goals," i.e., sell substantially all of their assets. Id. at ¶ 9.

55. Mr. Frank further acknowledges that "the Debtors' hold on [the] employees is tenuous because most either have job offers or would be absorbed readily in the marketplace if they were to quit their positions with the Debtors." Frank Declaration II at ¶ 7.[6]

56. Mr. Frank also represents that it is his belief that the Court's "failure to approve the revised program will result in the immediate departure of critical employees, with more to follow." Id. at ¶ 9. Mr. Frank states that "[t]he result of the loss of even a few employees would significantly impair the value of the Debtors' business, diminish the sale prospects and, ultimately, render the Debtors unable to operate as a going concern." Id. Mr. Frank further represents that "[t]he reality is that the key employees maintain interpersonal relationships with investors and other parties that will be crucial for the Debtors to successfully consummate a sale." Id. at ¶ 11.

57. Lastly, it appears that the only target provided by the Bonus Plan is for the Debtors to reach the Sale Hearing. Neither the Bonus Motion nor the attendant

---

[6] It is noted, however, the Debtors have not provided any documents that show that any of their employees proposed to be paid bonuses under the Bonus Plan have bona fide job offers.

declarations provides any information concerning performance targets that must be achieved by the eligible employees. To the contrary, the Bonus Plan provides that the discretion as to whether bonuses will be paid rests solely with Capstone which will determine whether the employee "made his or her expected contribution to the sale process by, among other things, facilitating due diligence and preserving the value of the Debtors' business pending the auction."[7] Frank Declaration II, at ¶ 13. For all of these reasons, the Court should conclude that the primary purpose of the proposed Bonus Plan is a retention plan, and not an incentive plan. See In re Nellson Nutraceutical, Inc., 369 B.R. 787, 802 (Bankr. D. Del. 2007) (Section 503(c)(1) applies to transfers to insiders for the primary purpose of inducing the person to remain with the debtor's business). Thus, the Court should not allow the proposed payments to the Debtors' insiders unless the Debtors can establish by competent evidence that the payments comply with Section 503(c)(1) of the Bankruptcy Code.

    (ii)    <u>The Bonus Plan Includes Bonus Payments to Insiders</u>

58.    In connection with the Bonus Motion, Mr. Frank represents that, based upon his "reading" of the definition in Section 101(31) of the Bankruptcy Code, "none of the eligible employees in the [Bonus Plan] are "insiders." Frank Declaration II at ¶ 24. A review of the Bonus Motion and the attendant declarations, together with testimony

---

[7] The Debtors cite only one unreported decision for the proposition that the Bonus Plan is a "sale-based" incentive plan. See Bonus Motion at ¶ 30, citing In re Nobex Corp., No. 05-20050, 2006 WL 4063024 (Bankr. D. Del. Jan. 19, 2006). It is noted that the plan in Nobex did not provide for the payment of bonuses to insiders and, thus, the plan was not considered under Section 503(c)(1) of the Bankruptcy Code which is the relevant inquiry here. In addition, the Debtors cite various orders in cases in which they state that the Court's have approved sale-based incentive plans. Bonus Motion at ¶ 30. The Debtors do not, however, provide an analysis as to how the facts of those cases relate to the facts before this Court.

offered by Mr. Eckert and Mr. Frank at the 341(a) Meeting, appear to indicate that as many as nine of the eligible employees may, in fact, be insiders of the Debtors.

59.     Section 101(31) provides, in pertinent part, that the term "insider" includes:

> (B)     if the debtor is a corporation –
>
> > (i)      director of the debtor;
> > (ii)     officer of the debtor;
> > (iii)    person in control of the debtor;
>
> (C)     if the debtor is a partnership –
>
> > (iii)    person in control of the debtor;

11 U.S.C. § 101(31).

60.     The definition of an insider has been applied flexibly. Herbert Contr. Co. v. The Greater New York Sav. Bank (In re CPW Assocs.), No. 99-5068, 2000 WL 1340569, at *5 (2d Cir. Sept. 14, 2000). "An insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor." In re 9281 Shore Road Owners Corp., 187 B.R. 837, 853 (E.D.N.Y. 1995) (internal quotation marks and citation omitted); see also, Matter of Krehl, 86 F.3d 737, 741 (7th Cir. 1996) (stating that "the ... definition [of insider] is intended to be illustrative rather than exhaustive") (citation omitted); In re ABC Elec. Servs., Inc., 190 B.R. 672, 675 (Bankr. M.D.Fla. 1995) (considering "whether or not the facts indicate an opportunity to self-deal or exert more control over the Debtor's affairs than is available to other creditors").

