Hearing Date and Time: December 22, 2010 at 9:00 a.m., EST
Objection Deadline: _____, 201_ at _:_ _.m., EST

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
(212) 819-8200
J. Christopher Shore
Evan C. Hollander
Abraham L. Zylberberg

ATTORNEYS FOR THE
NON-CONTROLLING LENDER GROUP

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| GSC GROUP, INC., et al.,[1] | Case No. 10-14653-AJG |
| Debtors. | (Jointly Administered) |

**MOTION OF THE NON-CONTROLLING LENDER GROUP FOR ORDER**
**APPOINTING A TRUSTEE PURSUANT TO 11 U.S.C. § 1104(b)**

TO THE HONORABLE ARTHUR J. GONZALEZ,
CHIEF UNITED STATES BANKRUPTCY JUDGE:

The Non-Controlling Lender Group,[2] by and through its undersigned counsel, hereby

submits this motion (the "Motion") for an order appointing a trustee in each of the above-

referenced chapter 11 cases (the "Chapter 11 Cases"). In support of the Motion, the Non-

Controlling Lender Group respectfully represents as follows:

---

[1] The Debtors, along with the last four digits of each Debtor's federal tax identification number, are: GSC Group, Inc. (6382), GSCP, LLC (6520), GSC Active Partners, Inc. (4896), GSCP (NJ), Inc. (3944), GSCP (NJ) Holdings, L.P. (0940), GSCP (NJ), L.P. (0785), and GSC Secondary Interest Fund, LLC (6477).

[2] The members of the Non-Controlling Lender Group (each, a "Non-Controlling Lender") are those lenders (the "Lenders") under the Fourth Amended and Restated Credit Agreement dated as of February 28, 2007 (as amended and supplemented, the "Prepetition Credit Agreement") identified in Exhibit A of the Preliminary Objection of the Non-Controlling Lender Group to the Debtors' Motion for Entry of an Order Authorizing (A) Sale of Assets Free and Clear of All Liens, Claims, Encumbrances, and other Interests, and (B) Assumption and Assignment of Executory Contracts [Docket No. 220].

## PRELIMINARY STATEMENT

1.      The bankruptcy (and corporate) law of the United States recognizes that the affairs of a corporate debtor may at times be entangled with those of its executives, and the law provides mechanisms to deal with such issues.  It is therefore not unusual for a member of the management team of a debtor in possession to have a conflict of interest which requires the manager to step aside to allow unconflicted fiduciaries to carry on a particular transaction on behalf of the debtor.

2.      The management problem here is of an entirely different quality and magnitude, going to the core issues at stake in these Chapter 11 Cases and of a nature virtually unheard of in our experience.  As outlined in detail below, the two insiders in control of the Debtors here, Alfred Eckert and Peter Frank, in addition to merely having personal interests that conflict with those of the Debtors of the routine kind (e.g., disputes arising out of ownership interests or claims arising from employment contracts) have (i) allowed themselves to become quasi-agents of Black Diamond, the very party seeking to acquire substantially all of the Debtors' assets and (ii) have extracted personal consideration from Black Diamond directly in exchange for agreeing to sell GSC's assets to Black Diamond.

3.      This Court has heard of prior issues relating to pre- and postpetition management conflicts, but the recent depositions of Mr. Eckert (GSC's CEO and Chairman) and Stephen Deckoff (Black Diamond's Managing Principal) have revealed a shocking arrangement between the two.  As further set forth below, as soon as Black Diamond became majority Lender under GSC's prepetition secured credit facility, Messrs. Eckert and Deckoff discussed Black Diamond's plans for acquiring GSC's assets.  According to Mr. Deckoff's sworn testimony, based on those discussions, Mr. Eckert made clear that new compensation was a "prerequisite to moving forward

with the [auction] process."[3]    That kind of <u>quid pro quo</u> – "I will not carry out my existing

fiduciary duties unless you pay me" – is, without question, a breach of fiduciary duty.  In pursuit

of gain, Mr. Deckoff capitulated to that breach.  Eventually, he and Mr. Eckert agreed on a

package of compensation to Messrs. Eckert and Frank (GSC's President), most of it contingent on

<u>Black Diamond's</u> purchase of GSC's assets, totaling more than $6,000,000.  A Schedule of the

arranged compensation, showing that which is contingent on a sale to Black Diamond, is attached

hereto as Exhibit B.  Critically, almost none of the valuable items set forth on Exhibit B would

have been available to Mr. Eckert and Mr. Frank if they did not accept the BD Joint Bid.  Those

item were, in effect, payment for acceptance.  That prepetition arrangement – delivery of assets to

Black Diamond in exchange for $6,000,000 – alone is grounds for a trustee here.

      4.      Discovery has shown an even more egregious arrangement between Mr. Deckoff

and Mr. Eckert relating to the "Option Agreement" previously brought to the Court's attention.

This agreement has already been branded by Debtors' counsel as at best unfortunate, and

discovery has shown why.  Due to Black Diamond's greed and an inflated credit bid that Mr.

Deckoff now agrees was a mistake, the auction resulted in Black Diamond Agent agreeing to

waive liens on collateral without payment in full of all Lenders under the Prepetition Credit

Agreement.  That mistake led to Mr. Eckert potentially receiving many millions of dollars more

in respect of his prepetition claims and interests than the $6 million he had agreed to.[4]  Given that

Mr. Deckoff's intention was to retain all of GSC's assets for his own fund's account, Mr. Deckoff

sought to fix the credit bid.  GSC refused to do so.  Armed with "moral" outrage at Mr. Eckert's

enhanced recovery, within a few days of the auction, Mr. Deckoff then threatened to terminate the

---

[3]  Declaration of Colin T. West in support of the Motion ("West Decl."), Ex. B, Deckoff Dep. Tr. (Dec. 12, 2010), 82:24 – 83:4.
[4]  Because the credit bid left only a $25 million residual claim secured by the remaining assets, a large amount of management's prepetition claims may be paid.

signed Asset Purchase Agreement unless Mr. Eckert capped his recovery. Eventually, the two negotiated a deal, memorialized in the Option Agreement, that Mr. Eckert would sell to Black Diamond an option on his $2 million 2008 bonus claim and 49% of his prepetition equity. In exchange, Black Diamond agreed to pay Mr. Eckert $500,000 upon Black Diamond closing the sale, whether or not the claims and stock sold had <u>any</u> value. And, while one might question the thought-process of two sophisticated financiers engaging in such a transaction while a sale process was underway, the Court cannot overlook the stakes here. If the transaction on the table as of the date of Option Agreement had closed, Black Diamond stood to earn more than $200 million on a $25 million investment made in June 2010.[5] In other words, Mr. Deckoff had hundreds of millions of dollars of reasons to make every effort to ensure that he obtained GSC's assets, even if he had to sign the Option Agreement. In the context of these cases, that payment is nothing more than an inappropriate inducement to ensure that Black Diamond would get the assets, and the Court should so find.

5.       These events, as well as other conflicted activity of the insiders acting for the Debtors leave the Court and the parties in interest without any trustworthy fiduciary to manage the property and affairs of the Debtors or to administer their estates. These Chapter 11 Cases have thus been taken outside the ordinary realm of chapter 11 practice where a court can make pragmatic, ad hoc adjustments as needed to the general rule of debtor-control, and have instead been brought into a hopeless situation in which the debtors in possession cannot be trusted to

---

[5] Mr. Deckoff testified that, for its claim of approximately $125 million, most of which was acquired in June of this year, Black Diamond has a basis of less than 22 cents (i.e., Black Diamond paid less than $25 million for its GSC debt). Deckoff Dep. Tr. (Dec. 12, 2010), 20:11 – 21:7. Based on the testimony of Mr. Gooden, the assets that Black Diamond would acquire for $11 million are worth approximately between $184 and $193 million. Declaration of Ted J. Gooden (Dec. 2, 2010), ¶ 10 [filed under seal]. Taking into account Black Diamond's pro rata share of the credit bid assets and the excluded assets, Black Diamond's recovery would exceed $200 million. Even under Mr. Manzo's valuation, the cash bid assets are worth $126 million, resulting in a 500% return to Black Diamond. BDCM. Ex. A to the Declaration of Rebecca Bodony (Dec. 12, 2010) [Doc. No. 312]. ¶

operate in the best interests of the Debtors' estates and their creditors. The only remedy left open

is the appointment of a disinterested fiduciary, i.e., a chapter 11 trustee.

