KAYE SCHOLER LLP

425 Park Avenue
New York, NY 10022
Telephone: (212) 836-8000
Facsimile: (212) 836-8689
Michael B. Solow
Seth J. Kleinman

-and-

70 West Madison Street, Suite 4100
Chicago, IL 60602
Telephone: (312) 583-2300
Facsimile: (312) 583-2360
D. Tyler Nurnberg
Anthony G. Stamato
Matthew J. Micheli

Attorneys for Debtors
and Debtors-in-Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GSC GROUP, INC., <u>et al.</u>,[1] | ) | Case No. 10-14653 (AJG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DEBTORS' OBJECTION TO MOTION**
**FOR APPOINTMENT OF A CHAPTER 11 TRUSTEE**

GSC Group, Inc. and certain of its direct or indirect subsidiaries and affiliates

(collectively, the "<u>Debtors</u>", and together with their non-debtor affiliates, "<u>GSC</u>") hereby object

(this "<u>Objection</u>") to the motion (the "<u>Original Motion</u>") [Docket No. 337] and supplement to the

motion [Docket No. 339] (the "<u>Supplement</u>" and together with the Original Motion, the

---

[1]     The Debtors, along with the last four digits of each Debtor's federal tax identification number, are GSC
Group, Inc. (6382), GSCP, LLC (6520), GSC Active Partners, Inc. (4896), GSCP (NJ), Inc. (3944), GSCP
(NJ) Holdings, L.P. (0940),  GSCP (NJ), L.P. (0785), and GSC Secondary Interest Fund, LLC (6477).

"Motion") filed by the Non-Controlling Lenders,[2] for entry of an order appointing a chapter 11 trustee pursuant to section 1104 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"). In support of this Objection, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

The Non-Controlling Lenders' request for appointment of a trustee lacks both factual and legal grounds to support it. Mr. Eckert, the Chairman, CEO and Director of GSC, has entered into a consulting agreement and option agreement with Black Diamond. Mr. Frank, the President and other Director of GSC, has entered into an employment agreement with Black Diamond. Standing alone, those agreements do not disqualify either individual from performing his responsibilities to the Debtors' estates.

The Non-Controlling Lenders attempt to cobble together the option agreement and first amendment to the Asset Purchase Agreement (the "APA") as some sort of *quid pro quo* that harmed the estates. However, the amendment, negotiated by Kaye Scholer and Capstone, resolved a contractual ambiguity and eliminated further challenge by Black Diamond to the sale process, resulting in a purchase price modification of less than two percent (2%). Moreover, Mr. Eckert and Mr. Frank, while participating in portions of the negotiations that culminated in the amendment, deferred to the positions formulated by the GSC's professionals.

In addition, neither Kaye Scholer nor Capstone was involved in the negotiations regarding Mr. Eckert's personal sale of potential bankruptcy claims and interests to Black Diamond, both firms having advised Mr. Eckert, on GSC's behalf, not to pursue it. This personal lapse in judgment by Mr. Eckert in making what appears to be a poor personal economic choice has had no impact on the conduct of the Debtors or the results achieved in these

---

[2]  All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Motion.

cases. Instead, a more complete review of Mr. Eckert's and Mr. Frank's record of conduct both before and after these cases were filed dispels any notion that the Debtors have been improperly managed. In fact, the concerns raised by the Non-Controlling Lenders regarding the influence Black Diamond allegedly asserted over GSC both as Agent on behalf of all lenders as well as in it capacity as a bidder for GSC's assets, belies the truth. At each turn, GSC's senior management team has, either directly or through its court-approved professionals, fought each and every improper advance of Black Diamond. Examples of those disputes include:

- Management's refusal to comply with prepetition demands that GSC only hire restructuring counsel approved by Black Diamond, as majority lender.

- Refusing to agree to cash collateral budgets that did not adequately protect operations through a sale and contained overly-aggressive sale milestones.

- Resisting efforts by Black Diamond to cause GSC to revoke its commitment to sell securities of an affiliate prior to the commencement of these cases.

- Refusing a paltry $5 million stalking horse bid from Black Diamond, followed by its threats to file an involuntary bankruptcy against GSC.

- Resisting repeated demands from Black Diamond, both before and after the filing of these cases, that GSC fire Capstone as its financial advisor.

- Refusing to accept sale procedures that would not permit third parties to properly evaluate GSC's assets and participate in the auction.

- Refusing to accept objections from Black Diamond regarding the qualifications of other bidders at the auction.

- Resisting demands to sell assets sought by Black Diamond that the Debtors believed would not fetch an adequate price at the auction.

- During the auction, refusing to accept modified bid terms that would have been favorable to Black Diamond and requiring final sealed bids.

- Resisting Black Diamond's improper advances to combine one of its distressed portfolio companies with a competitor owned by GSC.

The Debtors, through their management and professionals, have protected these estates and have put these cases in a position to return a dividend to interests junior to the lenders. The Court should recognize that the Debtors followed proper corporate governance, always keeping the best interests of the estates as their guidepost. The Debtors and Black Diamond are ready to close the transaction, and investors, insurers and other consent parties have voted overwhelmingly to approve the transaction. The sale hearing should go forward.

## STATEMENT OF FACTS[3]

### A.    Debtors' Organizational Structure

Debtor GSC Group, Inc., ("GSC Group") the Debtors' ultimate parent company, is a corporation organized under the laws of Delaware. The Debtors offer investment management and advisory services through their principal subsidiary, GSCP (NJ), L.P. ("NJLP").

The Debtors, through GSCP (NJ) Holdings, LP ("NJ Holdings") and GSC Secondary Interest Fund, LLC ("Secondary Fund"), hold investments in certain affiliated investment funds. Debtor GSCP (NJ), Inc. ("NJ Inc.") serves as the general partner of NJLP and Holdings LP. Debtor GSCP, LLC is a subsidiary of GSC Group that provided investment advisory services to NJLP and monitoring and management services to certain portfolio companies of the funds.

---

[3]    The facts set forth herein are drawn largely from the Supplemental Declaration of Robert Manzo in Support of Sale of Substantially All of GSC's Assets, filed on December 3, 2010 (the "Supp. Manzo Decl.") [Docket No. 271]. Reference is also made herein to the Declaration Of Robert Manzo In Support Of The Debtors Proposed Sale Procedures, filed on September 13, 2010 (the "Manzo Decl.") [Docket No. 48], and the Second Supplemental Declaration Of Robert Manzo In Support Of Sale Of Substantially All Of GSCs Assets, filed on December 9, 2010 (the "Second Supp. Manzo Decl.", and together with the Manzo Declaration and Supplemental Manzo Declaration, the "Manzo Declarations") [Docket No. 302]. In addition, on December 3, 2010, the Debtors filed the Memorandum of Law in Support of Sale of Substantially all of GSC's Assets, Free and Clear of Liens, Claims and Encumbrances, and Assumption and Assignment of Executory Contracts (the "Sale Brief") [Docket No. 270] and incorporate herein by reference the facts and legal arguments set forth in the Sale Brief.

Non-debtor GSC Active Partners Holdings, L.P. ("AP Holdings") holds one hundred percent of the Class A common stock of GSC Group. AP Holdings was created in 2006 as part of a restructuring transaction pursuant to which some of the former owners of GSC contributed their partnership ownership interests in GSC Group in exchange for limited partnership interests in AP Holdings. Debtor GSC Active Partners, Inc. was created as part of the same restructuring transaction and acts as the general partner of AP Holdings.

