1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 10-14653-ajg

5   - - - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   GSC GROUP, INC., et al.,

9

10           Debtors.

11

12  - - - - - - - - - - - - - - - - - - - - - -x

13

14              United States Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              December 22, 2010

19              9:01 AM

20

21  B E F O R E:

22  HON. ARTHUR J. GONZALEZ

23  CHIEF U.S. BANKRUPTCY JUDGE

24

25

1

2    HEARING re Motion to Appoint Trustee.   Objections Filed.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Transcribed by:   Pnina Eilberg

25

1

2   A P P E A R A N C E S :

3   KAYE SCHOLER LLP

4           Attorneys for Debtors

5           3 First National Plaza

6           70 West Madison Street

7           Suite 4100

8           Chicago, IL 60602

9

10  BY:    MICHAEL B. SOLOW, ESQ.

11          ANTHONY G. STAMATO, ESQ.

12          D. TYLER NURNBERG, ESQ.

13          MATTHEW J. MICHELI, ESQ.

14

15

16  LATHAM & WATKINS LLP

17          53rd at Third

18          885 Third Avenue

19          New York, NY 10022

20

21  BY:    DAVID M. BRODSKY, ESQ.

22

23

24

25

1

2   LATHAM & WATKINS LLP

3        Attorneys for Black Diamond Capital Management

4        233 South Wacker Drive

5        Suite 5800

6        Chicago, IL 60606

7

8   BY:   DOUGLAS BACON, ESQ.

9        ALICE DECKER BURKE, ESQ. (TELEPHONICALLY)

10

11

12   LATHAM & WATKINS LLP

13        Attorneys for Black Diamond Capital Management

14        355 S. Grand Avenue

15        Los Angeles, CA 90071

16

17   BY:   VICKI E. MARMORSTEIN, ESQ. (TELEPHONICALLY)

18

19

20

21

22

23

24

25

UNITED STATES DEPARTMENT OF JUSTICE

      Office of the United States Trustee

      33 Whitehall Street

      21st Floor

      New York, NY 10004


BY:   ANDREA B. SCHWARTZ, ESQ.



WHITE & CASE LLP

      Attorneys for Non-Controlling Lenders

      1155 Avenue of the Americas

      New York, NY 10036


BY:   J. CHRISTOPHER SHORE, ESQ.

      ANDREW W. HAMMOND, ESQ.

      EVAN C. HOLLANDER, ESQ.

      RADEK PAWLOWSKI, ESQ. (TELEPHONICALLY)

      IAN SILVERBRAND, ESQ. (TELEPHONICALLY)

1

2    WINSTON & STRAWN LLP

3          Attorneys for Black Diamond Commercial Finance

4          35 W. Wacker Drive

5          Chicago, IL 60601

6

7    BY:   GREGORY M. GARTLAND, ESQ. (TELEPHONICALLY)

8

9

10   AKIN GUMP STRAUSS HAUER & FELD LLP

11         Attorneys for Interested Party, Limited Partners & Funds

12         1 Bryant Park

13         New York, NY 10018

14

15   BY:   NATALIE E. LEVINE, ESQ. (TELEPHONICALLY)

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2          THE COURT:  Please be seated.

3      (Pause)

4          THE COURT:  All right.  Let's set forth how we'll

5   proceed this morning.  First I'll -- I want to address Mr.

6   Shore with respect to the 2019 issue that was raised yesterday

7   by an e-mail from my chambers to Mr. Shore and cc'd to the

8   various other counsel.

9          Once that's disposed of it's my estimate that it

10  seemed, based upon the agenda submitted, there's approximately

11  seven hours set forth as the time for this hearing.  So we'll

12  proceed this morning till about 12 or 1 o'clock, take a break

13  and then continue this afternoon.

14          My intentions are the following with respect to

15  ruling, is either rule tonight or tomorrow morning at 9 a.m.

16  If I grant the motion and a trustee is directed -- the U.S.

17  Trustee is directed to select a trustee then I would schedule a

18  status conference with that trustee on 12/28 at 9 o'clock in

19  the morning.

20          If I deny the motion, then we will proceed to the sale

21  and I would expect that sale to take place on 12/27 or 12/28.

22  But -- well, I'll allow some time for discussion of those

23  issues when we reach that point in these proceedings.

24          All right.  Mr. Shore?

25          MR. SHORE:  Thank you, Your Honor.  Let me address the

1  2019 issues.  The 2019 statement just hit the docket.  I don't

2  have copies here in court because we were working on it.  I'll

3  be printing them out but let me tell you what's in there.

4          White & Case represents the group that we've been

5  calling the non-controlling lenders.  It's over thirty holders,

6  all of whom are identified in the 2019 statement with aggregate

7  secured claims under the facility or under the swap agreement

8  in excess of eighty million dollars.

9          It essentially represents all of the secured creditors

10 under the prepetition credit agreement other than Black Diamond

11 and ING.  So that's what's disclosed on the statement.  We're

12 in the process of tracking down any additional information

13 which the Court may require, but that's what we've set forth.

14          THE COURT:  And why was it not filed before today?

15          MR. SHORE:  I do not know.  Just -- I don't think

16 people focused on that issue.

17          THE COURT:  Well, it is a bit troubling to me.  I

18 mean, it is a situation where you find yourself, as a firm,

19 often representing parties who should file 2019 and it's

20 something that really should be, I think, given a higher

21 priority in terms of these representations.

22          All right.  I will review them during one of the

23 breaks and if I have anything further to add I will do so at

24 that time.

25          MR. SHORE:  Thank you, Your Honor.

1    THE COURT:  All right.  All right.  You may proceed,

2    then, with your opening statement.

3    MR. SHORE:  All right.  Thank you, Your Honor.  And

4    let me thank the Court for making time on such short notice to

5    take up what is essentially an agreed expedited motion between

6    the parties for a -- for the appointment of a trustee.  There

7    have been a lot of papers filed and a lot of exhibits filed and

8    I don't think we can properly address for the Court today all

9    of the issues that have been raised and all of the exhibits

10   that have been put before the Court.

11       I'm going to tailor the presentation today to try to

12   focus on the most critical issues and since it is a quick trial

13   I think we may be a little disjointed but I hope we can

14   minimize that as much as possible.

15       I'd like to start by being clear, we understand the

16   seriousness of the motion and the burdens on us, the burdens on

17   the Court and the consequences of the action on the debtors and

18   their cases.  I want to make that clear.

19       I will say I have been very clear, since I first came

20   into this estate or into this matter, reminding people of the

21   issues out there, asking people and imploring people to take

22   those issues seriously and to take all remedial steps.  The

23   fact is we're here today because management, and we'll talk

24   about who that is in a bit, remains committed to proceeding

25   down the course they elected more than a month ago.

1    I think the central issue of this motion has now been

2    twice framed by the Court.  Who is running these cases, and I

3    think we've understood that to have a subsidiary question

4    embedded in it which is, is whoever running these cases

5    actually capable of doing so?

6    So first let me address what are these cases.  I think

7    the evidence is pretty clear and will show that these cases

8    were always ever going to be a liquidating Chapter 11.  That at

9    the time of filing there was contemplated to be a Section 363

10   sale and all anticipated that there would be a quick process of

11   marketing, sale, selection and closing.

12   In that context, these cases presented only three jobs

13   for management.  One, administer the bankruptcy process; two,

14   keep the collateral safe until the assets could be sold; and

15   three, conduct the sale which include marketing, running an

16   auction, selecting bidders and closing.  That's it.  That's all

17   management had to do in this case.

18   And while we may have issues with respect to the way

19   the case has been administered or how the debtors have

20   protected the collateral, the trustee motion is about that

21   third job, how management has gone about marketing the assets,

22   running the auction, selecting the bidder and attempting to

23   close.

24   The evidence is going to show that there are two

25   principals involved in that.  There are, of course, lots of

1    lawyers involved and financial advisors.  There are two

2    principals involved, Mr. Eckert and Mr. Frank.  The two of

3    them, according to the evidence submitted by the debtors,

4    decided to sell in an auction.  The two of them negotiated and

5    agreed to the APA with Black Diamond.  The two of them

6    negotiated and agreed to the amendment to the APA and the two

7    of them, apparently, are deciding to press forward with this

8    sale process despite the challenges that have been raised.

9         We're also going to show that with respect to both of

10   those gentlemen; they had a combination of self-interest, lack

11   of knowledge and fundamental misunderstanding of their

12   fiduciary duties to allow them to make the sale decisions.

13        So who did we get to that state?  First, in our view

14   there was clearly a prepetition quid pro quo which comes out of

15   the mouth of the Black Diamond principal.  Black Diamond wanted

16   the assets; he was told that management wanted money in

17   exchange for that.  And management said to him, in effect, if

18   you want us to engage in any consensual sale process you have

19   to agree to new management contracts.

20        There can be no doubt that after that demand both Mr.

21   Frank and Mr. Eckert received, actually received millions of

22   dollars and were committed millions more much of it tied to

23   Black Diamond becoming the winning bidder in the auction.

24        That kind of bargain is a breach of the officers and

25   directors duty of loyalty under applicable Delaware law.  And

1   that bargain is exactly what caused the conflict that led to

2   the debtors' decision to proceed on a quasi fiduciary basis,

3   and I'll come back to that in a bit.  It's exactly that

4   conflict that allowed the debtors to accept the allocation

5   which has caused so much consternation to the parties and,

6   perhaps, the Court.  It's not my intent to address issues

7   relating to the sale hearing.  I hope, however, the Court

8   understands our problem with the allocation.

9         Sankaty has a bid out there, and other bidders had out

10  there, which would have gone directly to creditors in these

11  cases if they were accepted.  Because of the allocation that

12  management accepted in the Black Diamond bid, creditors in this

13  case get, at most, seventy-five million dollars and as little

14  as twenty-five million dollars.  That is third-party creditors,

15  people with allowed secured claims in these cases under the

16  allocation and according to the debtors own valuation, under

17  that bid get as little as twenty-five million dollars and a

18  maximum of around seventy million dollars.  The rest of the

19  value of the estate is either given to the bidder, who

20  according to the debtors' valuation got over a hundred million

21  dollars in value for an eleven million dollar bid, to hold

22  their insider holders of unsecured claims and to equity.

23        And Mr. Frank gave a deposition yesterday that, from

24  our perspective, summed up the whole problem with that.  He was

25  asked questions regarding how the allocation affects creditor

1    recoveries and what went into the management's decision to

2    accept the Black Diamond bid.  And in testimony you'll hear

3    from Mr. Frank he was asked so what the creditors of the estate

4    would actually receive was not your concern, right?  He

5    answered, that's right.  And your advisors told you that was

6    okay?  And he answered yes.

7         From the beginning of that process of selecting the

8    bid this management was not concerned with what third-party

9    creditors would receive.  They were concerned about what they

10   would receive, either because they -- with the Black Diamond

11   accepting the bid they would get additional consideration or

12   because their prepetition claims might be paid or because their

13   prepetition equity might have value.

14        Those two gentlemen are not maximizing credit --

15   recoveries for third-party creditors at all and that's the

16   problem.  And that's exactly -- that problem was exactly set up

17   by the prepetition quid pro quo.  Then it got worse with the

18   option agreement.

19        I hope the Court understands now our problem with the

20   option agreement and if we don't by the end of the trial I

21   really want to make sure you understand that.  The option

22   agreement came about because of the following:  Black Diamond

23   was very, very angry that the result of this bid was going to

24   make additional distributions to management and prepetition

25   equity.  And Black Diamond would not deliver an amendment to

1  the APA unless Mr. Eckert agreed to sell his prepetition claims

2  in equity.  And the option agreement then became the glue that

3  held this deal together.  But for the option agreement there

4  would have been no sale -- no sale hearing set.

5       Now that option agreement has been described by

6  counsel as a lapse in judgment, not in the best interest of the

7  estate, a mistake and done despite the advice of counsel and

8  over the objection of counsel.  And there's no better evidence

9  of the key role of that option agreement here then the fact

10  that despite all of the statements being made by counsel about

11  the detrimental nature of that agreement, the agreement still

12  exists.  The parties are not willing to proceed with a sale

13  hearing unless that option agreement exists.

14       So what's the problem with the option agreement?  Mr.

15  Eckert sold his prepetition claims and his prepetition claims

16  and his prepetition equity and he gets 500,000 dollars for

17  that, regardless of whether those assets had any value.  If

18  Black Diamond wins he gets 500,000 dollars, even if this Court

19  disallows the prepetition claim for a bonus leading into

20  bankruptcy and even if there is no value to equity in these

21  cases.

22       And we'll have lots of lay opinions about what the

23  stocks and the claims were worth, but there is no evidence out

24  there that that stock or that prepetition claim is worth more

25  than a dollar.  So we're left with a situation where the

1  principal involved in the negotiation of the amendments of the

2  APA is getting 500,000 dollars for assets that may be worth

3  zero, payable only if the Black Diamond transaction closes.

4        That's exactly why Mr. Manzo and Kaye Scholer wanted

5  that agreement ripped up and it's exactly why it wasn't

6  disclosed until after the first sale hearing.  It's a terrible

7  problem in this case and this sale process cannot go forward,

8  in our mind, if that option agreement is there.  And we don't

9  believe a trustee would ever allow that transaction to go

10  forward with the option agreement out there.

11       So what's really going on here in these cases?

12  Counsel have bad clients and the financial advisors have bad

13  clients.  And the original way that they were going to deal

14  with that was this notion of quasi fiduciary.  And Your Honor

15  heard, I think, on three separate occasions they're quasi

16  fiduciaries in the case and I think the testimony's going to

17  show that Mr. Manzo realized that the conflict of management

18  was so great that he wanted them to stand back and allow the

19  bid process and selection to be run by the financial advisors.

20       Now Your Honor has expressed views, and they're

21  correct under the law, Mr. Manzo and Kaye Scholer are agents,

22  they are not principals.  The debtors must have a principal to

23  make these decisions.  And the only fair reading, after Your

24  Honor said that, the only fair reading of their papers is

25  they're going forward on a theory now of operation ring-fence

1    Mr. Eckert.

2            The papers that are put before you have nothing to do

3    with Mr. Eckert.  Now the obvious reason for that is it's not

4    just his prepetition conduct, it's not just the option

5    agreement but you're going to hear that Mr. Eckert has a

6    history of having problems with exercising his fiduciary

7    duties.  So what you see in the papers that were filed midnight

8    or early in the morning yesterday, is a whole disclosure about

9    points one and two, jobs one and two.  We've done a great job

10   administering these cases; we've done a great job protecting

11   these assets.  Mr. Frank is a good manager, he has excellent

12   staff.  We have bylaws and resolutions and processes in place

13   and this company is being run just great.

14           It overlooks the relevant question.  We're not

15   complaining, right now, about the administration of the estate

16   or the protection of the assets.  We're complaining about the

17   sale process.  And with respect to that sale process, first of

18   all there was no corporate process.  There are no board

19   minutes, there were no board meetings, there were nothing

20   written down, at all, about how management was deciding to

21   select the bid or go forward with the amendments.  No corporate

22   resolutions, nothing.  It's just the two gentlemen who both

23   worked on selecting or negotiating and signing the APA and

24   negotiating and signing the amendment.

25           And let me read you, and I think this is critical in

1    these cases.  The only other thing I'm going to read you on

2    opening is from Mr. Frank's declaration at paragraph 29.  If

3    the issue in this case is what's the involvement of Mr. Eckert

4    in the sale process, Mr. Franks says, in paragraph 29, "In

5    connection with other elements of the debtors' bankruptcy cases

6    Mr. Eckert was consulted and involved in the negotiations

7    regarding the underlying asset purchase agreement and

8    amendment".

9           So this notion that we're going ring fence Mr. Eckert

10   and allow this all to be done with Mr. Frank is already

11   problematic because Mr. Frank is inside the ring.  Then Mr.

12   Frank says, "The only involvement that Mr. Eckert has had, from

13   the debtors' managerial perspective in Black Diamond related

14   matters concern the auction, the underlying asset purchase

15   agreement, negotiations regarding the amendments to the

16   purchase agreement and employee bonus and staffing issues".

17          The whole point is that Mr. Eckert is involved in all

18   the issues we're complaining about, every single one of them.

19   So this notion that -- what can happen here is we can push Mr.

20   Eckert aside, maybe he did some wrong stuff, maybe he had a

21   lapse in judgment but Mr. Frank can run this process is wrong

22   because the process is already corrupted and has been corrupt

23   and quite frankly hasn't been fixed at all because Mr. Eckert

24   was involved in all the decision we're talking about.

25          The only way to fix the process is to get a trustee in

1  place who can review all the relevant facts and make his or her

2  own decision about how the -- what bid should be selected and

3  how the closing should occur.  Because the whole process now

4  has been corrupted by the influence that both Mr. Frank and Mr.

5  Eckert have with respect to the prepetition agreements and the

6  serious problems that are raised with respect to the

7  postpetition option agreement.

8         The only fix here is to remove both of those gentlemen

9  and allow a trustee for the limit -- we're not asking for a

10  trustee to run the bankruptcy cases, administer the bankruptcy

11  cases or protect the assets.  We need a trustee -- that may be

12  a duty that they pick up but the most critical thing we need is

13  a trustee to sign off on the sale process, who's going to buy

14  the assets and when they're going to buy the assets.

15         Our intent today is to proceed with three crosses, Mr.

16  Frank, Mr. Eckert and Mr. Deckoff.  We're not intending right

17  now to call Mr. Manzo, we may have to do that but we may read

18  in some additional testimony from his deposition and we've

19  designated parts of that and I'd like to reserve time to close.

20         We'll have two exhibit binders for the Court, which

21  we'll use for each of the witnesses.  We've given witness list

22  this morning to counsel, we haven't agreed on anything but we

23  will, at the end of the hearing then, move in those exhibits

24  that we believe are admissible.

25         THE COURT:  All right.  Thank you.

1      MR. SOLOW:  Good morning, Your Honor.  Michael Solow

2    on behalf of the debtors.

3          I have to confess Your Honor, I'm a bit confused.  I

4    have to say that in my twenty-seven years of doing this and

5    having spent this much time on a particular case I'm rarely

6    confused.

7          I heard the Court and I heard and read the motions

8    with respect to this very serious matter that the movants have

9    brought and the Court asked us not to address the sale process,

10   not to address our motion to approve a sale.  But as I

11   suspected and as I've stated to the Court on several times, and

12   candidly what has been made absolutely apparent from the first

13   day we appeared in this courtroom by Mr. Shore's partner, Mr.

14   Pell, this is not a fight about the debtors it's a fight

15   between our secured creditors.

16         Secured creditors, by the way Your Honor, that our

17   evidence will show we are subject to a credit agreement and

18   that credit agreement, as Your Honor knows because it's

19   standard in all of these cases, is a syndicated loan.  It has

20   an agent and that agent has a contractual duty among his

21   constituents.  But our duty is singular, that duty is to pay

22   the agent and then the agent will take care of its creditors

23   and if there is a dispute as among those people, as the Court

24   has previously stated, I won't say opined but stated, that your

25   view was that that belonged in a different courtroom.

1        Now Your Honor, I'm going to stick to the facts

2   because I believe that's what openings are about.  I want to

3   reserve my argument to after the facts are put in but I don't

4   want the Court to come to any conclusion that I've ignored the

5   arguments that have been put forward in Mr. Shore's opening.

6        Now as I've said, we're here to address this

7   extraordinary request for relief of removing the debtor in

8   possession.  The debtors have understood how serious this

9   request is and have always taken our responsibilities to this

10  Court and the estate seriously.  The request requires the Court

11  to conclude, by clear and convincing evidence, not innuendo or

12  speculation, that current management has committed fraud, been

13  dishonest or incompetent regarding the management of this

14  debtor.

15       The movants will point, and it's become quite clear

16  that they've already done this, three agreements among the

17  letters; agent Black Diamond and Misters Eckert and Frank,

18  there is no dispute or mystery about the existence of these

19  agreements.  In fact, the employment agreements have been known

20  since the beginning of the case, they were in Mr. Frank's

21  initial paper.

22       It is also a fact that there has never been an issue

23  raised about these contracts and the propriety of both Eckert

24  and Frank working for the debtors in connection with the sale

25  process before the debtors moved for the approval of the sale

1   that the non-controlling lenders object to.

2          It's also undisputed that Mr. Eckert entered into an

3   option agreement with Black Diamond to sell his personal claims

4   in this case.  This agreement has no economic effect, either

5   positive or negative, on the estate.

6          Other than these three agreements and any stories the

7   movants can weave, that is the sum and substances of the facts

8   set forth in the movant's papers.  The movants will not be able

9   to prove that these agreements either factually or legally are

10  in and of themselves disqualifying events that require the

11  appointment of a trustee.

12         The movants will also point to the sale process and

13  their dispute with Black Diamond regarding the allocation of

14  the sale proceeds as a failure by management to exercise

15  appropriate fiduciary duties to the estate.

16         The debtors can prove, if it's disputed, that there is

17  a single credit agreement pursuant to which the debtors owe,

18  currently, approximately 245 million dollars to the lender

19  syndicate.  That obligation is owed to the agent on behalf of

20  the lenders and the debtors intend on paying that obligation in

21  full.  And as a result of being able to pay it in full it is

22  not clear that this case is a case for liquidation, Your Honor.

23         The debtor will also prove, if it's necessary since

24  it's not our burden of proof, that management has and continues

25  to operate these businesses in accordance with its obligations

1　to investors, the Securities Act, the Investment Advisor's Act

2　of 1940, the Investment Company Act of 1940 and normal business

3　operating procedures.

4　　　　The debtor will also prove that it has resisted

5　constant attacks from its lenders to manipulate the sale

6　process for their own ends, including at least ten important

7　examples.  First, management has refused to comply with

8　prepetition demands that GSC only hire restructuring counsel

9　approved by the agent and majority lender.

10　　　　Management has refused to agree to cash collateral

11　budgets that did not adequately protect operations through a

12　sale and contained overly aggressive milestones.  The debtors

13　resisted efforts by Black Diamond to cause GSC to remove its

14　commitment to sell securities of an affiliate prior to the

15　commencement of these cases.

16　　　　We have refused a paltry five million dollar stocking

17　horse bid from Black Diamond, followed by its threats to file

18　an involuntary bankruptcy case against GSC.  We have resisted

19　repeated demands from the agent, both before and after the

20　filing of these cases, that GSC fire Capstone as its financial

21　advisor.

22　　　　The debtors have refused to accept sale procedures

23　that would not permit third parties to properly evaluate GSC

24　assets and participate in the auction.  The debtor has refused

25　to accept objections from Black Diamond regarding the

1    qualifications of other bidders at the auction.  Management has

2    resisted demands to sell assets sought by Black Diamond that

3    the debtors believe would not fetch an adequate price at the

4    auction.

5         During the auction -- number nine, Your Honor, during

6    the auction we refused to accept modified bid terms from any

7    party that would not have been favorable to one group of

8    bidders over another and we required final sealed bids over the

9    objections of Black Diamond.

10        Finally, and tenth Your Honor, we resisted Black

11   Diamond's improper advances to combine one of its distressed

12   portfolio companies with a competitor owned by GSC.

13        Those will be the facts presented, Your Honor.  At its

14   core, this is not a dispute of how this company is run or how

15   the process was managed.  I think Mr. Shore has already stated

16   that.  It continues to be about the relationship between the

17   lenders and the allocation of the assets of the proposed

18   purchase which Your Honor has said you don't want to hear about

19   today.  That, of course, is not before us.  And what is before

20   you is how the debtors have been operated and whether their

21   conduct has protected the assets of the estate and the value to

22   be transferred to creditors in satisfaction of their claims.

23        Finally, given the opportunity the debtors believe we

24   will satisfy this Court in accordance with any appropriate

25   legal standard regarding our obligations to have that sale

1  approved later this month.

2  　　　　Thank you, Your Honor.

3  　　　　THE COURT:  All right.

4  　　　　MR. BACON:  Good morning, Your Honor.  Doug Bacon for

5  Black Diamond Capital Management.

6  　　　　Your Honor, I'm mindful of our role today, which is

7  somewhat on the periphery of this dispute but not entirely.

8  We're not here today as the successful bidder which we were

9  designated at the end of the auction because I know, as we've

10  all acknowledged, the sale hearing is not before you today.  I

11  also understand that in a 363 sale the successful bidder is

12  always pushing for the bid and is somewhat on the periphery.

13  　　　　But Judge, I think we do have two important roles here

14  today.  One is it should be kept in mind from time to time that

15  Black Diamond holds the lion's share of the secured debt,

16  fifty-one percent or thereabouts.  We're the largest single,

17  secured creditor in this case.  Fifty-one cents of every dollar

18  that's been spent on this process, and there have been a lot of

19  dollars spent on this process, is for Black Diamond's account.

20  That may, under some circumstance, even include White & Case'

21  expenses which I'm sure have been enormous.

22  　　　　So the cost of the process is predominantly borne by

23  Black Diamond which is not a fact that I think has been lost on

24  the minority lenders.  Furthermore, Your Honor, to the extent a

25  trustee is appointed, the resulting value loss, which could be

1    tremendous, will predominantly affect Black Diamond, more than

2    any other party in the case.

3           Secondly Your Honor, Black Diamond, the inference --

4    the allegation of the minority lenders is that this process has

5    been co-opted, that management's been co-opted and the sale

6    process has been corrupted and the inference there is that it's

7    my client who did at least a good part of the co-opting or the

8    corrupting and we're going to speak to that today recognizing

9    that Black Diamond's not on trial and this is not a hearing

10   really about Black Diamond's behavior.

11          But to the extent the minority lenders can dirty up

12   Black Diamond, I think they've concluded they'll dirty up

13   management.  Which I think, if the Court hears the evidence,

14   the Court will conclude is inappropriate.

15          I do want to note that in recognition that Black

16   Diamond is not on trial today, I'm not going to stand up and

17   refute everything that's said about Black Diamond.  That will

18   take a lot more time than this Court wants to spend and that's

19   not today's issue but it may be an issue another day and of

20   course we reserve all our rights.

21          Just a minute on Black Diamond and their approach to

22   this case, Your Honor.  Black Diamond is in the business of

23   buying distressed debt.  That's what Black Diamond does.  When

24   other lenders run from a dysfunctional situation Black Diamond

25   very often buys into that dysfunctional situation.  I think

1    even Mr. Shore will, and his clients would admit, that this was

2    a dysfunctional situation before Black Diamond came on the

3    scene.

4         This company had been in default under its credit

5    agreement for more that a year before Black Diamond got its

6    controlling position on the debt, which it never would have

7    gotten if banks weren't looking to bail out of the situation.

8         So you had a tough situation when Black Diamond came

9    on the scene and once Black Diamond's into a scene like this

10    what do they do?  Well Your Honor, they're very proactive.  And

11    if they weren't proactive they wouldn't be successful in this

12    business.

13         Is Black Diamond aggressive in these situations?  I

14    think that would be a fair characterization.  Proactive and

15    aggressive.  But does Black Diamond stay within the boundaries?

16    Absolutely.  Absolutely, Your Honor.  They may push the

17    boundaries from time to time but they're within the boundaries.

18         Judge, everybody said this morning this is not the

19    sale hearing.  I wouldn't be surprised to hear the Court say

20    that from time to time and remind the parties of that.  But the

21    sale process is going to leak into this hearing; it already has

22    in opening statements because at heart what the minority

23    lenders are saying is that Black Diamond corrupted the sale

24    process.  That's the only process in this case that really

25    affects creditors' economics, nobody's ever said this business

1   wasn't being properly run or that value was leaking out, other

2   than through the expenses, the tremendous expenses of this

3   case.  So really what's going on and the whole heart of this

4   case has been the sale process which the minority lenders are

5   very unhappy with.

6        Your Honor may conclude, at the end of this hearing,

7   that the right thing to do, it's too soon to tell but Your

8   Honor may conclude that the thing to do is hear -- is hold this

9   trustee motion in abeyance and hear the sale motion, get into

10  the nitty gritty of what happened in that sale process and then

11  decide whether a trustee's appropriate.  But that's obviously

12  the Court's process.

13       Your Honor, the minority lenders single worst fact, as

14  they're before you today and it's a big fact and Mr. Solow

15  touched on it and it's uncontrovertibly true, it's that the

16  minority lenders have been involved with this sale process

17  every single step of the way, every step of the way.  The

18  management agreements, which were put out on the very first day

19  of the case in the initial filings which of course they should

20  have been, have always been out there and they have been probed

21  and examined  and there have been depositions taken and tens of

22  thousands of documents and they've been out there from the very

23  get go and the minority lenders were well aware of them.  They

24  didn't like them.  They looked at them six ways to Sunday and

25  then they signed on to the sale process.

1    They came in here when Your Honor set up procedures

2    with their fingerprints all over the sale procedures that were

3    significantly modified to resolve their objection and they let

4    this process go forward with Mr. Eckert and Mr. Frank at the

5    ultimate helm.

6    They even signed on, and you'll hear this in the sale

7    hearing but it's important, they signed on to the joint bidding

8    that they're so unhappy with.  They literally signed on to it.

9    They literally, in the middle of the night, crafted a letter,

10   revised it on their own computer and then they signed it and

11   they don't like the outcome.  And they never once, not once,

12   did they press an integrity issue before the Court until they

13   didn't like the results of that outcome and they hate that

14   result, Judge.  They hate it so much that they'd rather blow up

15   this case then see that result approved.  They've got nothing

16   to lose in this hearing, Judge, because they'll get a trustee

17   and blow up the process or they'll continue in what's been, I

18   think, a dramatic effect to try to poison the well in this

19   court.

20   I've never been in a case where we dealt with so many

21   supplements and supplements and supplements and letters to the

22   Court to say -- to innuendo and unsubstantiated assertions that

23   there was a real problem here.  Finally we're here.  You'll

24   hear evidence and you'll decide.

25   And I understand, Judge, that this Court decision, as

1    you've said and as is appropriate, is going to be driven by

2    your evaluation of the integrity, not really by the economics.

3    But I think the economics are a factor. They're certainly not

4    going to overcome a corrupt process or a fundamental lack of

5    integrity if you conclude that. I understand that, Judge, but

6    they are important.

7            It's important that this estate has got a 235 million

8    dollar deal on the table. It's important that this estate has

9    gone through a several week, incredibly intensive investor

10   process and it's easy to lose sight of the investors here but

11   they're fundamentally all on board with that process, a trustee

12   might blow that up. You're not going to -- nobody's going to

13   try to tell the Court today, I don't think, about the interplay

14   between the various investor protection regulations in the

15   Bankruptcy Code because I don't think there's an expert in the

16   room on that subject and I'm certainly not and I don't think

17   the Court has to be one today to know that there are going to

18   be huge problems if a trustee is appointed.

19           So I hope that this will get through today and I hope

20   the Court will hear the sale motion and I hope the Court will

21   recognize that process did exactly what bankruptcies are all

22   about these days, which is capturing value and dividing it up

23   among the creditors which, Judge, we have heard you, this Court

24   is not going to pass on the allocation and that's fine.

25   There's several different ways to preserve that issue. We'll

1    probably do it six times over and that allocation will either

2    get resolved by agreement or in the state court lawsuit that

3    the minority lenders have already brought.

4         Two last points, Judge.  The option agreement.  I'll

5    tell you, I can see the optics and the timing of that option

6    agreement are terrible and I think you'll hear Mr. Manzo

7    testify and you'll hear Mr. Frank testify that they thought the

8    optics and timing of that option agreement were terrible,

9    there's no getting around that.

10        I think you'll also -- I know you'll hear Mr. Frank

11   say he thinks it was a bad deal for Mr. Eckert.  I think Mr.

12   Manzo may say that.  Certainly Mr. Manzo's got an analysis that

13   says it's a bad deal for Mr. Eckert.  And I'll tell you, Judge,

14   my client being in the business of buying distressed debt, and

15   there's no more distressed debt in this case than Mr. Eckert's

16   bonus claim, thinks it's a bad deal for Mr. Eckert in the sense

17   that they think it's -- Black Diamond thinks it's a better deal

18   for Black Diamond or they wouldn't have done it.

19        Why don't we just tear it up?  A lot of people have

20   said just tear it up, rescind it.  I think there are two

21   problems with that.  One is, Black Diamond doesn't want to.

22   They think they cut a valuable deal that mollified their

23   concerns about cutting a deal on the first amendment that cost

24   Black Diamond a lot of value.  So they don't want to tear it

25   up.

1      Second, tearing it up, that's -- we're not willing to

2  tear it up, Judge, but if we were -- if you think it's a

3  tainter -- when you really understand and you think it's a

4  killer, tearing it up doesn't unring that bell.  In fact,

5  tearing it up may create an inference that it's something that

6  everybody ought to be ashamed of.  So we have -- it's been

7  suggested and we have never seriously considered tearing it up

8  any more than we would have had an oral handshake deal with Mr.

9  Eckert that nobody knew about.  Instead, it was put on a piece

10  of paper.  It was sent to debtors' counsel.  On the Saturday it

11  was put on a piece of paper and it was sent to these lawyers

12  the following Tuesday morning when the debtor told us that they

13  thought it was our role to disclose it.

14      There was never, ever -- nobody's going to really tell

15  you that was going to be a secret and if they did they're not

16  telling you the truth.  Judge, that auction agreement was

17  entered into over a month after the auction that the minority

18  lenders hate so much; it couldn't have affected the auction.

19      It did -- was it a bribe?  Your Honor will decide

20  that.  I don't want to characterize it as a bribe to my client,

21  because it wasn't.  But if economics transferred under that

22  option agreement, the evidence will say that economics

23  transferred to my client and that's absolutely my client's view

24  and that's why my client doesn't want to tear it up.

25      Finally, Judge, employment agreements.  Your Honor, I

1    doubt you've had a Section 363 sale before this Court where the

2    go forward role of management wasn't an issue.  Certainly when

3    you have financial buyers, as opposed to strategic buyers, they

4    often bring along management as part of the process.  Sometimes

5    that's overt, sometimes it's dealt with after the sale,

6    sometimes it's right out in the open like it is with this case.

7         So the employment agreements are nothing new.  I think

8    if you're going to have employment agreements you do exactly --

9    you should do exactly what the parties did here; put them in

10   writing, put them out in front of the process day one, let

11   creditors do what these minority lenders do which is examine

12   them and depose them and look at them every different way.  And

13   if they think there's a problem, bring it to the Court.  But

14   don't wait a hundred days into a sale process that I'll bet

15   cost ten million dollars, if you add up all the costs of this

16   case.  Don't wait a hundred days in and when you don't like the

17   outcome, which is not even before Your Honor yet, don't all of

18   a sudden come in and say oh my goodness these fellows are co-

19   opted by these agreements that we've known about for a hundred

20   days.

21        The other issue with those employment agreements,

22   Judge, is they involve a lot of money, a lot more money then I

23   think you'll see in the average 363 sale.  And Judge, I think

24   that's the nature of the business we're in.  And you'll hear in

25   the evidence these gentlemen make a whole lot more money and

1    have made a lot more money over the past than the average

2    runner of a widget factory and even than the average lawyer.

3    They're well compensated people.  Black Diamond thinks they're

4    getting real value.  They're comfortable.  Black Diamond didn't

5    get to be Black Diamond by throwing money away.  Black Diamond

6    thinks, and you'll hear evidence from Mr. Deckoff, Mr.

7    Deckoff's declaration is on file, that he thinks he got a good

8    deal.  He testified in a seven-hour deposition conducted by Mr.

9    Shore that he thinks he got a bargain with Mr. Eckert.

10          Mr. Eckert and Mr. Frank have been really beaten up in

11   this process but I hope you'll hear from them and Your Honor

12   will draw his own conclusions.

13          So in summary, Judge, obviously we hope you deny the

14   trustee motion because if you grant it it's going to cost us a

15   ton of money.  It may cost us the deal.  It may cost this

16   company their investors.  But again, I know you're not going to

17   be driven by economics.

18          I hope -- if the Court thinks there's merit to this

19   motion I hope the Court will give it another week and hear the

20   sale, hear what's really at stake here.  Mr. Shore's not in

21   here trying to vindicate the bankruptcy law, Judge.  He's in

22   here trying to stop a sale that's not even here yet.

23          Thank you, Your Honor.

24          THE COURT:  You're welcome.  Anyone else?

25      (No response)

1      THE COURT:  Mr. Shore, who is your first witness?

2      MR. SHORE:  Mr. Frank.

3      THE COURT:  All right.  Mr. Frank, would you approach

4  the witness stand.  We're going to take a five minute recess;

5  we need to set up the witness stand a bit.  Do you have binders

6  that you want to put --

7      MR. SHORE:  Yes, and we'll --

8      THE COURT:  Why don't you set all that up and I'll

9  return in, you know, really literally in five minutes.

10      MR. SHORE:  Okay.

11      (Recess from 9:46 a.m. until 9:54 a.m.)

12      THE COURT:  Please be seated.

13      (Pause)

14      THE COURT:  All right.  Is everyone here that needs to

15  be hear?

16      (No response)

17      THE CLERK:  Please stand and raise your right hand.

18      (Witness duly sworn)

19      THE COURT:  All right.  You may proceed.

20      MR. SHORE:  Thank you, Your Honor.

21  DIRECT EXAMINATION

22  BY MR. HAMMOND:

23  Q.   Good morning, Mr. Frank.

24  A.   Good morning.

25  Q.   Mr. Frank, you were a successful businessman prior to

1  joining Mr. Eckert, right?

2  A.    Yes.

3  Q.    You joined him in 2000, is that right?

4  A.    Yes.

5  Q.    So you had choices with whom to associate with prior to

6  the time that you joined GSC?

7  A.    Yes.

8  Q.    I want to show you, turn to Exhibit 72 in your binder,

9  please.

10  A.    Yes, I see it.  I've turned to it.

11         MR. STAMATO:  Your Honor, I object to the introduction

12  of this exhibit.

13         THE COURT:  Did you notice that I'm not open yet?

14         MR. STAMATO:  Okay.

15         THE COURT:  Thank you.

16         MR. STAMATO:  Sorry, Judge.

17         THE COURT:  Which binder is this in?

18         MR. HAMMOND:  This would be, Your Honor, in the second

19  binder.

20      (Pause)

21         THE COURT:  All right.  Let's start all over.  This is

22  document --

23         MR. HAMMOND:  72, Your Honor.

24      (Pause)

25         THE COURT:  All right.  And what is your objection?

1      MR. STAMATO:  Your Honor, for the record Tony Stamato

2  on behalf of the debtors.

3      Your Honor, I was handed this exhibit list at

4  approximately 8:46 a.m.  Exhibit 72 is somewhat new to us.

5  Yesterday Mr. Shore circulated an e-mail suggesting that the

6  exhibits that the non-controlling lenders would be submitting

7  included materials that had been previously produced by the

8  debtors or materials submitted in previous papers.  While I

9  recognize that everybody's operating under tight time

10  constraints, this is something that we haven't seen before.

11      Further, this appears to be an unpublished New Jersey

12  court opinion from 2002.  I question its relevance, the

13  underlying loan that the non-controlling lenders have entered

14  into dates from 2005.  So I'm objecting on the timeliness of

15  disclosure of this exhibit as well as relevance.

16      THE COURT:  All right.

17      MR. HAMMOND:  Thank you, Your Honor.  Andrew Hammond

18  from White & Case.

19      Your Honor, we believe that that opinion, which is

20  obviously a public record, is admissible.  What's directly at

21  issue in this case is the credibility and the honesty of the

22  directors and officers of the debtors and this opinion, Your

23  Honor, goes to show that Mr. Eckert was found to have breached

24  his fiduciary duty and his duty of loyalty in connection with

25  prior proceedings.

1        The inquiry here, Your Honor, with respect to Mr.

2   Frank is whether he was aware of that at the time that he

3   joined GSC.

4        THE COURT:  And what relevance is that?

5        MR. HAMMOND:  Well Your Honor, we think it bears

6   directly on the honesty of the management of GSC and we think

7   it bears directly on confidence creditors can have in the

8   management of GSC.

9        THE COURT:  I don't see how it's relevant to this

10  witness; you can ask Mr. Eckert about it.

11       MR. HAMMOND:  Thank you, Your Honor.

12       THE COURT:  All right.

13  BY MR. HAMMOND:

14  Q.   Mr. Frank, you're currently the president and senior

15  managing director of GSC, right?

16  A.   Yes.

17  Q.   And you're on the board of directors of GSC?

18  A.   Yes.

19  Q.   And Mr. Eckert's also on the board?

20  A.   Yes.

21  Q.   You and Mr. Eckert are the only two members of the board?

22  A.   Yes.

23  Q.   Mr. Eckert's the chairman, right?

24  A.   Yes.

25  Q.   Mr. Eckert can't be fired from the board, right?

1   A.   No.

2   Q.   Not even for cause, right?

3   A.   That's my understanding.

4   Q.   And no one can serve on the board that Mr. Eckert doesn't

5   want on the board, right?

6   A.   That's correct.

7   Q.   Now if there's a tie on the board there's no mechanism to

8   resolve that tie, right?

9   A.   No, there isn't.

10   Q.   And you believe that if there was a tie ultimately Mr.

11   Eckert's view would prevail, right?

12         MR. STAMATO:  Objection, Your Honor.  That's calling

13   for a legal conclusion.

14         MR. HAMMOND:  Your Honor, this witness was produced as

15   the corporate governance representative of the debtors

16   yesterday in our response to our request for a deposition.

17         MR. STAMATO:  It's also calling for speculation on his

18   part, if there ever was a tie.

19         THE COURT:  I'll overrule the objection.  Go ahead.

20         THE WITNESS:  We've never had a tie but I believe that

21   if there was a tie and it was an irresolvable tie, which I

22   think is your question, that since Mr. Eckert controlled the

23   common stock of the company he would eventually be able to

24   remove me as a director.

25   Q.   So Mr. Eckert is the chairman of the board, right?

1    A.    Yes.

2    Q.    CEO of the company?

3    A.    Yes.

4    Q.    Controls the common stock of GSC active partners?

5    A.    Yes.

6    Q.    And GSC Active Partners is the controlling shareholder of

7    GSC Group, Inc., right?

8    A.    Yes.

9    Q.    And that's the entity of which you're a director, right?

10   A.    Yes.

11   Q.    And GSC Group, Inc., is the party or the entity that

12   directs the affairs of the debtors, right?

13   A.    Yes.

14   Q.    Okay.  Now the person who's responsible for calling board

15   meetings is Mr. Eckert, right?

16   A.    Yes.

17   Q.    And sitting here today, you don't know if you need a --

18   you don't remember whether you called a board meeting to

19   approve a sale of substantially all of the assets of the

20   company, right?

21   A.    At what time?  We did have -- we approved a bankruptcy.

22   After the sale we had a board meeting that approved the sale.

23   I didn't remember it last night but I've owned up on it.

24   Q.    I'm sorry?

25   A.    So we did have a -- we did have a board meeting after the

1    sale, after the bidding ended and I signed the APA.  We then

2    had a board meeting to approve the sale and going forward and

3    putting it in front of the court.

4    Q.   Are there minutes of that board meeting?

5    A.   Yes, there are.  I haven't read them but Kaye Scholer

6    prepared them.

7    Q.   Have they been produced, do you know?

8    A.   I don't know.

9         MR. HAMMOND:  Your Honor, we'll just move to exclude

10   that testimony, given that we don't have any record of any

11   board minutes having been prepared or provided to us, which is

12   information that we believe is certainly relevant to

13   management's role here.

14        THE COURT:  All right.  Anyone wish to respond?

15        MR. STAMATO:  Your Honor, Mr. Frank was deposed

16   yesterday.  It's probably the fourth time he was deposed in the

17   last couple weeks.

18        THE COURT:  I'm not interested in how many times,

19   would you answer the question?

20        MR. STAMATO:  Your Honor, we've produced pretty much

21   every single piece of paper that we have.  If they haven't

22   found it or those minutes aren't there, that's what the record

23   is.  He can proceed as he sees fit but I think he was probed

24   pretty extensively yesterday on what was going on.

25        THE COURT:  Can you just answer this question, did you

1    produce these minutes?

2          MR. STAMATO:  Your Honor --

3          THE COURT:  Well let me ask first, do these minutes

4    exist, in your view?

5          MR. STAMATO:  I haven't seen them, Judge, but if they

6    were in the files they were produced.  I can't say here if

7    there were minutes that were produced.

8          THE COURT:  Who would have produced the minutes --

9          MR. STAMATO:  We would have produced them, Your Honor.

10   Yes.

11         THE COURT:  All right.  Just let me finish the

12   statement.  Who would have put them in writing?

13         MR. STAMATO:  They would have been done either by a

14   Kaye Scholer associate or somebody at the debtors and whether

15   that --

16         THE COURT:  And who is here on behalf of Kaye Scholer

17   can tell me whether or not they ever existed in a document?

18         MR. STAMATO:  If you give me an opportunity to consult

19   with one my colleagues.

20         THE COURT:  Go ahead.

21         MR. SOLOW:  Your Honor, I do not believe there are any

22   minutes.

23         THE COURT:  You don't believe there are any written

24   minutes?

25         MR. SOLOW:  Any written minutes, that's correct, of

1    that meeting.

2              THE COURT:  All right.

3    BY MR. HAMMOND:

4    Q.   Now yesterday I had asked you whether you had a board

5    meeting since the petition date, right?

6    A.   Yes.

7    Q.   You didn't recall having any board meetings as of

8    yesterday, right?

9    A.   That's correct.

10   Q.   So between the time of filing on August 30th and December

11   20th or 21st, you don't recall sitting in any board meetings of

12   GSC, right?

13   A.   Last night I didn't recall.

14   Q.   Okay.  And we ended our deposition last night around 5

15   o'clock?

16   A.   Yes.

17   Q.   And why do you think there are board minutes of a meeting

18   to approve the APA at this point in time?

19   A.   I asked Kaye Scholer whether we had board meetings and

20   whether they were recorded.  And I got an e-mail saying that we

21   did have a board meeting the day after the APA was signed and

22   we also had a board meeting after the modification of the APA

23   and a third one just -- and a third one after we received the

24   letter from Black Diamond.

25   Q.   So let me get this straight, now there are three board

1    meetings that you recall?

2    A.   Yes.

3    Q.   There's one to approve the APA?

4    A.   Yes.

5    Q.   And that was a meeting with you and Mr. Eckert?

6    A.   Yes.

7    Q.   And you and Mr. Eckert voted to approve the APA?

8    A.   Yes.

9    Q.   And then there was a meeting to approve the amendment to

10   the APA, is that right?

11   A.   Yes.

12   Q.   And that was you and Mr. Eckert?

13   A.   Yes.

14   Q.   And you both voted to approve the amendment to the APA, is

15   that right?

16   A.   Yes.

17   Q.   And the amendment to the APA wouldn't have been approved

18   unless there was board approval of that --

19           THE COURT:  One second, speak slower please.

20           MR. HAMMOND:  Sorry, Your Honor.

21           THE COURT:  Thank you.

22   Q.   The amendment to the APA would not have been approved

23   unless you and Mr. Eckert both voted to approve it, right?

24   A.   Yes.

25   Q.   And then there's this -- I know I might get into trouble

1  for this but a letter agreement, right?

2  A.   Yes.

3  Q.   Okay.  And this letter was what was filed with the Court

4  Saturday night around 8 o'clock, right?

5  A.   Yes.

6  Q.   Okay.  And based on that letter you and Mr. Eckert have

7  decided to proceed with the sale hearing with Black Diamond,

8  right?

9  A.   Yes.

10  Q.   And you and Mr. Eckert voted at a board meeting to approve

11  going forward with the sale, is that right?

12  A.   Yes, continue with it.  Yes.

13  Q.   And you sit on the board, right?

14  A.   Yes.

15  Q.   And you didn't know there was a board meeting yesterday,

16  right?  You didn't know of any board meetings yesterday, right?

17  A.   That is correct.

18  Q.   You had to ask Kaye Scholer, right?

19  A.   Yes.

20  Q.   And who did you ask at Kaye Scholer?

21  A.   Anthony Stamato.

22  Q.   And he told you there was board meetings?

23  A.   Yes.

24  Q.   Now Mr. Eckert's the person who's responsible for calling

25  the board meetings, right?

1    A.   Yes.

2    Q.   You don't recall having board meetings without Mr. Eckert

3    wanting one, right?

4    A.   I don't recall any, yes.

5    Q.   You haven't called for a board meeting that Mr. Eckert

6    didn't want, right?

7    A.   I've never called for a board meeting.

8    Q.   And you'd concede that you haven't had a -- GSC hasn't had

9    a model corporate governance policy since the filing of this

10   bankruptcy proceeding, right?

11        MR. STAMATO:  Objection to the form of that question,

12   Judge.

13        THE COURT:  I want your specific objection.

14        MR. STAMATO:  I think he said model corporate

15   governance policy; I'm not sure what that means.

16        THE COURT:  All right.  Clarify the question, please.

17        MR. HAMMOND:  Sure, Your Honor.

18   Q.   GSC hasn't been a model of corporate governance since the

19   filing of the bankruptcy petition, right?

20        MR. STAMATO:  Same objection.

21        THE COURT:  All right.

22        MR. HAMMOND:  Do you want me to clarify, Your Honor?

23        THE COURT:  Yes, I would.

24        MR. HAMMOND:  Thank you.

25   Q.   You would say there have been some deficiencies in the

1  corporate governance processes at GSC since the filing of the

2  bankruptcy petition, right?

3  A.   You'd have to show me one.  I'm not -- I'm unclear where

4  you're driving.

5  Q.   It's just a question.  You're not aware of any

6  deficiencies in the corporate governance processes at GSC since

7  the filing date?

8  A.   No.

9  Q.   Okay.  And yet you couldn't recall yesterday whether there

10  was a board vote to approve the asset purchase agreement?

11  A.   Fred and I meet often.  We talk on the phone about what's

12  happening and sometimes -- I was tired last night and I didn't

13  quite remember when is an official board meeting and when it

14  was an unofficial board meeting.

15  Q.   So it's just you and Fred running the company, right?

16  A.   Yes.

17  Q.   So it's really not fair to say when a board meeting's

18  being called, right, any time you and Fred meet that could be a

19  board meeting?

20  A.   It could be.  Yes.

21  Q.   All right.  And you said that there's never been a tie

22  between you and Mr. Eckert in terms of board votes, right?

23  A.   Yes.

24  Q.   You've never disagreed with him, any decision of Mr.

25  Eckert's since you joined?

1  A.   We have disagreed but we've resolved the matter.

2  Q.   All right.  And you've resolved the matter --

3       MR. HAMMOND:  Strike that.

4  Q.   And if there was ever a dispute Mr. Eckert's opinion would

5  control, right?

6  A.   No.  Hopefully reason would control.  We'd have a

7  discussion, we'd come to -- hopefully we can come to a

8  solution.

9  Q.   All right.  Could we turn to Exhibit 79, please?

10 A.   Sure.

11      MR. HAMMOND:  I apologize to the Court; this is the

12 way we got this document.

13 Q.   We looked through this document yesterday, do you recall

14 that Mr. Frank?

15 A.   Yes.

16 Q.   It's the shareholder agreement?

17 A.   Yes.

18 Q.   The shareholder agreement of GSC Group?

19 A.   Yes.

20 Q.   You're familiar with this document?

21 A.   Not intimately familiar with the document, no.  But I've

22 seen it and it is that document.

23 Q.   All right.  Can we go to section 2.03?

24 A.   What page is that?

25 Q.   I believe it's on page 10 where it says required CEO

1    consents.  Do you see that?

2    A.    Yes.

3    Q.    Do you see where it says, "The company shall take no

4    action, including any action by the board or any committee of

5    the board after the date hereof with respect to any of the

6    following matters without the affirmative approval of Alfred C.

7    Eckert".  Do you see that?

8    A.    I see it.

9    Q.    And then one of the lists there is any sale, under section

10   d, "Any sale, transfer or lease pledge or other disposition of

11   fifty percent or more of the company's assets to any person

12   that's not an affiliate of the company".  Do you see that?

13   A.    Yes.

14   Q.    That's correct, right?  You understand that to be the

15   case, right?

16   A.    Yes.

17   Q.    Okay.  And it provides in paragraph A for how to --

18   potential for removal of Mr. Eckert.  Do you see that?

19   A.    Yes.

20   Q.    And it says, "The removal of and the determination of

21   compensation to the chief executive officer of the company

22   cannot be done without the affirmative approval of Mr. Eckert,

23   provided that Mr. Eckert may be removed from the position of

24   chief executive officer of the company by the board with the

25   unanimous vote of all directors other than Mr. Eckert, without

1    Mr. Eckert's consent if the board, with the unanimous vote of

2    all directors, other than Mr. Eckert and supported by a third

3    party medical opinion determines that Mr. Eckert is subject to

4    permanent disability," right?

5    A.    Yes.

6    Q.    And that's the only way to remove Mr. Eckert, as far as

7    you're aware, from this position as CEO, right?

8    A.    Yes.

9    Q.    Now I want to move on to the subject matter of when -- the

10   time period when Black Diamond became the majority holder under

11   the prepetition credit agreement.

12        Now in June or July of this year Black Diamond Capital

13   Management acquired a majority position in the debt under the

14   prepetition credit agreement, right?

15   A.    Yes.

16   Q.    And shortly after gaining the majority position Black

17   Diamond Capital Management appointed a new administrative agent

18   under the credit facility?

19   A.    Yes.

20   Q.    And that agent was Black Diamond Commercial Finance,

21   right?

22   A.    Yes.

23   Q.    And Black Diamond Capital Management and Black Diamond

24   Commercial Finance are affiliates, right?

25   A.    Yes.

1  Q.  Black Diamond had been seeking to acquire GSC's assets

2  before the time that it actually became agent under the credit

3  facility, right?

4  A.  Yes.

5  Q.  And after Black Diamond became a majority holder you began

6  negotiating a deal in which Black Diamond would acquire some or

7  all of GSC's assets in a 363 sale, right?

8  A.  Yes.

9  Q.  And I believe we talked yesterday that you said the

10  debtors had defaulted under the credit facility?

11  A.  The debtors had defaulted, yes.

12  Q.  That default was in place in early 2010, right?

13  A.  They were in default in early 2010, yes.

14  Q.  And as agent Black Diamond controlled your cash, right?

15  A.  Yes.

16  Q.  And Black Diamond had the final say about how GSC spends

17  its cash, right?

18  A.  Yes.

19  Q.  And GSC was required to submit expenditure requests to

20  Black Diamond, right?

21  A.  Yes.

22  Q.  So, for example, when you and Mr. Eckert negotiated

23  employment contracts during the summer, Black Diamond had to

24  approve that expenditure, right?

25  A.  Yes.

1    Q.   And they had to approve your retention bonuses, right?

2    A.   Yes.

3    Q.   And they had to approve your retention bonuses, right?

4    A.   Yes.

5    Q.   And Black Diamond wanted to be conservative with the

6    estate's cash, right?

7    A.   Yes.

8    Q.   And they didn't want to make too many expenditures on

9    retention bonuses, right?

10   A.   Yes.

11   Q.   And so Black Diamond provided you with a list of employees

12   at GSC that they wanted to sever, right?

13   A.   Yes.

14   Q.   Now you heard Black Diamond voice concerns with respect to

15   the company's professionals on several occasions, right?

16   A.   Yes.

17   Q.   And Black Diamond, for example, told you to tire Capstone?

18   A.   Yes.

19   Q.   They told you to fire other law firms that you had

20   retained, right?

21   A.   Yes.

22   Q.   And at some point in time, during the summer, you began

23   discussing with Black Diamond whether to retain the general

24   counsel of GSC, right?

25   A.   Yes.

1    Q.    And that was Mr. Rubenfeld?

2    A.    Yes.

3    Q.    And you wanted to retain Mr. Rubenfeld, right?

4    A.    I personally did.  Fred was less inclined to.

5    Q.    But even Mr. Eckert didn't want to risk the disruption

6    associated with getting rid of Mr. --

7    A.    That's right.

8    Q.    -- Rubenfeld?  I'm sorry.

9    A.    Yup.

10   Q.    But Black Diamond wouldn't allow that, right?

11   A.    Yes.

12   Q.    So Mr. Rubenfeld was fired, right?

13   A.    Yes.

14   Q.    And Mr. Rubenfeld was fired because Black Diamond didn't

15   think that GSC needed an in-house counsel during the 363

16   process, right?

17   A.    Yes.

18   Q.    And Mr. Rubenfeld wrote to you about this, didn't he?

19   A.    Yes.

20   Q.    Would you turn to Exhibit 63, please?  Sorry, I think my

21   exhibit list is flawed, if you'll excuse me for one moment.

22         (Pause)

23             MR. HAMMOND:  I apologize, Your Honor.

24         (Pause)

25   Q.    Okay.  It is 63, I think.  Sorry.  Is this an e-mail you

1    received from Mr. Rubenfeld?

2    A.   Yes.

3    Q.   Mr. Rubenfeld wrote to you, in the second paragraph, "I

4    fear I may have been unfocused on Friday so I want to be clear

5    about what I think is happening," do you see that?

6    A.   Yes.

7    Q.   And he writes, "I believe GSC, acting at the request and

8    possibly direction of Black Diamond, which may constitute a

9    violation of the Investment Advisor's Act, is terminating me

10   with minimal notice and severance, contrary to established GSC

11   practice in retaliation for, among other things, my insistence

12   that the original Black Diamond transaction comply with the

13   terms of applicable law, including the Investment Advisor's

14   Act," do you see that?

15   A.   Yeah.

16   Q.   And do you remember receiving that e-mail?

17   A.   Yes.

18   Q.   And you forwarded that to Black Diamond, right?

19   A.   And -- Black Diamond and Kaye Scholer and all the

20   advisors.

21   Q.   And in any event you didn't think you needed in-house

22   counsel during the 363 process, right?

23   A.   We felt we had -- we could do it with Kaye Scholer.

24   Q.   And so --

25   A.   This made it more difficult, for sure.

1    Q.   And so Mr. Rubenfeld was fired?

2    A.   (No audible response).

3    Q.   Now when Black Diamond became agent they wanted to

4    negotiate a bankruptcy filing, right?

5    A.   Yes.

6    Q.   Black Diamond wanted GSC to sell its assets in a 363 sale?

7    A.   Yes.

8    Q.   And Mr. Eckert told you he didn't want to meet with Black

9    Diamond until you got your employment deals done with Black

10   Diamond, right?

11   A.   These were employment deals for Fred, myself and the

12   retention or incentive bonuses for all the other employees.

13   Q.   Right.  You didn't want to meet with Black Diamond until

14   you got your employment deals done, right?

15   A.   Didn't want to meet another time, yes.

16   Q.   And can we turn to Exhibit 53?

17      (Pause)

18   Q.   Are you there, Mr. Frank?

19   A.   Yes.

20   Q.   And it says, I'm looking at the second e-mail in the

21   chain.

22   A.   I'm looking at the first.

23   Q.   Okay.  I'll spare you.  But the first e-mail in the chain

24   says can we meet in Greenwich tomorrow afternoon, right?

25   A.   Yes.

1    Q.    And that's sent on June 27th from Mr. Nahas to you and Mr.

2    Eckert, right?

3    A.    Yes.

4    Q.    Mr. Nahas works at Black Diamond?

5    A.    Yes.

6    Q.    Okay.  And you say, "Sure," and Mr. Nahas says, "See you

7    then".  And then you write back to Mr. Nahas, right?

8    A.    Yes.

9    Q.    You say, "You talked to Fred and he doesn't want to meet

10   till we get our deals done," right?

11   A.    Yes.

12   Q.    And our deals refer to your employment deals, right?

13   A.    The employment deals of Fred, myself and the retention

14   incentive bonuses for the rest of the employees.  Please don't

15   read the next.

16   Q.    Okay.  We can do without that.  And in June or July you

17   started negotiating an employment contract with Black Diamond

18   and an employment contract with GSC, right?

19   A.    Yes.

20   Q.    And since Black Diamond controlled the purse strings, they

21   had to approve your employment agreement with GSC, right?

22   A.    Yes.

23   Q.    And ultimately you executed an employment agreement with

24   GSC during the summer, right?

25   A.    Yes.

1    Q.   And that agreement was approved by Black Diamond, right?

2    A.   Yes.

3    Q.   And under that employment agreement you'll receive one

4  million dollars, right?

5    A.   Yes.

6    Q.   And part of that one million dollars included a 500,000

7  dollar bonus that you received immediately after executing the

8  employment agreement?

9    A.   Yes.

10    Q.   And in addition you also received a salary of between 325

11  and 350,000 dollars, right?

12    A.   Yes.

13    Q.   And you also received D&O insurance under that employment

14  agreement, right?

15    A.   Yes.

16    Q.   The D&O insurance was important to you, right?

17    A.   It was very important.

18    Q.   And you were particularly concerned about what they call a

19  D&O tail?

20    A.   Yes.

21    Q.   Can you say what a D&O tail is?

22    A.   Once a company ceases to exist, D&O is a claims made kind

23  of policy so we have to have D&O coverage for the statute of

24  limitations when claims can be brought, and that's six years.

25  So we need -- a tail is a coverage for any cases that are

1    brought after the company ceases to exist.

2    Q.   And can you turn to Exhibit 64 for a moment?

3    A.   Yes.

4    Q.   Exhibit 64 is the employment agreement you signed with

5    GSC, right?

6    A.   Yes.

7    Q.   You signed that agreement on or about July 30th, right?

8    A.   Yes.

9    Q.   And there was no outside consultant that opined on the

10   fairness of this employment agreement, right?

11   A.   No, other than for managing directors in our industry this

12   is probably at the low end of it and it was consistent with

13   what I was getting paid before and it's consistent with what

14   the prior bank group had negotiated with me, in fact slightly

15   worse.

16   Q.   I think I asked you the question were there any outside

17   consultants --

18   A.   No.

19   Q.   -- who opined on this?

20   A.   No.  No outside consultants.  No.

21   Q.   And on July 30th you also signed an employment contract

22   with Black Diamond, right?

23   A.   Yes.

24   Q.   And can you turn to Exhibit 17, please?

25   A.   Seventeen?

1  A.   Yes, sir.

2  Q.   Is that your employment agreement with Black Diamond?

3  A.   Yes.

4  Q.   Any reason why you wanted to keep this confidential?

5  A.   Well typically employment agreements and rates of pay we

6  like to keep confidential.

7  Q.   Your employment agreement with GSC wasn't labeled

8  confidential employment agreement, was it?

9  A.   No, it wasn't.

10  Q.   But your employment agreement with Black Diamond was

11  labeled confidential, right?

12  A.   It was drafted by different people.

13  Q.   You didn't strike that in the draft, did you?

14  A.   No.

15  Q.   Okay.  And under -- I want to talk about your compensation

16  under this employment agreement that you have with Black

17  Diamond, okay?

18  A.   Yes.

19  Q.   And under this employment contract with Black Diamond you

20  will earn a minimum of 1.2 million dollars annually for the

21  next two years, right?

22  A.   Yes.

23  Q.   And under this employment contract you'll work exclusively

24  for Black Diamond, right?

25  A.   That's right.

1  Q.   And this employment contract is contingent upon Black

2  Diamond acquiring the general partnership interest and

3  investment management agreements with respect to GSC Recovery

4  II LP, Recovery IIA LP and Recovery III Parallel Fund, right?

5  A.   Right.  They wouldn't need me if they didn't acquire these

6  assets.

7  Q.   And you wouldn't get paid if they didn't acquire those

8  assets, right?

9  A.   Not from Black Diamond.  No.

10  Q.   And if you go to work at Black Diamond you'll run the

11  private equity business there, right?

12  A.   I don't know if I'll run it, I'll be instrumental in it.

13  Maybe co-head.

14  Q.   Do you recall being deposed on September 13th, I think you

15  have the transcript in front of you?  I know there's a

16  multitude of transcripts here, this is the September 13th

17  transcript.

18          MR. HAMMOND:  May I approach, Your Honor?

19          THE COURT:  Go ahead.  You said September 13th?

20          MR. HAMMOND:  September 13th, Your Honor.

21          THE COURT:  All right.

22      (Pause)

23  Q.   And page 41.

24      (Pause)

25  Q.   Do you see page 41 here, Mr. Eckert?

1    A.   Yes.  Yes.

2    Q.   And I asked you the question,

3    "Q.  And what did you say to Steve and Steve say to you about

4    this paragraph 3 provision that I just referred to?"

5         THE COURT:  What line are you reading from?

6         MR. HAMMOND:  I'm sorry, Your Honor.  It's line 18.

7         THE COURT:  On page 41?

8         MR. HAMMOND:  Page 41, Your Honor.

9         THE COURT:  Of September 13th?

10        MR. HAMMOND:  Of the September 13th Frank.

11        THE COURT:  All right.  I had the wrong person.  Thank

12   you.  Go ahead.

13   Q.   And do you recall me asking you --

14        MR. HAMMOND:  Strike that.

15   Q.   I asked you, "And what did you say to Steve and Steve say

16   to you about this paragraph 3 provision that we just -- that I

17   just referred to?"  Do you see that?

18   A.   Yes, I see the sentence.

19   Q.   And you answered, "Steve told me that once this

20   transaction would go this way he would like me to work at Black

21   Diamond and run their private equity business and that is what

22   this refers to."  Do you see that?

23   A.   Yes.

24   Q.   Does this refresh your recollection that Mr. Deckoff told

25   you that you would run their private equity business?

1  A.   I don't think he ever told me I would run it.  I would be

2  co-head, have the opportunity to run it.  It certain was an

3  important position at Black Diamond.

4  Q.   So it is your testimony, under oath on September 13th,

5  inaccurate?

6  A.   Inaccurate, yes.  Not precise enough.

7  Q.   So when you said on September 13th that Mr. Deckoff wanted

8  you to run Black Diamond's private equity business, that wasn't

9  right?

10 A.   Right.

11 Q.   Now, no outside consultant opined on the fairness of the

12 consideration you'd receive under your employment agreement

13 with Black Diamond, right?

14 A.   No.

15 Q.   You're aware that Black Diamond wanted to acquire GSC's

16 assets at the time you executed that employment contract with

17 Black Diamond, right?

18 A.   Yes.

19 Q.   So as of July 30th you were the president of GSC and a

20 member of GSC's board, right?

21 A.   Yes.

22 Q.   And you knew that you'd also be one of the two people

23 responsible for selecting the winning bid at the 363 auction,

24 right?

25 A.   That's right.

1    Q.    And you also have an employment contract that's contingent

2    on Black Diamond acquiring certain of GSC's assets, right?

3    A.    That's right.  But that contract, again, is not -- not

4    particularly lucrative contract and didn't sway my decisions.

5    Q.    We'll talk about that, Mr. Frank.

6    A.    Okay.

7    Q.    But the fact is you had an employment contract.  It would

8    provide you with multi-million dollars consideration that's

9    contingent on Black Diamond acquiring certain of GSC's assets,

10   right?

11   A.    Yes.

12   Q.    And you were aware, when you signed this contract with

13   Black Diamond, that it would create the appearance of

14   impropriety, right?

15   A.    Well actually, no.  It is very similar to the contract

16   that I had with Black Diamond before and with the lenders

17   before and everybody knew about this.

18   Q.    So, in your -- just so I'm clear right now, we're going

19   to -- I'm going to go to the transcript.  But just so I'm

20   clear, there's no conflict of interest in having millions of

21   dollars riding on selecting Black Diamond as the winning bid,

22   right?

23          MR. STAMATO:  Objection, Your Honor.  That

24   mischaracterizes what he said.

25          THE COURT:  Well I think it's a question more than a

1    restatement of what he said.  He can answer the question.  What

2    is the witness' view on this issue?

3         (Pause)

4         THE WITNESS:  Could you restate it, then?

5    Q.   Okay.  Mr. Frank, in your view the fact that you had

6    millions of dollars riding on selecting Black Diamond as the

7    winning bidder in the auction didn't create the appearance of

8    impropriety, right?

9    A.   It could create the appearance, yes.

10   Q.   And when I asked you earlier and you said it didn't create

11   the appearance of impropriety I want to direct you to your

12   deposition testimony on December 2nd.

13   A.   Yes.

14   Q.   In front of you.

15        (Pause)

16   A.   Got it.

17   Q.   Page 9, starting at line 8.  Are you there?

18   A.   Yes.

19   Q.   And I asked you,

20   "Q.  So why sign the contract, you recognize the contract

21   creates the appearance of impropriety?

22   "A.  Yes, it does."

23   A.   I just said that too, a few minutes ago.

24   Q.   So you agree --

25   A.   Yes.

1    Q.    -- it creates the appearance of impropriety, right?

2    A.    Yes.

3    Q.    All right.  Let's move on.

4          (Pause)

5    Q.    Now you don't like the appearance of impropriety, right?

6    A.    Right.

7    Q.    And you've said that one reason that you say you signed

8    the employment agreement with Black Diamond is that you wanted

9    to continue running the business, right?

10   A.    Yes.

11   Q.    And there was nothing that prevented you from staying on

12   with GSC if you didn't execute the employment contract with

13   Black Diamond, right?

14   A.    Staying on with GSC?

15   Q.    Yes.

16   A.    I don't know how long GSC would continue.

17   Q.    Okay.  But there's nothing that prevented you from staying

18   on with GSC --

19   A.    That's correct.

20   Q.    -- if you didn't sign the contract with Black Diamond,

21   right?

22   A.    Correct.

23   Q.    And in fact you thought the contract was under value,

24   right?

25   A.    Yes.

1    Q.    And it created the appearance of impropriety but you

2    signed it anyways, right?

3    A.    Yes.

4    Q.    Now the real reason that you signed this contract with

5    Black Diamond is that you wanted to get compensated in the same

6    manner that you've been paid for years and you know that GSC

7    would not be able to make those payments, right?

8    A.    Yes.

9    Q.    Now Mr. Eckert also signed a consulting agreement with

10   Black Diamond on July 30th too, right?

11   A.    Yes.

12   Q.    And Mr. Eckert gets paid a total of three million dollars

13   for consulting for Black Diamond, right?

14   A.    Yes.

15   Q.    And I want to ask you a question here, but -- in

16   describing his consulting agreement with Black Diamond, Mr.

17   Eckert testified as follows, and this is at Mr. Eckert's

18   transcript on September 13th at page 104, lines 4 through 20.

19   He said Mr. Deckoff told him, "Well why don't we give you" --

20   he said, "well I'll pay you three million dollars and you can

21   sit in New Jersey and play cards with your buddies.  And when

22   this came out it's exactly what he said so I don't have to do

23   anything".

24        Do you have any reason to dispute Mr. Eckert's

25   characterization of the consulting agreement?

1   A.   I'm not familiar with what he has to do but I have no

2   reason to dispute it.

3   Q.   You're aware, though, that Mr. Eckert's consulting

4   agreement only comes into effect if Black Diamond buys a

5   substantial portion of the debtors' assets in a 363 sale,

6   right?

7   A.   Yes.

8   Q.   And you're aware that Mr. Eckert has been having financial

9   difficulties, right?

10   A.   Yes.

11   Q.   Now back in October you sought approval from the Court to

12   get a 500,000 dollar bonus for yourself, right?

13   A.   Yes.

14   Q.   And the trustee objected to that bonus, right?

15   A.   Unfortunately, yes.

16   Q.   And the debtors withdrew the request for approval of that

17   bonus, right?

18   A.   Yes.

19   Q.   And after you withdrew the bonus request you started

20   discussing a consulting agreement with the debtors, right?

21   A.   Yes.

22   Q.   And can you turn to Exhibit 19, please?

23      (Pause)

24   Q.   Are you there, Mr. Frank?

25   A.   Yes.

1    Q.    Okay.  And this is your consulting agreement that you're

2    seeking court approval of?

3    A.    Yes.

4    Q.    And Mr. Eckert signed this agreement on behalf of the

5    company, right?

6    A.    Yes.

7    Q.    And under this consulting agreement you'll be paid 500,000

8    dollars for ninety days of consulting work, right?

9    A.    That's right.

10   Q.    The economics of the bonus that you sought in the proposed

11   consulting agreement are the same, right?

12   A.    Yes.

13   Q.    And that's because Black Diamond, as agent, already

14   approved paying you 500,000 dollars in its budget, right?

15   A.    Yes.

16   Q.    And Black Diamond hasn't opposed giving you this

17   additional 500,000 dollars, right?

18   A.    No.

19   Q.    And you sought bankruptcy court approval of this

20   consulting arrangement after you selected the Black Diamond

21   joint bid as the successful bid, right?

22   A.    Yes.

23   Q.    Now you negotiated this consulting agreement with Mr.

24   Eckert, right?

25   A.    Yes.

1  Q.  But you didn't really have any negotiations with Mr.

2  Eckert about this consulting agreement, right?

3  A.  They were not heated negotiations, no.

4  Q.  This was just another way to get you the 500,000 dollar

5  bonus that the trustee objected to, right?

6  A.  Yes.  It was also to perform some additional work.

7  Q.  Now back in October the debtors also sought approval from

8  the Court to pay a 1.5 million dollar bonus to Mr. Eckert,

9  right?

10  A.  Yes.

11  Q.  And the trustee objected to Mr. Eckert's request for a

12  bonus, right?

13  A.  Yes.

14  Q.  And the debtors withdrew the request for approval of that

15  bonus, right?

16  A.  Yes.

17  Q.  And after you withdrew the request for a bonus for Mr.

18  Eckert, the debtors started discussing entering into a

19  settlement with Mr. Eckert, right?

20  A.  Yes.

21  Q.  And you, on behalf of the company, authorized a settlement

22  with Mr. Eckert, right?

23  A.  Yes.

24  Q.  You signed the settlement agreement, right?

25  A.  Yes.

1  Q.   And that settlement agreement is Exhibit 20 in your

2  binder, right?

3  A.   Yes.

4  Q.   Now the debtors have fifty million dollars in life

5  insurance on Mr. Eckert, right?

6  A.   Yes.

7  Q.   And you believe there's a fluid market in which to sell

8  those life insurance policies, right?

9  A.   Yes.

10  Q.   And those policies could have between five and ten million

11  dollars in value according to your financial advisor, Mr.

12  Manzo, right?

13  A.   That's right.

14  Q.   But in order to maximize the value of those policies you

15  need to have Mr. Eckert's medical records, right?

16  A.   That's right.

17  Q.   And he won't agree to give them to you, right?

18  A.   That's right.

19  Q.   Now Mr. Eckert also holds a two million dollar unsecured

20  claim against the debtors, right?

21  A.   Yes.

22  Q.   That's for his unpaid 2008 bonus?

23  A.   That's right.

24  Q.   And in addition, in your view, the debtors may need Mr.

25  Eckert's participation to avoid triggering a change of control

1  under certain management contracts, right?

2  A.    Right.

3  Q.    And so to obtain Mr. Eckert's medical records, resolve Mr.

4  Eckert's two million dollar unsecured claim and to insure that

5  Mr. Eckert continues to hold certain shares to avoid triggering

6  a change of control, you, on behalf of the debtors, agreed to

7  pay Mr. Eckert 1.5 million dollars, right?

8  A.    Yes.

9  Q.    And the 1.5 million is the same amount Mr. Eckert was

10  seeking as a bonus, right?

11  A.    Yes, it is.

12  Q.    And the amount of the settlement is 1.5 million dollars

13  because that amount was already approved by Black Diamond in

14  the budget, the contemplated bonus, right?

15  A.    That's right.

16  Q.    Now in setting the amount of the settlement at 1.5 million

17  you didn't do any market test did you, Mr. Frank?

18  A.    No.

19  Q.    There's no outside consultant that opined on the fairness

20  of the settlement, right?

21  A.    No.

22  Q.    Now Mr. Eckert's settlement has actually been modified

23  since it was presented to the Court, right?

24  A.    That's right.

25  Q.    And you know that Mr. Eckert entered into an option

1  agreement with Mr. Deckoff pursuant to which, among other

2  things, he sold his two million dollar unsecured claim to Black

3  Diamond, right?

4  A.   Yes.

5  Q.   And we'll talk about the option agreement later.  But as a

6  result you had to modify the price of the settlement agreement,

7  right?

8  A.   Yes.

9  Q.   And now the settlement agreement will provide Mr. Eckert

10  with one million dollars, right?

11  A.   Yes.

12  Q.   And Mr. Eckert will agree to release his medical records

13  and remain a controlling shareholder, right?

14  A.   Yes.

15  Q.   So let's talk about how that one million dollar price tag

16  was negotiated and I want to read you some testimony from Mr.

17  Eckert's December 14th deposition.  And this is at page 75 of

18  Mr. Eckert's December 14th.

19       (Pause)

20  Q.   I apologize, I believe it's page 76.  I started on line 5.

21  "So who have you negotiated this" -- and I say, "Is this

22  agreement executed and Mr. Eckert said, "I think so..

23  "Q.  Who was the counterparty?

24  "A.  Well, Peter knows about it.  Kaye Scholer knows about it.

25  Bob Manzo knows about it.

1  Q.   And I asked Mr. Eckert --

2  "Q.  Who did you negotiate it with?

3  "A.  I mean, I didn't have anyone to negotiate it with, like a

4  lot of other things around here."

5  Q.   And then later on, on page 77 starting at line 5, I

6  asked --

7  "Q.  I'm understanding if I'm negotiating an agreement with

8  somebody don't you have to talk to somebody on the other side?"

9  Q.   And Mr. Eckert says --

10  "A.  I'm talking to myself, aren't I?"

11  Q.   And then I say --

12  "Q.  Okay."

13  Q.   Mr. Eckert says --

14  "A.  Let me be clear, Peter knew.  He's the only other guy I

15  could negotiate with so the relevant parties here that are

16  protecting the interest of the people here all knew.

17  "Q.  Who said, on behalf of the company, let's do this deal?"

18  Q.   Mr. Eckert replied --

19  "A.  Let's do which deal?

20  "Q.  This one million dollar deal.

21  "A.  The current one?

22  "Q.  Uh-huh.

23  "A.  I did because I wanted to modify the first one and I

24  thought that it would be clearer and fairer to reduce the money

25  I was getting.  Let that claim float as it may."

1  Q.   Do you see that testimony, Mr. Frank?

2  A.   Yes.

3  Q.   Is that an accurate characterization of how this

4  settlement agreement of one million dollars was negotiated?

5  A.   Fred did talk to me about the change in the settlement

6  agreement.

7  Q.   I think the question was, was that an accurate

8  characterization of the way in which this one million dollar

9  settlement agreement, which you signed on behalf of the

10  company, was negotiated?

11  A.   I can only say the part that I was part of and I did have

12  a conversation with Fred on this.  Whether he was negotiating

13  with himself and all these other issues, I don't -- I don't

14  know, I wasn't part of that.

15  Q.   All right.  I'll move on.  Now, you know that Mr. Eckert,

16  as we talked about previously, has been having some financial

17  difficulties, right?

18  A.   Yes.

19  Q.   In fact, you think he's judgment proof, right?

20  A.   Yes.

21  Q.   That means that Mr. Eckert doesn't have any money to pay a

22  judgment, right?

23  A.   Yes.

24  Q.   Now we discussed that Mr. Eckert holds more than ten

25  percent of the outstanding preferred stock previously?

1   A.   Yes.

2   Q.   And according to Mr. Manzo the preferred stock is

3   expecting to receive a recovery here, right?

4   A.   Yes.  It may.

5   Q.   And that recovery --

6   A.   It may.  I mean, a lot of things have to happen.

7   Q.   And that recovery may be significant, right?

8   A.   It may but it may not be.

9   Q.   Well the insurance policies that the company holds on Mr.

10  Eckert were excluded from the auction, right?

11  A.   Yes.

12  Q.   And Mr. Manzo believes that these policies could be worth

13  between five and ten million dollars?

14  A.   Yes.

15  Q.   So to the extent that the preferred stock gets a recovery,

16  Mr. Eckert could obtain between 500,000 and a million dollars

17  if the policies are sold, right?

18  A.   Could you repeat the question?

19  Q.   Sure.  You understand that say that there's between a five

20  and ten million dollar distribution to preferred stockholders

21  that would result from the value of the excluded assets, right?

22  A.   That may be the case.  Many assumptions, including the

23  value of the life insurance and the taxes and sales of the

24  company loans and there are a whole variety of things that have

25  to happen.

1    Q.   But you heard Mr. Bacon testify that he thought it was a

2    good economic deal for his client --

3            MR. STAMATO:  Objection, Your Honor.

4            MR. HAMMOND:  Strike that.

5            THE COURT:  One second, there's no testimony by Mr.

6    Bacon.

7            MR. HAMMOND:  I'm sorry.  I didn't -- I slipped, Your

8    Honor.  That was my fault.

9    Q.   You heard Mr. Bacon, during oral argument this morning,

10   right?

11   A.   Yes.

12   Q.   And you heard Mr. Bacon say that his client thinks this is

13   a really good deal for him, right, the option agreement?

14   A.   Yes.

15   Q.   And the option agreement is an option on GSC Active

16   Partners, right?

17   A.   Yes.

18   Q.   GSC Active Partners holds all the preferred stock of GSC

19   (NJ) LP, right?

20   A.   That is right.

21   Q.   And Mr. Eckert owns a hundred percent of GSC Active

22   Partners, right?

23   A.   A common, yes.

24   Q.   Well, he owns a hundred percent of the equity of GSC

25   Active Partners, right?

1    A.    Of the common, yes.

2    Q.    Right.  And the Active Partners holds the preferred stock

3    of GSC (NJ) LP, right?  If you want to go through a work chart

4    we can do that too, if it'll make your life easier.

5    A.    Let's do that.

6          (Pause)

7    Q.    Go to Exhibit 78, Mr. Frank, we talked about it yesterday.

8          (Pause)

9    A.    Okay.

10         (Pause)

11   Q.    Just so we're clear here on Exhibit 78, see there's a line

12   between GSC Active Partners Holdings LP and GSC (NJ) LP, right?

13   A.    Yes.

14   Q.    And that line represents preferred stock holdings, right?

15   Do you recognize that?

16   A.    Yes.

17   Q.    And the far left entity, GSC Active Partners Inc., that's

18   Mr. Eckert's entity, right?

19   A.    I believe so.

20   Q.    And that's the one he holds a hundred percent of?

21   A.    I believe that's true, yes.

22   Q.    And so -- I just want to -- just a flow chart, right.  The

23   value of preferred stock flows up from GSC (NJ) to GSC Active

24   Partners.  Mr. Eckert as the hundred percent equity owner of

25   GSC Active partners could receive a distribution on that

1    preferred stock too, right?

2    A.   That's right.

3    Q.   In any event, getting back to our story, let's assume, to

4    keep this simple, he only owns ten percent of the preferred

5    stock, okay.  And assume that the value of the excluded assets

6    is such that there's a five to ten million dollar distribution

7    to preferred stockholders.

8    A.   Yes.

9    Q.   Okay.  So Mr. Eckert could stand to benefit 500,000 to a

10   million dollars from releasing his medical records so these

11   policies can be sold, right?

12   A.   That would be the swing, yes.

13   Q.   And if he didn't release his medical records he'd receive

14   nothing on these policies, right?

15   A.   From these polices.

16   Q.   The insurance policies that you excluded from the auction.

17   A.   Well it depends on the value of the other assets.

18   Q.   I'm talking about --

19   A.   He'd have to be in the money from the other assets, the

20   intercompany loans, the employee -- so it's the sum of those

21   things that have to go over the -- through the waterfall which

22   is the unsecured and others.  So it's not clear.  The math in

23   the delta is right but the beginning is --

24   Q.   So it's not clear that he's ever going to receive a

25   distribution, right, on the preferred stock?

1    A.   It's not clear.  No.

2    Q.   All right.  Let me just move on here.  I want to talk

3    briefly about the events of the auction, a little bit and how

4    the auction unfolded.

5         The debtors conducted a 363 sale auction that lasted from

6    October 26th until October 29th, right?

7    A.   Yes.

8    Q.   And you attended the auction, right?

9    A.   Yes.

10   Q.   And Mr. Eckert attended the auction?

11   A.   Yes.

12   Q.   And at the auction Black Diamond Capital Management and

13   Black Diamond Commercial Finance submitted several joint bids,

14   right?

15   A.   Yes.

16   Q.   And part of that bid was a credit bid by the agent, right?

17   A.   Yes.

18   Q.   And another part of that bid was a cash note bid by Black

19   Diamond, right?

20   A.   Yes.

21   Q.   And --

22        MR. HAMMOND:  Excuse me, Your Honor.

23        (Pause)

24        MR. HAMMOND:  May I proceed, Your Honor?

25        THE COURT:  Go ahead.

1  Q.  And non-Black Diamond bidders asked to join their own bids

2  on the lots, mostly made up of valuable management contracts

3  with Black Diamond's credit bid on the rest of the lots, right?

4      MR. STAMATO:  Objection, Your Honor, on relevance.

5  This is really getting to issues regarding the sale hearing as

6  opposed to the conduct of management in connection with the

7  issues raised by the trustee motion.

8      THE COURT:  All right.  How does it tie into the

9  conduct of management?

10     MR. HAMMOND:  I can skip through this piece pretty

11 quickly, Your Honor.  But there is a key decision here -- the

12 question here that we're trying to address is can management

13 fulfill its duties.  And at the end of the day, Your Honor,

14 that question, I think, is perhaps best exemplified by the fact

15 that management selected a bid that its own financial advisors

16 said would provide to a bidder, not on account of prepetition

17 claims it would provide to a bidder 126 million dollars of

18 value for an eleven million dollar bid.

19     And on the other hand, it would provide the creditors

20 of the estate eleven million dollars for a 224 million dollar

21 credit bid that they've known about this and they won't change

22 their course of action.

23     MR. STAMATO:  Your Honor, I think counsel just stated

24 what my objection is, the way we've set these hearings up he's

25 putting the cart before the horse.  He's raising issues about

1  allocation that Mr. Solow alluded to in opening as well as Mr.

2  Bacon.

3         The motion to approve the sale is up for hearing.

4  Evidence will be put on about whether that was in fact the

5  appropriate bid and evidence on issues regarding their

6  objections during the auction process as well as evidence

7  regarding the so-called allocation issue, I'm sure will be

8  presented then.

9         What I'm hearing counsel say, Your Honor, is that he

10  wants to go through, whether he says he can do it quickly or

11  not, he wants to walk through management's assessment of the

12  bid.  There's no dispute what bid was selected.  We can get

13  into whether that was the highest and best bid and the factors

14  that led up to it and whether it was a good faith bid at the

15  sale hearing.

16         MR. SHORE:  Your Honor, this is Chris Shore --

17         THE COURT:  No, wait a minute.  We're going to have

18  one counsel handle the witness.

19         MR. SHORE:  Your Honor, could we do this without the

20  witness in the room?  Would that be okay?  To continue this

21  argument but exclude the witness from the argument?

22         THE COURT:  All right.  The witness may step down.

23         THE WITNESS:  Do I have to leave the room too?

24         THE COURT:  Yes.

25         THE WITNESS:  Okay.

1      THE COURT:  Just go down to the end of the hallway.

2      THE WITNESS:  Okay.

3      THE COURT:  Thank you.

4  (Witness exits courtroom)

5  (Pause)

6      MR. HAMMOND:  Your Honor, it's our view that there's a

7  duty of care issue on behalf of directors of GSC, Mr. Frank and

8  Mr. Eckert.  And this issue is best exemplified by the fact

9  that they didn't consider the recoveries to creditors at all.

10      THE COURT:  No, you -- this is an issue from the

11  outset of this case that has been, I'd say, unclear although

12  I've tried to make it clear.

13      You used the term creditors of this case, there is a

14  facility that's a secured claim, that has a secured claim and

15  you have those that participate in that facility.  And there's

16  a non-controlling group and a controlling group.

17      The estate has a duty to pay its creditors or try to

18  enhance value to pay its creditors and that's the facility, is

19  the creditor.  I don't see it having a duty to any particular

20  holder of a part of that facility and it has a duty to

21  unsecured creditors, etcetera, outside of a facility claim or

22  in deficiency claim as well as equity.

23      So to the extent you're argument is that the debtor

24  had a duty to insure that the allocation was fair, I question

25  that seriously.  To the extent your argument is the debtors'

1  principal cooperated in a way that was improper with the bidder

2  to exact an allocation that somehow is unfair, that may be

3  relevant to the conduct of the debtor.

4       MR. HAMMOND:  Your Honor, and I think our view is

5  certainly the latter but to get at that, and we've already

6  demonstrated the fact that these folks have a financial

7  interest in selecting this bid that was put forward by Black

8  Diamond, and you'll hear further evidence, Your Honor, that

9  these folks had unsecured claims.  They had preferred stock

10  interest and they didn't consider the interests of creditors in

11  selecting a bid or the value that was provided to the estate.

12       THE COURT:  What creditors are you talking about?

13       MR. HAMMOND:  I'm talking about all creditors.  The

14  value that was provided to the estate in connection with --

15       THE COURT:  The value provided to the estate, in

16  absolute terms, is the elimination of a 230 or 240 million

17  dollar claim plus added value that comes forward, probably at

18  the outset of this case was not anticipated by anyone.  So when

19  you look at it from that standpoint, it was the highest bid

20  numerically.

21       What happens, in terms of how value is then

22  distributed through the facility and whatever the cash bidder

23  may get is a separate and distinct issue.  And my only concern,

24  really is, is what did the debtors principals -- what may have

25  the debtors' principals done in that allocation aspect of this

1  case.  But I don't see it as a fiduciary duty to the individual

2  secured creditors of the facility.

3          MR. SHORE:  May I be heard on that, Your Honor,

4  because we are switching over to the sale hearing bit?

5          THE COURT:  Very quickly.

6          MR. SHORE:  All right.  Fundamentally our view of what

7  happened here is why I want the witness out; management was

8  presented with an option.  Take the Sankaty bid, or any other

9  bid, and that money would go directly to the creditor body.

10         The other option they had was, do a bid which provides

11  190 million dollars of value to a bidder.  Now Your Honor would

12  never approve a sale which if the evidence came on that 190

13  million dollars of assets were sold for eleven million dollars,

14  you'd never approve that.

15         The reason they're asking for approval is coupled with

16  that came a piece of paper which destroyed the value, the

17  recoveries of one set of creditors.  Okay.  That's a joint bid

18  issue, that's going to be dealt with at the sale.

19         The problem we have here with the management in doing

20  this, is they were directly interested and put in a position of

21  being directly interested by this joint bid process because all

22  of the value that's flowing gets paid not even to creditors but

23  to preferred holders.  So we get -- so in exchange for the

24  delivery of a piece of paper that savages the recovery of

25  allowed third party creditors, they accepted or they accepted

1    the benefits which all flow to them.

2         Your Honor asked the question, there are no third

3    party creditors here.  There are insiders who would never be

4    permitted to vote on a plan anyway and interest holders.  And

5    that's the problem.

6         Over the third party creditors in this case they chose

7    themselves.  And so all Mr. --

8         THE COURT:  Who are the other third party creditors?

9         MR. SHORE:  There are no other third party creditors.

10   There are insiders of the debtors and there's preferred.  And,

11   you're right, potential rejection damage claims from a now

12   solvent estate.

13        THE COURT:  All right.  But those potential rejection

14   damage claims I thought were being paid ahead.  If this case

15   closed tomorrow the way it's structured right now, wouldn't

16   they be paid?

17        MR. SHORE:  They would be paid if the debtors in a

18   solvent estate decided to reject the leases, yes.  But

19   otherwise they're going to be paid, in any event, in the normal

20   course of business.

21        THE COURT:  Right.  So I lost your concern there, from

22   the standpoint of those creditors.  How do those creditors get

23   harmed by the preferreds getting paid anything?

24        MR. SHORE:  The potential rejection damage claim

25   creditors don't get harmed and you're right.  So if the

1    analysis is accept the bid that potentially pays a rejection --

2    a third party rejection damages contingent claim overpays

3    secured creditors, that may in fact be the calculus.

4         THE COURT:  But the paid secured creditors, the

5    secured creditors are paid.  They're paid through the

6    satisfaction of the credit bid.

7         MR. SHORE:  No, they're not paid through the

8    satisfaction of the credit bid.  They're given a cause of

9    action against the --

10        THE COURT:  Oh no, that's separate and apart.  Mr.

11   Shore, you can't -- if that credit bid is made by the

12   authorized agent, that eliminates the claim against the estate.

13   So from the estate's standpoint those creditors are satisfied.

14   They may have expressed serious concerns about what the agent

15   did in exercising its right to credit bid and the consequences

16   that flow from it.

17        From an estate standpoint there's no deficiency claim,

18   there's no longer a secured claim against the estate.  What is

19   left?

20        MR. SHORE:  But there is but it gets satisfied out of

21   its --

22        THE COURT:  It gets satisfied out of the proceeds,

23   that tail that was not credit bid gets satisfied.  So in the

24   estate's standpoint there is no longer, when it's all said and

25   done, any outstanding claim?  There's no deficiency claim that

1   goes unsatisfied and there's no outstanding secured claim.  And

2   it really then returns to somewhat where we started from a

3   couple months ago and that's the battle.

4          MR. SHORE:  The battle -- the battle I have and the

5   way Your Honor has framed it is, accept a bid which is free of

6   any issue with respect to collusion, is free of any issue with

7   respect to management influence or everything else, right.

8   There's no question that would have been done and put at risk

9   the third party contingent rejection damages claim, yes.  Or --

10  or go forward with this bid, which raises substantial issues

11  and we believe -- you're not going to hear Mr. Eckert say that

12  the reason -- this is what Mr. Hammond's getting to.  He's not

13  going to say that the reason I selected this bid is because

14  this is what creditors would be receiving.  He's not concerned

15  about the third party rejection damage claim.  He's going to

16  say they didn't consider that at all.  This wasn't about what

17  creditors would receive.  This was about reaching a deal with

18  Black Diamond.

19         THE COURT:  Well, you can ask -- you can pursue it but

20  at the end of the day I'm not sure his subject -- how much of a

21  subjective intention there carries the burden.

22         MR. SHORE:  No, I think it's a question as to why the

23  duty of care issue was raised.  If they don't consider it and

24  there's no process in place by which they consider it and look

25  at that issue and make an open eye determination with respect

1    to that, then we have a problem.

2         And I'll tell you why they didn't do it, because they

3    were indifferent to it because the bid that was on the table

4    provided them tens of millions of dollars and it doesn't take

5    really long in the context of this -- this corporation which

6    has its board meetings on the phone whenever to say of course

7    we'll do that deal.  I'll give myself a million; I'll give

8    myself six million.  That's the concern we have.

9         THE COURT:  You can pursue whether or not they

10   considered it but the other bids on the table would not have

11   reached that contingent claim either.

12        MR. SHORE:  No.  Fundamentally, Your Honor, our issue

13   is whether or not they followed proper procedures in doing this

14   and whether that, in the context of it became the highest and

15   best bid.

16        Your Honor is not going to say, I don't believe, that

17   no matter how the bid was reached if it has the highest number

18   I'm going to approve that because that reads out best.

19        There has to be a process here.  There was no process

20   here.

21        THE COURT:  And what happens if it turns out to be the

22   best bid and no one considered the issues that you raised as

23   about who gets paid but at the end of the day it's the only bid

24   that achieves that result.  Isn't it then still the best bid?

25        MR. SHORE:  Look -- see, that's where we come down.  I

1    think when we get to the sale hearing I'll argue and I

2    hopefully will convince you that a -- the highest bid reached

3    through an improper process is never the best bid.  That's

4    exactly what the Court is here to do.  It would all be done

5    without Court supervision and without Court approval if the

6    only issue was 224 million dollars more than 194 million

7    dollars.  Yes, it is.  We agree.

8            THE COURT:  Well best --

9            MR. SHORE:  Because those numbers are higher.  How it

10   affects creditor recoveries is, and I think the calculus says

11   that creditors in this case will get -- secured creditors will

12   get five cents on the dollar and a right to sue in order to

13   protect a contingent third party lease rejection damage claim,

14   is not an appropriate calculus.

15           And I don't believe -- we wouldn't be here moving for

16   a trustee if we thought a trustee would look at it that way and

17   say, oh of course, 224 is higher than 191 go with it.

18           THE COURT:  Well, I think if you look into case law in

19   Best it often talks about which bid is maybe more likely to

20   close, you know, other contingencies.  But you're still going

21   down a path that would have the debtor examine what's best and

22   take into consideration what happens within the facility.

23           MR. SHORE:  That's always a question because accepting

24   a bid always comes with risks that go with that.  No question.

25           For example, this may be a higher bid but it raises

1    anti-trust risk.  Not going to accept it.  This may be a

2    facially higher bid but it raises significant issues with

3    respect to recoveries in this case or it raises significant

4    issues as to who actually is deciding this and who can decide

5    it within corporate governance.

6          All those things have to come into play in deciding

7    it.  And all creditors are entitled to have a principal there

8    to approve that transaction, consistent with both their duty of

9    care and their duty of loyalty and that didn't happen here.

10         THE COURT:  All right.  The debtor?

11         MR. SOLOW:  I'll be brief, Your Honor.  Two points; as

12   I suspected we're going to the path of having our sale hearing

13   and I know that was not your desire.  We're prepared to do that

14   and we'll move quickly to it because that's really what's going

15   on here.

16         This is not about whether or not there should be a

17   trustee appointed.  This is about whether or not a sale should

18   be approved or not.  And as cited in our papers, Your Honor, we

19   understand that because of the disclosed issues that have been

20   put into testimony and were disclosed by the debtor from day

21   one in this case, the debtor has a level of -- that it must

22   meet with respect to the law and Integrated Resources, I

23   believe the appropriate case in this circuit, with respect to

24   your consideration of whether or not that sale should be

25   approved.

1          Also just factually, Your Honor, Mr. Shore is

2     absolutely incorrect.  There are other creditors in this case.

3     There are taxes to be paid of an unknown amount right now.  I'm

4     not sure whether or not the taxes, based upon the price that's

5     being paid, will consume whatever might otherwise go in a

6     waterfall analysis to the equity.  I'm not sure.  I don't know.

7          There are general unsecured creditors; the debtor has

8     already rejected these.  There are non-insider employees, the

9     Court has already taken evidence on those employees with

10    respect to their -- with respect to payments that the debtor

11    has been authorized to make, with respect to their work during

12    these cases.  They're non-insiders and that's how you approved

13    it, how the U.S. Trustee examined it and then he had no

14    objection to it and there are contingent litigation claims.

15         Your Honor, I'm not going to repeat what you said

16    best.  We're just trying to pay off our secured creditor.

17         THE COURT:  All right.  The non-controlling lender,

18    you can pursue a line of questioning regarding what the debtor

19    considered in terms of that process, about whether you think,

20    and I'm trying to articulate it the same way you did, that due

21    care, etcetera, was taken with respect to the bidding process

22    itself.  But you're not going to go too much further than that

23    before I'm going to cut you off.

24         MR. HAMMOND:  Okay, Your Honor.  Just so I'm clear and

25    I'm trying to -- I'll have to refine my examination here.  But

1   with -- we think that involves the allocation issue because the

2   allocation issue has been raised to the debtors since the

3   time --

4           THE COURT:  Well, you can ask if he considered it or

5   not and considered the interest of the other secured creditor

6   as having their secured claim -- their secured claim satisfied

7   through the credit bid or receiving a cash distribution as to

8   whether they considered it, whether he did or he didn't.

9           MR. HAMMOND:   I mean we've talked about if he did.

10  There's a chart that shows this and I thought it would be

11  easier to walk him through it.  That's what I was planning on

12  doing.

13          MR. SHORE:  Your Honor, can we take a short break?

14  I'll talk to Mr. Hammond about how to shorten this up.

15          THE COURT:  All right.  We'll take a five minute break

16  and then we'll pick up.

17      (Recess from 11:10 a.m. to 11:20 a.m.)

18          THE COURT:  Please be seated.  All right.  Go ahead.

19          MR. HAMMOND:  All right.  Thank you, Your Honor.

20  CONTINUED DIRECT EXAMINATION

21  BY MR. HAMMOND:

22  Q.   Mr. Frank, I want to talk a little bit about the decision

23  making process that was made in connection -- that was engaged

24  in the connection with the selection of the final bid at the

25  auction that was held between October 26th and October 29th,

1    okay?

2    A.    Okay.

3    Q.    Now, you and Mr. Eckert are the two individuals at GSC

4    with the responsibility of selecting a successful bidder,

5    right?

6    A.    Yes.

7    Q.    And you're the only two people at GSC who have the

8    authority to decide which bid or bids to accept, right?

9    A.    Yes.

10   Q.    And each of you had a financial interest in seeing Black

11   Diamond prevail in the bidding, right?

12   A.    Yes.

13   Q.    So, you're operating under a conflict, right?

14   A.    It certainly didn't sway our -- my opinion at all.

15   Q.    I understand you think that but the fact is you were

16   operating under a conflict, right?

17   A.    I didn't view it as a conflict.

18   Q.    You didn't view the fact that you had the potential to

19   receive millions of dollars of consideration if you selected

20   Black Diamond as the winning bidder a conflict?

21          MR. STAMATO:  Objection.  Asked and answered in one

22   way, shape or form over three times.

23          THE COURT:  All right.  I'll grant -- sustain the

24   objection.  Go ahead.

25   Q.    You never considered setting up a special committee of

1  people who did not have and form their consulting contracts

2  with Black Diamond to decide the successful bid, right?

3  A.   No, we didn't.

4  Q.   And you know how to set up those firewalls, right?

5  A.   Yes.

6  Q.   Like, for example, when Black Diamond was trying -- was

7  having discussions with you about an entity and one of your

8  funds, do you recall we had that subject matter in the

9  deposition the other day?

10  A.   Yes.

11  Q.   And I'm not going to name the entity because I believe

12  that's still confidential.

13  A.   Yes.

14  Q.   You know what I'm talking about, right?

15  A.   Yes.

16  Q.   And when they tried to have discussions with you about a

17  transaction between the funds, there were walls put up, right?

18  A.   Yes.

19  Q.   So, that couldn't be accomplished, right?

20  A.   Yes.

21  Q.   But no such wall has been put up here?

22  A.   Yes.

23  Q.   Now, I deposed Mr. Manzo the other day.  I want to turn to

24  page 346 of his transcript.

25  A.   Which one?

1    Q.    I believe they're --

2    A.    There's a December 2nd one.

3    Q.    -- it's the December 7th.

4    A.    17th?

5    Q.    And on the 17th I asked Mr. Manzo on page 345, line 25,

6    starting there,

7    "Q.  Did you have any discussion with Mr. Frank about earlier

8    in that auction process on the 28th as to whether Mr. Eckert

9    should be there?"

10       And he said,

11   "A.  We had discussions throughout the auction.  Mr. Eckert was

12   there for, you know, various periods of time.  You know,

13   interchangeably, Mr. Eckert would be there and Mr. Frank would

14   be there.  Mr. Frank was there for virtually all of the auction

15   except for a very narrow window of time in the prior days, I

16   recall.  But again, I think the feeling was, to a great extent,

17   the decision of the winning bid was not something that, in my

18   view, I will tell you in my view, that Mr. Eckert and Mr. Frank

19   should really decide.  That, in fact, they had consulting

20   agreements with Black Diamond, the Court mandated a process,

21   they acceded that process with respect to bidding procedures

22   negotiation, the auction itself myself and Kay Scholer.  And I

23   believe the ultimately party here who will opine as to the

24   transaction with any winning bidder would be Judge Gonzalez."

25   Q.    You see that?

1  A.   I don't have a copy of that but I heard what you said.

2        MR. HAMMOND:  May I approach?

3        THE COURT:  Go ahead.

4        THE WITNESS:  I understood it.

5  Q.   Do you recall ever discussing the Mr. Manzo that in his

6  view you and Mr. Frank should -- you and Mr. Eckert shouldn't

7  be selecting the winning bid?

8  A.   No.

9  Q.   He never told you that?

10 A.   I don't recall.

11 Q.   Now, Capstone didn't make the decision about which bid to

12 select, right?

13 A.   Capstone advised.

14 Q.   They didn't make the decision, right?

15 A.   Right.

16 Q.   Kay Scholer didn't make the decision on which bid to

17 select, right?

18 A.   Yes.

19 Q.   And, in fact, when the decision was made to the select the

20 final bid, the board would make, Mr. Manzo wasn't even in the

21 room, right?

22 A.   Repeat that?

23 Q.   Yes.

24        MR. HAMMOND:  Can I get a copy of Mr. Manzo's

25 transcript?

1  Q.  When the decision was made to select the successful bid,

2  Mr. Manzo wasn't even in the room, right?

3         MR. HAMMOND:  May I approach the witness, Your Honor?

4         THE COURT:  Go ahead.

5  A.  Do you want me to read this or --

6  Q.  I can restate the question if you don't recall.

7  A.  Please restate the question.

8  Q.  Mr. Manzo wasn't even present when the decision was made

9  by GSC to select the BD joint bid.  Isn't that right?

10 A.  Mr. Manzo and I and Mr. Solow were together when this

11 decision was made around 4 o'clock in the morning on Friday.

12 Q.  He wasn't aware of any board meeting at that point in

13 time, right?

14 A.  Board meeting did not occur until the next day.

15 Q.  And so, Mr. Manzo wasn't at that board meeting, right?

16 A.  I don't know whether he was or not.

17 Q.  You don't recall?

18 A.  The board meeting approved it.  The decision was made

19 together on Friday morning.

20 Q.  Was that board meeting by phone, by --

21 A.  By phone.

22 Q.  You didn't discuss with Mr. Manzo whether the board voted

23 on a decision, did you?

24 A.  Which decision?

25 Q.  To select the Black Diamond bidders as the accepted bid?

1    A.    The board meeting -- we selected it on Friday.  We didn't

2    have the board meeting to select the winning bid.  We had a

3    board meeting afterwards to proceed with it, go ahead and move

4    it to the court.

5    Q.    And --

6    A.    So, the decision was made Friday morning and everyone was

7    in the room except Fred.

8    Q.    That decision was -- Fred wasn't there at 4 a.m.?

9    A.    That is correct.

10   Q.    Now, was there any reason why you had to select the

11   winning bid at 4 a.m.?

12   A.    We wanted to conclude the process and sign the APA.

13   Q.    You have -- the chairman of the board and CEO, wasn't

14   there, right?

15   A.    That's right.

16   Q.    There was no reason why you couldn't have done it the next

17   day, right?

18   A.    There's really no controversy in the decision so we felt

19   no need to wake him up.

20   Q.    Mr. Eckert, if he voted against the transaction, could

21   have hung that transaction, right?

22   A.    That is correct.

23   Q.    You didn't see any need to consult him about that, right?

24   A.    No, I didn't.

25   Q.    All right.  You understood you were determining who to

1    sell substantially all the assets of the company to, right?

2    A.   That's right.

3    Q.   And we went through the shareholder agreement and that

4    needed the affirmative consent of the CEO, right?

5    A.   We had signed a resolution that allowed either one of us

6    to proceed with any activity relating to the bankruptcy and I

7    relied on that.

8    Q.   And that -- you think that resolution overrode the

9    provision in the shareholder agreement that is 2.03 Section D?

10         MR. STAMATO:  Your Honor, I just want to see if we can

11   perhaps streamline this.  I understand the case law to suggest

12   that shareholder approval in a 363 context isn't necessary.  We

13   have the Court as the ultimate gatekeeper on the

14   appropriateness of the transaction.  And we've got a couple of

15   cases in our papers along those lines.  Mr. Frank has already

16   testified that their corporate resolutions passed authorizing

17   for Mr. Eckert to take appropriate actions to effectuate the

18   Chapter 11 process.  Those resolutions are apart from the

19   partition package and were explored yesterday in his

20   deposition.  I'm just trying to streamline this as being

21   somewhat tangential if not irrelevant.

22         MR. HAMMOND:  Your Honor, this is all about the

23   process of the decision making here.  The fact that the CEO and

24   chairman of the company wasn't even in the room at 4 a.m. when

25   they selected the winning bid, there was no reason or no cause

1   as to why they would have to select the winning bid at 4 a.m.

2   And the fact that under the shareholder agreement which

3   provides Mr. Eckert with the authority to reject the sale of

4   substantially all of the assets of the company and requires in

5   the form of consent, I think that that's an issue that I should

6   be entitled to explore.

7          THE COURT:  To what end though?

8          MR. HAMMOND:  To what end?

9          THE COURT:  Yes.  What --

10         MR. HAMMOND:  Well, I think --

11         THE COURT:  -- what would you like -- what are trying

12  to establish as a result of Mr. Eckert's absence in the

13  decision making process going forward?

14         MR. HAMMOND:  I think the idea is that the process is

15  flawed and there was time to consider this and get the input of

16  the CEO and chairman who did have a right to object to it and

17  the fact that they didn't I think speaks volumes.

18         THE COURT:  Well, that's the very CEO who you think

19  shouldn't be involved in it?

20         MR. HAMMOND:  That is correct, Your Honor.

21         THE COURT:  All right.  Go ahead.

22         MR. HAMMOND:  Maybe they didn't need his involvement

23  because it involves -- was, you know, in the bag.

24  BY MR. HAMMOND:

25  Q.   Did Mr. Eckert give you his proxy on how to vote?

1    A.   When he left earlier in the evening he said if you need me

2    you can certainly reach me but you're certainly have -- I had

3    his proxy unless it was going to be contentious and difficult

4    and close.

5    Q.   You had his proxy?  Can you go to your deposition, your

6    December 2nd deposition, at page 49?

7    A.   Which one?

8    Q.   December 2nd.  Page 49.

9    "Q.  How did it work?  Did he give you his written proxy?

10   "A.  No.

11   "Q.  Were there any board meeting or board minutes or any

12   reflection of what was considered in connection with making

13   this monumental decision?

14   "A.  No."

15   Q.   You see that?

16   A.   Yes.

17   Q.   Is that true?

18   A.   He did not give me his written proxy, no.

19   Q.   Now, there is not a more important decision a director can

20   make in deciding who to sell the assets the company to, right?

21   A.   We certainly agree a very important decision.

22   Q.   And you thought he should be there to make that decision,

23   right?

24   A.   I don't think it was needed.  I don't think it would have

25   changed anything.

1  Q.   You thought he should be there to make that decision,

2  right?

3  A.   I felt comfortable with what we did.

4  Q.   Sir, I'm going to ask you again.  You thought he should be

5  there to make that decision, right?

6  A.   I think it would have been better if he was there.

7  Q.   And you told him that, right?

8  A.   I don't know if I told him that.  I don't remember.

9  Q.   Now, none of your advisors told you that you had to vote a

10  4 o'clock in the morning, right?

11  A.   No.

12  Q.   There's no reason you couldn't wait until the afternoon of

13  October 29th to make this decision, right?

14  A.   Other than we wanted to get on with it and sign the APA.

15      MR. STAMATO:  Objection, Your Honor.  This whole line

16  has become a cumulative.  He's already testified that the

17  decision was made at 4 o'clock.  That there was a subsequent

18  decision and meeting with Mr. Eckert the following morning to

19  approve counsel going forward with the APA and purchase

20  agreement by filing a motion.

21      THE COURT:  All right.  How much longer are you going

22  to pursue this line?

23      MR. HAMMOND:  I'm just going to go through it really

24  quickly, Your Honor.  Maybe three or four more questions.

25      THE COURT:  All right.  Go ahead.

1    MR. HAMMOND:  Can you read back the last question?

2    Oh, I'm sorry.  The last question was, "There's no reason you

3    couldn't wait until the afternoon of the 29th to make this

4    decision, right?"

5    A.   Other than we'd want to just expedite the process and end

6    it, we're all there.  The APA was being prepared and we signed

7    it.

8    Q.   None of your advisors told you that the non-controlling

9    lenders were objecting to this, right?

10   A.   We knew that -- that the non-controlling lenders were not

11   satisfied with the result.

12   Q.   You knew that at the time the auction was going on, right?

13   A.   Yes.

14   Q.   And where did you obtain this understanding?

15   A.   Well, we were in the room with them.

16   Q.   Does this refresh your recollection that you had, Mr.

17   Frank?

18   A.   It's a recollection I have right now.

19   Q.   It wasn't your recollection yesterday, right?

20   A.   Probably not.  No.  But they were in the room.  It was --

21   Q.   And so, in any event -- let's just wrap this up.  You've

22   got to make the decision at 4 a.m. than to wait for the input

23   of the CEO, right?

24        MR. STAMATO:  Again, Your Honor, this is --

25        MR. HAMMOND:  That's the last question in the line.

1          THE COURT:  Was there an answer to that question?

2          THE WITNESS:  What was the last question, sir?

3          THE COURT:  "You decided to make a decision at 4

4   o'clock in the morning instead of waiting for the input of the

5   CEO."

6          THE WITNESS:  Yes.

7          THE COURT:  All right.  Go ahead.

8   Q.   Now, at any point in time during this process, did it come

9   to your attention that there was a misallocation of assets

10  under the bid?

11         MR. STAMATO:  Your Honor, object -- standing

12  objection.  The question is regarding the allocation or

13  relevance.

14         THE COURT:  All right.  Go ahead.  Answer the

15  question.

16  A.   On the last night, we didn't focus on the allocation so we

17  didn't do the calculation of how it really laid out until

18  later.

19  Q.   Okay.  So, during the auction process, you didn't

20  understand from this allocation of assets, is that right?

21         MR. STAMATO:  Your Honor, I object to his

22  characterization of --

23         THE COURT:  Yes.  Restate the question without the

24  characterization of misallocation.

25         MR. HAMMOND:  Thank you, Your Honor.

1  Q.  Mr. Frank, during the process, you didn't -- during the

2  auction process itself prior to selecting the final bid, you

3  didn't understand the allocation of assets, right?

4  A.  That is correct.

5  Q.  You just knew there was an allocation of assets, right?

6  A.  That is correct.

7  Q.  And so, Mr. Manzo never said to you that when he was

8  looking at the bid during the auction process, he said to

9  himself clearly looking and saying, wow, for eleven million

10  dollars, look at everything you're buying, right?

11  A.  Everything you're buying is not a calculation.  We knew

12  there was an allocation.  We didn't understand completely the

13  ramifications until quite a bit later when we did the

14  calculation.

15  Q.  When was it actually that it came to your attention the

16  allocation of the assets under the bid?

17  A.  The math behind it, probably four days later.

18  Q.  And what did that reveal when you saw it four days later?

19  A.  That revealed that most valuable part of -- the highest

20  value of the assets went to the cash and note bid and a small

21  part of the assets, smaller part of the assets were allocated

22  to the credit bid.

23  Q.  And I think, Mr. Frank, there's been two parts.  What I'll

24  ask you to do is turn to Exhibit 11.  If you could tell me if

25  that's the allocation that you're referring to?

1    A.    Tab 11?

2    Q.    Tab 11.

3    A.    Okay.  That's the tab that we went over yesterday

4    together.

5    Q.    It's not the one we went over yesterday together but tab

6    11, is that --

7    A.    No, it isn't.  You're right.  Let me look at it again.  I

8    see it.

9    Q.    Is this the allocation you received -- the allocation of

10   assets you considered four days later?

11   A.    I don't know if it was this particular page but this

12   information is what I received, yes.

13   Q.    If you look at page 1 and page 2, I think they fit

14   together.  It's an Excel spreadsheet that's been cut in half.

15   A.    Tab 11?  Where am I?

16   Q.    Tab 11.

17   A.    Now, I have --

18   Q.    The double page, I'm sorry.

19   A.    Oh, I see.  It's on the other side of the page.  Yes.

20   Q.    And that allocation shows that the credit bid assets are

21   valued at fifty-five million dollar trade?

22   A.    Yes.

23   Q.    And that Black Diamond would acquire eighty-two million

24   dollars in assets with eleven million dollar cash note bids?

25   A.    That's what this says, yes.

1  Q.  And subsequent to that, you've become familiar with other

2  allocations, right?

3  A.  Yes.

4  Q.  In fact, I believe it's tab 40?

5        MR. STAMATO:  Your Honor, again I'm going to renew my

6  objection on the question regarding allocation.  I thought we

7  were going to proceed on the process and decision making at the

8  auction and what Mr. Frank --

9        THE COURT:  Your objection's overruled.

10  A.  Okay.  I'm at tab 40.

11  Q.  And you've seen tab 40, right?

12  A.  I think this is the one that we worked together with.

13  Q.  This is the one we went there yesterday, right?

14  A.  Yeah.

15  Q.  And you know this is an evaluation that's been prepared by

16  your financial advisor, right?

17  A.  Yes.

18  Q.  It was prepared by Mr. Manzo?

19  A.  Yes.

20  Q.  Okay.  And this reflected that the credit bid assets, that

21  you valued them as 11.6 million dollars, right?

22  A.  11.6 it says -- yes, I see it, yes.

23  Q.  And the note attached to that that valued at 126 million

24  dollars, right?

25  A.  Yes.

1    Q.   Do you remember when you became aware of this valuation

2    prepared your financial advisors?

3    A.   It was sometime after the auction.  I don't know exactly

4    when.

5    Q.   Was it December?

6    A.   It was before December.

7    Q.   But before the sale hearing was set to commence on

8    December 6th, you were aware of this allocation of value that

9    had been prepared by your financial advisor, right?

10   A.   Yes.

11   Q.   And you understood that the debtors weren't reorganizing

12   when you made your selection of the Black Diamond joint bid,

13   right?

14   A.   Yes.

15   Q.   You understood that they were going to be selling

16   substantially all of their assets and liquidating those assets

17   to the creditors of the estate, right?

18   A.   Yes.

19   Q.   And you understood that you were responsible for selecting

20   a bid that gave creditors the most value, right?

21   A.   Yes.

22   Q.   And -- but you didn't look at what actual creditors would

23   receive in selecting the Black Diamond joint bid, right?

24   A.   I understood that my obligation was to the estate.

25   Q.   I believe my question, Mr. Frank, was you didn't look what

1    actual creditors would receive in selecting the Black Diamond

2    joint bid, right?

3    A.    I did know the -- I did know this allocation.

4    Q.    Let's do a time frame.

5    A.    Okay.

6    Q.    As of October 29th when you selected the Black Diamond

7    joint bid, you didn't know of this allocation, right?

8    A.    That is correct.

9    Q.    You didn't even look at it, right?

10   A.    Yes.

11   Q.    Your advisors told you this is not something you should be

12   concerned with, right?

13   A.    Correct.

14   Q.    And then at some point in time subsequent to that, four

15   days later, you learned of the allocation that was set forth in

16   Exhibit 11?

17   A.    Yes.

18   Q.    That's the one that showed that 55 million dollars of

19   value was going to go to a 224 million dollar credit bid?

20   A.    Yes.

21   Q.    And that about eighty-two million dollars was going to go

22   to pay the Black Diamond for the eleven million dollar cash

23   note bid?

24   A.    Yes.

25   Q.    And you understood that Black Diamond wasn't getting those

1  assets as the creditor of the estate, right?

2  A.   Yes.

3  Q.   And then, yet later in the process, you got another

4  revised valuation from your financial advisors, right?

5  A.   Yes.

6  Q.   And that's the valuation that's reflected on Exhibit 40,

7  right?

8  A.   Yes.

9  Q.   And then you learned at some point in time prior to

10  December that your financial advisors valued the assets that

11  would go to the credit bid at 11.6 million dollars, right?

12  A.   Yes.

13  Q.   And that you valued the excess at -- Mr. Manzo valued the

14  assets and that would go to the no cash bid for 11 million

15  dollars, he valued those assets at 126 million dollars, right?

16  A.   That's correct.

17  Q.   I just want to see if we can put a finer point on when you

18  actually learned that fact.

19  A.   I was sure that I knew it probably two weeks after the

20  close of the auction.

21  Q.   And just to be clear, you never considered how much value

22  was actually being distributed to secured creditors under the

23  Black Diamond joint bid, right?

24  A.   My advisors told me that my responsibility was to the

25  agent for the first -- for the senior, so the allocation didn't

1    affect my choice of what the bid would be.

2    Q.   I'm just trying to put it in bits and pieces of time.

3    Okay?

4    A.   Okay.

5    Q.   As of October 29th, you didn't consider how much value was

6    actually being distributed to secured creditors under the Black

7    Diamond joint bid, right?

8    A.   That's correct.

9    Q.   When was it that you started to consider that issue?

10   A.   Could you repeat the question?

11   Q.   Yes.  When was it that you started to consider the issue

12   of how the assets were allocated between Black Diamond on one

13   hand and the secured lenders on the other?

14   A.   We were aware of it; I think I answered the question

15   before, within two weeks.  I was -- I checked with my legal and

16   financial advisors and they said that is not our issue.  So, I

17   didn't do anything about it.

18   Q.   Well, we'll get to this --

19   A.   Okay.

20   Q.   -- later on in your examination but the fact is at some

21   point in time during the process, you did think it was your

22   issue, right?

23   A.   When minority lenders -- in a way it was on my issue.

24   Again, I'm confused.

25   Q.   You tried to address this issue with Black Diamond, didn't

1  you?

2  A.   Yes.  We tried to have a meeting to have a resolution.

3  That was a few weeks ago.

4  Q.   And you wanted to change the allocation issue, right?

5  A.   I was trying to have a settlement on the allocation issue,

6  yes.

7  Q.   And you actually proposed changing the allocation issue to

8  Black Diamond, right?

9  A.   I didn't propose it to Black Diamond, no.  We arranged for

10  a settlement meeting.

11  Q.   The debtors never proposed changing -- or fixing the

12  allocation issue?

13  A.   We weren't able to do that.  We wanted consensual

14  situation that would go on so we could move ahead in this

15  transaction.  But we didn't come with a framework.

16  Q.   I understand, Mr. Frank, but the question is did you ever

17  try to fix the allocation issue with Black Diamond?

18  A.   No.

19  Q.   In any way, shape or form?

20  A.   I don't recall doing that.  No.  I don't think I did.

21  Q.   You don't recall --

22  A.   I don't we did, no.

23  Q.   -- I'm sorry; I'm jumping around so I apologize.  I'll get

24  to that later.

25  A.   Okay.

1  Q.  Now, sitting here today looking at your own financial

2  advisor's evaluation, do you have any reason to believe that

3  the allocation of value there is fair to the secured creditors

4  of the estate?

5  A.  I can have my personal opinion on it but my understanding

6  is that that's really not our fight.  That's an issue between

7  the various lenders.

8  Q.  I understand it's not your fight and I asked you that

9  question whether you think it's fair?

10 A.  Certainly, if I was a minor -- a noncontrolled lender I'd

11 be very unhappy.

12 Q.  Does that mean you don't think it's fair?

13       THE COURT:  Well, answer the question whether you're a

14 controlled lender or not.  Answer the question whether it was

15 fair in your view to the secured creditors?

16 A.  No.

17 Q.  And Black Diamond as the agent is getting the same

18 treatment as all the other lenders, right?

19 A.  Yes.

20 Q.  And Black Diamond, the bidder, is getting different

21 treatment, right?

22 A.  In that allocation, yes.

23 Q.  Absent that 224 million dollar credit bid, did you have

24 any reason to believe that Black Diamond could acquire the

25 assets, the subject of the cash note bids, for 11 million

1  dollars?

2  A.   No.

3  Q.   And --

4       MR. HAMMOND:  I apologize, Your Honor.  I'm skipping

5  around a little bit.  I'm trying to cut to the chase.

6  Q.   -- and so, let's be clear here, so you have one million

7  dollar unsecured claim against the estate, right?

8  A.   Yes.

9  Q.   And Mr. Eckert has a two million dollar unsecured claim

10 against the estate, right?

11 A.   Yes.

12 Q.   And the Sankaty bid was submitted, the runner-up bid, that

13 was valued at 194 million dollars, right?

14 A.   Yes.

15 Q.   It's less likely that you'd get any recovery on your one

16 million dollar unsecured claim or that Mr. Eckert would get any

17 recovery on his two million dollar unsecured claim if you

18 selected the Sankaty bid?

19 A.   On October 29th?  That's correct.  It's a lower number so

20 less chance of recovery.

21 Q.   And you hold preferred stock in the company, right?

22 A.   Do I hold preferred stock?  A little bit.  Yes.

23 Q.   Three percent or so?

24 A.   Maybe yes.  I don't remember how much.

25 Q.   Mr. Eckert holds preferred stock In GSCP (NJ), LP, right?

1    A.    Yes.

2    Q.    And Mr. Eckert holds -- and GSC Active Partners holds a

3    big slug of equity in preferred equity in GSC --

4    A.    Yes.

5    Q.    -- (NJ), LP, right?

6    A.    Yes.

7    Q.    And Mr. Eckert owns a hundred -- as we talked about

8    before, Mr. Eckert owns a hundred percent of the common equity

9    of GSC Active Partners, right?

10   A.    Yes.

11   Q.    And so, Mr. Eckert would stand to benefit to the extent

12   that you selected the Black Diamond joint bid, right?

13   A.    Yes.

14   Q.    And, in fact, Mr. Eckert actually owned -- preferred

15   equity in GSC Group, Inc. too, right?

16   A.    Yes.

17   Q.    As the Jeffries preferred right?

18   A.    Yes.

19   Q.    He owns about ten percent of that Jeffries preferred

20   stock?

21   A.    I believe so.

22   Q.    And it's possible by selecting the Black Diamond joint bid

23   that he'll get some recovery on that as well, right?

24   A.    It's hard to imagine that it ever get down there.

25   Q.    And now, let's talk about the unsecured creditors of the

1    estate.  You had about ten million dollars in unsecured claims,

2    right?

3    A.   So far, yes.

4    Q.   Ballpark?

5    A.   Yes.

6    Q.   You had about seven million dollars in employee claims,

7    right?

8    A.   Yes.

9    Q.   You get about three million dollars of that as comprised

10   of you and Mr. Eckert, right?

11   A.   Yes.

12   Q.   And it's less likely, as we discussed, that those claims

13   would get a recovery in the event that you selected the Sankaty

14   bid, right?

15   A.   Sure.

16        MR. STAMATO:  Objection, Your Honor, as to the extent

17   the claims disallowance process and review process hasn't even

18   started yet.

19        THE COURT:  All right.  Address that in your

20   question -- address that in the way you're asking your question

21   in that assumes that they're allowed claims.

22   Q.   Mr. Frank, assuming those claims that have been filed to

23   date are allowed claims, it's less likely that the unsecured

24   claimholders will receive a distribution in the event that the

25   Sankaty bid was elected, right?

1    A.    Yes.

2    Q.    Mr. Frank, I now want to turn to a period of time when the

3    amendment to the asset purchase agreement was negotiated and

4    the issues giving rise to the amendment to the asset purchase

5    agreement arose, okay?

6    A.    Yes.

7            MR. STAMATO:  Your Honor, again, I think these issues

8    can be explored in connection with the sale hearing.  We've

9    gone almost two hours.  I recognize there's been a break or two

10   but they've put down Mr. Frank in an hour on your agenda and I

11   haven't had a chance to do a limited cross yet and I'm just

12   kind of wondering how we can streamline as to move it forward

13   with the issues of today.

14           MR. HAMMOND:  Your Honor, if I may?

15           THE COURT:  Go ahead.

16           MR. HAMMOND:  Your Honor, with respect to the

17   amendment to the asset purchase agreement, clearly you'll hear

18   evidence in testimony today about the fact that the option

19   agreement was negotiated simultaneously with the amendment to

20   the asset purchase agreement.  That it was open as of December

21   3rd.  Mr. Manzo says in his declaration that "I learned they

22   were negotiating the option agreement as of December 1st."  And

23   so, the amendment to the asset purchase agreement is critical

24   to the motion that we have in front of Your Honor.  We think

25   it's a very important part --

1          THE COURT:  All right.  How long is your examination

2     in that regard?

3          MR. HAMMOND:  Fifteen minutes maybe and then it folds

4     right into the option agreement.

5          THE COURT:  All right.  Go ahead.  I'll overrule the

6     objection.

7     BY MR. HAMMOND:

8     Q.   Mr. Frank, you recall a dispute that arose between the

9     debtors and Black Diamond during November regarding who should

10    get the cash that was generated by certain funds during this,

11    like, gap period between the time the auction concluded and the

12    proposed sale was approved, right?

13    A.   Yes.

14    Q.   And the position the debtors took was that cash earned

15    after the execution of the asset purchase agreement should stay

16    with the debtor, right?

17    A.   Yes.

18    Q.   And Black Diamond took the opposite position?

19    A.   Yes.

20    Q.   They said that if cash was generated it should come to the

21    purchaser rather than stay with the debtor, right?

22    A.   Yes.

23    Q.   And you and Mr. Eckert both took part in those

24    negotiations, right?

25    A.   Yes.

1  Q.   And you and Mr. Eckert participated in a meeting with your

2  counsel, Mr. Manzo, and the folks from Black Diamond's side in

3  an attempt to resolve those issues during the week after

4  Thanksgiving, right?

5  A.   Yes.

6  Q.   And this meeting took place at a law firm in New York?

7  A.   Yes.

8  Q.   And it took place around December 1st?

9  A.   Yes.

10  Q.   And, in fact, you left that meeting and Mr. Eckert and Mr.

11  Manzo was the one to close those negotiations, right?

12  A.   Yes.

13  Q.   And you left the meeting and there were a couple of deal

14  points still open.  Is that right?

15  A.   Yes.

16  Q.   And to be clear, this amendment was about a six million

17  dollar issue, right?

18  A.   That's correct.

19  Q.   And if you turn to Exhibit 31 there's a chart in there

20  that reflects the fees and distributions that the debtors

21  received during the course of the sales auction?

22  A.   Yes, I see it.

23  Q.   But Exhibit 31 reflects the fees generated by the debtors'

24  assets after the sale auction concluded, right?

25  A.   Yes.

1  Q.   And the -- ultimately, the resolution of the dispute with

2  Black Diamond has returned about 5.2 million dollars to the

3  general partner recovery fund, too, right?

4  A.   Yes.

5  Q.   And those assets would be required by Black Diamond as the

6  bidder, right?

7  A.   Yes.

8  Q.   And in exchange, the debtors would get to keep about

9  800,000 dollars of what they call "a carry".  Is that right?

10 A.   Management fees, yes.

11 Q.   And in addition, that amendment allowed the debtors to

12 sell Black Diamond certain additional assets that were located

13 in the U.K., right?

14 A.   Yes.

15 Q.   And those are the assets that the U.K. entity GSC Group,

16 Limited, right?

17 A.   They were the assets but there's furniture, fixtures.

18 There was hardly no value to it.

19 Q.   And the debtors didn't obtain an independent valuation of

20 the assets that it would sell to Black Diamond in connection

21 with the APA amendment, right?

22 A.   That's right.

23 Q.   And it was you and Mr. Eckert who authorized the amendment

24 to the asset purchase agreement, right?

25 A.   Yes.

1    Q.   You understood that was a serious negotiation, right?

2    A.   Yes.

3    Q.   Black Diamond could have walked away from the transaction,

4    right?

5    A.   Yes.

6    Q.   And you understood that that negotiation did not close

7    until December 3rd, right?

8    A.   I think so.  I can't remember the exact date but yes, it

9    didn't close -- it didn't close quickly.

10   Q.   Could you please turn to Exhibit 80, please?

11   A.   80?

12   Q.   Yes.  Are you there, Mr. Frank?

13   A.   Yes.

14   Q.   The top e-mail is an e-mail from you -- from Mr. Manzo to

15   you and Mr. Eckert cc'ing some of Mr. Manzo's colleagues,

16   right?

17   A.   Yes.

18   Q.   That e-mail was sent at 4:17 in the afternoon of December

19   3rd, right?

20   A.   Right.

21   Q.   And Mr. Manzo wrote to you, "Guys, see below.  We have no

22   deal because they are refusing to sign the APA amendment."  Do

23   you see that?

24   A.   Yes.

25   Q.   That's true, right?

1    A.    Yes.

2    Q.    Now, at the time that you were negotiating the amendments

3    to the APA with Mr. Eckert, Mr. Eckert was also negotiating an

4    option agreement with Mr. Deckoff, right?

5    A.    Yes.

6    Q.    Now, the first that you knew about the option agreement

7    that Mr. Eckert had negotiated with Black Diamond, was December

8    5th, right?

9    A.    Yes.

10   Q.    That was a Sunday morning before the December 6th sale

11   hearing, right?

12   A.    Yes.

13   Q.    Mr. Eckert had never told you that he was negotiating an

14   option agreement before that time, right?

15   A.    No.

16   Q.    Mr. Manzo never told you that Mr. Eckert was negotiating

17   an option agreement with Black Diamond before that, right?

18   A.    Right.

19   Q.    And that is something that you as the president of GSC

20   would have liked to have known, right?

21   A.    Yes.

22   Q.    Now, you learned of this agreement on December 5th, right?

23   A.    Yes.

24   Q.    Mr. Eckert called you?

25   A.    That's when I learned about it, yes.

1   Q.   And immediately after you got that call from Mr. Eckert,

2   you called Mr. Manzo, right?

3   A.   Yes.

4   Q.   And deleting the expletives that you uttered to Mr.

5   Manzo, you told Mr. Manzo that Mr. Eckert had signed the option

6   agreement, right?

7   A.   That's what Fred told me, yes.  I told him that.

8   Q.   And you told Mr. Manzo that on December 5th, right?

9   A.   Yes.

10  Q.   And you're upset when you learned about it, right?

11  A.   Yes.

12  Q.   You thought the whole thing stunk, right?

13  A.   That's was my opinion, yes.

14  Q.   And when you spoke to Mr. Eckert you said "A deal,

15  especially without letting me know, that in view of where we

16  were in negotiations this just had a really bad appearance."

17  Right?

18  A.   Yes.

19  Q.   And during your conversation with Mr. Manzo, did you learn

20  that Mr. Eckert had been negotiating this since December 1st?

21  A.   Bob said that he was aware that there was a negotiation

22  but no deal had been reached.  And, of course, there had been

23  many negotiations about many things and until they have a deal

24  we don't have a deal.

25  Q.   So, when Mr. Manzo wrote in his declaration that he didn't

1    find out from you until Monday, December 6th, that wasn't

2    right?

3    A.   His recollection is different from mine.

4    Q.   Let's look at page 257 of Mr. Manzo's declaration.

5            MR. HAMMOND:  Your Honor, the transcript is a

6    sequential list.  Two transcripts here but the pagination is

7    sequential.

8    Q.   And at the bottom of the page, I ask Mr. Manzo about this

9    option agreement.  And I ask him,

10   "Q.  This is all taking place on December 1st, right?"

11       And Mr. Manzo says,

12   "A.  The initial discussion with Mr. Eckert was in the morning

13   of December 1st.

14   "Q.  Did you tell Mr. Frank that Mr. Eckert was contemplating

15   this agreement with Mr. Deckoff?  It could potentially

16   jeopardize the transaction?

17   "A.  I did.  Although I don't recall a specific date.  I have

18   to go back and think about it.  I know I absolutely spoke to

19   Mr. Frank shortly thereafter that discussion with Mr. Eckert.

20   "Q.  Was it the same day or the next day?

21   "A.  It was the same day or the next day certainly."

22   Q.   You see that testimony?

23   A.   Yeah, I'm hearing it, yes.

24   Q.   Okay.  That testimony is inaccurate, right?

25   A.   Our recollections are different.

1    Q.   Your recollection is that no one ever told you Mr. Eckert

2    was doing that?

3    A.   I believe the first time that I heard about it was from

4    Fred.

5    Q.   And that was such a significant event that would probably

6    stand out in your mind, right?

7    A.   There were many significant events.  I could be wrong but

8    that's when I reacted to it.  That's when I focused on it.

9    That's when I became aware of it.

10        (Pause)

11   Q.   Now, during the course of these cases, there has been no

12   discussion of removing Mr. Eckert as a board member, right?

13   A.   No.

14   Q.   And you're not aware of any circumstances under which Mr.

15   Eckert can be removed as CEO for cause, right?

16   A.   That's right.

17   Q.   And since you learned that Mr. Eckert executed the option

18   agreement --

19             MR. HAMMOND:  Strike that.

20   Q.   Mr. Eckert has not offered to resign from the board,

21   right?

22   A.   That's correct.

23   Q.   And could you turn to Exhibit 81 for a moment?

24   A.   Yes.

25   Q.   You with me Mr. Frank?

1  A.   I'm with you.

2  Q.   This is the notice for filing a letter agreement.  Do you

3  see that?

4  A.   Yes.

5  Q.   And I want to walk through a little bit of the background

6  here.  Under the original APA that the debtors sought to prove,

7  there was an explicit allocation of assets among the bidders,

8  right?

9  A.   Yes.

10  Q.   And at some point in time, you became concerned with

11  comments from the Court of an allocation of assets, right?

12  A.   Yes.

13  Q.   And so, a negotiation ensued with Black Diamond, right?

14  A.   Yes.

15  Q.   And the debtors asked Black Diamond to transfer all the

16  assets to the agent for the benefit of all secured creditors,

17  right?

18  A.   Yes.

19  Q.   And Black Diamond refused, right?

20  A.   Yes.

21  Q.   And the resolution of this, there was other discussions

22  that took place between the time that you asked Black Diamond

23  to send --

24  A.   This is the resolution, yes.

25  Q.   Let me put the question --

1    A.    Sorry.

2    Q.    There were negotiations that took place over the course

3    of -- from December 13th or so forward concerning how to

4    resolve this issue, right?

5    A.    Yes.

6    Q.    And you didn't participate in those though, right?

7    A.    That's correct.

8    Q.    And ultimately, what's put forward on Exhibit 81, the

9    letter agreement that was signed by -- the letter that was

10   signed by Black Diamond, GSC Active Partners, LLC and the

11   designated purchasers, GSC Acquisition Holdings, LLC, that was

12   the solution to this issue, right?

13   A.    Yes.

14   Q.    Now, with this letter, you understand that the assets that

15   will be acquired pursuant to the joint bid will not be

16   explicitly allocated among the agents in Black Diamond Capital

17   Management, right?

18   A.    Yes.

19   Q.    And you're prepared to proceed with the sale hearing based

20   on this letter that you received from Black Diamond, right?

21   A.    Yes.

22   Q.    And it was you and Mr. Eckert who made this decision to

23   proceed with the sale hearing based on this letter, right?

24   A.    After our advisors told us we should -- we could do that,

25   yes.

1  Q.  So, your advisors told you it was okay and you and Mr.

2  Eckert were the two people who had to approve it, right?

3  A.  Yes.

4  Q.  And both of you did, right?

5  A.  Yes.

6  Q.  And I've heard you testify earlier there was actually a

7  board meeting about that, right?

8  A.  Yes.

9  Q.  And it's your understanding that this letter, Exhibit A-1,

10  doesn't fix the allocation issues between the agent and the

11  non-controlling lenders, right?

12  A.  No.

13  Q.  But notwithstanding the concerns that you understand the

14  Court to have expressed, you're still prepared to proceed along

15  the lines set forth in this letter, right?

16  A.  Yes.

17  Q.  And sitting here today, you don't have any idea whether

18  the allocation issue between the agent and Black Diamond

19  Capital Management would be solved, right?

20  A.  Yes.

21  Q.  And during the course of these negotiations, you never ask

22  for a representation from Black Diamond Capital Management to

23  change the allocation -- that they would agree to change the

24  allocation, right?

25  A.  No, I didn't.

1  Q.   And -- but you could have solved the issue by getting such

2  a representation, right?

3  A.   I don't believe we would have been able to get

4  representation like that.

5  Q.   You didn't even ask, right?

6  A.   Right.

7  Q.   Now, Mr. Eckert has the authority to change the selection

8  of the bids, right?

9  A.   Yes.

10  Q.   And you've discussed this issue with Mr. Eckert, right?

11  A.   Which issue?

12  Q.   The selection of the bids?

13  A.   Yes.

14  Q.   And you're aware that Mr. Eckert, as we discussed

15  previously, as having financial problems, right?

16  A.   Yes.

17  Q.   And Mr. Eckert has three million dollars riding on the

18  selection of the Black Diamond joint bid, right?

19  A.   Yes.

20  Q.   And Mr. Eckert won't change his selection of the Black

21  Diamond joint bid notwithstanding the allocation issues that

22  you are now aware of, right?

23  A.   Yes.

24       MR. HAMMOND:  Now, I just have a few wrap-up questions

25  here, Your Honor.

1   Q.  Now, we talked yesterday about -- you were asked some

2   questions yesterday about the impact of appointing an examiner,

3   right?

4   A.  Yes.

5         THE COURT:  You said "examiner"?

6         MR. HAMMOND:  I'm sorry.  I apologize, Your Honor.

7   Q.  A trustee, right?

8   A.  Yes.

9   Q.  And we talked about the need for a sale to close quickly,

10  right?

11  A.  Yes.

12  Q.  You haven't done anything since the auction to keep any of

13  the other bidders interested right?

14  A.  No, we haven't because we have an APA that prevents us

15  from negotiating this.

16  Q.  Leave aside negotiating, you haven't done anything to keep

17  anyone else interested in this transaction, right?

18  A.  That's correct.

19        MR. HAMMOND:  No further questions, Your Honor.

20        THE COURT:  All right.  Thank you.  From the debtor?

21  CROSS-EXAMINATION

22  BY MR. STAMATO:

23  Q.  Good afternoon, Mr. Frank, and for the Court.  My name's

24  Anthony Stamato of Kaye Scholer.

25       Mr. Frank, just so I'm clear, are you aware the debtors

1   are intending to proceed with an asset purchase agreement that

2   contained any form of allocation between the assets of one of

3   the acquiring parties?

4   A.   My understanding is that there's no allocation in the APA

5   and we're going forward with it, yes.

6   Q.   Mr. Frank, very early on in your examination you were

7   shown a contract you had with Black Diamond.  I believe it was

8   marked as Non-controlling Lenders' Exhibit 17 just to kind of

9   bring you back to where we were in terms of that.

10   A.   Do I have a tab at 17?

11   Q.   Number 17.

12       (Pause)

13   A.   Yes, I see it.

14   Q.   Who negotiated the economic terms of that contract on your

15   behalf, Mr. Frank?

16   A.   I did.

17   Q.   And who drafted the document?

18   A.   Black Diamond did.

19   Q.   Was it your understanding at the time you were in

20   negotiations with respect to this document that Black Diamond

21   was interested in hiring you in the event they ultimately

22   acquired assets of the company?

23   A.   Yes.

24   Q.   And was there any condition in that document that

25   precluded you from talking about potential employment with

1   other parties that might be interested --

2   A.   No, it didn't.

3   Q.   -- in acquiring the assets of the debtors?

4   A.   No, it didn't.

5   Q.   Okay.  Now, since these cases have been pending, have you

6   ever been approached by any potential interested party about

7   possible employment opportunities?

8   A.   Yes, I have.

9   Q.   Can you tell me who that was and when that was?

10   A.   Well, the bidders from Philadelphia and bidders from

11   London.

12   Q.   The bidders from Philadelphia, Apidos?  --

13   A.   Apidos.

14   Q.   And were the London folks Compass?

15   A.   Yes.

16   Q.   Thank you.  Just for the record to be clear.

17   How many years in investment management business do you

18   have -- how many years experience do you have in the investment

19   management business, Mr. Frank?

20   A.   I've been with GSC since 2001.

21   Q.   Your professional career, how long have you been working

22   in the world of private equity investment management?

23   A.   I was in private equity only with GSC.

24   Q.   How many -- when did you get out of college, Mr. Frank?

25   A.   Pretty embarrassing here.  I got out of college in 1969.

1   Q.   Why don't you -- do you have any advanced degrees?

2   A.   Yes, I do.

3   Q.   And where is that from?

4   A.   From Harvard.

5   Q.   What's that degree?

6   A.   MBA.

7   Q.   Okay.  Why don't you just tell me generally since you

8   received that MBA what you've been doing professionally apart

9   from what you've been doing at GSC?

10   A.   I went to work for Goldman Sachs for a few years and then

11   I bought and sold businesses for my own account for thirty-some

12   years.  And then sold all of my assets except for my real

13   estate in 2000 and retired and that didn't work out so well.

14   And then I started out as a board member and a consultant for

15   GSC.  And then I, because I had business experience more than

16   the other members of GSC, I was tasked with the turnaround and

17   the then portfolio improvements of the various companies that

18   we owned.  And then I got brought into GSC as the senior

19   managing director and then became president when GSC found

20   itself in trouble with the debt.

21   Q.   Based on that professional experience you've had since you

22   graduated from Harvard, do you have a general understanding of

23   the terms of compensation agreements with people that occupy

24   positions similar to yours in the industry?

25   A.   Yes, I do.

1    Q.    And do you believe that the compensation and the

2    employment agreement that's been marked as Non-controlling

3    Lender 17 was fair based on your experience in the industry?

4    A.    It certainly wasn't overly generous.

5    Q.    You think it was below market?

6    A.    I believe so, yes.

7    Q.    And prior to signing the agreement that's been marked as

8    Non-controlling Lender's Exhibit 17, have you ever been in any

9    discussions with any other members of the lending group about

10   possible employment in the event a successful restructuring

11   transaction was achieved?

12   A.    Yes.  The first group we -- when we were going to do a

13   standalone restructuring.

14   Q.    Just so the time frame and the record's clear, when was

15   the standalone restructuring contemplated?

16   A.    The end of last year.

17   Q.    When you say first group, are you aware if that group

18   contained any members of the so-called non-controlling lender's

19   group that are rejecting today?

20   A.    Non-control lender's group is a subset of the other group.

21   Q.    And were any understandings ever reached with the first

22   group about possible employment?

23   A.    Yes.

24   Q.    And were the terms of that agreement more favorable to you

25   from an economic perspective or less favorable to you in the

1   terms that are set forth in non-controlled lender's agreement?

2   A.   They were more favorable.

3   Q.   Did you in any way consider that contract that's been

4   marked as non-controlled Lender's Exhibit 17 a windfall for

5   you?

6   A.   It's not a windfall to me.

7   Q.   Do you believe that this contract, the existence of this

8   contract has compromised your business judgment in any way in

9   connection with your assessment of the bid you'll receive at

10  the auction?

11  A.   No.  As you know, I pay personal taxes in multiples of

12  what this contract is.

13  Q.   In a given year?

14  A.   Yes.

15  Q.   And during the course of this bankruptcy case, have you

16  been mindful of your obligation to the fiduciary to the estate?

17  A.   Yes, I have.

18  Q.   Do you believe that you have faithfully discharged your

19  fiduciary duties?

20  A.   Yes, I have.

21  Q.   And just so I'm clear, did the existence of this

22  employment agreement in any way affect your judgment in

23  connection with the auction process?

24  A.   No, it has not.

25  Q.   You were involved in the auction process, correct?

1  A.    Yes.

2  Q.    And just generally tell me what your role was at a high

3  level?

4  A.    I was involved in it.  The auction was run by Bob Manzo of

5  Capstone and Kaye Scholer and I was in attendance all the time.

6  When the bids were being evaluated, I was there for the

7  evaluation.  I conferred with the evaluation.

8  Q.    And just so I'm clear, you mentioned Capstone and Kaye

9  Scholer.  Did members of GSC's management team delegate any

10 specific responsibilities to Capstone in connection with the

11 auction process?

12 A.    The process was delegated to them.

13 Q.    And who were the members of the management team that

14 delegated those responsibilities?

15 A.    Fred and myself.

16 Q.    Fred Eckert?

17 A.    Yes.

18 Q.    And yourself?

19       Just turning quickly to the topic of Black Diamond, when

20 did you first begin having discussions with Black Diamond about

21 a role in the possible restructuring transaction?

22 A.    When the second variation of a solution to the bankruptcy

23 came up.  This was in springtime when the banks decided not to

24 have a standalone restructuring but to have a sub-advisory

25 agreement where Black Diamond would be the sub-advisor to the

1    GSC.

2    Q.   And just simply, you're talking about the spring of 2010?

3    A.   Correct.

4    Q.   And just so the record's clear, can you briefly explain

5    what a sub-advisory arrangement is?

6    A.   Because of the 40 Act, we can't transfer these management

7    contracts without investor consent but we are able to keep the

8    contracts and subcontract much of the -- many of the functions

9    that we did.  We would retain certain capabilities within GSC

10   but the vast majority of the work and we couldn't sub-advisor

11   and sub-contract it out.

12   Q.   And did those discussions regarding the sub-advisory

13   arrangement ever lead to a definitive agreement  --

14   A.   What kind of agreement?

15   Q.   -- of restructuring?

16   A.   We came very close.  In fact, the press releases were

17   already made and the banks decided to turn that -- close it

18   down because the market value of these assets had risen and

19   they wanted to do a 363 sale and go into bankruptcy.

20   Q.   And just so I'm clear, when you say --

21   A.   I believe that's in May.

22   Q.   -- okay, in May of 2010?

23   A.   Yes.

24   Q.   And when you state bank's reviewing with an agent under

25   the credit facility --

1    A.    The agent was Guggenheim at the time.

2    Q.    Now, at some point in time did the agent under the credit

3    facility change?

4    A.    Yes, it changed to Black Diamond in late June/July.

5    Q.    And do you know how that came to be?

6    A.    Because Black Diamond acquired the control position from

7    Royal Bank of Scotland.

8    Q.    And after Black Diamond obtained a control position from

9    RBS, did discussions about possible restructuring scenarios

10   continue?

11   A.    Yes.

12   Q.    Can you flip, briefly, to what has been marked as Non-

13   controlling Lender's Exhibit 53?  I believe it was an e-mail.

14        (Pause)

15        You see it?

16   A.    I just want to get --

17   Q.    I'm talking about the one in the middle.  I think one of

18   Mr. Nahas' e-mail.

19   A.    Okay.

20   Q.    Just so the record's clear, I believe you said that when

21   you are talking about deals, you're not just talking about

22   deals between you and Fred, who I presume is for the record,

23   but deals for all of the key employees that were going to be

24   retained in the restructuring scenario?

25   A.    That's right.

1    Q.   And was that very important to you?

2    A.   That was very important to me.

3    Q.   At any time, did you condition discussions with Black

4    Diamond in procuring the deal just for yourself?

5    A.   No.

6    Q.   And can we move to what has been marked as Exhibit --

7    Nonconrolling Lender's Exhibit 63?

8    A.   Yes.

9    Q.   This is the e-mail that Mr. Rubenfeld forwarded to you.

10   A.   Yes.

11   Q.   Mr. Rubenfeld makes reference to a transaction in the

12   second paragraph -- actually, I'm sorry; in the second

13   paragraph of those e-mails the phrase "my insistence that the

14   original Black Diamond transaction comply with the terms of

15   applicable law," can you tell me what that original transaction

16   was if you know what he's talking about?

17   A.   It's some advisory structure.

18   Q.   And that transaction, as I understand, was never --

19   A.   No.

20   Q.   -- was never accomplished?

21   A.   Never happened.

22   Q.   Were there ever any concerns raised about Mr. Rubenfeld's

23   performance by Mr. Eckert?

24   A.   Yes, there was.

25   Q.   What did Mr. Eckert tell you about Mr. Rubenfeld?

1    A.    Fred had lost confidence in Mr. Rubenfeld and friction

2    between the two of them and his production was low.  It took a

3    long time to get things done.

4    Q.    And I believe you said that the termination of Mr.

5    Rubenfeld made it a little bit more difficult with the action

6    of the bankruptcy plan process.

7    A.    Yes, it did.

8    Q.    But that you ultimately hired a restructuring lawyer?

9    A.    Yes, I did.

10   Q.    Did Black Diamond have any input in connection with the

11   restructuring lawyer that you hired?

12   A.    The ones we hired were not the ones that -- not one of the

13   firms that Black Diamond suggested.

14   Q.    Who was that firm?

15   A.    Kaye Scholer.

16   Q.    Okay.  Did Black Diamond ever tell you that you could not

17   proceed with certain professionals?

18   A.    Well, the existing restructuring professionals that we had

19   Stroock and Dechert were let go.

20   Q.    Generally, the gentlemen -- or how would you characterize

21   the negotiations you had at that time since the late summer up

22   until this point in time?  Spirited?  Contentious?

23   A.    Contentious, spirited, turbulent.

24   Q.    Difficult?

25   A.    Difficult.

1    Q.   Can you give me some examples with Black Diamond as being

2    difficult?

3    A.   The negotiations always took much longer than we ever

4    imagined and they were -- they were just difficult.  Every

5    single issue had to be negotiated.

6    Q.   What were -- can we talk in specifics?  What types of

7    issues needed to be negotiated?

8    A.   Which one do you want to focus on?  There were so many in

9    every way.

10   Q.   Just in the interest in getting this started, what about

11   cash collateral?

12   A.   Cash collateral also very contentious.  I wasn't involved

13   in every issue of it but it was --

14   Q.   Did they ever threaten to file involuntary bankruptcy

15   against Jeffries?

16   A.   Yes they did.

17   Q.   Did Black Diamond make any demands with respect to the

18   timing of the proposed auction timetable?

19   A.   They wanted the timetable much shorter than we eventually

20   came up with.

21   Q.   Did those negotiations ultimately resolved in a form of

22   bid procedures that were submitted to the Court?

23   A.   Yes.

24   Q.   And were you involved in the negotiations in the bid

25   procedures?

1    A.    I was not heavily involved in those.

2    Q.    Were they -- was that part of the responsibilities that

3    you had delegated to Mr. Manzo?

4    A.    Yes.

5    Q.    And was Kaye Scholer involved in that process?

6    A.    Yes.

7    Q.    I'm just going to jump around.  Mr. Hammond covered one of

8    the topics.  One of the issues that was discussed was the

9    consulting agreement that you have with the company, GSC.  Can

10   you just tell me generally what those terms involve you doing?

11   A.    The consulting agreement at the end of the one that's

12   before the Court now?

13   Q.    Yes.

14   A.    It is a transition agreement.  When the assets transfer,

15   I'm the committed employee of Black Diamond.  However there's a

16   series of things that still have to be done to wind up the

17   estate.  And I'm in the best position to do that.

18   Q.    Why do you say you're in the best position to do that?

19   A.    Because I am familiar with the issues.

20   Q.    And you said the agreement is subject to Court approval

21   right now?

22   A.    Yes.

23   Q.    You also discussed with Mr. Hammond of the settlement

24   agreement that the company has with Mr. Eckert?

25   A.    Yes.

1    Q.   Just generally, can you tell me what that agreement

2    involved?

3    A.   He needs to turn over his medical records which will have

4    a, we believe, a positive impact on the value of the insurance

5    policy.

6    Q.   And would that ultimately merit to the benefit of the

7    estate?

8    A.   Yes.

9    Q.   And again, is that agreement based on your understanding

10   subject to a Court approval?

11   A.   Yes, it is.

12   Q.   Turning back to the auction and bid procedures, is it your

13   understanding that the bid procedures allow for credit bidding?

14   A.   Yes.  It -- yes.

15   Q.   And how are credit bids to be treated with respect to cash

16   bids?

17   A.   The same.

18   Q.   But from the debtors' perspective a dollar of credit bid

19   is equal to a dollar in cash?

20   A.   Yes.

21   Q.   And it's your understanding that those bid procedures were

22   approved by the Court, correct?

23   A.   Yes.

24   Q.   And during the auction which was at our offices, did you

25   ever have any discussion with anyone at Black Diamond?

1    A.   Other than pleasantries, no.

2    Q.   And who did you exchange those pleasantries with?

3    A.   Almost everyone on the team.

4    Q.   But there wasn't any discussion, just so the record's

5    clear, about bids themselves?

6    A.   No.

7    Q.   And was there any discussion with any other bidders

8    throughout the auction about the bids themselves?

9    A.   No.

10   Q.   Who was handling questions about process at the auction?

11   A.   It was either myself or Bob Manzo.

12   Q.   Do you recall whether Black Diamond raised any objections

13   at the auction?

14   A.   Numerous objections.

15   Q.   Tell me what you recall that those rejections were about.

16   A.   Process.  Objection about qualifications of other bidders.

17   Objection of the sealed bid at the end.

18   Q.   How about the removal of lots?

19   A.   Removal of lots, an objection to that also.

20   Q.   And we heard you say you were at the auction for all four

21   days, correct?

22   A.   Yes.

23   Q.   You spent a lot of that time sitting next to me, right?

24   A.   Yes I did.

25   Q.   During the time that Mr. Eckert was in attendance at the

1  auction, did you have any discussions regarding the process?

2  A.  Observations, yes.  Sure we discussed that.

3  Q.  Were you aware of how long -- first, who was evaluating

4  the bids as they came in after each round?

5  A.  Could you repeat the --

6  Q.  Sure, sure.

7  A.  You're drowned out here I assume.

8  Q.  Were your financial advisors evaluating the bids as they

9  came in after each round?

10  A.  Yes.

11  Q.  Were they consulting with you?

12  A.  Yes.

13  Q.  Were they consulting with Mr. Eckert when he was there?

14  A.  Yes.

15  Q.  And did you review the bids as they came in?

16  A.  Yes.

17  Q.  And you're familiar with -- have some evaluation

18  methodology?

19  A.  Yes, I was.

20  Q.  One of the bids, as I understand it, were so-called

21  revenue sharing bids?

22  A.  Yes.

23  Q.  And were you comfortable with the valuation methodology

24  that Capstone had provided?

25  A.  Yes, I was.

1  Q.  And from what I heard you testify the final bid came in at

2  around 4 o'clock in the morning, correct?

3  A.  Yes.

4  Q.  Why did you view this bid as the highest bid?

5  A.  Well, 234 million is much higher than 190-something

6  million.

7  Q.  When you say 190-something, are you referring to the bid

8  that was submitted by Sankaty?

9  A.  The revenue sharing bid, that's right.

10  Q.  Okay.  As the president of the GSC Group, did you believe

11  that you had the required authority to make a decision to

12  accept that bid?

13  A.  Yes.

14  Q.  And as the president of the GSC Group, do you believe that

15  had the required authority to sign the APA, asset purchase

16  agreement, at that time?

17  A.  Yes.

18  Q.  Have the form of the asset purchase agreement been

19  previously discussed between you and Mr. Eckert?

20  A.  Yes.

21  Q.  And did you discuss it with your advisors?

22  A.  Yes.

23  Q.  And did you and Mr. Eckert agree that the form of the

24  asset purchase agreement was acceptable?

25  A.  Yes.

1   Q.   Would it really have made any sense to call Mr. Eckert at

2   4 o'clock in the morning to discuss the acceptance of the bid?

3   A.   No.   I felt that forty million dollars was -- didn't need

4   very much discussion.

5   Q.   But did Mr. Eckert tell you when he left that evening that

6   he would be available by telephone if there were any problems

7   or issues?

8   A.   Yes.   He was at the Four Seasons just a few blocks away.

9   Q.   And in the time that that bid was accepted, has Mr. Eckert

10   ever indicated to you that it was a mistake; something else

11   should have been accepted?

12   A.   No.

13   Q.   And the following morning, did you discuss the results of

14   the auction with Mr. Eckert and advisors?

15   A.   Yes.

16   Q.   Did the two of you discuss with your attorneys about how

17   to seek approval of the bid and the asset purchase agreement?

18   A.   Yes.

19   Q.   And did you and Mr. Eckert direct your attorneys to file a

20   motion to approve the asset purchase agreement?

21   A.   Yes, we did.

22   Q.   Mr. Hammond alluded to this toward the end of the direct

23   examination, can you just go into a little bit more detail

24   about the concerns you have about the appointment of a trustee

25   and what that might be to the estate.

1    A.    As you know, I'm involved in the -- I'm responsible for

2    the day to day management and I see risks in the delay.  And we

3    have retention bonuses that run out -- essentially, that run

4    out at the end of this year.  This was contemplated with our

5    employees to end on 12/31.  And I'm aware that several key

6    employees have found employment someplace else.  IT, we'll have

7    no one in the IT department.  So, I am concerned if that drags

8    out that there could be harm from an operation standpoint at

9    GSC.

10         In addition to that, I think there are real issues with

11   our investors in dragging this thing out.

12   Q.    When you mention your investors, are you aware of

13   solicitations that were sent to investors for acceptance of the

14   new bid --

15   A.    That's right.

16   Q.    Of the new arrangement?

17   A.    We approached all investors and we've gotten approval to

18   withdraw funds, very small funds.

19   Q.    And do you fear that the continued passage of time will

20   potentially impact their ongoing approval?

21   A.    I think so, yes.

22         MR. STAMATO:  Your Honor, may I have thirty seconds

23   just for a second?

24         THE COURT:  Go ahead.

25         (Pause)

1  Q.   Real brief so the record's clear, are you generally

2  familiar with the objections that the company's filed in

3  opposition to the motion to appoint a trustee?

4  A.   Yes.

5  Q.   Okay.  Can you clarify a couple of things just so the

6  record's clear.

7       At any time did Black Diamond exert pressure on GSC to

8  remove any distinct commitment to sell securities to any of its

9  affiliates?

10 A.   Are you referring to the BDC transaction?

11 Q.   I'm actually referring to the Saratoga transaction.

12 A.   That is the Saratoga transaction.

13 Q.   Can you elaborate?

14 A.   We had an agreement to sell our publicly traded BDC --

15 actually, no.  We didn't sell it.  BDC was in trouble and had

16 to be restructured.  And we put on a process to find someone to

17 take it over and we did.  Saratoga did that.  Since it's a

18 public company, we've had to go through shareholders and get

19 shareholder approval.  And Black Diamond had asked us and in

20 that we had to lock up our shares and vote for the transaction

21 and also to not interfere with the transaction.  Black Diamond

22 asked us to send a better offer to the board to consider an

23 offer that would cause Black Diamond to take over instead of

24 the Saratoga transaction.  And that would involve us putting up

25 a subordinate note or we would provide nine million dollars of

1  capital in the form of a subordinate note and Black Diamond

2  would put up the senior account.

3  Q.   Did the debtor agree to this proposal?

4  A.   No, he didn't and they had a different structure.

5  Q.   Can you turn back to the time frame of the late summer of

6  2010?  In connection with your restructuring negotiations of

7  Black Diamond, did they ever submit a stalking horse bid to you

8  pre-bankruptcy?

9  A.   Yes, they did.

10  Q.   And what was the value that they put on that bid?

11  A.   Five million dollars.

12  Q.   And was that bid rejected?

13  A.   Yes, it was.

14  Q.   And was that rejection by GSC made -- the decision made by

15  you and Mr. Eckert?

16  A.   Yes.

17  Q.   And why was that rejected?

18  A.   As you can see, that was very low.

19  Q.   At any time did Black Diamond suggest that Capstone should

20  be removed as financial advisor to GSC?

21  A.   Yes.

22  Q.   GSC has refused to do, correct?

23  A.   Yes.

24  Q.   I believe there was an allusion to a company called

25  Coverspot in the --

1   A.    I think we're not using names.

2   Q.    -- with Recovery II portfolio.

3   A.    I would prefer we don't use names.

4   Q.    Okay.  Let's call it this company that's in a Recovery II

5   portfolio.  Did Black Diamond ever make any inquiries to you

6   about that?

7   A.    Yes.

8   Q.    And was there pending a deal cut with Black Diamond?

9   A.    There was no deal cut with Black Diamond.

10  Q.    Okay.  And in connection with that transaction, have you

11  indicated that you would recuse yourself from any proceedings?

12  A.    Yes.

13          MR. STAMATO:  Nothing further, Judge.

14          THE COURT:  All right.  Any redirect?

15          MR. BACON:  Your Honor, may I ask just a few?

16          THE COURT:  I'm sorry; go ahead.

17  CROSS-EXAMINATION

18  BY MR. BACON:

19  Q.    Mr. Frank, before you got into this bankruptcy, did

20  anybody ever intend --

21          THE COURT:  One second.  Can you identify yourself for

22  the record?

23          MR. BACON:  I beg your pardon, Judge.  Doug Bacon,

24  Latham & Watkins for Black Diamond.

25          THE COURT:  All right.

1    Q.   Mr. Frank, before you got into this bankruptcy proceeding,

2    did anybody ever impede your integrity?

3            MR. HAMMOND:  Objection.  Relevance, Your Honor.

4            MR. BACON:  I'll withdraw the question.

5            THE COURT:  One second.  Do you mind standing up if

6    you're going to raise an objection?

7            MR. HAMMOND:  I'm sorry, Your Honor.

8            THE COURT:  And what was your objection?

9            MR. HAMMOND:  Relevance, Your Honor.

10           THE COURT:  All right.

11           MR. BACON:  Actually, Your Honor, I think it is -- I

12   would like to ask a question.  His integrity is front and

13   center to that.

14           THE COURT:  I think it has been put at issue but go

15   ahead, ask the question.  I'll overrule the objection.

16   Q.   And, Mr. Frank, am I correct that you were with the

17   company when the banks, including the minority lenders, lent

18   this company 200 million dollars.  Is that right?

19   A.   Yes.

20   Q.   And that was about when?  Four years ago?

21   A.   2006.

22   Q.   What was your role with the company when that money was

23   lent?

24   A.   I was a managing director out -- I believe I was already a

25   managing director in -- as an operating partner working in the

1    private equity portfolio.

2    Q.   Did any of the banks ever question your integrity when

3    that loan was made?

4    A.   No.

5    Q.   And then you told some of the history but it's a little

6    bit disjointed from different questioners, that the bank went

7    into default -- excuse me; the company went into default with

8    its credit facility in about May of last year.  Is that right?

9    A.   Correct.

10   Q.   And the minority lenders that are here today, they were --

11   most of them were in bank group back then, weren't they?

12   A.   All of them were.

13   Q.   Who was the agent?  Was it Guggenheim?

14   A.   At what point?

15   Q.   Prior to Black Diamond taking over --

16   A.   Prior to Black Diamond, it was Guggenheim.

17   Q.   And when you were in workout discussions when you were in

18   default and Guggenheim was the agent, did Guggenheim ever take

19   it upon itself to approve company budgets?

20   A.   Yes.

21   Q.   How long did workout -- you know what I mean what I mean

22   by work -- well, I know you know what I mean by workout

23   discussions because you're a private equity guy, you do know

24   what I mean, right?

25   A.   I do.

1  Q.   And how long were you at workout negotiations with the

2  bank group before Black Diamond took their controlling fees?

3  A.   Personally or the firm?

4  Q.   The company.

5  A.   The company was in workout negotiations from the time it

6  defaulted which I believe was May '09 till the time with Black

7  Diamond which was the end of June the beginning of July this

8  year.

9  Q.   So, over a year.  Do you have any idea how much money the

10  company spent on that process between its professionals and the

11  bank's professionals and the agent's professionals?  Do you

12  have any idea?

13  A.   Yes.  It was about a million and a quarter a month.

14  Q.   Per year?

15  A.   Each month.

16  Q.   And that workout didn't work out, did it?

17  A.   No.

18  Q.   Mr. Eckert -- excuse me; Mr. Frank, is it fair to describe

19  the assets that the -- the assets that make up this company is

20  it in effect wasting assets in the sense that they over time

21  decrease in value as the management fees run off.  Is that a

22  fair characterization?

23  A.   Yes, it is.

24  Q.   Mr. Frank, why would Black Diamond want to hire you if

25  they got these assets?

1    A.    Because I'm familiar with these assets and I, in fact, sit

2    on the board a fair percentage of the -- the liquidation of

3    these assets, we want to be -- well, not all, but in the

4    private equity area, over the next two or three years will

5    impact --

6    Q.    Will impact what?

7    A.    Be finished.  What would have been liquidated and realized

8    over that time.

9    Q.    And when you -- liquidation in bankruptcy has a little

10   connotation.  Do you use that synonymously with sort of

11   monetizing --

12   A.    Monetizing is a better word.

13   Q.    Exiting the amendment--

14   A.    Exiting the amendment, right, on the private equity side.

15   Q.    And how many investments are we talking about, ballpark?

16   A.    In the private equity area about twenty.

17   Q.    Twenty different investments that you've got primary

18   responsibility for?

19   A.    No.  Those are the total portfolio.  I have twenty

20   investments.

21   Q.    How many roughly do you have primary responsibility for?

22   A.    Seven or eight.

23   Q.    Do you have any influence over the other --

24   A.    Yes.

25   Q.    -- twelve or thirteen?

1    A.    Yes.

2    Q.    What's the nature of your influence in them?

3    A.    The portfolio manager reports to me.

4    Q.    You have ultimate responsibility?

5    A.    Yes.

6    Q.    Mr. Frank, have you ever had a substantive disagreement

7    with Bob Manzo since this case was filed?

8    A.    Nothing material.

9    Q.    And how would you describe your relationship between Mr.

10   Manzo and Mr. Deckoff?

11   A.    Strained.

12   Q.    You think Mr. Deckoff cows to Mr. Manzo?

13   A.    No.

14   Q.    During your tenure with GSC, what's the approximate peak

15   of assets under management while you've been at the company?

16   A.    Twenty-eight billion.

17   Q.    Twenty-eight billion?

18   A.    Yes.

19   Q.    And when you were with the company and it was managing

20   twenty-eight billion dollars, did you make a lot more money

21   than the Black Diamond contract contemplates?

22   A.    Yes.

23   Q.    And, sir, you testified that you didn't like the optics

24   and the -- I'm turning to Mr. Eckert's option agreement in just

25   a couple minutes.  You didn't like the optics of that

1   agreement, did you?

2   A.   No.

3   Q.   And you didn't like the substantive timing of that

4   agreement, did you?

5   A.   No.

6   Q.   Did you think that was a good deal for Mr. Eckert?

7   A.   No.

8   Q.   Why not?

9   A.   Because I think that he -- the value of what he has is

10  better than what he'd received in his trade.

11  Q.   But Black Diamond got the better deal?

12  A.   I believe so.

13  Q.   You think it was a bribe to Mr. Eckert?

14  A.   It's not a bribe.  It works the other way.

15  Q.   Well, it's not a bribe with Black Diamond is it?

16  A.   No, it's the other way around.  Black Diamond got a better

17  deal than Fred did.

18  Q.   And I just got a couple of questions for you about the

19  auction and then I'm done, Mr. Frank.

20       Tell the judge, again, how long that auction went on

21  roughly?

22  A.   It went on for four days.

23  Q.   And it ended about 4 o'clock in the morning?

24  A.   Yes.

25  Q.   Were all the serious bidders still there at 4 o'clock in

1  the morning?

2  A.   Yes.

3  Q.   You had a room full of folks?

4  A.   Yes.

5  Q.   Were the minority lenders represented throughout that

6  process?  They had representatives there, right?

7  A.   Yes.

8         MR. BACON:  May I approach the witness?

9         THE COURT:  Go ahead.

10  Q.   Mr. Frank, I'm handing you what I'll represent to you is

11  the bidding procedures that this Court previously approved and

12  they're in the court record.  Have you seen those before?

13  A.   Yes.

14  Q.   Let me ask you -- do you see the orange flag on there?

15  A.   Not the pink one?

16  Q.   I think there's just one that's orange.  Isn't there?

17  A.   No.  It looks like there are two that are orange.

18  Q.   Is that an orange one?

19  A.   Yes.

20         MR. BACON:  Your Honor?

21         THE COURT:  Go ahead.

22  (Pause)

23  Q.   You see the sentence there that's circled in red?

24  A.   Yes.

25  Q.   Read the heading, Mr. Frank, and then read that sentence

1  to me.  Could you please?

2  A.   "Selection of successful bidder" is the heading.  And the

3  sentence reads, "Prior to the conclusion of the auction, the

4  debtors will take the various bids received under consideration

5  and determine and announce publicly to all qualified bidders

6  which bid or combination of bids is in the best interest of the

7  debtor and their estate."

8  Q.   Is that what you did, Mr. Frank?  Did you conclude the

9  auction and tell everybody that was there at 4 o'clock in the

10  morning what the company had decided?

11  A.   Yes.

12  Q.   Did you or Mr. Manzo have any disagreement that it was

13  time to bring that auction to an end?

14  A.   No.

15       MR. BACON:  No further questions.  Thank you, Mr.

16  Frank.

17       THE COURT:  Any redirect?

18       MR. HAMMOND:  I have a few minutes, Your Honor.

19  REDIRECT EXAMINATION

20  BY MR. HAMMOND:

21  Q.   Mr. Frank, you were just asked a series of questions about

22  whether you thought the auction agreement was a bribe to Mr.

23  Eckert.  Do you remember that?

24  A.   Yes.

25  Q.   And you said based on your assumption you thought maybe

1    Mr. Eckert might be given more value then he gets, right?

2    A.   Yes.

3    Q.   Those assumptions include the fact that Mr. Eckert's

4    claim, unsecured claims, two million dollar bonus would be

5    allowed, right?

6    A.   Yes.

7    Q.   And that assumes that his preferred equity interest

8    wouldn't get subordinated to others, right?

9    A.   That's right.

10   Q.   So, if those two events were to occur, it would, in fact,

11   be a 500,000 dollar payment for nothing, right?

12   A.   Can you repeat that last question?

13   Q.   If those two circumstances were to occur, it would be, in

14   fact, be a 500,000 dollar payment to Mr. Eckert for nothing,

15   right?

16   A.   Yes.

17   Q.   And, in fact, it probably advantages to say that Mr. --

18   assume that Mr. Eckert's unsecured claim would be allowed,

19   right?

20          MR. STAMATO:  Objection.  Argumentative.

21          THE COURT:  It is and I'll sustain the objection.

22   Q.   You know, Mr. Stamato had asked you a few questions about

23   deciding to accept Black Diamond's bid over the Sankaty bid,

24   right?

25   A.   Yes.

1    Q.   You remember that?  And he was asking you whether, I think

2    the number was 234 or 235 and it was bigger than 194, right?

3    A.   Yes.

4    Q.   And of that 235 million dollar bid, do you know that not

5    all of the value of that goes to creditors, right?

6    A.   Yes.

7    Q.   You know a substantial portion of that 235 million dollars

8    of value goes to Black Diamond as the bidder, right?

9    A.   Yes.

10   Q.   And under the Sankaty bid, that bid's for 194 million

11   dollars, correct?

12   A.   Yes.

13   Q.   All of that value would go to creditors, right?

14   A.   Yes.

15   Q.   And in addition to the 194 million dollars, creditors

16   would also get a value of the excluded assets, right?

17   A.   Yes.

18   Q.   And that value would be up to between twenty and forty

19   million dollars, right?

20   A.   Yes.

21   Q.   So, the total value of accepting the Sankaty bid would be

22   somewhere between 214 million dollars and 234 million dollars,

23   right?

24   A.   Yes.

25   Q.   Now, Mr. Frank, there were a handful of questions about

1    Exhibit 17 which is your employment contract with Black

2    Diamond?

3    A.    Yes.

4    Q.    That's an exclusive agreement with Black Diamond, right?

5    A.    Yes.

6    Q.    You can't work for anybody else, right?

7    A.    That's correct.

8    Q.    But you're still seeking a consulting agreement for the

9    company, right?

10   A.    Right.

11   Q.    Have they agreed to waive that provision?

12   A.    Yes.

13   Q.    Okay.  And in addition, you testified that you didn't

14   think that that contract was market, right?

15   A.    Yes.

16   Q.    You realize that contract created the appearance of

17   impropriety, right?

18   A.    Yes.

19   Q.    So your testimony is you signed an under-market contract

20   that created the appearance of impropriety, right?

21   A.    Yes.

22   Q.    Now, you could have gone forward -- let me back up for a

23   second.  You testified that it was less than the other banks

24   had offered you before, right?

25   A.    Yes.

1   Q.   The other banks weren't going to be offering you the

2   opportunity to pass on their bid for the company, right?

3   A.   Could you --

4        MR. HAMMOND:  Strike that.  I apologize, Mr. Frank.

5   That's a poor question.

6   Q.   When the banks had offered you that contract before --

7   A.   Yes.

8   Q.   -- they weren't going to be acquiring the assets in the

9   363 sale, right?

10  A.   No, they weren't.

11  Q.   And they weren't asking you to approve them as the

12  successful bidder in a subsequent 363 sale, right?

13  A.   No.

14  Q.   Now, with respect to compensation, all of that

15  compensation could have been front-loaded in your employment

16  contract, right?

17  A.   Could you repeat it?  I'm not --

18  Q.   Sure.

19  A.   -- clear.

20  Q.   You have two employment contracts, right, one with GSC,

21  one with Black Diamond?

22  A.   Yes.

23  Q.   You could have put all the compensation in your contract

24  with GSC, right?

25  A.   Yes.

1   Q.  And that would have alleviated any conflict that you would

2  have in connection with the auction process, right?

3  A.  Yes.

4  Q.  But that didn't happen, right?

5  A.  No.

6  Q.  In fact, Black Diamond wanted to split it, right?

7  A.  Yes.  And I think the reason there is the U.S. Trustee

8  would have objected to the bonus.

9  Q.  We already talked about the fact that the U.S. Trustee had

10  objected to the bonus.

11  A.  Right.

12  Q.  But we're talking about an employment contract that was

13  signed prior to bankruptcy, right?

14  A.  But that employment contract also had a bonus.

15  Q.  But it was signed prior to bankruptcy, right?

16  A.  That is right.

17  Q.  And we talked about -- you had a couple questions from Mr.

18  Stamato about having offers of employment with Apidos and

19  Compass.  Is that right?

20  A.  Not offers of employment.  Discussion.

21  Q.  So no one ever offered you a future employment, right?

22  A.  No.

23  Q.  Okay.  And you didn't have any discussions with Sankaty

24  about future employment, right?

25  A.  No.

1  Q.   And we talked about whether -- you talked about whether

2  the employment agreement you have with Black Diamond is a

3  windfall, right?

4  A.   Could you repeat that again?

5  Q.   Sure.  In response to questions from Mr. Stamato, you said

6  the employment contract with Black Diamond provides you with a

7  windfall?

8  A.   That's correct.

9  Q.   Remember that?  And my question is, in considering whether

10 it was a windfall, did you consider the fact that you had just

11 piloted this company into Chapter 11?

12 A.   Yes.

13 Q.   And was there anything that prohibited you from offering

14 to partner with any bidder that wanted to -- rather than --

15 strike that.

16      Rather than locking up with Black Diamond early on in the

17 process, was there anything that prohibited you from just

18 saying that you were willing to sign an employment agreement

19 with any bidder at the auction?

20      MR. STAMATO:  Objection to the extent that locked up

21 is a bit vague.  I'm not sure where he's -- what he means by

22 that.

23      THE COURT:  No need to change the question.  Restate

24 the question.

25 Q.   Did you ever consider having just an agreement -- a form

1  agreement, that you would agree to partner with any party that

2  won the auction, ultimately?

3         MR. STAMATO:  Objection, it's compound.

4         THE COURT:  Well --

5         MR. STAMATO:  Your Honor, I'm sorry, for not

6  stating -- I'm just having a hard time following him.  Maybe

7  can he break it down a little bit more?

8         THE COURT:  Restate the question, please.

9  Q.   Mr. Frank, was there any reason that you decided to sign

10 with Black Diamond -- sign an employment agreement with Black

11 Diamond, rather than just offering to be employed by whoever

12 won the auction?

13 A.   The agreement with Black Diamond didn't prevent me from

14 talking to other people, which, when they approached me, I did.

15 Q.   And why is it that you wanted to sign an under-market

16 contract with these guys, Black Diamond?

17 A.   Well, there were several reasons why I signed that.  One

18 is, I did want to complete the work with the portfolio

19 companies that we have.  Black Diamond felt that -- in fact,

20 initially, the employment agreement -- the sub-advisory was

21 conditional on me going to work for them, because I knew the

22 assets best and could monetize them in the best way.

23 Q.   Okay.  But you weren't dealing with the sub-advisory

24 agreement, right?

25 A.   I beg your -- I'm talking about the sub-advisory.

1   Q.  Yet you weren't dealing with the sub-advisory agreement in

2  July, right?

3   A.  That's right.

4   Q.  You were a free agent, right?

5   A.  That is correct.

6   Q.  And you decided to sign and under-market contract, right?

7   A.  Yes.

8   Q.  Now, we talked -- Mr. Stamato asked you some questions

9  about deciding to accept the bid on the morning of October

10  29th.  Do you remember that?

11   A.  Yes.

12   Q.  Now, regardless of whether you accepted the bid, Mr.

13  Eckert was free to avoid -- to say he didn't want to sign the

14  APA, right?

15   A.  Yes.

16   Q.  And so your acceptance of the bid on October 29th was an

17  interim step in the process, right?

18   A.  It could have been overruled in a subsequent board

19  meeting, yes.

20   Q.  And if Mr. Eckert had said no, I don't want to accept this

21  bid, that would have prevented the execution of the APA, right?

22   A.  Yes.

23   Q.  Now, Mr. Stamato asked you some questions about concerns

24  regarding the appointment of a trustee.  Do you remember that?

25   A.  Yes.

1    Q.   Now, would your concer -- your concerns would be

2    alleviated if the judge made an immediate appointment of the

3    trustee and the trustee acted quickly, right?

4    A.   My concern is the timing.

5    Q.   Okay.  And if the trustee acted quickly, your timing

6    concerns would be alleviated, right?

7    A.   If the trustee could finish the business quickly.  If it's

8    going to take him several months to get through this, we

9    have -- we have an exposure.  If it can be done in a few days,

10   then it doesn't matter from an operations standpoint.

11        MR. HAMMOND:  No further questions, Your Honor.

12        THE COURT:  All right.  Any recross?

13        MR. STAMATO:  Nothing, Your Honor.

14        MR. DOUGLAS:  Your Honor, we don't have anything.  I

15   just want to be clear on the record.  He elicited a lot of

16   testimony about the Sankaty bid, which really isn't here today.

17   If we get to a sale hearing, we would reserve the right --

18   we've got a lot to say about Sankaty if that ever happens.  I

19   just want to be clear on that, Judge.

20        THE COURT:  All right.  You may step down.  Thank you.

21        All right.  We will take a break now.  Let's try to

22   get back by 1:45, so we can get started by 2 o'clock.  And then

23   we'll have some brief discussion of how we proceed then

24   throughout the afternoon.

25        (Recess from 12:57 p.m. to 1:50 p.m.)

1          THE COURT:  Please be seated.  All right, your next

2     witness.

3          MR. HAMMOND:  Your Honor, we'll call Mr. Eckert.

4        (Pause)

5        (Witness sworn)

6          THE COURT:  You may proceed.

7     DIRECT EXAMINATION

8     BY MR. HAMMOND:

9     Q.   Good afternoon, Mr. Eckert.

10    A.   Good afternoon.

11    Q.   Mr. Eckert, have you been found to breach of fiduciary

12    duties before?

13    A.   Yes, I have.

14    Q.   Mr. Eckert, could you turn to Exhibit 72 --

15    A.   In what book, sir?

16         UNIDENTIFIED SPEAKER:  Your Honor, I'd like to renew

17    my objection to any questioning on this exhibit.  This is the

18    case that is from 2002 --

19         THE COURT:  Well, I think with respect to Mr. Eckert,

20    this clearly goes to issues of credibility.  Here, I'll

21    specifically overrule the objection.

22         THE WITNESS:  What did you ask me to look at?

23         MR. HAMMOND:  Your Honor, may I approach the witness

24    please?

25         THE COURT:  Yes.  Try to have the -- make the witness

1    familiar with the various books that are before him.

2        (Pause)

3    Q.    Mr. Eckert, are you familiar with this case, Salovaara v.

4    Eckert?

5    A.    Yes, I am.

6    Q.    Okay.  And you were found, pursuant to a -- strike that.

7        In that case, on page 4 --

8    A.    Is it the one that's marked up?

9    Q.    Page 4 of Exhibit 72.

10   A.    I'm sorry.  I was looking at 4.

11   Q.    It should be Exhibit 72, page 4.

12   A.    All right.  Yes?

13   Q.    Do you see the paragraph -- second full paragraph on the

14   page that reads, "The Court stated in its prior opinion that

15   Eckert breached his fiduciary duty to Greycliff by going to

16   work for a competing fund, while simultaneously remaining

17   partner in Greycliff.  This is as clear as a breach of duty of

18   loyalty can be.  Further the Court previously ruled that Eckert

19   breached the implied covenant of good faith and fair dealing in

20   the Greycliff agreement.  Thus, if Eckert was not acting in

21   good faith in carrying out the contract, he logically must have

22   been acting in bad faith."

23        Do you see that?

24   A.    Yes.

25   Q.    The Court found that, right?

1   A.   Yes.  In the second action.

2   Q.   And if you'd turn to page 5?

3   A.   Yes.

4   Q.   We're looking in the first full paragraph on the page.

5   A.   Right.

6   Q.   Which starts with, "Under these circumstances, Eckert's

7   conduct must be construed as willful misconduct in addition to

8   being construed as bad faith.  Eckert was a very experienced

9   and well-known financial guru.  There is little doubt he

10  understood the implications of going to work for a company that

11  directly competed with his."

12  Q.   Do you see that?

13  A.   Yes.

14  Q.   And the Court found that as well, right?

15  A.   Yes.

16  Q.   And you exhausted all your appeals on that issue, right?

17  A.   Yes.

18  Q.   And that was a final determination of the Court, right?

19  A.   Correct.

20  Q.   Is that the only time you've been found in breach of

21  fiduciary duties?

22  A.   Yes.

23  Q.   Mr. Eckert, I'm not going to try to retread ground that I

24  covered with Mr. Frank, so I might be jumping around a little

25  bit.  But I want to start -- orient you to the time frame in

1  the spring of 2010.  Okay?

2  A.  Okay.

3  Q.  Now, Black Diamond had been trying to cut a deal with GSC

4  for some time, right?

5  A.  Yeah.  Six months, seven months.

6  Q.  And in June or July of the year, Black Diamond Capital

7  Management acquired a majority position in the debt under the

8  credit facility, right?

9  A.  Yes.

10  Q.  And then it appointed itself as agent?

11  A.  Yes.

12  Q.  And after they became agent, they controlled the debtors'

13  cash, right?

14  A.  Yes.

15  Q.  And Black Diamond had to approve expenditures that GSC

16  would make on retention bonuses and other expenses, right?

17  A.  Yes.

18  Q.  And since Black Diamond controlled your cash, if you

19  wanted an employment agreement, you had to negotiate with Black

20  Diamond, right?

21  A.  Yes.

22  Q.  And Mr. Deckoff is the managing principal of Black

23  Diamond, right?

24  A.  Yes.

25  Q.  You understand that Mr. Deckoff is ultimately the decision

1    maker on behalf of Black Diamond, right?

2    A.    Yes, I do.

3    Q.    You've been discussing working together with Mr. Deckoff

4    since February of 2010, right?

5    A.    I think that's right.

6    Q.    And when Black Diamond acquired the majority position in

7    the debt, you continued your discussions with Mr. Deckoff about

8    working for Black Diamond, right?

9    A.    Yes.

10   Q.    And you're excited about working for Black Diamond, right?

11   A.    I am.

12   Q.    And then in June you began negotiating with Black Diamond,

13   right, on an employment contract?

14   A.    Yes.  Yes.  That's correct.

15   Q.    Mr. Eckert, can you turn to Exhibit 51, please?

16   A.    In the same binder?

17   Q.    Yes, sir.

18   A.    Okay.  I see it.

19   Q.    Are you there?  Now, in the second paragraph, you wrote to

20   Mr. -- this is your e-mail to Mr. Deckoff, right?

21   A.    Yes.

22   Q.    Do you remember sending this on or about June 20th?

23   A.    Yes.

24   Q.    And you wrote to Mr. Deckoff in the second paragraph, "I'm

25   very interested in understanding your strategy for GSC now that

1    you control the debt securities," right?

2    A.    Yes.

3    Q.    So you understood, as of June 20th that Mr. Deckoff

4    controlled the debt securities, right?

5    A.    Yes.

6    Q.    And you wrote in the last paragraph, "I would very much

7    like to join Black Diamond," and I'm not going to finish this

8    sentence, because I think you think that's confidential, right?

9    A.    Yes.

10   Q.    And then if you flip to the next page, you wrote to Mr.

11   Deckoff, "This letter may be too blunt, but I doubt it, because

12   I believe you and I think in very similar ways.  Bottom line, I

13   need five million now" --

14   A.    I can't see that.  Where are you?

15   Q.    It's on the other side of the page?

16   A.    Yes, I see it now.

17   Q.    Can I start over?

18   A.    I've read it, yes.

19   Q.    And it says -- you wrote to Mr. Deckoff, "This letter may

20   be too blunt, but I doubt it, because I believe you and I think

21   in very similar ways.  Bottom line, I need five million now.  I

22   will do everything to keep the forty issue compliant, much

23   lower than was discussed before.  I would like the option to

24   discuss joining Black Diamond the 1st of January."

25   Q.    Do you see that?

1    A.    Yes.

2    Q.    You wrote that to Mr. Deckoff, right?

3    A.    I did.

4    Q.    And in Exhibit 51, you wanted to discuss Mr. Deckoff's

5    strategy for GSC, right?

6    A.    Yes.

7    Q.    And his strategy was putting GSC through bankruptcy and

8    conducting a 363 sale, right?

9    A.    Well, that's what he did in the end.  His -- if I -- I'm

10   not speaking for him.  What I understood his strategy to be was

11   to add assets under management.  Because he and I believed that

12   that -- at this time, that increases the valuation of the

13   companies in this business.

14   Q.    But as of June, the strategy was to put it through a

15   bankruptcy, right?  Is that right?

16   A.    I believe so.

17   Q.    Now, following up on this issue, you wrote to Mr. Nahas,

18   right?

19   A.    What page, please?

20   Q.    Could you turn to Exhibit 52?

21   A.    Yes.  Yes.

22   Q.    And Exhibit 52 is an e-mail written by Leanne Deterano

23   (ph.) to Mr. Nahas and Mr. Deckoff.  Do you see that?

24   A.    Yes.

25   Q.    And that was sent on your behalf, right?

1   A.   Yes.

2   Q.   And Ms. Deterano, she's my secretary.  Is that right?

3   A.   She's my assistant.

4   Q.   Okay.  And she can send e-mails on your behalf, right?

5   A.   She can.

6   Q.   And what do you do, dictate them to her?

7   A.   Sometimes I dictate them; sometimes I write them by hand;

8   and sometimes I send her an e-mail.

9   Q.   And in this e-mail, you write to Mr. Nahas, "Sorry we

10  could not finish our conversation this afternoon.  In summary,

11  I leave to you to select the appropriate time to pay me the

12  three million dollars and to have as much of a Black Diamond

13  guarantee that is available without hurting other parts of the

14  transaction."  Do you see that?

15  A.   Yes.

16  Q.   And then you continue, "I agree the new one million dollar

17  annual salary begins at the end of the asset sale and includes

18  any business, personal expenses like a driver, et cetera.  We

19  agree to discuss the transition of New Jersey to Greenwich, my

20  view is as soon is as we can.  While keeping our key support

21  people, we should move.  New Jersey should be closed and the

22  goal should be to close the office by the end of the auction."

23  Q.   Do you see that?

24  A.   Yes.

25  Q.   So you're planning to merge GSC with Black Diamond at the

1   end of the auction, right?

2   A.   Well, we're planning -- we were planning, then, to make

3   them close together.  I think, whether they would merge or not,

4   was more dependent upon how many of GSC's assets Black Diamond

5   was able to acquire.

6   Q.   So at this time you understood that Black Diamond was

7   going to be looking to acquire GSC's assets in connection with

8   an auction, right?

9   A.   Yes.

10  Q.   And at the same point in time, Mr. Nahas was having

11  discussions with Mr. Frank as well, right?

12  A.   I think so.  I wasn't part of any of those.

13  Q.   If you look at the second page of this e-mail, the other

14  side, the top line, it says, "How are your discussions with

15  Peter progressing," right?

16  A.   Right.

17  Q.   That was referring to the employment discussions with

18  Peter?

19  A.   I think so.

20  Q.   And eventually you entered into an employment agreement

21  with GSC, right?

22  A.   Um --

23  Q.   During the summer?

24  A.   -- yes.

25  Q.   And you entered into a consulting agreement with Black

1  Diamond, right?

2  A.  Yes.

3  Q.  And I want to talk about your employment agreement with

4  GSC for a moment.

5  A.  All right.

6  Q.  I believe it's behind tab 71.

7  A.  That's right.

8  Q.  And this is your employment agreement with GSC that was

9  signed over the summer, right?

10  A.  Well, I don't see the signature page.

11  Q.  I believe it's all the way in the back.

12  A.  After all the charts?

13  Q.  Just before the charts.  It's on a page that's marked as

14  1.

15  A.  I see it, yes.

16  Q.  And that's your signature on the "executive" line?

17  A.  It is.

18  Q.  And that's Mr. Frank's signature on the "employer" line?

19  A.  Yes.

20  Q.  Okay.  And this agreement was approved by Black Diamond,

21  right?

22  A.  Yes.

23  Q.  And if you could just explain, what are the terms of this

24  employment agreement?

25  A.  The employment agreement was structured so that I would be

1    paid some money to begin the process of running an auction and

2    doing all the other things that were necessary to end the

3    bankruptcy process.  And with that -- for that one and a half

4    million dollars, I was supposed to make sure that the

5    bankruptcy process was efficient and fair.  The second one and

6    a half million dollars was to be paid at the end of the process

7    after the assets were acquired and the bankruptcy was approved.

8    So it was three million dollars in two pieces.

9    Q.    And then there was other compensation as well, right?

10   A.    Well, there was a salary, yes.

11   Q.    And in addition to your salary, if you look on page 3 in

12   bullet-point 4 --

13   A.    Um-hum.

14   Q.    -- it says, "Employer shall assign, transfer and deliver

15   to executive all of its right, title and interest in to and

16   under the term life insurance policies, insuring the life of

17   executive, each issued by," I'm not going to read the policy

18   numbers, but by Prudential, AIG, U.S. Life, Phoenix, CNA,

19   TransAmerica, and Empire General?

20   A.    Yes.

21   Q.    "Executive shall be responsible for the payment of all

22   future premiums on these policies which have not been

23   previously paid by the company."  Do you see that?

24   A.    Yes.

25   Q.    And that was about sixty-five million dollars in insurance

1  policies, right?

2  A.   Yes.

3  Q.   And you didn't go out and get an independent consultant to

4  pass on the propriety of this employment contract, right?

5  A.   No.

6  Q.   And then I want to talk about -- I apologize, we're going

7  to go to another binder -- Exhibit 16.

8  A.   Where's the number of the binder?

9  Q.   It's Exhibit 16.

10  A.   It is.

11  Q.   Is that the binder?

12  A.   It is.

13      (Pause)

14  Q.   Exhibit 16 is your consulting agreement with Black

15  Diamond, right?

16  A.   Yes.

17  Q.   And you signed this agreement on or about July 30th,

18  right?

19  A.   Yes.

20  Q.   And you also get three million dollars under this

21  consulting agreement, right?

22  A.   Over three years, yes.

23  Q.   This consulting agreement only comes into effect if Black

24  Diamond buys a substantial portion of the debtors' assets in a

25  363 sale, right?

1    A.   Well, however they get fifty percent or more of the

2    assets, it comes into effect.

3    Q.   And under this consulting agreement, they pay you the

4    three million dollars, you don't have to do any work, right?

5    A.   That's correct.

6    Q.   In fact, when we met in September, you told me that prior

7    to executing this agreement, Mr. Deckoff explained to you, I'll

8    pay you three million dollars, and you can sit in New Jersey

9    and play cards with your buddies.  And when this came out, it's

10   exactly what he said.  So I don't have to do anything, right?

11   A.   Well, Mr. Deckoff and I were joking around.  The point

12   that we were discussing seriously was what he wanted from this.

13   And what he said to me that he wanted, is he wanted me to get

14   comfortable with him and the organization, because he thought

15   there would be lots of things that I would enjoy doing, and

16   the -- and certainly, if I did them successfully, there was

17   upside.  The crack you just read was just two guys relaxing a

18   bit.

19   Q.   All right.  Can you turn to page 104 of your deposition on

20   September 13th?  It should be --

21          MR. HAMMOND:  May I approach, Your Honor?

22          THE COURT:  Yes.

23   A.   Yes.  Are we going back?

24          (Pause)

25   Q.   I'd like you to turn to page 104 of your deposition

1  transcript of September 13th.  And on line 2 I asked you, "Can

2  you tell me the circumstances under which it was negotiated?"

3  And you replied, "Yes.  I had dinner with Steve early on in the

4  process and discussed with him how he saw my role.  Because, as

5  I told you, the prior proposal had me leaving.  He, of course,

6  knew all about that.  He said well, that's not what I want.

7  And I said well, I can't tell you that I'm going to work

8  anymore right after this.  But he said, well, why don't we give

9  you -- he said well, I'll pay you three million, and you can

10  sit out in New Jersey and play cards with your buddies.  And

11  when this all came out, it's exactly what he said, so I don't

12  have to do anything."

13      I asked you that question at your deposition on September

14  13th, right?

15  A.   On September 13th.  I don't recall.

16  Q.   Do you recall giving that answer?

17  A.   I certainly recall giving it the last week.  Whether I

18  said it on December 13th (sic), I don't remember.

19  Q.   That was truthful testimony when you gave it?

20  A.   Yes, as I've already testified.

21  Q.   That was a very favorable arrangement for you, right?

22  A.   It was a favorable arrangement if it worked out the way

23  Mr. Deckoff and I discussed it.  The -- my market value for the

24  businesses I do is substantially higher than that.

25  Q.   So you're willing to leave money on the table to go work

1    for Mr. Deckoff?

2    A.   Yes.  In the short-run.

3    Q.   How many offers have you had during the auction process?

4    A.   I haven't had any firm offers, because I have discouraged

5    them.  I have had inquiries from several people.  And I have

6    said, since I have had more discussions with Mr. Deckoff, and

7    since we have talked in some detail about his business, and

8    I've gotten much more excited about working with him, I have

9    told people who inquire, without telling the name of Black

10   Diamond, that while I haven't signed anything that binds me to

11   them, that I'm leading -- I've basically made up my mind and

12   they would be wasting their time.

13   Q.   And so you discouraged offers.  Is that right?

14   A.   Yes.

15   Q.   And why would you discourage them?

16   A.   Well, I don't think it's fair if I have worked through

17   this with Mr. Deckoff, to use that to go get other offers.  I

18   want to do what Mr. Deckoff and I had discussed.

19   Q.   So you have another agreement with Mr. Deckoff, right?

20   A.   Another agreement?

21   Q.   Yes.  About the future employment, right?

22   A.   Well, that's the agreement we've been talking about.

23   That's the three million dollar agreement.

24   Q.   The three million dollar agreement that doesn't require

25   you to work, right?

1  A.   Right.  One million a year.

2  Q.   And now, there wasn't any independent analysis done to

3  determine whether this consulting agreement that you signed

4  with Mr. Deckoff was a market transaction, right?

5  A.   Well, I don't see how that would be relevant, since it was

6  negotiated between me and Mr. Deckoff.  It didn't have anything

7  to do with -- the amount of it didn't have anything to do with

8  anything other than what he was willing to pay me and what I

9  was willing to accept.

10 Q.   So it had no relevance to the process that was going to be

11 put in place, right?

12 A.   No.

13 Q.   And the fact is, you didn't go out and hire any employment

14 consultants to gauge whether this was a fair consulting

15 arrangement, right?

16 A.   No.

17 Q.   Now, Mr. Manzo was aware of this consulting agreement,

18 right?

19 A.   Yes.

20 Q.   And Mr. Manzo told you he didn't think that the consulting

21 arrangement created the appearance of impropriety, right?

22 A.   Could you read that again, please?

23 Q.   Sure.  Mr. Manzo told you that he didn't think that this

24 consulting arrangement that you had with Mr. Deckoff created

25 the appearance of impropriety, right?

1    A.    Right.

2    Q.    And Kaye Scholer was aware of this consulting arrangement,

3    right?

4    A.    I don't recall telling them.  But I think they were aware

5    of it.

6    Q.    No one from Kaye Scholer ever raised with you the fact

7    that the consulting agreement would present a problem, right?

8    A.    Right.

9    Q.    And you spoke to Mr. Frank about your consulting

10   arrangement, right?

11   A.    Yes.

12   Q.    And Mr. Frank has a similar arrangement with Black

13   Diamond, right?

14   A.    Well, it's structured somewhat differently, but he has an

15   arrangement to work for them.

16   Q.    Yes.  Unlike your arrangement, Mr. Frank's actually

17   required to work, right?

18   A.    Yes.

19   Q.    But in your discussions with Mr. Frank about this

20   consulting arrangement, Mr. Frank did not tell you that he

21   thought the consulting agreement that you had with Black

22   Diamond would create the appearance of impropriety, right?

23   A.    I think it would have been difficult for him to say that.

24   And he didn't.

25   Q.    Why would that be difficult?

1    A.   Because he's doing the same thing.

2    Q.   Well, so as of July 30th, you're the CEO and chairman of

3    the board of GSC, right?

4    A.   Yes.

5    Q.   And you understand that Black Diamond will be seeking to

6    acquire the assets of GSC in a 363 sale, right?

7    A.   I'm sorry.  What date?

8    Q.   As of July 30th, the date you executed this consulting

9    agreement, you understand that Black Diamond would be seeking

10   to acquire the assets of GSC in a 363 sale, right?

11   A.   I certainly thought they were going to try.

12   Q.   And you have a consulting agreement with Black Diamond

13   that will pay you three million dollars if Black Diamond

14   prevails in the auction, right?

15   A.   Yes.

16   Q.   And you didn't think that -- this consulting agreement

17   would put you in a position of conflict later in the

18   proceedings, right?

19   A.   I'm sorry, I didn't hear the last part.

20   Q.   Sure.  You don't think that this consulting agreement

21   would put you in a position of conflict later on in the

22   proceedings, right?

23   A.   Well, I think technically, the -- when you're doing two

24   things that in some sense could overlap, it is a conflict.  In

25   my business career, which has been a fair number of years, I

1    have dealt with lots of conflicts.  To me, a conflict is not a

2    reason that you can't do something.  It is -- it puts more

3    responsibility on you to figure out how to act with the

4    conflict.  And you should, in most cases, act differently.  So

5    it is clear that the contract (sic) has not affected your

6    judgment as the CEO of a company.

7    Q.    You know, in most circumstances when there's a conflict on

8    a board, you appoint a special committee, right?

9    A.    I think that is probably correct.  However, that is

10   generally with public companies.  And unfortunately, at this

11   time, we had only two directors.

12   Q.    Right.  And --

13   A.    So it would be hard to get a committee of outside

14   directors, since we didn't have any.

15   Q.    -- and you would agree with me that during the course of

16   these bankruptcy proceedings, GSC would not qualify with the

17   highest standard of board governance, right?

18   A.    I would not agree with that.

19   Q.    You wouldn't agree with that?

20   A.    No, I wouldn't.

21   Q.    Can you turn to your deposition on December 14th, please?

22   A.    Yes.

23   Q.    Page 56.

24   A.    Yes.  I left a couple of words out.  What I was referring

25   to there --

1  Q.   Well, wait a second.  Let me ask a question.

2  A.   I'm sorry.

3  Q.   Page 56, I asked you the question with respect to who

4  approved the amended APA.  You were talking about you or Peter.

5  And my question was, "Wouldn't it be both?  You're both on the

6  board, right"?

7       And your answer was, starting at page 55 line 23, "We have

8  an understanding that this company certainly in the last three

9  months has not been run like a Fortune 500 company.  I'm

10 certain we would not qualify for the highest standards of board

11 governance.  You can only do so much.  Peter and I have an

12 understanding that if things are complicated, we talk about

13 them and we delegate to each other.  We have board meetings,

14 but they're quite short."

15      Do you see that?

16 A.   Yes.

17 Q.   You remember me asking you that question, right?

18 A.   Yes.

19 Q.   And you gave that answer, right?

20 A.   I did.

21 Q.   All right.  Thank you very much.  And after you executed

22 the consulting agreement with Black Diamond, you again wrote to

23 Mr. Deckoff, right?  Can you turn to Exhibit 55?

24 A.   In which book?

25 Q.   There's one book with tab 1 to 40 and the other one has

1  tabs that are left.

2  A.   I'm sorry.  I'm confused.

3  Q.   These are the same exhibits.  The exhibits will be in the

4  big binder.

5  A.   And how would we --

6  Q.   They're deposition transcripts.

7  A.   I see.

8       (Pause)

9  A.   Yes, I sent this to Mr. Deckoff as an e-mail.

10  Q.   Right.  You sent it to him on August 5th, right?

11  A.   Yes.

12  Q.   That's five days after you signed the consulting

13  agreement, right?

14  A.   Yes.

15  Q.   And you wrote in the second paragraph, "I want to thank

16  you for giving me the opportunity for a second chance.  I

17  intend to work hard and hopefully my experience and imagination

18  will add to the wealth of Black Diamond.  I've already

19  developed some ideas that I would like to share with you when

20  you return."  Right?

21  A.   Yes.

22  Q.   You wrote that to Mr. Deckoff --

23  A.   Yes.

24  Q.   -- on August 5th, right?

25  A.   Yes.

1    Q.   Mr. Eckert, I apologize.  Just so we have a clean record,

2    can you wait for me to finish my question before you provide an

3    answer?

4    A.   I apologize.

5    Q.   No problem.  Now, in addition to the employment agreement

6    that you had with GSC that Black Diamond approved, and in

7    addition to the consulting arrangement that you had with Black

8    Diamond, you also talked to Mr. Deckoff about the ability to

9    use his plane, right?

10   A.   Yes.  Mr. Deckoff had said to me when we were talking

11   about working together, and he had, as you've already

12   mentioned, told me that -- this a perk generally, where it was

13   that it was better just to pay an appropriate salary and let

14   the executive figure out what perks he wants, the executive

15   wants.  However, with respect to private aircraft, Mr. Deckoff

16   and his company have a plane.  And he said to me, look Fred, if

17   I'm not using the plane, and it's sitting in the hangar, you

18   could use it and pay us the direct costs of flying the plane.

19   Q.   And you asked to use his plane, right?

20   A.   Once.

21   Q.   That was on November 24th, right?

22   A.   I asked to use it on December 5th.  I don't remember what

23   day I raised it with him.

24   Q.   Could you turn to Exhibit 58?

25   A.   Okay.  Yes, I see it.

1  Q.   Mr. Eckert, this is an e-mail that you sent to Mr. Deckoff

2  on November 24th, right?

3  A.   Yes.

4  Q.   And in this e-mail in the second paragraph, you said, "I

5  become more excited" --

6          THE COURT:  Wait one second, counselor.  There is no

7  Exhibit 58 in by book.  There's a tab, but nothing's behind it.

8          MR. HAMMOND:  Your Honor, may I approach?

9          THE COURT:  Yes.  Thank you.

10          MR. HAMMOND:  May I proceed, Your Honor?

11          THE COURT:  Go ahead.

12  Q.   You sent this e-mail to Mr. Deckoff on November 24th,

13  right?

14  A.   Yes.

15  Q.   And you asked him to use his plane, right?  To use his

16  plane?

17  A.   Yes.

18  Q.   And you wanted to use his plane on December 5th, right?

19  A.   Yes.

20  Q.   That was the day before the sale hearing, right?

21  A.   Yes.

22  Q.   And Mr. Deckoff wouldn't let you use the plane, right?

23  A.   Correct.

24  Q.   And the reason he wouldn't let you use the plane was

25  because some people might misunderstand your use of the plane

1    so close to the sale hearing, right?

2    A.    Yes.

3    Q.    People might think that that was improper, right?

4    A.    That was what Mr. Deckoff thought.  And when I thought

5    about it, I thought he was absolutely right.

6    Q.    You thought getting some benefit from Mr. Deckoff so close

7    to the sale hearing would be improper, right?

8    A.    Well, after -- Mr. Deckoff was the one who suggested it to

9    me.  I said to him, I should have thought of that.  You're

10   absolutely right.  I withdraw the request.

11   Q.    So when you thought -- when you had a second chance to

12   reflect on it, you thought getting a favor from a guy I'm

13   awarding substantially all the assets of the company to in a

14   bid, that would be a problem, right?

15   A.    Well, certainly getting a favor of the magnitude of using

16   a private plane to fly to a football game.

17   Q.    What was the order of magnitude of that?

18   A.    Well, I don't know what the direct costs are for Mr.

19   Deckoff's plane, but I would guess that it would have been in

20   the magnitude, for the round trip, of 10,000 dollars.

21   Q.    So 10,000 dollars would be too much of a benefit, right?

22   A.    Yes.

23   Q.    Too close to the sale hearing, right?

24   A.    Yes.

25   Q.    Now, Mr. Eckert, I want to talk to you a little bit about

1  the settlement agreement that you entered into with the company

2  during the course of these Chapter 11 proceedings.

3  A.   All right.

4  Q.   I'm trying to keep this short.  But back in October the

5  debtors sought approval from the Court to pay you a 1.5 million

6  dollar bonus, right?

7  A.   Yes.

8  Q.   The trustee objected to that bonus, right?

9  A.   I believe so.

10  Q.   The debtors withdrew the request for approval of that

11  bonus, right?

12  A.   Yes.

13  Q.   And after the debtors withdrew this request for your

14  bonus, you entered into a settlement agreement with the

15  debtors, right?

16  A.   Yes.

17  Q.   Mr. Frank was the person who authorized your settlement

18  agreement with GSC, right?

19  A.   Yes.

20  Q.   He signed the settlement agreement on behalf of the

21  debtors, right?

22  A.   I believe so.

23  Q.   Now, the debtors have fifty million dollars in life

24  insurance policies on you, right?

25  A.   Yes.

1    Q.    And --

2    A.    They do now.  Life insurance policies were switched

3    around.

4    Q.    -- there is a fluid market in which to sell those life

5    insurance policies, right?

6    A.    I wouldn't use the word fluid.  The -- and it is not

7    selling for its cash value.  Those insurance policies' cash

8    value all added together are a minimal amount of money.  So you

9    can't go sell them that way.

10   Q.    So when Mr. --

11   A.    So what -- excuse me.

12   Q.    -- I'm sorry.  When Mr. Frank was testifying earlier about

13   Mr. Manzo's valuation of those insurance policies at between

14   five and ten million dollars, you don't agree with that

15   valuation?

16   A.    Well, as I was starting to say, the cash value is low.

17   What Mr. Manzo was referring to is what is called settlement --

18   life settlement.  And that, there are a dozen people that do

19   that.  And what it is, is they take into account the age and

20   physical condition of the person, and they take over the

21   policy.  So Mr. Manzo's comment about the value isn't selling

22   the policy for its cash value, it's true of what I just said.

23   Q.    And in order to maximize the value of those policies, the

24   debtors need to have your medical records, right?

25   A.    Yes.

1    Q.   And you refused to release the medical records unless you

2    received compensation from the debtors, right?

3    A.   Yes.

4    Q.   In fact, you asked to receive one-third of the

5    compensation from the life insurance policies, right?

6    A.   That was my first thought about what was fair, yes.

7    Q.   Now, in addition, you had a 1.5 million dollar unsecured

8    claim, right?  I'm sorry, a 2 million --

9    A.   Okay.

10   Q.   -- dollar unsecured claim against the estate?

11   A.   I have a two -- yes, I have at two million dollar

12   unsecured claim against the estate.

13   Q.   That's for your 2008 bonus?

14   A.   Yes.

15   Q.   And you entered into a settlement with the company to pay

16   your 1.5 million dollars, right?

17   A.   Yes.

18   Q.   And you sought court approval of that settlement?

19   A.   Yes.

20   Q.   And at that point in time, your request for a 1.5 million

21   dollar bonus had been rejected by the trustee, right?

22   A.   Yes.

23   Q.   Now, your settlement agreement has been modified since it

24   was first presented to the Court, right?

25   A.   Yes.

1    Q.   That initial request for a settlement agreement has been

2    withdrawn?

3    A.   Correct.

4    Q.   And we'll get into this later, but you entered into an

5    option agreement with Mr. Deckoff, pursuant to which you sold

6    your two million dollar unsecured claim to Black Diamond,

7    right?

8    A.   Not at that time, but later, yes.

9    Q.   And but that was the impetus for amending your settlement

10    agreement with the company, right?

11    A.   No.  I had no discussions with Mr. Deckoff about that at

12    the time I did this.  The impetus for it was that the original

13    filing, in addition to the medical records, there were two

14    other things that the company was getting.  They were getting

15    my promise to do what was necessary, if I could do it, to keep

16    the change of control issue off the table by it being

17    affiliated with the company.  That is potentially a very

18    valuable thing to the company.  And second, what I waived was

19    the two million dollar secured claim, which was in the first

20    one.  By doing that, I thought that I certainly should reduce

21    the money.

22    Q.   Right, because you sold a two million dollar unsecured

23    claim to Mr. Deckoff --

24    A.   I had not --

25    Q.   -- in connection with an option, right?

1    A.    -- I had not done that at that time.

2    Q.    I didn't say you did it at that time.  But that's when you

3    amended the settlement agreement, right?  You amended the

4    settlement agreement after you signed the option agreement,

5    right?

6    A.    That's not my recollection.

7    Q.    So you just unilaterally withdrew the two million dollar

8    unsecured claim with no impetus at all and agreed to reduce

9    that 1.5 million dollar payment you'd received under the

10   settlement agreement?

11   A.    To one million.

12   Q.    Right.

13   A.    Yes, I did.  Because as I testified a minute ago, the

14   company was getting less in the settlement than they had

15   previously been getting, so I thought it was fair to reduce the

16   amount that they were paying for it.

17   Q.    Why would -- can you just explain to me why the company

18   was getting less in the settlement?

19   A.    Because I removed from the settlement the two million

20   dollar life insurance policy.  In the first settlement, it had

21   been in there.  In the second settlement, it was removed, and

22   so it only had two parts rather than three.

23   Q.    A two million dollar life insurance policy?

24   A.    I'm sorry.  The two million dollar 2008 bonus.  Pardon me.

25   Q.    All right.  That was the option that you sold to Mr.

1  Deckoff later on, right?

2  A.   No.  It was one of the pieces of securities that I sold

3  Mr. Deckoff an option on.

4  Q.   So let's talk about how that one million dollar price tag

5  was negotiated, okay?  Mr. Frank's the counterparty to that

6  agreement, right?

7  A.   Would you tell me what page?

8  Q.   Well, let me ask you this.  Is there anybody else in the

9  company who can authorize your settlement other than Mr. Frank?

10  A.   No.

11  Q.   And it's at -- we don't have a copy of your new settlement

12  with the company, but if you'd turn to Exhibit 18?

13       Sorry, this may not be correct.  Exhibit 20.  I'm sorry.

14  A.   Okay.  What I see at Exhibit 20 is the consulting

15  agreement for Peter signed by me.

16       MR. HAMMOND:  May I approach, Your Honor?

17       THE COURT:  Go ahead.

18  A.   I found it.  Yep.

19  Q.   And this was the initial settlement agreement that you

20  sought approval from from the Court, right?

21  A.   May I have a minute, please?

22       (Pause)

23  A.   Yes.

24  Q.   Okay.  And then you amended it to take out the two million

25  dollar unsecured claim and reduce the amount to one million

1 dollars, right?

2 A. Yes.

3 Q. And you didn't have anyone to negotiate this agreement

4 with, right?

5 A. Not really, although, cert -- I discussed it with Peter at

6 some length. I discussed it with our advisors.

7 Q. Okay, so --

8 A. But I don't have an opinion.

9 Q. -- okay. Let's turn to the transcript at page 76, of your

10 December 2nd -- December 14th deposition. Page 76.

11 A. Yes.

12 Q. I asked you, "Who did you negotiate it with?" Do you see

13 that, line 12?

14 A. Yes.

15 Q. And you responded, "I mean, I didn't have anyone to

16 negotiate it with, like a lot of other things here.

17 "Q. So you just think this is the appropriate way to go about

18 it?

19 "A. Well, I don't think there's anybody else that I could have

20 told about it. If someone had objected, I would have discussed

21 it. No one thought it was -- there was anything improper about

22 it. I mean, as I told you before, when you only have two

23 managers, senior managers, left in a company that's in

24 bankruptcy, you have complicated business, and you have all the

25 kind of issues we talked about today, the corporate governance

1    process is not necessarily the best."

2    Q.   And I asked you, "To my understanding, if I'm negotiating

3    an agreement with somebody, don't you have to talk to somebody

4    on the other side?"

5         You responded, "I'm talking to myself aren't I?"

6         Did I read that correctly?

7    A.   You did.

8    Q.   And I asked you those questions during your deposition on

9    December 13th, right?

10   A.   You did.

11   Q.   And you gave those answers, right?

12   A.   I did.

13            THE WITNESS:  Could we have a break, Your Honor.

14            THE COURT:  All right.

15            THE WITNESS:  Maybe five minutes.

16            THE COURT:  That's fine.  Just don't discuss your

17   testimony with anyone during the break.

18        (Recess from 2:37 p.m. until 2:48 p.m.)

19            THE COURT:  Please be seated.

20            THE WITNESS:  Your Honor, I don't know the procedures

21   for this.  But I would like, if you're willing, to meet with

22   you and my lawyers privately to discuss an issue that affects

23   this testimony that I would rather not discuss publicly.

24            THE COURT:  I think --

25            MR. STAMATO:  Your Honor, I guess -- it wasn't what I

1   was going to get up to say -- Tony Stamato on behalf of the

2   debtors.  If the witness is --

3           THE COURT:  I can't hear you.

4           MR. STAMATO:  Tony Stamato on behalf of the debtors.

5   Your Honor, if the witness isn't feeling well, if counsel has

6   no opposition, I'd just request for an opportunity to see if

7   he's feeling okay.

8           THE COURT:  All right.  Does it have to do with how

9   you're feeling?

10          THE WITNESS:  I feel fine now, but it does have to do

11  with how I was feeling throughout this period of time that I

12  gave this testimony.

13          THE COURT:  Well, what you should do is step down.

14  You can discuss health issues with your counsel, and then

15  counsel can advise me of what, if anything, that they would

16  like to do in terms of any formal conference.  In all

17  likelihood, though, I believe that conference would have to

18  include the counsel for the various parties.  All right?

19          So we'll take a recess and --

20          THE WITNESS:  My lawyers are fully knowledgeable of

21  this issue.

22          THE COURT:  All right.

23          MR. STAMATO:  Thank you, Judge.

24          THE COURT:  We'll take a recess.  Let counsel speak

25  for a few minutes, and then contact chambers as to how you wish

1   to proceed at that point.

2         MR. STAMATO:  Thank you.

3         THE COURT:  All right.

4      (Recess from 2:50 p.m. until 2:53 p.m.)

5         THE COURT:  Please be seated.

6         MR. STAMATO:  Your Honor, we spoke with Mr. Eckert.

7   He indicated that he's feeling fine and able to continue with

8   the examination.

9         THE COURT:  All right.  If anyone wishes -- we're

10   trying to regulate the heating and ventilation system here

11   without a lot of success.  But in any event, if you wish to

12   take off your jackets, feel free to do that.

13         MR. STAMATO:  Best news I've heard all day, Your

14   Honor.  Thank you.

15         THE COURT:  All right.  Go ahead.

16         MR. HAMMOND:  May I proceed, Your Honor?

17         THE COURT:  Yes, please.

18         MR. HAMMOND:  Again, Andrew Hammond from White & Case.

19   CONTINUED DIRECT EXAMINATION

20   BY MR. HAMMOND:

21   Q.  Mr. Eckert, I'd like to talk a little bit about the period

22   leading up to the filing for bankruptcy, okay?

23   A.  Okay.

24   Q.  Leading up to the filing for bankruptcy, the debtors and

25   Black Diamond were negotiating a stalking-horse bid, right?

1   A.   Yes.

2   Q.   Black Diamond offered approximately five million dollars

3   for all of GSC's assets in connection with this proposed

4   stalking-horse bid, right?

5   A.   Yes.

6   Q.   You didn't think that offer was reasonable, right?

7   A.   Correct.

8   Q.   This is far less than the initial value assessment that

9   you received from your professionals, right?

10   A.   Yes.

11   Q.   And Black Diamond wasn't happy that the company's

12   professionals rejected this stalking-horse bid, right?

13   A.   They were not.

14   Q.   Now, let's turn to Exhibit 56, if we could.

15   A.   56?

16   Q.   56, sir.

17   A.   The exhibit is in front of the tab or behind the tab?

18   Q.   Behind tab 56.

19   A.   Thank you.

20   Q.   And you should have in Exhibit 56, an e-mail.  The first

21   e-mail in the string is written on August 27th from Mr. Deckoff

22   to you.  Do you see that?

23   A.   Yes.

24   Q.   Mr. Deckoff wrote, "We just got a new budget which has in

25   it an additional five million dollar for KS and a 1.5 million

1   dollar for Manzo!  My dislike of GSC's professionals is

2   escalating fast.  This is totally unreasonable for a company

3   this size.  There are other professionals GSC could have gone

4   with, if we knew this was what they were going to try and

5   pull."  Do you see that?

6   A.   Yes.

7   Q.   And you wrote back to Mr. Deckoff, right?

8   A.   Yes.

9   Q.   You wrote back to him on August 28th?

10  A.   Yes.

11  Q.   And you wrote to him, "I understand and share your

12  aggravation.  I spoke with Manzo at length about four hours ago

13  about the stalking-horse bid, and he now wants no bid."  Do you

14  see that?

15  A.   Yes.

16  Q.   And you asked Mr. Deckoff, "How much does that hurt us?"

17  Do you see that?

18  A.   Yes.

19  Q.   That "us" is you and Mr. Deckoff, right?

20  A.   It could be read that way.  It was basically --

21  Q.   Is there anybody else in this e-mail chain?

22  A.   No.

23  Q.   And then you started talking about the fees, right?

24  A.   Yes.

25  Q.   Now, after the debtors filed for -- I want to talk about

1    the period of time just after the debtors filed for bankruptcy,

2    all right?

3    A.    Okay.

4    Q.    You understood that there were bidding procedures that the

5    debtors had agreed to, right?

6    A.    Yes.

7    Q.    And then there was an objection filed by the non-

8    controlling lenders to the bidding procedures submitted by the

9    debtor, right?

10   A.    Yes.

11   Q.    And in fact, I deposed you on September 13th, about the

12   bidding procedures issues, right?

13   A.    Yes.

14   Q.    Now, the debtors wanted a shorter process, right?

15   A.    Yes.

16   Q.    And the non-controlling lenders wanted a longer process,

17   right?

18   A.    Yes.

19   Q.    The non-controlling lenders wanted to have people --

20   provide people with the opportunity to have a chance to conduct

21   due diligence, right?

22   A.    Yes.

23   Q.    And then there were settlement negotiations between the

24   non-controlling lenders and the debtors and Black Diamond,

25   right?

1   A.   I believe so, but I don't recall.  I was not part of that.

2   Q.   You weren't part of it.  Can you turn to Exhibit 65,

3   please?  And Exhibit 65, the first e-mail in the chain is an

4   e-mail that you wrote to Mr. Manzo and Mr. Nahas, right?  Do

5   you see that?

6   A.   Yes.

7   Q.   And it's an e-mail dated September 18th, right?

8   A.   Yes.

9   Q.   You wrote to Mr. Nahas, right?

10   A.   Yes.

11   Q.   And you said, "This is crazy," right?  Do you see that?

12   That's what you wrote?

13   A.   I thought it starts with "Need your help".

14   Q.   That's Mr. Manzo --

15   A.   Oh, that's Mr. Manzo, excuse me.  Yes, I see it at the

16   top.  Yes, I said, "This is crazy".

17   Q.   Right.  And what was crazy was that parties were fighting

18   over a couple days of delay in the bidding procedures, right?

19   A.   Yes.

20   Q.   And you said -- you wrote to Mr. Nahas of Black Diamond,

21   "The downside risk of sliding to a process that will likely

22   result in the appointment of a trustee is a terrible result for

23   me, for Steve, for Peter, and for you and Sam.  How can it make

24   any sense to take this risk over a couple of days of delay in

25   an auction process."  Do you see that?

1  A.  Yes.

2  Q.  Then it says, "If Steve wants my view, I'm of course

3  available to him."  Do you see that?

4  A.  Yes.

5  Q.  And you wrote that to Mr. Manzo and Mr. Nahas on September

6  18, 2010, right?

7  A.  Correct.

8  Q.  So at that point in time, you were concerned about the

9  potential appointment of a trustee, right?

10  A.  Yes.

11  Q.  And that's before any of the events that happened at the

12  auction, right?

13  A.  This is before the auction.

14  Q.  I want to turn and touch on the auction process for a

15  little bit.

16  A.  Okay.

17  Q.  The auction took place -- just so we're clear -- between

18  October 26th and the early morning of October 29th, right?

19  A.  Yes.

20  Q.  And you attended the auction?

21  A.  Yes, I did.

22  Q.  Now, do you recall at some point during the auction Mr.

23  Manzo wanted to allow joint bidding?

24  A.  Yes.

25  Q.  Did he tell you at that point in time that if joint

1    bidding was allowed, BD and the agent would likely misallocate

2    value?

3    A.    No.  Not that I recall.

4    Q.    Now, the winning bid was selected in the morning of

5    October 29th, right?

6    A.    Yes.

7    Q.    And that was around 4 a.m.?

8    A.    Yes.

9    Q.    And the joint bid consisted of a credit bid of 224 million

10   dollars by the agent and a cash bid of 11 million dollars by

11   Black Diamond, right?

12   A.    Yes.  I believe the cash bid included a note, but yes.

13   Q.    So it was 11 million dollars, 5 million of cash; 6 million

14   in a note, right?

15   A.    I don't remember the mix, but that's probably right.

16   Q.    And the next best bid was a bid submitted by Sankaty at

17   about 194 million dollars, right?

18   A.    Yes, but it was a different kind of bid.  It was a revenue

19   sharing bid.

20   Q.    Right.  But Mr. Manzo valued that bid, right?

21   A.    I believe so.

22   Q.    And he valued it -- you understood he valued it at about

23   194 million dollars, right?

24   A.    Yes.  I'm not questioning the value.

25   Q.    And my question to you is, during the course of selecting

1   the winning bid, did Mr. Manzo ever tell you that it was -- he

2   thought it was inappropriate for you and Mr. Frank to be

3   selecting the winning bid?

4   A.   No.  Let me add to that.  I think what he told me was it

5   was very important that the professionals run the process.  And

6   at the end, there would be strong recommendations for the --

7   from the professionals.  And if we didn't take that, we ought

8   to have a damned good reason.

9   Q.   All right.  Can you turn to page -- let me just grab the

10  transcript for you.  This is Mr. Manzo's deposition transcript.

11          MR. HAMMOND:  May I approach, Your Honor?

12          THE COURT:  Go ahead.

13       (Pause)

14  Q.   Now, I asked Mr. Manzo this question --

15          UNIDENTIFIED SPEAKER:  What page, please?

16          MR. HAMMOND:  Page 345 line 25.

17          THE COURT:  What page was that?

18          MR. HAMMOND:  345, line 25.

19          THE COURT:  All right.

20  Q.   "Did you have any discussions with Mr. Frank about earlier

21  in that auction process on the 28th, as to whether Mr. Eckert

22  should be there, right?"

23  A.   Yes.

24  Q.   And Mr. Manzo responded, "We had discussions throughout

25  the auction.  Mr. Eckert was there for, you know, various

1  periods of time. And, you know, interchangeably, Mr. Eckert

2  would be there, Mr. Frank would be there. Mr. Frank was there

3  for virtually all of the auction except for a very narrow

4  window of time on the prior day, as I recall. But again, I

5  think the feeling was, to a great extent, the decision of the

6  winning bid was not something that in my view -- I will tell

7  you my view -- that Mr. Eckert and Mr. Frank should really

8  decide."

9  Q.  Do you see that?

10  A.  Yes.

11  Q.  He never said anything like that to you?

12  A.  If he did, I don't recall it. And I wasn't there at the

13  time he said it to Mr. Frank.

14  Q.  Well, Mr. Manzo wasn't the person selecting the winning

15  bid, right?

16  A.  Well, I believe there's a difference between selecting,

17  recommending and formally approving. And Mr. Manzo certainly

18  selected and recommended to Peter, and Peter accepted that.

19  Q.  Mr. Manzo couldn't approve the winning bid, right?

20  A.  No.

21  Q.  And Peter, standing by himself, couldn't approve the

22  winning bid without your consent to sign the APA later on,

23  right?

24  A.  Mr. Frank had been empowered by me to represent GSC. I

25  had told him that if there is any kind of complicated issue, it

1  didn't matter what time it was, he should call me.  I believe

2  that if -- could you ask me the last part again?

3  Q.   Mr. Eckert, the issue is, you provided authorization to

4  enter into the asset purchase agreement that would transfer the

5  assets of the debtors to Black Diamond, right?

6  A.   Yes.

7  Q.   And you approved that authorization at a board meeting

8  that was held at the end of October, right?

9  A.   Yes.

10  Q.   And if you objected to Mr. Frank's selection of the Black

11  Diamond bid, the bid couldn't have gone forward, right?

12  A.   Well, as Mr. Frank testified, we generally didn't get to

13  that point, because we worked it out between us.  But the

14  answer to your question is, it couldn't go forward without both

15  of our votes.

16  Q.   Now, Mr. Eckert, when did this board vote take place after

17  the auction?

18  A.   I don't remember.

19  Q.   Was it the morning of -- was it the 29th, or was it the

20  30th or 31st?

21  A.   I don't remember.

22  Q.   You know the auction closed at 4 a.m. on the 29th, right?

23  A.   I do.

24  Q.   Do you recall speaking with Mr. Manzo after that -- after

25  the auction closed?

1    A.   Not at 4 a.m.

2    Q.   Not at 4 a.m., but the next morning?

3    A.   I'm not sure whether it was the next morning or sometime

4    during the day or sometime the next day.

5    Q.   I want to go back to Mr. Manzo's transcript, okay?  And

6    this time I want to go to page 385.  Do you need me to assist

7    you with that, sir?

8    A.   No, I could do it.

9    Q.   Do you see at line 10 on page 385, I asked Mr. Manzo --

10   well, this is actually Mr. Stamato asking Mr. Manzo, "If we

11   could move on to page 27, specifically turn everyone's

12   attention to lines 9 to 13.  The question, 'Did Mr. Manzo tell

13   you'" -- he's reading your testimony now --

14   A.   Pardon me, you're at page 385?

15   Q.   385.

16   A.   What line?

17   Q.   Line 10.

18   A.   Thank you.

19   Q.   And to set the context, this is Mr. Stamato, your lawyer,

20   asking Mr. Manzo, your financial advisor, to comment on your

21   testimony that you provided on the December 14th, okay?

22   A.   Okay.

23   Q.   And the question began, "If we could move on to page 27,

24   specifically turn everyone's attention to lines 9 to 13.  The

25   question:  'Did Mr. Manzo tell you that when he saw the bid

1    from Black Diamond, a joint bid, he said wow, look at all the

2    assets these guys are getting for eleven million dollars?'.

3         "Mr. Eckert's response:  He did not.

4         "Did you have any reaction to that testimony, Mr. Manzo?"

5         Mr. Manzo responds, "Yeah, I called Mr. Eckert.  After

6    taking several hours of sleep on the 29th, we finished the

7    auction -- I think I got home 6 in the morning, called Mr.

8    Eckert later that morning when I woke, told him the winning

9    bidder, and told him that when he saw the bid, he would not

10   believe what the allocation of the assets were between the

11   agent and Black Diamond.  Neither one of us were surprised at

12   that.  We always assumed that would be the case."

13   Q.   Do you see that testimony?

14   A.   Yes.

15   Q.   Did you always assume it would be the case that the agent

16   and Black Diamond would misallocate value?

17   A.   I'm not sure what I'm talking about there; whether I'm

18   talking about what you just said, which I don't think at that

19   point I would have assumed that, or whether you're talking

20   about the significant size of the bid.

21        I knew that Mr. Deckoff wanted this -- wanted to buy this.

22   And it did not surprise me that he chose to bid what he did.

23   So I may have been referring to the allocation, but I don't

24   think so.

25   Q.   I wasn't asking whether you referred to the allocation.

1    This is what Mr. Manzo said he told you.  Okay?  Please read

2    it -- I'll read it again.  This is Mr. Manzo testifying:

3    "Yeah, I called Mr. Eckert.  After taking several hours of

4    sleep on the 29th, we finished the auction -- I think I got

5    home 6 in the morning, called Mr. Eckert later that morning

6    when I woke, told him the winning bidder, and told him that

7    when he saw the bid, he would not believe what the allocation

8    of the assets were between the agent and Black Diamond.

9    Neither one of us were surprised at that.  We always assumed

10   that would be the case."

11   A.   I don't remember that.

12   Q.   You don't remember Manzo calling you --

13   A.   I remember -- I now remember Manzo calling me.  What -- as

14   I testified before, I wasn't sure what day it was.  But I don't

15   recall a discussion about allocation.  But Mr. Manzo's memory

16   is significantly better than mine during this period of time.

17   Q.   So this was days before you approved the asset purchase

18   agreement, right?

19   A.   Days before -- yes.

20   Q.   So you knew when you approved the asset purchase

21   agreement, that there was a misallocation of the assets between

22   the agent and Black Diamond, right?

23           MR. STAMATO:  Objection, Your Honor.  I raised this

24   objection before on the use of the word "misallocation" --

25           THE COURT:  Just speak louder, please.

1     MR. STAMATO:  Objection, Your Honor.  I raised this

2  objection before on the use of the word "misallocation".

3     THE COURT:  All right.  Restate your question.

4  Q.   So you knew there was an issue with respect to the

5  allocation of the assets between the agent and Black Diamond at

6  the time that you authorized the execution of the asset

7  purchase agreement on October 31st, right?

8  A.   Yes.

9  Q.   But you decided not to consider that issue when

10  authorizing the execution of the asset purchase agreement,

11  right?

12  A.   Yes, after discussing it with Peter and our advisors, as

13  to whether we had a responsibility to do that.

14  Q.   You had a responsibility to do that?

15  A.   No.  That's what I was advised.

16  Q.   I'm sorry.  You didn't have a responsibility to consider

17  the allocation of assets.  Is that right?

18  A.   Correct.  That's what I believed at the time.

19  Q.   Do you believe --

20  A.   I believed that what we had to focus on was the value of

21  the bid.

22  Q.   -- do you believe something different now?

23  A.   No.  I believe that that was right.  I knew there was

24  another process available, if the allocation was deemed not to

25  be fair, that a state court could change it.  I also knew that

1  it couldn't be -- it couldn't go into effect without the

2  court -- the bankruptcy court approving it.

3  Q.   Well, is it a fair allocation of value between creditors

4  and a bidder?

5  A.   I'm sorry, I don't understand that question.

6  Q.   Well, you understand that under the joint bid that was

7  submitted, right --

8  A.   Yes.

9  Q.   -- Black Diamond, on behalf of itself as a bidder, was

10  going to be acquiring certain assets, right?

11  A.   Yes.

12  Q.   And you understood that the agent was combining with Black

13  Diamond to submit a credit bid, right?

14  A.   Yes.

15  Q.   And the agent was going to be acquiring assets on behalf

16  of creditors of the estate, right?

17  A.   Yes.

18  Q.   Okay.  And so, given that fact, did you consider whether

19  it was a fair allocation of value between a bidder and

20  creditors of the estate?

21  A.   No, I didn't think that was my responsibility.

22        MR. STAMATO:  Your Honor, I just want to impose an

23  objection.  This line of questioning is getting a little bit

24  cumulative.

25        THE COURT:  You're going to have to speak louder.  And

1    use actually right in front of --

2         MR. STAMATO:  Can you hear me now?  I'm sorry, Your

3    Honor.  I just said to continue an objection here, that this

4    line of questioning is becoming cumulative on the allocation

5    issue.

6         THE COURT:  No, I don't think it's cumulative.  At

7    this point, we're getting into what the debtor believes --

8    debtor's principal believed his obligations were.

9         MR. STAMATO:  Okay.

10        THE COURT:  Go ahead.

11   Q.   And sitting here today, do you believe the allocation of

12   value is fair to secured creditors?

13   A.   Do I personally believe it's fair?

14   Q.   Yes.

15   A.   Well, I believe that, as I understand the rules and laws

16   that relate to this, as I was advised in several discussions,

17   that legally, it's fine.  Whether or not it is fair, I don't

18   know what fair means in this context.  If I were involved in

19   this and I was one of the other lenders, I wouldn't be happy

20   with it.  But I don't think that means that it's not fair.

21   Q.   Can you turn to Exhibit 40, please?

22   A.   40?

23   Q.   Yes, sir.  Before I start talking about 40, you've been

24   involved with this company for a long time, right?

25   A.   I founded this company in 2000.

1  Q.   And you're a sophisticated financial executive, right?

2  A.   Yes.

3  Q.   So you have a good sense of value of this company, right?

4  A.   Yes.  Although this company, particularly now, there is a

5  pretty wide range of what one would say is fair.  One of the

6  reasons we looked at a 365 was that we thought that would be

7  the way to get the highest value from these assets, and we

8  thought if we tried to sell it as a whole, we'd get less.  So

9  there's two very big differences in "value".

10 Q.   Okay.  Before the auction was conducted, did you ever

11 receive a valuation of the company that would suggest that the

12 secured creditors would be paid in full?

13 A.   No.

14 Q.   And so, looking at Exhibit 40, this is actually your

15 financial advisor's valuation, right?

16 A.   Exhibit 40 begins with Article 9.  Oh, I'm sorry.

17          MR. HAMMOND:  May I approach, Your Honor?

18          THE COURT:  Go ahead.

19      (Pause)

20          THE WITNESS:  Okay, yes.

21 Q.   And you've seen Exhibit 40 before, right?

22 A.   I don't know.  If I've seen it, I haven't spent much time

23 studying it.  So I wouldn't say I haven't seen it, but I don't

24 remember seeing it.

25 Q.   You'd say your financial advisor kept you informed during

1  the course of the bankruptcy proceeding, right?

2  A.   Yes.

3  Q.   You had calls with him on a day-to-day basis, right?

4  A.   Yes.  Or even more frequently.

5  Q.   And you spoke with your counsel, right?

6  A.   Not as frequently, but yes.

7  Q.   They kept you abreast of what was going on, right?

8  A.   Most of the time.

9  Q.   All right.  And we actually talked about this document at

10 your deposition on December 14th.  Do you remember that?

11 A.   No.

12 Q.   So you have no knowledge as to whether this is your

13 financial advisor's valuation and breakdown of the assets that

14 would be acquired pursuant to a credit bid versus the assets

15 that would be acquired pursuant to a note-cash bid?

16 A.   Well, it says it is.  Capstone's value.

17 Q.   Capstone's your financial advisor?

18 A.   Yes, sir.

19 Q.   But you have no independent knowledge of this.  Is that

20 what you're saying?

21 A.   As I said, I wouldn't swear that I didn't see it, but I

22 don't remember seeing it.

23 Q.   Let's work off of this for a second.  Do you see in this

24 valuation --

25 A.   We're still on the same page?

1    Q.   Yes.

2    A.   Okay.

3    Q.   Under the credit bid, there's a 224 million dollar number.

4    Do you see that?

5    A.   Yes.

6    Q.   That's the amount of the credit bid, right?

7    A.   Yes.

8    Q.   It says "Capstone value, 11.6 million dollars."  Do you

9    see that?

10   A.   Yes.

11   Q.   And then on the other column it says "Note-cash bid",

12   right?

13   A.   Yes.

14   Q.   And that says "11 million dollars", right?

15   A.   Yes.

16   Q.   And that was the amount of the note-cash bid submitted by

17   Black Diamond at the auction, right?

18   A.   Yes.

19   Q.   And the value there is 126.6 million dollars, right?

20   A.   That's what it says.

21   Q.   Assuming that's the actual allocation, do you think that's

22   fair?

23   A.   I think that's fair.  I think, as I testified before, when

24   you asked me what fair means, I think if the process is

25   followed and each side of the people are sophisticated

1  financially to understand what they're doing, that fair is

2  in the -- it's sort of in the eye of the beholder.  So I don't

3  think this is unfair in a legal sense.  I don't think it's

4  unfair in the process of an auction.

5      Do I -- as I testified before, if I was a non -- if I was

6  an independent lender, a non-controlling lender, I wouldn't

7  like it.  Which doesn't mean it's not fair.

8          THE COURT:  Why would you like it if you were a lender

9  at all, whether you're a controlling or non-controlling?  What

10  do the lenders get from this?  Whether they're in a majority or

11  the minority, what does the facility receive, in your view?  Is

12  it fair?

13          THE WITNESS:  Well, Your Honor, if I understand your

14  question, they receive, in the aggregate, all of them receive

15  about 135 million dollars -- 138 here.  And as a whole, I

16  believe that's much more than fair.

17          THE COURT:  No, that's not what I was asking.  I'll

18  ask --

19          THE WITNESS:  I'm sorry.

20          THE COURT:  -- the question again.  If you accept

21  these figures, and these are the only figures you use to

22  determine fairness, the facility bids 224 million dollars in

23  credit bid and receives asset values of 11,681,570 dollars.

24  And the cash bidder bids 11 million dollars and receives assets

25  of 126,690,357.  My question to you is, do you think that is

1  fair from the standpoint of the secured creditor?

2  THE WITNESS:  May I ask you a clarifying question?

3  THE COURT:  Go ahead.

4  THE WITNESS:  When you use the term secured creditor,

5  are you referring to --

6  THE COURT:  I'm referring to the facility, the secured

7  credit facility.  You have merged, I think, in your mind, Black

8  Diamond and the secured creditor facility, in answering the

9  question considering Black Diamond separate and apart on one

10  hand, and then combined on another.

11  The bottom line is, the facility gets 224 million

12  dollars under this analysis, for approximately 11 and a half

13  million dollars worth of asset value.  Is that fair compared to

14  the cash bidder who bids 11 million and gets 126 million

15  dollars worth of value?

16  THE WITNESS:  Well, let's assume these valuations are

17  correct.

18  THE COURT:  That's where I started from.  Assuming

19  that they are correct, answering the question, do you think

20  it's fair?

21  THE WITNESS:  I think, as I testified a minute ago,

22  conditioned on no -- that the auction process was run fairly,

23  that the people bidding knew what could happen, I believe it's

24  not unfair.  However, if it was done in a way where it was not

25  an open process, I think it would be drastically unfair.

```
 1            THE COURT:  All right.
 2    BY MR. HAMMOND:
 3    Q.   You'd agree that this is a great result for Black Diamond,
 4    right?
 5    A.   Yes, sir.
 6    Q.   And you're going to go work for Black Diamond after this
 7    auction is over, if the sale is approved, right?
 8    A.   Yes.
 9    Q.   Mr. Eckert, I want to walk through the time line
10    concerning the amendment to the asset purchase agreement, okay?
11    A.   Okay.
12    Q.   Mr. Eckert, do you recall, after Thanksgiving or before
13    Thanksgiving, a dispute arose between the debtors and Black
14    Diamond, regarding who should get the cash that was generated
15    by certain funds during the gap between the time that the
16    auction concluded and the proposed sale was approved?
17    A.   Yes.
18    Q.   And the debtors took the position that the cash generated
19    during the gap period should belong to the debtors, right?
20    A.   Yes.
21    Q.   Black Diamond took the position that the cash generated
22    during the gap period should belong to Black Diamond, right?
23    A.   Yes.
24    Q.   This was a big dispute between the debtors and Black
25    Diamond, right?
```

1   A.   Yes.

2   Q.   And you thought Black Diamond would walk away from the

3   deal at that point in time, right?

4   A.   Did I think they could?  Yes.

5   Q.   And you recall negotiating that issue with Black Diamond,

6   right?

7   A.   Yes.

8   Q.   You and Mr. Frank both attended those negotiations, right?

9   A.   Yes, I think Mr. Frank was there the whole time.  I

10  believe it was Mr. Manzo and me and Mr. Frank most of the time.

11  Q.   Well, actually, Mr. Frank left during the later part of

12  this negotiating meeting you had in New York, right?

13  A.   The meeting was in New York.  I don't remember if he left.

14  Q.   You don't recall that it was you and Mr. Manzo who

15  finalized the negotiations?

16  A.   Yes.  I do recall it.  But it's not clear.

17  Q.   And you talked about the meeting that took place in New

18  York, and Mr. Goldfarb and Mr. Deckoff attended on the part of

19  Black Diamond, right?

20  A.   Yes.

21  Q.   And the meeting took place on the Tuesday or Wednesday

22  after Thanksgiving, right?

23  A.   I think so.

24  Q.   And you walked -- I'll try to be brief here.  But this

25  amendment was about a six million dollar issue, right?

1    A.   Yes.

2    Q.   And Black Diamond said the six million dollars should come

3    to me, and the debtors thought I should keep the six million

4    dollars, right?

5    A.   Yes.

6    Q.   And the dispute was ultimately settled, right?

7    A.   Yes.

8    Q.   And the resolution of the dispute was Black Diamond would

9    return about 5.2 million dollars of cash to the general partner

10   of Recovery Fund II, right?

11   A.   Yes.

12   Q.   And those are assets that are going to be acquired by

13   Black Diamond, the bidder, for 11 million dollars in cash,

14   right?

15   A.   Well, they're certainly in the mix of assets that are

16   going to be acquired by Black Diamond.

17   Q.   And in exchange, the debtors would get to keep about

18   800,000 dollars of carry, right?

19   A.   Yes.  And the debtors were able to sell our London oper --

20   our London office and operations to Black Diamond for a price

21   that was more than fair, because that office is simply fixtures

22   and furniture.

23   Q.   And that's in a U.K. entity, GSC Group Ltd., right?

24   A.   Yes.

25   Q.   And the amount of that sale was about 700,000 dollars,

1  right?

2  A.   Yes.

3  Q.   And in connection with that transaction, you'd sell to

4  Black Diamond the lease, an FSA license, furniture and

5  fixtures, TP&E, and the books and records of that entity,

6  right?

7  A.   My hesitation is, I'm not certain that the lease was in

8  the right to operate.  I believe that requires some fairly

9  English-like process for approval of that transfer.  But

10  otherwise, you're -- I agree with you.

11  Q.   And so, in any event, you negotiated with Black Diamond

12  during the first week after Thanksgiving, right?

13  A.   Yes.

14  Q.   But the agreement wasn't signed until December 3rd, right?

15  A.   I'm not sure.

16  Q.   Well, can you turn to Exhibit 80?

17  A.   I'm sorry, sir, I don't -- I only see 75.

18       MR. HAMMOND:  May I approach, Your Honor?

19       THE COURT:  Go ahead.

20       THE WITNESS:  Oh, it's after the -- I find it now.

21  I'm sorry.

22  Q.   And this is an e-mail -- Exhibit 80 is an e-mail from Bob

23  Manzo to you and Mr. Frank and some of Mr. Manzo's colleagues,

24  right?

25  A.   Yes.

1    Q.   It says, "Guys, see below.  We have no deal because they

2    are refusing to sign the APA amendment."  Do you see that?

3    A.   Yes.

4    Q.   And that e-mail is dated December 3rd, right?

5    A.   Yes.

6    Q.   And it's dated at 4 p.m., right?

7    A.   Yes.

8    Q.   And so, does this refresh your recollection that the asset

9    purchase agreement -- strike that -- the asset purchase

10   amendment wasn't executed until the evening of December 3rd?

11   A.   I remember that it was a somewhat contentious negotiation.

12   I remember that there was -- it took a while and that it was

13   signed -- and this is an expression -- in the nick of time, so

14   that we could go forward.  I do not remember the dates in this

15   time frame.

16   Q.   Well, in any event, to execute this amendment to the asset

17   purchase agreement, you had to have a board meeting, right?

18   A.   Yes.

19   Q.   And you had a board meeting, right?

20   A.   I'm sure we did, but I don't remember it.

21   Q.   And the two people who are on the board are you and Mr.

22   Frank, right?

23   A.   Correct.

24   Q.   And you authorized the execution of the amendment to the

25   asset purchase agreement, right?

1   A.   Yes, I did.  And I knew its provisions.

2   Q.   And so, as a result, you have this six million dollar

3   dispute, right?

4   A.   Yes.

5   Q.   5.2 million of that 6 goes to Black Diamond, right?

6   A.   Yes.

7   Q.   And then 800,000 goes to the debtors, right?

8   A.   Yes.

9   Q.   And then there's this transaction in which Black Diamond

10  pays another 700,000 dollars for certain of your assets in

11  London, right?

12  A.   Yes.

13  Q.   And those assets in London were excluded from the auction

14  in the first round, right?

15  A.   Yes.

16  Q.   Now, you started negotiating with Mr. Deckoff, an option

17  agreement on December 1st, right?

18  A.   I believe so.  It was either the 1st or the 2nd.

19  Q.   Okay.  But it was before the asset purchase agreement was

20  amended, right?

21  A.   Yes, it was.

22  Q.   Now, under the option agreement, you would agree to sell

23  Mr. Deckoff your two million dollar unsec -- an option on your

24  two million dollar unsecured claim and an option on forty-nine

25  percent of your equity interest in GSC Active Partners, right?

1   A.   Yes.

2   Q.   And that was the deal you were discussing with Mr. Deckoff

3   as of December 1st, right?

4   A.   You mean -- you're asking me if that's when I was

5   discussing the option deal?

6   Q.   Yes.

7   A.   I said I don't remember what day it was.  It was in that

8   time period, yes.

9   Q.   You know Mr. Manzo submitted a declaration in this case

10  discussing your option agreement, right?

11  A.   I saw that.

12  Q.   Yeah.  We covered it at your last deposition, right?

13  A.   Yes.

14  Q.   And that is located in your binder at Exhibit 41.  Maybe

15  that will help refresh your recollection as to what actually

16  happened.

17       (Pause)

18  A.   Second supplemental declaration of Robert Manzo?

19  Q.   Yes, sir.

20  A.   Okay.

21  Q.   And I'm going to start on paragraph 7.  If you want to

22  read more of it before that, feel free.

23  A.   You're starting on "Eckert agreement"?

24  Q.   Yes, sir.

25  A.   Okay.

1  Q.  It says, "On December 1st, 2010, I learned that Alfred C.

2  Eckert III, Mr. Eckert, the chief executive officer and

3  chairman of GSC, and Steve Deckoff, principal of Black Diamond

4  Capital Management, LLC, were having discussions regarding a

5  scenario in which Black Diamond would purchase:  1) Mr.

6  Eckert's scheduled pre-petition claim against the debtors for

7  Mr. Eckert's unpaid 2008 bonus, and 2) an option to buy forty-

8  nine percent of Mr. Eckert's equity in GSC Active Partners."

9      Do you see that?

10 A.  Yes.

11 Q.  Does that refresh your recollection that you began

12 negotiations with Mr. Deckoff regarding an option agreement as

13 early as December 1st?

14 A.  No.  But if Mr. Manzo said I did, I'm sure I did.  I don't

15 remember what day it was.

16 Q.  His memory is better than yours, right?

17 A.  Yes, it certainly is.

18 Q.  Do you recall talking to Mr. Manzo about the option

19 agreement?

20 A.  Yes.

21 Q.  And at this point in time, on December 1st, you were told

22 by Mr. Manzo, do not do anything with respect to that option

23 agreement, right?

24 A.  Yes.

25 Q.  And Mr. Manzo wanted to notify Kaye Scholer, right?  I'm

1   sorry, let me put that aside.

2       And at this point in time, Mr. Manzo wanted to consult

3   with Kaye Scholer, right?

4   A.   I believe so.

5   Q.   Did he tell you that he was going to do that?

6   A.   I don't remember.

7   Q.   On the last sentence in paragraph 7 it reads, "I informed

8   Mr. Eckert that he should not do anything further with respect

9   to this issue without first informing Kaye Scholer LLP to

10  solicit their advice."

11      Do you see that?

12  A.   Yes, I do.

13  Q.   Do you have any reason to believe that's not true?

14  A.   That he didn't say that to me?

15  Q.   Yes, sir.

16  A.   No, I believe he said that to me.

17  Q.   And then shortly thereafter, Mr. Manzo called you back,

18  right?

19  A.   I think so.

20  Q.   And when Mr. Manzo called you back, he told you that he

21  had spoken with Mr. Solow, right?

22  A.   Yes.

23  Q.   Mr. Solow is your bankruptcy counsel, right?

24  A.   Yes, he is.

25  Q.   And Mr. Manzo relayed the following comments: One, neither

1    Kaye Scholer or nor Capstone represents Mr. Eckert.  Do you see

2    that?

3    A.    Yes.

4    Q.    Do you recall Mr. Manzo telling you that on December 1st?

5    A.    I don't remember what day it was.  I remember that Mr.

6    Manzo told me that.

7    Q.    Two; the proposal made by Mr. Deckoff was an issue solely

8    between Mr. Eckert and Mr. Deckoff.  Do you recall Mr. Manzo

9    telling you that, on December 1st?

10   A.    Again, I remember him telling me.  I could not swear it

11   was December 1st.

12   Q.    Three; it was Mr. Eckert's right to sell his claim or

13   equity, but such actions could have a negative impact on a;

14   GSC's proposed asset sale, and b; Mr. Eckert's settlement

15   agreement with GSC, both of which are pending before this Court

16   for approval.  Do you see that?

17   A.    Yes.

18   Q.    Do you recall Mr. Manzo telling you that, on December 1st?

19   A.    Same answer.

20   Q.    And four; did Mr. Manzo tell you, the best thing for the

21   debtors' estates would be for Mr. Eckert to wait until the

22   current sale process was completed, before entertaining further

23   discussions on this issue with Mr. Deckoff?

24   A.    Um, my recollection of that conversation now, is that he

25   certainly told me it was a bad idea, and he certainly told me

1    Kaye Schol -- Kaye Scholer thought it was a bad idea, and he

2    emphasized that it wasn't wrong per se, but that I was doing it

3    at a time that could be -- that could mess up the process of

4    this bankruptcy.  I don't recall him ever saying that the

5    transaction itself would hurt GSC.  He was making a comment, as

6    I heard him, about the process being more difficult and -- so I

7    had to weigh that against other factors, which I did.

8    Q.   Okay.  And so you don't recall Mr. Manzo specifically

9    telling you that this transaction could be injurious to GSC,

10   right?

11   A.   Well, I just said what I -- were telling me.  That it

12   would hurt the process.  He didn't -- I do not remember him

13   saying to me, this will stop the sale.  I do not believe he

14   said that to me.

15   Q.   He never told you this could blow up the sale transaction?

16   A.   I don't recall that he did.  What he said is what I

17   testified to a couple of minutes ago.

18   Q.   And you thought if it just hurt the process, then it's

19   okay, right?

20   A.   Well, not in its -- not -- not alone.  It has the other

21   part of it.  The other part of it is, in my experience in

22   dozens and dozens of merchant transactions, I know that when a

23   buyer finds out that he has perhaps overpaid, he looks for ways

24   to fix that.  I had a conversation with Mr. Deckoff, and I

25   think I had conver -- I had several conversations with Mr.

1  Goldfarb.  I felt very, very strongly that they were telling

2  me, that if this wasn't done, they would not go forward to buy

3  GSC.  I think that would have been a disaster.  So I was

4  trading off buying an option that he offered to me, which

5  anybody with financial sophistication looked at, they would

6  think I bought -- that Mr. Deckoff got a great deal.  I didn't

7  dispute that.  It was worth it to me to buy an option that no

8  one said was illegal -- it was a private transaction, and it

9  was below market.  Because I felt that that would induce Mr.

10  Deckoff to close this deal.  It's a business judgment.  I may

11  or may not have been wrong.

12  Q.    You wanted to induce Mr. Deckoff to close this deal,

13  right?

14  A.    Yes.

15  Q.    That's why you entered into the option agreement, right?

16  A.    Yes.

17  Q.    Why did you take a 500,000 payment in that regard?  Why

18  didn't you just give it to him?

19  A.    Give it to him?

20  Q.    Yes.

21  A.    Well, it was my property, and I thought that I'd try to

22  sell it -- I don't feel bad about being paid for my property.

23  In fact, I was paid less than the market.  And so, the timing

24  of when I take it has a very little -- has very little impact

25  on the value.  And so, my negotiation with him was, look, if

1  you want it this way, I want to take some of the risk out.  And

2  the way you could do that is give me 500,000 at the closing of

3  this transaction.

4       As I recall, Mr. Deckoff said okay, that's a fair trade.

5  And then he said, of course I'm taking a risk, because it might

6  not -- he may never get it.  And I said, well, when you write

7  an option like this, you got to take some risk.  And he agreed,

8  and I still believe that I increased the probability that this

9  deal would close, with Black Diamond.

10  Q.   Well, let's -- there's a couple different pieces in there,

11  Mr. Eckert, but let's talk about the deal closing with Black

12  Diamond -- is getting Black Diamonds signature on the asset

13  purchase agreement, right?

14  A.   Yes.

15  Q.   That's the only risk of blowing up this transaction,

16  right?

17  A.   I don't think so.  I think if -- that Black Diamond can

18  pull out of this, by paying a fee of two and a half million

19  dollars.

20  Q.   You think -- you just saw the allocation of assets, didn't

21  you?

22  A.   Yes.

23  Q.   You think Black Diamond's going to walk away from this

24  deal for three and a half million dollars, when they're getting

25  126 million dollars for an 11 million dollar cash and note bid?

1    A.    I didn't want to take the risk of that, when all I was

2    doing was nothing that hurt GSC.  In fact, there's no way it

3    can be said that it hurt GSC.  It was me giving some value to

4    Black Diamond voluntarily, because I heard from them, several

5    times, that this was extremely important to them, and they --

6    they didn't use these words, but I'm old enough to know what

7    someone's saying.  When they say how important it is to them,

8    and I thought, look; I don't want to take the risk, and it's my

9    money.  I didn't use any of GSC's money.

10   Q.    So it's your money and you gave it to them, right?

11   A.    I gave -- I didn't give it to him.  I sold him an option

12   on something, and -- at a bit of a bargain price.

13   Q.    And was there any doubt they wouldn't have closed, but for

14   this option agreement?

15   A.    I didn't want to take the risk.  Yeah, there was some --

16   there was some doubt.  And I wasn't using any of the estates

17   assets for this.  I was personally doing this.

18   Q.    You wouldn't have done this diff -- the option is a

19   500,000 dollar payment up front and 1.5 million dollars if they

20   elect to purchase your unsecured claim and your equity

21   interest, right?  That's how it's structured?

22   A.    Correct.

23   Q.    You would not have done this deal for a million dollars,

24   right?

25   A.    To pay him a million dollars up front?  What do you mean?

1   Q.   I'm saying -- say it was 500,000 and a 500,000 dollar

2   exercise price.  You wouldn't have done that deal, right?

3   A.   Um, if that's what Mr. Deckoff had asked me to do, I would

4   have begun negotiating with him.

5   Q.   Well, what --

6   A.   I would have told him, that's not fair.

7   Q.   Well, let's go to your transcript, okay?

8   A.   Okay.  My transcript.

9           THE COURT:  How much longer do you think your

10  examination will take?

11          MR. HAMMOND:  Maybe ten minutes, Your Honor?

12          THE COURT:  At the conclusion of the -- this

13  examination, we'll take a break before the cross examination.

14          THE WITNESS:  I'm sorry, what page did you ask me

15  about?

16  BY MR. HAMMOND:

17  Q.   I'm looking right now, I apologize.

18          UNIDENTIFIED SPEAKER:  Your Honor, may I approach the

19  dais?  He looks like he could use a Coke.

20          THE WITNESS:  Oh, water.  I thought it was

21  prohibited -- drinking a coke.

22          THE COURT:  It is water -- there's water in that

23  pitcher right there.

24          THE WITNESS:  I'm sorry.

25          THE COURT:  All right.

1    BY MR. HAMMOND:

2    Q.   All right.  On page 35 of your deposition transcript,

3    which you revised on December 14th, do you remember -- I

4    deposed you?

5    A.   Wait a minute.  35.

6    Q.   See that?  Okay.

7    A.   Yes.

8    Q.   Let's start with line 8 -- line 6.  "Was there any

9    analysis done to value that 500,000 dollar option price?

10        "Answer:  Not by me.  I didn't think I needed to analyze

11   it.  I know the values of securities pretty clearly.  It was

12   for Mr. Deckoff to decide if it was what he wanted to do."

13   A.   Pardon me.  You're on page 36?

14   Q.   35, sir.

15   A.   I'm sorry.  35.  And about on line 6?

16   Q.   Yep.  And the next question is, "What if he said --"

17        Are you there?

18   A.   After not yet, it's and yet, they've paid you a million

19   and a half dollars already.

20   Q.   Let me read the question.  I asked you, "What if he said

21   I'm only going to give you one million dollars.  Would you

22   still have done the deal?"

23        And you say, "Yeah, probably."

24        And I say, "What if he said just give it to me?"

25        And you say, "Wait a minute, give me one million dollars

1    total and leave two on the table?"

2         "Yes.

3         "No, I would not have done that."

4    Q.   Do you see that?

5    A.   Yes.

6    Q.   Was that truthful testimony, when you gave it?

7    A.   Yes.

8    Q.   So you wouldn't have done the deal for -- for a million

9    dollars.

10   A.   For a million dollars?

11   Q.   Yeah.

12   A.   No.  I don't think so.  As I said a minute ago, I would

13   have gone back to Mr. Deckoff and asked him what else he'd give

14   me.  I mean, there's a lot of things you can do to restructure

15   an option.

16   Q.   Did you get any fairness opinions on this transaction with

17   Mr. Deckoff?

18   A.   No.  I don't know why I would have.  It's a private

19   transaction.

20   Q.   Did you get any legal --

21   A.   Mr. Deckoff is extremely sophisticated, and I'm reasonably

22   sophisticated.

23   Q.   Did you get any legal opinions on the transaction?

24   A.   I spoke to my personal lawyer, who said he saw no reason

25   that it was illegal; he certainly had a -- part -- he agreed

1    with those who said my timing wasn't ideal.

2    Q.   And did he say to you that you're likely to recover on

3    your secured claims?

4         THE COURT:  Counsel -- one second.  Don't turn away

5    from the microphone.

6    Q.   Sorry.  Did he say to you, you're unlikely to -- strike

7    that.

8         Did he tell you, or give you an opinion on whether you

9    would recover on your two million dollars of unsecured claims

10   against the estate?

11   A.   Did my personal lawyer?

12   Q.   Yes.

13   A.   No.  He has not been involved with this process to that

14   extent.

15   Q.   Did he give you any advice as to whether -- you know, what

16   the value of the GSC active partners thought, that you were

17   providing an option under Mr. Deckoff, was worth?

18   A.   Did my attorney?

19   Q.   Yes.

20   A.   I don't have the hab -- I don't have the habit of asking

21   my attorney questions that are -- that I -- investment banking

22   type questions, evaluation questions, for which I've had a long

23   experience.

24   Q.   And at that point in time, you hadn't received Mr. Manzo's

25   recovery analysis, right?  At the time that you executed this

1  option agreement?

2  A.   I hadn't seen -- as I testified last time, I can't sit

3  here and swear I did not have it.  What I told you then and

4  I'll tell you now is, I do not have any recollection of seeing

5  it.

6  Q.   And at that point in time, you're not aware of an

7  evaluation that was done, to the likely recovery of preferred

8  stock, right?

9  A.   No, I do not.

10  Q.   And at that point in time, you hadn't discussed with Mr.

11  Manzo the potential order of magnitude of the recovery of the

12  preferred, right?

13  A.   I'm sorry, would you repeat that?

14  Q.   Strike that.  Let's just move on.

15       Now, it's true that Mr. Deckoff tied the option agreement

16  to completing the sale as before the Court, right?

17  A.   I -- is this directed at me?

18  Q.   Yes, sir.

19  A.   Is it true that he signed the option agreement before

20  what?  Please repeat it.

21  Q.   I apologize, sir.

22  A.   I couldn't --

23  Q.   It is true that Mr. Deckoff tied the option agreement to

24  completing the sale, right?

25  A.   He did.

1  Q.  And you didn't want to take that chance, right?

2  A.  I did not.

3  Q.  So you spoke --

4  A.  For something that was -- in my own -- it was my money.

5  I'm not a fiduciary of my own money.

6  Q.  And -- but you are a fiduciary to the estate, right?

7  A.  Absolutely.

8  Q.  And if your con -- your personal conduct blew up this

9  deal, right --

10  A.  Yes?

11  Q.  -- that would be a problem, right?

12  A.  Yes.  I made a valid --

13  Q.  Now --

14  A.  I made a valid -- I made a business judgment.  Perhaps I

15  was too risk averse.  But I made a business judgment, in good

16  faith.

17  Q.  Now, you spoke with Mr. Manzo again, on December 2nd,

18  right?  Do you recall that?

19  A.  December 2nd -- I guess that was Tuesday.

20  Q.  If you look at paragraph 9 of Exhibit 41, maybe that will

21  help.

22  A.  In my deposition?

23  Q.  No, in Exhibit 41, sir.

24  A.  Okay.

25  Q.  Page 3, paragraph 9.

1    A.   Yes, I'm reading the carryover page.  I remember that.

2    Q.   Okay.

3    A.   That's true.

4    Q.   And when he called you on December 2nd, he told you not to

5    execute the option agreement, right?

6    A.   Well, Mr. Manzo does not have the habit of ordering me

7    around.  He told me it was a very bad idea.

8    Q.   And Mr. Manzo -- and by December 2nd, you had consulted

9    with Mr. Furey, your personal counsel, right?

10   A.   Yes.

11   Q.   Now, did you speak -- the asset purchase agreement we just

12   discussed, wasn't executed until the evening of December 4th --

13   3rd, right?

14   A.   I don't remember the date, as I said before.

15   Q.   But we saw that e-mail that's listed as Exhibit 80, where

16   you got an e-mail from Mr. Manzo at four o'clock that said it

17   hasn't been executed yet, right?

18   A.   I'm not disputing it, I just -- that I don't personally

19   remember.

20   Q.   Got it.

21        Now, at this point in time, did Mr. Manzo tell you that

22   this option agreement could blow up the proposed sale

23   transaction?

24   A.   I don't remember him using those words.  I know he thought

25   it was a bad idea.  I know he thought it would have an adverse

1    impact on the process, and I -- he knew by, if -- he knew that

2    if I did it, why I was going to do it.

3    Q.   Can we turn to page 390 of Mr. Manzo's deposition for a

4    moment?

5    A.   Yeah.

6         Yes?

7    Q.   On page 390, I'm sorry -- at line -- right after the

8    woefully inaccurate line, line 19?  This is, again, Mr. Stamato

9    questioning Mr. Manzo.

10        "Question: Your advis --" This is reading your testimony.

11        "Question:  Your advisors to you that your signing the

12   agreement would jeopardize the transaction."

13        "Mr. Eckert responds, "Compromise the process?  I asked

14   directly which risk is worse.  They did not use the same words

15   that indicated it would blow up the deal.  They just didn't."

16   Did you have any reaction to that testimony, Mr. Manzo?

17        "Answer:  The discussions I had with Mr. Eckert, from the

18   first time he told me, through that Friday, including up to

19   that Saturday morning, I believe the 4th, was that it would

20   absolutely have a material -- could have a material impact on

21   the transaction.

22        "I actually think I used the word blow up.  Could blow up

23   the transaction.  In my opinion, he was well aware, through my

24   discussions with him as well as Mr. Solow's, that this was a

25   significant event, which could absolutely jeopardize the

1    closing of the transaction.  Not compromise, solely;

2    jeopardize."

3    Q.   Do you see that?

4    A.   Yes.

5    Q.   Does that refresh your recollection about what Mr. Manzo

6    told to you about the -- said to you about the option

7    agreement?

8    A.   Not at all.  All I remember is that I knew Bob thought I

9    was making a mistake.  That's -- I'm sorry, that's all I

10   remember.  I'm certainly not disputing Mr. Manzo's reluc --

11   recollection of what he told me.

12   Q.   And you spoke with Mr. Manzo again on Saturday morning,

13   right?

14   A.   Saturday morning?

15   Q.   December 4th, right?  Two days before the sale hearing.

16   A.   I don't know.

17   Q.   You don't recall?

18   A.   I don't.

19   Q.   Okay.

20   A.   I don't recall.

21          THE COURT:  Counsel, finish up your questioning.

22          MR. HAMMOND:  Yes, Your Honor.

23   Q.   At this point in time, you were getting repeated phone

24   calls from Black Diamond, right?

25   A.   By this point in time, you're referring to Saturday and

1  Sunday?

2  Q.   Yes.

3  A.   Yes.

4  Q.   Saturday.

5  A.   More on Sunday, I think, but yes.

6  Q.   Sun --

7  A.   Saturday and Sunday.

8  Q.   You signed it on Saturday, right?

9  A.   I'm sorry; I don't remember much about the dates.  I

10  don't -- I won't dispute that it was Saturday.  I thought it

11  was Sunday.  And I know that the Black Diamond people were

12  very, very concerned, that -- and pressed me hard to get inside

13  and get them a copy.  Whether that was Saturday or Sunday, I

14  don't remember.

15  Q.   All right.  And Mr. Goldfarb, Mr. Deckoffs lawyer, called

16  you four or five times and said where is that signature page,

17  right?

18  A.   Well, he said it more politely than that, but yes.

19  Q.   And notwithstanding the fact that your bankruptcy advisors

20  told you not to do it, you executed the option agreement

21  anyways, right?

22  A.   I did.  And I testified twice I think, already, why I did

23  it.

24  Q.   And -- I have a few questions here.  You understood when

25  you signed the option agreement, that you had to disclose it,

1  right?

2  A.   Yes.

3  Q.   And when you -- when you executed the option agreement,

4  you told Mr. Manzo, right?

5  A.   Not then.  I didn't tell him until after the period of the

6  6th.  I told him -- he came over to the Ritz Carlton where I

7  was waiting -- I was not in this room, and I told him.  And he

8  had learned from someone else, and he asked me point-blank if I

9  did it.  I said, yes I did it.

10  Q.   You told him --

11  A.   And he was not happy.

12  Q.   And you told Mr. Frank on Sunday that you executed the

13  option agreement, right?

14  A.   I don't remember whether it was Sunday or not.

15  Q.   You were sitting here in the courtroom today and you heard

16  him testify, right?

17  A.   I would not dispute his testimony.

18  Q.   And with respect to Mr. Manzo, can you turn to page 45,

19  lines 6-9?

20  A.   Is there another book?  Because this one starts at 200.

21        THE COURT:  Go ahead.

22  A.   Those are mine.

23  Q.   Those are yours?

24  A.   Yes they are.  Oh, you want mine.  I'm sorry.

25  Q.   It's the December 14th --

1    A.   Is it the first?  Yeah -- it's the first.  Page 45?

2    Q.   Page 45, sir.

3    A.   Okay.  Okay.

4    Q.   And I asked you, sir, at lines 6, "As soon as you signed

5    it, you told Mr. Manzo, right?"

6        And you answer, "I told him, yes.  As soon as it was --

7    soon after.

8        "Well, it's important, which date it was.  Did you tell

9    him on the weekend, or did you tell him on Monday?

10       "Oh, I told him on the weekend.

11       "Where he says it happened on December 6th -- December 6th

12    was a Monday, that would be incorrect, right?

13       "Yeah.  No, I told him before that.

14    A.   Pardon me.  Are you reading on page 45?

15    Q.   Yes, sir.  Of the December 14th transcript.

16    A.   That's the September 14th.  Sorry.

17    Q.   Again, on that line 6 --

18    A.   Yes?

19    Q.   -- I asked you, "As soon as you signed it, you told Mr.

20    Manzo, right?

21       "I told him, yes.  As soon -- it was soon after.

22       "Well, it's important, which date it was.  Did you tell

23    him on the weekend, or did you tell him on Monday?

24       "Oh, I told him on the weekend.

25       "Where he says it happened on Monday -- December 6th was a

1    Monday, that would be incorrect, right?

2        "Yeah.  I told him before that.

3        "He says here that Peter Frank told him.  That's not

4    right, is it?

5        "I don't know what Peter Frank told him on the 6th, but I

6    had told him before that."

7    Q.   Do you see that --

8    A.   Yes.

9    Q.   -- testimony?

10   A.   Yes.  That testimony is wrong.  Completely wrong.  I was

11   very confused then, about the events of that weekend.  And I

12   will tell you now, I believe strongly that Mr. Manzo was

13   correct, and that I saw -- when I saw him in the restaurant of

14   the Ritz Carlton, I confirmed that I had.

15   Q.   I just have a few more questions, Mr. Frank (sic), about

16   the option agreement.

17       THE COURT:  All right, let's speed it up.  You're now

18   into this nearly two hours, with an hour estimate.

19       MR. HAMMOND:  I apologize, Your Honor.

20       THE WITNESS:  You said -- you said Mr. Frank.  Do you

21   mean me?

22       MR. HAMMOND:  I'm sorry, Mr. Eckert, yes.

23       THE WITNESS:  All right.

24   Q.   Now, you're -- you assumed that this is a good -- option

25   agreement's a good deal for Black Diamond, right?

1    A.    For Black Diamond?

2    Q.    Yes.

3    A.    Yes.

4    Q.    That assumption is based on the fact that claim -- the

5    unsec -- the two million dollar unsecured claim is allowed,

6    right?

7    A.    Yes.

8    Q.    And it's based on the assumption that preferred stock has

9    value, right?

10   A.    Some -- has some value.  It may well be an out of the

11   money option, but it's got -- it's got value.

12   Q.    Okay.  Unsecured claims could be disallowed, right?

13   A.    Yep.

14   Q.    Creditors could object to your 2008 bonus, right?

15   A.    They could.

16   Q.    And you know, at this point in the process, that the non-

17   controlling lenders would probably object, right?

18   A.    The what?

19   Q.    The non-controlling lenders?

20   A.    I'm sure they would, but I'm -- I'm positive that I --

21   that before I considered exercising this, they would all have

22   been paid off.

23   Q.    And so, as we discussed, if your claims are disallowed,

24   they're valueless, right?

25   A.    Yes.

1    Q.    Now --

2    A.    I misspoke.  I said I would exercise it.  It's their

3    decision to exercise it, not mine.

4    Q.    And the preferred stock, let's talk about that for a

5    minute.  At the time you executed the option agreement, you

6    didn't know if the preferred stock had value, right?

7    A.    I still don't.

8    Q.    And you hadn't spoken to Mr. Manzo about the recovery

9    analysis that he performed with respect to the preferred stock,

10   right?

11   A.    I don't know.  I might have had some -- Mr. Manzo and I

12   frequently talked about how the -- what we called the waterfall

13   analysis, would really work, because of the com -- the complex

14   nature of the structure of GSC.

15   Q.    And this assumes -- the last piece of this is -- this also

16   assumes that your preferred -- your claim is based on your

17   preferred interests -- could also be disallowed, right?

18   A.    I would think that would be unlikely.

19   Q.    Okay.  But you don't --

20   A.    Because it would have meant that all the debt was paid

21   off.

22   Q.    All right.  And then, the third thing I wanted to mention

23   is, you knew at this point in time that you had executed the

24   option agreement, that the non-controlling lenders were

25   objectant to the sale, right?

1    A.   Yes.

2    Q.   And if the sale transaction wasn't approved -- strike

3    that.

4         MR. HAMMOND:  Your Honor, I have no further questions

5    at this time.

6         THE COURT:  We'll take a recess until 4:15.

7         (Recess from 4:04 p.m. to 4:19 p.m.)

8         THE CLERK:  Your Honor -- please be seated.

9         THE COURT:  Are you ready -- you want to go forward,

10   Mr. Eckert?

11        THE WITNESS:  Yes, I am.

12        THE COURT:  All right.

13   CROSS EXAMINATION

14   BY MR. STAMATO:

15   Q.   Good afternoon, Mr. Eckert.  For the record again, Tony

16   Stamato, on behalf of the debtors.

17        Mr. Eckert, going back to the very early part of your

18   direct exam, when Mr. Hammond was talking with you about Mr.

19   Deckoffs initial approach to you, was it your understanding

20   that Mr. Deckoff wanted you involved, in connection with the

21   potential Black Diamond acquisition, in the event Black Diamond

22   acquired the assets of the company?

23   A.   Yes.

24   Q.   And was it your understanding, at the time these

25   discussions first started, that Black Diamond was contemplating

1    acquiring the assets in a Bankruptcy Court supervised asset

2    sale?

3    A.    No.

4    Q.    Okay.  When you refer to the auction process, what were

5    you talking about, in those e-mails with Mr. Deckoff?

6    A.    Well, generally, whether it's a 363 or not, companies are

7    sold at auctions, unless somebody comes in with a 'take it now

8    or leave it' and some mass -- it's a monster number.

9    Q.    And at some point in time, did you come to understand that

10   this was a matter that was going to go to a bankruptcy related

11   sale?

12   A.    Did Steve understand?

13   Q.    Did you?

14   A.    Well, I had been working with the bank lenders for a year

15   and a half, and three deals were proposed, and they -- pulled

16   by the banks a day or two before we were going to do.  So I was

17   pretty pess -- pessimistic, I guess, about what was going to

18   happen.

19        But it was my strategy, and Peter's, that we were going to

20   go all the way.  Because -- we were going to do it.  And -- so,

21   I wouldn't say I didn't think of bankruptcy, but I was trying

22   like hell to avoid it.

23   Q.    Was there any discussion with Black Diamond

24   representatives about a potential stalking-horse bid?

25   A.    Well, not with me.

1    Q.    Were you aware of any discussion between Black Diamond and

2    representatives of the company about a stalking-horse bid?

3    A.    I believe they talked to Mr. Manzo, but I'm not positive.

4    Q.    Do you recall if Black Diamond ever submitted a proposal

5    that contemplated a stalking-horse bid?

6    A.    In writing?

7    Q.    In writing.

8    A.    I don't know.  I never saw one.

9    Q.    Mr. Eckert, do you remember the e-mail about the request

10   that you made to Mr. Deckoff to use the plane to go to the

11   Packers game?

12   A.    Yes.

13   Q.    You didn't go on his plane to the Packers game, did you?

14   A.    No.

15   Q.    And didn't you offer to pay the direct expenses associated

16   with that flight, in that e-mail?

17   A.    Of course.

18   Q.    How long have you known Peter Frank?

19   A.    Since 1973.

20   Q.    What is his role at GSC?

21   A.    Peter is the Chief -- effectively the Chief Operating

22   Officer.  He runs the business.  He runs the operations.  He

23   runs the trading.  He works on this -- he has investor

24   relations report to him.  And because of his unique background

25   in actually managing the company, which most financiers like us

1   don't know the first thing about -- we use him when we buy

2   companies.  He goes on the board, and he assesses what we need

3   to do.

4   Q.   And is he -- does he hold the title of President of GSC

5   Group, Inc?

6   A.   He does.

7   Q.   Do you and Mr. Frank discuss GSC Group, Inc. business

8   decisions together?

9   A.   Constantly.

10  Q.   Have you ever had any disagreements with Mr. Frank on a

11  particular business matter?

12  A.   Sure.

13  Q.   Have you ever had any disagreements with Mr. Frank on

14  matters that are decided by the GSC board of directors?

15  A.   Yes.

16  Q.   Has there ever been a deadlock?

17  A.   No.

18  Q.   Now, you testified earlier that you were in attendance, on

19  certain days, at the auction of the debtors' assets, correct?

20  A.   Could you repeat that, sir?

21  Q.   Sure.  I mean, it's probably a bad question.  I believe

22  you testified earlier that you were present for some portions

23  of the auction of the debtors' assets, that was held in

24  October?

25  A.   Yes, I was.  For a portion of it.

1    Q.   And at some point in time, did you discuss the bid that

2    was chosen as the winning bid, with Peter Frank?

3    A.   Well -- after it -- after he had said it was gonna happen,

4    yes.

5    Q.   And did you and Peter discuss whether you should advise

6    your attorneys to go ahead and file the motion to approve that

7    asset sale?  The asset sale as contemplated by the bid at the

8    auction?

9    A.   I don't remember.

10   Q.   Okay.  Did you have any meeting with Peter and your

11   advisors after the auction, in person or on telephone?

12   A.   I believe so, but I don't know what day it was.

13   Q.   Okay.  We heard some testimony from you about the option

14   agreement.  Is it your belief that the option agreement only

15   involves your personal property interest?

16   A.   Yes.

17   Q.   Does the option agreement create any obligations on the

18   part of the debtors' estates?

19   A.   No.

20   Q.   Do you believe that the option agreement compromised your

21   fiduciary duties to the debtors' estates in any way?

22   A.   No.

23   Q.   And you were represented by your own personal counsel --

24   A.   Yes.

25   Q.   -- in connection with the option agreement?

1    A.    Excuse me.  Yes.

2    Q.    We also heard some testimony from you about the consulting

3    agreement that you entered into?

4    A.    Yes.

5    Q.    Do you believe that the consulting agreement has

6    compromised your fiduciary responsibilities in any way, in

7    connection with these cases?

8    A.    No.

9    Q.    And do you believe that the price that you're being paid,

10   under that consulting agreement, is at fair market value, based

11   on your experience?

12   A.    The price --

13   Q.    The salary.

14   A.    It's not market for someone like me.

15   Q.    Is it below market?

16   A.    Yes.

17   Q.    And that's based on your experience in the industry?

18   A.    Yes.  I work -- I know Goldman Sachs' structure, and I

19   know the various private equity firms, and what they pay.

20   Q.    Okay, Mr. Eckert, I appreciate your time today.  I don't

21   have anything further for you.  I hope you're feeling --

22   A.    Thank you very much.

23         THE COURT:  Anyone else?

24         MR. BACON:  No questions.

25         THE COURT:  All right.

1          MR. SHORE:  One minute, Your Honor, just to talk?

2     REDIRECT EXAMINATION

3     BY MR. HAMMOND:

4     Q.   Mr. Eckert, I just have probably three or four questions.

5     A.   All right.

6     Q.   We were talking about the consulting agreement being

7     market, right?

8     A.   We were talking about whether it's market?

9     Q.   Right.

10    A.   Yes.

11    Q.   If Black Diamond didn't close the transaction, do you know

12    whether anyone else would have paid you three million dollars

13    to do nothing?

14    A.   Well, in the way -- I think there are other people who

15    would writ -- who would write a contract like that.  Probably

16    shorter and more per year, that would allow me to do less than

17    full time.  So, I doubt anyone else would do what -- what he

18    did.  And I think, as Mr. Deckoff has told me, that he assumes

19    that I'm not the kind of guy that is going to sit out in New

20    Jersey, and that I'll be working in, you know, a few weeks.

21    And he's probably right.

22         MR. HAMMOND:  No further questions, Your Honor.

23         THE COURT:  All right.  Any re-cross on the follow-up

24    direct?

25         MR. STAMATO:  No, Your Honor.

1      THE COURT:  All right.  You may step down.  Thank you.

2      UNIDENTIFIED SPEAKER:  Okay, I'll take the warning.

3      THE COURT:  All right, take your time.

4      All right, who is -- I know from the agenda who's

5  supposed to be the next witness, but who is handling that --

6      MR. SHORE:  Mr. Deckoff.

7      THE COURT:  -- calling that witness?

8      MR. SHORE:  Mr. Deckoff, please.

9      THE COURT:  All right.  Come forward, please, Mr.

10  Deckoff.

11      (Witness duly sworn)

12  DIRECT EXAMINATION

13  BY MR. SHORE:

14  Q.   Good afternoon, Mr. Deckoff.  I'm Chris Shore from White &

15  Case, for the non-controlling lenders.  Sorry to keep you here

16  all day.  I'll try to be brief and I'm going to try to skip a

17  lot of things that other people have covered, and just focus on

18  the things that we don't know about Black Diamond yet.

19      First of all, for the period of time prior to owning

20  the majority stake of the pre-petition loan, Black Diamond

21  actually owned about a ten percent piece, right?

22  A.   That varied over time.  We did a very small amount when

23  the deal was first done.  My recollection, that was on '06.

24  That was increased after the company defaulted, to around the

25  percent that you just said.

1  Q.   So it's your recollection that since the default, there's

2  about a ten percent stake in the GSC senior facility?

3  A.   My recollection was after the default we increased it to

4  approximately ten percent, before we did further trades that

5  took us over fifty percent.

6  Q.   Okay.  And then -- for a period of time you were also

7  pursuing a deal, in which Black Diamond would act as a

8  subservicer, which some people have already testified to,

9  right?

10  A.   Correct.

11  Q.   And in that deal, Black Diamond would manage some of the

12  GSC contracts for a management fee?

13  A.   I don't know if technically there's a management fee, but

14  the concept's correct.

15  Q.   All right.  And then that transaction didn't go forward,

16  right?

17  A.   Yes.

18  Q.   And was one of those reasons that there were issues under

19  the '40 act as to how much control could be given to Black

20  Diamond without triggering a default under the contracts?

21  A.   That was an issue that required a lot of structuring, and

22  I do believe that we ultimately were able to structure a

23  transaction that would allow for a subservicing type of

24  arrangement to take place, not result in a change of control.

25  To answer your question, no, that's not the reason why the

1    trans -- I don't believe that's the reason why the transaction

2    didn't go forward.

3    Q.   Did everybody in the deal, both all the other lenders and

4    the company and everybody at the company agree with you that

5    the deal that was structured would satisfy the '40 act?

6    A.   I think the lenders -- I don't know that the lenders were

7    that focused on that issue.  I think the lenders were more

8    focused on the economics to them.  It was more the company's

9    advisors that were focused on that issue, and I believe at the

10   end it took some tweaks, but we ultimately came to a

11   structure -- I don't want to speak for them, but I believe that

12   the company's professionals thought it worked from the

13   investment advisors act.  But it certainly was complicated --

14   very complicated because of that issue, and the negotiations to

15   get the documentation done was very prolonged because of

16   structural changes that were needed because of that issue.

17   Q.   And that after the subservicing deal was off the table,

18   that's when Black Diamond purchased -- started purchasing more,

19   including a forty percent stake that it bought in one trade?

20   A.   Yes.

21   Q.   Okay.  And that the blended amount of Black Diamond's

22   investment in the whole senior facility is at around $0.21 or

23   less?

24   A.   I don't know the exact number.  Approximately $0.20.  The

25   trade that was the large trade was done at $0.21.  We did

1    trades, both before that and after that at lower prices.

2    Q.    And Black Diamond currently owns or controls about 120

3    million dollars of the senior facility?

4    A.    Black Diamond, by itself, controls a little bit in excess,

5    I believe, of fifty-one percent.  In addition, we have a

6    partner in this transaction with us, which is ING Bank.  ING, I

7    believe, has approximately ten percent, so between us, I think

8    we're sixty or a shy bit over sixty.

9    Q.    Okay.  And I think I'm using your words here, that you

10   purchased -- when you purchased that forty percent piece, that

11   was purchased with an intent to "gain control of the process,"

12   right?

13   A.    Correct.

14   Q.    And at that time, you were unhappy with the banks?

15   A.    Correct.

16   Q.    And at that time, Black Diamond's intent was to move

17   quickly to some sort of auction process, right?

18   A.    Correct.

19   Q.    In fact, you wanted to do a three hundred -- a Section 363

20   sale, within 120 days of a filing of GSC?

21   A.    I don't remember what the exact timetable was -- that

22   timetable was put together by the deal team working with our

23   professionals and what they thought was reasonable, but we

24   certainly felt like the assets were deteriorating in value.

25   The company was burning cash, and you know, my instruction was

1    to try and do a sale as fast as we could, because we wanted to

2    protect the collateral.

3    Q.   And you understood, at the time, that you were putting

4    together -- the deal team was putting together this timeline,

5    that Black Diamond might actually purchase the assets, for the

6    right price?

7    A.   Correct.

8    Q.   And by the time you -- you purchase your -- no, sorry.  At

9    the time you purchased your majority stake, or soon thereafter,

10   you appointed BD agent as agent under the credit facility,

11   right?

12   A.   Yes

13   Q.   All right.  And I'm going to try to keep a distinction

14   between Black Diamond and Black Diamond agent.  You understand

15   the distinction?

16   A.   Yes.

17   Q.   All right.  And one of the first things on the table for

18   Black Diamond to do, was to deal with management, right?

19   A.   Yes.

20   Q.   And immediately, you understood --

21   A.   I'm sorry, I don't want to say it was the first thing --

22   it was one of the first things.

23   Q.   One of the first -- that's what I said.  One of the first

24   tings.  And immediately you understood that if there was going

25   to be a 363 sale, you'd have to deal with management contracts,

1  right?

2  A.   I'm sorry, when you're referencing management contracts,

3  are you talking about our collateral?

4  Q.   No, I'm talking about contracts with the management of the

5  company.

6  A.   Well, what we were concerned about was the management of

7  the company over the process, and then we were also concerned

8  about what would happen after the sale.

9       In terms of over the process, GSC had lost a tremendous

10  number of employees over the last year and a half.  I know that

11  employees had not been paid bonuses for 2009, and I believe

12  most employees hadn't been paid bonuses for 2008 either.  So

13  what we thought should be implemented, which is common in these

14  situations, was a retention program for the employees.  That

15  retention program, though, wasn't between Black Diamond and the

16  employees.  That was between the companies and the employees.

17  I don't know whether you'd call it a management contract or

18  not.  It was designed to be a retention package, so that

19  employees wouldn't leave the company during the course of the

20  bankruptcy and the sale process.

21  A.   Well, I'm going to ask you also to try to draw a

22  distinction between Black Diamond and Black Diamond agent.

23       When you say we in this context, you're talking about

24  Black Diamond, right?

25  Q.   When I say we, assume I'm talking about Black Diamond

1    unless I specify otherwise.

2    A.    And so, bought --

3    Q.    Black Diamond -- Black Diamond as a lender.

4    A.    Sure.  Okay.  Black Diamond as lender, but not Black

5    Diamond as agent.

6    Q.    Correct.  Well, Black Diamond as agent is a separate

7    company than Black Diamond Capital Management.  I'm an employee

8    of Black Diamond Capital Management.  I'm not an employee of

9    the entity that's an agent, so unless you ask me, or unless I

10   specifically say, I'm talking about Black Diamond Capital

11   Management.

12   A.    So let's go to Exhibit 51 in the binders there.

13   Q.    I'm sorry, which binder?

14   A.    51.  There're two binders there, one's going to be 1

15   through about 40, and the other's gonna be 40 through 80, I

16   think.

17   Q.    Okay.

18   A.    All right.  And just to expand on your answer a bit.  When

19   you're talking about Black Diamond as lender, Black Diamond as

20   lender only owes, as far as you're concerned, a duty to itself

21   to maximize the recovery on its own loans, right?

22   A.    Yes, although I'm not sure that I legally owe a duty, but

23   I morally feel that I owe a duty to ING, who's our partner in

24   the transaction as well.

25   Q.    But you don't owe a duty to any other lender under the

1    credit facility?

2    A.   As lender, I don't believe Black Diamond does.

3    Q.   Black Diamond agent, though owes a duty to all lenders to,

4    for example, preserve collateral for the benefit of all

5    lenders, right?

6         MR. BRODSKY:  Objection, Your Honor.  It calls for

7    legal conclusions.

8    Q.   Your lay answer understanding only.

9    A.   I don't know the answer to that question.

10   Q.   Well, that wasn't your concern, because you're not running

11   BD agent, right?

12   A.   BD agent is run by separate people, and they have separate

13   counsel.

14   Q.   Okay.  So let's -- looking at trial Exhibit 51, that's an

15   e-mail from Mr. Eckert to you, of June 20th, 2010, right?

16   A.   Yes.

17   Q.   And that's sent -- that's not sent to the agent, that's

18   sent to Black Diamond the lender, right?

19   A.   It's sent to me personally, so I'm going to take it as

20   Black Diamond the lender.

21   Q.   And then if you turn to the second page, this is something

22   we got from Mr. Eckert's testimony.  And he says on the second

23   page, bottom line, "I need five million now.  I will do

24   everything to keep the '40 issue compliance much lower than

25   what was discussed before.  I would like the option to discuss

1    joining Black Diamond the first of January."

2        Is it your testimony you didn't ask him what he meant by

3    that, at the time he sent this e-mail?

4    A.    I don't believe I did.

5    Q.    And have you since talked to him about what he meant by

6    that?

7    A.    I have not.

8    Q.    And as far as you know, he could have been saying, I want

9    five million dollars in compensation, and in exchange I will

10   cooperate on the '40 act issue.

11   A.    That was not how I interpreted it.

12   Q.    But you don't know how -- what he meant, because you never

13   talked to him about it, have you?

14   A.    I have not.

15   Q.    And let's turn to Trial Exhibit 53.  And this is an e-mail

16   on the top that Mr. Nahas sent to you on June 27th, right?

17   A.    That's what it says.

18   Q.    Okay.  And what do you understand him to be saying by

19   "It's time for you to get firm."

20   A.    I don't know.

21   Q.    Okay.  And with respect to the bottom, or the e-mail below

22   that, that's getting forward, "Talked to Fred and he does not

23   want to meet till we get our deals done."

24   Q.    Did you ever talk to Mr. Eckert about what he meant by the

25   deals?

1    A.   I don't know.  I don't know what -- this was between -- it

2    looks like Peter Frank and Mounir.  I'm not positive what it

3    was referring to.

4    Q.   But in the time between when you got the majority stake in

5    the facility, and the time that you actually executed

6    management contracts, management led you to believe that the

7    contracts were a prerequisite for moving forward with the 363

8    sale process, didn't they?

9    A.   Management -- actually, let me say -- be more specific.

10   Neither Peter nor Fred ever had any conversation with me about

11   that, or any conversation with me, saying that it was a

12   prerequisite.  I did have a conversation with Bob Manzo, where

13   Bob Manzo said to me that if we wanted to do a sale process,

14   one of the things that we needed to work on, early on, was the

15   arrangements with management.  Bob didn't say it was a

16   prerequisite, but he did advise that it was something that we

17   needed to address early on.  I didn't necessarily disagree with

18   Bob; this is pretty common in these types of transactions.  And

19   there were some things in GSC that were unique to GSC; so while

20   Bob said that to me, we had our own reasons why we thought that

21   it was important to put arrangements in place with management,

22   both to exist during the process, as well as potentially after

23   the process.

24   Q.   What was the need to get those management contracts in

25   place?

1  A.   I'm going to -- I need to break it up, if you'll allow me

2  to do that.

3  Q.   Well, let me just ask you -- let me ask you a summary

4  question, rather than that.

5  A.   I can't answer --

6  Q.   Well, let me just ask you a different question, then.  Is

7  it the purpose of getting the contracts in place, in your view,

8  to protect the collateral?  That is, to be able to maximize

9  value?

10  A.   Yes.

11  Q.   All right.  And the negotiation that went on, from the

12  moment that -- that Black Diamond took over as the majority

13  lender through the time that the contracts were signed, was

14  between Black Diamond the lender and the management, right?

15  A.   Yes.

16  Q.   You're not aware of any negotiations, are you, between

17  Black Diamond agent, where Black Diamond agent was trying to

18  protect the collateral for the benefit of all the secured

19  lenders?

20  A.   We were trying to protect the collateral for the -- for

21  our benefit, but at the same time, we're protecting the

22  collateral for everyone's benefit, and the agent ultimately

23  needs to take the direction of the required lenders, so that it

24  would be more efficient for us to have those negotiations, than

25  for the agent just to act as a middleman, which is why we did

1   it ourselves, as lender; and this is not unusual in other

2   situations like that. We do this as lender -- we've done this

3   as lender many times.

4   A.   Um-hum. But -- okay, I understand the negotiations -- it

5   seems to be easier for Steve Deckoff to do the negotiations

6   with these two gentlemen, but did you ever make the management

7   contracts available to BD agent for the benefit of all the

8   lenders, or was this just tied to Black Diamond?

9          MR. BRODSKY:  Objection.  Of --

10         THE COURT:  What's your objection?

11         MR. BRODSKY:  It's a compound question.

12         THE WITNESS:  First of all, I don't --

13         THE COURT:  No, wait a minute.  Break up the question.

14  Q.   Sure.  Are you aware of any incidents, between the time

15  that Black Diamond became the majority lender and the present

16  date, in which the concept was even broached, with anybody,

17  that the contracts would be signed by BD agent on behalf of all

18  the lenders?

19  A.   Well first of all, one of the contracts is the retention

20  agreement, and that's not signed by either Black Diamond or BD

21  agent.

22       The other contract -- one contract that is the

23  management -- is the employment contract with Peter, and that

24  would be if Peter became an employee of Black Diamond, so it

25  would make no sense for it to be with anyone other than Black

1  Diamond.  The agent wouldn't hire Peter as an employee.

2      The third piece of it is the consulting agreement, and I

3  think people -- I'd like to sort of, if I can, explain the

4  background on the consulting agreement.

5  A.   I'll let your counsel ask you direct questions late -- can

6  you just answer mine?  Was there any time that there was even a

7  contemplation that either the employment agreement of Mr. Frank

8  or the consulting agreement of Mr. Eckert would be executed by

9  BD agent for the routable benefit of all the secured lenders?

10 A.   It would be nonsensical, and it would be nonsensical

11 because BD agent wouldn't hire someone as an employee for the

12 benefit of lenders, so in relation to Peter, that wouldn't make

13 sense.

14     In relation to the consulting agreement, the consulting

15 agreement was basically a backup agreement.  Fred -- as the

16 transaction was structured, and this was done for investment

17 advisor act reasons, was to remain an employee of GSC; so Fred

18 would continue to have an employment agreement between GSC and

19 himself, and that was something that was important to us,

20 because we didn't know, at the end of the process, how many of

21 the contracts would actually sell, and we needed to have

22 managements -- have someone who could still be management at

23 GSC, and we needed it to be Fred, so there wouldn't be a change

24 of control.

25     Fred agreed to do that, but what Fred's concern was, was

1  that, well, what if GSC doesn't have enough money to pay me our

2  salary, and that's what the origin of the consulting agreement

3  was; in that if, for some reason, GSC didn't have enough money

4  to pay Fred his salary, then GS -- then Black Diamond, through

5  that consulting agreement, would backstop it.  I don't believe

6  the agent, on behalf of the lenders, could offer something like

7  that.

8  Q.   So let's -- let's go back.  I'm going to -- I'm going to

9  pick this apart into the employment agreement and the

10  consulting agreement.

11       I'm going to first of all refer to them as management --

12  the two management agreements.

13  A.   I'm sorry, so we're not talking --

14  Q.   The two --

15  A.   -- we're not talking about the retention --

16  Q.   No, I'm not talking about --

17  A.   -- program anymore.

18  Q.   I'm not talking about the retention program.

19       At the time that Mr. Manzo led you to believe that this

20  was a prerequisite, the company was falling apart in your view,

21  wasn't it?

22  A.   Mr. Manzo didn't say that it was a prerequisite.

23  Q.   No, you were led to believe, from what Mr. Manzo said,

24  that it was a prerequisite.

25  A.   Mr. Manzo said that it was something that we had to deal

1  with early on.  He didn't say that it was a prerequisite, and

2  we had -- we agreed with him, for our own reasons, that it was

3  something that needed -- that made sense to be dealt with,

4  early on.

5  Q.  Didn't you form a view that at this point -- that it was a

6  prerequisite to get the management contracts in place, in order

7  to move forward with the process?

8  A.  As I re -- as I already said, neither Peter nor Fred, did

9  I ever have any conversations on this, with.  I did have a

10  conversation with Bob Manzo, I don't believe Bob Manzo said

11  that it was a prerequisite, but he -- I don't remember what Bob

12  Manzo's words were, but his words were that if we wanted to do

13  a sale process, this was one of the things that we needed to

14  deal with early on.

15  Q.  And you answered --

16  A.  But I don't believe -- as I say, I don't remember Bob

17  Manzo's words, exactly.  I don't know that it was the ultimatum

18  that you're suggesting.

19  Q.  My question was, independent of what Mr. Manzo said, did

20  you form a view that giving the management contracts to Mr.

21  Eckert and Mr. Frank was a prerequisite for moving forward with

22  the sale process?

23  A.  I thought it was in our best interest to do that, because

24  we wanted to protect the collateral, and we needed management

25  to manage the company during the process; and then we also

1  wanted to provide for the scenario that it was possible that

2  not all of our collateral would be able to trade, and we needed

3  to know that we had Fred, who would stay at GSC, in the event

4  that not all of the collateral traded, because of the investor

5  consent risk.

6  Q.  Can you pull out your deposition, please?

7  A.  I need you to --

8  Q.  In the stack there, you're going to find a copy of your

9  depo -- oh, here it is here.  Never mind.

10       MR. SHORE:  May I approach, Your Honor?

11       THE COURT:  Go ahead.

12  Q.  Can you turn to page 82, please, of your deposition?

13  A.  Sorry, what page, Chris?

14  Q.  82?  Because that's where the -- I just want you to read

15  82 to yourself, and see that we're talk -- what we're talking

16  about here are contracts with Mr. Eckert and Mr. Frank.

17  A.  Okay.  The top of 82, or the bottom of 82?

18  Q.  The top of 82, you can see that you and I were having a

19  colloquy, and I was asking you questions, and you were

20  answering under oath, regarding contracts with Mr. Eckert and

21  then -- and Mr. Frank.

22       And then I asked you a question beginning at line 24.

23       "But you felt it was necessary to hire them with a

24  contract, in order to get them to engage on the process of

25  getting an auction out?

1    "Answer:  We believed it was a prerequisite for moving

2    forward with that process."

3    A.    I'm -- I'm sorry.

4    Q.    Did you say --

5    A.    I'm sorry, that's not what it -- I don't think that's what

6    it says.  It says a, "Answer:  No, we had a need for additional

7    people.  Black Diamond is growing."

8    Q.    No.  Let's go -- sorry.  You're just not following me.

9    82, line 24.

10   A.    I'm sorry.  Page eighty -- page 82 --

11   Q.    Line 24.  Down at the bottom.

12   A.    I'm sorry.  I thought before you said at the top.

13   Q.    No.  82, down at the bottom, line 24.  "Question:  But you

14   felt it was necessary to hire them with a contract, in order to

15   get them to engage on the process of getting an auction out."

16   A.    It says "we believed it was a prerequisite", but we had

17   our own reasons for why we -- why we thought it was important

18   to have this.

19   Q.    Just -- let me finish my question, and you then you can

20   answer.  And if you feel like you have to explain further, your

21   counsel can redirect you to do that.

22        My question was, "But you felt it was necessary to hire

23   them with a contract, in order to get them to engage on the

24   process of getting an auction out."

25        And didn't you answer "We believed it was prerequisite for

1    moving forward with that process," at your deposition?

2        Is that what you said?

3    A.    I said we thought that, yes.

4    Q.    Okay.  And was that a true response at the time?

5    A.    It's true, but you didn't ask the reasons why I thought it

6    was a prerequisite.

7    Q.    Well, we're going to come to that in just a bit.  And at

8    the time that you were believing this was a prerequisite, the

9    company was falling apart, right?

10   A.    It was certainly deteriorating.

11   Q.    It was losing its employees, right?

12   A.    Yes.

13   Q.    It was -- the management contracts were at risk of being

14   terminated by investors, right?

15   A.    Yes.

16   Q.   And you were told that the managing contracts were a

17   "hurdle" you had to get a sale process going.  Is that what you

18   were told?

19   A.    I don't know.

20   Q.    Well, let's go to page 181 of your deposition.  Page 181,

21   line 5 -- actually, I'm sorry.  It's on -- the question starts

22   on page 179.  There was an "okay" by me and then you continued

23   with an answer.  "What I know is that I was trying to get the

24   best deal I could for -- I wanted to get the best deal I could

25   to preserve the collateral of all the secured lenders and that

1    we got a deal that was better than what the banks got.  And

2    what I was concerned with was protecting the collateral of

3    secured creditors, and I believe we got a better deal than what

4    otherwise was going to be the case in the previous bank deal."

5    And you understand that applied to the deal on the management

6    contracts with Mr. Eckert, Mr. Frank?

7    A.    I believe that applies to the retention program, as well.

8    Q.    Okay, "And what I was concerned with was that this company

9    was falling apart.  This company was losing its employees, this

10   company was at risk of being terminated by its investors, and

11   keeping this process moving, and I was told that this was a

12   hurdle we had to get over before we could get to the next steps

13   to do a process like this."  Do you recall that, giving that

14   answer?

15   A.    I don't recall it, but I assume the transcript is correct.

16   Q.    Well, you can't independently sit here today -- you have

17   any kind of testimony as to whether or not you understood

18   that -- or, were told that a hurdle to getting a sale process

19   going forward was locking up management with new contracts?

20   A.    As I already testified, the only person I ever had

21   conversations with on this topic was Bob Manzo.  And Bob Manzo

22   said that if we wanted to do a sale process, that the debtor

23   was open to that, but one of the things that we needed to deal

24   with on the front end was the management situation.  I don't

25   remember exactly what Mr. Manzo's words were, but what I just

1  testified to is my recollection of the conversation with Mr.

2  Manzo.

3  Q.  Well, let's refresh your recollection.  Go down to page

4  181, and there's a carryover question.  And then you answer,

5  continuing, essentially, the earlier answer at line 5.  "For

6  that" -- so actually I should give you the question at line 2.

7  "Isn't it a fact that Black Diamond only has to backstop that

8  three million dollars if its bid was accepted?"  You recognize

9  what we're talking about here is the consulting agreement,

10  right?

11  A.  Yes.

12  Q.  "And for that piece of it, that is correct, and that is

13  what was asked of us.  And if we didn't do that, then the

14  company wasn't -- we believe the company wasn't going to

15  consensually pursue the sale process."  Was that a true answer

16  at the time you gave it?

17  A.  I think that might not be right with respect to the

18  consulting agreement.  What the consulting agreement was

19  enabling us to do was it enabled us to get Fred to agree to

20  stay at GSC after the auction was over.

21  Q.  So your answer under oath before was incorrect, that he

22  consulting agreement wasn't something you had to give in order

23  to get the sale process going consensually?

24  A.  The origin of the consulting agreement was we wanted Fred

25  to agree to stay at GSC in case contracts didn't trade, and

1  Fred was concerned that GSC might not have enough money to pay

2  him his salary of one million dollars a year, and that was how

3  the origin of the consulting agreement came to be.

4     There's a different concept, which is the retention

5  program, and the retention program, the need there was to make

6  sure that the collateral was preserved and to stop the exodus

7  of employees that was -- that was going on.  When I gave this

8  testimony, maybe I thought you had said the retention

9  agreement.  I don't recall, but maybe I was confused between

10  the retention agreement and the consulting agreement.

11  Q.  So either the -- that one way or the other it was either

12  the retention agreement or the consulting agreement which had

13  to be done in order to move the process forward consensually?

14  A.  You know, Mr. Manzo -- I think I've testified to what Mr.

15  Manzo said.  I don't know what Mr. Manzo had in his mind when

16  he said to it.  We did what we did for our own business

17  reasons, and our own business reasons were in regards to the

18  retention agreement, and the retention agreement wasn't just

19  for Peter and Fred, but it was for all the remaining employees

20  at GSC.  That was designed to enable people to stay with the

21  company for that process.  The employees at GSC had not gotten

22  paid their bonus.  We were now in the summer of 2010 and the

23  employees at GSC had still not been paid their bonuses for

24  2009.

25     The consulting agreement is a very different concept.  And

1    the consulting agreement was asked of us -- well, what was

2    asked of us by Fred was to backstop his GSC employment

3    agreement, in case GSC didn't have enough money to pay him, and

4    then the consulting agreement ended up being the document that

5    we used -- that we created to do that.  But Fred was concerned,

6    and I don't blame him -- if I was in his shoes, I would've been

7    concerned, too, if it was being asked of me -- what happens if

8    GSC doesn't -- or, I agree to stay at GSC for whatever the

9    remaining contracts are, but we don't know how many they are,

10    we don't know what revenue they're going to throw off, what if

11    GSC doesn't have enough money to pay it.

12    Q.   I'm just going to go back to my question.  If we can go

13    back to my question for a bit on page 181.  I asked you a

14    question with respect to the consulting agreement, and you

15    said, "And if we didn't do that, then the company wasn't -- we

16    believe the company wasn't consensually -- going to

17    consensually pursue the sale process."  Is that answer

18    incorrect?  Is that what you're telling us, now?

19    A.   I'm sorry, can you point me to the line that you're

20    looking at?

21    Q.   Sure.  Page 181, starting on line 2, "Isn't it a fact that

22    Black Diamond only has to backstop that three million dollars

23    if its bid was accepted."  And you answered -- is there any

24    doubt that what we're talking about there is the consulting

25    agreement?

1  A.   Yeah, I don't recall my deposition.  I'm reading this, but

2  on the consulting agreement, the consulting agreement, we would

3  only be on the hook for if we were the successful bidder.  But

4  the purpose of the consulting agreement was for what I said,

5  which was to backstop the employment agreement between Fred and

6  GSC.

7  Q.   Let me ask my question one last time and see if you can

8  answer it.  Is there any doubt that what we're talking about

9  there is the consulting agreement?

10  A.   I don't know.

11        MR. BRODSKY:  Your Honor, I object.  This has been

12  asked and answered several times.  I think there is some

13  ambiguity in the transcript and I object to Mr. Shore's

14  badgering the witness like this.

15        MR. SHORE:  And I'm going to say --

16        THE COURT:  Just a minute, Mr. Shore, before you're

17  going to say anything.  The objection is overruled.  What

18  you'll do is break up the question and slow it down.  Go ahead.

19  Q.   Just so we're clear, the question that goes from lines 2

20  to 4 on page 181, is there any doubt in your mind that what

21  that's referring to is the consulting agreement?

22  A.   Yes, it appears to be the consulting agreement.

23  Q.   Right, and that in response to a question about the

24  consulting agreement, you said, for that piece of it, that is

25  correct, and that is what was asked of us.  And if we didn't do

1    that, then the company wasn't -- we believe the company wasn't

2    going to consensually pursue the sale process."

3    A.    That may not be correct.

4    Q.    So now go back to my prior question.  Are you saying, now,

5    that -- is it "may not be correct" or "is not correct" or you

6    don't know?

7    A.    I don't know because I don't know what Mr. Manzo had in

8    mind when he said to me what he said.  I don't know if he was

9    referring to that or to the retention plan.  I think he was

10   probably, most likely, referring to the retention plan because

11   the concept that we had where Fred would stay behind, I'm not

12   sure that Mr. Manzo knew that from me at that point in time.

13   Q.    So the answer -- are you saying your answer was inaccurate

14   because what you should have said was that they said that they

15   would do -- they wouldn't do the deal without the retention

16   program but they would do the deal without the consulting

17   agreement?

18   A.    First of all, it's not "they".  It was Bob Manzo, and he

19   said arrangements with management.  I don't know what Bob had

20   in his mind when he said that.

21   Q.    Okay, well, let's talk about what you don't have in

22   anyone's mind.  Go back to Trial 53.  Just so I understand your

23   testimony, now you don't know what Mr. Manzo was referring

24   to --

25   A.    I'm sorry, we're going to page 53?

1  Q.   No, Trial Exhibit 53.

2  A.   That would be the other book?

3  Q.   Yeah.  I just want to understand your testimony.  So Mr.

4  Manzo said you've got to get some things in place before

5  there's any consensual deal, and now you're confused about what

6  he meant by that, right?  Whether that meant the consulting

7  agreement or the retention bonuses or the employment agreement,

8  you just don't know.

9  A.   I don't remember the exact wording that Mr. Manzo used in

10  the conversation with me, but I believe it was very close to

11  whatever the wording is that I just said under testimony, which

12  I don't believe is the same wording that you just used in your

13  question.

14  Q.   And then on Trial Exhibit 53, you get forwarded an e-mail

15  that says, "Talked to Fred, and he does not want to meet until

16  we get our deals done."  It's your testimony you didn't even

17  ask anybody what they meant about what it meant to get the

18  deals done, "our deals done"?

19  A.   I don't reme -- this is an e-mail from Peter to Mounir.  I

20  do see that Mounir forwarded it to me, but I don't recall it.

21  Q.   So after the message that you got from Mr. Nahas, is it

22  your testimony now that you didn't read the e-mail below to see

23  what he was talking about, referring to your borrower that way

24  and telling for you to get firm?

25  A.   I don't recall; I get a tremendous number of e-mails.

1    Q.   So the answer is yes, you don't know, and you never

2    followed up to ask anybody what they meant by we're not meeting

3    until we get our deals done?

4    A.   I don't recall.

5    Q.   All right, so let's go to the contracts themselves.  And

6    the ones I'm going to focus on are the consulting agreement

7    with Mr. Eckert and the employment agreement with Mr. Frank.

8    The consulting agreement, you recall, was signed by management

9    on July 30th?

10   A.   I don't recall the date.

11   Q.   All right, and you countersigned -- you recall that you

12   countersigned the consulting agreement on the same day?

13   A.   I don't remember.

14   Q.   All right, and do you know why there was a one-month delay

15   between the time that Mr. Frank signed his employment contract

16   and the date that you countersigned it?

17   A.   I don't know.

18   Q.   So let's go to the consulting agreement, which is Trial

19   Exhibit -- I've got a different number here -- 17.  Could we go

20   to 17, please?  19; sorry.  And that's Mr. Eckert's consulting

21   agreement?  Is it 16?  I'm sorry.  My numbers are messed up,

22   relative to the list, so.

23   A.   That's what it appears.

24   Q.   Okay, so let's go through this agreement, just for a

25   second.  The consulting agreement, that's dated as of July

1   30th, as signed by both you and Mr. Eckert, right?  Oh, sorry,

2   Mr. Nahas and Mr. Eckert, right?

3   A.   Yes.

4   Q.   And that's going to be between Black Diamond Capital

5   Management and Mr. Eckert, right?

6   A.   Yes.

7   Q.   So the only party who's benefited, the only lender that's

8   benefited by this is going to be Black Diamond, if it wins the

9   auction, right?

10  A.   No.

11  Q.   Well, under the current bid structure, right -- oh, sorry,

12  ING would be included in that, right?

13  A.   At the point in time that we did this, we didn't know what

14  the auction result was going to be.  I actually believe that

15  what Black Diamond did was beneficial for all the lenders

16  because it was ensuring that we wouldn't have a change of

17  control and it was ensuring that Fred would stay at GSC for

18  whatever collateral, which was all of our collateral, which may

19  not be able to be sold.

20  Q.   Okay, well, let's go to the -- so is it your testimony,

21  then, that if the agent won the auction, that this would have

22  been beneficial to all the lenders?

23  A.   Yes, because only Black -- this is a liability to Black

24  Diamond.  Black Diamond is on the hook if GSC can't pay Fred,

25  and we went on the hook by ourselves.

1    Q.   Okay, and if you turn to page 2, the only time this starts

2    is if Black Diamond or one of its affiliates won a substantial

3    portion of the assets in an auction?

4    A.   Yes.  But it would be possible that Black Diamond could

5    win a substantial number of the assets; other assets Black

6    Diamond didn't win, and those assets could -- might have to

7    stay behind at GSC.  Fred would manage them.  Fred would also,

8    by managing them, ensure that there wasn't a change of control.

9    And those might not have been the same assets that Black

10   Diamond bought, so I actually believe we benefited all the

11   lenders by agreeing to do this.

12   Q.   Okay, and then -- so then we get to the consulting fees

13   which is something that Mr. Eckert testified to.  And you

14   actually said this is a backstop, right?

15   A.   Yes.

16   Q.   Okay, but it's a backstop more than just if the company

17   doesn't pay, right?  For example, if Mr. Eckert can't work

18   because of a disability, you would still be required to pay,

19   even though he might not have to pay under his GSC contract,

20   right?

21   A.   I don't remember those subtleties.  I was involved in the

22   general architecture of it.  The detailed negotiations are --

23   were not done by myself.  But in terms of the general

24   architecture of it, it was a backstop in case GSC didn't have

25   enough money to pay Fred, and Fred was agreeing that he would

1    stay at GSC after the auction for assets that weren't able to

2    trade because of the investor consent and the investment

3    advisor issue.

4    Q.   Were you aware of whether the obligation to backstop is

5    contingent off the inability to pay or the actual nonpayment by

6    the company?

7    A.   I don't know.

8    Q.   Okay, and do you want to review paragraph A or is that

9    something for the lawyers to do?  Would that help you to

10   refresh your recollection as to whether or not, for example, if

11   the company just didn't pay Mr. Eckert, that you would be

12   responsible for paying as Black Diamond?

13   A.   I don't know.  I'm familiar with the general macro

14   business concept and the general architecture of it.  The

15   actual drafting of the agreements and the negotiation of the

16   agreements themselves, I was not involved in.

17   Q.   Well, let's go back to section 1(a), then, and see whether

18   you were involved in this.

19   A.   I'm sorry, which?

20   Q.   Section 1(a) of Trial Exhibit 16, first page.  That sets

21   forth the scope of the consulting services.  It says, "During

22   the term of this agreement, the consultants shall render to the

23   company" -- and that company's Black Diamond, right?

24   A.   Yes.

25   Q.   -- "its parent and affiliates such consulting services

1    relating to the company, its parent and affiliates, as may be

2    reasonably requested by Stephen Deckoff from time to time and

3    as agreed by the consultant."  See that?

4    A.   Yes.

5    Q.   So if you requested something from Mr. Deckoff, even

6    reasonable -- or, sorry, Mr. Eckert, and he didn't agree to do

7    it, you'd still have to pay, wouldn't you?

8    A.   I don't know.

9    Q.   All right, well, do you have any reasons to believe that

10   there was some deal there that isn't memorialized in the actual

11   words, here?

12   A.   I don't know.  I wasn't worried about it, though.

13   Q.   Okay, and, "The company acknowledges the consultant has

14   significant other business activities and the consultant shall

15   have the right to allocate his time between the performance of

16   the consulting services and such other business activities as

17   the consultant may determine in his sole discretion."  That

18   gives Mr. Eckert, basically, the right to work on anything he

19   wants and still get a million dollars a year from Black

20   Diamond.

21   A.   I don't know that that's correct.  He was going to get

22   paid a salary of a million dollars a year by GSC.  This was

23   just a backstop if GSC didn't have the money to pay it.

24   Q.   Well, can you tell me where that backstop arrangement is,

25   if the sentence there says, "The company acknowledges the

1    consultant has significant other business activities and the

2    consultant shall have the right to allocate his time."

3    A.   Well, I think it would have to say that because one of his

4    business activities would be he's an employ -- he's still the

5    CEO and the chairman of GSC.

6    Q.   Right.  And let's talk about how the backstop works, then.

7    If you go to page 2, it's really that the company shall pay the

8    consultant one million dollars, annually, right, unless the

9    consultant is also employed by GSC simultaneously.

10   A.   Which is what the intent was.

11   Q.   Right, so if he didn't even have a GSC employment

12   contract, you obligated yourself to pay a million dollars

13   annually.

14   A.   However, I believe there was a GSC employment contract

15   that was done simultaneous with this.

16   Q.   But if that contract wasn't there, can you tell me that

17   the agreement that you actually wrote with him would say that

18   you didn't have to pay him?

19   A.   I don't know.

20   Q.   Okay, and so it assumes that if he does have a contract

21   and the company pays -- sorry, GSC pays, then you can reduce

22   the million dollars annually, right, pro rata to the amount he

23   gets paid under that contract.

24   A.   This is similar, by the way, to consulting agreements that

25   Black Diamond has with many other people, where many other

1  people -- we have a number of people where we have consulting

2  agreements, they are also CEOs of companies, and it works --

3  and it works similarly, that they would only come to us if they

4  weren't getting compensated at the level that they were

5  expecting from the primary employer.

6  Q.  Just so I'm clear, right, and then tell me if I'm reading

7  the document wrong, or that it doesn't memorialize the

8  agreement you cut, you agreed to pay Mr. Eckert a million

9  dollars annually unless he was paid by GSC.

10  A.  I don't know the entire agreement.  I was not the one who

11  negotiated and drafted the agreement.  I know the business

12  concept.  And the business concept was what I said, which was

13  we wanted Fred to agree to stay as the CEO and the chairman of

14  GSC.  This was very important to us because we had no idea how

15  many contracts would be able to transfer and how many wouldn't.

16  And what Fred asked was well, what if GSC doesn't have the

17  money, and none of us knew the answer to that question because

18  we didn't know what the revenues would be that would be left to

19  GSC, and that's how the consulting agreement came to be.  The

20  actual document, the termination rights, the mechanics of it, I

21  was not involved in.

22  Q.  Okay, so do you have any reason to believe that this

23  doesn't, actually, reflect the deal between Mr. Eckert and

24  Black Diamond regarding the circumstances under which he's

25  going to get paid a million dollars a year by Black Diamond?

1   A.   I relied on people that worked for me to make sure that

2   this was negotiated in a tight manner that would be consistent

3   with the business deal, which was that Fred was to be paid by

4   GSC, and if GSC couldn't pay him, then Black Diamond would be

5   on the hook.

6   Q.   And we heard from Mr. Eckert about his side of the

7   transaction.  You didn't do any -- kind of hire any consultant

8   to determine whether or not paying Mr. Eckert a million dollars

9   a year, even if he wasn't employed by GSC was some kind of

10  market transaction?

11  A.   I think it's a bargain.

12  Q.   That's not my question.  Did you hire any consultant or

13  anybody else to provide a fairness opinion?

14  A.   I did not.  I'm in this business, I have sixty-five people

15  that work for me, many senior people that work for me.  I've

16  been doing this for a long time.  I think I have a pretty good

17  idea of what the market rate is for various people.  The amount

18  that Fred is getting paid is lower than other people that work

19  at Black Diamond currently that have nowhere near the

20  experience that Mr. Eckert has, nowhere near the relationships

21  that Mr. Eckert has.  I think this was -- I think Fred Eckert

22  for one million dollars a year is a very good deal.

23  Q.   But Fred Eckert for a million dollars a year, when you say

24  Fred Eckert for a million dollars a year, he doesn't have to do

25  anything unless he wants to do it, right?

1    A.   I view that -- I don't know that that's true.  I don't

2    know that -- the language in this agreement inside and out, but

3    I also view that risk as nominal because Fred made it very,

4    very clear to me from the very first time I met him that he

5    very much wanted to work.  And in all the communications and

6    time I've spent with Fred since then, I believe there's nothing

7    that Fred wants more than this to work.  So one, I don't know

8    that what you're saying is true, but even if what you're saying

9    is true, I put the risk on it as very low.

10   Q.   Can you tell me why, then, that if what you wanted to do

11   was have him work and he wanted to work, you didn't write an

12   agreement that says that the consulting job, the consulting

13   services are that Mr. Eckert shall do what Steve Deckoff tells

14   him to do, reasonably tells him to do in exchange for a million

15   dollars a year?

16   A.   I'm not a lawyer, but I think there must have been

17   Investment Advisory Act issues if we were to have done that.

18   Q.   So you're saying that you put in a contract that he

19   doesn't have to work just to get around a law which would

20   impact the ability of the company to manage assets?

21   A.   Fred was to remain the CEO and the chairman of GSC.  I'm

22   not an attorney, but it smells to me that if we were to do

23   something of the language that you just said, that that

24   probably would cause issues.  But I'm not an attorney; maybe it

25   doesn't.

1  Q.   So other than it might cause some smell issues, you can't

2  tell me why you didn't write a contract that actually puts some

3  duties on the part of Mr. Eckert?

4        MR. BRODSKY:  Objection.  Asked and answered.

5        THE COURT:  It has been.  I'll sustain the objection.

6        Go ahead, Mr. Shore.

7  Q.   Can you turn to Trial Exhibit 58, please?  Let's talk for

8  a second, then, about smell tests.

9        MR. BRODSKY:  Chris, where are we?

10       MR. SHORE:  Trial Exhibit 58.

11 Q.   See that document?

12 A.   Yes.

13 Q.   This is the document regarding, among other things, the

14 request for the plane.

15 A.   Yes.

16 Q.   Do you recall you and I had a colloquy at your deposition

17 regarding about what would be proper, improper, in the

18 circumstance in which a sale process was still open?

19 A.   I remember we discussed it; I don't remember the exact

20 exchange.

21 Q.   And you recognize, don't you, that when we're talking

22 about a sale process, that runs from the time that the sale

23 process is open up to the time that the sale closes, right?

24 A.   That sounds generally correct.

25 Q.   All right, and that we talked about the propriety of even

1    allowing Mr. Eckert to use the airplane in exchange for the

2    direct expenses, right?

3    A.   I believe you asked me about it.

4    Q.   Right, and that you said paying that wouldn't work from a

5    propriety standpoint, right?

6    A.   I didn't feel that -- I didn't feel that Black Diamond

7    should be letting our -- letting Fred use our plane at that

8    point in time in any circumstance, regardless of what the

9    amount was that he was prepared to pay us for it.

10   Q.   Well, didn't you say -- well, you said -- we went into a

11   colloquy on whether you would pay market -- whether he'd pay

12   market for that, and you said no, Black Diamond wouldn't even

13   do that for market, wouldn't let him use the plane for a market

14   rate, right?

15   A.   I don't recall.

16   Q.   Do you recall testifying that maybe if it was double

17   market, maybe if he paid 20,000 dollars to use the plane, if

18   10,000 dollars was the market, that might be appropriate?

19   A.   I do remember you asked me that question, and I believe

20   the answer that I gave you was that I wouldn't do it because

21   cosmetically, it would be bad, although if it was above a

22   market rate, morally, it might not be bad.  After I had that --

23   your deposition, I actually thought about it, and I thought it

24   would probably be morally bad, also.  Not morally bad because

25   of what it would be insinuating about -- your insinuation would

1  be that I would be bribing Fred.  It would be morally bad,

2  because if he paid me twice as much, then it would be -- Fred

3  would be bribing me.  So at the deposition, I do remember I

4  said, sure, I thought if it was above market, morally it would

5  be okay, but cosmetically it would be bad, and after I left my

6  deposition and I thought about it, I decided I was wrong.  It

7  would be morally wrong and cosmetically wrong.

8  Q.   Right, and the only way to do it the right way is if

9  you're going to transact with a principal during the sale

10 process while the sale process is open is to do it at a market

11 rate.

12 A.   I -- I think I disagree with that and I told Fred I

13 wouldn't let him use my plane.  And I believe that was the

14 correct decision and I stand by that decision.

15 Q.   Well, you did transact with Mr. Eckert personally while

16 the sale process was open, right?

17 A.   For a business purpose.

18 Q.   Right, first of all, you signed a consulting agreement

19 with him, right?

20 A.   For a business purpose.

21 Q.   Right, and for that business purpose, you have no third

22 party document you can turn to that says that the one million

23 dollars a year for his consulting services that he can do what

24 he wants or not what he wants to do is actually a market rate.

25 A.   That's not the deal.  It's a backstop in case GSC can't

1    pay him.

2    Q.   Whatever the deal is, you don't have any kind of third

3    party consultant that says that's actually a market rate.

4    A.   Well, I think it matters what the deal is, and if one did

5    want to get a third party consultant, I assume the consultant

6    would want to know what the deal was.

7    Q.   Right, but you don't have that.  You never did that.

8    A.   I never hired a consultant to look at that, that is

9    correct.

10   Q.   And you never got a fairness opinion as to whether the one

11   million dollars a year for whatever services he has to do is a

12   market rate?

13   A.   One million dollars --

14        MR. BRODSKY:  Your Honor, I'm going to object to this

15   continued line of questioning.  I don't think Mr. Shore --

16        THE COURT:  Mr. Shore, where is this going?  I mean,

17   you've made your point.  No consultant hired.

18        MR. SHORE:  Okay, fine.

19        THE COURT:  Go ahead.

20        MR. SHORE:  All I ever want to do is make my point.

21   A.   For an employee, which is what Fred would be of GSC, I

22   think I said one million is cheap.

23        MR. SHORE:  Motion to strike to an answer that wasn't

24   a question.

25        THE COURT:  Granted.

1  Q.  Okay, so let's talk, then, about the sale process, and

2  then we'll come to the other personal transaction at the end of

3  that sale process.

4      Prior to the company going to bankruptcy, Black Diamond,

5  your deal team, was considering setting up a quick 363 sale,

6  right?

7  A.  We wanted to do a 363 sale and we wanted to do it as

8  quickly as was reasonable.

9  Q.  And it was never your intent in the context of that sale

10  to provide value to unsecured creditors, right?

11  A.  I never thought about it because I didn't think the result

12  of that auction would ever come anywhere close to the secured

13  claim.

14  Q.  Well, was it, in fact, your intent not to make

15  distributions to unsecured creditors in the context of a 363

16  sale?

17  A.  Our intent was to, if we were to buy the assets, buy the

18  assets at the lowest price.  If the price was so high that we

19  didn't want to buy the assets, to let the assets trade away.

20  And I wasn't thinking about unsecured creditors because I never

21  thought that the result of the auction would come anywhere

22  close to covering the secured claim.

23  Q.  If you go to page 245 of your deposition.  Just so we're

24  clear that at the time that you walked into that auction, you

25  didn't believe that there was value sufficient to pay off all

1   the secured debt, right?

2   A.   When I walked into the auction, I thought that people that

3   bid in the auction would either be bidding in cash or, in the

4   case of ourselves, we had the ability to bid in credit, and I

5   didn't think that the result of the auction, assuming that

6   people would bid in cash, would be enough to cover the secured

7   claim.

8   Q.   And in the context of these cases at all, have you ever

9   seen a valuation in which anybody's done a bottom-up valuation

10  of the assets of GSC and shown a value that is sufficient to

11  pay the secured claims in full?

12  A.   Do you consider our joint bid a value?

13  Q.   No, I'm talking about a bottom-up valuation.  Do you know

14  what a bottom-up valuation is?

15  A.   No, I don't.

16  Q.   Okay, have you ever seen any kind of report done by

17  anybody, whether on your team or anywhere else, in which

18  anybody has put forward a valuation which uses standard

19  principles of valuation techniques to come up with a value of

20  GSC's assets that is in excess of, let's say, 250 million

21  dollars?

22          MR. BRODSKY:  250 -- sorry, 250,000?

23          MR. SHORE:  250 million dollars.

24          MR. BRODSKY:  Okay, I couldn't hear you.

25  A.   My view of value is at an arm's-length basis, what a

1    willing buyer and a willing seller would transact at.  And I've

2    never seen an analysis from anyone on what price a willing

3    buyer and a willing seller would transact at.  To me, that was

4    what the purpose was of the auction process, was to do a market

5    test and to find out what was the price on an arm's-length

6    basis, where a willing buyer and a willing seller would

7    transact at.  And when you use the word "value", that's what,

8    to me, the word "value" means.

9    Q.   Okay, let's talk about willing seller for a bit, and then

10   I'm going to come back to the credit bid.  The agent -- or,

11   sorry, willing buyer.  The agent, here, is the one who

12   submitted the credit bid, right?

13   A.   At the direction of the required lenders --

14   Q.   That's right.

15   A.   -- which was Black Diamond Capital Management.

16   Q.   That's right.  So the point, here, is that the -- is it

17   your understanding that the agent exercised any discretion on

18   behalf of all the lenders with respect to what the right amount

19   of the credit bid was?

20   A.   I believe under the credit agreement, the agent is

21   required to, on a credit bid, bid what it's told to do by the

22   required lenders.

23   Q.   Okay, so when you talk about what a willing buyer is

24   willing to pay, here, you're really talking about what Black

25   Diamond is willing to put up in cash and what it's willing to

1    direct the agent to credit bid, even if it means a total loss

2    or near total loss on its secured claims.  That's the willing

3    buyer, here, who's willing to put forward this bid?

4    A.   I was talking about willing --

5         MR. BRODSKY:  Your Honor -- I object to the question,

6    Your Honor.  At least to me, quite confusing.

7         THE COURT:  Let's restate the question.

8         MR. SHORE:  Sure.

9    Q.   So when you were talking -- I think what you're talking

10   about is you're talking about the 235 million dollar cash and

11   credit bid which was embodied in the APA, right?

12   A.   I'm sorry, can you repeat the question?

13   Q.   Sure.  The valuation.  You were talking about a willing

14   buyer and a willing seller.  Are you saying that the 235 price

15   is an expression of what a willing buyer's willing to pay for

16   the assets?

17   A.   On that particular day, for those particular assets in the

18   circumstances that existed on that day, there was a willing

19   buyer that was willing to do that; that was Black Diamond.

20   Q.   Right, and what Black Diamond was willing to do was put up

21   eleven million dollars of its own cash, right?  Or cash and a

22   note, right?  That's what Black Diamond -- one of the things

23   Black Diamond was willing to do on the day of the auction was

24   put up eleven million dollar of cash and a note.

25   A.   Yes.

1   Q.   Okay, and the other thing that it was willing to do was

2   direct the credit agent to bid 224 for the assets?

3   A.   Yes.

4   Q.   And the agent wasn't willing to do anything.  It was

5   directed to submit that bid?

6   A.   Yes.

7   Q.   Okay, so coming into the auction, there was some testimony

8   before about the stalking horse bid that was rejected by the

9   company, all right.  But even without the stalking horse bid,

10  you believed, walking into the auction, there was a high

11  likelihood that Black Diamond would win the auction, right?

12  A.   There were many, many lots.  I thought there was a high

13  likelihood that Black Diamond would win a large number of lots.

14  I didn't think it was that high a likelihood that Black Diamond

15  would necessarily win all of the lots.

16  Q.   And one of the reasons you had to believe there was a high

17  likelihood you could win because Black Diamond could use the

18  credit bid to its advantage as the majority lender.

19       MR. BRODSKY:  Objection.  Misstates his prior answer,

20  Your Honor.

21       MR. SHORE:  No, I'm just asking a leading question.

22       THE COURT:  Just restate the question again.

23       MR. SHORE:  Sure.

24  Q.   Isn't it a fact that one of the reasons that there was a

25  high likelihood Black Diamond was going to get the assets is

1  because as the majority lender, it could be directing the way

2  in which the credit bid was used?

3       THE COURT:  I'll allow the question.  Go ahead.

4  A.   I think that was one reason, but it's not the only reason.

5  Q.   Now, I'm going to stay away from the ins and outs of the

6  auction, but isn't it a fact that by the end of the auction,

7  right, a bid was submitted that was a combination of a cash bid

8  and a credit bid, right, by Black Diamond?

9  A.   Yes.

10  Q.   All right, and the cash bid was -- the cash and credit was

11  11, and the credit bid was 224, right?

12  A.   Yes.

13  Q.   And the 224 was not a bid that related to the underlying

14  value of the assets, did it?  It was, rather, a construct that

15  was put together by Black Diamond, right?

16  A.   It was the amount that we were willing to bid on that

17  particular day, given the circumstance.  And I'll explain what

18  I mean by the circumstance, if you'd like me to.  If you'd like

19  me not to, I won't.  But it's what we were willing to bid on

20  that day given the situation that we found ourselves in which

21  we didn't expect, and that's what we were willing to do and in

22  the currency that we were willing to do it in, which was

23  credit.

24  Q.   Right.  I just want to focus on the way the credit bid was

25  done.  The credit bid was a plug number, wasn't it?  It was the

1  difference between the amount of assets which would be left

2  outside the auction, right, subtracted from the total amount of

3  the credit, right?

4  A.   We put in multiple bids over the course of the three-day

5  auction.  Each time we bid, we were looking at what was the

6  leading bid at that point in time and then deciding to bid.  I

7  believe what you're referencing was the final bid.

8  Q.   Yes.

9  A.   And when the final bid was done and we believed -- we were

10  surprised by the change in the auction procedure that happened

11  at the end was we were told there'd be one sealed bid.  There'd

12  be no more bidding after that.  And at that point in time, we

13  decided to bid the full amount of our claim, subtracting out

14  what we thought were the remaining assets that would still be

15  at the estate because the debtor had taken some of the assets

16  out of the auction, which we had originally thought, and under

17  the bid procedures, we thought were going to be in the auction.

18  Q.   When you said "our claim", you didn't bid your claim; you

19  bid all the secured creditors' claim?

20  A.   We exercised our right to direct the agent to credit bid.

21  Q.   Right, but credit bid the lenders' claim.  You said "our"

22  claim.

23  A.   Is there a question?

24  Q.   Yes, what you bid, what you directed to be bid was all the

25  lenders' claims?

1  A.   Correct.  As was -- as was -- as was our right.

2  Q.   Sure.  So under -- well, we have some disputes about whose

3  right it is to do what.  But we'll resolve that in another

4  court.

5      The 250 -- let's start with the 250 million dollar secured

6  claim, all right?  As I understand it, the credit bid was the

7  following math.  You're going to subtract out the eleven

8  million dollars in cash and a note that's going to be raised in

9  the auction, and then you're going to subtract out fifteen

10 million dollars that your team believed was the value of the

11 other assets which were outside the auction, right?  Isn't that

12 how the 224 number got reached?

13 A.   Because at the end of the auction the procedure where it

14 would be one final sealed bid, I made the decision that we

15 would go, what is called, all-in, and making the decision to go

16 all-in, we did a calculation that is similar to what you just

17 said.

18 Q.   Right.  Because you weren't going to -- when you go in all

19 in, you weren't going to waive your lien on what you thought to

20 be other assets outside the auction, right?

21 A.   I wanted to maintain a large enough claim so that we would

22 be able to capture that value at a later point in time when the

23 company decided to sell those assets.

24 Q.   Right.

25 A.   Again, we were surprised by that because the assets that

1  were excluded were originally supposed to be in the auction,

2  and we were surprised, when we got to the auction, that they

3  had been taken out.

4  Q.  Right, what you did there was you bid the maximum amount

5  of the secured claim, less the amount that you thought was out

6  there to ensure the Black Diamond bid of eleven million dollars

7  of cash and a note wasn't overrun by other creditors who were

8  also doing sealed bids, right?

9  A.  Since it was going to be one -- as I say, the process of

10  the auction changed on the last round.  What we had thought --

11  the way the auction had been conducted up to then and how we

12  thought the auction was meant to be conducted was it would be

13  repetitive bidding until no one was willing to bid any higher,

14  similar to how an auction might work if you were to go to

15  Sotheby's.  We were startled when Mr. Manzo changed the rules

16  and said it's one last bid.  And since it was one last bid, and

17  we wouldn't be allowed to rebid, we bid the maximum amount.

18  Q.  Right, so let me go back to my earlier question.  The 224

19  is just math, right?  It's the difference between the eleven

20  million dollars plus the fifteen million you thought was

21  outside the auction, subtracted from the total amount of the

22  secured claim.  It's just math.

23  A.  Well, all bids that we put in, Mr. Shore, are just math.

24  But the logic behind it is what you just said.

25  Q.  Right.  It wasn't that the 224 credit bid was tied to any

1  valuation of the underlying assets such that the agent, for

2  example, just totally choked and thought that the assets that

3  they were buying were actually worth 224 million?

4  A.   I had the right to exercise the credit bid up to a size of

5  that size, and I exercised that right.

6         THE COURT:  Let me just interject a question.  You

7  spoke about what you believed at this hearing.  Did you believe

8  that you could direct the agent to credit bid for the exclusive

9  benefit of the majority lender?

10        THE WITNESS:  I believe that we -- I believe that we

11 had the right to direct the agent to credit bid.  I don't think

12 I thought about it beyond that, Your Honor.  And it -- when the

13 auction changed on that last bid, I used the comment a few

14 minutes ago, given the circumstances, and if you'll allow me, I

15 can tell you what I meant by that.

16        THE COURT:  No, it's all right.  You answered my

17 question.

18 Q.   So then what we have here is the assumption in the 224

19 million dollar credit bid was that there were about 15 million

20 dollars of assets outside the auction, right?

21 A.   That was what we thought at that point in time.

22 Q.   Right, and that was actually based upon a mistake that

23 your team had made in not including certain things in that

24 including cash and an intercompany note, right?

25 A.   That was based on what the people that work for me told me

1    at that point in time.  I don't want to say whether it was a

2    mistake, but I think they could have done a better job at it.

3    On the cash number that they were assuming, they were low.  So

4    they did have cash in their assumption, but it turned out they

5    were probably low on what they were assuming for cash.  And on

6    the intercompany note, the intercompany note was an issue that

7    we were aware of.  We actually had lobbied the debtor hard that

8    it was important that the intercompany note be included.  And

9    we had been led to believe that the intercompany note would be

10   included.  When we put in that last bid, it was at 4 in the

11   morning.  It was after three days had gone by.  We were tired.

12   And after we did it, we realized that the debtor hadn't put the

13   intercompany note back into the auction.

14   Q.   I don't understand what you're saying.  You're saying that

15   it wasn't a mistake; you were just tired?

16   A.   No, I'm saying that on the intercompany note, we knew that

17   there was an intercompany note and we had been pressing the

18   debtor to include the intercompany note as one of the lots.

19   The first day of the auction, in the very, very -- in the

20   morning of it, we met with the debtor and we explained to him

21   why it was important that that intercompany note be included,

22   and the debtor, through their body language, led us to believe

23   that it would be included.  As it turned out, though, they

24   never went in and included it.  So at the end, when we made

25   that calculation of what was left, my guys did not have in it,

1  in that analysis, that intercompany note.

2  Q.   So it was an honest mistake on your part.  You were

3  mislead by --

4  A.   I don't believe that my guys made any dishonest mistakes.

5  I think in terms of the intercompany note, we knew about the

6  intercompany note issue, and the auction was moving fast, and

7  all of a sudden, we noticed afterwards, holy cow, we forgot

8  about the intercompany note.  But we knew there was this

9  intercompany note issue.

10  Q.   Okay.

11  A.   Regarding the cash, the people that worked for me had made

12  estimates for the cash, and they were probably too conservative

13  in the estimates that they made on the cash.

14  Q.   Right, so I think you testified that there were three

15  problems, as you saw it, from the debtors.  One was that they

16  did this final best sealed bid, right?

17  A.   I'm not going to say whether it was a problem, but it

18  wasn't what we were expecting, and it caught us by surprise.

19  Q.   And then there was the issue of the cash movement, and

20  then there was also the issue of assets that were taken out of

21  the auction, right?

22  A.   Can you repeat your question?

23  Q.   Sure.  There were a series -- let's put it this way.

24  There were a series of problems that you saw with the way the

25  auction was run that made you very, very unhappy, right?

1    A.   Yes, we made many, many objections over the course of the

2    auction.

3    Q.   And the main objection, wasn't it, with all of this is

4    that you ended up making too big a credit bid such that value

5    would be flowing to unsecured creditors and even equity?

6    A.   No.

7    Q.   Really, that wasn't your concern?  Your concern was more

8    about what?

9    A.   The objections that we were making over the auction, we,

10   you know, we overestimated some things and we undere -- it

11   turns out we overestimated some things and we underestimated

12   some things as we were figuring out the final bid.  And as I

13   say, we had to do it very quickly, it was done at 3 in the

14   morning, and we were tired.  But that's our own fault.  If we

15   overestimated or we underestimated something, that's Black

16   Diamond's fault.

17        When we made objections at the auction, the objections had

18   to do with specific things that happened at the auction.  For

19   example, there were assets that were taken out of the auction;

20   that was one thing that we had objected to.

21   Q.   Okay, I take it the net effect of all those things,

22   though, was that you were put in a situation in which value was

23   going to be flowing to unsecured creditors and even preferred

24   stockholders, right?  Didn't you tell me that the entire

25   purpose of the option agreement was to act as a hedge to

1  prevent the flow of value?

2  A.   Can you repeat your question?

3  Q.   Sure.  The net effect of what you saw as problems in the

4  auction to which you had objected was that Black Diamond was

5  left in a position where value was flowing to unsecured

6  creditors and potentially even the preferred equityholders,

7  right?

8          MR. STAMATO:  Your Honor, Tony Stamato on behalf of

9  the debtors.  I've given Mr. Shore a lot of latitude here.  I'm

10  just questioning what this has to do with the conduct of the

11  debtors' executives and how it relates to the appointment of a

12  trustee.

13          MR. SHORE:  May I respond, Your Honor?

14          THE COURT:  Yes.

15          MR. SHORE:  The issue, here, is going to be what was

16  the purpose of the amendment, one, and two, what the backing up

17  on this issue of what's the effect on secured creditors, and

18  does anybody believe it's fair.  I don't have to address this

19  issue.  I can go on.

20          THE COURT:  All right, how much further are you going

21  to go on in terms of time?

22          MR. SHORE:  I have two more areas of inquiry:  the

23  amended APA and the option agreement.

24          THE COURT:  That doesn't help me much.

25          MR. SHORE:  That's a half hour at most.

1      THE COURT:  Now, you said --

2      MR. SHORE:  I'm getting long -- I know, I'm getting

3  long answers to very short questions, Your Honor.

4      THE COURT:  All right, we'll take a ten-minute recess

5  and then return.

6      (Recess from 5:43 p.m. until 5:57 p.m.)

7      THE COURT:  Please be seated.

8  CONTINUED DIRECT EXAMINATION

9  BY MR. SHORE:

10  Q.  All right, Mr. Deckoff, we ended -- we were talking about

11  some things that had happened at the auction that had made you

12  very, very unhappy.  I take it that at that time you thought

13  GSC had breached the asset purchase agreement, right?

14  A.  At the auction?

15  Q.  No, following the auction and once you found out what

16  happened with the amount of the assets, right.  You actually

17  tried to lower your bid, right?

18  A.  At the auction, when the rules changed for the last round

19  and we put in our bid, which ultimately was declared the

20  winning bid, the 235 that everyone's talking about --

21  Q.  Let me be clear.  When you say "we put in our bid", now,

22  you put in 11 million dollar bid, and the BD agent put in the

23  credit bid?

24  A.  We put in a joint bid and we had been given permission by

25  the debtor and by the minority lenders to allow us to joint

1    bid.  And when Mr. Manzo gave us that abil -- he gave everyone

2    the ability to joint bid, and it was expressly allowed and

3    consented to that it could be Black Diamond and the agent, and

4    when Mr. Manzo did that, he said that he had spoken to the

5    minority lenders.  People understood that they didn't know what

6    this would result in, that maybe it would help, maybe it would

7    hurt, but that the minority lenders had consented to a joint

8    bid by Black Diamond and the agent.  So the final bid, what I

9    call the 235, is a joint bid between Black Diamond and the

10   agent, the agent being directed by Black Diamond as the

11   required lender.

12       What I wanted to add was, though, on that last round, when

13   the rules changed and we put in that bid, we reserved our right

14   to lower our bid to the minimum bid increment over the next

15   highest bid.  And that was very clearly put on the record and

16   part of the bid that we made that was our winning bid at the

17   auction.  I don't know the exact time period, but my

18   recollection is that a few days later, the APA was signed --

19   this was the original APA, not the amended APA.  And when the

20   original APA was signed, that right was put into the original

21   APA that we retained the right to lower our bid to the minimum

22   bid increment over the next highest bid.

23   Q.   Right, so that was a dispute that was live at that point,

24   which is your belief that you had the ability to lower your

25   bid.

1    A.   I don't know if it was a dispute.  That was how we put in

2    our bid at the end, at the auction, and that was put into the

3    original APA before the amendment.  I don't know that at that

4    point in time there was a dispute.

5    Q.   Well, it came to be a dispute, didn't it?  A dispute so

6    serious that you thought that if Black Diamond lowered its bid,

7    GSC would blow up the deal.

8         MR. BRODSKY:  Objection to form.

9    A.   There was --

10        THE COURT:  One second.  Sustain the objection.

11   Restate the question.

12   Q.   At some point, the issue over lowering your bid was

13   discussed with the debtors, and the debtors said that there

14   weren't circumstances under which they were going to let you

15   lower the credit bid?

16   A.   There was a negotiating meeting that went on.  I,

17   personally, was not at that meeting.  I was traveling back from

18   Europe at the time.  What was told to me by my guys that were

19   at that meeting was that the debtor told them that the 235 was

20   sacrosanct and that if we attempted to lower the bid and

21   exercise that right, that they would squash the deal.

22   Q.   And so would that dispute -- there was also a dispute over

23   the movement of assets, right, after you signed the APA?

24   A.   That was a dispute.

25   Q.   Right, and you believed that the debtors had breached the

1    APA?

2    A.   Yes.

3    Q.   And those two disputes, among some others, were all

4    wrapped up into an amendment to the APA, right?

5    A.   I don't know if I would call it two disputes.  The

6    movement of cash after the auction, I would call it dispute.

7    The issue of lowering our bid was a right that we felt that we

8    had but we were told by the company that if we tried to

9    exercise that right, that they would no longer go forward with

10   the process.  I don't know that that was a dispute, though.

11   Q.   And that was -- do you recall when -- well, first of all,

12   do you have any reason to believe that the signatures

13   weren't -- on the APA amendment weren't delivered on Friday

14   night, December -- before the Monday hearing?  That is --

15   A.   I believe they -- I believe they were delivered on the

16   Friday before the Monday hearing; that sounds correct.

17   Q.   Right.  And what was the reason you were holding up the

18   signatures in that period?

19   A.   I was struggling with giving up the right to lower our bid

20   to the next highest bid because as soon as I gave up that

21   right, then that would lock in the 235, and once the 235 was

22   locked in, that would then cause recovery assets to -- that

23   would cause the secured creditors to be paid in full, and

24   recovery that came out of the remaining assets to flow down

25   lower into the capital structure.  If we had lowered our bid to

1   the minimum bid increment over the next highest bid, then that

2   would not have happened.

3   Q.   And while you were still struggling over that issue, you

4   were also negotiating the option agreement with Mr. Eckert,

5   right?

6   A.   Before that, I actually believe this was an issue that we

7   had commonality with the minority holders on, so I asked our

8   lawyers to reach out to your law firm to see if this was

9   something that we have hit common ground on, and we were

10  rejected on that.  So when we were rejected on that, I then

11  thought of how could we protect ourselves if we give up our

12  right to lower the bid, and I came up with the idea that

13  perhaps we could buy an option from Fred, and if we bought an

14  option from Fred, that would then, you know, protect us from

15  value that was going to go lower down into the capital stock.

16  Q.   Let me go back to my question, please.  While you were

17  struggling over the issue of whether you were going to send out

18  the signatures to the APA, you were also negotiating the option

19  agreement with Mr. Eckert?

20       MR. BRODSKY:  Your Honor, I think asked and answered.

21       THE COURT:  I don't think so.

22       Answer the question, please.

23  A.   Can you repeat the question?

24  Q.   Sure.  You didn't send the signatures until the Friday

25  night before the Monday hearing because you testified that you

1  were struggling over the issue of whether or not unsecured

2  creditors would get paid.  My question is, while you were still

3  struggling with that issue, isn't it a fact that you were also

4  negotiating the option agreement with Mr. Eckert?

5  A.   That is correct because if we could obtain the option

6  agreement with Mr. Eckert, then it was an easier decision for

7  me to make to give up our right to lower our bid.  Ultimately,

8  however, Friday came around and we went ahead and executed that

9  agreement, and we gave up that right to lower our bid before we

10  had the option agreement from Fred.

11  Q.   Before you had the option agreement?  Or before you had

12  the option agreement signed?

13  A.   I think a previous witness, Peter, testified nothing's

14  done until it's signed, and I come from the same school.

15  Q.   Well, when did you reach agreement with Mr. Eckert on the

16  material terms of the option agreement relative to when you got

17  the signature?

18  A.   It was late that -- he and I discussed the terms late that

19  week.  I told Fred, though, that he should talk to his counsel

20  before we did anything and then it got handed over to his

21  counsel.  So at the point in time when we signed the APA, which

22  was on that Friday, I didn't know whether we would ultimately

23  be successful in getting the option agreement with Fred or not.

24  When Friday came, it was push came to shove.  It would have

25  been my -- it would have made it an easier decision to give up

1  the right to lower our bid had we had the signed option

2  agreement from Fred, which is what I would've liked.  But when

3  we got to Friday, we didn't have it, and I ultimately made the

4  decision to give up the right to lower the bid.

5  Q.   Do you think Mr. Eckert was being truthful when he

6  testified before that his mental state was that you weren't

7  going to deliver the signatures on the APA amendment until the

8  option agreement was agreed to?

9  A.   I believe he was being truthful and that was what he

10  believed.  Had we not, however -- I think one thing that's a

11  little bit different is had we not signed the amended APA, the

12  original APA would have still been in force and been binding.

13  So it would not have necessarily meant that Black Diamond was

14  walking from the deal entirely.  It would've meant that the

15  operative document would've been the original APA which was

16  signed, which was the one that had the provision in it

17  regarding lowering our bid.

18  Q.   Okay, so just so we understand the importance of the

19  option agreement, Mr. Bacon stood up at the opening and said

20  that Black Diamond is not going to be ripping up that option

21  agreement.  Was he truthful when he said that?

22  A.   Yes.

23  Q.   Okay, so I take it that you're not going to go forward

24  with the sale if that option agreement isn't in place?

25  A.   We are where we are right now.  There's an amended APA

1    that's been signed.  There's an option agreement that Fred did

2    execute that we have, and we're anxious to go forward and close

3    the transaction and we're anxious to move into the sale

4    hearing.  If that doesn't happen, then we'll have to assess the

5    situation at that point in time.

6    Q.   Just want to answer -- can you answer my question?  Is

7    Black Diamond willing to proceed with the sale process and the

8    amended APA without the option agreement?

9    A.   No.

10   Q.   Okay, so if you could turn to what's Trial Exhibit 70,

11   please, which is your declaration that was filed, I think, late

12   yesterday afternoon.  Can you go to Exhibit 70?

13   A.   Okay.

14   Q.   I want you to turn to page 7 of that.  This is your

15   declaration, right, that you executed under penalty of perjury?

16   A.   Yes.

17   Q.   Okay, so turn to page 7.

18   A.   Okay.

19   Q.   You state at the end of paragraph 15, "I believe the deal

20   that was made with Mr. Eckert was advantageous for BDCM, and

21   one that I believe will ultimately be profitable for BDCM" --

22   and that's the option agreement, right?

23   A.   Yes.

24   Q.   And then you say, "but one which has nothing to do with

25   the debtors."  That's what you say there, right?

1   A.   Yes.

2   Q.   But you are not willing to close the transaction unless

3   the option agreement is in place, right?

4   A.   The option agreement is a separate agreement from the

5   amended APA.  We are prepared to go forward and close the

6   amended APA, and on the option agreement, we're not prepared to

7   tear up the option agreement.

8   Q.   Right, so my point is, if, for example, Mr. Eckert said,

9   you know what?  My momentary lapse in judgment, I'm going to

10  write Mr. Deckoff a letter and say, I hereby rescind the

11  agreement.  Sue me for breach of damage contracts, but I'm not

12  going to deliver you my shares or my claim, okay?  Wouldn't

13  that have everything to do with the debtors?  Because you're

14  not going to be closing the transaction.

15  A.   I don't think that's correct.

16  Q.   What's incorrect about that?

17  A.   I don't believe our amended APA is contingent on that

18  option agreement or the enforceability of that option

19  agreement.  We have a binding APA which I believe is binding

20  both on us -- obviously it's subject to the Court's approval,

21  but I believe it's binding on us and binding on the debtor

22  regardless -- there's no -- there's no mention of the option

23  agreement in the APA.

24  Q.   That's my point.  There's nothing in the APA which says

25  one of the contingencies of Black Diamond closing is Mr. Eckert

1    fulfilling his obligations under the option agreement; that's

2    not in the APA that was put up for approval, right?

3    A.    No.

4    Q.    But what you're saying is an implicit term is Black

5    Diamond is not going to close unless that option agreement is

6    there.

7    A.    That's not what I said.

8    Q.    And then you say down later --

9    A.    We're -- we're prepared to honor that option -- we're

10   prepared to honor the APA as the APA is drafted and --

11   Q.    But only if the option agreement's there.

12   A.    That's untrue, uncorrect (sic).

13   Q.    So let's go back.  Are you willing to close if the option

14   agreement is not in full force and effect?

15   A.    We are willing to close the deal independent of the option

16   agreement.  However, that doesn't mean I'm willing to tear up

17   the option agreement.

18   Q.    Okay, so we got this now.  So that one of the

19   prerequisites is that the option agreement is still in full

20   force and effect.

21          MR. BRODSKY:  Objection.

22   A.    No, it's not.

23          THE COURT:  I'll sustain the objection.  Move off this

24   point, please.

25   Q.    And then you say in paragraph 16, "And contrary to the

1  allegations by the non-controlling lenders, if the option

2  agreement was not entered into to induce Mr. Eckert to cause

3  GSC to enter into the amendment of the APA, but as stated

4  above, was in fact negotiated after that amendment to address

5  an issue raised by the amendment."  Right?

6  A.   Yes.

7  Q.   Just so we're clear, though, that it was negotiated while

8  the amendment was still open, right?

9  A.   It was -- I approached Fred on this after the amendment

10  had been negotiated, however, before I had executed it.

11  Q.   Right, you said before --

12  A.   The amendment had been negotiated by Mr. Goldfarb and Mr.

13  Nahas; as I said, I was not there.  The negotiation of the

14  option was after the negotiation of the amendment.  The

15  execution of the agreement on the option was after the

16  execution of the amendment.  The negotiation of the option,

17  while after the negotiation of the amendment was before I

18  signed the amendment.

19  Q.   Right, and my point is you said you don't really have a

20  contract until the signature's there, right?

21  A.   That is correct.

22  Q.   So you negotiated the option agreement before there was

23  ever a deal on the amendment, right?

24  A.   It was -- I negotiated the option after the amendment had

25  been negotiated but before I signed it.  And then when push

1   came to shove, I signed the amended APA without having the

2   option agreement in hand.  So had Fred not, over the following

3   weekend, signed the option, we would have been in a position

4   where we had signed the APA and not had an option agreement.

5   Q.   And is it your testimony that no one communicated to you

6   that Mr. Eckert had agreed to the terms of the option

7   agreement?

8   A.   Fred and I discussed the terms and he said he was

9   agreeable.  And I said before we do this, you should talk to

10   your lawyers.  And he said he was going to do that.  At that

11   point in time, that moved over, I believe, from Fred to Fred's

12   lawyer and from me to Sam Goldfarb, and in terms of the actual

13   documentation of it, I wasn't involved in it.

14   Q.   Okay, so do you -- at least from your conversations with

15   anybody, do you have any reason to believe that Mr. Eckert

16   wasn't delivering the signature on that?

17   A.   I don't know.

18   Q.   Okay, well, when you sent around a copy --

19         MR. SHORE:  Can we just take a one-minute break, Your

20   Honor?  Sorry to interrupt.

21         THE COURT:  Go ahead.  But if it's one minute, I'm

22   staying here.

23         MR. SHORE:  Actually, I have no further questions,

24   Your Honor.

25         THE COURT:  All right, thank you.

1      Any --

2          MR. BRODSKY:  Short cross, Your Honor.

3   CROSS-EXAMINATION

4   BY MR. BRODSKY:

5   Q.   David Brodsky from Latham & Watkins for Black Diamond.

6   Mr. Deckoff, with respect to the consulting agreement and the

7   management contract, did you ever suggest to Mr. Eckert or to

8   Mr. Frank that the employment and consulting agreements that

9   were offered to them were intended to influence their decisions

10  at the auction?

11  A.   Absolutely not.

12  Q.   Did you hear Mr. Shore's opening statement when he said

13  that the auction was tilted to Black Diamond?

14  A.   I don't remember his exact words, but I believe he said

15  something of that nature.

16  Q.   Now, you attended the full several-day auction, correct?

17  A.   Yes.

18  Q.   Was there any action taken by Mr. Eckert or Mr. Frank that

19  tilted the auction to Black Diamond?

20  A.   No.

21  Q.   Now, you testified briefly about the APA amendment.  There

22  were two issues with respect to the APA amendment, isn't that

23  right?  The six million dollar cash movement, and also the

24  right to drop the price?

25  A.   Yes.

1   Q.  And your concern about the right to drop the price was if

2   you did not have that right, then there would be, what you

3   referred to earlier as leakage, leakage to tranches below the

4   secured creditors, correct?

5   A.  Yes.

6       MR. SHORE:  Objection.  Leading, Your Honor.  He needs

7   to avoid that going forward.

8       THE COURT:  It is leading.

9       MR. BRODSKY:  Sorry, Your Honor.

10   Q.  Can you tell the Court why you entered into the amendment

11   to the APA?

12   A.  We wanted to resolve the issue about the cash that had

13   been moved after we had signed the original APA.  And then the

14   debtor was insisting that we take away our right that we had to

15   lower our bid.

16   Q.  Now, once those issues were resolved, you then signed the

17   option agreement, correct?  I'm sorry.  Did you then sign the

18   option agreement?

19   A.  The option agreement wasn't signed until after the APA was

20   signed.

21   Q.  Sometime after the APA amendment was signed, did you then

22   enter into the option agreement with signatures?

23   A.  Yes.

24   Q.  During the negotiation of that option agreement, did you

25   ever threaten to ditch the sale process in any conversations

1  you had with Mr. Eckert or any of his representatives?

2  A.   I didn't threaten -- I did not threaten to ditch the sale

3  process.  I did threaten to not sign the amended APA and that

4  without the option agreement, I didn't want to give up our

5  right to lower our bid.

6  Q.   But did you tie the signing of the option agreement to

7  going forward with the sales process?

8  A.   No.

9  Q.   And just to clarify a bit of confusing testimony,

10  questioning and testimony a moment ago with Mr. Shore asking

11  you some questions, did you testify that you would go forward

12  with the deal if the option agreement fell for some reason?

13  A.   I'm not willing to tear up the option, but I'm willing to

14  go forward with the transaction, regardless of the option.

15          MR. BRODSKY:  I have no further question.

16          THE COURT:  Thank you.  Anyone else?

17          MR. STAMATO:  Your Honor, nothing from the debtors.

18          THE COURT:  Mr. Shore?

19          MR. SHORE:  Nothing Your Honor.

20          THE COURT:  All right, thank --

21          MR. BRODSKY:  Your Honor, I just want to make sure

22  that Exhibit 70, Mr. Deckoff's declaration was in.  I think Mr.

23  Shore moved it or referenced to it.  I just want to make -- if

24  it's not already moved, I'd move Exhibit 70.

25          THE COURT:  All right, we haven't addressed that at

1    all, so I'll reserve on this until then.

2              You may step down.  Thank you.

3         (Witness excused)

4              THE COURT:  All right, next witness.

5              MR. SHORE:  We actually just have deposition

6    designations right now for Mr. Manzo.

7              THE COURT:  Oh, we're not --

8              MR. SHORE:  And just one of Mr. Frank from yesterday.

9              THE COURT:  And that will conclude everything?

10             MR. SHORE:  Yes, Your Honor.

11             THE COURT:  Do you need time to -- and the debtor?

12   What does the debtor intend to do?

13             MR. STAMATO:  Your Honor, in the interest of

14   streamlining this process, I spoke with Mr. Hammond and have no

15   objection to the use of deposition designations.  But we never

16   actually saw the designations.  I know that things are moving

17   pretty fast, so, I believe I have his agreement to allow me to

18   put Mr. Manzo on the stand for a short cross on what I

19   anticipate those designations to be.  And then the movants can

20   rest their case.

21             THE COURT:  All right.  So Mr. Shore, then, do you

22   need a break before you put the designations in?

23             MR. SHORE:  I've got the designations here.  I just

24   don't know whether they want to --

25             THE COURT:  Do you need more time to look at them?

1          MR. STAMATO:  I'm comfortable, Your Honor.  I've been

2     in all the depositions, and I'm pretty sure I know where he's

3     going to go and I'm comfortable proceeding with Mr. Manzo.

4          THE COURT:  All right.  We need Mr. Manzo to take the

5     stand first, then, to facilitate this?

6          MR. STAMATO:  I'm happy to proceed in any order that

7     movant's counsel would like.

8          THE COURT:  All right, Mr. Shore, do you want to do

9     the designations?

10          MR. SHORE:  Well, I can hand to the Court and

11     everybody the designations.  I just -- whether you want to then

12     put -- I can rest after I hand this document off and it's in.

13     That's all.

14          THE COURT:  All right.

15          MR. STAMATO:  I would propose that he hand up the

16     document.  I call Mr. Manzo for some limited cross, and then he

17     can rest.

18          THE COURT:  All right.  All right, hand it up.  And I

19     assume you need a copy for Mr. Manzo as well, unless there's

20     one up here.

21          MR. SHORE:  May I approach, Your Honor?

22          THE COURT:  Yes.

23          MR. SHORE:  All right, here are the designations.  The

24     transcript is in this.

25          (Pause)

1    THE COURT:  One thing I do request.  Mr. Shore, can

2  you take, or if you have another copy of the deposition, a

3  two -- I guess there's two volumes to this deposition, this

4  part of designation -- and have someone highlight these lines

5  in accordance with this exhibit that you handed up.

6    MR. SHORE:  Yes.  I don't know that we have multiple

7  copies, and yes, I can get you that quickly.

8    THE COURT:  Well, you can take this set I have now, if

9  somebody wants to do it.

10    MR. SHORE:  And just get someone to highlight it?

11  Absolutely, Your Honor.

12    THE COURT:  All right.

13    MR. SHORE:  And then the only other issue we have on

14  our side is moving in the exhibits.  I don't think anybody has

15  any objections to any of the exhibits that are there.  I just

16  would, for record purposes, we can go through and call out some

17  of the stuff which is really more sale hearing related.

18    THE COURT:  All right.  Mr. Manzo, will you take the

19  stand?

20    (Witness duly sworn)

21  CROSS EXAMINATION

22  BY MR. STAMATO:

23  Q.   Good evening, Mr. Manzo.  For the record, again, Tony

24  Stamato on behalf of the debtors.  Mr. Manzo, can you tell me

25  where you presently work?

1    A.   I'm employed at Capstone Advisory Group.

2    Q.   What type of services does Capstone provide?

3    A.   It's a financial restructuring firm.

4    Q.   What is your position at Capstone?

5    A.   I'm executive managing director.

6    Q.   How many years of experience do you have in the

7    restructuring business?

8    A.   Approximately 27 years.

9    Q.   Can you provide me with an estimate of how many

10   restructuring projects you have worked on over the course of

11   your professional career?

12   A.   3 to 400, conservatively.

13   Q.   Have you testified at bankruptcy court before?

14   A.   Yes, I have.

15   Q.   Have you ever been qualified as an opinion or as an expert

16   witness?

17   A.   Yes, I have.

18   Q.   How many occasions?

19   A.   Oh, probably four or five.

20   Q.   In the course of your professional career, has anybody

21   ever impugned your professional integrity?

22   A.   I only recall a matter last year where, in Your Honor's

23   court, someone made that inference, yes.

24   Q.   Is that the only occasion?

25   A.   That's the only occasion.

1    Q.   Mr. Manzo, when did Capstone begin working with the GSC

2    Group?

3    A.   I believe at the end of February of 2009.

4    Q.   Are you the leader of the Capstone team in connection with

5    the GSC matter?

6    A.   I am at the moment.  I was not when Capstone got the

7    assignment.  I was on another matter and joined the team

8    subsequent to that.

9    Q.   When did Capstone get the matter?

10   A.   Again, I believe at the end of February of 2009.

11   Q.   And when did you join the team?

12   A.   I believe it was probably some time in the April/May time

13   frame.

14   Q.   Of 2009?

15   A.   I'm sorry, yes, of 2009.

16   Q.   And who are the members on your team working with you on

17   the GSC project?

18   A.   There are several.  The principal members are Bob Butler

19   and Ron Zaidman.

20   Q.   And from that time, have those individuals been working

21   with you on the project?

22   A.   I believe the answer's yes, on and off as the matter

23   sometimes would accelerate, in terms of pace, and then would,

24   again subside in terms of certain activities.  But yes, they've

25   been on it from the inception, I believe.

1  Q.   What is the nature of Capstone's role in connection with

2  this engagement?

3  A.   We represent the various GSC entities and initially were

4  retained to assist them in attempting to complete an out-of-

5  court restructuring with its senior lenders.

6  Q.   And this is a process that's been going on for over a year

7  and a half now?

8  A.   That's correct.

9  Q.   And in connection with that work, have you become familiar

10  with the GSC Group's capital structure?

11  A.   Yes, I have.

12  Q.   And in connection with that work, have you become familiar

13  with GSC's day-to-day operations?

14  A.   I have.

15  Q.   Who are the senior executives at GSC?

16  A.   The two principal executives are Peter Frank, who is the

17  president, who is really our day-to-day contact that we work

18  with on day-to-day operations, and Mr. Eckert, who is the CEO

19  and chairman.

20  Q.   Are Mr. Frank and Mr. Eckert members of the GSC Group's

21  board of directors?

22  A.   I believe they are.

23  Q.   Is there anybody else that presently sits on the board, to

24  your knowledge?

25  A.   No, I believe it's just the two of them.

1  Q.  Do you have an understanding of, for want of a better

2  phrase, how the chain of command works at GSC, vis-a-vis

3  decision-making between Mr. Eckert and Mr. Frank?

4  A.  Well, in my experience, since I've been involved, when

5  there are matters that require a decision -- and I'm speaking,

6  now, to matters as it relates to restructuring issues -- that

7  it is typical that we would first go to Mr. Frank -- again,

8  because our day-to-day contact on a daily basis is with Mr.

9  Frank -- and we would discuss that particular matter, and then

10  there'd be a decision made as to whether or not that was a

11  situation that Mr. Eckert needed to be either apprised of or

12  whether or not he needed to opine in terms of whether it was

13  appropriate to proceed a certain way.

14  Q.  As a general matter, what types of decisions did Mr.

15  Eckert get involved in?

16  A.  Well, when we -- when talking about significant issues in

17  the restructuring or significant issues in the asset sale

18  process, either myself or Mr. Frank would certainly inform Mr.

19  Eckert, listen to any suggestions that he had, and then we

20  would have a joint discussion, oftentimes.

21  Q.  Has the GSC board of directors conducted any meetings

22  while you have been involved in the engagement?

23  A.  Yes, I'm aware that there have been some board of director

24  meetings.

25  Q.  Have you been in attendance at any meetings?

1  A.  Yes, I believe I've been in attendance at several.

2  Q.  How many meetings are you aware of that have been

3  conducted over the last year and a half, during the course of

4  your engagement?

5  A.  You know, my recollection, I don't have specific dates,

6  but I recall somewhere between four and six meetings, four and

7  five meetings, something in that neighborhood.

8  Q.  When was the last board meeting that you attended?

9  A.  I believe I was on a call a couple of weeks ago when we

10  were talking about amendments to the APA and the process of

11  getting things accomplished and done in terms of furthering the

12  sale.

13  Q.  And have GSC's attorneys been involved in any of the board

14  of directors meetings that you've attended?

15  A.  Yeah, in fact, I believe that every meeting that I have a

16  recollection of attending, representatives from Kaye Scholer

17  were in attendance, as well.

18  Q.  Okay, over the course of Capstone's engagement, have you

19  become familiar with any credit facilities that GSC maintains

20  with third party banks?

21  A.  Yes, I'm aware of those.

22  Q.  Can you provide me with some detail?

23  A.  Sure.  When I initially got involved with the assignment,

24  we were beginning to enter into a negotiation, as I indicated

25  earlier, of a consensual plan of reorganization done outside of

1     court with that senior lender group which was owed

2     approximately -- at that time it was a lot less, of course --

3     but approximately 245 million dollars at the moment.  That plan

4     called for the lenders to receive a revenue stream from the

5     collection of the various management fees and capital interest

6     of GSC over a period of time, and there was a very spirited

7     negotiated that took place over a number of months to try to

8     effectuate that transaction.

9     Q.   I can take a step back.  You said senior lender group.  Is

10    there an agent on that facility?

11    A.   At the time that I'm speaking, in 2009, it was Guggenheim

12    was the agent for the bank group.

13    Q.   And in your experience, what is the role of the agent --

14    what role does the agent play in multiparty credit facilities?

15    Or, should I say multilender credit facilities?0

16          MR. SHORE:   Objection, Your Honor.

17          THE COURT:   What's your objection?

18          MR. SHORE:   Irrelevance to what we're doing, here.

19    We're late in the night, we didn't get into a direct exam from

20    the witness like everybody else has done.  So we're just put in

21    a position of having to essentially accumulate a day's

22    testimony.  Every single question that's been asked so far has

23    been cumulative, and this one is irrelevant.

24          MR. STAMATO:   Actually, I think -- two things.  First,

25    the choice to submit the deposition designations was made by

1   counsel for the non-controlling lenders.  I agreed to that in

2   the spirit of accommodating them.  Second, there has been some

3   questions, here, about the role the agent played in connection

4   with the credit facility and decisions that were made at the

5   auction, and I'm just asking Mr. Manzo what his experience has

6   been with the role of an agent.

7           THE COURT:  I'll allow the question.

8   A.   Yeah, I heard the question.  In my twenty-five years plus

9   experience, I have represented hundreds of money center bank

10  agents in these types of transactions.  And so it's fairly

11  typical, in my experience, that the agent oftentimes is the

12  point person and the conduit for the company to communicate to

13  and to further discussions with respect to amendments of credit

14  facilities and then often, sometimes, in discussions and

15  negotiations regarding new forms of liquidity that are used

16  from time to time by a company or debtor.

17  Q.   And is that general experience with agents consistent with

18  what the role the agent has been undertaking in connection with

19  this GSC senior credit facility?

20  A.   Yes, I think it is consistent.

21  Q.   Okay, and you mentioned that Guggenheim was the agent

22  initially, when you first got involved.  And did that at some

23  time change?

24  A.   It did.  It changed in the middle part of 2010 when we

25  were informed by, I believe it was Guggenheim that, in fact,

1   the major holder of bank debt, HBOS, a Scottish lender, had

2   sold its majority position in the facility to Black Diamond.

3   And then we were shortly informed by Black Diamond that they

4   would, in fact, be taking over the role of -- the agency role

5   of the bank syndicate.

6   Q.   And at what point in time was that?

7   A.   I believe it was the middle part of 2010.

8   Q.   So is it fair to say that at some point in 2010, you began

9   discussions with Black Diamond about restructuring alternatives

10  for GSC?

11  A.   We did, but we actually started even a little bit in

12  advance of that because when the initial -- my initial

13  involvement with trying to negotiate an out-of-court deal with

14  the bank group came to loggerheads, Black Diamond became

15  involved.  They were a lender at the time, and they become

16  involved in negotiating with the lender group, what we referred

17  to as a sub-advisory deal.  That is, they were negotiating with

18  the lender group to essentially take over the day-to-day

19  administration of the various funds in exchange for a fee.  And

20  certain employees of GSC would stay involved.  And so the pace

21  of the negotiations switched from a separate negotiation with

22  the lender group to now one involving a new party who would go

23  ahead and oversee the day-to-day operations of the various

24  funds.  That took place in the spring to middle part of 2010.

25       At that point, later on in approximately the July time

1  frame, those negotiations ceased between the lender group and

2  Black Diamond group for reasons, I don't know exactly why, and

3  then we began a direct dialogue with Black Diamond when they

4  became a majority lender on a different transaction.

5  Q.   Okay, and when that new dialogue began about the different

6  transaction you just characterized, with whom at Black Diamond

7  were you dealing?

8  A.   Three -- primarily two representatives and oftentimes a

9  third one.  Steve Deckoff, Mounir Nahas, and Sam Goldfarb being

10  the three principal people from Black Diamond that we had

11  interface with once they became a majority lender.

12  Q.   And just in the interest of moving this along, can you

13  give me a quick overview of what the nature of those

14  discussions entailed?

15  A.   Sure.  Black Diamond's view at that point was that the

16  debtor had really exhausted, over the past year and a half,

17  opportunities to do a consensual standalone plan of

18  reorganization outside of court and really rather believed that

19  the best answer to solve the problem with the lenders was to

20  embark on a sale of the company as part of a bankruptcy plan

21  and as part of a 363 sale.  And so when debtors have this type

22  of a lending position by its majority lender, particularly one

23  that has control of cash -- which this lender had, even going

24  back to Guggenheim, the control of cash was with the agent --

25  we very quickly entered into a negotiation on terms and

1    conditions of a 363 sale.

2    Q.   And were you authorized by members of GSC's management to

3    conduct these negotiations on behalf of GSC?

4    A.   Yes, I was, and, you know, as part of a normal engagement

5    that we would have, we would undertake that effort, principally

6    because principals of companies, even financial service

7    companies, are not sophisticated enough, not having been

8    through the issues that a debtor encounters in a 363 sale, and

9    so Mr. Frank and Mr. Eckert were very clear to myself and

10   representatives of Kaye Scholer that we would take the laboring

11   oar in those negotiations, including, you know, cash collateral

12   negotiations, including bidding procedures which were essential

13   to this 363.  We did that, kept Messrs. Frank and Eckert

14   involved in it, and ultimately wound up with a consensual set

15   of bidding procedures and a cash collateral order.

16   Q.   And from time to time, has Mr. Frank or Mr. Eckert

17   participated in those discussions?

18   A.   Oh, absolutely.  There were frequent discussions often --

19   certainly with Mr. Frank on a daily basis between me, him and

20   various counsels from Kaye Scholer and less frequently with Mr.

21   Eckert, but certainly on a periodic basis during the week.  As

22   things changed or things got resolved, he was certainly

23   updated.

24   Q.   And I don't want to put words in his mouth, but I believe

25   I heard Mr. Deckoff state that he had a conversation with you

1  at some point about implementing arrangements with management.

2  Do you recall that conversation?

3  A.   I do.

4  Q.   Can you tell me about what you recall?

5  A.   Sure.  As part of every engagement that I'm involved in,

6  particular when we're trying to sell a company in a 363 sale,

7  we're very concerned about the key management people staying in

8  place throughout the sale process.  And so I advised Mr. Frank

9  and Mr. Eckert that I believed that the debtor needed to put in

10  place a program to keep its people in place, so that as we

11  walked through due diligence in through a sale process, that in

12  fact there were people there running the business day to day

13  that would show a good face to prospective third party

14  purchasers.  Fairly common that we do this in each and every

15  situation when we're doing what I would consider to be a very

16  fast sale.  And the discussion I had with Mr. Deckoff was

17  related to the retention program for the management people and

18  it's a very broad list of management people at GSC.  I did not

19  have any discussions with him regarding individual contracts

20  for Messrs. Frank or Eckert.

21  Q.   And so in picking up on that, did you ever tell Mr.

22  Deckoff that an ongoing condition -- a condition of ongoing

23  discussions would be putting some type of resolution to

24  employment arrangements regarding Mr. Frank or Mr. Eckert?

25  A.   No, not individually.  My focus at this point of the case

1  is really to ensure to maximize the value of the assets for the

2  benefit of the estate is to make sure the right people are

3  running the business on a daily basis so when buyers do due

4  diligence, they're prepared to pay a maximum price.  So they

5  were part of the team, but it was certainly a very long list of

6  people.  My recollection is there were probably twenty or

7  twenty-two people on that initial list that I thought, based on

8  my discussions with the company and my colleagues at Capstone,

9  should have programs to ensure their continued employment at

10  the company.

11  Q.   As these discussions with Black Diamond continued through

12  the summer of 2010, was it ever contemplated that Black Diamond

13  would make a stalking horse bid?

14  A.   As we proceeded later on in the summer as we approached

15  the bankruptcy, which occurred at the end of August, we began a

16  dialogue with Black Diamond and what their interest level was

17  with respect to being a bidder at a 363 sale.  And it was not a

18  surprise to me.  I knew for many months that they would

19  certainly be interested in buying these assets.  And there was

20  a discussion regarding a negotiation of an asset purchase

21  agreement that might embody a stalking horse bid.  And those

22  negotiations between counsel at Kaye Scholer and counsel at

23  Latham & Watkins commenced on the form of an APA.  However, the

24  amount of the stalking horse bid really was not discussed until

25  a very short time before the bankruptcy, something that I was

1  very displeased about because I did not want to get boxed with

2  a bankruptcy, with issues on cash collateral, and then being

3  forced to accept what I would consider to be potentially a low-

4  balled stalking horse bid.

5  Q.   Did Black Diamond ever put a value on their stalking horse

6  bid?

7  A.   Yes, again, shortly before the bankruptcy, there was an

8  offer made to the debtors for a, I believe, a five million

9  dollar purchase price.

10  Q.   And was that offer rejected?

11  A.   Yes, rejected.  I spoke to Mr. Frank and Eckert.  It

12  wasn't a long discussion, and I was very candid.  I absolutely

13  would not recommend to the company that they accept a stalking

14  horse bid at that level from anybody.  I would prefer to have a

15  naked 363 sale and not permit the market to realize that, in

16  fact, the debtor might think that five million could be

17  indicative of value.

18  Q.   Through the course of this work, did you become aware if

19  Peter Frank entered into any contractual arrangements with

20  Black Diamond?

21  A.   Yes, I think Peter, as well as Fred, informed me at one

22  point that they actually had entered into an agreement with

23  Black Diamond with respect to future employment.  But it was

24  after the fact.

25  Q.   Were you involved in those negotiations on their behalf?

1    A.   No, I was not involved in any negotiations with Mr. Frank

2    or Eckert or anyone from Black Diamond.  The only negotiation

3    that I ever had with Black Diamond regarding Mr. Frank and

4    Eckert was during the sub-advisory negotiation period, which

5    was earlier in 2010, when GSC was still going to be involved

6    and the certain employees of GSC were going to be involved, I

7    did have discussions on behalf of the company with Black

8    Diamond regarding Eckert and Frank's ongoing involvement

9    because at that point it was critical to GSC to make sure it

10   retained senior people to be able to interface with the sub-

11   advisory in the future.  But once those negotiations ceased, I

12   did not have any more discussions with Black Diamond regarding

13   those two individuals.

14   Q.   Okay, and if I can shift this back into the time where --

15   shift back to the employment agreement with Mr. Frank and the

16   consulting agreement, I believe, with Mr. Eckert.  In your

17   experience, is it unusual for a party that's interested in

18   acquiring the assets of a company to enter into employment

19   arrangements with key executives?

20   A.   No, in bankruptcy circles, it's more the case than the

21   exception, in my experience.  I think what's essential about it

22   is that it needs to be handled properly in the context of

23   involving third party bidders because it can have an

24   opportunity to chill the process.  And here, I was very careful

25   to make sure that all the interested parties who executed

1   confidentiality agreements which numbered close to a hundred

2   with eighty people doing specific due diligence in a data room,

3   that they all realized that in fact Mr. Eckert and Mr. Frank

4   had agreements, that they were free to speak to them if they

5   wanted to discuss with them future employment, and to my

6   knowledge, no bidders had an issue with those agreements that

7   were in place.

8   Q.   And just so I can close the loop on the issue of

9   employment agreements and arrangements between GSC executives

10  and Black Diamond, at some point in time, did you become aware

11  of the so-called option agreement between Mr. Eckert and Black

12  Diamond?

13  A.   Yes, I did.

14  Q.   And when did you become aware of that?

15  A.   Well, as I said in my declaration, on Wednesday, December

16  1st, I got a call from Mr. Eckert who I had -- who I had called

17  that evening to give him an update on the negotiations of the

18  asset purchase amendment that we were negotiating on November

19  30th, that Tuesday, and he informed me on the Wednesday that he

20  had recently had a discussion with Mr. Deckoff where Mr.

21  Deckoff suggested to him that perhaps maybe there would be a

22  good idea to enter into an option agreement.  And I remember

23  saying to Fred, well, what are you talking about?  And he

24  explained the terms, the business terms of that option

25  agreement.

1  Q.   Did you tell Mr. Eckert that this was a bad idea?

2  A.   Yeah, initially, I was very displeased.  I told him that I

3  thought this had an optic issue that would be significant here,

4  given the litigious nature of the case, as it related to the

5  intercreditor disputes.  And I thought this would be, you know,

6  incredible fodder for continuing arguing and fighting and

7  depositions and, regrettably, that's what's happened.

8  Q.   Did you tell him it would jeopardize the sale process?

9  A.   Yeah, absolutely.  I told him it was -- it could put the

10  transaction in jeopardy and strongly urged him to not enter

11  into it and told him that I would immediately call counsel from

12  Kaye Scholer to get their advice since this was a legal issue,

13  and that we couldn't give him advice since this was a personal

14  matter.  And at that point, I called Mike Solow from Kaye

15  Scholer.

16  Q.   And we've heard some testimony from Mr. Eckert as well as

17  Mr. Frank on the timeliness of when you may or may not have

18  been told by them about the existence of this option agreement.

19  Just to expedite this, do you stand by the statements in your

20  second supplemental declaration on this issue as you sit here

21  today?

22  A.   Absolutely.

23  Q.   And do you stand by the statements that you made in the

24  deposition we had last week, where I asked you some specific

25  questions about the option agreement?

1    A.    Yes, I do.

2    Q.    Okay.  Does the existence of the option agreement itself

3    change any reviews in the various declarations that you filed

4    regarding the value realized by the estate in connection with

5    the auction?

6    A.    No, it doesn't, because from my view, representing GSC,

7    the option agreement from a financial point of view neither

8    helps nor hurts recoveries to the GSC estate.  It may, in fact,

9    involve different recoveries for Mr. Eckert or Mr. Deckoff, but

10   they have nothing to do with the recovery for the GSC estate.

11   Q.    Now, as part of bankruptcy -- let's step back to the

12   fall -- you're aware that a motion was filed regarding

13   prospective bid procedures in connection with the case?

14   A.    I certainly am.

15   Q.    Were you involved in the negotiations regarding those bid

16   procedures?

17   A.    Yes, I believe I was involved in probably most of them, if

18   not all of them.

19   Q.    With whom were you negotiating?

20   A.    On the business issues, directly with representatives from

21   Black Diamond, that's a combination of Mounir Nahas and

22   Goldfarb and a limited number of discussions with Mr. Deckoff,

23   but a large number of discussions with Messrs. Nahas and

24   Goldfarb.

25   Q.    And are you aware whether any objections were filed to the

1    proposed bidding procedures that were submitted in connection

2    with the debtors' first day motions?

3    A.   Yes, yes, there were by the, what are called the non-

4    controlling lenders and we, too, as they felt at that time that

5    there were certain provisions of those bidding procedures,

6    which I was reluctant to accept, but did so for fear of

7    potentially this bankruptcy case spiraling out of control.

8    They chose to raise those issues.  I'm thankful that they did.

9    It permitted us to have more time primarily to market the

10   assets of GSC, which, I think, insured a more fulsome auction

11   process in a more fulsome due diligence process with third

12   parties.

13   Q.   And, at some point did the objectors come to a resolution

14   with the debtors and Black Diamond regarding the proposed bid

15   procedures?

16   A.   Yes, there was a consensual order on the bidding

17   procedures entered.

18   Q.   Now, you've been involved in the auction process, correct?

19   A.   Yes, I have been.

20   Q.   Did Mr. Eckert or Mr. Frank ever delegate any authority to

21   you in connection with the auction?

22   A.   Yeah, they certainly did.  I recall a number of

23   discussions, including some with counsel from Kaye Scholer,

24   where I was quite emphatic.  I believe that, again, it was

25   critical for the bidders at the auction to not believe that

1    Messrs. Frank or Eckert would attempt to do anything that might
2    be viewed by them during their bidding to favor Black Diamond.
3    And I was concerned about it because of the existence of the
4    agreements.  Again, they're common in 363 sales.  The issue for
5    me was safeguarding the process to make sure that, as the
6    financial advisor, there was always an opportunity to maximize
7    the value in the auction.  And so I was, quite emphatic; I
8    didn't think they should be participating to any large extent.
9    They could certainly be there, they should be there, they
10   should give us input.  We approached them on a number of
11   occasions during the course of the auction for suggestions and
12   discussions of various things.  But I was pretty clear:  I
13   didn't want any perception to believe that they were
14   interfering with the auction in a way that bidders might
15   believe that, in fact, this was a fait accompli by Black
16   Diamond.
17   Q.   And just picking up on something you said.  Do you make
18   management decisions on behalf of the debtors?
19   A.   No, I'm absolutely an advisor.  I have no decision-making
20   ability and I think that was clear to everyone.
21   Q.   Okay.  So you're an advisor, and you make recommendations?
22   A.   That's correct.
23   Q.   Okay.  Let's talk briefly about the auction itself.  When
24   the auction first started on, I believe October 26, were joint
25   bids permitted?

1    A.    There was bidding, there were not joint bids permitted at

2    that point.  In fact, we had been quite careful early on in the

3    auction to preclude people from speaking with each other in

4    developing joint bids.

5    Q.    Who was involved in the decision that, I guess for want of

6    a better phrase, opened up the floor to allow joint bids?

7    A.    Well, after, you know, about a day and half in the

8    auction, myself and Mr. Solow from Kaye Scholer, at one of the

9    various breaks we had, began to compare the analysis that

10   Capstone had done with respect to where the various seven or

11   eight bidders at the auction were bidding on which specific

12   assets.  And it became very clear to us that there was an

13   opportunity to get individual auction bidders to join forces

14   together, and in doing so, it might result in an increase in

15   the overall bid to GSC.  And we thought that was important

16   because it was my belief that eventually the agent would go

17   ahead and bid with their credit currency.  And unless we

18   permitted other bidders to join forces together, individually,

19   the bidders would not be able to meet or exceed an individual

20   credit bid from the agent, given the 240 million dollar of

21   self-currency that the agent had.

22   Q.    Were you concerned that allowing joint bids might draw the

23   objection of some parties that were in attendance at the

24   auction?

25   A.    I was.  And, so what Mr. Solow and I did, when we

1   discussed this was, I had, from a business point of view,

2   concluded that it would be inappropriate to proceed with this,

3   because the risk was that the agent and Black Diamond would

4   potentially join forces together.  And the non-controlling

5   lender group, who we had permitted to attend the auction in an

6   observation capacity and bid if they'd like to but they chose

7   not to.  We made a decision and we informed, I believe it was

8   Mr. Frank, who was there at that time that this was an idea

9   that could result in increased value to the estate.  However,

10  the non-controlling lenders, who we were very cognizant of and

11  concerned about their involvement -- and we kept them apprised

12  the entire auction, they had access to everything during the

13  auction period -- we approached them and said that unless they

14  agreed that this was a process that they would support, we

15  would not permit joint bidding to occur.  And what transpired

16  was a several-hour discussion and a document that got produced

17  that memorialized that agreement.

18  Q.   Okay.  And two questions.  First, you mentioned a

19  document, I believe it's marked at Non-controlling Lenders' tab

20  24.  I just want you to look at that, so the record is clear,

21  so you can tell me if that's the document you're referring to?

22  A.   Yes, it is.

23  Q.   And you also said "we approached them", "we" being you and

24  Mr. Solow.  Before you approached them, did you have any

25  discussions at the auction with representatives of Black

1    Diamond about opening up the floor to joint bids?

2    A.    I did not.

3    Q.    Are you aware of any instance where Mr. Frank has chosen

4    to override any recommendations made by Capstone, as it relates

5    to the auction process?

6    A.    No, every time we had a discussion about a particular

7    change to the auction including this one, we discussed it with

8    Mr. Frank.  He oftentimes would ask, as any president of a

9    company would ask, quite a few questions as to why.  And,

10   again, Mr. Frank is a very experienced manager, but not an

11   experienced person as we wouldn't expect him to be in 363 sale.

12   And so, you know, representatives from Kaye Scholer and

13   Capstone would spend a fair amount of time in discussions and

14   for the most part, I don't recall Mr. Frank overriding us in

15   anything that we had recommended to him.

16   Q.    Are you aware of any instances -- let me step back.  Mr.

17   Eckert was in attendance at the auction as well for a portion

18   of time?

19   A.    He was.

20   Q.    Are you aware of any instance where Mr. Eckert chose to

21   override any recommendations made by Capstone at the auction?

22   A.    No.  No, I don't recall any.

23   Q.    Okay.  How long did the auction go and I'm hearing 4 a.m.

24   a lot, was it four days?

25   A.    It went three and half days, yeah, until the last half day

1   was on a Friday, Thursday into, you know, in the 4, 5 o'clock

2   hour on Friday.

3   Q.   And was it your judgment that -- 4 a.m. that Friday

4   morning that the so-called Black Diamond joint bid provided the

5   maximum value to the estate of all the bids that had been

6   received?

7   A.   Yes.  We had -- at each round of bidding we'd evaluate all

8   the bids.  People from Kaye Scholer, Capstone and Mr. Eckert or

9   Mr. Frank, depending on who was there at the moment, would

10  participate in that; and it was certainly my advice to Mr.

11  Frank, who was in attendance at that point that the 235 million

12  dollar combined bid, excuse me, combined bid was absolutely the

13  superior bid at that moment for the debtor.

14  Q.   You said evaluate the bids.  Were some of the bids

15  submitted there in the auction process revenue sharing bids?

16  A.   Yes, they were.

17  Q.   And were you sharing your valuation model and analyses

18  with Mr. Eckert and Mr. Frank during the course of the auction?

19  A.   Yes, we were sharing it with Messrs. Frank and Eckert.

20  But we also shared it with the bidders themselves, because we

21  wanted them to know how we were valuing their bid, so that we

22  made sure that they didn't believe they were bidding more and

23  then have our valuation turn out to be less.  So we wanted to

24  give them the full benefit of understanding our methodology, in

25  an effort to get them to increase their bids.  And they did for

1  several rounds.

2  Q.   And at the end of the auction, after the winning bid was

3  selected, did the debtors execute an asset purchase agreement

4  with Black Diamond?

5  A.   Yes, I believe later on that morning, 5 or 6 o'clock in

6  the morning, I understand Mr. Eck -- Mr. Frank executed the

7  asset purchase agreement.

8  Q.   Okay.  And subsequent to the execution of that asset

9  purchase agreement, did any disputes arise with Black Diamond?

10  A.   Yes.

11       THE COURT:  I want -- all right.  Answer question.

12  A.   Yes, they did.

13       THE COURT:  All right, I wanted to go back to the

14  bidding procedures for a moment.  I think, in response to

15  counsel's question, you felt either obligated or you thought it

16  was important to ask the non-controlling lenders for their view

17  and get their consent to joint bidding?

18       THE WITNESS:  Yes, Your Honor, I did say that.

19       THE COURT:  Why?  What was your concern?

20       THE WITNESS:  Well, Your Honor.  We had heard for

21  quite a while that the non-controlling lenders believed that

22  the relationship between the agent bank and Black Diamond was -

23  - I'll use my words -- one and the same; and I was mindful that

24  the last thing I wanted to do was have a failed auction, that

25  is, an auction where we permitted certain things to happen that

1   later on, they would object to and see -- and attempt to stop

2   the sale from being approved by this Court.  And I believed

3   this was a critical element that they might raise to, perhaps,

4   object to a sale.  And so it was out of an abundance of caution

5   that I suggested to Mr. Solow that we approach the non-

6   controlling lenders to solicit their views, and if they agreed,

7   we would proceed and if they did not agree that they didn't

8   think it was a good idea, we would not permit joint bidding.

9   And I personally had five or six discussions with principals

10  from the non-controlling lenders who were there and their

11  counsel from White & Case, laying out the specific risks that I

12  saw --

13           THE COURT:  Well that's --

14           THE WITNESS:  -- with joint bidding.

15           THE COURT:  Okay, that's what I want you to

16  articulate.  What were the risks that you envisioned?

17           THE WITNESS:  I recall saying to the principals from

18  the non-controlling lenders who were there as well as White &

19  Case that I believed giving Black Diamond -- not the agent but

20  Black Diamond, the management company -- who had bid that it

21  was really their desire to want to own the assets of GSC.  And

22  I fully expected that it was a risk, that if a joint bid was

23  developed, that the allocation, potentially, between the agent

24  on the credit bid side and the Black Diamond piece on whatever

25  currency they chose to bid in a joint bid, might be shared

1   between them in a disproportionate manner.  And I wanted to

2   make sure the non-controlling lenders realized that, in fact,

3   if we permitted joint bidding that could occur, and explained

4   that to them in four, five times, including after they executed

5   the agreement I went back and said, you now realize, this is a

6   real risk, so before I go back into that auction room with Mr.

7   Solow, are you sure you're comfortable with us proceeding with

8   joint bidding.  And they said they were.

9           THE COURT:  All right, thank you.

10          THE WITNESS:  You're welcome.

11          MR. STAMATO:  Thanks, Your Honor.

12  BY MR. STAMATO:

13  Q.   Mr. Manzo, I'm going to move a little bit ahead in time, a

14  little bit more contemporaneously.  We were talking about

15  whether --

16          THE COURT:  Just wait.  I need to take a very short

17  recess.  So we'll take ten-minute recess.

18          MR. STAMATO:  Sure.  I don't have very much more --

19       (Recess from 7:00 p.m. until 7:12 p.m.)

20          THE COURT:  Please be seated.

21          All right, I didn't really pick up the last thing you

22  said before --

23          MR. STAMATO:  Yes, sure.  And Your Honor, I'm mindful

24  of the lateness of the hour.  I appreciate the Court's time.  I

25  only have about ten more minutes at most with Mr. Manzo.

1    THE COURT:  All right.  Go ahead.

2    CONTINUED CROSS EXAMINATION

3    BY MR. STAMATO:

4    Q.   Mr. Manzo, at some point after the auction, did any issues

5    arise between the debtors and Black Diamond under the asset

6    purchase agreement?

7    A.   Yes.  A significant issue arose.

8    Q.   Can you tell me what that was?

9    A.   Yes.  It had to do with a distribution from one of the

10   funds that -- that we believed GSC was entitled to receive from

11   the underlying fund under the asset purchase agreement.  Black

12   Diamond had a different view of that.  And a series of

13   discussions took place.

14   Q.   How much was at issue?

15   A.   Initially was a six million dollar total distribution to

16   several GSC funds that was under question.

17   Q.   When did the discussions take place?

18   A.   There were a number of discussions in the week or so

19   before a face-to-face meeting that we had on November 30th.  We

20   met in person on November 30th with no resolution before we got

21   there.  And representatives from the company, Messrs. Eckert

22   and Frank, myself, one of my colleagues from Capstone and a

23   number of representatives from Kaye Scholer attended a in-

24   person meeting with representatives from Latham & Watkins, I

25   believe the agent, and Black Diamond.

1    Q.   And did you hear -- I heard Mr. Deckoff mention something

2    about Black Diamond having a right that they had reserved to

3    lower its bid; was that consistent with your recollection?

4    A.   Yes.  Black Diamond, at the auction, but notwithstanding,

5    you know, we weren't pleased about the language they put on the

6    record in the auction transcript, reserved their right to say

7    that -- one of the procedures that we had done at the auction

8    at the end, which was to go from what's been called open

9    bidding that is individual bids with increments to what I

10   consider to be in the debtors' best interest, a final and last

11   bid for the three remaining bidders who were bidding for all

12   the assets of GSC.  We made that bidding decision in

13   consultation with Mr. Frank and representatives from Kaye

14   Scholer, of course, and as part of that, Black Diamond,

15   notwithstanding they were the highest bidder, reserved their

16   rights on the record and in the APA to later argue in this

17   court that, in fact, that price ought to be reduced to an

18   amount that would be slightly higher than the second place bid,

19   which was approximately a 194 million.

20   Q.   And during these discussions did you or any of the

21   debtors' representatives convey to Black Diamond that the 235

22   million dollar figure was sacrosanct?

23   A.   Yes, absolutely.  We had -- representatives from Kaye

24   Scholer and myself had spoken to Mr. Eckert and Mr. Frank in

25   advance of that negotiating meeting on Tuesday, November 30th.

1    And we were very focused that in our mind this was not just a

2    negotiation to resolve where the six million dollar dispute was

3    going to go, that is, would it be an adjustment to the 235

4    purchase price or would it not be, but rather, we had other

5    things that in that negotiation we wanted to, for lack of a

6    better word, clean up.  And the reason why cleaning up that --

7    that, in our view, the opportunity they had to argue in front

8    of Judge Gonzalez a reduction in the price was critical because

9    we had just recently completed a recovery analysis.  And -- and

10   from a financial point of view, it became very clear to us that

11   even with a reduction to the purchase price, that is an

12   accommodation on the six million, we still would be able to

13   return a significant, if not full payment to unsecured

14   creditors and potentially a distribution to equity; and that

15   would only take place if the 235 purchase price was locked in

16   and not subject to further argument later on.  And we were very

17   focused on that.  Candidly, Black Diamond didn't know this,

18   that was the bigger issue we had going to that negotiation.  It

19   wasn't the six million.

20       The six million was significant.  Counsel from Kaye

21   Scholer absolutely believed that there was an argument based on

22   the document that Black Diamond could make to say that, in

23   fact, they were entitled to that six million.  And so, again,

24   we were cognizant of that.  I recommended to Mr. Eckert in that

25   negotiation that we initially put forth an offer to split the

1    difference that is, split the six million in exchange for

2    getting the 235 million dollars agreed to, not subject to a

3    reopener.  It was my suggestion that we say to them, listen,

4    why don't we go ahead and we'll agree that you get half of the

5    six million and, so that it's you'll take three million of it

6    and we take three million of it.  I thought that was a fair

7    compromise having listened to Kaye Scholer describe the legal

8    risks attendant with the language in the document regarding the

9    six million and it buttoned up for us, in my opinion, a very

10   high likelihood that there would be a distribution to junior

11   creditors and to equity, which I was very concerned about.

12   Q.   And, ultimately, was a business agreement reached on these

13   outstanding points?

14   A.   Yes.  Ultimately, we negotiated a transaction where Black

15   Diamond agreed to the 235 purchase price and on the six million

16   dollars we -- and through a series of negotiations that took

17   place throughout the entire day, our last offer to them was

18   that, in fact, they would receive 4.2 million of the 6 million

19   dollars of cash -- higher than at least I recommended to the

20   company.  But I recommended to Mr. Frank and Mr. Eckert

21   throughout the day that we increase that allocation and,

22   ultimately, we wound up with the 4.2 million dollar agreement,

23   which, I thought, was a very good agreement for the debtor.

24   Q.   And, just so the record's clear, as part of that agreement

25   was the issue regarding the adjustment of the purchase price

1    resolved as well?

2    A.    Yes.    That's what I was speaking to, when I said that on a

3    net basis the 6 million was finally agreed to that Black

4    Diamond would essentially receive credit on a net basis for 4.2

5    million of that.    That is, the debtor would wind up receiving

6    value of, you know, a million-five thereabouts, million-five to

7    a million-eight.

8    Q.    And the 235 million dollar purchase price remained intact?

9    A.    That's correct.

10   Q.    When did you become aware that that agreement had been

11   signed by Black Diamond?

12   A.    Well, there was a spirited drafting session that took

13   place, starting on December 1st, the day after that went all

14   the way through December 3rd and at various points in time on

15   Wednesday, December 3rd in discussions with Kaye Scholer, we

16   recommended to Messrs. Eckert and Frank that we draw a line in

17   the sand and tell Black Diamond that if they were not prepared

18   to sign that agreement, we were not prepared to continue this

19   discussion over the weekend and that we would notify chambers

20   that we would not proceed with a hearing on the following

21   Monday, which would have been December 6th.    Late in the

22   evening, finally, on December 3rd, after a lot of yelling and

23   threats on both sides, I understood the agreement was signed.

24   Q.    And after that amendment number 1, which is what we are

25   calling it to the asset purchase agreement, was signed, were

1　there any additional discussions with representatives of Black

2　Diamond on the one hand and the debtors on the other, regarding

3　additional modifications to the asset purchase agreement?

4　A.　Yes, as I testified to in my deposition, there was another

5　reason to have a subsequent discussion, that is, to consider an

6　additional amendment.　At my deposition I talked about some of

7　those key elements of that and there were principally several.

8　One was having to do with what we on the debtors' side believed

9　was being relayed to us or what we inferred from Judge

10　Gonzalez, relating, you know, how the transaction and the

11　assets would be allocated.　And we believed that the allocation

12　issue, that is, splitting the debtors' assets into two streams

13　that would go to the seller could be an issue at a potential

14　sale hearing.　And we wanted to avoid, again, a failed auction.

15　And so we told Black Diamond that we believed they needed to

16　modify the terms of the asset purchase agreement and permit

17　assets from the debtor to only be sold to one entity.　And

18　there is a letter agreement that, I believe, memorializes that.

19　That was one of the two issues we wanted to address.

20　Q.　What's the other issue?

21　A.　The other having to do with the ten million dollars of

22　future cash coming in from funds and, ultimately, it was

23　decided, that that did not to be modified.

24　Q.　And you mentioned a letter agreement.　Can you flip to

25　Exhibit 81 in Non-controlling Lenders' exhibit binder?　I

1    specifically would direct you to what is marked as Exhibit A,

2    to exhibit --

3    A.   Yes, I see it.  This is the letter I was referring to.

4    Q.   Mr. Manzo, if this asset purchase agreement is ultimately

5    approved by the Court, what will be left for the estates to do?

6    A.   It's actually very little.  In the way of assets there are

7    really two significant assets and they're -- they're fairly

8    simple.  One is a life insurance policy in the face amount of

9    fifty million dollars on Mr. Eckert.  And that was one of the

10   assets that we thought we would sell at auction but we

11   concluded that there was not enough spirited bidding and we

12   withdrew that from the bidding.  That needs to be sold.  And

13   there are a number of people, who have as a business, are in

14   the life settlement business, which this is referred to, that

15   pay for the right to be the beneficiary of that policy.  These

16   policies don't have any cash surrender value, they're merely

17   paying for the option value.  That's one asset that has to be

18   sold.  That's very, very closely tied, I think as someone

19   testified to earlier, the release of Mr. Eckert's medical

20   records.  So that's one asset.

21        The second asset has to do with the collection of certain

22   revenue fees from a set of funds that is contemplated to be

23   sold in the Black Diamond transaction.  The debtor has on its

24   books an intercompany receivable that's owed to it from a set

25   of these funds that the purchaser is buying.  And it has

1    significant value.  The face value is approximately twenty

2    million; the discounted value I believe is somewhere between

3    ten and thirteen million.  And again that would need to be

4    sold.

5         Other than that, the debtor has cash on its balance sheet,

6    today approximately seventeen or eighteen million dollars.  And

7    it has very few miscellaneous assets, primarily in the form of

8    recourse employee loans from various employees, amount

9    approximates a million to million and a half dollars.

10        So, there are very few assets to liquidate and, of course,

11   we haven't had a bar date yet, so I can't speak to the claim

12   side of it, but we're expecting a fairly concise and a fairly

13   clean set of claims being filed that we can resolve very, very

14   quickly.

15   Q.    Thank you, Mr. Manzo.  I don't have anything further.

16   A.    Welcome.

17            THE COURT:  Excuse me.  Any questions?

18            MR. BACON:  Maybe five minutes, Your Honor?

19            THE COURT:  Go ahead.

20   CROSS EXAMINATION

21   BY MR. BACON:

22   Q.    Good evening, Mr. Manzo, Doug Bacon again for Black

23   Diamond Capital Management.  I just got a few questions for

24   you, sir.  Were you here in the courtroom earlier, when I

25   characterized my client as being proactive and aggressive?

1    A.   I was.

2    Q.   You think that's a fair characterization?

3    A.   I think it's fair.  I think they're much more difficult

4    than what you described.

5    Q.   They're proactive, aggressive and difficult.

6    A.   Yeah, very difficult.

7    Q.   Okay.  And you knew that long before this bankruptcy was

8    filed, didn't you?

9    A.   Having been in the distressed debt market for a long time,

10   I was aware of Black Diamond's reputation in the marketplace.

11   Q.   And did you see it is part of your job to act as a

12   counterbalance to that proactivity and aggression,

13   aggressiveness?

14   A.   I didn't look at it so much as a counterbalance; I looked

15   at it as, as I do in all my assignments, that on the debtor's

16   side of an assignment that we're charged with safeguarding the

17   assets of the company and getting the maximum price in any

18   transaction we do.  And so, as I would in any transaction, we

19   have to be aware of the parties we're negotiating with and have

20   to be prepared to be very direct and equally combative from

21   time to time in terms of a negotiation.

22   Q.   And do you think you were equally combative?

23   A.   I believe so.

24   Q.   You held your own against Black Diamond?

25   A.   I think the debtor received a very fair price for the

1  assets being auctioned and I think, throughout the case, I

2  believe that at all critical times the debtor made sure,

3  notwithstanding there could be repercussions, made sure that in

4  fact it didn't do anything that would jeopardize maximizing the

5  value of the assets.  I think the debtor did a good job in that

6  regard.

7  Q.   You agree with Mr. Frank that GSC's assets are essentially

8  wasting assets?

9  A.   Yes.  They're wasting in a sense of that they haven't a

10  finite collection amount and that they're not replenished.  So,

11  it is a wasting asset.

12  Q.   And just a couple of questions about the Eckert option,

13  which I know we've heard a lot about today.  Your declaration

14  that you filed with the Court in the wake of that option used

15  the phrase, I think, that you thought it would jeopardize the

16  transaction.

17  A.   I think I said it could.

18  Q.   It could jeopardize the transaction and isn't it correct

19  that your issues with that option were timing and optics

20  issues?

21  A.   Yeah.  I thought timing was terrible and I thought the

22  optics could result in non-controlling lenders seizing that as

23  an opportunity to disrupt a potential sale, which I knew they

24  didn't like.  And I believe that's what the last -- in my

25  opinion, the last few weeks have really resulted in that.

1    Q.   So you were right about that, weren't you?

2    A.   Unfortunately I was.

3    Q.   And you've already testified that you've got an analysis

4    that shows potentially significant value going to equity, if

5    this transaction is proven, right?

6    A.   Yes.  I testified to that and it was an exhibit in my

7    deposition.

8    Q.   And if that's right, that option will turn out to be a

9    good deal for Black Diamond, won't it?

10   A.   Well --

11   Q.   Assuming the claim's allowed too.  Assuming Mr. Eckert's

12   claim is allowed.

13   A.   Yeah, assuming a lot of things.  But I must tell you, I

14   have not looked at where the distribution to equity holders

15   would go.  That is, does it go to preferred or to common?  My

16   analysis was to the equity as a class and I can't speak to the

17   securities that Mr. Eckert holds and where they would come in

18   the recovery analysis.  But in tota, for the equity I believe

19   there could be a substantial recovery.

20   Q.   And Mr. Manzo, I want to make sure the record's just

21   crystal clear; did you conclude independently, at the

22   conclusion of the auction, that the Black Diamond deal was the

23   best deal for this estate?

24   A.   Yes, I did.

25   Q.   And Mr. Eckert and Mr. Frank didn't influence that

1  conclusion, did they?

2  A.   No, only Mr. Frank was there at the end of the auction and

3  we reviewed, you know, the methodology of valuation with him

4  and representatives from Capstone and Kaye Scholer and I gave

5  him my advice, which is I thought that the Black Diamond bid to

6  the debtors' estate was a superior bid.

7  Q.   And is that still your opinion, as you sit here today?

8  A.   It is.

9  Q.   And your reputation is really your stock in trade, isn't

10  it Mr. Manzo?

11  A.   I believe in the advisory business it is.

12  Q.   And would you attach your reputation to the position you

13  just took if you weren't entirely comfortable with that

14  conclusion?

15  A.   No.

16  Q.   Would you attach your reputation to a sale process that

17  you thought lacked integrity?

18  A.   No, I would not.

19  Q.   Would you work for a company if you felt the management

20  lacked integrity?

21  A.   Absolutely would not.

22  Q.   Thank you very much.

23       MR. BACON:  No further questions.

24       (Pause)

25       MR. HAMMOND:  Your Honor, I probably have about ten,

1    fifteen minutes.

2          THE COURT:  Go ahead.

3    CROSS EXAMINATION

4    BY MR. HAMMOND:

5    Q.   Good afternoon -- good evening, Mr. Manzo.

6    A.   Good evening.

7    Q.   I had --

8          MR. HAMMOND:  Before I start, Your Honor, I just

9    wanted to make sure that we're reserving our rights for cross

10   with respect to the sale hearing.  This witness has tread a lot

11   of ground.

12         THE COURT:  Yes.

13   Q.   Mr. Manzo, you were asked some questions about a letter

14   that was signed by the non-controlling lenders, right?

15   A.   At my deposition?

16   Q.   Well, no.  Today by Mr. Stamato.

17   A.   I was.

18   Q.   And that was Exhibit 24 in your binder, right?

19   A.   I don't recall the exhibit number but I did look at it,

20   yes.

21   Q.   Look to Exhibit 24, please.

22         (Pause)

23   A.   Yes, I have it.

24   Q.   You testified that this letter was prepared by the

25   debtors, right?

1    A.   the debtors took -- Kaye Scholer and myself took the first

2    cut at drafting this letter during the auction and then we

3    supplied the draft to representatives from White & Case and the

4    non-controlling lender group during the auction, for their

5    comments and review.  Yes.

6    Q.   And you testified that you never spoke to Black Diamond

7    about a joint bid, right?

8    A.   That's correct.

9    Q.   And the letter says specifically in the first paragraph,

10   Black Diamond Capital Management and the agent specifically

11   requested that the debtors permit them to submit a joint bulk

12   bid for substantially all of GSC's assets, right?

13   A.   Yes.

14   Q.   That's what it says, right?

15   A.   It does say that, yes.

16   Q.   And that just magically appeared there?

17   A.   No, I don't believe it magically appeared.  I think that

18   was inserted by the non-controlling lenders and I know that the

19   representatives from Kaye Scholer had discussions with

20   representatives from Black Diamond's counsel regarding a joint

21   bid.  I was responding to my involvement and I had no

22   discussions with Black Diamond.

23   Q.   And you believe the drafts will bear that out at the sale

24   hearing, right?  That the non-controlling lenders put this

25   language in there?

1  A.   I don't recall if they put it in here or not.

2  Q.   You just testified they did.

3       THE COURT:  Slow down.

4  A.   I know that from my perspective I didn't put it in because

5  I didn't have any discussions with representatives from Black

6  Diamond.  And so I don't know if it was put in by either the --

7  by counsel from Kaye Scholer based on its discussions or

8  whether or not counsel from Kaye Scholer was speaking to

9  counsel from White & Case at the auction and that's how it got

10 put in.

11 Q.   So you know that counsel for the debtors spoke with Black

12 Diamond about this, don't you?

13 A.   I know that counsel from Kaye Scholer spoke to counsel

14 from Black Diamond about this.  That I do know.

15 Q.   All right.  So you do know that this was a request of

16 Black Diamond, right?

17 A.   That's what the letter says.

18 Q.   And the letter says the request was made to the debtors,

19 right?

20 A.   That's what it says.

21 Q.   It doesn't say it was made to the non-controlling lenders,

22 does it?

23 A.   No, it does not.

24 Q.   And you said that you think that the non-controlling

25 lenders were comfortable with this, right?  That's what your

1    testimony was?

2    A.   Yes.  I believe that they were comfortable with joint

3    bidding.

4    Q.   Right.  And you were actually advised by the non-

5    controlling lenders that they questioned the propriety of the

6    agent joining in a joint bid with Black Diamond Capital

7    Management and that such joinder and other actions taken by the

8    agent in the course of the action constitute an improper use by

9    the agent of the credit bid to further the interests of Black

10   Diamond Capital Management as bidder to the detriment of the

11   non-controlling lender group and in disregard for agent's

12   obligations to use the credit bid solely to protect the

13   interests of the lenders and the collateral, right?

14          MR. STAMATO:  Your Honor, just objection.  That was,

15   kind of, a long question but I also think he's trying to elicit

16   testimony regarding the plural evidence rule.  I don't think

17   there's been anything in the record that establishes that this

18   agreement is ambiguous or been the product of fraud or coercion

19   or mistake.

20          MR. HAMMOND:  Your Honor, I was attempting to -- he

21   testified that the non-controlling lenders were comfortable

22   with this and I was establishing the fact that the letter

23   actually identifies that they are clearly not.

24          THE COURT:  No, actually -- before you go any further

25   what were you reading from?  You'll have to direct me to where

1    you were reading.

2              MR. HAMMOND:  I'm sorry, Your Honor.

3              THE COURT:  You were reading, a moment ago, from

4    something.

5              MR. HAMMOND:  Paragraph 3 of the letter.

6              THE COURT:  Where it begins, "The debtors asked"?

7              MR. HAMMOND:  I said it was you had advised the

8    debtors, from that sentence.

9              THE COURT:  And what's the question about this?

10   BY MR. HAMMOND:

11   Q.   The question was, do you think that reflects that the non-

12   controlling lenders were comfortable with this, right?

13   A.   Yes, on the paragraph right below paragraph 4, it's only

14   two lines.  It says, "We have advised you that we will not

15   agree to the modifications referenced herein unless you consent

16   to a joint bid by the agent and BDCM".  And so in my

17   discussions with the principals from the non-controlling

18   lenders, they absolutely agreed that there could be joint

19   bidding and that paragraph, in my mind, sets forth my

20   understanding of what they've agreed to.

21   Q.   Did they agree to collusive bidding?

22   A.   Did they agree -- I don't believe anybody agreed to

23   collusive bidding.

24   Q.   You thought if the agent and Black Diamond Capital

25   Management got together they'd collude, right?

1    A.   I told them that in my belief that the agent and Black

2    Diamond could, in fact, get together and could, in fact, do

3    something that they might not find acceptable, like an

4    allocation of assets in a different way.  I wasn't using, and

5    I'm not a lawyer I don't know what collude legally means, but I

6    can tell you that we permitted lender -- we permitted bidders

7    to join forces together during the auction.  We did permit

8    that.

9    Q.   Okay.  You used the word collude in your declaration,

10   right?  We went through that the other day.

11   A.   Yes.

12   Q.   You said there was no collusion, right?

13   A.   Yes.  I said that and I said that from --

14   Q.   Your --

15   A.   I'd like to finish the answer if I could.

16   Q.   I thought my question was you used it in your declaration,

17   right?

18   A.   I'd have to retake a look at the declaration, if you don't

19   mind.

20   Q.   We can do that.

21        (Pause)

22   Q.   I believe it's Exhibit 22.

23   A.   Okay.

24        (Pause)

25   A.   I have 22, yes.

1   Q.   Okay.

2        (Pause)

3   Q.   I believe at paragraph 45 you used these words, right, "I

4   am not aware of any elements of fraud, collusion or price

5   manipulation in connection with the negotiations or at the

6   auction".  Those are your words, right?

7   A.   They are.

8   Q.   And I asked you on, I believe December 2nd, at page 150

9   when we were talking about the prospect of allowing joint

10  bidding, right?  Your deposition should be up there.

11  A.   Okay.  I'll take a look.

12       MR. HAMMOND:  May I approach, Your Honor?

13       THE COURT:  Yes.  I don't know if you've -- if

14  someone's finished marking the two volumes I have.

15       (Pause)

16       THE COURT:  Thank you.  What page should I be looking

17  at?

18       MR. HAMMOND:  Your Honor, this is the first day of the

19  deposition, December 2nd, and it's page 150.

20  Q.   I asked you at your deposition at line 3 --

21  "Q.  Can you tell me what the cons were?"

22  Q.   And your response is --

23  "A.  The cons were that this could create an environment where

24  collusive bidding on the Black Diamond agent side could result

25  in a situation that the non-controlling lenders might find

1   would produce less value for the credit bid and therefore it

2   was something they should be aware of."

3   Q.   Do you see that?

4   A.   I do.

5   Q.   All right.  That was your testimony, right?

6   A.   That is right.

7   Q.   And that's honest testimony, right?

8   A.   I believe it is, yes.

9   Q.   So a misallocation of value under the bid, in your mind,

10  constitutes collusion, right?

11  A.   My use of the word collusion here is, I think I gave you

12  the example in my deposition, is really to talk about

13  permitting people to join together forces.  That is, permitting

14  joint bidding to occur.  And I believe, as I do now, that there

15  was a risk in that process with the agent and Black Diamond.

16  That the process could result in them developing a bid where

17  the assets could be disproportionately shared and perhaps that,

18  as many might view to be an unfair allocation.  I believe that.

19  Q.   And that unfair allocation constitutes collusion in your

20  mind, right?

21  A.   I don't know, from a legal point of view, if that does or

22  doesn't.

23  Q.   Well I'm just asking you from your testimony, sir?

24  A.   My testimony, again I'm referring in the word collusion as

25  permitting people to develop bids together.  I'm not using it

1  in the legal sense of the -- whatever the benchmarks are with

2  respect to, you know, collusion from a legal standpoint.  I

3  think I had mentioned that during my deposition.

4  Q.   So in your mind joint bidding equals collusive bidding,

5  right?

6  A.   Yeah.  Joint bidding -- I'm using the word collusion here

7  to talk about joint bidding, that's correct.

8  Q.   So in your mind the letter was permitting collusive

9  bidding, right?

10 A.   The letter permitted individual parties who heretofore and

11 during the auction had bid separately to join together in any

12 combination of bids that they would have liked and develop

13 joint bids.

14 Q.   And so the letter permitted collusive bidding in your

15 mind, right?

16 A.   From a non-legal sense, yes.

17 Q.   Mr. Manzo, you talked a little bit about Mr. Frank's

18 employment agreement with Black Diamond, right?

19 A.   I talked --

20 Q.   In your testimony?

21 A.   I talked about Mr. Frank's employment agreement terms with

22 Black Diamond as it related to the sub-advisory period when the

23 management of GSC was still going to stay involved.  But I

24 never discussed anything with Mr. Frank or Black Diamond about

25 Mr. Frank's agreement once the subadvisory period ended and he

1  entered into this new understanding that he has with them as it

2  relates when they became a majority lender.

3  Q.   Okay.  So just to be clear for the record, you never

4  passed on the propriety of Mr. Frank's employment agreement

5  with Black Diamond, right?

6  A.   No, I don't think I've ever seen it.

7  Q.   And you never passed on the propriety of Mr. Eckert's

8  consulting agreement with Black Diamond, right?

9  A.   No, that's correct.  Until you showed it to me at my

10  deposition I had never seen or spoken to anybody about it.

11  Q.   And you've never passed on the propriety of the option

12  agreement between Mr. Eckert and Black Diamond.  Is that right?

13  A.   That is correct.

14  Q.   Now, you're not a principal of the debtors, right?

15  A.   No, I'm not.  I'm an advisor.

16  Q.   You're not on the debtors D&O policies, right?

17  A.   I'm not.

18  Q.   You can't make decisions for the debtors, right?

19  A.   No, I cannot.

20  Q.   You don't owe any duties to creditors of the estate, do

21  you?

22  A.   Well, as an advisor in the restructuring environment,

23  financial advisors are always mindful of making sure that they

24  have the interests of creditors in mind, since many of the

25  situations we're involved in are solvency or insolvency

1  situations.  So we certainly have that in the forefront of our

2  minds as we practice.  But we owe our duty and loyalty to the

3  estate.

4  Q.  Do you believe you owe legal duties to creditors of the

5  estate, as a principle?

6  A.  No, I never had that legal distinction or discussion with

7  anyone.  But I can tell you from having been in the industry

8  for a long time, that we are very mindful of the rights of

9  creditors, particularly when they, in our view, could be

10  impaired.

11  Q.  And ultimately here, the decision whether to do a deal,

12  select a bid or not select a bid, that's a decision for the

13  principals of the company, right?

14  A.  It is.

15  Q.  And you thought they were very conflicted as a result of

16  the employment agreement and consulting agreement, right?

17  A.  I thought, certainly, that the fact that they existed, as

18  I indicated earlier, has a potential chilling effect,

19  potentially, if it's not handled properly, in a 363 sale

20  environment.  But I believed, at the end of the day, that the

21  final adjudicator of whether a deal was good or not, would, in

22  fact, be the bankruptcy court.

23  Q.  Now, I had a question about valuation.  You talked a

24  little bit about the valuation you prepared in connection with

25  the auction, right?

1    A.   Okay.

2    Q.   Have you ever prepared a valuation that showed the value

3    of these assets exceeding 200 million dollars?

4    A.   No, I have not.

5    Q.   Have you ever seen one?

6    A.   I have not.

7    Q.   In your two years of work with the company?

8    A.   No, I don't think I've ever seen one.

9    Q.   Now, I had a question for you.  It's your second day of

10   deposition on page 385.  And this was at the end of your

11   deposition.

12        Do you need a hand?

13   A.   I see one book.  Is there a second book?

14        MR. HAMMOND:  May I approach, Your Honor?

15        THE COURT:  Yes.

16        THE WITNESS:  This one goes to 211.

17        (Pause)

18   Q.   Mr. Manzo, do you recall, at the end of your deposition on

19   December 17th, Mr. Stamato asking you a handful of questions?

20   A.   I do.

21   Q.   And this was in response to testimony that the CEO of the

22   company had provided, right?

23   A.   Yes.

24   Q.   And you wanted to correct the record after that, right?

25   A.   Yes.

1  Q.   And the question starting at line 10 was, "If we can move

2  on to page 27, specifically turn everyone's attention to lines

3  9 to 13.  The question:  'Did Mr. Manzo tell you that when he

4  saw the bid from Black Diamond, a joint bid, he said wow, look

5  at all the assets these guys are getting for eleven million

6  dollars?'.

7       "Mr. Eckert's response:  He did not.

8       "Did you have any reaction to that testimony, Mr. Manzo?"

9  A.   Well, as I testified here --

10  Q.   Can I read the answer?

11  A.   Sure, sorry.

12  Q.   Your answer was:  "Yeah, I called Mr. Eckert.  After

13  taking several hours of sleep on the 29th, we finished the

14  auction -- I think I got home 6 in the morning, called Mr.

15  Eckert later that morning when I woke, told him the winning

16  bidder, and told him that when he saw the bid, he would not

17  believe what the allocation of the assets were between the

18  agent and Black Diamond.  Neither one of us were surprised at

19  that.  We always assumed that would be the case."

20  Q.   Do you see that testimony?

21  A.   I do.

22  Q.   You had discussions with Mr. Eckert prior to Friday,

23  October 29th, that you always assumed it would be the case that

24  the allocation of the assets between the agent and Black

25  Diamond would be disproportionate?

1    A.    Yes.  From time to time, prior to the auction, we had, at

2    the company, mused about the fact that Black Diamond had made a

3    stalking-horse bid for five million dollars.  And it was no

4    secret that Black Diamond was, from our perspective, anxious to

5    own the assets of GSC.  So I was not at all surprised.

6    Notwithstanding, I didn't put dollar signs next to specific

7    lots that were purchased, I was not surprised by the way the

8    bid looked when it was submitted in the auction.

9    Q.    So you noticed it right away when it came in, right?

10   A.    No, I actually first noticed the overall price, because

11   from our side, we were most -- only concerned with the ability

12   of the buyer to potentially close and the aggregate amount of

13   consideration for the debtor.  And so very quickly, when I was

14   up there at the podium with Mr. Solow opening up the bids, we

15   focused very quickly on the 235 purchase price at the bottom.

16   And then we went back and evaluated it; that's what we spoke

17   about in our internal discussions because we came back in the

18   auction and announced that that, in fact, in our view, was a

19   superior bid.

20   Q.    This is -- I think we're moving along a little bit further

21   in the process.  You realized the first bid was submitted on

22   October 27th, right?  The express joint bid from Black Diamond?

23   A.    I don't recall a date, but it's probably -- probably

24   accurate.

25   Q.    That was -- there was a round of bidding on October 27th.

1    Black Diamond submitted a joint bid.  It was much lower than

2    the one that ultimately prevailed at the end of the auction,

3    right?

4    A.    Yeah.  I don't recall the exact date.  But I'm -- if

5    you're telling me that's the date, I believe it.

6    Q.    And then what they did was, there was an eleven million

7    dollar bid, right -- cash bid for the same assets, right?

8    A.    It was a combination of cash and notes, yes.

9    Q.    Right.  And it was about 120 million dollars credit bid,

10   the first bid they submitted, right?

11   A.    I believe that's the approximate range.  I'd have to go

12   back to the transcript if you wanted to know the exact amount.

13   Q.    But, in any event, the allocation was always there, right?

14   The delta in the allocation?

15   A.    I believe there were allocations by lots.  But again, I'd

16   have to go back and take a look at the -- you know, the exact

17   copy of the bid.

18   Q.    It didn't come to your attention earlier in the auction

19   that the allocation of assets that would be acquired for cash

20   versus the allocation of assets that would be acquired for

21   credit may have disproportionate value?

22   A.    I think I recall seeing that, because, again, there are

23   not dollar signs next to, you know, the individual lots being

24   purchased, broken out between the agent credit bid and the

25   Black Diamond component.  But again, I can tell you, in each

1  one of those bids, we virtually had no discussion of any kind

2  that I recall about the components, because from our

3  perspective, we had had a fair number of discussions with Kaye

4  Scholer, and believed that it was, you know, our responsibility

5  in the auction, on behalf of the debtor, to produce the highest

6  aggregate dollar bid for the debtor, and not attempt to involve

7  ourselves in allocation issues.

8  Q.   Well, you may not have had any discussions, but my

9  question to you is, you noticed it right away when it came in

10  that there was this disproportionate allocation of value

11  between the credit bid side and the cash bid side, right?

12  A.   Well, as I indicated, first we're looking at the overall

13  aggregate value.  I did notice that there was the, you know,

14  allocation of the various lots that were being sold by the

15  debtor in the two columns that were in the bids.  But again,

16  there were no dollar amounts associated with those, nor did we,

17  during the auction, attempt to ascribe what we thought values

18  would be for the individual lots, to see the allocation.  It

19  wasn't something that we were interested in and not something

20  that we thought was incumbent upon us to do during the auction.

21  Q.   If you can turn to page 178 of your December 2nd

22  deposition?  And I'm going to start at line 8.

23  A.   Okay, I have it.

24  Q.   I asked you the question:  "It had to come to your

25  attention at some point in time, that you yourself had prepared

1    and supervised valuations that reflect that the value of the

2    assets being bid for, 224 million dollars were valued

3    approximately 50 million dollars or so, right?"

4         And your answer:  "Yes.  When the bid was made and we

5    analyzed the bids I remember clearly looking and saying wow,

6    for eleven million dollars, look at everything you're buying.

7    Yeah, absolutely I was aware of it.  It wasn't unnoticed.  From

8    the discussions with counsel, it was our view that the debtor's

9    responsibility was to maximize the overall price" -- I think

10   that's a typo -- "annual, that's what we were focused on."

11        Do you see that?

12   A.   I do.

13   Q.   I asked you that question, right?

14   A.   Yes, you did.

15   Q.   And you gave that answer, right?

16   A.   Yes, I gave that answer.  But the amount that you're

17   referencing, fifty million, was not an amount that we knew of

18   during the auction.  It was only in a subsequent spreadsheet

19   that we completed at the end of November -- I believe somewhere

20   between the 27th and the 30th of November -- did somebody on

21   the Capstone team just take the valuation that we had done

22   leading into the auction and lay it against the allocation of

23   the bids.  And we didn't do that until the end of November.

24        And candidly, it was done -- it wasn't used for

25   anything.  But at the auction, we did not have any indications

1    of the allocation of value, because we weren't concerned with

2    it.

3    Q.   You weren't concerned about it --

4         MR. BACON:  Excuse me.  Excuse me.  Your Honor, this

5    is the kind of objection I only make at this hour.  But he's

6    way, way outside the scope of cross-examination.

7         THE COURT:  Well, I'm going to allow it, because I

8    have a few questions I want to ask as well.  But finish up with

9    this.

10        MR. HAMMOND:  Your Honor, I'll move along quickly.  I

11   just had one question along this line.

12   Q.   You weren't aware of it, right, of the allocation issue,

13   on October 28th?  Is that right?

14   A.   I was aware that the bid contained individual lots being

15   allocated between the agent bid and the Black Diamond bid.  But

16   I was not aware of dollar amounts.

17   Q.   But you did recognize the disproportionate allocation of

18   value as between the joint bid components, right?

19   A.   Yeah.  I believed, in looking, that it appeared to me to

20   be that there were many good lots that you would view to be

21   good lots -- that is having value -- would be on the side of

22   the Black Diamond bid and not as many on the side of the agent

23   bid.

24   Q.   And you had a sufficient view of value that was allocated

25   between the two lots that on the morning of October 29th, after

1    you got a few hours of sleep, you called Mr. Eckert and told

2    him about it, right?

3    A.   Again, not value.  Again, looking at the breakout of the

4    lots, it appeared to me to be that there was a disproportionate

5    allocation from a bid versus value point of view.  And that's

6    what I pointed out to Mr. Eckert.  But again, I didn't have any

7    dollar amounts or any valuations in mind.

8    Q.   And --

9    A.   I hadn't done any.

10        THE COURT:  All right.

11   Q.   I'm sorry, I think the word you used was "unbelievable",

12   right?

13   A.   I don't recall the word I used, but it was a fairly

14   emphatic word.  I don't know if I used "unbelievable" or "wow".

15   One of the two.

16        THE COURT:  All right.  My question, though, is, take

17   a few steps back to the earlier question I had about the whole

18   joint bidding and then asking the non-controlling -- or getting

19   the letter -- parties prepare the letter; the letter gets

20   signed off on.  Your concern, if I understood you correctly,

21   was that if you did not do that, the non-controlling lending

22   group would have come to court and argued that the process was

23   unfair, because joint bidding took place, and we believe there

24   was an inappropriate allocation of value.

25        THE WITNESS:  No, I'm sorry, Your Honor, if I said

1    that.  I didn't mean to.

2         THE COURT:  No, I don't you think you said all of

3    that.

4         THE WITNESS:  Okay.

5         THE COURT:  I'm just -- I'm trying to focus on what

6    was -- what were you envisioning the argument would have been

7    had you not gotten the consent of the non-controlling lenders

8    and just authorized joint bidding, and we would have the

9    same -- assuming we had the same result.  What was your

10   concern?  What were you thinking about that would have been the

11   challenge to the approval by the Court of the sale process?

12        THE WITNESS:  Well, Your Honor, when the bidding

13   commenced, each round of bidding, Mr. Solow from Kaye Scholer

14   made each bidder acknowledge in advance that they had not

15   spoken to any other bidders there, had not done anything that

16   would tamper with the valuations, and then in fact said, there

17   is no joint bidding.  You cannot join together.  We prohibited

18   it during the auction.

19        And our feeling was that since, in each round of

20   bidding, up until the last several, we had precluded bidding

21   under the procedures -- joint bidding, that we were concerned

22   that the non-controlling lenders might later say, you weren't

23   authorized, under the bidding procedures, to now permit joint

24   bidding, because you had given instructions to all the bidders

25   at the commencement of the auction that no joint bidding would

1    be permitted.  That was the concern that we had, which is why

2    we went to the non-controlling lenders for their acquiescence.

3          THE COURT:  And so your concern wasn't whether or not

4    there would be some inappropriate allocation, your concern was

5    that someone would say don't approve the sale because the

6    process was changed along the way and we didn't consent to it.

7          THE WITNESS:  Yes, you violated the bidding procedures

8    by changing it, and you weren't authorized to do it, and you

9    accepted a bid from a party who was not qualified.  And then

10   we'd have a, in my view, a failed auction which would be

11   disastrous for GSC.

12         We absolutely, you know, did not concern ourselves

13   with the allocation, but I did --I was very clear on five or

14   six occasions during those hour to two hour time periods when

15   we were in discussions with the non-controlling lenders, that I

16   thought that that was a risk and they should be made aware of

17   it.

18         THE COURT:  All right, thank you.

19   BY MR. HAMMOND:

20   Q.   At no point in time did the non-controlling lenders ever

21   agree to collusive bidding, did they?

22   A.   Again, as I refer to the word -- you've asked me that a

23   couple of times, I need to --

24   Q.   You used it a couple of way.

25   A.   -- clarify it.  I'm using it in the business sense.  In my

1    view collusive in the sense that they permitted two parties,

2    any two parties, or more than two parties in the bid, in the

3    auction to join forces and develop a joint bid.  So in that

4    sense, yes, I do believe, they authorized and signed off on

5    that.  From a legal sense, I don't think anybody agreed that to

6    the extent that it's an illegal activity, no one was signing of

7    on illegal activities.  No question in my mind.

8         MR. HAMMOND:  Your Honor, I have no further questions

9    at this time.  Thank you Mr. Manzo.

10        THE WITNESS:  You're welcome.

11        THE COURT:  All right.  Anyone else have questions?

12        MR. STAMATO:  Nothing from the debtors, Your Honor.

13        MR. BACON:  I've got just a couple, Judge.

14        THE COURT:  All right, go ahead.

15   RECROSS EXAMINATION

16   BY MR. BACON:

17   Q.   Mr. Manzo, it's Doug Bacon, again for Black Diamond

18   Capital Management.

19        As you sit here today are you aware of anyone from Black

20   Diamond having any input into the drafting of that letter that

21   you testified about; Exhibit 24?

22   A.   Not that I'm aware of.

23   Q.   As far as you know that was worked out between the

24   debtors' professionals and the non-controlling lenders'

25   professionals, right?

1    A.    That is correct.

2    Q.    And, sir, I want to refer you back to your deposition, if

3    we could.  Take a look at the December 2nd deposition and go to

4    page 204.

5    A.    I have it.

6    Q.    Do you remember in that deposition we had a lot of back

7    and forth about collusion and what you meant by that, and Mr.

8    Hammond was asking you a bunch of questions about that.  You

9    remember that, generally?

10   A.    I'm looking at it now, and I do remember that generally,

11   yes.

12   Q.    Sir, I want you to read my question beginning at line 21

13   on page 204.  I want you to read -- you can read the whole

14   question if you want to out loud until we get to the debt.  I

15   want to ask you about those definitions.

16   A.    Okay.  Did you ask me to read it out loud?

17   Q.    Yes, please.

18   A.    Okay.  "Let me read you a couple of definitions and ask

19   you to consider these definitions.  From Blacks Law Dictionary,

20   collusion; an agreement to defraud another or to obtain

21   something forbidden by law.  From the Oxford English

22   Dictionary; a secret agreement or understanding for purposes of

23   trickery or fraud, underhand scheming or working with another

24   to seek fraud or trickery."

25   Q.    And, Sir, using those two definitions, any combination

1 thereof, anything in either one of those definitions, using

2 those definitions of collusion are you aware of anything that

3 went on at that auction, anything, that amounts to collusion?

4 A.   I'm not.

5 Q.   Finally, sir, you testified a few minutes ago, I think in

6 response to the Court's inquiry, that a failed auction would be

7 disastrous for GSC, remember that?

8 A.   I do.

9 Q.   Why is that, sir?

10 A.   Well, there are a number of parties who were paying very

11 close attention to GSC's financial situation.  One is we have a

12 number of LPs and investors, and all the various funds who have

13 a heightened interest and are anxiously looking for a

14 resolution of the GSC matter.

15       And my feeling is that there's a significant risk that if

16 we embarked on a several month auction ending with an asset

17 purchase agreement and a failed closing, that that patience

18 that we've garnered from our LPs and investors would wane and

19 many of them would either seek to cancel their agreements with

20 GSC or they had to render their contract, or come to the

21 bankruptcy court to seek relief.  It was a significant risk.

22       The second significant risk is that there's a very fragile

23 employee base at GSC.  When we started this process there were

24 approximately sixty employees --

25 Q.   I'm sorry sixty or --

1  A.   Sixty, 6-0.  I believe now the number is less than thirty.

2  Many have announced their desire to want to leave in the short-

3  term.  And since this is a service business, and it's a very

4  technical service business, there is a risk with respect to

5  employees leaving.  And it is a substantial risk that could

6  erode value.

7      The third thing is someone mentioned before the idea this

8  is a wasting asset.  It is truly a wasting asset.  There's

9  collections of receipts going forward, they last for a finite a

10  period of time.  Each fund will have a termination date

11  somewhere in the next two to five years.  And so the longer the

12  process goes without a resolution the more money gets expended

13  in the form of costs of running the company as well as

14  professional fees, which means ultimately less value to

15  distribute to the estate's stakeholders.

16      So I'm concerned about all three.

17  Q.   Do you think the appointment of a trustee would be

18  disastrous for GSC?

19  A.   It certainly is, in my view, a very, very negative event

20  to occur as it relates to the LPs and to the investors.  And I

21  have a visceral reaction that in my experience when I've heard

22  about trustees being appointed in cases where there's been a

23  failed 363 sale my experience tends to lead me to believe that

24  values will erode quite quickly if there's a subsequent round

25  of bidding.

1    Q.   Thank you, Mr. Manzo.

2          THE COURT:  Anyone else?

3       (No response)

4          THE COURT:  All right, you may step down.  Thank you.

5          THE WITNESS:  Thank you, Your Honor.

6          MR. HAMMOND:  (Away from microphone.)

7          THE COURT:  Go ahead.

8    RECROSS EXAMINATION

9    BY MR. HAMMOND:

10   Q.   Mr. Manzo, do you know whether Sankaty is still standing

11   by with 194 million dollar bid?

12   A.   I don't know, we've not spoken to Sankaty directly.  We

13   have heard from --

14          MR. BACON:  Excuse me, Judge, I object to anything he

15   heard, see or say.

16          THE COURT:  Your response?

17          MR. HAMMOND:  Your Honor, depends on where he heard

18   it.  I don't know --

19          THE COURT:  Excuse me?

20          MR. HAMMOND:  It could be an admission straight from

21   the debtors.

22          THE COURT:  Well, what's your argument?  Is it hearsay

23   or is it not hearsay?  Or is it an exception to hearsay?

24          MR. HAMMOND:  It would be an exception to the hearsay

25   rule if he heard it from --

1          THE COURT:  All right.

2          MR. BACON:  Can I ask a question on voir dire?

3          THE COURT:  I couldn't hear what you said.

4          MR. BACON:  Could I ask a question on voir dire, Your

5     Honor?

6          THE COURT:  Go ahead.

7     VOIR DIRE EXAMINATION

8     BY MR. BACON:

9     Q.   Without telling us what you heard, who did you hear it

10    from?

11    A.   There have been dialogue with the lawyers from the non-

12    controlling lenders regarding the status of Sankaty.

13         MR. BACON:  I renew my objection, Your Honor.

14         THE COURT:  All right.  It is hearsay.  I'll sustain

15    the objection.

16    CONTINUED RECROSS-EXAMINATION

17    BY MR. HAMMOND:

18    Q.   Mr. Manzo, have you done anything -- since you think this

19    is -- the consequences are so dire here, what have you done as

20    the financial advisor of this company to ensure and to protect

21    the assets of the debtors?

22    A.   It's a very frustrating position to be in because in

23    speaking with counsel under the terms of the asset purchase

24    agreement we are not able to have dialogue with prospective --

25    either old third parties who are interested or new third

1  parties regarding their interest in GSC.  So it -- from a

2  market point of view there is very little we can do based on

3  advice of counsel as they interpret the asset purchase

4  agreement.

5       Internally, I believe the debtor is doing everything they

6  can.  Their costs and expenses are down to an absolute minimum

7  with the exception, regrettably, of this, you know, very

8  litigious situation we've had now for almost a month.

9  Q.   And, Mr. Manzo, are you aware of any offers that have been

10  filed with the Court?

11  A.   I believe I've seen something from the non-controlling

12  lenders.  And I don't recall if it had attached to it an

13  exhibit with Sankaty.  I'd have to, you know, refresh my

14  recollection of that.  But I do recall seeing something from

15  the non-controlling lenders.

16  Q.   And did you discuss that with your principals?

17  A.   Yes.  We did discuss that with the principals of GSC and

18  counsel.

19  Q.   Did anything in that discussion with your principals

20  reflect that Sankaty wasn't standing by?

21  A.   I really don't know because none of us had had contact

22  with Sankaty for the reasons that I mentioned.  So unless I can

23  really speak to the third party directly it's very difficult to

24  determine their ongoing interest level.

25       MR. HAMMOND:  No further questions, Your Honor.

1        THE COURT:  Anyone else?

2        MR. STAMATO:  Nothing from the debtors, Your Honor.

3        THE COURT:  All right.  Mr. Bacon?

4        MR. BACON:  Northing further, Your Honor.

5        THE COURT:  You may step down.  Thank you.

6        THE WITNESS:  Thank you, Your Honor.

7        THE COURT:  All right.  Mr. Shore, what was your

8   before -- I won't look at the agenda right now.  What was your

9   estimate of your closing argument?

10        MR. SHORE:  I don't know.  I think we can tailor it to

11  Your Honor's time.  The big point is it going to be helpful to

12  you?  Right.  How much time is going to be helpful to you.

13        THE COURT:  Well, we'll take a ten-minute break.

14        How many parties want to have something to say?

15        MR. BACON:  I'd like to say something, Judge, but no

16  more than ten minutes at the outside.

17        THE COURT:  The debtor?

18        MR. SOLOW:  Five minutes or less, Your Honor.

19        THE COURT:  Mr. Shore?

20        MR. SHORE:  Be about fifteen minutes.

21        THE COURT:  All right.  So if I come back at

22  approximately twenty after, assuming Mr. Shore's comments have

23  doubled in time estimate, and everyone else's are as well, I'm

24  sure.  But in any event, we should finish about 9/9:30.

25        MR. STAMATO:  Your Honor, just one quick housekeeping?

1          THE COURT:  Go ahead.

2          MR. STAMATO:  We would like to have an opportunity

3    just to move our declarations in for our rebuttal case, which

4    is what we were primarily relying on.

5          THE COURT:  All right.  Coordinate that while I'm on

6    the break, and as soon as I get back take care of those

7    evidentiary issues.

8          MR. STAMATO:  I don't think there are any, Your Honor,

9    we've been talking all day during the breaks about it.

10         THE COURT:  No, just from a procedural standpoint --

11         MR. STAMATO:  Okay.

12         THE COURT:  -- make the record clear.

13         MR. STAMATO:  Okay, thank you.

14         THE COURT:  Thank you.

15       (Recess from 8:09 p.m. until 8:20 p.m.)

16         THE COURT:  Please be seated.  All right, Mr. Shore.

17         MR. SHORE:  I think we've agreed to just put in all

18   the exhibits into evidence that are in the binders, right?

19         UNIDENTIFIED SPEAKER:  Yes.

20         MR. SHORE:  Okay.  And then you have our designations

21   now.  So I think that includes the evidentiary piece.

22         THE COURT:  All right.  Just so the record is clear,

23   the binders would be the non-controlling lender group or

24   Movant's Exhibits 1 through 86, is that right?

25         MR. SHORE:  Yes.

1          THE COURT:  That's the last number I see.  And then I

2     think someone stood up and moved a document in but it was

3     already in.

4          MR. BRODSKY:  Yes, Your Honor.

5          THE COURT:  Was that Mr. Bacon, did you?

6          MR. BRODSKY:  Yes, Your Honor.  I moved in --

7          THE COURT:  Oh, I'm sorry.

8          MR. BRODSKY:  I moved in Mr. Deckoff's declaration

9     which I believe is --

10          MR. SHORE:  It's already in the exhibits.

11          MR. BRODSKY:  It's in the exhibits already.

12          THE COURT:  All right.  So you really only have

13     exhibits from the Movant 1 through 86.

14     (Movant's Exhibits 1 through 86 were hereby received for

15     identification, as of this date.)

16          UNIDENTIFIED SPEAKER:  That's right.

17          MR. SHORE:  And the deposition --

18          THE COURT:  And the deposition declaration.

19          MR. BACON:  And, Judge, I think we're -- I don't know

20     if Mr. Shore has weighed in on this yet, but I'd like to see

21     the whole depositions go in if nobody's got objection to that,

22     as opposed to excerpts.  I don't feel strongly about it.

23          MR. SHORE:  I'd rather see -- I'd rather see you guys

24     come back with designations and I'm sure there's all kind of --

25          MR. BACON:  Okay, that's fine.  And, Judge, the other

1  thing we talked about if we get to a sale hearing, I think we

2  all think it would make a lot of sense for this -- for these

3  exhibits to be part of that record, too, and we'll save a

4  couple of trees.

5         THE COURT:  That's fine.

6         MR. STAMATO:  Your Honor, just procedurally from the

7  debtors' perspective.  We did submit an exhibit list; Exhibits

8  1 to 19, which primarily include the various declarations that

9  have been filed in this case, as well as some documents that

10  were also included in the non-controlling lender's exhibit

11  binder.

12         Just so the record's clear, I'd like to move them in

13  as well.  I don't believe there's an objection.

14         THE COURT:  All right.  So the Debtors' Exhibits 1

15  through 19.

16  (Debtors' Exhibits 1 through 19 were hereby received for

17  identification, as of this date.)

18         MR. STAMATO:  Thank you.  That will be our case-in-

19  chief.

20      (Pause)

21         MR. SHORE:  Whenever you're ready, Your Honor.

22         THE COURT:  All right, go ahead.

23         MR. SHORE:  I started this morning saying I wanted to

24  focus on one thing, and I think we all, as we do, kind of lose

25  focus as we go through.

1          This isn't about whether the assets, the collateral,

2     is safe right now.  This isn't about whether the professionals

3     have done a good job here.  I've said this morning that the

4     problem the professionals face is because they have bad

5     clients.

6          And what we heard on the debtors' case-in-chief, on

7     their opposition to the trustee motion, is that the

8     professionals have been doing their best throughout this

9     process to manage with the fact that their clients put

10    themselves in a position where they were compromised.

11         Section 1104 does not allow us to remove debtors'

12    counsel, it does not allow us to remove financial advisors, it

13    allows us to remove management for cause, fraud, dishonesty and

14    competent gross mismanagement.  Or if it's in the interest of

15    creditors that that happen.

16         Management is the issue here.  And while we have some

17    problems with people's recollection of when they did what and

18    who did what, and, you know, in FA's desire to point out that

19    his client may not be telling the truth, I'm not putting them

20    on trial.  It's management; it's Mr. Eckert and Mr. Frank.

21         The two gentlemen control the company and have

22    controlled the company in all relevant periods.  The two make

23    decisions together the two operate on board meetings, board

24    phone calls, whatever they are.  They don't remember them as

25    board meetings, but they call them board meetings.  All right,

1    I understand that, it's a closely held corporation, that

2    happens.  But it's the two gentlemen who do this.

3            And the reason -- the reason the code permits us to

4    seek to remove management under 1104 is because creditors and

5    parties-in-interest in the bankruptcy case are entitled to have

6    a fiduciary to make the tough decisions.  To make the initial

7    call with respect to how allocations are going to be made.  How

8    we're going to deal with a particular group of creditors.  What

9    we're going to do with the case.  They make the tough calls,

10   and then the business judgment rule kicks in and says Your

11   Honor's not -- doesn't have to make these touch calls, as long

12   as they fall -- they weren't interested, you don't have to do

13   it, and if they put themselves in a conflict position you can

14   look at entire fairness.

15           But at the end of the day, there is one party who's

16   responsible for the decisions of a debtor; that is the

17   management of the debtor.  Nothing in the code supplants their

18   responsibility for making decisions.

19           What are management's actions here that we're

20   complaining of?  Again, not with respect to the assets, we're

21   complaining about management putting themselves in a position

22   where they couldn't deal with the most fundamental issue in

23   this case from the moment it was filed.  How are we going to

24   conduct a sale process, to whom are we going to sell, and what

25   are the terms upon which we're going to sell.

1              And we have three problems here with that.  We don't

2       think, and all of them relate to the fact that we don't think

3       management can act on the sale.  It's exactly what I think the

4       Court was concerned with, with who's running the show here,

5       who's actually making the decisions, who's responsible for

6       making the tough decision.  And I think there is one tough

7       decision and we're all struggling with it.  Over the do you pay

8       secured creditors very little and pay unsecured creditors,

9       which -- something that they wouldn't normally be getting, or

10      do you just let value flow in the way people view value in

11      these cases.  I'll come back to that in a bit.

12             But those are -- they're tough decisions that have to

13      be made and Mr. Eckert and Mr. Frank put themselves in a

14      position where they couldn't fairly assess that.

15             They entered into pre-petition contracts.  Now I

16      don't -- you know, with respect to people testifying that

17      generally management want to lock up in contracts, and want to

18      travel with the assets, we all know that, I'm not stating a

19      contrary point on that.  They signed contracts with one bidder.

20             Before this sale process was ever put together they

21      were already printing up their Black Diamond business cards,

22      metaphorically speaking.  And that's what the e-mail traffic

23      shows with respect to this.  They believe that signing up these

24      agreements were getting them in the door at Black Diamond and

25      that's where they were going to go.

1    And I didn't -- the one that is most troubling to us,

2    of course, is Mr. Eckert's.  Because when you look at the terms

3    of that contract, he is offered a million dollars to do

4    whatever he wants.  And if the company pays him, that is if

5    he's actually working under his employment agreement, he gets

6    paid.  If the company isn't paying, if he doesn't go to work at

7    GSC or anything else, he still gets a million dollars a year

8    for doing nothing.  That's the position he put himself in when

9    he signed the consulting agreement with Black Diamond.

10    THE COURT:  Wait, isn't he selling, you know,

11    arguably, his presence to enable the debtor to continue to

12    manage the assets that are left behind?

13    MR. SHORE:  No, that's a different consulting

14    agreement.  He has a consulting agreement with the debtors as

15    well.

16    THE COURT:  Oh.

17    MR. SHORE:  That's the employment contract again.

18    He's got a contract that only kicks in after the sale is

19    concluded, Black Diamond gets all -- substantially all the

20    assets.  In that case, he's got an employment contract with

21    GSC, and he's got the consulting agreement with Black Diamond.

22    So he gets a contract.  And the only person who is

23    offering him that contract, that was this whole thing about it

24    being market and everything else.  There was a question asked,

25    wait a minute, do you think anybody else would be offering you

1  three million dollars not to do anything?  And he said well,

2  no, I don't think they would do that, I might get some money

3  or what -- it was a gobbledygook answer to a very important

4  question.

5            Nobody's going to offer anybody three million dollars

6  to do nothing.  Payable expressly in the situation when he's

7  not working for GSC.

8            And in that move, that move that they made back in

9  June, they immediately started losing sight of what they were

10  doing.  Black Diamond is two entities here, really three

11  entities.  There's a Black Diamond agent, who's responsible for

12  all of the lender's claims.  There's a Black Diamond lender;

13  that is the majority lender.  And there's a Black Diamond

14  business.  And what you heard the gentleman testify to today,

15  the two principals who were on trial, is that from their

16  perspective this was all about Black Diamond; the business,

17  going forward.  That's what they were looking to do.

18            Now, whether or not that influenced their decision,

19  we're going to come back to that in a bit.  But that's the

20  position they put themselves in when they signed those

21  contracts.  Because the effect of those contracts is if I don't

22  select the bid, if I don't work here to keep Black Diamond as

23  the winning bidder I don't get that consideration.  Whether

24  other people were willing to offer it or not they said I will

25  accept the compensation you'll give me as long as the bid goes

1    through.

2          And that process continued through the entire sale

3    process and manifested itself in the very end, in the option

4    agreement.  Where, quite frankly, I think the testimony is all

5    over the lot.  The best I can reconcile the testimony is that

6    Mr. Deckoff will swear to his deathbed that this was not a

7    material part of the consideration in the deal.  But Mr. Eckert

8    emphatically in five or six times during his testimony said he

9    understood and was led to believe by Black Diamond that unless

10   he signed the option agreement they would not close.  That was

11   his whole testimony about how I did this for the good of the

12   company.  I thought Black Diamond was going to walk away.  If I

13   didn't give him the option agreement it was going -- this was

14   for the good of the company.

15         The problem with the Black Diamond -- with the option

16   agreement, is not just the optics that everybody's talking

17   about, it's the fact that nobody -- nobody has done any

18   fairness work on it.  Because they can't.

19         The key of the option agreement is the allowability of

20   the pre-petition claims and the flow of assets to the preferred

21   stock, in which forty-nine percent was sold.  If the pre-

22   petition claims; Mr. Eckert's pre-petition two million dollar

23   bonus claim, is disallowed or subordinated, it's not worth

24   anything.

25         If his -- you heard Mr. Manzo testify they haven't

1    done an analysis yet that shows that any value is flowing to

2    those preferred shares.  That's what Mr. Bacon just asked him.

3    He said no, I don't know.  And there's still going to be a

4    significant question given the pre-petition conduct of Mr.

5    Eckert, whether the Court is going to allow that.

6           So what we have is a combination of two risks here.

7    One, that value isn't going to flow, sufficient to put the

8    preferred in the money, and, two, that the claims aren't going

9    to be allowed, or the preferreds not going to be recognized in

10   the way in which Mr. Eckert and Mr. Deckoff want it to be

11   recognized.

12          And there's a 500,000 dollar payment being made.  One

13   thing is clear from the testimony, Mr. Eckert doesn't do

14   anything for free.  If I'm going to save the company, which is

15   my fiduciary obligation to do, I'm willing to enter into a

16   private transaction, which is not my fiduciary duty.  Okay.

17   But I'm only going to do it if you pay me 500,000 dollars for

18   assets of an indeterminate value.

19          And that's where we come to the process issue.

20          I certainly understand the Court's inclination that's

21   come out in questions, and I suspect Your Honor's struggling

22   with it.  Which is, can you ever have a process in which

23   management has totally corrupted itself and selected a bid, but

24   nonetheless, the Court can find its highest and best?  It's a

25   difficult question.  You should never have been put in the

1    position of doing that.

2           I will submit that allowing these two gentlemen to be

3    the people who select the ultimate fiduciaries who sign off on

4    this, allowing them to do that is dangerous.

5           We're going to sign up with pre-petition contracts

6    with bidders before the bid's accepted, that's not something

7    the Court wants to be promoting in any respect.  I'm willing to

8    sign up an open contract with any bidder, fine.  I'm willing to

9    travel with the assets, fine, all great.  I will work for this

10   one bidder if the bidder wins, according to these terms;

11   dangerous.  I'm going to go work for these -- this bidder for a

12   contract that really doesn't even pass the smell test extremely

13   dangerous.

14          Mr. Eckert entered into that option agreement; 500,000

15   dollars for assets of an indeterminate value over the advice of

16   counsel; his own counsel, over the advice of debtors' counsel,

17   over the advice of the FA, and has not rescinded the agreement.

18   And all this talk about I'll do the deal even if -- as long as

19   the contract isn't ripped up.  What are people worried about?

20   They should get rid of that contract, they haven't gotten rid

21   of that contract.  No explanation as to why they haven't gotten

22   rid of that contract.  And I would suggest that saying that

23   righting a rule that management, who participated in the sale

24   process, is the poster child for not -- how not to behave like

25   management in the sale process, and then doing that option

1     agreement at the end is bad.

2          So, yes, I would say that there are circumstances, and

3     this is one, in which the process management ran was so bad,

4     and the way they behaved in that process was so bad that you

5     can't permit the result.

6          And what is the result that they're permitting?  With

7     fiduciaries, I understand, they like the high bid, they like

8     the high bid number.  Or, sorry, the professionals like the

9     high bid number.  And they counseled all you need to do is to

10    accept the high bid.

11         Mr. Frank candidly testified this is not a fair deal

12    for the secured lenders.  Mr. Eckert, I guess, was a little

13    less clear on that, it was fair but if they could have done

14    something differently.  Which I think -- think what he meant

15    was that if you had come to the auction and had not signed the

16    consent to allow a joint bid you would have protected yourself.

17    Maybe.  You never waive the right on a collusive bid, that's

18    really a sale issue hearing, and I promise you you'll gets lots

19    of testimony on that.

20         But Mr. -- the other thing, I think, Mr. Eckert was

21    talking about was the bid -- we could have come in and bid.

22    And that's not right.  We're trying to protect an eighty

23    million dollar claim and trying to avoid what he said was a

24    drastically unfair result.  And I think the glib response is

25    you could have gotten in a bidding war with Black Diamond who's

1   using your money in the credit bid.

2          So you've got a drastically unfair result here in

3   exchange for what?  There is no evidence that there has ever

4   been a valuation of this company, which has shown asset values

5   sufficient to pay the secured lenders in full, that's the

6   starting point.

7          Unsecured creditors then and, certainly, pre-petition

8   equity couldn't have any reasonable expectation under those set

9   of circumstances that they would be getting something.  So is

10  it unfair to say that from a valuation perspective, just value

11  flowing to creditors, there's not enough value to go to?  No.

12  What's happened here is the non -- the people who don't owe

13  fiduciary duties to the creditors, the financial advisors and

14  the lawyers, have convinced the person who does owe fiduciary

15  duties, the two men who have corrupted themselves, to go

16  forward with the transaction that is grossly unfair to

17  unsecured creditors in the -- no, drastically unfair, sorry, in

18  the pursuit of a higher number.

19         We are entitled to have that decision resolved by a

20  fiduciary, someone who owes us a duty directly.  And as I said

21  before, we would not be moving for a trustee if we thought a

22  trustee wouldn't give us a fair shake on that decision.

23  Because I think a trustee who recognizes they owe duties to

24  people, and has an ability to talk to the unsecured creditors

25  and try to broker some kind of deal, or go forward with another

1   deal, or go forward with this deal, or do something else, rerun

2   the sale process, isn't going to feel like they have to accept

3   what is just the highest number.  Particularly when the way in

4   which that number is presented by the very bidder who put the

5   management in their position they're in, or, at least, gave

6   them the opportunity to put themselves in that position.

7           So the problem we have is we've got a grossly -- we've

8   got no one -- no one making that tough decision.  We want

9   someone to make that decision and we want that person to be

10  free of the taint.  They said, it's the most fundamental

11  decision in this case, and we don't have anybody who owes us a

12  duty who is in a position to make that fair assessment.  And at

13  the end of the day the result -- the response of the debtors'

14  counsel is don't worry the process was run, Mr. Manzo did a

15  great job, he got out there, he got this, he got a high number.

16  But we're entitled to a fiduciary.  And what entitles us to a

17  fiduciary is 1104.  Because if management has breached their

18  fiduciary duty, or they mismanaged the company, or they've been

19  incompetent, all of which I think apply here, then we can get

20  them out.

21          Now, the last piece of this, and I do want to address

22  the issue of harm.  I'm still not sure of what's going on here,

23  except I believe that what the debtors have done, and what Mr.

24  Manzo has done, is create the exigency.  There's no question

25  there were other bidders out there.  They're taking the

1    position that an unapproved asset purchase agreement, which

2    says they shall not shop, prohibits them from even coming to

3    ask the -- coming to the Court to say we have a problem here.

4    We've got a bid that's at risk, has some legal risks in it.

5    And we are going to go down with that bid.  We are not willing

6    to try to do anything to hold any other bidder around or seek

7    any other alternative, we are going to go forward with the

8    Black Diamond bid, and if you don't like that appoint a

9    trustee.  But I'll tell you when you appoint a trustee, I've

10   now got this situation so far along that that's going to have

11   drastic consequences.

12        The only fiduciary to testify about those drastic

13   consequences, though; Mr. Frank, said very clearly his concerns

14   were one of finding.  We have moved as quickly as we can, we

15   understand Your Honor is trying to move as quickly as you can,

16   we understand the U.S. Trustee's office is trying to move as

17   quickly as they can.  We've provided names, I understand that

18   people are looking for counsel.  We're going to try to get this

19   done as quickly as possible.  But, fundamentally, at the end of

20   the day, Your Honor's instinct was right, you want to have this

21   trustee hearing before the sale hearing to find out whether

22   management has committed cause which would allow their removal,

23   or it's in the interest of creditors to have them removed

24   before getting to the sale hearing, because we're all entitled

25   not to have to get to that difficult decision.  Is it better to

1  have a drastically unfair result for secured creditors to pay

2  unsecured and preferreds, who didn't really have an expectation

3  that they were going to get something, as opposed to a ratable

4  distribution according to rational valuations.

5       So, yes, I think before you go forward with that sale

6  hearing we're all entitled to have a fiduciary answer then.

7       Unless Your Honor has any questions --

8       THE COURT:  What would you expect in a plaintiff

9  fiduciary to do?  What -- what would you expect that fiduciary

10  to do in terms of raising issues in which there was a breach of

11  some duty that you could point to regarding the sale process?

12       MR. SHORE:  The trust -- a fiduciary coming in -- you

13  mean, the trustee?

14       THE COURT:  Trust -- assume a trustee, a trustee looks

15  at the sale process, do you think it was incumbent upon a

16  trustee to say now that advisors to the debtors say that this

17  allocation is in the debtors' view -- or debtors' advisor's

18  view, a completely distorted allocation of credit bid to value

19  of assets received, versus amount paid to value received in

20  assets that I should not -- I, as the trustee, should just

21  simply say this should not go forward on its face, it's just

22  not fair.  I mean, is that what you're looking -- I'm trying to

23  understand what you're articulating a trustee would do if they

24  saw this -- sale process.

25       MR. SHORE:  I think there are two pieces of it to

1    address here.  If they saw pre-petition breaches of fiduciary

2    duty or post-petition breach of fiduciary duty the trustee

3    would have the power to seek to remedy that, however the

4    trustee would do that.  I assume the trustee would be into the

5    removal of the two people from their positions, so the trustee

6    would do that.

7           Then the trustee has to decide one thing.  Am I

8    proceeding with this sale hearing?  There's a sale hearing that

9    Your Honor's going to schedule.  The trustee has to decide am I

10   going to proceed or not?  That's the decision that has to be

11   made.  There are going to be a number of other decisions that

12   have to be made in the context of integrating into the business

13   in order to run the sale process.  But that's it, it's

14   fundamentally it.  And that that decision --

15          THE COURT:  But in that decision process what does the

16   trustee consider?

17          MR. SHORE:  The trustee considers whether it is in the

18   best interests of the estate, in his or her judgment, to

19   proceed with the sale process which has this set of economics

20   versus some other process which has another set of economics,

21   or a third process, or a fourth process or something else.

22          Fundamentally, there needs to be a go, no-go decision

23   that has to be made and it may be -- it may be at the end of

24   the day the trustee comes in and says you know what, I've

25   looked at this, I see the allocation issues, I hear what people

1  say, we can't fix these allocation issues, we think that

2  notwithstanding it was a distorted bid, it was a arbitrary

3  credit bid or anything else. And say you know what, I think we

4  got to go with this deal, that's the risk we run in doing this.

5  I recognize that. I'm telling you I think a fiduciary wouldn't

6  look at it that way.

7        I think the fiduciary would be just as troubled as

8  many of us are in the way this was done and would look at it

9  and say it's not in the best interest of the estate to proceed

10 this way. So the first decision is go, no-go on the sale. And

11 then if we're not going forward with the sale hearing, which

12 has, you know, has consequences, obviously, difficult decisions

13 for a trustee to make, that's why we proposed the trustee who

14 can make those kind of decisions. And then if not that, what?

15 And that could run -- we're not trying to tie a trustee's

16 hands, that can be an abbreviated sale process, that could be

17 a -- you know, moving forward with another bid, it could be a

18 whole host of other things, it could be a plan process.

19        But that -- I don't think anybody should be

20 restricting the fiduciary's consideration of the options that

21 are available because it's going to be a crisis situation.

22        THE COURT: All right, thank you.

23        MR. SOLOW: Michael Solow, Your Honor, on behalf of

24 the debtors.

25        Your Honor, there's been a lot of talk about what the

1    fiduciary obligations of the debtor are, and whether or not the

2    debtor has exercised those fiduciary obligations.  And I

3    believe they have.

4         I know that the Court will ultimately decide that.

5    They've heard a lot about the opinions that I've expressed and

6    my firm has expressed with respect to those fiduciary

7    obligations, and our view with respect to what our contractual

8    obligations are as a debtor.

9         But I want to go back to the beginning when you first

10   established this hearing, when you first said I want to talk

11   about management.  I really don't want to talk about the sale.

12   And much was made about the three documents I identified in my

13   opening.  Each of these agreements dealt with Mr. Eckert and

14   Mr. Frank.  The agreements focus on their sales scenarios and

15   post-petition responsibilities with Black Diamond.  It's a very

16   interesting set of contracts.  They're not unique, they're not

17   unusual in either the business world outside of cases

18   administered by this Court, or actually companies in Chapter

19   11.

20        And as a point to answer the Court's question with

21   respect to Mr. Eckert, specifically, the one contract that was

22   put in front of him for his work -- continuing work at GSC, is

23   specific to the '40 Act, the securities requirements, and his

24   key man provision in the investor agreements.  And that if

25   contracts cannot be transferred and there are some contracts

1    that can't be transferred, because we don't have investor

2    consent, they remain back at GSC, and that is what I believe

3    Black Diamond was trying to protect.

4         The other set of facts focused on during this hearing

5    relate to the results of the auction and the process.  And let

6    me be more specific.  The alleged allocation of the assets by

7    the bidder is also a fact, Your Honor, that the allocation

8    issue, at least as far as this Court will be asked to consider,

9    is not now part of the bid, as the buyer, pursuant to the

10   original APA has assigned the purchase right to an entity

11   jointly owned by the agent and Black Diamond.  That's what

12   happened.  We tried to negotiate even more, Your Honor, but the

13   fact is based upon your comments in previous hearings, we made

14   it clear to Black Diamond that we would not go further with the

15   sale process unless the sale was made into a single entity so

16   that the Court would not have to opine on allocation, and it

17   will not be asked to do so.

18        The Court today needs to consider whether the process

19   of getting to a hearing on a sale, a sale that is objected to

20   the by the non-controlling lenders because of a potential

21   allocation, is a cause for the appointment of a trustee.  A

22   consideration that requires the movant to convince you by clear

23   and convincing evidence that they've achieved.  No other

24   grounds can be part of the consideration because, as promised,

25   the movants have put in no evidence regarding the operations,

1    investment strategy, collection of revenue of the management.

2        And as I noted in my opening, Your Honor, I listed ten

3    points, I will not repeat them because of the late hour, but I

4    can promise you that the ten points, the ten pieces of evidence

5    are in the record now and they are uncontroverted with respect

6    to how the company's being managed.

7        So we, again, go back to the sale, a sale where the

8    price achieved is higher than any expert, whether it is the

9    non-controlling lender's expert, Mr. Shore's statements today;

10   Black Diamond or Bob Manzo and Capstone expected to achieve.

11       THE COURT:  That's true.  But what happens if that

12   price resulted from a manipulation that was enabled by the

13   joint bidder?  And that manipulation, if you accept the

14   debtors' view of value albeit was determined in dollar amount

15   after the sale but before the sale hearing, would support that

16   view.  Do you look away from it; from the debtors' standpoint?

17   Do you question the fairness of it if this is the result?

18   What -- I've heard some reference to the debtors' counsel's

19   view on this, but what is the debtors' counsel's view?

20       MR. SOLOW:  Your Honor, I have two views on it.  First

21   of all, as I've stated before, our obligation; our fiduciary

22   obligation is to all creditors, I accept that.  And the way we

23   satisfy our fiduciary obligation to the lenders is to pay their

24   fiduciary; Black Diamond, as agent, in full.

25       If Black Diamond, as agent, does not fulfill their

1    fiduciary obligations, then the lenders who have been wronged

2    in that contract will have a tremendous cause of action.  And,

3    more importantly, they will have a very high damage because

4    Black Diamond has established the value of those assets in

5    their bid at a price that not even the objectors to the sale,

6    the non-controlling lenders, believed would ever be achieved.

7            So what happened, in essence, Your Honor, is that if

8    Black Diamond, as agent, acted improperly then the controlling

9    lenders who, in the marketplace, at least, believe that their

10   debt was worth twenty cents on the dollar, now have 100 cent

11   piece of paper.  Because that's what their agent paid for.

12           So I believe, Your Honor, that from a fiduciary

13   standpoint the debtor fulfills its contract.  But, more

14   importantly, Your Honor, we were mindful of what you said in

15   hearings subsequent to the auction, and obviously, before we

16   started the sale process.  And in light of that, we demanded of

17   the buyers that they close into a single entity so that there

18   was no indication to any subsequent court if that's what chosen

19   to be done by Black Diamond, as agent, and Black Diamond, as

20   buyer, an improper allocation that no other court would believe

21   that this Court opined with respect to that allocation.

22           In fact, Your Honor, there's no evidence today that

23   there's going to be any allocation that's improper.

24           THE COURT:  I understand that.  But just come back on

25   me a moment to another -- to the prior point.

1        It's one thing I think for a group to argue the

2   allocation is not right, it should be accessed at Y, and it may

3   be close, it may be not close.  But if the debtor advisor tells

4   the debtor I think this is worth X and they allocated Y, and it

5   appears to be a gross distortion, and I'm not saying that

6   debtors' advisor said that.  But I said hypothetically, if they

7   were to say that, do you move away from the position you may

8   have had well, let them fight it out, it's kind of their issue?

9   And do you move into a situation has the debtor willingly or

10  unwillingly enabled this to happen through the bidding process

11  that allowed joint bidding?  Because absent joint bidding you

12  couldn't do this.  So when you step back and say all right, the

13  debtor fulfilled its fiduciary duties, is this process fair,

14  you know, from the standpoint of the way the debtor -- assuming

15  the debtor concludes that the result is unfair amongst the --

16  based on the allocation issue, and it's so grossly unfair it's

17  apparent on its face?  Does the debtor still move forward and

18  say we support our good faith finding because the purchaser,

19  albeit may have been able to use the process in a way that we

20  believe, as the debtor, was unfair?  I'm trying to get to a

21  point where do you ever think the debtor should step away and

22  say wait a minute this is not fair, and I don't want to

23  participate?  Or do you just leave that up to the Court?

24        MR. SOLOW:  Your Honor, you've got two parts to your

25  question.

1    The first part is whether or not we should go forward

2  with the sale, and whether or not the sale can be proved under

3  363(a)?  And my answer is I believe it can be.  I believe that

4  when you judge highest and best the case law looks to price and

5  ability to close.

6    There's a second piece to your question, which is I

7  think the harder question.  And I think it will be a very hard

8  question for you to reach a conclusion on unless there's

9  different evidence that's put in at the sale hearing.  And

10  that's whether or not a 363(m) finding can be made.  And if

11  there is a gross allocation, take your hypothetical, and there

12  is a disparity, and because they are creditors in this estate,

13  I think a 363(m) finding is very difficult, if not impossible,

14  to make.

15    I say --

16    THE COURT:  I interrupt for you one point.  But if

17  that is the debtors' conclusion after the sale process, and

18  albeit, the allocation may not be off at all, it may be, you

19  know, a matter of evidence at some point at what the value

20  should have been.  But if the debtor concludes that sometime

21  before the sale hearing my modify a gross misallocation does

22  the debtor go forward with the process and just say you know,

23  we'll leave it to the Court as to whether they find 363(m), or

24  does the debtor have to do a duty to say wait, this should not

25  go forward?

1          MR. SOLOW:  Actually, Your Honor, I think that the

2     debtor can go forward.  I think that the question is whether or

3     not we can ask for an (m) finding, because I don't think an (m)

4     finding is required for a sale to be approved.  It's a request

5     of a buyer.

6          THE COURT:  No, I understand that.  But the debtor

7     usually supports that request.  I haven't presided over a

8     hearing in which the buyer asked for a 363(m) and the debtor

9     says no.

10          MR. SOLOW:  Right, I appreciate that.

11          THE COURT:  So the debtor is --

12          MR. SOLOW:  But I also believe that there are actually

13     cases out there, Your Honor, I happened to look, as to whether

14     or not a court can approve a 363 sale without an (m) finding.

15          THE COURT:  Oh, I don't question that at all.

16          MR. SOLOW:  Yeah.

17          THE COURT:  I don't know whether absent a 363 finding

18     there may be an out under the APA, I haven't looked at it.

19          MR. SOLOW:  They actually have an out I have.  They

20     have an out with respect to an order acceptable to them, there

21     are other outs in it as well.  And as I said, Your Honor, this

22     has been a transaction in movement, it's hotly contested, it's

23     been hotly negotiated.  And we have continued to push the buyer

24     to what we believe is as fair a transaction as possible.  And

25     that's why we continue to press forward with this transaction.

1          And we believe, and management supports and directs

2     us, in trying to achieve that.  That included trying to put the

3     parties in the room and get a settlement conference.  You heard

4     about that evidence, as well as making certain demands with

5     respect to going forward with our sale hearing.

6          THE COURT:  All right, thank you.

7          MR. SOLOW:  I'll conclude quickly, Your Honor.

8          I believe that if Black Diamond and management are

9     being accused of cooking the deal, they failed miserably.  They

10    didn't do that, they didn't try to do that.  Management, with

11    the assistance of it's -- as advisors, made sure that the

12    process worked properly, that we had third party bidders to

13    keep it honest.  Management here does not need to be replaced,

14    Your Honor.  The Court needs to consider whether the sale goes

15    forward, and if so, whether the lenders who will get paid in

16    full should seek redress, I believe, in another court.

17         Thank you, Your Honor.

18         THE COURT:  All right.

19         MR. BACON:  Good evening, Your Honor.  Doug Bacon for

20    Black Diamond Capital Management.

21         Well, I was wrong about one thing, Judge, I said at

22    the outset of the day that I thought the sale process would

23    creep into this hearing from time-to-time, and it turned out I

24    think this hearing was probably appropriately very focused on

25    the sale process, and hopefully, that saves time if we're back

1     before Your Honor on the sale process.

2          I think a couple of things, Judge.  I think the

3     biggest problem -- the biggest problem that the minority

4     lenders have today and they really ought to be -- they ought to

5     be held to it, Judge, they didn't indict the sale process until

6     they didn't like the result.  And I won't belabor that, because

7     I brought it up at the outset.  But it's really important to

8     sign onto a process.  They knew all about Mr. Eckert's

9     contract.  Mr. Eckert gave that unfortunate testimony that he's

10    going to go play cards with his buddies.  He did that before

11    the procedures hear -- and I don't know why he said that.  But

12    he said it before the procedures hearing.  They knew all about

13    that, and they knew all about Mr. Frank's contract, as was

14    entirely appropriate.  And they looked at that and they took

15    depositions and then they came on and said okay, let's go onto

16    the sale.  Let's do it.

17         I'm sure they looked at Bob Manzo and said we got a

18    very reputable guy in the middle of it, let's go.  And they

19    didn't -- they signed onto a hundred-day -- I wish I knew how

20    much it cost, Judge; no question in the millions and probably

21    more than several million dollars.  And when they don't like

22    the result all of a sudden the guys who get all this stuff pre-

23    petition and it was disclosed, all of a sudden they're bad

24    guys.

25         Mr. Shore made a remarkable comment, and I thought I'd

1    bust him on it.  But then he said it again in his closing, so

2    he'll stand by it.  He said when Mr. Frank was excused from the

3    room and we got into a little back and forth argument, he said

4    we wouldn't be here moving for a trustee if we thought the

5    trustee would reach the same result.  Now, that's tactics,

6    Judge.  And Your Honor's going to get to decide next week, I

7    hope, whether a trustee would reach the same result.  You don't

8    have to appoint a trustee to make that decision.

9           Are there conflicts here?  Yes, there are.  I mean,

10   and I think they're inherent in this process.  They're -- you

11   got two individuals who are going to work for the buyer.

12   There's case law in our objection that -- reports that address

13   that and said you know, it needs to be disclosed.  It happens

14   all the time in the process.  Mr. Manzo said it happened all

15   the time, it's not unusual, it's kind of inherent in the

16   process.

17          But that's what's beautiful about bankruptcy, that's

18   what makes bankruptcy such a perfect forum for these kind of

19   meltdown situations.  Because this is the place to navigate

20   that kind of issue.  And you start by spraying sunshine on

21   everything, and that's exactly what happened on this case.

22   Even on that option agreement, to get that thing out, because,

23   obviously, that was going to be controversial.  Put it out,

24   shine the light on it, let the judge decide.  Put the sale

25   procedures in front of the Court, let everybody come in and

1    fight about and ultimately agree upon what the sale process is

2    going to be.  That's what this Court's here for, to be a

3    balance and the ultimate arbiter of what's right and what's

4    wrong.  You're going to get -- you know, you're going to get to

5    decide that -- this decision today is not going to prejudge --

6    we know, we understand what the Court may do next week.

7           And then the best thing about this process, Judge, is

8    after you've navigated all that, after you've disclosed any

9    conflicts and let people take depositions and let everybody

10   weigh in on the bid procedures, and have an auction that goes

11   three and a half days and -- cost another fortune, and it's got

12   lawyers, and it's court reporters, and it's got the minority

13   lenders with at least two lawyers there.  You do that whole

14   process, checks and balances, sunshine, everybody knows what's

15   going on.  And then even when you get through the process the

16   ultimate check and balance is the deals got to be brought

17   before the Court.  And everybody gets to take the shots at the

18   deal they want.  And obviously, they're going to take shots to

19   the deal, and Your Honor's going to present everybody with some

20   difficult questions in that hearing, there's no question about

21   it.  In some ways that hearing is going to be very simple

22   because the math is not very complicated.

23          And, Judge, what you don't have to decide here, this

24   is what I think's really important, you don't have to decide

25   the intercreditor issues.  And once you get drawn into deciding

1    those issues, I don't know where you stop.  I don't know where

2    you draw the line on whether intercreditor issues taken in

3    accordance with the contract were appropriate.  You get into

4    that and you're going to really be working long hours, Judge,

5    because it's going to happen all the time.  And the non-

6    controlling lenders have made that a lot easier for you.

7           Judge, I just refer you to take a look at your leisure

8    at their objection to the sale motion.  It's 246 on the docket,

9    I believe.  And they say in that objection on page 7, they say

10   "That for purposes of their sale objection this Court can

11   assume the preposterous, that no Black Diamond entity breached

12   its intercreditor agreements in these Chapter 11 cases."  They

13   invite you to make that assumption.  And they think it's

14   preposterous, but they're essentially saying Judge, you don't

15   need to get in the middle of that.  And in the next sentence

16   they say "All agree that any issues of such breach are properly

17   the subject of the non-controlling lenders state court

18   litigation and are fully preserved."

19          And one things for sure, Judge, this Court's not going

20   to enter an order blessing the sale that precludes any claims

21   they think they may have against their agent.  That's already

22   been agreed to.  They've already drafted language for the order

23   and the order's -- it's already in there in the order at least

24   twice, and I'll bet it's in there six times by the time the

25   order's presented to you, and that's okay.  But they take Your

1   Honor off that hook.  And they did it on the first day of the

2   case, we've cited that a couple of times, where Mr. Pell said

3   again, and again, and again, we're not going to get you into

4   the middle of these intercreditor issues, we're going to state

5   court, Judge.  And then they went to state court, they've sued

6   us in state court, Judge.

7        And, by the way, I'm not here today to defend that

8   state court lawsuit, and I'm not here to take issue when Mr.

9   Solow talks about whether the agents got fiduciary duties,

10  that's for another day.  We disagree with a lot of that, and

11  we'll have our own things to say in that state court lawsuit.

12  But you don't have to get into that, and they've, essentially,

13  encouraged you not to.  But just like they don't like the

14  outcome of the process so they want to go back and indict the

15  process, if they can knock -- if they can draw you into this

16  intercreditor dispute and get you to look at the agents duties

17  and where -- you know, where the line on the allocation is, I'm

18  sure they'd love to do that, but they've invited you not to.

19  And they have brought a state court lawsuit.  And I hope you do

20  stay out of it, Judge, or we'll never get this done.

21        Mr. Shore said the two issues in this case are did

22  they follow the appropriate procedures and was the highest and

23  best bid obtained?  There was no evidence, none, whatsoever,

24  none, that Mr. Eckert or Mr. Frank did anything that was

25  inconsistent with the bid procedures that this Court approved

1    after they -- after the non-controlling lenders spent lots of

2    time on those procedures. It was the highest and best bid

3    obtained. That's not tonight's issue, that's next week's

4    issue. And the Court's here to solve to that.

5          I'll tell you what I think's not appropriate, Judge, I

6    think it's not appropriate to sign onto a process, tailor

7    procedures, attend and auction, run into the Court right after

8    the auction, a day or two after the auction, challenge every

9    aspect of the sale and then wait and all of a sudden come back

10   and say you know, the guys running this thing are crooked.

11   Write letters to the Court alluding to criminal behavior and

12   then bring a trustee motion which is -- Judge, it's tactical

13   and it's an inappropriate tactic.

14         Judge, this hearing, perhaps appropriately, was all

15   about the sale process, and this case was all about the sale

16   process, always has been. This was one of those debtors that

17   needed to get sold and nobody -- nobody, before or after this,

18   nobody at any stage of this process has challenged the

19   proposition that this company needed to be sold right away.

20   And it has been -- be sold if Your Honor supports the sale.

21   But there hasn't been a smidgen of evidence, nothing tonight --

22   today that indicted that sale process or said there was

23   anything tilted or crooked about that sale process.

24         Two last things, Judge, this Eckert consulting

25   agreement, I don't want to get buried in that, but Mr. Deckoff

1    testified again and again and again, that that consulting

2    agreement backstopped the company's obligation.  It wasn't a

3    million dollars a year from Black Diamond to go play cards with

4    your buddies it was -- it was an assurance to Mr. Eckert that

5    if he would stay with the company and manage assets that

6    couldn't trade out, that couldn't for whatever reason be

7    transferred, and there are assets -- I think there are three or

8    four contracts, and I think the debtor at the last sale hearing

9    came in and acknowledged they're not going to transfer.  And

10   they need to leave Mr. Eckert there.  And Black Diamond

11   backstopped Mr. Eckert's financial compensation for staying and

12   managing those assets.

13          That contract which is in evidence also precludes Mr.

14   Eckert from going out and raising money.  It's in the contract,

15   and going out and soliciting investments.  And when you buy

16   somebody's investment management business you don't want that

17   somebody to leave and go out and raise money from those same

18   investors that you're trying to bring into your organization.

19          The option agreement, Judge, I've been wondering all

20   day whether to call that stupid.  And, you know, my clients are

21   a party to that option agreement, the optics and the timing

22   were terrible.  I'm certainly -- my client's here, so I'm not

23   going to say my client was stupid and I don't think it's fair

24   to say Mr. Eckert was stupid, but there's an error -- there are

25   a lot of people who would say that was a bad idea.  The timing

1    and the optics were terrible.  And I will so stipulate the

2    timing and the optics were terrible.  But nobody has said, that

3    had any influence on the sale process.  Mr. Frank thought it

4    was a bad deal for Mr. Eckert, time will tell.  But that was

5    done a month, five/six weeks after the auction, it couldn't

6    have influenced the auction.

7            I'll tell you what would have been really stupid, and

8    really wrong, would have been for Black Diamond and Mr. Eckert

9    to make that deal and not to put it on a piece of paper and

10   sign their names to it and disclose it.  That would have been

11   much more than problematic.  So if you're going to make that

12   deal, which my client felt very strongly about, put it in

13   writing, put it out there, let them take shots at it, which

14   they've certainly done, and they're entitled to do.  But

15   there's no evidence; no reasonable evidence -- it couldn't have

16   affected the auction, Judge, unless people lied to you and that

17   option existed six weeks earlier than it was reduced to

18   writing.  And nobody said that, nobody's even suggested that.

19   And it wouldn't have been true.

20           Judge, I don't see how the appointment of a trustee

21   can possibly be in the interest of creditors.  There will be

22   value evaporation.  Mr. Manzo, who's been around a long time

23   said it could be disastrous for GSC.  I think that's pretty

24   self-evident.

25           I also understand that that's not the end of the

1   analysis.  I understand that.  But it's a factor.  And it's a

2   factor when you look into motivations of people that are

3   bringing the action for the trustee, because to the extent

4   val -- to the extent value evaporates it's worse for my client,

5   it's bad for everybody.  If there's value that they're entitled

6   to, if it turns out that the their state court lawsuit has

7   merit, they're better off, we're all better off if that value

8   is captured.  And then we can go fight about it later, Judge,

9   in the forum that they've already started the fight in.

10          Thank you.  And thank you for staying so late, Judge,

11  it's remarkable to give us a day in court like this.  Thank

12  you.

13          THE COURT:  All right.

14          MR. SHORE:  Your Honor, may I just be heard on

15  three/four points?

16          THE COURT:  Go ahead.

17          MR. SHORE:  Very quickly.  First, there were some

18  statements made at that the allocation was fixed, that this

19  letter agreement that's only signed by the Black Diamond

20  entities, fixes it.  We'll show you next week, it doesn't fix

21  it at all, it's just more trickery and moving the ball, they're

22  closing into a process in which Black Diamond; the bidder, is

23  still going to control the ball.

24          Second, Your Honor raised this point about it being a

25  gross disproportionate and hypothetical speaking.  I'll tell

1    you, the evidence that you got on Exhibit 40, that's in

2    evidence, is the debtors best view as to proportionality right

3    now.  We've actually got a view that's worse, that shows that

4    the value of the credit bid assets is five million dollars and

5    you're not going to get any different evidence.  So that we can

6    stop with the hypothetical.  The debtors' best view right now

7    is that the cash bid of eleven applies to assets of 126 million

8    dollars.  And the credit bid of 225 applies to assets of

9    fifteen million dollars.

10       And the debtors have somehow -- not even the debtors,

11   the professionals have talked themselves into position that

12   having one foot in a bucket of fire and having the other foot

13   in a pool of liquid nitrogen, they are standing at room

14   temperature.  They're not.  They've got a credit bid that bears

15   no relation to the testimony of the witnesses, it was intended

16   to bear no relation to the value of the assets, and they've got

17   a cash bid that absolutely bears no relation to the value.  And

18   then they're throwing it at Your Honor to say eh, you'll decide

19   it.

20       We think from our perspective that's okay, but why

21   don't you stand in the bucket with us and see if you feel the

22   same.  And it's always troubled us that an officer and

23   director -- or director can be so sanguine about that.  All

24   right, fire, liquid nitrogen, it's all good.  And the reason

25   they're so sanguine about it is what you saw in the two

1   principles.  Again, those two guys, was there any doubt that

2   what they were doing is looking for ways to make opp -- make

3   money?  Every opportunity they've been given in this case they

4   have made the decision for themselves.  You need to settle,

5   I'll settle it myself and have my partner sign it.  Okay.  I

6   need a new contract, okay, I'll do it, you back me up, I'll

7   back you up.  That's what goes on with these guys.  They're not

8   looking out for creditors.

9         And the people who have made the decision to throw it

10  on Your Honor don't owe us the duties.  We're looking for

11  somebody who will stand back and look at it.  Maybe they'll

12  say step right into those two buckets with the debtors, I don't

13  believe they will.

14        And our right to get somebody to do that is in 1104

15  caused by the fact that the two people who were there are not

16  capable of making that decision.

17        THE COURT:  Anyone else?

18     (No response)

19        THE COURT:  All right.

20        As I guess announced earlier and I'll attempt to stick

21  to the schedule of a decision tomorrow morning at 9 o'clock.

22  But -- and I'll close the hearing with that statement.

23        But I would like to see various parties' counsel in

24  chambers, and, you know, about 9:30.  So, counsel of the U.S.

25  Trustee's office, counsel for the debtors, non-controlling

1  lender group, counsel for Black Diamond, counsel for the agent,

2  in a couple of minutes.

3         Thank you.

4         MR. BACON:  Judge, could I ask you to just to consider

5  something on scheduling?  You know what, we'll do it at

6  chambers.

7         THE COURT:  I may be able to answer your question

8  quickly.  In terms of tomorrow morning, you can certainly

9  listen in by phone, there's no need for anybody to be here in

10  person, unless they want to be.

11         MR. BACON:  What I ask the Court to consider is if

12  we're back on the 28th if it would be possible to start in the

13  afternoon, because that's going to be -- that Monday's going to

14  be a terrible travel day.  I think you said we might be back on

15  28th at 9 o'clock?

16         THE COURT:  All right, we can talk about that inside,

17  I'll have to figure it out.

18         MR. BACON:  Thank you, Your Honor.

19       (Whereupon these proceedings were concluded at 9:24 p.m.)

20

21

22

23

24

25

1

2                          I N D E X

3    OPENING STATEMENTS                        PAGE

4    Mr. Shore                                    7

5    Mr. Solow                                   19

6    Mr. Bacon                                   24

7

8    WITNESS              EXAMINATION BY      PAGE

9    Peter Frank          Mr. Hammond          34

10   Peter Frank          Mr. Stamato         129

11   Peter Frank          Mr. Bacon           150

12   Peter Frank          Mr. Hammond         158

13   Fred Eckert          Mr. Hammond         168

14   Fred Eckert          Mr. Stamato         251

15   Fred Eckert          Mr. Hammond         257

16   Steve Deckoff        Mr. Shore           258

17   Steve Deckoff        Mr. Brodsky         322

18   Bob Manzo            Mr. Stamato         327

19   Bob Manzo            Mr. Bacon           361

20   Bob Manzo            Mr. Hammond         366

21   Bob Manzo            Mr. Bacon           387

22   Bob  Manzo           Mr. Hammond         391

23   Bob Manzo            Mr. Bacon           392

24   Bob Man              Mr. Hammond         392

25

I N D E X (cont.)

E X H I B I T S

| MOVANT'S | DESCRIPTION | EVID |
|----------|-------------|------|
| 1 through 86 | | 396 |

| DEBTORS' | DESCRIPTION | EVID |
|----------|-------------|------|
| 1 through 19 | | 397 |

| CLOSING ARGUMENTS | | PAGE |
|-------------------|--|------|
| Mr. Shore | | 397 |
| Mr. Solow | | 419 |
| Mr. Bacon | | 420 |
| Mr. Shore | | 429 |

C E R T I F I C A T I O N

I, Pnina Eilberg, certify that the foregoing transcript is a
true and accurate record of the proceedings.

Pnina Eilberg   Digitally signed by Pnina Eilberg
                DN: cn=Pnina Eilberg, c=US
                Reason: I am the author of this document
                Date: 2010.12.28 11:37:37 -05'00'
_____

PNINA EILBERG (CET**D-488)

AAERT Certified Electronic Transcriber


Also transcribed by:  ELLEN KOLMAN (CET**D-568)


Veritext

200 Old Country Road

Suite 580

Mineola, NY 11501


Date: December 27, 2010