61.     In addition to the list set forth in Section 101(31) of the Bankruptcy Code, "courts have identified a category of creditors, sometimes called 'non-statutory insiders,'

who fall within the definition but outside of any of the enumerated categories." Bruno Mach. Corp. v. Troy Die Cutting Co., LLC (In re Bruno Mach. Corp.), No. 05-20412, 2010 WL 2403124, *7 (Bankr. N.D.N.Y. June 9, 2010) (quoting Schubert v. Lucent Techs., Inc. (In re Winstar Commc'ns), 554 F.3d 382, 395 (3d Cir. 2009)); accord Hirsch v. Tarricone (In re A. Tarricone, Inc.), 286 B.R. 256, 262 (Bankr. S.D.N.Y. 2002) (collecting cases). Under the non-statutory analysis, insider status may be based on a professional or business relationship with the debtor that "compels the conclusion that the individual or entity has a relationship with the debtor, close enough to gain an advantage attributable simply to affinity rather than to the course of business dealings between the parties." Bruno, 2010 WL 2403124 at *7 (citing Friedman v. Sheila Plotsky Brokers, Inc. (In re Friedman), 126 B.R. 63, 70 (9th Cir. BAP 1991); accord, DeRosa v. Buildex Inc. (In re F&S Cent. Mfg. Corp.), 53 B.R. 842, 838 (Bankr. E.D.N.Y. 1985)).

62.     Courts apply two factors in determining whether a person is a non-statutory insider: (1) the closeness of the relationship between the debtor and the transferee, and (2) whether the transactions between the transferee and the debtor were conducted at arm's length. Tarricone, 286 B.R. at 262. "The analysis is a fact intensive one and must be done on a case-by-case basis." Id. In addition, more than one court in this Circuit has found that "control over the debtor" is not necessary for a finding of "insider status." See Bruno, 2010 WL 2403124 at *7 (citing Tarricone, 286 B.R. at 264-65). As the court reasoned in Tarricone:

> Where Congress intended control to be an element in determining insider status, it was specified in the statute. Only two of the sub-categories in Section 101(31) require a finding of control by the person who is to be held an insider. See Section 101(31)(B)(iii) and (C)(v). It is self-evident that most directors (subsection (i)) and subordinate officers (subsection (ii)) of the debtor do not exercise "control" over the debtor, much less do

25

relatives of officers and directors (subsection (vi)). Nor is it necessary to find that a statutory insider with whom a creditor has a close personal relationship ... has a position of control over the debtor. If it were not abundantly clear from subsections (i)-(v), only one of which requires control, the disjunctive in subsection (vi) denominating as an insider a relative of a general partner, officer, director "*or* person in control of the debtor" puts it beyond argument that Congress did not make control necessary for either statutory or non-statutory insider status. The nature of the relationships listed in all of the subparts of Section 101(31) are such that influence can be assumed, and it is therefore unnecessary to prove that there is actual control if such a relationship has been established.

Id. (citing Friedman, 126 B.R. at 69-70) ("the Code assigns insider status to entities or relatives of the debtor, or of persons in control of a related entity, whose affinity or consanguinity gives rise to a conclusive presumption that the individual or entity commands preferential treatment by the debtor.")).

63.     By the Bonus Plan in these cases, the Debtors seek to pay bonuses to two Vice Presidents, four Managing Directors, and three Senior Managing Directors that appear to be insiders of the Debtors. As set forth above at paragraph 59, the Bankruptcy Code expressly provides that officers and directors are insiders of the Debtors. 11 U.S.C. § 101(31)(b)(i) and (ii). Notwithstanding their titles, Mr. Frank asserts that none of these employees fall within the term "insider" as defined by the Bankruptcy Code. Frank Declaration II at ¶ 24.