## BACKGROUND

6.      On September 2, 2010, the Debtors filed the Motion For Entry Of (I) An Order

Approving (A) Bidding Procedures, (B) Form And Manner Of Notice Of Sale, And (C)

Procedures For Determining Cure Amounts, And (II) An Order Authorizing (A) Sale Of Assets

Free And Clear Of All Liens, Claims, Encumbrances, And Other Interests, And (B) Assumption

And Assignment Of Executory Contracts To Successful Bidder(s) (the "Sale Motion," and such

sale of assets, the "Sale") [Doc. No. 24], such successful bidders later having been designated by

the Debtors as Black Diamond Commercial Finance, L.L.C. ("Black Diamond Agent" or the

"Agent"), as Administrative Agent under the Prepetition Credit Agreement and Collateral Agent

under a security agreement (the "Security Agreement") related thereto, and GSC Acquisition

Partners, LLC (together with any other Lenders under the Prepetition Credit Agreement that are

affiliates of Black Diamond Capital Management, L.L.C., "BDCM", and together with Black

Diamond Agent, "Black Diamond") pursuant to their final bid (the "BD Joint Bid"). As the Court

is aware, the Sale Motion and the related relief sought by the Debtors has been the subject of four

objections by the Non-Controlling Lenders Group (all such objections, together with the related

papers filed in support thereof, the "Non-Controlling Lender Group Objections").[6] The Non-

---

[6] These objections include (i) Objection Of Non-Controlling Lender Group To Debtors Motion For Entry Of (I) An
Order Approving (A) Bidding Procedures, (B) Form And Manner Of Notice Of Sale, And (C) Procedures For
Determining Cure Amounts, And (II) An Order Authorizing (A) Sale Of Assets Free And Clear Of All Liens, Claims,
Encumbrances, And Other Interests, And (B) Assumption And Assignment Of Executory Contracts To
Successful Bidder(s) [Doc. No. 63]; (ii) the Preliminary Objection of Non-Controlling Lender Group to Debtors'
Motion for Entry of an Order Authorizing (A) Sale of assets Free and Clear of Liens, Claims, Encumbrances and
Other Interests, and (B) Assumption and Assignment of Executory Contracts [Docket No. 220]; (iii) Objection of
Non-Controlling Lender Group to Debtors' Motion for Entry of an Order Authorizing (A) Sale of Assets Free and
Clear of Liens, Claims, Encumbrances and Other Interests, and (B) Assumption and Assignment of Executory
Contracts [Docket No. 246] (Under Seal) (the "Primary Objection"); and (iv) Supplement to the Objection of Non-
Controlling Lender Group to Debtors' Motion for Entry of an Order Authorizing (A) Sale of Assets Free and Clear

Controlling Lender Group Objections, filed at various stages of sale process, have sought to guard the procedural integrity and substantive fairness of the auction and proposed sale of the Debtors' assets.

7.        For the reasons set forth in those objections, including (1) an $11 million underbid for the Management Contract Assets (as defined in the Primary Objection) that the Debtors' own financial advisor now admits are worth over $100 million, (2) a grossly negligent and manipulated overbid by Black Diamond Agent for the Credit Bid Assets (as defined in the Primary Objection) which was intentionally designed to drive other bidders away from the Management Contract Assets, (3) a post-auction private sale of assets that were not competitively auctioned and which have uncertain value, and (4) a multimillion dollar settlement between management and Black Diamond without any disclosure of the underlying dispute, it is manifest that approving the sale of such assets to Black Diamond as proposed by the Debtors' management would be inappropriate to say the least.  At the risk of over-simplifying, the Non-Controlling Lender Group Objections have shown that rather than acting in the best interests of the Debtors' estates and their creditors, management has abused its authority to benefit the insiders in control – Messrs. Eckert and Frank – and their Sale-contingent benefactor, Black Diamond.  Because the Court is already familiar with many of these facts, the Non-Controlling Lender Group will not reiterate all the facts or reproduce all the arguments set forth in Non-Controlling Lender Group Objections here but will instead use this space to focus on the interests and self-dealing of the

---

of Liens, Claims, Encumbrances and Other Interests, and (B) Assumption and Assignment of Executory Contracts (the "Objection Supplement") [Docket No. 311].  Capitalized terms otherwise undefined herein carry the meanings assigned them in the Objection Supplement.

management fiduciaries since Black Diamond first took control of the Debtors' Prepetition Credit Facility.[7]

## A.  The Debtors' Chapter 11 Cases

8.      On August 31, 2010 (the "Petition Date"), each of the Debtors filed petitions for relief under chapter 11 of title 11 of the United States Code (11 U.S.C. §§ 101-1532, the "Bankruptcy Code"[8]), thereby commencing these Chapter 11 Cases.[9]

9.      Since the Petition Date, the Debtors have been operating their business as debtors and debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

10.     Significantly, no committee of unsecured creditors has been appointed in these Chapter 11 Cases.

## B.  The Debtors' Management

11.     The Debtors' management consists of only two individuals:  Alfred C. Eckert III and Peter Frank.  Mr. Eckert is founder of the GSC group of companies, Chairman, Chief Executive Officer and a Director of the parent company, Debtor GSC Group, Inc. ("GSC Group"), and an officer and director of all or most of GSC Group's direct and indirect Debtor and non-Debtor affiliates (together with GSC Group, "GSC").[10]  As described in more detail below, he owns or controls, directly or indirectly, a substantial amount of the shares in several series of common stock issued by GSC Group.[11]  Mr. Frank is the President and Senior Managing Director of GSC.[12]

---

[7]  Nevertheless, because they bear directly on management's conduct, the Non-Controlling Lender Group hereby incorporates each the Non-Controlling Lender Group Objections herein by reference.
[8] Unless otherwise indicated, section and chapter references herein are to the Bankruptcy Code.
[9] The Chapter 11 Cases are being jointly administered for procedural purposes only.
[10] Amended Motion Pursuant to Bankruptcy Rules 9019 tor Approval of Amended Settlement with Alfred C. Eckert III (the "Eckert Settlement Motion") [Docket No. 275] ¶ 14.
[11] Id.
[12] Debtors' Motion for Authority to Enter into a Post-Sale Consulting Agreement with Peter Frank (the "Frank Consulting Motion") [Docket No. 213] ¶ 10.

12.    Messrs. Eckert and Frank are the only directors of GSC Group.[13]  They are also the officers authorized to act on behalf of the Debtors in these Chapter 11 Cases.[14]  They are the only remaining officers of the Debtors[15] and are therefore only the individuals directing the Debtors as debtors in possession in the Chapter 11 Cases.  As sworn by Robert Manzo, an executive director with Capstone Advisory Group, the Debtors' financial advisor, "strategic decision-making [at the Debtors]. . . is exclusively reserved for the two most senior GSC employees, Messrs. Eckert and Frank."[16]

13.    The votes of Mr. Frank and Mr. Eckert, the only two directors on GSC's Board, are not weighted.[17]  Accordingly, there is the possibility of a tie in the event of a vote of the Board of Directors.  While there is no legal mechanism to address tie votes in GSC's corporate governance, Mr. Eckert testified that he can "break the tie" in such circumstances.  As Mr. Eckert explained he has "control" under the relevant corporate documents in such circumstances because he cannot be fired by the Board and nobody can serve on the Board of GSC that Mr. Eckert does not want on the Board.[18]  As a result, GSC can only act through its Board of Directors, and therefore can only act through Mr. Eckert.  In short, Mr. Eckert controls the keys to any sale of GSC's assets.

---

[13] Unanimous Written Consent in Lieu of a Meeting of the Board of Directors of GSC Group, Inc. dated August 31, 2010 (attached to GSC Group's Petition [Docket No. 1]).

[14] Id.

[15] Declaration of Andrea B. Schwartz [Docket No. 169], Exhibit A, Section 341(a) Hearing Transcript from October 15, 2010 ("341(a) Hearing Trans."), at p. 40 ln. 9-13, p 58 ln. 9.

[16] Declaration of Robert Manzo, attached as Exhibit B to Debtors' Motion to Approve /Motion for Approval of Revised Incentive Compensation Program for Additional Employees [Docket No. 197], at ¶ 12.

[17] Eckert Dep. Sept. 13, at 75-76.

[18] Eckert Dep. at pp. 75-76.

<u>Management's Prepetition Equity Interests in and Claims Against the Debtors</u>

14.    Prior to the Petition Date, one debtor, GSC Group, issued preferred equity that is held substantially by the current managers and former officers of the Debtors.[19]  As of February 19, 2010, Messrs. Frank and Eckert hold preferred equity with accreted value of approximately $3.45 million.[20]  GSC Group's common equity is owned by former and current employees and "friends of the firm,"[21] including Mr. Eckert.[22]  According to their respective statements of financial affairs, item 21(b), Mr. Eckert owns 24.17% of the Series A Common Shares of GSC Group, Inc.[23] and all the common equity of GSC Active Partners, Inc,[24] which owns most of the preferred shares of  (NJ), L.P. ("<u>GSCP</u>"), through which most of the remaining proceeds of the Sale, after payment of its creditors, would flow to Mr. Eckert.