## B.    The Debtors' Senior Management

### 1.    Alfred C. Eckert III

GSC (initially established as Greenwich Street Capital Partners, Inc.) was founded in 1994 by Alfred C. Eckert III as a subsidiary of Travelers Group Inc. Mr. Eckert is the Chief Executive Officer and Chairman of the Board of Directors of GSC Group. In 1998, following the merger of Travelers Group Inc. and Citicorp, GSC became independent from Citigroup. *See* Declaration of Peter R. Frank in Support of First Day Motions and Applications and in Compliance With Local Rule 1007-2 at ¶8, filed on August 31, 2010 ("First Day Affidavit") [Docket No. 9].

### 2.    Peter Frank

Peter Frank is the President of GSC Group, the President and Senior Managing Director of NJ Inc. and the Senior Managing Director of GSCP LLC. *See* Dec. 20 Frank Decl. (as defined herein) at ¶1.

Mr. Frank began working for GSC in 2001 as a consultant, often representing GSC as a board member of certain of GSC's portfolio companies and serving as chief restructuring officer when those companies commenced bankruptcy proceedings. *See* Transcript of Section 341 Meeting of Creditors (Case No. 10-14653), October 15, 2010, pp. 36:15-16; 55:16-25, 56:1-8 ("341 Meeting Transcript"). In 2005, Mr. Frank became a full-time employee

of GSC with the title of managing director. *Id*. at pp. 36:19-24. On or around 2006, Mr. Frank became a senior managing director and, in 2010, Mr. Frank became president. *Id*. at pp. 37:4-6, 12-14.

### 3. Management of GSC's Business

Mr. Frank was charged with managing the day to day operations of the Debtors. *See* Supplemental Declaration of Peter Frank in Support of Proposed Employee Incentive Bonus Program, As Revised, filed on October 14, 2010 at ¶17 ("Suppl. KEIP Decl.") [Docket No. 157]; Dec. 20 Frank Decl. at ¶¶15-25. His responsibilities include, but are not limited to: (i) signing all checks; (ii) managing the cash; (iii) serving on all of the Debtors' investment committees; (iv) working closely with the investors and maintaining investor relations; (v) acting as director on the boards of five of the Debtors' portfolio companies; and (vi) generally overseeing day to day operations. *See* Suppl. KEIP Decl. at ¶17; Dec. 20 Frank Decl. at ¶¶15-25.

Mr. Frank is assisted in this process by numerous employees.[4] In particular, Mr. Frank is directly responsible for general corporate activities and is assisted by:

   a.   Eric Snyder: Mr. Snyder is the Controller and is responsible for the Debtors' accounting and financial records, budgeting, forecasting and internal auditing [Suppl. KEIP Decl. at ¶33(a)];

   b.   Debbie Lombardi: Ms. Lombardi is actively involved with investor relations and is responsible for communications with investors and marketing activity [Suppl. KEIP Decl. at ¶27(g)];

   c.   Melissa Smith: Ms. Smith handles the day-to-day accounting activities for the Debtors' European mezzanine funds [Suppl. KEIP Decl. at ¶29(a)]; and

   d.   Brendan Roberts: Mr. Roberts handles the day-to-day accounting activities for the Debtors' private equity funds [Suppl. KEIP Decl. at ¶29(b)].

---

[4]   The Debtors incorporate herein by reference the Supplemental KEIP Declaration, as defined herein, that provides a detailed description of the various employees and their roles in day to day operations. Suppl. KEIP Decl. at ¶¶27-34.

In fulfilling his duties as head of GSC's private equity business, Mr. Frank is assisted by:

a. <u>David Browne</u>: Mr. Brown is a Portfolio Manager and responsible for monitoring the Debtors' positions in U.S.-based private equity funds, serving as a board member on behalf of the Debtors for a number of portfolio companies and preparing financial reporting for the Debtors' funds [Suppl. KEIP Decl. at ¶33(g)].

In fulfilling his duties as head of GSC's CLO/CDO business, Mr. Frank is assisted by:

a. <u>Seth Katzenstein</u>: Mr. Katzenstein is a Portfolio Manager. He is responsible for the management of a portion of the Debtors' U.S. CLO/CDO portfolios and is in charge of the Debtors' trading activities [Suppl. KEIP Decl. at ¶34(b)];

b. <u>Alex Wright</u>: Mr. Wright is a Portfolio Manager and is responsible for the management of a portion of the Debtors' U.S. CLO/CDO portfolios [Suppl. KEIP Decl. at ¶34(a)];

c. <u>Harvey Siegel</u>: Mr. Siegel is a workout professional for the Debtors' CLO/CDO portfolio and is responsible for the workout and restructuring of troubled credits within the CLO/CDO portfolios [Suppl. KEIP Decl. at ¶33(c)]; and

d. Peter Firth: Mr. Firth handles the sourcing, evaluation and execution related to the Debtors' European CLO/CDO investments [Suppl. KEIP Decl. at ¶33(d)].

In fulfilling his duties as head of GSC's European Mezzanine Investment business, Mr. Frank is assisted by:

a. <u>Nick Petrusic</u>: Mr. Petrusic is responsible for day-to-day management of the UK office, including, without limitation, compliance, corporate governance, portfolio management of the European mezzanine funds, fund reporting and investor relations [Suppl. KEIP Decl. at ¶34(c)].

## C.    <u>Prepetition Restructuring Activities</u>

Debtor NJLP is the borrower under that certain Fourth Amended and Restated Credit Agreement, dated as of February 28, 2007 (as amended, modified or supplemented from

time to time, the "Existing Credit Agreement"), that was provided by various lenders from time to time party thereto (collectively, the "Prepetition Lenders").[5] As of March 2009, Guggenheim Partners ("Guggenheim") was the administrative agent and collateral agent (collectively, the "Agent") under the operative loan and security documents.

Capstone was engaged by GSC in February 2009 to assist in negotiations with the Agent and Prepetition Lenders and to analyze various strategic alternatives. From March 2009 through the filing of these chapter 11 cases on August 31, 2010 (the "Petition Date"), GSC and Capstone engaged in extensive discussions with the Agent and Prepetition Lenders. For most of this period, Capstone led the discussions with Guggenheim, as the Agent, and a steering committee of Prepetition Lenders. During negotiations, the parties considered a number of restructuring alternatives but, ultimately, did not reach a consensus as to the path to pursue. *See* Dec. 20 Frank Decl. at ¶30.

One option that was negotiated involved a stand-alone restructuring scenario in which Mr. Frank would stay on as an employee with a restructured GSC, under the terms of an employment agreement approved by the then lenders under the Existing Credit Agreement (the "Prior Proposed Employment Agreement"), a group that includes the current members of the Non-Controlling Lender Group. *Id.*

In the Spring of 2010, a second option was negotiated that featured a sub-advisory arrangement, where it was structured so that Black Diamond Capital Management ("BDCM") would act as sub-advisor for the Debtors. Those discussions also included an employment agreement between Black Diamond and Mr. Frank on terms consistent with the Prior Proposed Employment Agreement. These discussions did not lead to an agreement, because the lenders

---

[5]     All of the Debtors except GSC Secondary Interest Fund, LLC are guarantors under the Existing Credit Agreement, and substantially all of GSC's assets are pledged as collateral thereunder.

decided the assets of the Debtors should be sold in a sale under section 363 of the Bankruptcy Code. *Id.* at ¶31.