64.     The Bankruptcy Code defines neither "officer" nor "director." At least one court has held that an "officer" is a "person holding office and taking part in the management or direction of a society or institution, esp. one holding the office of president, treasurer or secretary." See In re Foothills Texas, Inc., 408 B.R. 573, 579 (Bankr. D. Del. 2009) (additional citations omitted). "Management," in this context is defined as "the administration of (a group within) an organization or commercial enterprise. Id.

65.     As in Foothills, certain of the Debtors' eligible employees are vice presidents.  The bankruptcy judge in Foothills held that a vice president is "[a] person representing or deputizing for a president; an official who ranks immediately below a president.  Id.  Thus, the Foothills court found that, under the plain meaning of the words, a vice president is presumptively an officer, who, in turn, is an insider.  Id.

66.     The Court in Foothills acknowledged that simply because an employee holds an "officer" title, does not mean that the person takes part in the management of the debtor.  Id.  The Court held that to overcome the presumption that a person holding an officer's title is not what he or she appears to be requires submission of evidence sufficient to establish that the officer does not, in fact, participate in the management of the debtor.  Id. at 583.

67.     As stated above at paragraph 33, Mr. Frank states that none of the eligible employees have "control over personnel or management decisions," "dictate corporate policy or disposition of corporate assets," "generally are authorized signatories for the Debtors, or "control the Debtors' financial and business operations."  However, the facts set forth in Mr. Frank's own declarations and the facts obtained at the 341(a) Meeting contradict these statements.

68.     First, as concerns the two Vice Presidents proposed to be paid under the Bonus Plan.  The fact that they may not be "officers" "of the Debtors," by virtue of the fact that they are employed by non-debtor GSC UK, is not determinative of their "insider" status.  Rather, as stated above, the law of this Circuit recognizes non-statutory insiders.  See Bruno, 2010 WL 2403124 at *7; Tarricone, 286 B.R. at 264-65.  Here, these Vice Presidents each "handle the sourcing, evaluation and execution related to the

Debtors' European structured products or European mezzanine lending investments."
Frank Declaration II at ¶ 32. Although these descriptions are somewhat vague, it appears
clear that these Vice Presidents: (i) have control over certain of the Debtors' assets and
(ii) have a close relationship with the Debtors. In addition, the Debtors have put forth no
facts that the bonus payments proposed to be made to these employees were negotiated at
arms' length or that these employees had independent counsel advising them in this
regard. It appears based upon these facts alone these Vice Presidents are insiders of the
Debtors. Therefore, the Debtors must meet their evidentiary burden to show that the
proposed payments to these employees comply with Section 503(c)(1) of the Bankruptcy
Code.

69.     With respect to the remaining seven insiders, all hold "director" titles and
all possess far greater responsibilities than the responsibilities held by the Vice
Presidents. Thus, if the Court finds that the Vice Presidents are "insiders," it follows that
the Court should find that the Managing Directors and Senior Managing Directors are
also insiders.

70.     In addition, Managing Director Snyder is the Debtors' Controller and,
upon information and belief, the Debtors' Acting Chief Financial Officer. It appears
plain that a debtor's CFO is an "officer" of the debtor as that term is used in Section
101(31). Indeed, other than the statements of Mr. Frank contained in his declarations, the
Debtors have not put forth any facts to show that Mr. Snyder is _not_ an insider of the
Debtor.