15.    Messrs. Eckert and Frank have also asserted prepetition unsecured claims against the Debtors.  According to Debtor GSCP's Schedule F [Docket No. 88], Mr. Eckert and Mr. Frank have one claim each against GSCP for unpaid 2008 bonuses in the amounts of $2,000,000 and $1,000,000, respectively.  Subtracting intercompany claims from the known claim amounts set forth in GSCP's Schedules, leaves a difference of $7,309,988.60 in claims against GSCP. Thus, about 41% of the claims against GSCP are owed to Mr. Eckert and Mr. Frank.  GSCP also lists employee incentive compensation plan agreements with each of Messrs. Eckert and Frank in Schedule G [Docket No. 88].

---

[19] Declaration of Andrea B. Schwartz, Exhibit A, 341(a) Hearing Trans., at p. 57 ln. 18-22.

[20] West Decl., Exhibit L.

[21] Declaration of Andrea B. Schwartz, Exhibit A, 341(a) Hearing Trans., at p. 60 ln. 16- p. 61 ln. 22.

[22] According to their respective statements of financial affairs, item 21(b), Mr. Eckert owns 24.17% of the Series A Common Shares of GSC Group, Inc. [Docket No. 91] and all the common equity of GSC Active Partners, Inc. [Docket No. 93].  He apparently also has indirect equity holdings.  <u>See</u> Eckert Settlement Motion ¶ 14 ("Mr. Eckert owns or controls, directly or indirectly, a substantial amount of the shares . . . in several series of common stock issued by GSC Group.").

[23]  [Docket No.  91].

[24] [Docket No. 93].  He apparently also has indirect equity holdings.  <u>See</u> Eckert Settlement Motion ¶ 14 ("Mr. Eckert owns or controls, directly or indirectly, a substantial amount of the shares . . . in several series of common stock issued by GSC Group.").

The Eckert Loan

16.    Mr. Eckert made a promissory note dated as of July 15, 2008 (the "Non-Recourse Note") and delivered it to GSC in exchange for "a non-recourse loan to Mr. Eckert which, as of October 31, 2010, had a balance of $168,917 . . . ."[25]

The Eckert Life Insurance Policies

17.    Listed as property of GSCP on its Schedule B is "AXA EQUITABLE UNIVERSAL LIFE" with a scheduled value of $50,000,000 (the "Scheduled Policies").[26]  This consists of "several life insurance policies relating to Mr. Eckert, which have a combined face amount of $50,000,000 . . . ."[27]  The full value of these policies are not realizable without granting prospective purchasers access to certain confidential medical records of Mr. Eckert, who has not consented to grant such access except under the terms of a settlement agreement with the Debtors discussed below.[28]

18.    In addition to these scheduled insurance policies, GSCP owned eight term insurance policies on the life of Mr. Eckert issued by six different insurers that have a total death benefit of $65 million that were not set forth on GSCP's schedules or statement of financial affairs (such undisclosed policies, the "Transferred Policies").  As described in more detail below, after Mr. Deckoff cut his quid pro quo deal with Mr. Eckert, Black Diamond (as majority Lender) consented to allow GSCP to transfer these policies to Mr. Eckert shortly before the Petition Date. The transfer was not disclosed as required, but was only learned of through discovery.  It may be that, given Mr. Eckert's poor health, this transfer was of a valuable asset for no consideration, exposing Mr. Eckert to liability under chapter 5 of the Bankruptcy Code.

---

[25] See Eckert Settlement Motion ¶ 16.
[26] GSCP Schedule B, item 9 [Docket No. 88].
[27] Eckert Settlement Motion ¶ 11.
[28] Id. ¶¶ 11-12.

## C. Management's Dealings Shortly Before the Commencement of These Chapter 11 Cases

19.    On or about July 22, 2010, BDCM and its affiliates used their collective majority stake to appoint Black Diamond Agent as Administrative Agent under the Prepetition Credit Agreement and Collateral Agent under the Security Agreement after buying – at a steep discount – sufficient additional debt thereunder to obtain such majority.  Mr. Deckoff testified that Black Diamond owns or controls approximately $120 million in Lender claims, all of which have a blended basis of less than $0.22/1.00.  In other words, Black Diamond's entire investment in these cases is less than $25 million.

20.    "Immediately" after acquiring its $120 million stake, Black Diamond entered into discussions with Mr. Eckert and Mr. Frank over terms for transferring the Debtors' business to Black Diamond.  Black Diamond also entered into negotiations with the Debtors' managers about their own futures with Black Diamond in connection therewith.  Mr. Eckert's help would be advantageous for a number of reasons but was needed primarily (i) because under GSC's corporate governance, he would have to approve any sale to Black Diamond and (ii) the investment adviser/collateral management agreements, the revenue-generating assets of the business, contain provisions that allow investors to terminate or cause the termination of such agreements upon a change of control of the investment adviser/collateral manager.  If Mr. Eckert sold his equity interests, a change of control might be deemed to have occurred, destroying the value of the collateral securing the Prepetition Credit Agreement and target of Black Diamond's acquisition plans.

21.    In an email to Mr. Deckoff dated June 20, 2010, Mr. Eckert named his price to cooperate with Black Diamond's acquisition.  In that email, Mr. Eckert stated "This letter may be too blunt, but I doubt it because I believe that you and I think in very similar ways.  Bottom line,

**I need $5 million now**…" (emphasis added).[29]  Indeed, Mr. Deckoff himself testified that, based

on discussions he'd had with Mr. Eckert and Mr. Frank, he saw the personal compensation

agreements as a "prerequisite to moving forward with the [auction] process."[30]  When asked why

he chose not to bring management's demand for personal compensation in order to protect the

collateral, to the attention of the court, Mr. Deckoff asked: "What court would I have gone to?"[31]

22.     Ultimately, following Mr. Eckert's demand, he and Mr. Deckoff created a

package of consideration, most of it contingent on Black Diamond getting its prize.  Notably,

these deals were not contingent on creditor recoveries, but rather on Black Diamond's recoveries.

Some of the money was to come from a new three-year employment agreement between Mr.

Eckert and GSC (the "Eckert-GSC Employment Agreement") and a three-year "consulting"

agreement with Black Diamond (the "Original Eckert Consulting Agreement") that was

contingent upon Black Diamond's acquisition of the Debtors' business.  Mr. Frank's cooperation,

less valuable than Eckert's but nevertheless important in some instances for procuring Debtor

action, was made possible by a generous short-term employment agreement with GSC (the

"Frank-GSC Employment Agreement") and a lucrative long-term employment agreement with

Black Diamond

23.     Notably, neither of the new employment agreements were disclosed on GSC's

Schedule G, which specifically calls for a description of "all executory contracts of any nature."

---

[29] Declaration of Colin T. West in support of the Motion ("West Decl."), Ex. A (BDCM0075759 - BDCM0075762).
[30] West Decl., Ex. B, Deckoff Dep. Tr. (Dec. 12, 2010), 82:24 – 83:4.
[31] West Decl., Ex. B, Deckoff Dep. Tr. (Dec. 12, 2010), 181:22 – 182:9:
   Q. Is there any reason you didn't go to the court to complain that management was saying that in order to
   engage in a process of protecting the collateral, as you say, you must sign the management agreements?
   A. What court would have I gone to?
   Q. The Bankruptcy Court, when you filed.
   A. It wasn't in bankruptcy at that point in time.
   Q. No, when you filed.
   A. It wasn't in bankruptcy at that point in time when we agreed to this agreement with Fred and Peter.

Obviously, Black Diamond did not Complain to this Court after GSC filed.

The failure to disclose these agreements on the Debtors' schedules is particularly surprising, because each of them appear to have been formed in late July 2010, the month before the Debtors commenced these Chapter 11 Cases, and each contemplates GSC Group's bankruptcy and states that the parties intend to seek assumption of the contracts "as part of [the GSC Group's] reorganization or in connection with the sale of some or all of its assets as part of a Section 363 sale(s) of assets . . . ."[32]

<u>The Eckert Employment Agreement</u>

24.    The term of the Eckert-GSC Employment Agreement begins as of July 15, 2010 and ends on the third anniversary date of the consummation, following Bankruptcy Court approval, of the Section 363 sale of the assets of the Employer . . . ."[33]  It provides for an initial annual salary of $750,000 that is adjustable to an annual salary ranging between $50,000 and $1,000,000, "which adjustment shall take into account the number and size of the funds for which the Company or its affiliates remain as investment adviser/collateral manager following the 363 sale."[34]  In addition, Mr. Eckert was to receive a $1.5 million "incentive bonus" on July 29, 2010 and another $1.5 million upon completion of the sale of the Debtors' assets.[35]  According to GSCP's Statement of Financial Affairs, transfer of the first bonus was transferred to Mr. Eckert on August 6, 2010.[36]

25.    None of the Debtors' Statements of Financial Affairs reveal, however, the transfer of Transferred Policies to Mr. Eckert that was another term of the undisclosed Eckert-GSC

---

[32] Employment Agreement (undated) between GSC Group, Inc. and Alfred C. Eckert III (the "<u>Eckert-GSC Employment Agreement</u>"), at p.1, Employment Agreement dated as of July 30, 2010 between GSC Group, Inc. and Peter R. Frank (the "<u>Frank-GSC Employment Agreement</u>"), at p.1.  (The space provided for the date in the Eckert-GSC Employment Agreement is blank, but the month set forth July.)
[33] Eckert-GSC Employment Agreement, at ¶ 1.
[34] <u>Id.</u>, at ¶ 1(b)(i).
[35] <u>Id.</u>, at ¶ 1(b)(ii).
[36] GSCP Statement of Financial Affairs [Docket No. 89], Exhibit 3(c), at p.2.