BDCM acquired the control position under the Existing Credit Agreement. In July 2010, Guggenheim was replaced as agent with Black Diamond Capital Management ("<u>BDCF</u>"; along with BDCM, "<u>Black Diamond</u>"). Black Diamond made it clear that it also wanted to proceed in a scenario in which the assets of the Debtors would be sold in a sale under Section 363 of the Bankruptcy Code. Black Diamond took an aggressive stance with GSC, and indicated it would only support the use of cash collateral on certain specified terms, including an expedited sale process in bankruptcy. *Id.* at ¶32.

At that time, Mr. Frank and Mr. Eckert, as the Directors of GSC Group, in consultation with GSC's advisors determined to pursue a sale under section 363 of the Bankruptcy Code.

As part of those discussions, Black Diamond reviewed the Debtors' operations and made determinations regarding budget items. Black Diamond also made an offer of employment to Mr. Frank and Mr. Eckert, in the event that Black Diamond were the successful bidder at a 363 sale. The terms of that transaction were negotiated at arms' length, and were actually less favorable to Mr. Frank than the terms set forth in the Prior Proposed Employment Agreement offered by certain of the objectors. Under the Black Diamond agreement, Mr. Frank was free to discuss possible employment with other third parties. In fact, Mr. Frank was approached by two interested bidders about discussions for possible employment opportunities. *Id.* at ¶33.

In connection with those negotiations, Mr. Frank and Mr. Eckert negotiated employment agreements with GSC.[6] The terms of such agreements are usual and customary. Around the same time, Mr. Frank and Mr. Eckert also independently entered into agreements with BDCM for employment in the event that BDCM ultimately acquired GSC's assets.[7] *Id.* at ¶33.

## D. <u>BDCM's Stalking Horse Bid</u>

On or about August 26, 2010, after several weeks of intense negotiations, BDCM advised GSC that it was prepared to submit a bid of $5 million for GSC's assets.

In order to assess the reasonableness of the bid, Capstone performed an initial assessment and estimated that all of GSC's assets had a value in the range of at least $50-$75 million. *See* Dec. 20 Frank Decl. at ¶35. This assessment was preliminary in nature but adequate for GSC to determine that BDCM's proposal was unreasonably low. GSC and its advisors attempted to negotiate further with BDCM but it was unwilling to materially increase the price of its bid. Time did not permit GSC to shop the assets to alternative interested parties because BDCM informed GSC that it would not continue to allow GSC to use cash collateral outside of a chapter 11 process.

GSC rejected BDCM's stalking horse proposal. The determination to reject was made by Mr. Eckert and Mr. Frank, as the Directors of GSC, in consultation with Capstone and

---

[6]      *See* Declaration Of Colin T. West in Support of the Motion of the Non-Controlling Lender Group for Order Appointing a Trustee Pursuant to 11 U.S.C. Section 1104(b), filed on December 20, 2010 [Docket No. 338], <u>Exhibit K</u>, Employment Agreement between GSC Group, Inc. and Alfred C. Eckert III, dated July __, 2010; and <u>Exhibit O</u>, Employment Agreement between GSC Group, Inc. and Peter R. Frank, dated July 30, 2010.

[7]      *Id.*, <u>Exhibit G</u>, Consulting Agreement between Black Diamond Capital Management, L.L.C. and Alfred C. Eckert III, dated July 30, 2010; <u>Exhibit H</u>, First Amended and Restated Consulting Agreement between Black Diamond Capital Management, L.L.C. and Alfred C. Eckert III, dated December 3, 2010; and <u>Exhibit M</u>, Confidential Employment Agreement between Black Diamond Capital Management, L.L.C. and Peter R. Frank, executed by Peter R. Frank on July 30, 2010, and by Stephen H. Deckoff on August 24, 2010.

Kaye Scholer.  Mr. Frank and Mr. Eckert also determined to commence chapter 11 proceedings without a stalking horse bid.  GSC continued contentious discussions with BDCM leading up to the Petition Date on other aspects of these chapter 11 cases, including, for example, the release of funds to pay the Debtors' professionals for preparation of the cases, the consensual use of cash collateral and the form of bidding procedures that would govern the sale of GSC's assets.  Rejecting each overreaching demand made by Black Diamond, management asserted its independence from Black Diamond and at all times acted consistent with its fiduciary obligations to all parties.

In determining whether to file these cases, Mr. Frank and Mr. Eckert considered that GSC was in default under the Prepetition Credit Agreement for more than a year, numerous attempts at out of court restructuring deals had failed, BDCM indicated that it was not longer willing to allow GSC to use their collateral, and investors were losing patience, as evidenced by the Motion of Debtors For Order Enforcing the Automatic Stay With Respect to NJLP's Rights Under the Gemini CMA, filed on September 1, 2010 [Docket No. 16].  All of this culminated in the determination by GSC's board of directors that GSC needed to commence chapter 11 proceedings on August 31, 2010.

E.    **Negotiation of the Bid Procedures**

The negotiations regarding the sale process continued after the Petition Date, as the Debtors sought approval of bid procedures.  GSC's management delegated responsibilities to Capstone to negotiate the bid procedures, and were kept apprised by Capstone of developments in this regard.  The Debtors ultimately approved the bid procedures negotiated by Capstone.  Objections to the bid procedures were asserted by the Non-Controlling Lenders, investors and other creditors and parties in interest.  Ultimately, Black Diamond proposed an expedited sale process and conditioned the use of cash collateral on adherence to the sale timeline.

In September and October 2010, the Debtors' advisors spent substantial time negotiating with the Non-Controlling Lenders and moderating and facilitating negotiations among Black Diamond and the Non-Controlling Lenders. In the dispute over the bid procedures, the Non-Controlling Lenders propounded written discovery requests on the Debtors that resulted in the Debtors' production of several thousand pages of responsive documents in an extremely expedited period. Kaye Scholer responded to the discovery on behalf of the Debtors, and Mr. Eckert and Mr. Frank were produced for deposition.

Ultimately, the Debtors reached a consensus among the objecting parties and Black Diamond that resolved most of the objections to the bid procedures. Mr. Frank ultimately determined to pursue the sale with the modified bid procedures. The unresolved objections were disposed of at a hearing on September 23, 2010, following which the Bankruptcy Court entered an Order Approving Bidding Procedures, Form and Manner of Notice of Sale and Assumption and Assignment Procedures, dated September 24, 2010 [Docket No. 134] (the "<u>Bid Procedures Order</u>"), in which the Court approved the bid procedures as modified (the "<u>Bid Procedures</u>").

**F.**     <u>**Marketing Process**</u>

In the days leading up to the Petition Date, Capstone began contacting potential bidders and on the Petition Date, Capstone commenced its marketing campaign.

Capstone identified potential bidders based on their standing in the market, with a focus on their experience with assets similar to those offered for sale by the Debtors. In putting together its potential bidder list, Capstone utilized its understanding of GSC's business and its knowledge of, or connections to, strategic and financial buyers in GSC's industry, and supplemented that with additional names from GSC's management, Kaye Scholer and several contacts received from the Non-Controlling Lenders.

Capstone ultimately contacted well over 100 potential bidders. If a party expressed interest, Capstone provided a form confidentiality agreement. Capstone negotiated the terms of over 95 confidentiality agreements with potential bidders, and more than 80 executed confidentiality agreements were returned. All parties who signed confidentiality agreements were given access to the virtual data room and all performed due diligence.

Capstone, with the assistance of Kaye Scholer, prepared the electronic data room that was first made accessible on September 9, 2010, to interested parties who executed the required confidentiality agreement. To ensure a symmetrical process among potential bidders, the information available in the data room was identical for all bidders and was the same information that was made available to BDCM as a potential bidder for GSC's assets.