71.     Moreover, by his own declaration, Mr. Frank acknowledges that Mr.
Snyder is the employee responsible for the Debtors' accounting and financial records,

budgeting, forecasting and internal auditing.  Frank Declaration II at ¶ 33.  Furthermore, the 341(a) Meeting was adjourned because Mr. Snyder, the person who prepared, reviewed and executed the Debtors' Schedules, was not present, and the individuals who appeared at the 341(a) Meeting (Mr. Eckert and Mr. Frank) indicated that they did not participate in putting together the information contained therein, or approve the filing of these documents.  Indeed, upon information and belief, Mr. Eckert and Mr. Frank relied upon Mr. Snyder and counsel to discharge the Debtors' important duties in this regard.  It appears clear that, contrary to Mr. Frank's representations, Mr. Snyder, as Managing Director, Controller and Acting CFO, has substantial control over Debtors' financial and business operations and, therefore, would be an insider also under Section 101(31)(B)(iii) of the Bankruptcy Code.

72.     Even if the Court were to determine that Mr. Snyder did not fall within the statutory definition of "insider," the law of this Circuit supports a finding that Mr. Snyder would be a non-statutory insider because he has a sufficiently close relationship with the Debtors.  In addition, as stated above, the Debtors put forth no facts that any of the Letter Agreements were negotiated at arms' length, or that any of the eligible employees obtained independent counsel.  Accordingly, the Debtors have failed to establish that Mr. Snyder is not an insider and, therefore, they must meet the requirements of Section 503(c)(1) to pay him a proposed bonus.

73.     Similarly, Managing Director Browne appears to be an insider of the Debtors.  Mr. Frank represents that Mr. Browne is a "portfolio manager" and responsible for monitoring the Debtors' positions in U.S. – based private equity funds, serving as a board member on behalf of the Debtors for a number of portfolio companies and

preparing financial reporting for the Debtors' funds." Frank Declaration II at ¶ 33.  In addition, upon information and belief, Mr. Browne is the business unit head of the Debtors' distressed debt business, and a member of the investment committee for that business unit.  Thus, in addition to being a director of the Debtors, he has substantial control over a significant portion of the Debtors assets in his capacity as head of the Debtors' distressed debt business and as a member of one of the Debtors' investment committees.  At a minimum, Mr. Browne has a close relationship with the Debtors and, like the other eligible employees, the Debtors have not put forth any evidence to show that the Letter Agreement into which Mr. Browne entered, was negotiated at arms' length.  For all of these reasons, it appears that Mr. Browne is an insider of the Debtors. Thus, proposed payments to Mr. Browne must meet the requirements of Section 503(c)(1) of the Bankruptcy Code.

74.  Managing Director Siegel holds responsibilities similar to Mr. Browne, but with respect to the Debtors' CLO/CDO business.  Mr. Frank represents that Siegel is a workout professional and is responsible for the workout and restructuring the troubled credits within the CLO/CDO portfolios.  Frank Declaration II at ¶ 33.  Although this description is somewhat vague, it appears based upon the fact the Debtors' CLO/CDO business is extremely active, based upon testimony offered at the 341(a) Meeting, Seigel's responsibilities in performing workouts for these structures are very important to the Debtors' financial viability.  It appears that Siegel, as a director and person in control of the Debtors, appears to be an insider of the Debtors.  Thus, proposed payments to Siegel must meet the requirements of Section 503(c)(1) of the Bankruptcy Code.

75.     In addition, Managing Director Firth is responsible for the sourcing, evaluation and execution related to the Debtors' structured products investments. Again, it appears that because Mr. Firth is a director, and a person in control of substantial of the Debtors' assets, he qualifies as an insider under the Bankruptcy Code. Even if the Court were to find that Mr. Firth did not fall within the statutory definition of insider, he would still qualify as a non-statutory insider because (i) he has a close relationship with the Debtors and (ii) the Debtors have put forth no evidence that the Letter Agreements were negotiated at arms' length. Absent such evidence, it appears that Mr. Firth is an insider of the Debtors. Thus, proposed payments to Mr. Firth must meet the requirements of Section 503(c)(1) of the Bankruptcy Code.

76.     The Bonus Plan also provides for substantially higher bonuses to be paid to three Senior Managing Directors, including Messrs. Wright, Katzenstein and Petrusic. As stated above at paragraph 40, each of these Senior Managing Directors is a member of one or more of the Debtors' investment committees. Upon information and belief, based upon testimony obtained at the 341(a) Meeting, the role of these committees is critical to the Debtors' financial viability because they dictate all of the Debtors' investment decisions.