Employment Agreement.  As noted above, the Transferred Policies consist of eight term policies

on the life of Mr. Eckert issued by six different insurers with a total death benefit of $65 million.

26.    On August 6, 2010, the same date that Debtor GSCP paid the above-described

prepetition bonuses to Messrs. Eckert and Frank, Eric Snyder, GSCP's controller and a managing

director (who is sometimes described as the "acting CFO" of the Debtors),[37] sent Mounir Nahas, a

principal and Chief Operating Officer of BDCM, an email advising that[38]:

> Fred Eckert has indicated that the ownership of all term life insurance policies,
> currently owned by GSCP (NJ), LP are to be transferred
> Ownership Interest transferred
> From    GSCP (NJ), LP
> To      Alfred C Eckert
>
> For avoidance of doubt, the above solely relate to the term life insurance policies
> (request excludes the Universal Whole Life policies),
>
> Can you please confirm, or direct me to the person that could confirm that the
> lenders do not object to the transfers of term life insurance policies?

Below his signature line, Mr. Snyder included a list of all of the policies in question.

27.    Although the Non-Controlling Lender Group has not discovered any response to

that e-mail, other materials uncovered during discovery demonstrate that GSCP completed the

requested transfer.  On December 10, 2010, following a specific request for further

documentation pertaining to the Transferred Policies, the Debtors' counsel produced further

materials regarding the Additional Life Insurance Policies, including letters from each of the six

insurers noting that they had confirmed and approved the transfer of ownership of the Transferred

---

[37] Mr. Eckert has also described Mr. Snyder as the "acting CFO," who received a "battlefield promotion." Declaration of Andrea B. Schwartz ("Schwartz Decl.")[Doc. No. 169], Ex. A, Transcript from October 15, 2010 341 Hearing ("341 Trans."), at 19:5-6, 65:14-20, 66:12-14.

[38] See West Decl., Exhibit C (e-mail from Eric Snyder to Mounir Nahas, dated August 6, 2010).

Policies to Mr. Eckert.[39]  GSCP completed ownership change forms, and each such form appears

to have been signed by Mr. Frank, as president of GSCP, in August 2010.

<u>Undisclosed Frank Employment Agreement</u>

28.    The term of the Frank-GSC Employment Agreement runs from sometime in July

2010 (the space for the date was left blank) and ends "on the closing of the 363 Sale."[40]  It

provides Mr. Frank with an annual salary of $350,000 and an "incentive bonus" of $500,000

(apparently paid with Mr. Eckert's $1,500,000 bonus on August 6, 2010)[41] and another $500,000

to be paid "upon the closing of the 363 Sale . . . ."[42]  Like the Eckert-GSC Employment

Agreement, there is a non-competition covenant that specifically carves out "any services [Frank]

provides to Black Diamond Capital Management Company or its Affiliates."[43]

<u>Employment/"Consulting" Arrangements With Prospective Bidder Black Diamond</u>

29.    In the days just before the Petition Date, Messrs. Eckert and Frank also negotiated

employment packages with Black Diamond, whom Mr. Frank described on the Petition Date as a

"potential bidder" for the collateral management business of the Debtors, the terms of which fit

hand-in-glove with the terms of their employments with the Debtors to secure their futures.  Both

agreements were contingent on the sale of the Debtors' assets to Black Diamond.[44]  On August

24, 2010, Mr. Frank entered into a "Confidential Employment Agreement" with BDCM that will

make him a "Senior Managing Director" of that company and guarantee him payment of a

minimum of $1.2 million annually for the next two years and provide him a $1 million forgivable

---

[39] West Decl., Exhibit D (confirmation letters from the insurers of each Additional Life Insurance Policy).
[40] Frank-GSC Employment Agreement, at ¶ 1.
[41] GSCP Statement of Financial Affairs [Docket No. 89], Exhibit 3(c), at p.11.
[42] Frank-GSC Employment Agreement, at ¶ 1(b)(ii).
[43] Frank-GSC Employment Agreement, at ¶ 3.
[44] Declaration of Peter R. Frank in Support of First Day Motions and Applications and in Compliance With Local Rule 1007-2 [Docket No. 9] ¶ 28.

loan.[45]   Afterward he will receive his annual base salary of $350,000 and a discretionary bonus.[46]

(According to the Debtors' Statements of Financial Affairs, Mr. Frank was paid $350,000 by the

Debtors in the year prior to the Petition Date, not including expense reimbursements or the

$500,000 bonus described above that he received just before the Petition Date.[47])   The term of

employment commences "upon the completion of the proposed acquisition by Black Diamond or

one or more of its affiliates of the general partnership interests and investment management

agreements with respect to GSC Recovery II, L.P., GSC Recovery IIA, L.P., GSC Recovery III,

L.P. and GSC Recovery III Parallel Fund, L.P. in a Section 363 sale in a bankruptcy proceeding

commenced by or on behalf of GSC Group, Inc. and/or its affiliated entities . . . ."[48]   In an ironical

touch, the agreement also provides that "under no circumstance shall Mr. Frank engage in any

activity that could create a conflict of interest between him and Black Diamond or any of its

affiliates."[49]   Correspondence clearly reflects that Mr. Frank did not want to disclose his

employment agreement with BDCM, as he knew that it was facially improper.   Specifically, after

being advised by BDCM that that Kaye Scholer advised that the agreements between BDCM and

Messrs. Frank and Eckert should be disclosed, Mr. Frank begrudgingly responded "ok, if I

must".[50]

         30.       Mr. Eckert entered into the Original Eckert Consulting Agreement with Black

Diamond dated as of July 30, 2010, that pays him $3 million to "render such consulting services .

. . as may be reasonably requested by [Black Diamond Managing Principal] Stephen Deckoff,"

---

[45] West Decl., Exhibit P, Eckert Dep. Tr. (Sept. 13, 2010) 9:11-15; West Decl., Ex. Q, Frank Dep. Tr. (Sept. 13, 2010)37:10-12; West Decl., Ex. O.
[46] West Decl., Exhibit O.
[47] Statement of Financial Affairs of GSCP, Schedule 3(c) [Docket No. 87] at p.3 and Statement of Financial Affairs of GSCP, Schedule 3(c) [Docket No. 89] at p.11.
[48] West Decl., Ex.O.
[49] WestDecl., Ex. O.
[50] West Decl., Exhibit R (Frank email) (BDCM 10263).

less salary received in respect of any employment of him by GSC Group.[51]   Black Diamond

acknowledges that Mr. Eckert "has significant other business activities and that [he] shall have

the right to allocate his time between performance of the Consulting Services and such other

business activities as [he] may determine in his sole discretion."[52]   The term of the agreement

commences "upon completion, following Bankruptcy Court approval, of a Section 363 sale of the

assets of the GSC Group, Inc. ('GSC') in which the company (i.e., BDCM), or its affiliates, is the

winning bidder of a Substantial portion of the assets of GSC . . . ."[53]   In other words, before these

cases were ever filed, Mr. Eckert and Mr. Deckoff were clearly vectoring to a sale to Black

Diamond.  The agreement is signed on behalf of BDCM by Mounir Nahas, the recipient of Mr.

Synder's email about the undisclosed transfer of the Transferred Policies.

31.     As noted above, Mr. Eckert's salary from GSC Group under the Eckert-GSC

Employment Agreement is $750,000 per annum, which amount may be adjusted, "taking into

account the number and size of the investment funds for which [GSC Group] or its affiliates

remain as investment adviser/collateral manager following the 363 sale," to as low as $50,000 per

annum.[54]   Thus, the more successful the sale of the Debtors' collateral management agreements to

Black Diamond, the more Mr. Eckert was likely to receive as a consultant for Black Diamond,

and the less he will be required to do.  As Mr. Eckert explained during his deposition, "[Stephen

Deckoff] said, 'Well, I'll pay you $3 million and you can sit in New Jersey and play cards with

your buddies.' …[that] is exactly what he said, so I don't have to do anything."[55]

---

[51] West Decl., Exhibit O at §§ 1, 3.
[52] West Decl., Exhibit O at § 1.
[53] West Decl., Exhibit O at § 2.
[54] West Decl., Exhibit K at ¶ 1(b)(i).
[55] West Decl., Exhibit B, Eckert Dep. Tr. (Sept. 13, 2010) 104:4-20.