Capstone led the due diligence and negotiation efforts throughout the sale process. Capstone's efforts enabled potential bidders, in any stage of the process, to remain interested in the assets, resulting in a diverse and qualified group of bidders across the Debtors' multiple business units. This, in turn, laid the foundation for a successful auction because the qualified bidders had all spent considerable time conducting meaningful due diligence.

On October 22, 2010 -- the bid deadline under the Bid Procedures Order -- the Debtors received bids from eleven bidders.[8] After receipt, Kaye Scholer and Capstone reviewed each bid and determined that all bids received were qualified bids, under the terms of the Bid Procedures. One bid was a bulk bid for all or substantially all of GSC's assets. Two bids were based upon revenue sharing arrangements. Eight bids were for cash or cash and notes with respect to lots or combinations of lots.

---

[8] BDCF did not submit a bid prior to the auction. In accordance with the Bid Procedures, BDCF, as Agent, was permitted to bid at the auction.

In advance of the auction, Capstone valued each bid and Kaye Scholer analyzed each bid based on the modifications made to the form asset purchase agreement and other related documents. Capstone began its analysis by reviewing pricing for the secured debt under the Existing Credit Agreement. Prior to the auction, the market was suggesting a price for the debt in the range of $0.15 to $0.20, implying a value of $30 to $45 million for substantially all of GSC's assets. In addition, Capstone performed a separate valuation for GSC's assets based upon, among other factors, the projected cash flow for each lot/asset being sold. Based on these calculations, Capstone believed that the value for all or substantially all of the assets could, in a best case scenario, potentially reach approximately $140 million.

**G.    The Auction**

The auction commenced on October 26, 2010. Twelve bidders attended, plus representatives of the Non-Controlling Lenders who attended as observers. Mr. Frank was present for substantially all of the auction. The auction was initially to be conducted in phases:

- Phase 1:  Bulk bids for all or substantially all of the assets;

- Phase 2:  Bids for combinations of lots or assets; and

- Phase 3:  Individual bids for specific lots or assets.

The first phase of the auction ended on October 26, 2010, with only one bulk bid for substantially all of GSC's assets, from BDCM, in the amount of $5 million cash. The Agent declined to bid for the assets. The Debtors' professionals then commenced the combination phase of the auction, which included several bidders and various combinations of lots or assets. The combination phase lasted into the evening on October 26, 2010, and continued on October 27, 2010. Over the four-day auction, Capstone and Kaye Scholer met with individual bidders and was successful in getting them to gradually increase their bid levels and remain active.

Late in the second day, Capstone determined that the best way to get the overall bids to increase substantially was to allow bidding consortiums that could collectively compete with the Agent's credit bid rights in the approximate amount of $240 million. Because this would require bidders to combine their bids, Capstone approached the representatives of the Non-Controlling Lenders who were in attendance as observers throughout the auction. Capstone explained to them the rationale and further explained that this change would also permit BDCM and BDCF, as Agent, to develop a joint bid. Capstone told them that it would not permit joint bidding unless they agreed. After several hours of discussions with the representatives of the Non-Controlling Lenders, including their counsel, White & Case LLP, and financial advisors, Berkshire Capital Securities, LLC, they agreed with Capstone's approach. The Non-Controlling Lenders provided written consent to these modifications to the auction process (the "Consent Letter"). *See* Supp. Manzo Decl., Exhibit C. Based on the bids received to that point in the auction, this new tactic conservatively resulted in a $75-$90 million increase in the final price.

Thereafter, the auction procedures were modified as follows: (i) all bidders would now receive information on the highest bids received on every lot and combination, in sealed envelopes; (ii) all bidders would be allowed to speak to other bidders and combine bids to maximize value; (iii) all bidders would be allowed in the auction room; and (iv) Capstone and Kaye Scholer suggested bid configurations to assist bidder teams to maximize value.

At that time, the Debtors also informed bidders that the assets related to Lots 28-39 and 41-44, which included, without limitation, non-operating assets such as stock and options, the equity of each Debtor, key man life insurance, leases, causes of action and employee loans, were being removed from the auction. Based on the low values of the bids received for those assets, as well as information obtained during the marketing process, GSC and its professionals

determined that in order to maximize value, additional analysis and marketing was required. In accordance with the Bid Procedures Order, those lots were removed from the auction.[9]

The auction then proceeded and ended after four days (starting at approximately 9 a.m. on October 26, 2010, and ending at approximately 4:00 a.m. on October 29, 2010). In the first round of bidding under the modified procedures, the Debtors received eight bids from a total of nine bidders. Several of the bids included a component of revenue-sharing and the auction was adjourned for the night to allow Capstone to value the bids received. Capstone's valuations were used to compare each bid and determine the highest and best value at each round of the auction. The auction commenced again early on October 28, 2010, and each bidder was provided with (i) the Debtors' calculation of each bid's value, and (ii) each bidder's asserted bid value.

Thereafter, Capstone and Kaye Scholer conducted four additional rounds of bidding on October 28, 2010, into the early morning hours on October 29, 2010. In the second round, the Debtors received various bids or variations of those bids from seven bidders. In the third round, the Debtors received various bids or variations of those bids from seven bidders (not including the leading bid from the previous round). In the fourth round, the Debtors received various bids or variations of those bids from seven bidders. Lastly, in the fifth and final round, the Debtors received three bids (from a total of four bidders).

After the fourth round, the highest bid was an astonishing $190 million by Black Diamond. At that time, Capstone believed that an additional change was appropriate, as allowed

---

[9] BDCF objected to the removal of the assets on the record at the auction. The Debtors considered the objection and responded on the record. Thereafter, in a "middle of the night" exchange of correspondence, BDCF asserted, again, its objection to the removal of the assets. *See* Supp. Manzo Decl., Exhibit D. The Debtors, after further consideration of BDCF's position, reiterated that the assets would be removed in the Debtors' discretion under the terms of the Bid Procedures Order. *See* Supp. Manzo Decl., Exhibit E.

by the Bid Procedures Order. Based upon the value of the bids received, Capstone determined, in consultation with Kaye Scholer, that the fifth round would be conducted with sealed bids as the final round of bidding. All bids would be submitted in closed envelopes and the highest qualified bid at the end of the round would be declared the winner. This would require bidders to make their best offer and was intended to drive the price even higher.

Ultimately, BDCM and BDCF, as Agent, submitted a joint bid that the Debtors determined was highest and best bid for the assets in the amount of $235 million, comprised of $5 million cash, $6 million of notes and a credit bid of $224 million.[10] The bid was $41 million higher than the second highest bid received in the final round. After consultation with Capstone and Kaye Scholer, the Debtors accepted the bid. *See* Supp. Manzo Decl. at ¶39; Dec. 20 Frank Decl. at ¶24. There was no bid made at auction that represented a value to the Debtors' estates greater than Black Diamond's bid and, in fact, both Black Diamond's and the Non-Controlling Lenders' experts have testified that the price obtained was substantially greater that their respective valuations of the purchased assets.

## H. The Amendment to the APA

On December 3, 2010, the Debtors and Black Diamond entered into an amendment to the APA, described further below, which, in relevant part, provides for Black Diamond's purchase of certain UK assets for an additional $700,000, increasing the total value of the winning bid to $235.7 million [Docket No. 269]. In addition, on December 18, 2010, the Debtors filed a letter agreement and counterpart to the APA which assigns the cash bid items to the designated purchaser, GSC Acquisition Holdings, LLC, and the Agent [Docket No. 334].