77.     Further, although Mr. Wright formerly was the Debtors' Chief Accounting Officer and Chief Financial Officer, it is not clear whether his role with respect to the Debtors' CDO/CLO business has less responsibility or impact upon the Debtors. It also is not clear whether Mr. Wright's salary was modified or whether his bonus was renegotiated when he decided to defer leaving the Debtors' employ to work for another company. What is clear is that the Debtors view Mr. Wright as an essential employee,

who was critically necessary to the viability of the Debtors. Without more, and given his current position as a portfolio manager, and responsible for the management of a portion of the CDO/CLO portfolio, he has substantial control over the Debtors' assets and is an insider of the Debtors. Thus, proposed payments to Mr. Wright must meet the requirements of Section 503(c)(1) of the Bankruptcy Code.

78. With respect to Senior Managing Director Katzenstein, Mr. Frank states that Mr. Katzenstein "is a Portfolio Manager and is responsible for the management of a portion of the Debtors' CLO/CDO portfolios, and is in charge of the Debtors' trading activities." It appears based upon this description alone, that Mr. Katzenstein exercises substantial control over the Debtors' finance and business operations. With respect to Mr. Petrusic, Mr. Frank states that he is "responsible for the day-to-day management of the UK office, including without limitation, compliance, corporate governance, portfolio management of the European mezzanine funds, fund reporting and investor relations." In addition to their memberships on the Debtors' investment committees, as well as the fact that Mr. Katzenstein is the head of the CLO/CDO business unit, and Mr. Petrusic is the head of the European mezzanine business unit, the responsibilities held by these employees lead to the conclusion that they are statutory insiders of the Debtors. As is the case with each of the nine eligible employees identified herein, even if the Court does not find that Mr. Katzenstein and Mr. Petrusic are statutory insiders of the Debtors, they appear to, at a minimum, be non-statutory insiders. Thus, proposed payments to Mr. Katzenstein and Mr. Petrusic must meet the requirements of Section 503(c)(1) of the Bankruptcy Code.

(iii)     The Debtors Have Not Met Their Burden Of Proof To Show That The
          <u>Proposed Payments to the Nine Insiders Comply with Section 503(c)(1)</u>

79.     To the extent that the Court finds that the nine employees identified above are insiders of the Debtors, Section 503(c) of the Bankruptcy Code requires that the Debtors establish specific evidentiary standards for the Court to approve the proposed payments.  The law is clear that the burden is on the Debtors to show that their proposed payments comply with the requirements of Section 503(c)(1).  <u>See</u> <u>Dana I</u>, 351 B.R. at 100; <u>see also</u>, <u>Mesa Air Group</u>, 2010 WL 3810899, at *2 (citing <u>Global Home Prods.</u>, 369 B.R. at 785).

80.     Here, the Debtors have failed to put forth competent evidence to prove that, among other things, any of the nine employees have <u>bona fide</u> job offers with other companies at the same or greater rates.  In addition, the Debtors have not put forth any evidence to show that the amounts of the proposed bonuses do not exceed the statutory amounts set forth in Section 503(c)(1)(C) of the Bankruptcy Code.  In fact, the Debtors have not disclosed to the Court the amounts to be paid to any one employee.

81.     Because the Debtors have failed to meet their evidentiary burden of proof under Section 503(c)(1) of the Bankruptcy Code, the Court should deny the proposed payments to the nine employees who are insiders of the Debtors.

WHEREFORE, the United States Trustee respectfully requests that the Court (i) sustain the Objection, (ii) deny the Bonus Motion with respect to the payments to the seven insiders of the Debtors, and (iii) grant such other relief as is just.

Dated: New York, New York
   October 18, 2010

        Respectfully submitted,

        TRACY HOPE DAVIS
        UNITED STATES TRUSTEE

        By _/s/ Andrea B. Schwartz_
         Andrea B. Schwartz
         Trial Attorney
        33 Whitehall Street, 21st Floor
        New York, New York 10004
        Tel. No. (212) 510-0500