**D.  Management's Dealings During the Chapter 11 Cases**

32.    As mentioned at the outset, rather than to repeat the facts set forth in the Non-Controlling Lender Group Objections, this Motion incorporates them by reference.  To summarize, armed the principals of the Debtors interested in its success and, if necessary, its ability as Collateral Agent to block the cash bids of others with an enormous credit bid, Black Diamond went to auction well positioned to obtain direct control of the Debtors' business.

33.    Ultimately, Black Diamond put together the BD Joint Bid pursuant to which BDCM would bid $11 million for the Debtors' most valuable assets (the "Management Contract Assets") and Black Diamond Agent would credit bid $224 million of debt under the Prepetition Credit Agreement for substantially less valuable assets (the "Credit Bid Assets").  The Non-Controlling Lenders' expert has testified that the the Management Contract Assets are worth between $184-193 million and the Credit Bid Assets are worth less than $12 million.[56]  Even the Debtors' own professionals have conceded that the Management Contract Assets are worth at least $127 million, while the Credit Bid Assets are worth, at most, $11 million.[57]  The Debtors' managers nevertheless pronounced the BD Joint Bid the "highest and best" bid and asked the Court to approve a Sale on the basis of the BD Joint Bid.

34.    Discovery has now confirmed that this "highest and best" bid was a sham to deliver assets to Black Diamond.  In fact, the BD Joint Bid was calculated based on Black Diamond's view of the value of the assets that the Debtors were not selling in the auction and in fact have no relation to the value of the assets that Black Diamond Agent was bidding on.[58]  To explain, as of the date of the auction, approximately $250 million was owed under the Prepetition

---

[56] Declaration of Ted J. Gooden (Dec. 2, 2010), ¶¶ 10-11 [filed under seal].
[57] Ex. A to the Declaration of Rebecca Bodony (Dec. 12, 2010) [Doc. No. 312].
[58] West Decl., Ex. B, Deckoff Dep. Tr. (Dec. 12, 2010), 205:5-16.

Credit Agreement.[59]  At that time, Black Diamond viewed the value of assets outside the auction as being worth approximately $15 million,[60] according to Mr. Deckoff.  On the contrary, Black Diamond Agent arrived at the $224 million credit bid figure by taking the full value of the secured claim and subtracting out the $11 million cash bid and the $15 million in excluded assets.[61]  The credit bid was merely a plug number meant to block other bids and to give Debtors' management, whose future depended on selling to Black Diamond, a rationale to declare the BD Joint Bid the "highest and best."

35.    Immediately following the auction, however, Black Diamond learned that it had grossly miscalculated the value of the Debtors' remaining assets.  Rather than having a value of $15 million (plus the $11 million in the cash and note bid), the value of those assets was more likely in the range of $40 – 50 million.  According to Mr. Deckoff's testimony, the miscalculation stemmed from failing to account for (i) the amount of cash the Debtors would have on hand at closing, (ii) overlooking intercompany claims, and (iii) miscalculating the value of the Scheduled Policies.[62]  Mr. Deckoff candidly admitted that his employees made a mistake at no fault of the other Lenders, that had the effect of waiving secured claims on valuable collateral.[63]

36.    At that moment, unless something were done, the miscalculation would mean, depending on the administrative costs of the bankruptcy, which are mounting, a potential value windfall for unsecured creditors, who could normally expect no distribution at all given the size of the secured debt under the Prepetition Credit Agreement.  From the face of the Debtors' schedules, much of that windfall would go to Messrs. Eckert and Frank, who, it will be recalled, together hold $3 million of the approximately $7 million "known" unsecured claims in these

---

[59] West Decl., Ex. B, Deckoff Dep. Tr. (Dec. 12, 2010), 205:21-22.
[60] West Decl., Ex. B, Deckoff Dep. Tr. (Dec. 12, 2010), 206:3-5
[61] West Decl., Ex. B, Deckoff Dep. Tr. (Dec. 12, 2010), 205:8-206:5
[62] West Decl., Ex. B, Deckoff Dep. Tr. (Dec. 12, 2010), 269:4 – 270:14
[63] West Decl., Ex. B, Deckoff Dep. Tr. (Dec. 12, 2010), 269:4 – 270:14

Chapter 11 Cases. The remainder of the excess value, it would appear, would fall to preferred equityholders, the most important of which, again, being Mr. Eckert, who would stand to "earn" millions of dollars more than his original $5 million ask.

37.    Mr. Deckoff was apparently outraged by the possibility of these results and demanded of Mr. Eckert that steps be taken to ensure that Black Diamond would not suffer from its miscalculation, or there simply would not be a deal. Mr. Eckert testified as follows: "I did [the Option Agreement] because [Mr. Deckoff] made it quite clear to me he would not go forward with the transaction if I did not do this." [64]

38.    Messrs. Eckert and Deckoff, however, found a way to reroute enough of the excess cash back to Black Diamond to satisfy Mr. Deckoff and leave Mr. Eckert better off than he had been before. Because the methods chosen did not involve rerouting the money through Black Diamond Agent and the Prepetition Credit Agreement, the other Lenders were once again left empty-handed. This post-auction rerouting scheme had four parts.

### Debtors Amend Asset Purchase Agreement With Black Diamond

39.    First, on December 3, 2010, the Debtors filed the Notice of Amendment,[65] attaching an amendment (the "Amendment") to the asset purchase agreement with Black Diamond (the "APA"), which Amendment is also dated December 3, 2010 and which recites that its purpose is to resolve certain claims and disputes that had arisen between the Debtors and Black Diamond in relation to the APA. The Amendment modifies the APA (as amended, the "Amended APA") to sell additional assets to Black Diamond, generously settle a dispute over whether BDCM is entitled to earnings from the Debtors' collateral management business prior to closing by awarding $5.2 million of the $6 million in controversy to BDCM, and release Black

---

[64] West Decl., Ex. E, Eckert Dep. Tr. (Dec. 14, 2010), 15:3-6.
[65] [Docket No. 269].

Diamond of all liability on claims and rights that the Debtors may have against it, all as further detailed in the Objection Supplement.

<u>Mr. Eckert and Mr. Deckoff Enter Into the Option Agreement</u>

40.     Second, Messrs. Eckert and Deckoff engaged in a private securities transaction. On the evening of December 9, 2010, the Debtors filed the Second Supplemental Declaration of Robert Manzo in Support of Sale of Substantially All of GSC's Assets (the "<u>Second Supplement</u>).[66]  In the Second Supplement, Mr. Manzo revealed that on December 1, 2010, he learned that Mr. Eckert and Stephen Deckoff, the managing principal of BDCM and Black Diamond Agent, were having discussions regarding a scenario in which the Black Diamond would purchase an option to buy Mr. Eckert's $2 million prepetition unsecured claim and 49% of Mr. Eckert's equity in Debtor GSC Active Partners, Inc.,[67] the entity through which Mr. Eckert holds it preferred stock in GSCP.  (A purchase of more that 49% might risk the value-destroying change of control scenario all parties have sought to avoid.)  In reaching the option price, there was no fairness opinion, no valuation, no third party review or indeed anything to establish that Mr. Eckert gave away ice in winter in exchange for $500,000.  Mr. Manzo further explained that, notwithstanding that he and Debtors' counsel Michael Solow advised Mr. Eckert that it would be best for the Debtors' estates to wait until the sale process was completed before entertaining further discussions with Mr. Deckoff, Mr. Manzo was aware on December 3 and 4 that Mr. Eckert and Mr. Deckoff were still in discussions.[68]  Mr. Manzo again warned Mr. Eckert that his actions could be harmful to the sale but later learned that on December 6, 2010 that Messrs. Eckert and Deckoff reached and executed a deal, which involved a $500,000 payment to Mr. Eckert "upon the commencement of the term of the Consulting Agreement between Black

---

[66] [Docket No. 302].
[67] Second Supplement, at ¶ 7.
[68] Second Supplement, at ¶¶ 8-10.

Diamond and Mr. Eckert dated July 30, 2010, as amended,"[69] whereupon Mr. Manzo and Mr. Solow informed Mr. Eckert that "it would be in the best interests of the estate if he and Mr. Deckoff rescinded the agreement."[70] That advice was, of course, sage – viewed as a stand-alone arrangement, according to its terms, Black Diamond agreed to pay Mr. Eckert $500,000 to close this transaction even if his claims against and interests in the Debtors turn out to be worthless.