---

[10] BDCM and BDCF, as Agent, also submitted a $250 million bid comprised of cash and a note in the amount of $11 million, plus a $239 million credit bid which bid was rejected by the Debtors because it included the assets that were removed from the auction process.

The impact of the election means that there will be no allocation of assets among the cash bid and the credit bid.

## ARGUMENT

### A.    The Non-Controlling Lenders have failed to establish Cause under Section 1104(a)

As the Second Circuit has noted, "the standard for § 1104 appointment is very high." *In re Smart World Techs., LLC,* 423 F.3d 166, 176 (2d Cir. 2005) (dicta).  Court's have discretion to grant the appointment of a trustee but that discretion is not unfettered.  *In re Sletteland*, 260 B.R. 657, 672 (Bankr. S.D.N.Y. 2001) (denying motion to appoint trustee given the "strong presumption that the debtor should be permitted to remain in possession in a Chapter 11 case").  In recognition of all these considerations, courts have held that the parties seeking appointment of a trustee must prove the need for a trustee by "clear and convincing evidence." *In re Euro-American Lodging Corp.*, 365 B.R. 421, 426 (Bankr. S.D.N.Y. Apr. 3, 2007).  For all of the reasons set forth below, the Non-Controlling Lenders have failed to meet their burden.

### B.    The Debtors have Maintained Proper Corporate Governance

GSC Group, the parent corporation of the Debtors' operating entities, is a corporation organized under the laws of Delaware.  The operations of substantially all of the GSC entities are ultimately governed by GSC Group and its officers and directors.  *See* First Day Affidavit, Exhibit A.

GSC Group has at all times maintained proper corporate governance in accordance with Delaware law.  Mr. Eckert and Mr. Frank are the directors and officers of GSC Group and as such are authorized to act on behalf of the GSC.  *See* Delaware General Corporation Law (the "DGCL") §§ 141(a) and 142(a); Amended and Restated By-Laws of GSC Group Section 3.01 ("the business and affairs of the Corporation shall be managed by or under

the direction of the Board of Directors"); Amended and Restated Certificate of Incorporation of GSC Group Section 7.01 (same).[11]  Accordingly, Mr. Frank and Mr. Eckert are properly acting on behalf of GSC Group.

1.    Written Consent in Lieu of a Meeting of Stockholders

On August 31, 2010, Mr. Eckert, in his position as president and general partner of GSC Active Partners, Inc., authorized AP Holdings to execute a certain Written Consent in Lieu of a Meeting of the Stockholders of GSC Group, Inc., dated August 31, 2010 [Docket No. 1 at ¶10] (the "Stockholder Consent").[12]  The Stockholder Consent approved the filing of these chapter 11 cases and provides that the board of directors of GSC Group is "authorized to take or cause to be taken any and all action and to authorize the officers of the Corporation to take or cause to be taken any and all action and to execute, file or deliver . . . all necessary documents . . . in connection with the chapter 11 cases . . . ."  *Id.*

2.    Unanimous Written Consent in Lieu of a Meeting of the Board of Directors of GSC Group, Inc.

On August 31, 2010, Mr. Frank and Mr. Eckert, the directors of GSC Group, executed, pursuant to Section 14(f) of the Delaware General Corporation Law, a certain Unanimous Written Consent in Lieu of a Meeting of the Board of Directors of GSC Group, dated August 31, 2010 (the "Unanimous Board Consent") [Docket No. 1 at ¶7].  *See* Dec. 20 Frank Decl., Exhibit 1.  The Unanimous Board Consent references the fact that the shareholders'

---

[11]    On December 24, 2009, Section 7.01 of the Amended and Restated Certificate of Incorporation of GSC Group, Inc. was further amended pursuant to a Certificate of Amendment to provide that, "[t]he business and affairs of the Corporation shall be managed by or under the direction of a Board of Directors consisting of not less than (2) nor more than eleven (11) directors . . . ."

[12]    *See* Exhibit 1 to the Declaration of Peter R. Frank in Support of Debtors' Objection to Non-Controlling Lender Group's Motion for Appointment of Chapter 11 Trustee (the "Dec. 20 Frank Decl."), filed contemporaneously herewith.

agreement dated October 1, 2005 among GSC Group and its shareholders requires approval of GSC's Board of Directors for the commencement of bankruptcy, insolvency, liquidation or similar proceedings with respect to GSC Group or its shareholders. The Unanimous Board Consent approved the filing of these chapter 11 cases and provides in relevant part that the Chief Executive Officer, Mr. Eckert, and the Senior Managing Director, Mr. Frank, are Authorized Officers (as defined therein) and that either Authorized Officer is (i) "authorized empowered and directed . . . to execute and verify a petition in the name of the Corporation or its Subsidiaries," (ii) "authorized to execute and file or cause to be executed and filed . . . all necessary documents . . . which they or any one of them deem necessary, proper or desirable in connection with the chapter 11 case," and (iii) with full authority to act without the other . . . in the name and on behalf of the Corporation, to take or cause to be taken any and all such further action and to execute . . . all such further agreements, documents, certificates and undertakings . . . as in their judgment shall be necessary, appropriate or advisable to effectuate the purpose and intent of any and all of the foregoing resolutions." *Id.*

3. Mr. Frank's and Mr. Eckert's Actions with Respect to the Sale Process are Supported by Applicable Law

Mr. Frank's and Mr. Eckert's actions, as directors of GSC, with respect to the sale process are appropriate and are supported under applicable law. The Non-Controlling Lenders assert in the Motion that the alleged conflicts of the Debtors' directors require the immediate appointment of a trustee. However, it is clear from the Motion that the Non-Controlling Lenders have not and cannot allege facts warranting such an extreme remedy.

The Debtors' directors approved the sale in accordance with their corporate organizational documents and applicable law. *See* Amended and Restated By-Laws of GSC Group Section 3.01; Amended and Restated Certificate of Incorporation of GSC Group Section

7.01; Dec. 20 Frank Decl. at ¶24.  The business judgment rule traditionally applied to transactions under section 363(b) of the Bankruptcy Code provides that if the Debtors can make a showing of a legitimate business justification for the sale, there is a the presumption that the Debtors' decision was made "on an informed basis, in good faith and in the honest belief that the action was taken in the best interests of the company."  *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).  As set forth at length in the Sale Brief, there are sufficient facts to justify the validity of the sale and auction process and a legitimate business justification to warrant the presumption of the business judgment rule.  *See* Sale Brief ¶¶19-27.

Instead of analyzing the sale under these well-established legal principals, the Non-Controlling Lenders try to obfuscate the issue by altering the legal analysis.  Specifically, the Non-Controlling Lenders argue that the Debtors' directors are conflicted and incapable of discharging their fiduciary duties.  The law holds otherwise.  Even assuming the allegations set forth in the Motion are true, Mr. Frank's and Mr. Eckert's corporate actions are still legal, they are just subject to higher scrutiny.  Thus, the sale should be approved if the Debtors establish the "entire fairness" of the transaction.  *See In re Integrated Res., Inc.*, 147 B.R. at 658 (*quoting Mills Acquisition Co. v. Macmillan Inc.*, 559 A.2d 1261, 1279 (Del. 1988)).

The Debtors have already set forth substantial evidence and legal argument through the Sale Brief and the Manzo Declarations to satisfy any questions as to the entire fairness of the transaction.  By way of summary:[13]

- The sale process was approved by Mr. Frank and Mr. Eckert.  Dec. 20 Frank Decl. at ¶24.