41.    Under the Option Agreement, Mr. Eckert agreed to sell Black Diamond an option to buy 49% of his shares of common stock of Active Partners, Inc. and his $2,000,000 claim against GSC Group in respect of his unpaid 2008 bonus for a $1,500,000 exercise price.  The Option Agreement would become effective as of upon the commencement of the term of the Original Eckert Consulting Agreement, "as amended," i.e., when the Sale to Black Diamond closed.  Essentially, Mr. Eckert would receive $500,000 for assets that nobody has valued and are of dubious worth.  Such an arrangement does not even comport with Mr. Deckoff's own stated sense what is proper for a transaction between a management of a debtor in bankruptcy and a proposed purchaser of the debtor's assets.  On November 24, Mr. Eckert requested the use of Mr. Deckoff's private plane to fly to a professional football game on December 5.[71]  Even though Mr. Eckert offered to pay "direct expenses", Mr. Deckoff testified that he declined the request, because, in his view "his paying the direct expenses is much less than what the market value would be for renting my plane."[72]  In fact, according to Mr. Deckoff, out of caution, he would likely not have allowed Mr. Eckert to rent the plane for *two times* the market rate.[73]

42.    Either Mr. Deckoff violated his own notion of propriety, or, by late November, he was more interested in appearances of propriety than actual propriety.  According to Mr. Eckert,

---

[69] Option Agreement, at § 1.
[70] Second Supplement, at ¶¶ 9-12.
[71] West Decl., Ex. F, (November 24, 2010 email from Mr. Eckert to Mr. Manzo) (BDCM00080229).
[72] West Decl., Ex. B, Deckoff Dep. Tr. (Dec. 12, 2010), 160:14-17.
[73] West Decl., Ex. B, Deckoff Dep. Tr. (Dec. 12, 2010), 160:21-25.

in June, Mr. Deckoff told him that, "while he didn't believe in perqs, that he would make an exception and I could use his plane or the Company's plane, whichever it is, if I paid the variable cost. And I guess that's a favor."[74] At the time of the November request for the use of the airplane, Mr. Deckoff declined, only because "because it would be misunderstood by the people in this room."[75]

### Mr. Eckert Amends His Consulting Agreement With Black Diamond

43.    Third, on the same day as the date of the Option Agreement, Mr. Eckert executed a "First Amended and Restated Consulting Agreement" with BDCM, which amends the Original Eckert Consulting Agreement (as amended, the "Amended Consulting Agreement").    The amendments expand the amounts deductible from Mr. Eckert's consulting fee to include not only his salary from the Debtors but "any amounts (pre-tax) received . . . from GSC . . . directly or indirectly, in the form of salary or bonus pursuant to [Mr. Eckert's] employment agreement with GSC . . ., dividends from GSC or any of its affiliated entities or other distributions from GSC or any of its affiliated entities," but carving-out from these expanded deductions from Mr. Eckert's payments from Black Diamond amounts he receives from the Debtors to release his medical records (to increase the value of the Scheduled Policies), any amount he receives in respect of his claim against the Debtors for his 2008 bonus, and the first $1.5 million "bonus" he received from the Debtors shortly before the Petition Date.[76]  The amendment also requires Mr. Eckert to use his "best efforts to cause GSC to pay him an annual salary of $1,000,000," thus lessening Black Diamond's obligations to pay him, though he is not required to breach his legal obligations in doing so.[77]

---

[74] West Decl., Ex. E, Eckert Dep. Tr. (Dec. 14, 2010), 88:9-13.
[75] West Decl., Ex. E, Eckert Dep. Tr. (Dec. 14, 2010), 88:18-19.
[76] West Decl., Exhibit H, Amended Consulting Agreement at § 3(a).
[77] Id.

<u>Mr. Eckert Enters Into Settlement with the Debtors</u>

44.     Fourth, on December 3, 2010, the Debtors filed an Amended Motion Pursuant to Bankruptcy Rule 9019 for Approval of Amended Settlement with Alfred C. Eckert III (the "<u>Eckert Settlement Motion</u>").[78]   The Motion seeks approval of a settlement reached with Mr. Eckert that would require him to retain control of his common stock in GSC Group until the Debtors' assets are sold and provide his medical records to potential bidders in respect of Scheduled Policies.[79]   In return, the Non-Recourse Note to the Debtors will be deemed satisfied and he will receive $1,000,000 from the Debtors.[80]

45.     The net effect of all four of these maneuvers, contingent, of course, on the Sale being closed with Black Diamond, is as follows.  Before the commencement of these Chapter 11 Cases, Mr. Eckert could count on $6 million plus any amount he could obtain to release his health records and the value of the Transferred Policies as a result of Mr. Frank and Black Diamond Agent arranging the Eckert-GSC Employment Contract (under which he would receive $3 million in bonus and the Transferred Policies) and the Original Eckert Consulting Agreement (under which he would receive $3 million less his GSC Group salary).  For Black Diamond's part, other than (i) the portion of the relatively low-value Credit Bid Assets and the value of the remaining secured claim, each of which it would have to share the other Lenders, (ii) the premium it would pay Mr. Frank above the true value of his services ($350,000 per year, based on the year preceding the Petition Date (less his prepetition "incentive" bonus)) and (iii) the administrative costs of these Chapter 11 Cases, Black Diamond could have, but for its above-described credit bid miscalculation, enjoyed the full value of the Debtors' estates.

---

[78] Docket No. 275.
[79] <u>Id</u>., ¶ 17.
[80] <u>Id</u>.

46.    After the above series of postpetition, post-Sale transactions, Black Diamond has essentially made Mr. Eckert the conduit through which it will make up for the value it would otherwise have lost by miscalculation of the credit bid portion of the BD Joint Bid. But rather than losing, Mr. Eckert wins – after the rerouting, Mr. Eckert will receive $6.5 million rather than $6 million. He will still receive $3 million between his GSC salary and the Amended Consulting Agreement, and he would keep the $1.5 million bonus already awarded, but the other $1.5 million bonus will now be deducted from the $3 million under the Amended Consulting Agreement, as will any dividends he receives from his equity interests. He will also receive the $500,000 option price and up to $1.5 million (the option strike price) on account of (i) any distribution on his $2 million 2008 bonus claim or (ii) any a dividend distribution from the Debtors that exceeds what can absorbed by deducting such amount from the $3 million that Black Diamond would otherwise be paying under the Amended Consulting Agreement. If it appears that such distributions from the Debtors will be greater than $1.5 million, Black Diamond need only exercise its option to capture that excess value for itself. Although the value Black Diamond now stands to receive by the reduction in the amounts it will be obligated to pay Mr. Eckert under the Amended Consulting Agreement plus any value it obtains by exercising its option may add up to be less than it would have received as Black Diamond Agent had it not over credit-bid, any new money it receives under its post-Sale agreements with Mr. Eckert need not be shared with the other Lenders.

47.    It remains unclear what may have influenced any advisor to sign on to these arrangements, but because Mr. Eckert and Mr. Frank are the only managers with authority to make decisions for the Debtors, all decisions were made with gross conflicts of interest at play.

## JURISDICTION AND VENUE

48.    This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and

1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The predicate for the relief

requested herein is section 1104(a) of the Bankruptcy Code.

## RELIEF REQUESTED

49.    By this Motion, the Non-Controlling Lender Group seeks entry of an order

pursuant to section 1104(a) of the Bankruptcy Code appointing a trustee in the Chapter 11 Cases.

## ARGUMENT

50.    The Court should order the appointment of a trustee to act as a disinterested

fiduciary charged with the independent representation of the Debtors' estates.  Section 1104(a) of

the Bankruptcy Code provides for appointment of a trustee as follows:

> (a)    At any time after the commencement of the case but before
> confirmation of a plan, on request of a party in interest or
> the United States trustee, and after notice and a hearing, the
> court shall order the appointment of a trustee –
>
> (1)    for cause, including fraud, dishonesty,
> incompetence, or gross mismanagement of the
> affairs of the debtor by current management, either
> before or after the commencement of the case, or
> similar cause, but not including the number of
> holders of securities of the debtor or the amount of
> assets or liabilities of the debtor; or
>
> (2)    if such appointment is in the interests of creditors,
> any equity security holders, and other interests of
> the estate, without regard to the number of holders
> of securities of the debtor or the amount of assets or
> liabilities of the debtor.