---

[13] For a complete discussion on the sale process *see* Sale Brief pp. 3-16 and 24-26; *See also*, Supp. Manzo Decl.

- The sale process, culminating in the auction, was conducted appropriately. Supp. Manzo Decl. at ¶39 [Docket No. 271].

- The process began months prior to the Petition Date and included lengthy negotiations regarding a potential stalking horse bid, bidding procedures, the consensual use of cash collateral, and other matters critical to these chapter 11 cases. Those negotiations were conducted by the Debtors and their advisors at all times in good faith. The record is rife with clear examples of contentious, arm's length negotiations between Black Diamond and Capstone/Kaye Scholer at all times supported by management. Supp. Manzo Decl. at ¶¶15; 16; 17.

- Mr. Eckert and Mr. Frank delegated to Capstone the authority to conduct the sale process. Capstone led every aspect of the sale and auction process and kept Mr. Eckert and Mr. Frank apprised of all aspects of the sale. Dec. 20 Frank Decl. at ¶23.

- The auction lasted four days, and was highly contentious. Supp. Manzo Decl. at ¶35.

- Prior to the auction, the Debtors received a single bulk bid, from BDCM, to buy GSC's assets for $5 million. Supp. Manzo Decl. at ¶13.

- The winning bid was the highest and best bid at the auction and had a value of $235 million, consisting of $5 million cash, a note for $6 million, and a credit bid of $224 million. The next best bid was a revenue sharing arrangement that Capstone valued in the range of $193.7 million—$41 million less than Black Diamond's winning bid. Supp. Manzo Decl. at ¶38; Dec. 20 Frank Decl. at ¶¶ 23; 37.

- At the conclusion of the auction, the Debtors accepted the highest bid and locked in a price that provides tremendous value to the estates. Supp. Manzo Decl. at ¶¶39; 41; Dec. 20 Frank Decl. at ¶36.

Mr. Eckert's and Mr. Frank's actions have been entirely consistent with their fiduciary obligations. The actions giving rise to the sale should be approved both as a sound exercise of the Debtors' business judgment or under the higher "entire fairness" standard.

4.      Shareholder Approval is Not Required for a 363 Sale

As set forth above, the sale process, these chapter 11 cases, and ultimately the sale of substantially all of the GSC's assets, were properly approved by GSC Group's Board of

Directors. Dec. 20 Frank Decl. at ¶24. No additional approvals are necessary, including approvals by shareholders.

After notice and a hearing, a debtor-in-possession may sell all or substantially all of its assets if the proposed sale is approved by the court. *See* § 363(b); *In re Tempo Tech. Corp.*, 202 B.R. 363, 365-66 (D.Del.1996). The debtor-in-possession need not obtain shareholder approval for such sales. *See In re Entz*, 44 B.R. 483, 485 (Bankr.D.Ariz.1984).

The record is clear, the Debtors have maintained proper corporate governance. Mr. Frank and Mr. Eckert were authorized to act and acted in accordance with applicable law.

**C.       The Debtors are Properly Managing the Day to Day Affairs of GSC**

The Debtors are properly managing the day to day affairs of GSC and appointment of a trustee is not warranted. *See In re Adelphia Communications Corp.*, 336 B.R. 610, 658 (Bankr. S.D.N.Y. 2006) (holding that the appointment of a trustee is "the exception, rather than the rule."); *Schuster v. Dragone (In re Dragone)*, 266 B.R. 268, 271 (D. Conn. 2001); *see also In re Sletteland*, 260 B.R. 657, 672 (Bankr. S.D.N.Y. 2001) (denying motion to appoint trustee given the "strong presumption that the debtor should be permitted to remain in possession in a Chapter 11 case"). [14]

The Non-Controlling Lenders do not allege that the operations of the business or the decisions made in connection therewith are tainted. To the contrary, Mr. Frank has run the day to day operations in accordance with his fiduciary obligations and has preserved value pending the proposed sale. As set forth herein, Mr. Frank is authorized under the by-laws and

---

[14]       "[I]t is presumed that a Chapter 11 debtor will remain in possession and control of its assets during the pendency of a bankruptcy proceeding," and therefore "courts will grant relief under § 1104(a) only in extraordinary cases." *In re Fairwood Corp.*, No. 99 Civ 3177 (HB), 2000 WL 264319, at *2 (S.D.N.Y. Mar. 9, 2000) (affirming bankruptcy court's denial of motion to appoint trustee), *aff'd*, 242 F.3d 364 (2d Cir. 2001).

certificate of incorporation to operate the business and continues to manage and be involved in every aspect of the sale process. Dec. 20 Frank Decl. at ¶¶ 15-25.

Since the commencement of these cases, the Debtors have generally performed well and are cash flow positive. Mr. Frank maintains relationships with investors and has worked diligently to maintain morale and confidence in the process. Dec. 20 Frank Decl. at ¶22. Mr. Frank also continues to serve on the Board of a number of portfolio companies.

As a further example, Mr. Frank and Mr. Eckert have fought back against improper advances by Black Diamond with respect to one of GSC's portfolio companies, Color Spot. For more than two years, Black Diamond attempted to purchase Color Spot and combine it with one of its distressed portfolio companies, a competitor of Color Spot, Hines. For those two years, Mr. Frank, who is a director of Color Spot and on the advisory board of the funds that own Color Spot, has rejected Black Diamond's offers as too low. The parties are still in discussions, but there is no definitive agreement. Deposition Transcript of Peter R. Frank, December 14, 2010, pp. 20-74.

**D.      The Debtors Decisions about the Sale Process have been Appropriate and Remain Subject to Court Approval**

The Debtors' determination to select Black Diamond's bid as the winning bid was appropriate. Mr. Frank is a director and officer of GSC Group and authorized to act on behalf of the Debtors. In addition, the sale process is proceeding under section 363 of the Bankruptcy Code and therefore remains a Court-supervised process. This Court has ample authority to approve the transaction either as a sound exercise of the Debtors' business judgment or under a heightened standard. *See In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992); *In re Royster Co.*, 145 B.R. 88 (Bankr. M.D. Fla. 1992) (Court declined to appoint a trustee because

alleged conflicts were disclosed and the actions at issue would require court approval, and receive scrutiny from parties in interest); *In re Clinton Centrifuge, Inc.*, 85 B.R. 980 (Bankr. E.D. Penn. 1988).

Notwithstanding a relationship between a debtor's insiders and a potential purchaser, bankruptcy courts can approve a sale process so long as the sale process is conducted fairly and there is no finding of fraud or bad faith. *In re Filtercorp, Inc.*, 163 F.3d 570, 577 (9th Cir 1988) (although a purchaser was comprised of a debtor's insiders, there was no evidence of collusion between the debtor and the purchaser to deny an unsuccessful bidder access to information or the time necessary to make an effective bid); *Starr v. Player Wire Wheels, LTD.*, 2010 WL 2927187 (N.D. Ohio 2010) (the mere fact that the purchaser of the assets is also a party to the bankruptcy proceeding is insufficient to demonstrate a lack of good faith since record indicated that the debtor's assets were sold to the purchaser at a price reflecting the full value of the debtor's allowed claims as defined under the court-approved liquidation plan, and since the court found no indication that the sale was conducted in bad faith); *In re Triangle Transport, Inc.*, 419 B.R. 603 (Bankr. D. N.J. 2009) (court approved a sale to group of insiders of a chapter 7 debtor because it was established that the insiders had made a credible bid in a fully vetted and noticed sale process, their conduct did not involve fraud in the sale process, and that they did not take grossly unfair advantage of other bidders).