11 U.S.C. § 1104(a).  "Section 1104(a) is phrased in the disjunctive, meaning that there are two

discrete predicates for the appointment of a reorganization trustee.  Such appointment is

authorized upon either a showing of "cause" or demonstration that the appointment is in the

interests of the parties.  "Once the Court has found that cause exists under section 1104(a)(1),

there is no discretion; an independent trustee must be appointed."  In re V. Savino Oil & Heating Co., 99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989) (collecting cases); see also In re Marvel Entm't Group, 140 F.3d 463, 472 (3d Cir. 1998) (noting that section 1104(a)(1) provides for a mandatory appointment upon a specific finding of cause); U.S. Mineral Prod. Co. v. Official Comm. of Asbestos Bodily Injury (In re U.S. Mineral Prod. Co.), 2004 WL 115234 (D. Del. Jan. 16, 2004) (upholding appointment of chapter 11 trustee by bankruptcy court, where bankruptcy court had held that trustee had to be appointed because appointment was in the interest of creditors under Section 1104(a)(2)); In re Deena Packaging Indus., Inc., 29 B.R. 705, 706 (Bankr. S.D.N.Y. 1983) ("Appointing a trustee for cause is not a discretionary function . . ."); Midlantic Nat'l Bank v. Anchorage Boat Sales, Inc. (In re Anchorage Boat Sales, Inc.), 4 B.R. 635, 644 (Bankr. E.D.N.Y. 1980) ("Under subsection (a)(1), the Court's discretionary powers are more circumscribed . . . the Court's discretion is limited to a determination of whether 'cause' exists for such appointment . . . .").

51.    Moreover, although appointment of a trustee has been referred to as an "extraordinary" remedy, courts have nevertheless noted that Section 1104 "represents a protection that the Court should not lightly disregard or encumber with overly protective attitudes towards debtors-in-possession".  In re Bellevue Place Assocs., 171 B.R. 615, 623 (Bankr. N.D. Ill. 1994) (quoting V. Savino Oil & Heating, 99 B.R. at 525 (internal quotations omitted)).  Accordingly, as discussed below, numerous examples exist of trustees who have been appointed in chapter 11 cases.

52.    In these Chapter 11 Cases, the requirements under both subsections (a)(1) and (a)(2) of Section 1104(a) of the Bankruptcy Code have been met.

### A.  Cause Exists for the Appointment of a Trustee under Section 1104(a)(1)

53.    While courts have appointed trustees under section 1104(a)(1) on account of fraud, dishonesty, incompetence, and gross mismanagement, the grounds for appointing a trustee are not limited to those enumerated in the statute.  See V. Savino Oil & Heating Co., 99 B.R. at 525 ("[T]he words 'including' and 'or similar cause' before and after the enumerated examples of cause . . . indicate that the grounds for appointing a reorganization trustee are not even limited to the derelictions specifically enumerated."); Marvel Entm't Group, 140 F.3d at 472 ("[T]he language of § 1104(a)(1) does not promulgate an exclusive list of causes for which a trustee must be appointed . . . .").  Courts have also found "cause" for appointment of a trustee in a chapter 11 case based on factors such as "conflicts of interest . . . ; misuse of assets and funds; inadequate recordkeeping and reporting; nonfiling of required documents, including lack of adequate disclosure; lack of appropriate cost controls; various transgressions as to taxes, including nonpayment of taxes, failure to file returns, and nonwithholding of taxes; various instances of conduct found to establish fraud or dishonesty; failure to make required payments; and lack of credibility and creditor confidence."  Wilmington Trust Co. v. Aardvark, Inc. (In re Aardvark, Inc.), 1997 WL 129346, *4 (D. Del. March 4, 1997) (noting one commentator's grouping of decisions in which the appointment of a trustee has been ordered and finding sufficient evidence of a conflict of interest generated by the principal's operation of a competing business to reverse the bankruptcy court's decision to not appoint a trustee) (quoting In re Clinton Centrifuge, Inc., 85 B.R. 980, 985 (Bankr. E.D. Pa. 1988)); see also Cardinal Indus., 109 B.R. 755, 765-66 (Bankr. E.D. Ohio 1990) (finding that sufficient cause exists to appoint a trustee pursuant to section 1104(a)(1) of the Bankruptcy Code due to the creditors' "serious and general loss of confidence in the Debtors' management," despite no finding of any of the enumerated 1104(a)(1) factors); In

re Brown, 31 B.R. 583, 585 (Bankr. D. Colo. 1983) (appointing trustee based on the "close interrelationship" between a management corporation and individual debtors, rather than on any specific showing of an enumerated factor under Section 1104(a)(1) of the Bankruptcy Code); Dardarian v. La Sherene, Inc. (In re La Sherene, Inc.), 3 B.R. 169, 176 (Bankr. N.D. Ga. 1980) (finding that the appointment of a trustee was appropriate where, without an overseer, the enterprise would lack "managerial and operational credibility.").

54.     Court have also found "cause" for purposes of Section 1104(a)(1) of the Bankruptcy Code, in other circumstances, including, inter alia, where a debtor has been unable to perform its fiduciary duties as a debtor in possession, based on a debtor's pre-petition conduct, and where there has been significant acrimony between a debtor and creditor.  See e.g., Marvel Entm't Group, 140 F.3d at 473-74 (while noting that the court did not adopt a "per se rule" where conflicts or acrimony between a debtor and creditor requires the appointment of a trustee, finding sufficient cause based on "deep-seeded conflict and animosity" between the debtor and the creditors, as well as the lack of confidence of all creditors in the ability of the entities controlling the debtor to act as fiduciaries); In re Bellevue Place Assocs., 171 B.R. at 623 (although finding that none of the specifically enumerated "causes" under 1104(a)(1) were applicable, holding that debtor in possession's inability to fulfill fiduciary duties, like the duty to conduct an independent investigation of potential preference or fraudulent transfer claims, was itself cause to appoint a chapter 11 trustee); V. Savino Oil & Heating, 99 B.R. at 526 (finding that debtor's pre-petition course of conduct "in and of itself, constitute[d] 'cause' for the appointment of a chapter 11 trustee").

55.     Specifically, where a debtor or a debtor's management or board of directors is saddled with conflicts, as here, a trustee should be appointed.  See In re Embrace Sys. Corp., 178

B.R. 112, 128-29 (Bankr. W.D. Mich. 1995) (finding that underlying conflicts and self-dealing constituted cause for the appointment of a trustee); In re Sharon Steel Corp., 871 F.2d 1217, 1228 (3d Cir. 1989) (affirming appointment of trustee based, in part, on debtor's conflict of interest); In re McCorhill Publ'g Inc., 73 B.R. 1013, 1017 (Bankr. S.D.N.Y. 1987) (holding that conflicting interest in various related entities held by the debtor's directors warranted the appointment of a trustee); In re L.S. Good & Co., 8 B.R. 312, 315 (Bankr. W.Va. 1980) (granting motion to appoint trustee and noting that "[t]he magnitude of the number of intercompany transactions places current management of [the debtor] in a position of having grave potential conflicts of interest and the presumption arises that the current management of [the debtor] will be unable to make the impartial investigations and decisions demanded in evaluating and pursuing inter-company claims on behalf of [the debtor]."); In re Concord Coal Corp., 11 B.R. 552, 554-55 (Bankr. W. Va. 1981) (appointment of trustee was justified where loyalty of debtor's current management was called into question due to competing business interests and potential for intercompany dealings); In re SunCruz Casinos, LLC, 298 B.R. 821, 830-32 (Bankr. S.D. Fla. 2003) (concluding that "cause" existed to appoint chapter 11 trustee given the numerous significant inherent conflicts of interest of debtor's management).

56.    Here, the conflicts of interests of the Debtors' management are not only many, they are of the most serious kind, going to the heart of these Chapter 11 Cases, the Sale of the Debtors' business and the equitable distribution of the proceeds of such Sale.  And it is precisely those conflicts that were not pre-existing but rather created by Messrs. Eckert and Frank in anticipation of the bankruptcies and, in the case of Mr. Eckert, during them, possibly in violation of federal criminal law.

57.    In addition to the relatively routine conflicts one might expect in any chapter 11 case (the managers' old management contracts, claims against the Debtors arising therefrom, and ordinary equity interests in the Debtors), there were other less routine yet still relatively benign conflicts arising from the kind of business the Debtors operate (e.g., Mr. Eckert's ability, by selling his equity position, to threaten to destroy the value of the collateral management/asset adviser agreements, his forbearance from which he was eager to market) or the identity and health of the fiduciary (Mr. Eckert's ability to provide or withhold his medical records, which greatly affected the value of the Scheduled Policies, and which he was also happy to market).    These conflicts are of the kind that, in the norm, can be managed by ad hoc arrangements, such as by seeking the allowing the remaining disinterested fiduciaries to negotiate the interests of the estates, or appointing a committee of creditors to do so.