Further, GSC has relied heavily on the services of Capstone to run the sale and auction process. Capstone assisted Mr. Eckert and Mr. Frank in the early stages of negotiations. Thereafter, the Debtors delegated to Mr. Manzo the authority to conduct an impartial sale and auction process. Dec. 20 Frank Decl. at ¶23. Capstone and Kaye Scholer were in charge of every aspect of the process and kept Mr. Eckert and Mr. Frank apprised of all aspects of the sale.

Mr. Frank attended substantially all of the auction and consulted with the Capstone and Kaye Scholer prior to making the determination that Black Diamond's bid was the highest and best. *Id.*

In their relentless attacks on the sale process, the Non-Controlling Lenders ignore a simple but compelling fact—the successful bid was more than $41 million greater than the next bid. Mr. Frank's exercise of his fiduciary duties was justified based upon price alone.

## E.        **Prepetition Employment Contracts are not Per Se Debilitating**

The Trustee Motion, which is 36 pages long, focuses almost entirely on Mr. Eckert's conduct. The only arguments made with respect to Mr. Frank allege that (i) he signed an agreement for future employment with Black Diamond, contingent upon Black Diamond becoming the successful bidder for the rights to manage the Recovery funds, and (ii) he holds an unsecured claim for prepetition compensation as well as shares of senior preferred stock. (*See* Motion at ¶¶14-15. On those bases alone, the Non-Controlling Lenders contend that Mr. Frank is hopelessly compromised and rendered legally unable to discharge his fiduciary obligations.

Notwithstanding those conclusory allegations, there is nothing unusual or improper about a management team agreeing to terms for future employment with a buyer before the purchase and sale agreement is signed. *See In re Boradmoor Place Investments, L.P.*, 994 F.2d 744, 746 (10th Cir. 1993) (in declining to vacate a sale for alleged collusion based on a contract between the bidder and the debtor, the Tenth Circuit noted that the existence of the agreement—albeit not its details—was set forth in the bid on which the bankruptcy court had acted, negating any claims of concealment or collusion); *In re Thomson McKinnon Securities, Inc.*, 120 B.R. 301, 305 (Bankr. S.D.N.Y. 1990) (the court approved an asset sale even though the successful bidder had entered into a lock-up agreement, pursuant to which three key

employees agreed to support the bidder's offer in exchange for future equity interest in the new purchasing entity). In fact, such arrangements are common in practice, and a buyer knowing the terms on which it can hire the individuals who ran the business makes perfect business sense. Certainly other bidders discussed terms of future employment with Mr. Frank. Dec. 20 Frank Decl. at ¶33.

At the time that Mr. Eckert and Mr. Frank negotiated their future agreements, Black Diamond held a majority of the defaulted bank debt, had just replaced the agent with a Black Diamond affiliate, and was in discussions with GSC about becoming the stalking horse in a sale of GSC's assets. Those agreements were vigorously negotiated, and there is no evidence that Mr. Eckert or Mr. Frank agreed to compromise their fiduciary obligations in exchange for those agreements. To the contrary, they honored their obligations by delegating the sale and auction process to GSC's professionals and achieving a sale price far greater than anyone expected.

Similarly, there is nothing disqualifying about Mr. Eckert and Mr. Frank holding unsecured claims for unpaid compensation or shares of GSC's preferred stock. To the extent that there are bona fide concerns about Mr. Eckert or Mr. Frank receiving distributions on account of their claims or interests, those concerns can and should be addressed in the claims allowance process, versus denying a transaction that benefits other junior stakeholders.

**F.      Mr. Eckert's Sale of Personal Claims Have No Effect on the Estates**

The Non-Controlling Lenders take issue with the fact that Mr. Eckert sold his claim and an option to purchase shares. The Non-Controlling Lenders ignore several important facts. First, the equity and claim are Mr. Eckert's personal property and he is entitled to dispose of them as he wishes. Second, Mr. Eckert acted against the advice the Debtors' advisors. Third,

the agreement was negotiated without Kaye Scholer or Capstone. Second Supp. Manzo Decl. at ¶¶ 8; 12. This is nothing more than a personal lapse of judgment by Mr. Eckert. It has had <u>no</u> impact on the conduct of the Debtors or the results achieved in these cases. Instead, the record set forth herein, dispels any notion that the Debtors have been improperly managed.

## G.     The Motion Mischaracterizes or Misstates Facts

The Motion is replete with misstatements and exaggerations. Set forth below are several examples.[15]

- Misstatement: Mr. Eckert and Mr. Frank have become "quasi-agents" of Black Diamond (Motion at ¶2).

  - Response: the Non-Controlling Lenders have made no factual or legal showing that an agency relationship exists.

- Misstatement: "Mr. Eckert made clear that new compensation was a "prerequisite to moving forward with the [auction] process" (Motion at ¶3).

  - Response: Mr. Eckert actually testified that "I was reluctant to sign a contract before I knew what—what this entailed, what I felt like doing with—when this horror show was finished and how [Mr. Deckoff] and I got along."

- Misstatement: Mr. Frank's and Mr. Eckert's employment agreements were a prepetition arrangement to effectuate "delivery of assets to Black Diamond in exchange for $6,000,000 . . . ." (Motion at ¶3).

  - Response: The conspiracy theory lacks merit because Mr. Eckert, Mr. Frank and Black Diamond were all well aware that the sale of assets in the chapter 11 cases would be part of a court supervised process and subject to higher and better offers. In the face of these facts and the outcome of the auction, the conclusory statements by the Non-Controlling Lenders are without merit.

- Misstatement: The Debtors have "no trustworthy fiduciary to manage the property and affairs of the Debtors." (Motion at ¶5).

  - Response: As detailed above, Mr. Frank oversees the Debtors' day to day operations and has appropriately exercised his fiduciary

---

[15]     The list below is not intended to be an exhaustive analysis of the inaccuracies in the Motion and the Debtors reserve their rights to with respect to these issues after appropriate notice has been given.

duties. Further, Mr. Eckert's role as a board member approving significant transactions has not been compromised. Finally, the Non-Controlling Lenders have put forth no evidence to suggest that the sale process and the end result was impacted by the alleged misconduct.

- Misstatement: "Rather than acting in the best interests of the Debtors' estates and creditors, management has abused its authority to the benefit of insiders in control . . . and Black Diamond. (Motion at ¶7)

  o Response: There is no evidence that Mr. Eckert's or Mr. Frank's actions in connection with these chapter 11 cases abused their authority. To the contrary, the evidence, most importantly the results of the auction, shows that the auction and its outcome were detrimental to Black Diamond by virtue of the fact that their winning bid was $40 million higher than the next best bid. A Black Diamond representative has testified that they overpaid for the assets.

- Misstatement: Mr. Frank's and Mr. Eckert's employment agreements GSC are "Undisclosed" (Motion at ¶15).

  o Response: The employment agreements are included on Schedule G of the Schedules of Assets and Liabilities of GSCP (NJ), L.P. and each is described as "Employee Incentive Compensation Plan Agreement."

- Misstatement: Peter Frank knew his agreement with BD was "facially improper" because he didn't want it disclosed (Motion at ¶29)

  o Response: This unsubstantiated statement is based on a single email in which Mr. Frank indicated he would disclose the employment agreement if he had to. This does not indicate impropriety, and can be easily explained by the simple fact that Mr. Frank preferred not to have his compensation a matter of public record. Mr. Frank did, in fact, disclose its existence in his declaration filed on the very first day these cases were filed.