58.    But the situation here is much more egregious and ultimately irredeemable without the appointment of an independent fiduciary.    There are only two managers authorized to act on behalf of the Debtors (and no creditors' committee), and each contracted with the Debtors to favorably change the terms of their own employment contracts, transferring to themselves generous bonuses and, in the case of Mr. Eckert, the undisclosed Transferred Policies, just days before the chapter 11 petitions were filed.    Each of these conveyances may be constructively fraudulent given the GSCP's insolvency and the fact the transfers were made to insiders.    See 11 U.S.C. § 548(a)(1)(B)(ii)(I) (transfer made by insolvent debtor), (IV) (transfer made to insider under an employment contract outside the ordinary course of business).    The fact that the transfer of the Transferred Policies was not disclosed, particularly when disclosure was required under the Statement of Financial Affairs, is a badge of fraud, bringing into question whether an actual fraudulent transfer may have occurred, 11 U.S.C. § 548(a)(1)(A), and leading to the questions

about (i) what Black Diamond's role in respect of the transfer was and (ii) what other undisclosed, insider transactions may have occurred as the Debtors' position deteriorated. Although the fact that certain transactions with managers of debtors may be exposed to the risk of being clawed back may not, in and of itself, always merit the appointment of a trustee, the lack of disclosure with respect to the Transferred Policies and the Mr. Eckert's post-Sale option agreement with Black Diamond casts a negative light on the trustworthiness of the Debtors' management that constitutes an independent ground, aside from the employment- and deal structure-related conflicts of interests, for appointing a trustee before any determination is made on the Sale Motion.

59.    Far worse, however, is the fact that Mr. Eckert and Mr. Frank each acted on the eve of the bankruptcies to compromise his disinterestedness on the key series of decisions to be made in these Chapter 11 Cases, those surrounding the Sale of the Debtors' business and distribution of the proceeds of such Sale, by contracting with Black Diamond for lucrative employment packages that depended on it winning a competitive auction in which they were responsible for determining the winning bid.  At that point, because there were no disinterested managers who could act, no creditors' committee to oversee, and Messrs. Eckert and Frank remained in control, the Sale process was and remains tainted.

60.    Then, <u>during</u> the Chapter 11 Cases, when Black Diamond discovered that it miscalculated the credit bid such that there was still value in the Debtors' estates unexpectedly beyond its reach, it again enlisted Mr. Eckert, who for $500,000 more than he originally bargained for, was persuaded to amend his employment package and enter into an option agreement that will see much of such excess value routed to Black Diamond through its agreements with him and outside the Prepetition Credit Agreement, once again leaving the other

Lenders in the cold, if the Sale is approved as the Debtors that Mr. Eckert and Mr. Frank control have requested.  Mr. Eckert negotiated and executed the option agreement with Black Diamond in secret, and continued on course even after he was warned by Debtors' counsel and financial advisors that it would be in the best interest of the Debtors for him to stop negotiating and not to execute such agreement until after the Sale.  Despite these admonitions, Mr. Eckert continued his negotiations and concluded the option agreement, which is itself a key component of the APA up for approval.

61.    The loyalty of the Debtors' management has been exposed as hopelessly compromised by the conflicts its members have deliberately created.  Evidence is mounting that Messrs. Eckert and Frank have abandoned their fiduciary duties to the Debtors' creditors in order to advance the interests of Black Diamond and of themselves.  In the words of Judge Cardozo:

> Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties.  A trustee is held to something stricter than the morals of the market place.  Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior.  As to this there has developed a tradition that is unbending and inveterate.  Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the "disintegrating erosion" of particular exceptions.  Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd.  It will not consciously be lowered by any judgment of this court.

Meinhard v. Salmon, 164 N.E. 545, 546 (N.Y. 1928) (citation omitted).

62.    The above-described conduct, conflicts of interest and failures to disclose all require the appointment of an independent fiduciary to protect the interests of the Debtors' creditors and estates and clearly constitute ample "cause" for purposes of Section 1104(a)(1) of the Bankruptcy Code.  Accordingly, a trustee should be appointed in these Chapter 11 Cases as soon as possible.

**B. Further Grounds Exist for the Appointment of a Trustee Under Section 1104(a)(2)**

63.     Even if the above described conduct and conflicts of interest did not constitute "cause" under section 1104(a)(1), a trustee should nevertheless be appointed under section 1104(a)(2) because independent representation of Debtors' estates is in the best interests of the Debtors' creditors.  Courts have found that section 1104(a)(2) entails the exercise of a spectrum of discretionary powers and equitable considerations, including a cost-benefit analysis, to determine whether the appointment of a reorganization trustee would be in the interests of creditors, equity security holders and other interests of the estate.  In re Sharon Steel Corp., 86 B.R. 455, 458 (Bankr. W.D. Pa. 1988), aff'd, 871 F.2d 1217, 1226 (3d Cir. 1989); In re V. Savino Oil & Heating, 99 B.R. at 525.  Stated differently, section 1104(a)(2) creates a flexible standard and allows the appointment of a trustee even when no "cause" exists.  Sharon Steel Corp., 871 F.2d at 1226; Marvel Entm't Group, 140 F.3d at 474.

64.     In determining whether a trustee should be appointed under section 1104(a)(2) of the Bankruptcy Code, courts consider such factors as: "(i) the trustworthiness of the debtor; (ii) the debtor-in-possession's past and present performance and prospects for the debtor's rehabilitation; (iii) the confidence – or lack thereof – of the business community and of creditors in present management; and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment."[81]  In re Ionosphere Clubs, Inc., 113 B.R. 164, 168 (Bankr.

---

[81]     Although courts repeatedly set forth these factors, their application does not lend itself to clear-cut rules. Further, courts routinely discuss subsection (a)(2) in connection with (a)(1) and fail to provide guidance as to which provision informed their ultimate decision.  See, e.g., 7 COLLIER ON BANKRUPTCY § 1104.02[3][d][iii] (15th ed. rev. 2005) (noting that appointment of a trustee under subsection (a)(2) "might arise if creditors and equity security holders have entirely lost confidence in the current management of the debtor" as that distrust "could interfere with the operation of the business and the negotiation of a reorganization plan") (citing Marvel Entm't Group, 140 F.3d 463 (3d Cir. 1998), for the proposition that "deep-seeded conflict and animosity" between the debtor and its creditors made appointment of a trustee in the best interest)).  As the court in V. Savino Oil & Heating, noted: "the factors constituting a basis for appointing a trustee under § 1104(a)(2) are amorphous, diverse, and necessarily involve a great deal of judicial discretion."  99 B.R. at 527 n.11.

S.D.N.Y. 1990). "[T]he factors . . . are diverse and in essence reflect the practical reality that a trustee is needed." Sharon Steel Corp., 86 B.R. at 458.

65.     In applying the above-referenced factors, courts have held that loss of creditor confidence in current management and "[t]he need for a neutral party to mediate disputes between the debtor and its creditors is ground for a trustee's appointment." In re The Bible Speaks, 74 B.R. 511, 512-13 (Bankr. D. Mass. 1987); see also Marvel Entm't Group, 140 F.3d at 474 ("intense and high-stakes bickering" did not instill confidence that the debtors in possession "could fairly negotiate with the creditors to whom they owe[d] these [fiduciary] duties"); In re Colorado-Ute Elec. Ass'n, 120 B.R. 164, 177 (Bankr. D. Colo. 1990) (one benefit of appointing a trustee was that the parties "may be less confrontational and litigious"); In re Microwave Prods. of Am., 102 B.R. 666, 676 (Bankr. W.D. Tenn. 1989) (trustee appointed under § 1104(a)(2) because actions of debtor's board seriously eroded trust and confidence of creditors, which would likely yield increased litigation).

66.     By their conduct and the fatal conflicts of interest that Mr. Eckert and Mr. Frank have created for themselves, and given that they constitute the whole of the Debtors' management, the creditors here are left without a true fiduciary in these Chapter 11 Cases.  Nor has any creditors' committee been appointed.  These Chapter 11 Cases have become acrimonious and expensive, and because the aim of the cases is to sell the Debtors' business, there is no real question of rehabilitation here.  The real question to be addressed is how best to effect a fair sale. Appointment of a disinterested trustee is warranted to restore creditability to the "business judgment" of the Debtors and move these cases forward.

## CONCLUSION

67.     WHEREFORE, the Non-Controlling Lender Group respectfully requests entry of an order appointing a trustee in the Chapter 11 Cases.[82]

Dated: December 16, 2010
      New York, New York

                    WHITE & CASE LLP

                By:  */s/ J. Christopher Shore*
                    J. Christopher Shore
                    Evan C. Hollander
                    Abraham L. Zylberberg
                    1155 Avenue of the Americas
                    New York, New York 10036-2787
                    Telephone: (212) 819-8200
                    Facsimile: (212) 354-8113

                    Attorneys for the
                    Non-Controlling Lender Group

---

[82] A proposed order is attached hereto as <u>Exhibit A</u>.