- Misstatement: "Debtors made a tactical decision to hold back the amendments until after the deposition was complete in order to shield it from inquiry" (Motion Supplement at ¶1)

  o Response: Andrew Hammond, Esq, Counsel to the non-controlling lenders, was well aware at the continued deposition of Mr. Manzo on December 17, 2010 (the "Continued Manzo Trans.") that the "amendments" were subject to ongoing

negotiation between the Debtors and BDCM. At the deposition, Mr. Manzo was extensively questioned for nine pages on the very subject at the December 17, 2010 deposition.[16] [Continued Manzo Trans. at p. 169, ln. 4 - p. 178] As further evidence of the contingent and highly disputed nature of the "amendments," and that the Debtors were not making a "tactical decision," the "amendments" themselves were never executed between the parties or filed. Instead, GSC Acquisition Partners, LLC made an election pursuant to section 12.8 of the APA to assign the Cash Bid Allocable Items [See Docket No. 334]. The Debtors were not a counterparty to this agreement.

- o The Debtors' counsel were in continual contact with counsel to the Non-Controlling Lenders during this process. They produced nearly 500 pages of documents after completing a review. Mr. Manzo was also offered to be made available for another deposition on this issues.

- Misstatement: A "side deal" was negotiated between Mr. Eckert and Black Diamond "at the same time" as the Debtors and Black Diamond negotiated the December 3 Amendment to the Asset Purchase Agreement (Motion Supplement at ¶2)

  - o Response: The amendments to the Asset Purchase Agreement were negotiated on November 30, 2010.[17] Mr. Manzo first learned about discussions regarding the Option Agreement on December 1, 2010. Continued Manzo Trans at p. 2, ln. 24-25 - p. 3, ln 1-3

---

[16] In order that the Court not receive copies of the same voluminous documents multiple times, the Debtors incorporate by reference the copy of the Continued Manzo Trans. attached as <u>Exhibit C</u> to the Declaration of Rebecca M. Bodony in Support of the Supplement to Motion of the Non-Controlling Lender Group for Order Appointing a Trustee Pursuant to 11 U.S.C. § 1104(b) [Docket No. 340]

[17] Continued Manzo Trans. at p. 4, ln 22-5 - p. 5, ln 1-2:

Q: At the conclusion of those negotiations on November 30th you understood you had an agreement with Black Diamond, though, an amendment to the APA; is that right?

A: That's correct.

- Misstatement: The Debtors settled a $6 million dispute by transferring approximately $5.2 million to BDCM (Motion Supplement at ¶ 2)

  - Response: The Settlement resulted in approximately $4.5 million of value to BDCM and $700,000 to the Debtors. Continued Manzo Trans at p. 57, ln. 9-24.

- Misstatement: Timing and purpose of the Option Agreement are obviously key to this Court's determination of the propriety of the Asset Purchase Agreement (Motion Supplement at ¶ 2)

  - Response: The Option Agreement is a red herring, having nothing to do with the merits of the sale or the operations of the Debtors' estates. It is a transaction that the Debtors' professionals believed would cause a tempest in a teapot. Continued Manzo Trans at p. 8, ln. 3-8.

- Misstatement: Mr. Manzo's disclosures to the Court now appear to be less than fully candid (Motion Supplement at ¶ 4)

  - Response: Mr. Manzo stands by his sworn testimony.

- Misstatement: Mr. Manzo's testimony set up a "material conflict" between the professionals in these cases and their client (Motion Supplement at ¶ 7)

  - Response: The professionals' clients are the estates. As the Non-Controlling Lenders are fully aware, Mr. Eckert in his individual capacity is represented by his own counsel.

- Misstatement: Mr. Manzo's testimony regarding Mr. Eckert's statements is "a fact that by itself constitutes 'cause' to appoint a trustee (Motion Supplement at ¶ 7)

  - Response: Mr. The Non-Controlling Lenders cite no law on this point. Moreover, actions taken by Mr. Eckert in his individual capacity are not the actions of the Debtors.

- Misstatement: In signing the Option Agreement, Mr. Eckert was acting on behalf of the Debtors as "the individual is the client." (Motion Supplement at ¶ 7)

  - Response: As the Non-Controlling Lenders are aware, Mr. Eckert has his own counsel with respect to the Option Agreement. Mr.

Manzo advised Mr. Eckert that neither Kaye Scholer nor Capstone represented Mr. Eckert in his individual capacity. Continued Manzo Trans at p. 148, ln. 16-21.

- Misstatement: The process has been corrupted because the Option Agreement and the APA Amendment are inextricably intertwined (Motion Supplement at ¶ 10)

  o Response: The APA Amendment and the Option Agreement were not contemporaneously negotiated. The Debtors professionals took no part in the negotiation or execution of the Option Agreement; the Option Agreement is not an obligation of the estates. If anything, the Option Agreement creates a perception issue that is being exploited by the Non-Controlling Lenders for their own inter-creditor fight. Continued Manzo Trans at p. 29, ln. 19-22.

- Misstatement: The "needle" Mr. Manzo is threading is that a deal or the economics of the Option Agreement was known but that he did not know the agreement was executed until after the adjournment of the December 6, 2010 hearing (Motion Supplement at ¶ 11)

  o Response:  Mr. Manzo was very clear that he previously understood the economics of the Option Agreement being contemplated, Continued Manzo Trans. at p.44, ln. 15-25 - p. 45, ln 1-5., but that he did not learn that the Option Agreement was executed by the parties until the afternoon of December 6, 2010, Continued Manzo Trans. at p. 46, ln. 11-22.

- Misstatement: Evidence has surfaced that indicates that the Debtors' counsel were aware by December 4, 2010 that the Option Agreement had been signed (Motion Supplement at ¶ 11)

  o Response: This is false. The first time Mr. Manzo saw the Option Agreement was at his deposition. Continued Manzo Trans. at p. 157, ln. 25 - p. 158, ln. 1-9. Mr. Solow never opened the Option Agreement either. Continued Manzo Trans. at p. 160, ln. 5-9. Finally, the documents sent by Mr. Heller were not executed by Mr. Eckert.

- Misstatement: Mr. Manzo believed that it was appropriate for BDCM and Mr. Eckert to have an oral arrangement that would provide Mr. Eckert

with substantial consideration, provided that the deal was not reduced to writing.

- o Response: Mr. Manzo said nothing of the sort. Mr. Manzo repeatedly counsel Mr. Eckert not to sign an agreement with Mr. Deckoff or BDCM.

## **CONCLUSION**

The Non-Controlling Lenders have failed to meet the substantial burden for removing the debtor-in-possession. The actions of the Debtors, both directly through their officers as well as their Court-approved professionals, have represented the interests of theses estates at every turn. The efforts of all parties to maximizing value of the assets both before filing and during these cases have been shut down and instead the Court should review for approval a sale that has been appropriately negotiated and that will result in a substantial return for the estates and all parties in interest.

Dated:   December 21, 2010
         New York, New York

Respectfully submitted,

**GSC GROUP, INC., ET AL.,**

KAYE SCHOLER LLP

By:  */s/ Michael B. Solow*
Michael B. Solow
Seth J. Kleinman
425 Park Avenue
New York, NY 10022
Telephone:  (212) 836-8000
Facsimile:  (212) 836-8689

-and-

D. Tyler Nurnberg
Anthony G. Stamato
Matthew J. Micheli
70 West Madison Street, Suite 4100
Chicago, IL 60602
Telephone:  (312) 583-2300
Facsimile:  (312) 583-2360