**UNITED STATES BANKRUPTCY COURT**          **FOR PUBLICATION**
**SOUTHERN DISTRICT OF NEW YORK**
_____

|  |  |  |
|---|---|---|
| | : | |
| In re: | : | Chapter 11 |
| | : | |
| | : | Case No. 10-14653 (AJG) |
| GSC, Inc., *et al.*, | : | |
| | : | (Jointly Administered) |
| | : | |
| Debtors.[1] | : | |

_____:

### OPINION AUTHORIZING HEARING ON THE SALE OF ASSETS, ADJOURNING CONSIDERATION OF DISCLOSURE STATEMENT, AND APPROVING SALE OF ASSETS

APPEARANCES:

SHEARMAN & STERLING LLP
Attorneys for Chapter 11 Trustee, James L. Garrity, Jr.
599 Lexington Avenue
New York, NY, 10022

> By:    Andrew V. Tenzer, Esq.
>         William J.F. Roll, III, Esq.
>         Susan A. Fennessey, Esq.
>         Randall L. Martin, Esq.

WHITE & CASE LLP
Attorneys for the Non-Controlling Lenders
1155 Avenue of the Americas
New York, NY 10036

> By:    J. Christopher Shore, Esq.
>         Evan C. Hollander, Esq.
>         Abraham L. Zylberberg, Esq.

WINSTON & STRAWN LLP
Attorneys for Black Diamond Commercial Finance, L.L.C.
200 Park Avenue
New York, NY, 10166

---

[1] The Debtors, along, with the last four digits of each debtor's federal tax identification number, are: GSC Group, Inc. (6328), GSCP, LLC (6520), GSC Active Partners, Inc. (4896), GSCP (NJ), Inc. (3944), GSCP (NJ) Holdings, L.P. (0940), GSCP (NJ), L.P. (0785), and GSC Secondary Interest Fund, LLC (6477).

By:    Daniel J. McGuire, Esq.
       Carey D. Schreiber, Esq.
       Gregory M. Gartland, Esq.

LATHAM & WATKINS LLP
Attorneys for Black Diamond Capital Management, L.L.C.
885 Third Avenue
New York, NY 10022

By:    Douglas Bacon, Esq.
       David S. Heller, Esq.
       Adam J. Goldberg, Esq.


UNITED STATES DEPARTMENT OF JUSTICE
United States Trustee
33 Whitehall Street, 21st Floor
New York, NY 10004

By:    Andrea B. Schwartz, Esq.


**ARTHUR J. GONZALEZ**
**Chief United States Bankruptcy Judge**


Before the Court was: (i) the request by the chapter 11 Trustee for the estates of the

above-captioned debtors (the "Debtors") for approval of the Motion for Entry of an Order (A)

Authorizing (I) Sale of Assets and Assignment of Executory Contracts Pursuant to Certain Asset

Purchase Agreements and a Side Letter Agreement, (II) Tax Indemnification Agreement, (III)

Services Agreement, and (IV) Transition Services Agreement, (B) Authorizing the Payment of

De Minimis Prepetition Franchise Taxes, and (C) Granting Related Relief (the "Sale Motion");

and (ii) the request by the minority lenders to the Prepetition Credit Agreement (as defined,

*infra*) (the "Non-Controlling Lenders") for approval of their Motion for Entry of an Order (I)

2

Approving Disclosure Statement, (II) Approving Form of Solicitation and Notice Materials, (III)

Approving Form of Ballot, (IV) Establishing Solicitation and Voting Procedures, (V) Allowing

and Estimating Certain Claims for Voting Purposes, (VI) Approving Third Party Consent

Materials, (VII) Scheduling a Confirmation Hearing, and (VIII) Establishing Notice and

Objection Procedures (the "Disclosure Statement Motion"). Further, the Trustee sought

adjournment of the Disclosure Statement Motion and approval of the Sale Motion.

**JURISDICTION & VENUE**

This Court has subject matter jurisdiction over this proceeding under sections 1334 and

157 of title 28 of the United States Code. This is a core proceeding within the meaning of

section 157(b) of title 28 of the United States Code. Venue is proper before this Court pursuant

to sections 1408 and 1409 of title 28 of the United States Code.

**BACKGROUND**

**A. Business of the Debtors**

GSC was founded in 1994 as a subsidiary of Travelers Group, Inc. to invest in private

equity transactions. In 1998, GSC became an independent alternative asset manager, providing

debt-focused investment management of alternative assets with a full spectrum of

complementary investment product offerings. (Decl. of Peter R. Frank in Support of First Day

Motions and Applications and in Compliance with Local Rule 1007-2, ECF No. 9, ¶ 9 ["Frank

Decl."].) GSC offers such investment and advisory services through its principal subsidiary,

GSCP (NJ), L.P. ("NJLP"). NJLP has been a registered investment advisor with the Securities

and Exchange Commission since March 2001. Through GSCP (NJ) Holdings, L.P. ("Holdings

3

L.P."), and GSC Secondary Interest Fund, LLC ("SIF"), the Debtors hold investments in certain affiliated investment funds.[2]

The Debtors focus their business and funds along the following product lines: (i) distressed debt, (ii) U.S. Corporate Debt, (iii) European corporate debt, (iv) European mezzanine lending, and (v) U.S. ABS CDOs. The Debtors generate revenue through management fees, transaction and portfolio monitoring fees, incentive fees, and returns on investments.[3] The Debtors also co-invest in their funds, and are entitled to returns on such investments in accordance with the provisions of the applicable fund documents. *Id.* at ¶ 17.

GSC is privately owned and has approximately thirty-one (31) full-time employees. At its peak, GSC had $28 billion of assets under management. As of March 31, 2010, GSC had approximately $8.4 billion of assets under management in approximately twenty-eight (28) separately managed investment funds. *Id.* at ¶ 9.

Before the Petition Date,[4] the Debtors' executive management and GSC's board consisted of only two individuals – Alfred C. Eckert III ("Eckert") and Peter R. Frank ("Frank"). Eckert served as the Chairman and Chief Executive Officer of GSC. (Ex. A to Notice of Filing of Disc. Stmt. for the Joint Chapter 11 Plan for GSC and its Affiliated Debtors Proposed by the

---

[2] GSCP (NJ), Inc. ("NJ Inc.") serves as the general partner of NJLP and Holdings LP. GSCP, LLC ("GSCP LLC") is a subsidiary of GSC that provides investment advisory services to NJLP and monitoring and management services to certain portfolio companies of the funds. GSC Active Partners Holdings LP ("AP Holdings"), which is not a Debtor, holds one hundred percent of the Class A common stock of GSC Group, Inc. Debtor GSCP Active Partners, Inc. ("AP Inc.") also acts as the general partner of AP Holdings. (Frank Decl. ¶ 10.)

[3] The Debtors, through NJLP, earn fees for the management of funds. The transaction fees are earned by GSC for structuring and negotiating transactions with portfolio companies in which the Debtors' funds invest. Portfolio monitoring fees are earned by the Debtors for providing management advisory services to portfolio companies owned by GSC managed funds. Incentive fees are generally earned if the performance of an investment exceeds a threshold set forth in the applicable management contract. (Frank Decl. ¶ 17.)

[4] The Debtors each filed a voluntary petition for relief under title 11 of the United States Code (the "Bankruptcy Code") §§ 101-1532 on August 31, 2010 (the "Petition Date").

Non-Controlling Lenders, ECF No. 612, 10 § II ["Modified Disc. Stmt."].)  Eckert owns or

controls, directly or indirectly, a substantial number of the shares in several series of common

stock issued by GSC.  Frank is the Senior Managing Director and President of GSC.  *Id*. at 11 §

II.

**B.  Circumstances Leading to Chapter 11 Filing**

As a financial advisory firm, the success of GSC is heavily influenced by both the

financial markets and worldwide economic conditions.  (Frank Decl. ¶ 23.)  During 2008 and

continuing through the first half of 2009, GSC operated in an extremely unfavorable global

business environment, which included, among other things, a lack of liquidity in the credit

markets and declining asset values.  *Id*.  These factors resulted in a substantial decline in the

Debtors' revenues.  In order to address these financial concerns and liquidity issues, starting in

2009, GSC began meeting with certain of its creditors and revealed that it would be unable to

repay its debts.  *Id.* at ¶ 26.

On or about February 28, 2007, NJLP, as borrower, and certain affiliate guarantors[5]

(collectively, the "Guarantors") entered into the Fourth Amended and Restated Credit Agreement

(as amended or supplemented, the "Prepetition Credit Agreement") with UBS AG, Stamford

Branch, the Issuing Bank, and other lending institutions.  (Ex. A to Decl. of Hugo H.

Gravenhorst in Support of Debtors' Sale Motion, ECF No. 306.)  Pursuant to the Prepetition

Credit Agreement, NJLP borrowed $193.5 million in term loans and gained access to $56.5

million (subsequently reduced to $38 million[6]) in revolving credit commitments.  In the

---

[5] The guarantors were Debtors GSC Group, GSCP (NJ), Inc., GSCP (NJ) Holdings, LP, and GSCP, LLC and non-debtor GSC Group Ltd.
[6] First Amendment to the Prepetition Credit Agreement, § 2(v).

5

Prepetition Credit Agreement, pursuant to Section 12.1, all the lenders designated and appointed an administrative agent (the "Administrative Agent") to take action on their behalf and perform duties outlined in the Prepetition Credit Agreement. *Id.* at § 12.1.  UBS AG, Stamford Branch, was appointed Agent.  *Id.*

Additionally, NJLP entered into a $97 million notional principle and interest rate hedge contract (the "Swap") with Calyon New York Branch ("CALNY") that would have matured on February 15, 2012.  However, on April 7, 2009, CALNY presented NJLP with a notice of early termination, indicating a termination date of April 14, 2009.  The termination payment due from NJLP on April 14, 2009 in the amount of $10,192,828 remains unpaid.

The Prepetition Credit Agreement and the Swap (collectively, the "Prepetition Secured Debt") are secured by liens in substantially all of the Debtors' assets pursuant to the Second Amended and Restated Pledge and Security Agreement (the "Security Agreement"), dated as of February 15, 2006.  (State Court Answer, Ex. B.)  Under Section 1.1 of the Security Agreement, the Guarantors granted security interests to the collateral agent (the "Collateral Agent"), who acts on behalf of all the lenders of the Prepetition Secured Debt.[7]  In the event of default by the Guarantors, Section 6.1 gives the Collateral Agent the right to exercise any form of relief to protect or obtain the Collateral for the benefit of the lending institutions.[8]

---

[7] Section 1.1, in relevant part, states, "[a]s security for the prompt and complete payment and performance when due of all of its Obligations, each Grantor does hereby assign and transfer unto the Collateral Agent, and does hereby pledge and grant to the Collateral Agent for the benefit of the Secured Creditors, a continuing first priority security interest subject only to Permitted Liens, in all of the right, title and interest of such Grantor in, to and under all of the following, whether now existing or hereafter from time to time acquired (collectively, the 'Collateral') . . . ." (Prepetition Credit Agreement.)

[8] Section 6.1, in relevant part, states, "[i]f there shall have occurred and be continuing an Event of Default, then and in every such case, the Collateral Agent shall be entitled to exercise all of the rights, powers and remedies . . . for the protection and enforcement of its rights in respect of the Collateral, and the Collateral Agent shall be entitled to

6

As of the Petition Date, the Debtors were in default under the terms of the Prepetition Secured Debt and owed approximately $209.6 million under the Prepetition Credit Agreement and $10.2 million on account of the Swap.  (Frank Decl. ¶ 20.)

The "Prepetition Lenders,"[9] led by Guggenheim Corporate Funding, LLC ("Guggenheim"), then the Administrative Agent under the Prepetition Credit Agreement and Collateral Agent under the Security Agreement, and a steering committee (the "Steering Committee") consisting of a sub-group of the Prepetition Lenders, began to negotiate a restructuring with the Debtors pursuant to which the Prepetition Lenders would have canceled their claims against the Debtors in exchange for approximately 35% of the Debtors' future revenue, ownership of certain fund interests, and a less than 35% share in revenue from new management contracts.  (Modified Disc. Stmt. 12 § II.)

They never reached a deal, and in early 2010, Black Diamond Capital Management, LLC ("BDCM") purchased a small portion of the loans under the Prepetition Credit Agreement and proposed a transaction that would restructure the Debtors in a manner similar to the revenue-sharing proposal negotiated by Guggenheim and the Steering Committee.  This proposal also ultimately was rejected.

In the spring of 2010, Guggenheim, the Steering Committee, and the Debtors were in discussions about the Debtors' filing for bankruptcy under chapter 11 of the Bankruptcy Code and thereafter selling the Debtors' assets in a section 363(b) sale.  (Modified Disc. Stmt. 13 § II.) While negotiations for this proposal were still in place, BDCM bought a controlling stake in the

---

exercise all the rights and remedies of a secured party under the Uniform Commercial Code . . . ."  (Prepetition Credit Agreement.)

[9] The "Prepetition Lenders" are the lenders party to the Prepetition Credit Agreement.

Prepetition Credit Agreement and terminated these discussions.  *Id.*  Upon obtaining a

controlling stake in the Prepetition Credit Agreement, BDCM appointed Black Diamond

Commercial Finance, LLC ("BDCF" or the "Agent" and, with BDCM and its affiliates, "Black

Diamond"), a related entity, as Administrative Agent under the Prepetition Credit Agreement and

Collateral Agent under the Security Agreement.  (Original Disclosure Statement, ECF No. 479, ¶

3.)

Additionally, Black Diamond executed new employment contracts with Eckert and

Frank.  (Frank Decl. ¶ 28.)  On or about July 30, 2010, Eckert entered into a consulting

agreement with Black Diamond (the "BD-Eckert Consulting Agreement") wherein Black

Diamond would pay Eckert $3 million for consulting services.  The BD-Eckert Consulting

Agreement is effective upon the completion of a section 363 sale of assets in bankruptcy court

whereby Black Diamond obtains the winning bid of a substantial portion of the assets.

(Modified Disc. Stmt. 15 § II.)  On or about August 24, 2010, Frank also entered into a

confidential employment agreement with Black Diamond to make Frank a senior managing

director at Black Diamond, guarantee him payment of $1.2 million annually for two years, and

provide him a $1 million forgivable loan.  *Id.*  The employment agreement is also effective upon

the acquisition by Black Diamond of certain GSC assets in a section 363 sale.  *Id.*

## C. **Bankruptcy Filing**

On August 31, 2010, the Debtors filed for bankruptcy pursuant to chapter 11 of the

Bankruptcy Code.  The cases are being jointly administered for procedural purposes.  (Motion

for Joint Admin., ECF No. 2.)

1. Use of Cash Collateral

On the Petition Date, the Debtors filed a motion for authorization to utilize cash collateral (the "Cash Collateral Motion") to grant adequate protection to the Prepetition Lenders. (ECF No. 8.) In exchange for the consensual use of cash collateral, the Prepetition Lenders required the Debtors to conduct an auction by October 7, 2010 and close a sale by October 25, 2010 pursuant to section 363(b) of the Bankruptcy Code. (Supplemental Decl. of Robert Manzo in Support of Sale of Substantially all of GSC's Assets, ECF No. 271, ¶ 16 ["Manzo Decl."].) On September 2, 2010, the Debtors filed an emergency motion to establish bidding procedures and to sell their assets pursuant to section 363(b) (the "Initial Sale Motion"). (ECF No. 24.) On September 3, 2010, the Bankruptcy Court held a first-day hearing and entered an interim order granting the Cash Collateral Motion.

Shortly after the September 3, 2010 first-day hearing, the Non-Controlling Lenders filed limited objections to the Cash Collateral Motion and the Initial Sale Motion noting that the sale milestones were far too short and would chill interest in the proposed auction. (ECF No. 51.)

On October 8, 2010, the Bankruptcy Court entered a final order granting the Cash Collateral Motion but modifying the sale milestones so the auction would be conducted on or before October 26, 2010, and so that the sale would close on or before December 10, 2010.

2. Auction

From October 26 through October 29, 2010, the Debtors held an auction (the "Auction") for substantially all of their assets. Twelve bidders attended, plus representatives of the Non-Controlling Lenders. The Auction was conducted at the New York offices of Kaye Scholer LLP

9

("Kaye Scholer")[10] and bidder groups were assigned separate break-out rooms.  (Manzo Decl. ¶ 29.)  Bidders were required to sign an acknowledgment form stating explicitly that they were not engaging in any collusive conduct with any other potential bidders at the Auction.  *Id.*  The Auction was initially to be conducted in three phases.  Phase 1 was designed to facilitate bulk bids for all or substantially all of the assets.  Phase 2 permitted bids for combinations of lots or assets.  Phase 3 allowed individuals bids for specifics lots or assets.  *Id.* at ¶ 30.

The first phase of the Auction ended on October 26, 2010, with only one bulk bid for substantially all of the Debtors' assets, from BDCM, in the amount of $5 million.  The second phase of the auction, which included several bidders and various combinations of lots or assets, lasted into the evening on October 26, 2010 and continued on October 27, 2010.  *Id.* at ¶ 31.  Late in the second day, the Debtors' senior financial advisor from Capstone Advisory Group, LLC ("Capstone"), Robert Manzo ("Manzo"), approached representatives of the Non-Controlling Lenders and their counsel and advised that it was his belief that certain of the third-party qualified bidders at the Auction would provide more competitive bids if they were permitted to submit joint bids.  *Id.* at ¶ 32.  Manzo indicated that he would not permit joint bidding unless the Non-Controlling Lenders agreed.  *Id.*  After several hours of discussions with the representatives of the Non-Controlling Lenders, including their counsel and financial advisors, the Non-Controlling Lenders agreed with the approach.  *Id.*  The Non-Controlling Lenders provided written consent to the modification of the auction process.

Thereafter, the auction procedures were modified as follows: (i) all bidders received information on the highest bids for every lot and combination, (ii) all bidders were allowed to

---

[10] Kaye Scholer was retained, by order of the Court, as counsel to each of the Debtors, as a debtor-in-possession, nunc pro tunc as of the Petition Date on September 22, 2010.  (ECF No. 127.)

10

speak with other bidders and combine bids to maximize value, (iii) all bidders were allowed in

the auction room, and (iv) Capstone and Kaye Scholer provided suggested bid configurations.

*Id*. at ¶ 33.  After four rounds under the modified bidding procedures, the highest bid was $190

million by Black Diamond.  At that point, Manzo determined that in the fifth and final round,

bids would be submitted in closed envelopes and the highest qualified bid would be declared the

winner.  *Id.* at ¶ 37.

The fifth and final round produced three bids from a total of four bidders.  Saratoga

Partners, L.P. placed a bid that the Debtors valued at $175.8 million.  Sankaty Advisors, LLC

("Sankaty") placed a bid that the Debtors valued at $193.7 million.  BDCM and BDCF placed a

joint bid (the "BD Joint Bid") that the Debtors valued at $235 million,[11] comprised of $5 million

cash, a $6 million note, and a credit bid of $224 million.  *Id.* at ¶ 38.  After consulting with their

advisors, Eckert and Frank selected the BD Joint Bid as the successful bid.

3.  <u>Non-Controlling Lenders' Request for Order to Show Cause</u>

Subsequent to the Auction, the Non-Controlling Lenders petitioned the Court for an order

to show cause why the BD Joint Bid should not be disqualified under section 363(k) and another

bidder selected the winning bidder.  A hearing on that request was held on November 1, 2010.

The Non-Controlling Lenders argued that there were still several bidders interested in the assets

and requested the Court to reopen the auction.  (Order to Show Cause Hr'g Tr. 14: 9-12,

November 1, 2010.)  As evidence of impropriety at the Auction, the Non-Controlling Lenders

argued that Black Diamond's refusal to permit the Agent to credit bid with any party other than

---

[11] After the Auction, Manzo acknowledged that, in his view, the assets of the Debtors to be acquired by BDCM on
account of its $11 million bid were worth in excess of $126 million and that the assets of the Debtors to be acquired
by BDCF on behalf of the Prepetition Lenders with the $224 million credit bid were only worth $5.1 million.
(Modified Disc. Stmt. 19 § III.)

11

itself was patently in bad faith.  The Non-Controlling Lenders argued that if the Agent's credit

bid was made in good faith, the Agent would be willing to bid for the assets regardless of with

whom it joined, and by joining with parties other than BDCM, greater value could be conferred

upon the estate.  (Order to Show Cause Hr'g Tr. 14: 9-12, November 1, 2010.)  Moreover, the

Non-Controlling Lenders argued that when they executed the agreement to allow joint bidding,

they reserved all rights to contest the Agent's use of the credit bid if it was "exercised in a

manner that was detrimental to the Non-Controlling Lenders."  (Order to Show Cause Hr'g Tr.

29: 17-18, November 1, 2010.)  Accordingly, they sought to assert this right via an emergency[12]

order to show cause before the sale hearing scheduled for December 6, 2010.

     The Court denied the request for an order to show cause but gave leave for the Non-

Controlling Lenders to raise the issue through an adversary proceeding or at the sale hearing.[13]

(Order to Show Cause Hr'g Tr. 38: 3-7, November 1, 2010.)

### 4.  Certain Non-Controlling Lenders Sue Black Diamond

     On November 13, 2010, certain of the Non-Controlling Lenders filed a state court action

(the "State Court Litigation") in the New York Supreme Court ("State Court") against, *inter alia*,

BDCM and BDCF (the "Defendants".)[14]  On that date, the Non-Controlling Lenders stated that

they were seeking monetary damages and associated declaratory relief against the Defendants

under various legal and equitable theories including breach of contract, breach of duty, and tort

---

[12] The Non-Controlling Lenders stressed the emergency of the motion for an order to show cause due to the understood deterioration of the estate assets.  (Order to Show Cause Hr'g Tr. 14: 4-7, November 1, 2010.)

[13] The Court: "You can commence an adversary proceeding and seek injunctive relief as you so desire.  Or raise the – whatever issues you have at the sale hearing regarding this matter." (Order to Show Cause Hr'g Tr. 38: 4-7, November 1, 2010.)

[14] Crédit Agricole Corporate and Investment Bank New York Brank, *et al. v.* BDC Finance, L.L.C. *et al.* (Index No. 651989/2010).

for conduct undertaken by the Defendants related to the Prepetition Credit Agreement and
Security Agreement.

   5.   <u>Debtors and Black Diamond Execute and Amend Asset Purchase Agreement</u>

       On November 18, 2010, the Debtors filed an executed copy of the Asset Purchase
Agreement (the "Initial APA" or "APA") with the Bankruptcy Court dated as of October 31,
2010 between GSC Acquisition Partners, LLC ("GSCAP"), a vehicle established by Black
Diamond, and the Debtors.  Section 2.6 of the APA provided that the assets acquired would be
allocated pursuant to Exhibits G and H, which divided the assets into "Credit Bid Allocable
Items" and "Cash Bid Allocable Items." (APA 1, Ex. D to Sale Motion, ECF No. 548.)

       In response to a conference call with the Court, subsequently discussed at a sale hearing
on December 13, 2010 (Sale Hr'g Tr. 20: 23-25, 25: 4-6, December 13, 2010), GSCAP signed a
letter agreement providing that both the Credit Bid Allocable Items as well as the Cash Bid
Allocable Items would be assigned to and assumed by one purchaser (the "Designated
Purchaser" or the "Purchaser").  (APA 1, Ex. D to Sale Motion.)  In a counterpart letter, executed
the same day as the letter agreement, GSCAP deems GSC Acquisition Holdings, LLC
("GSCAH"), established by BDCF as Collateral Agent, the Designated Purchaser.  (Counterpart,
Ex. D-2 to Sale Motion.)  Significantly, in a side letter (the "Side Letter") dated May 23, 2011,
GSCAH is defined as jointly owned by Black Diamond (in its capacity as GSCAP) and BDCF at
closing.[15] (Side Letter, Ex. D to Sale Motion.)

---

[15] The relevant language of the Side Letter states, "GSC Acquisition Holdings, LLC, a limited liability company
organized under the laws of the State of Delaware, which will be owned at Closing by the Senior Secured Agent and
GSCAP and which has been designated by GSCAP as the designated purchaser under APA 1." (Side Letter.)

On or about December 3, 2010, prior to approval of the sale, Black Diamond and the

Debtors signed an amendment to the APA (the "Amendment"). The Amendment modified the

APA to sell additional assets to Black Diamond that were not subject to the Auction[16] and settled

a purported dispute over whether BDCM was entitled to certain earnings from the Debtors'

management contracts generated prior to the time that Black Diamond would take over

management control. (Manzo Decl. ¶ 48.) The Amendment resolved the dispute by awarding

Black Diamond $5.2 million, representing 100% of the amounts earned during the two-month

period from the Auction date to the projected closing date of the APA under management

contracts bought at the Auction.[17] *Id.* at ¶ 49.

6. <u>Option Agreement</u>

On or about December 4, 2010, Stephen Deckoff, Black Diamond's Managing Principal,

("Deckoff") and Eckert entered into an option agreement (the "Option Agreement"). Under this

transaction, Black Diamond would pay Eckert $500,000 for an option to purchase for $1.5

million (i) 49% of Eckert's common stock in GSC Active Partners Inc. (the entity through which

Eckert holds its preferred stock in GSCP), and (ii) his $2 million claim against GSC Group

related to his unpaid 2008 bonus. (West Decl. Ex. J, ECF No. 338.) The $500,000 was to be

paid to Eckert upon the commencement of the BD-Eckert Consulting Agreement. *Id.* The terms

of the Option were exercisable at any time after July 30, 2010 for a period of three years. *Id.*

On or about December 3, 2010, Black Diamond and Eckert amended the BD-Eckert

Consulting Agreement to include additional terms under section 3 Consulting Fees. (West Decl.

---

[16] The Amendment increased the purchase price by $700,000 to include ownership of the non-debtor UK entity,
GSC Group Limited ("GGL").
[17] Black Diamond agreed to let the Debtors keep $0.08 million, representing 100% of earnings under the same two-
month period that were attributable to other assets acquired at the Auction.

Ex. H.)  The first consulting agreement provided Eckert with an annual $1,000,000 consulting

fee, minus any salary received from GSC.  (West Decl., Ex. G.)  The amended consulting

agreement made additional items subject to deductions from Eckert's consulting fee, including

any bonus received from GSC, dividends from GSC or its affiliates, and the $1.5 million paid to

Eckert by GSC on or about August, 2010.  The agreement also required Eckert to use his best

efforts to cause GSC to pay him an annual salary of $1,000,000 so long as GSC has the financial

resources to do so and stipulated that any payments by GSC in excess of $1,000,000 will be

applied towards his next annual consulting fee.  The agreement provided some exceptions to the

deduction, including any amount related to the release of medical records, and any amount

received with respect to his 2008 bonus from GSC and related claims. (West Decl. Ex. H ¶ 3.)

Lastly, the Debtors filed a motion to amend a settlement originally entered into between

Eckert and GSC on or about November 19, 2010 related to Eckert's ownership of a substantial

amount of shares in GSC common stock and several life insurance policies related to Eckert for

which GSC was the beneficiary.  (West Decl., Ex. I.)  The beneficiary rights, valued at

$50,000,000, were initially offered for sale at the Auction.  No bids were made for those rights

since to realize the full value of those rights, Eckert's consent to release medical records was

necessary.  In exchange for Eckert's consent, GSC provided Eckert with $1,500,000 and

forgiveness of a $168,917 non-recourse loan Eckert had with GSC.  Additionally, the agreement

stipulated that Eckert retain control of his common stock in GSC Group until the Debtors assets

were sold and required that Eckert waive his right to a $2,000,000 unpaid bonus claim.  In

December of 2010, Eckert and the Debtors agreed to reduce the amount of consideration from

15

$1,500,000 to $1,000,000 and remove the requirement to waive the $2,000,000 claim. (Eckert Settlement Motion, ECF No. 275.)

### 7. December 6, 2010 Sale Hearing Never Commenced

On December 6, 2010, Black Diamond and the Debtors appeared before the Bankruptcy Court and sought to proceed with the sale hearing. The Non-Controlling Lenders objected and requested an adjournment in order to provide an opportunity to conduct discovery of the Amendment to the APA.[18] The Bankruptcy Court agreed to adjourn the sale hearing. During discovery, the Non-Controlling Lenders learned of the existence of the Option Agreement. (Modified Disc. Stmt. 22 § III.)

### 8. Chapter 11 Trustee was Appointed

On December 20, 2010, after information concerning the details of the Amendment and the existence of the Option Agreement were disclosed, the Non-Controlling Lenders filed a motion for the appointment of a chapter 11 trustee (the "Trustee Motion"). (ECF No. 337.) The Trustee Motion referenced the various agreements reached between Eckert and Black Diamond as evidence that there was a conflict of interest in the Debtors' management and that the parties were without any trustworthy fiduciary to manage the property and affairs of the Debtors or to administer their estates. (Trustee Motion ¶ 2-5.) On December 22, 2010, the Bankruptcy Court took the matter under advisement and the Debtors withdrew their request for approval of their pending sale to Black Diamond.[19] In response, on or about December 27, 2010, BDCF offered

---

[18] Counsel for the Debtors produced documents at the last minute which counsel for the Non-Controlling Lenders was unable to review prior to the hearing. (Initial Sale Hr'g Tr. 11: 15-17, December 6, 2010.)

[19] In the Objection of BDCM to the Debtors' Motion for Order Authorizing Marc Kirschner as CRO, ECF No. 371, ¶ 4, BDCM stated: "Following the [December 22, 2010] hearing, the Debtors stated their intention to withdraw their

16

to purchase all of the collateral securing the obligation under the Prepetition Credit Agreement other than $1 million for a credit bid of the full amount of the Prepetition Lenders' secured claims. *Id.*

On January 5, 2011, the Bankruptcy Court issued a bench ruling on the Trustee Motion which found cause under section 1104(a)(2) of the Bankruptcy Code for the immediate appointment of a chapter 11 trustee and directed the Office of the United States Trustee to appoint a chapter 11 trustee. (ECF No. 374.)  The Bankruptcy Court noted that the pre-petition and post-petition actions of Eckert regarding the sale process, including his relationship with Black Diamond, raised numerous concerns about the fulfillment of his fiduciary duties.  (Status Hr'g Tr. 4: 8-13, Jan. 5, 2011.)  On January 7, 2011, the Office of the United States Trustee filed a notice of appointment of James L. Garrity, Esq. as the chapter 11 trustee (the "Trustee") (ECF No. 379), and the Bankruptcy Court entered an order approving Garrity's appointment (ECF No. 380).

At a status hearing on January 13, 2011, the Trustee explained that he was focusing on the sale process and was trying to determine the most efficient means to dispose of the Debtors' assets.[20]  The Court responded that the primary concern giving rise to the Trustee's appointment was that issues had been raised that brought into question Eckert's ability to fulfill his fiduciary duties.  The Court reaffirmed that the purpose of Trustee's appointment was not to abandon the result of the Auction entirely, but rather to start from a clean slate and determine the best course

---

support of the BDCM/Agent APA, and subsequently unilaterally abrogated the BDCM/Agent APA by written notice to BDCM and the Agent."

[20] (Hr'g Tr. 10: 21, 11: 20-25, Jan. 13, 2011.)

of action.[21]  At a hearing on March 23, 2011 for an order approving a bonus program for certain

of the Debtors' employees, the Trustee informed the Bankruptcy Court that there had been

significant progress made on a section 363 sale transaction with Black Diamond that would

likely close in the next couple of weeks.  (Hr'g Tr. 11: 23 – 12: 3, March 23, 2011.)

    9.  Plan and Disclosure Statement

        On April 25, 2011, the Non-Controlling Lenders filed a joint chapter 11 plan for GSC

and its affiliated debtors (ECF No. 478, [the "Plan"]), together with a proposed disclosure

statement (ECF No. 479, [the "Original Disclosure Statement"].)  The Plan contemplates the

Debtors' reorganization whereby the reorganized Debtors (the "Reorganized Debtors") would

continue to service asset management contracts.  Pursuant to the Plan, the Prepetition Lenders

would become owners of the Reorganized Debtors.  Further, the Reorganized Debtors would

appoint Sankaty as sub-advisor who would provide management services for a fee equal to 40%

of the senior management fees to be earned by the Reorganized Debtors.

        On May 23, 2011, certain parties filed objections to the Plan and the Original Disclosure

Statement.  BDCM filed an objection to approval of the Original Disclosure Statement (BDCM

Obj., ECF No. 505) and argued, in relevant part, that the Original Disclosure Statement "should

not be allowed to advance until after the Court has considered the Winning Bid [the BD Joint

Bid] that [had] now been on file for six months."  (BDCM Obj. ¶ 1.)  BDCF filed an objection

(BDCF Obj., ECF No. 510) to the adequacy of the Original Disclosure Statement as well as to

---

[21] The Court: "My biggest concern was after the hearing that I believed that the position Mr. Eckert had placed
himself in made almost any decision he made through this process subject to question.  So I am not, or did not sit
here and say any particular decision in the sale process was a breach of fiduciary duty or et cetera throughout the
[A]uction, and I don't want to highlight any one, and they may well be decisions that the trustee in his - - in your
judgment decides well, this is the direction we should go on."  (Hr'g Tr. 14: 16-24, Jan. 13, 2011.)

the facial confirmability of the Plan.  Specifically, BDCF argued that the Original Disclosure

Statement was "fatally vague and incomplete."  (BDCF Obj. 7.)  In particular, BDCF argued that

the Court should not allow the solicitation of a plan which does not describe in detail how the

Reorganized Debtors would operate going forward.  The Plan is premised on the ongoing

management services provided by Sankaty pursuant to a document which was not included in the

Original Disclosure Statement.  *Id.* at ¶ 27.  BDCF contended that that this document would be

crucial.  *Id.* at ¶ 28.  In addition, BDCF argued that the Original Disclosure Statement failed to

disclose how the Non-Controlling Lenders would obtain investor consent to Sankaty

management.  *Id.* at ¶ 29.  BDCF also argued that disclosure regarding the Reorganized NJLP

New Senior notes was facially inadequate because it did not disclose whether the notes were to

be secured or unsecured.  *Id*. at ¶ 36.  Further, BDCF contended that the Plan was patently

unconfirmable due to improper classification, lack of an accepting impaired class, and an

inability to meet the "fair and equitable" requirements of the Code.  *Id.* at ¶¶ 42-44.

Similarly, the Trustee requested an adjournment of a hearing to consider approval of the

Original Disclosure Statement and objected to the entry of an order approving the Original

Disclosure Statement. With regard to the Trustee's request for an adjournment, the Trustee noted

that he was in the process of negotiating the final terms of a transaction to sell substantially all of

the Debtors' assets to BDCM pursuant to its winning bid at the Auction and that the proposed

transaction should be considered first.  (Trustee Obj., ECF No. 506, ¶ 2.)  The Trustee argued

that consideration of the Original Disclosure Statement at a later date would not prejudice the

Non-Controlling Lenders and that approval of the Original Disclosure Statement before

consideration of a sale transaction would damage the Debtors' estate and undermine the

confidence of the Debtors' investors and employees. *Id.* at ¶¶ 5-6. Additionally, the Trustee

objected to approval of the disclosure statement on the grounds that it lacked adequate

information, that the Plan appeared to contain at least one fatal confirmation defect, and that

confirmation would only benefit the Non-Controlling Lenders. *Id.* at ¶ 3.

On May 25, 2011, a hearing was held on the Original Disclosure Statement (the "Initial

Hearing"). The Trustee stressed the importance of a section 363 sale as opposed to the

confirmation of the Plan due to the rapid deterioration of the Debtors' assets. (Initial H'rg Tr.

25: 21-24, May 25, 2011.) At that hearing, the Non-Controlling Lenders agreed to address the

concerns relating to the adequacy of the Original Disclosure Statement by including a copy of

the agreement with Sankaty to provide ongoing management services, as well as by providing

information regarding which class would constitute the accepting impaired class. (Initial H'rg

Tr. 50: 6-12, May 25, 2011.) In addition, the Court instructed the Trustee to submit a motion for

approval of a sale transaction to Black Diamond and to schedule an interim hearing (the "Interim

Hearing") to determine whether the Original Disclosure Statement should be approved for

solicitation or be held in abeyance while the sale process goes forward.

The Non-Controlling Lenders subsequently filed a revised version of the Original

Disclosure Statement on May 25, 2011 in response to the objections of BDCM, BDCF, and the

Trustee. (ECF No. 521.) Again, on June 13, 2011, the Non-Controlling Lenders filed a further

revised version to the Original Disclosure Statement. (ECF No. 565, [the "June 13th Disclosure

Statement"].) On June 27, 2011, BDCM, BDCF, and the Trustee filed objections to the June

13th Disclosure Statement. (ECF Nos. 606, 605, 597, respectively.) The Trustee argued that

while the Non-Controlling Lenders attempted to address concerns about the adequacy of

20

information contained in the Original Disclosure Statement, the Plan was still patently

unconfirmable; therefore, the June 13th Disclosure Statement should not be approved.  Further,

the Trustee made a second request for adjournment, stating that even if the June 13th Disclosure

Statement could be approved, the Court should adjourn consideration of the June 13th Disclosure

Statement until after the Interim Hearing.  (ECF No. 597, ¶¶ 1-4.)  BDCF objected to the June

13th Disclosure Statement, arguing that it still contained insufficient details on the Sankaty

management services, that the Plan had tremendous confirmation risk, and that a sale transaction

offered the best resolution.  (ECF No. 605, ¶ 8.)  BDCM objected to the June 13th Disclosure

Statement on the grounds that it contained unsubstantiated allegations against BDCM, still failed

to provide adequate information regarding the proposed Sankaty sub-advisory agreement, and

did not provide adequate information regarding the forecasted recoveries of three purported

creditors of SIF.  (ECF No. 606, ¶ 3.)  The Non-Controlling Lenders filed an omnibus response

to the June 13th Disclosure Statement objections (NCL Omni. Resp. to Obj. to Disc. Stmt., ECF

No. 610) as well as a further revised version of the June 13th Disclosure Statement on June 28,

2011.  (ECF No. 612, [the "Modified Disclosure Statement" or the "Disclosure Statement"].)

    10. Trustee's Motion for Sale of Assets

        On June 7, 2011, the Trustee filed a motion seeking authorization by the Bankruptcy

Court to sell substantially all of the estate's assets pursuant to section 363 of the Bankruptcy

Code, and included a proposed sale order (the "Proposed Sale Order").  (Sale Motion, ECF No.

548.)  The proposed sale (the "Sale") primarily consists of two asset purchase agreements and

various subsidiary agreements (the "Proposed Transactions").  *Id.* at ¶¶ 24-32.  The main asset

purchase agreement ("APA 1") is based on the results of the prior auction process conducted by

the Debtors and the initial asset purchase agreement between the Debtors and BDCM. *Id.* at ¶

24.  In exchange for substantially all of the assets of the estate, the proposed consideration

provided to the Debtors under APA 1 includes (i) a $224 million credit bid by the Agent, (ii) a

$6.7 million promissory note, (iii) $5 million cash, and (iv) the assumption of certain liabilities.

*Id.*  The Trustee also proposed a second asset purchase agreement ("APA 2") providing for the

sale of the remaining assets of the estate not included in APA 1.  *Id.* at ¶ 31.  Should both APA 1

and APA 2 be consummated, all of the estates' obligations to secured creditors would be

satisfied.  *Id.*

        In addition to the asset purchase agreements, the Sale Motion includes a Tax

Indemnification Agreement, Side Letter, Services Agreement, and Transaction Services

Agreement.  The Tax Indemnification Agreement requires the Purchaser to indemnify the estates

against certain potential tax liabilities that might arise as a result of the consummation of APA 1

and APA 2.  *Id.* at ¶ 25.  The Side Letter and the Proposed Sale Order provide that all of the

Non-Controlling Lenders' rights are reserved with respect to any litigation in regard to the

Agent's actions.  *Id.* at ¶ 28.  The Services Agreement involves investment management

contracts that the Trustee had not assigned in connection with the close of APA 1.  *Id.* at ¶ 29.  In

particular, it provides that the Debtors retain sufficient fees from the contracts to cover their costs

for providing their required services under these contracts during the term of the Services

Agreement, but pay any balance to the Purchaser.  *Id.*  Finally, the Transaction Services

Agreement discusses how the Purchaser is responsible for providing free services to the Trustee

in the wind-down process of the estates' cases in bankruptcy.  *Id.* at ¶ 30.

Prior to the scheduled sale hearing on July 6, 2011 (the "Sale Hearing"), several objections were filed with respect to the Sale Motion. The Non-Controlling Lenders filed the Objection to the Trustee's Motion for Entry of an Order Authorizing the Sale of Assets arguing, *inter alia,* that the Sale Motion should be denied because the Trustee failed to present a valid business reason for the Sale because the Sale constituted a *sub rosa* plan, and because the Non-Controlling Lenders did not consent to the Sale. Further, they argued that the Sale was *not* in fact the highest and best bid, that the Sale was not better than the Plan, and that the Sale Motion provided insufficient information to assess the price of the assets. Additionally, the Non-Controlling Lenders raised concerns over whether Black Diamond was a good faith purchaser and whether BDCF and BDCM colluded in submitting their joint bid. (NCL Obj. to Sale Motion, ECF No. 642.)

Crédit Agricole Corporate and Investment Bank ("Crédit Agricole") filed a limited objection to the Sale Motion on the grounds that three Collateral Management Agreements were not adequately excluded from the Proposed Transactions. (Crédit Agricole's Limited Obj. to Sale Motion, ECF No. 640, ¶ 13.) Crédit Agricole is the holder of three notes issued by GSC European CDO I-R S.A., GSC ABS CDO 2006-4u, Ltd., and Cetus ABS CDO 2006-3, Ltd., (collectively, the "Issuers"). *Id.* at ¶ 1. The Issuers own investment portfolios and use the profits from these portfolios to pay the obligations due on the notes. *Id.* at ¶ 2. Significantly, the three notes are all subject to Collateral Management Agreements, which give the Collateral Manager the authority to exercise its skill and judgment to buy and sell assets for the ultimate benefit of the holders of the notes. (Ex. A to Crédit Agricole's Limited Obj. to Sale Motion, ¶ 2.) NJLP, one of the Debtors, was designated as the Collateral Manager for the notes in question. *Id.*

23

After the Debtors conducted their auction process in October 2010 of substantially all of their assets, the Debtors served note holders with a notice regarding the assignment of the Collateral Manager's duties to Black Diamond, the winning bidder.  (Crédit Agricole's Limited Obj. to Sale Motion, ¶ 8.)  In that notice, the note holders were given a deadline to affirmatively give or withhold consent, after which a holder would be deemed to have consented to the assignment.  *Id.*  The Collateral Management Agreements, though, required the issuer and a majority of the holders of the particular note to provide written consent regarding any proposed assignment of the Collateral Manager's duties to another party.  *Id.* at ¶ 5.

Crédit Agricole argued that the Trustee had not adequately dealt with these Collateral Management Agreements in the Sale Motion.  *Id.* at ¶ 12.  Prior to the appointment of the Trustee, the Debtors had agreed to remove the Collateral Management Agreements from the proposed assets to be sold.  *Id.* at ¶ 11.  The Trustee discussed in the Sale Motion that the Proposed Transactions did not involve the management agreements addressed by the original objecting investors, including Crédit Agricole.  *Id.* at ¶ 12.  The Services Agreement between the Trustee and the Purchaser discusses how the Purchaser will provide collateral management services to the Debtors with respect to any investment management contracts that the Trustee has not obtained the requisite consent to assign to the Purchaser at closing.  *Id.*  Crédit Agricole, therefore, requested that the Sale Motion be denied on the basis that it assigns the Collateral Management Agreements to Black Diamond without the prior written consent required by the Collateral Management Agreements.  *Id.* at ¶ 17.

UBS AG, London Branch ("UBS AG") also filed a limited objection to the Sale Motion on similar grounds to Crédit Agricole, but only regarding the note issued by GSC ABS CDO

24

2006-4u, Ltd., the note to which UBS AG is a holder, and its associated Collateral Management Agreement. (UBS AG's Limited Obj. to Sale Motion, ECF No. 635, ¶ 5.) In addition to the issues raised by Crédit Agricole regarding consent and assignment of the investment management contract, UBS AG raised a concern regarding the fact that the Collateral Management Agreement was not included in the Sale Motion's list of assets excluded from the Proposed Transactions. *Id.* at ¶ 19. The Collateral Management Agreement was included on the list of "Excluded Management Contracts" in the Side Letter to APA 1 but at the same time included on the list of "Assigned Assets" to the Side Letter. *Id.* at ¶¶ 22-23. UBS AG, therefore, requested that the Court deny the Sale Motion with respect to the assignment of the Collateral Management Agreement and require that the assignment follow the appropriate provisions of the Agreement. *Id.* at Conclusion.

Applied Insights, LLC, ("AI") objected to the Sale Motion with respect to contracts between AI and NJLP, one of the Debtors, regarding a software license as well as related products and services provided to GSCP. (Applied Insights' Limited Obj. to Sale Motion, ECF No. 637, ¶ 5.) In the Sale Motion, the Trustee requested assumption and assignment of the relevant contracts to the Purchaser, but one of the contracts, the Software License and Services Agreement, had a cure amount of $87,500. *Id.* at ¶ 6. AI requested that the Agreement not be included in the Sale Motion until the Debtors paid the cure amount in full. *Id.*

The Police and Fire Retirement System of the City of Detroit (the "Retirement System") also filed a limited objection to the Sale Motion, requesting that any independent tort claims they may have against any non-debtor affiliates be preserved. (The Police and Fire Retirement System's Limited Obj. to Sale Motion, ECF No. 636, ¶ 11.)

25

At the time of the Sale Hearing, the only objections left unresolved by the parties were that of the Non-Controlling Lenders and AI.  The Non-Controlling Lenders' objections are addressed herein.  Further, in the event that the parties cannot reach an agreement regarding AI's objection, a hearing will be held to determine the cure amount.

11. <u>Further Developments</u>

The Interim Hearing on whether the Plan and Modified Disclosure Statement should proceed was scheduled for June 29, 2011.  The day before the Interim Hearing was to commence, the Trustee produced approximately ten thousand pages of documents but could not assure the Non-Controlling Lenders that the documents were not relevant to the matters to be considered at the Interim Hearing.  (Interim Hr'g Tr. 6: 1-8, 9: 5-19, 15: 13-19, June 29, 2011.)  At the suggestion of counsel for the Trustee in response to the Non-Controlling Lenders' objection to going forward without opportunity for review of the documents at issue, the Court postponed the Interim Hearing to coincide with the hearing on the Sale Motion scheduled for July 6, 2011.  (Interim Hr'g Tr. 19: 17-20, June 29, 2011.)  If the Court had determined the Sale Motion should proceed ahead of any consideration of the Disclosure Statement, the hearing on the Sale Motion would then proceed later on July 6, 2011 or on July 7, 2011.

On July 6, 2011 the Court held the Interim Hearing.  At the conclusion of the Interim Hearing, the Court granted the request by the Trustee to proceed with consideration of the Sale Motion and to adjourn consideration of the Disclosure Statement Motion.  On July 7, 2011, the Court issued a minute order (the "Minute Order") to that effect.  (ECF No. 659.)  The Sale Hearing proceeded on July 7, 2011, after which the Court granted the Sale Motion.  On July 11,

26

2011, the Court entered an order authorizing the Sale (the "Sale Order"). (ECF No. 668.) This opinion reflects the basis upon which the was relief granted in those orders.[22]

## DISCUSSION[23]

### Proposed Sale was Valid Offer

Before the Trustee may consider whether to move forward with the Proposed Transactions, the Proposed Transactions must be valid, approvable agreements. The Non-Controlling Lenders argued that the Sale could not be approved because it was predicated on an asset purchase agreement between Black Diamond and the Debtors that had already been terminated. (NCL Obj. to Sale Motion, ¶ 81.) This argument was based on the assertion that the Debtors provided written notice of termination of the Initial APA to Black Diamond. *Id.* at ¶ 83.[24] The Non-Controlling Lenders further refered to the language of Section 4.4 of the Initial APA, which provides that the APA may be "terminated at any time prior to Closing . . . automatically upon occurrence of, entrance into an agreement for, or Bankruptcy Court approval of, an Alternative Transaction," including the filing of a plan of reorganization that does not contemplate the sale of the acquired assets to GSCAP. *Id.* at ¶ 85. Therefore, the Non-

---

[22] Since the Court entered the relevant orders before it set forth by written opinion the basis upon which the relief was granted, numerous references throughout this opinion regarding the Court's findings of fact and conclusions of law are in the past tense that otherwise would have been in the present tense had the opinion preceded the orders.

[23] The Court notes at the outset that the possibility that investors would withdraw their investments impacts a number of issues in this opinion. The continuing support of investors is crucial to maintaining estate assets where, as here, the estate consists largely of investment contracts.

[24] The Debtors purported to exercise their "fiduciary out" by providing written notice of termination of the Initial APA to Black Diamond and BDCF as Agent. (Letter from Debtors to BDCM and BCDF, faxed on Dec. 26, 2010, Ex. K to Hollander Decl., ECF No. 246.) Other actions cited by the Non-Controlling Lenders as evidence that the Debtors terminated the APA included: Debtors' representation to the Court, their advisors, and limited partners that the Initial APA was terminated (Motion to Appoint Trustee, Hr'g Tr. 7: 22-25, Dec. 28, 2010); Trustee's notification of the APA's termination to the Financial Services Authority (Garrity Dep. 209:17-22, 211: 25- 212:7, June 24, 2011); and Trustee's direction to Frank to inform investors that the APA was terminated and withdrawn from approval by the Court (*Id.* at 297:24-298:3; Ex. L and M to Hollander Decl.).

Controlling Lenders asserted that the Proposed Transactions were entirely new transactions that did not embody the joint bid from the Auction and, as such, could not have been approved because the Non-Controlling Lenders did not give their consent to the renewed joint bid. *Id.* at ¶ 91.

Black Diamond responded by claiming it intended to leave the Initial APA open, as evidenced by its rejection of the Debtors' termination notice and extensions of the closing date of the Initial APA. (Black Diamond's Resp. to NCL Obj. to Sale Motion, ECF No. 649, ¶ 27.) Further, Black Diamond argued that the terms of the Initial APA did not allow for termination even if the Debtors attempted to do so. *Id.*

It is irrelevant whether the Initial APA was validly terminated because the Initial APA is separate from the bid itself. The Initial APA was an embodiment of the winning bid at the auction (the "Winning Bid"). It is this bid by Black Diamond at the Auction that constituted the relevant offer. Black Diamond did not assert that it ever revoked the joint bid made at the Auction. To the contrary, Black Diamond argued the bid remained open. The Winning Bid remained outstanding, and the Trustee had the authority to accept it. *See, e.g. Wornick v. Gaffney*, 544 F.3d 486, 490 (2d Cir. 2011) ("It must be remembered that the trustee stands in the shoes of the debtor . . . ."); *In re Marker,* 100 B.R. 569, 570 (Bankr. N.D. Ala. 1989) ("The trustee, upon approval of appointment, replaces the debtor-in-possession in administering the assets of the estate and protecting the creditor's interests."). Termination of the Initial APA, therefore, would not affect whether the BD Joint Bid remained open. Whether the bid remained open was in the control of Black Diamond. The Trustee and Black Diamond incorporated the

Initial APA in APA 1 and thereafter affirmed in the Side Letter that the Initial APA is in full

force and effect.  (Side Letter, 1.)

In the alternative, the Non-Controlling Lenders argued that if APA 1 was a continuation

of the BD Joint Bid from the Auction, the Non-Controlling Lenders did not consent to the BD

Joint Bid because they did not consent to a collusive bid.  (NCL Obj. to Sale Motion, ¶ 93.)

Although the Bidding Procedures in their original form did not expressly allow joint bidding,

Manzo decided that the best way to increase the price of the assets was to enable combination

bids.  Pursuant to paragraph 15 of the Bidding Procedures, which preserved the ability of the

Debtors to make modifications to the Auction, Manzo approached the Non-Controlling Lenders

to obtain their consent.  (Manzo Decl., ¶32.)  After Manzo explained the risks to the Non-

Controlling Lenders, including those relating to Black Diamond's right to direct the Agent,[25] the

Non-Controlling Lenders consented to a modification of the bidding procedures, "including a

joint bid by the Agent and BDCM."  (Oct. 27, 2010 Letter, Manzo Decl., Ex. C.)  The Non-

Controlling Lenders memorialized their consent in a signed agreement before joint bidding was

permitted at the Auction.  Also, the Non-Controlling Lenders drafted portions of the agreement

that reflected their consent to the modification.

As further discussed, *infra*, BDCM and BDCF did not collude in submitting their bid.

Collusion requires "an intention or an objective to influence the price."  *Lone Star Indus., Inc. v.*

---

[25] "I fully expected that it was a risk, that if a joint bid was developed, that the allocation, potentially, between the Agent on the credit bid side and the Black Diamond piece on whatever currency they chose to bid in a joint bid, might be shared between them in a disproportionate manner.  And I wanted to make sure the [N]on-[C]ontrolling [L]enders realized that, in fact, if we permitted joint bidding that could occur, and explained that to them in four, five times, *including after they executed the agreement* I went back and said, you now realize this is a real risk, so before I go back into that auction room with Mr. Solow, are you sure you're comfortable with us proceeding with joint bidding.  And they said they were." (Hr'g Tr. 352: 21-25, 353: 1-5, December 22, 2010) (emphasis added).

*Compania Naviera Perez Company., S.A.C.F.I.M.F.A., SUDACIA, S.A. (In re N.Y. Trap Rock Corp.)*, 42 F.3d 747, 752 (2d Cir. 1994) (finding an effect on sale price alone not sufficient to constitute collusive bidding). *See also Ramsay v. Vogel,* 970 F.2d 471, 474 (8th Cir. 1992). An agreement between two bidders resulting in a single bid in exchange for consideration does not, without more, constitute collusion. *See In re Edwards,* 228 B.R. 552, 565 (Bankr. E.D. Pa. 1998) ("The existence of a joint bid does not itself amount to collusive bidding."), *discussing Landscape Properties v. Vogel,* 46 F.3d 1416 (8th Cir. 1995). Although two bidders acting together to lower the sale price constitutes collusion, *see Boyer v. Gildea,* 374 B.R. 645, 660 (Bankr. N.D. Ind. 2007), here the parties combined their bids to *raise* the sale price rather than to lower it.[26] The BD Joint Bid resulted in a $75-$90 million *increase* in the final purchase price. (Manzo Dec. at ¶ 32.)

Since there was no collusion between the bidders, the Non-Controlling Lenders' consent to the modification of the bidding procedures and the BD Joint Bid was valid. The Non-Controlling Lenders clearly contemplated an "improper use by the Agent of the credit bid to the detriment of the Non-Controlling Lender Group" when they signed a waiver with that language included. They endorsed joint bidding nonetheless. To the extent the Non-Controlling Lenders wished to challenge any allocation, as they did by commencing the State Court action, they were able to do so against the Agent, BDCM, and other entities in their individual capacity. (Oct. 27, 2010 Letter) (reserving "all claims and causes of action … *against the Agent and BDCM.*") (emphasis added). However, the Non-Controlling Lenders did not reserve their right to

---

[26] Moreover, collusion requires an agreement or understanding of two independent parties to act in concert. Here, the Agent had no discretion to act independently but simply was obligated to act in accordance with the instructions of BDCM for the reasons discussed, *infra*.

withdraw consent to the joint bid if Black Diamond acted, in their view, improperly.  They

simply reserved the right to take that issue, *inter alia*, to the State Court.

The Winning Bid remained outstanding regardless of whether the Initial APA was

terminated, and thus the Trustee had the authority to accept it.  The Proposed Transactions,

therefore, are simply a final execution of the Winning Bid, which was consented to the day of the

Auction.  To the extent the Non-Controlling Lenders wished to challenge any allocation, they

could have, and in fact did, challenge the Agent's use of the credit bid, in the appropriate forum

as contemplated by their consent letter.

## Legitimate Business Justification for Proceeding to Sale

Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a

hearing, may use, sell or lease, other than in the ordinary course of business, property of the

estate."  11 U.S.C. § 363(b)(1).  To sell property under section 363(b), the Trustee must

demonstrate a legitimate business justification for the proposed transaction.  *Comm. of Equity*

*Sec. Holders v. Lionel Corp.* (*In re Lionel*), 722 F.2d 1063, 1071 (2d Cir. 1983).  *See also Parker*

*v. Motors Liquidation Co.* (*In re Motors Liquidation Co.*), 430 B.R. 65, 83 (S.D.N.Y. 2010)

("The overriding consideration for approval of a Section 363 sale is whether a 'good business

reason' has been articulated."), *citing, inter alia, In re Chrysler LLC*, 576 F.3d 108, 114, (2d Cir.

2009); *In re Iridium Operating LLC,* 478 F.3d 452, 466 (2d Cir. 2007).  In determining whether a

good business reason exists to grant a motion to approve a sale pursuant to section 363(b), "a

court should consider 'all of the salient factors pertaining to the proceeding' and 'act to further

the diverse interests of the debtor, creditors, and equity holders.'"  *In re Chrysler LLC,* 405 B.R.

31

84, 95 (Bankr. S.D.N.Y. 2009), *aff'd*, 576 F.3d 108 (2d Cir. 2009), *vacated as moot*, 130 S. Ct.

1015 (2009), *citing In re Lionel,* 722 F.2d at 1071.

In addition to a reorganization plan, a section 363(b) sale is an appropriate means of

disposing of the debtor's assets. *See In re Gen. Motors Corp.*, 407 B.R. 463, 488 (Bankr.

S.D.N.Y. 2009), *citing In re Chrysler,* 405 B.R. at 94. "A debtor may sell substantially all of its

assets as a going concern and later submit a plan of liquidation providing for the distribution of

the proceeds of the sale. This strategy is employed, for example, when there is a need to

preserve the going concern value." *In re Chrysler,* 405 B.R. at 96 (citations omitted). The

Trustee must establish a good business reason for going forward with the Sale now rather than

proceeding to the Plan. *See In re Boston Generating, LLC*, 440 B.R. 302, 329 (Bankr. S.D.N.Y.

2010) ("[T]he Court concludes that there exists an articulated business justification and a good

business reason to grant the Sale Motion now and not wait for confirmation of a plan of

reorganization."). The Trustee, not the Court, was in the best position to make a decision of the

most advantageous way to proceed. *In re Global Crossing, Ltd.*, 295 B.R. 726, 744 n.58 (Bankr.

S.D.N.Y. 2003) (finding that Courts do not dictate the *means* to achieve the objective of

maximizing value). The "bankruptcy court has neither the role nor the expertise . . . to substitute

its own views as to the optimum business decision for the views of the Debtors' Board of

Directors . . . ." *Id.* at 729.

So long as a good business reason supporting the sale exists, a judge has considerable

discretion in approving that sale. *In re Lionel*, 722 F.2d at 1066. The court in *Lionel* set forth a

nonexclusive list of factors to guide a court in its consideration of whether approval of a section

363 sale would be appropriate, including, *inter alia*, the likelihood that a plan of reorganization

will be proposed and confirmed in the near future, the proceeds to be obtained from the

disposition vis-à-vis any appraisals of the property, and, most importantly, whether the asset is

increasing or decreasing in value.  *Id.* at 1071.

### A.  <u>Likelihood that Plan will be Confirmed in Near Future</u>

Even where a plan has already been proposed, a court will consider if that plan is

confirmable in weighing whether a good business reason supporting the section 363 transaction

exists.  *See In re Au Natural Rest., Inc.*, 63 B.R. 575, 581 (Bankr. S.D.N.Y. 1986).  This

consideration is especially relevant where, as here, value would be lost in the time it takes to

complete the plan process.  *See, e.g., In re Boston Generating*, 440 B.R. at 328 ("It is not

reasonable to believe that these Debtors, in light of their current liquidity situation and capital

structure, can confirm a plan without a great deal of litigation, and they certainly cannot confirm

a plan in the near future.  Given the costs and time associated with confirming a plan under these

circumstances, I find that the Debtors do not have the liquidity to survive until confirmation of a

plan.").

The Non-Controlling Lenders argued that there is "no basis in law for forcing a delay in

the consideration of approval of a disclosure statement" in order to permit a section 363 sale.

(NCL Omni. Resp. to Obj. to Disc. Stmt., ¶ 28.)  In support of that argument, the Non-

Controlling Lenders cited Federal Rule of Bankruptcy Procedure 3017(d), which requires

solicitation to follow immediately upon approval of the disclosure statement.  The Court notes

that in this case, solicitation has not begun because the Court has not approved a disclosure

statement.  Moreover, the Court has the ability to proceed to a sale hearing rather than to a plan

even when a plan has already been proposed if, among other considerations, the Court has "grave

doubts as to [the Non-Controlling Lenders'] ability to proceed to confirmation." *In re Au Natural,* 63 B.R. at 581. *See also In re WestPoint Stevens*, 600 F.3d 231 (2d Cir. 2010) (allowing a sale to go forward after over two years of inability to confirm a plan due to a stalemate between the debtor's two major creditors); *In re Global Crossing*, 295 B.R. 726 (Bankr. S.D.N.Y. 2003) (allowing a section 363 sale after a plan was confirmed); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 169 (Bankr. S.D.N.Y. 2007) (approving a section 363 sale despite the fact that a sale under a plan was originally proposed by the debtors because inter-creditor disputes made it impossible to confirm a plan in time to save the sale opportunity).

Although a plan had already been proposed, it was clear that in this case, proceeding to solicitation and confirmation would have been an extended and highly contentious process. The Court found that there was little likelihood of the Plan being confirmed within a reasonable period of time. The plan confirmation process as proposed would have placed the estate at risk. The Plan provided no benefit to the estate, and it effectively moved the State Court litigation between the Non-Controlling Lenders and Black Diamond into this Court in the form of designation of vote litigation, thereby putting not only the Sale at risk, but also the Debtors' liquidity -- without which the Debtors ultimately would have been unable to survive.

1.  Deficiencies in SIF Class

As a preliminary matter, it was not clear that the Plan was even confirmable.[27]  11 U.S.C. § 1129(a)(8) provides that if a plan is to be confirmed, each class of claims or interests must either accept the plan or be unimpaired under that plan.  If a class of claims is impaired, the plan

---

[27] An unconfirmable plan is grounds for rejection of the disclosure statement; a disclosure statement that describes a plan patently unconfirmable on its face should not be approved. *See In re Quigley Co.*, 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007).

may not be confirmed unless at least one class of claims that is impaired votes to accept the plan,

excluding acceptance by an insider.  11 U.S.C. § 1129(a)(10).  Under the Plan, there are three

voting classes of impaired claims.  (Plan ¶ 5.1.)  Class 2B consists of the Prepetition Lenders,

Class 3A-B consists of unsecured claims against SIF, and Class 3B-B consists of Intercompany

Claims against SIF.  (Plan ¶ 4.6.)

Black Diamond argued that Class 3A-B, consisting of three creditors of SIF, was illusory

and had no constituency.  (BDCF Obj., ¶¶ 2, 47.)  There were three claims filed against SIF.[28]

Claim number 127 was filed by Edward Steffelin ("Steffelin"), a former employee "at GSC

Group," who is allegedly owed full indemnity for legal fees in connection with "certain SEC and

investment advisor violations."  (Attachment to Claim 127.)  Claim number 160 was filed by

American Home Assurance Company ("AHAC") on behalf of itself and its affiliates for

premiums, deductibles, and other related fees.  (Attachment to Claim 160.)  Claim number 401

was filed by Mark H. Shaw ("Shaw") for $15,000 allegedly due for "Investment Borrowed."

(Claim 401.)

The Trustee filed objections to all three of the claims.[29]  With respect to Claim 127, the

Trustee asserted that Steffelin is neither a current nor a former employee of SIF and has no prior

relationship with SIF.  (ECF No. 601.)  With respect to Claim 401, he argued that Shaw is

merely an investor to whom SIF has no record of any obligation or debt owed.  (ECF No. 603.)

Regarding Claim 160, the Trustee contended that SIF had no liabilities to AHAC and noted that

---

[28] During the May 25, 2011 hearing, counsel for the Non-Controlling Lenders stated on the record that there were two claims in Class 3A-B, but actually there are three: Claim 127, Claim 160, and Claim 401.  (Initial Hr'g Tr. 15:8-9, May 25, 2011.)

[29] The hearing on the Trustee's motion objecting to the SIF claims is scheduled for July 20, 2011.  The deadline for filing opposition to the Trustee's motion was July 15, 2011.  The deadline passed without an opposition being filed.

35

SIF was absent from the list of insurance policies attached to AHAC's proof of claim. (ECF No.

615.)[30]

None of the three proofs of claim asserted a connection between the claimant and SIF.

BDCF raised the possibility that both Claims 127 and 160 were filed as protective proofs of

claim since the claimants filed six other proofs of claim in this case, one against each other

debtor. (BDCF Obj., ¶¶ 49, 52.) A class cannot be impaired if it has no creditors. *See In re

Friese*, 103 B.R. 90, 91-92 (Bankr. S.D.N.Y. 1989). Since at present there are no claims eligible

to vote, nor does it seem that any of the disputed claims will become allowed claims, as against

SIF, Class 3A-B could not constitute the accepting impaired class. *See, e.g.,* 7 Collier on

Bankruptcy, Section 1129.03[8], at 1129-60, n. 152 (5th Ed. Rev.) (The "requisite majorities

necessary for acceptance of a plan are computed on the basis of votes actually cast."). The Non-

Controlling Lenders failed to put forth any argument at the hearing as to whether the proposed

SIF class could constitute an impaired accepting class, and the Court did not believe that Class

3A-B would satisfy the requirements of section 1129(a)(10).

Regarding Class 3B-B, it is not clear whether the Non-Controlling Lenders ever intended

that class to be an accepting impaired class. However, when the issue was raised at the Initial

Hearing, counsel for the Non-Controlling Lenders stated that Class 3B-B would likely not be

used for section 1129(a)(10) purposes. (Initial Hr'g 15: 1-7.) Class 3B-B consists of one

intercompany claim against SIF in favor of GSCP (NJ), L.P., another Debtor. (BDCF Obj., ¶

---

[30] Additionally, with respect to Claim 160 specifically, BDCF alleges that SIF purchased no insurance pre- or post-
petition and was not a party to any insurance agreement with AHAC. (BDCF Obj., ¶ 53.)

55.)  That claimant's vote is controlled by the Trustee, an insider of SIF,[31] whose vote in favor of the Plan must be disregarded pursuant to section 1129(a)(10).[32]

    2.  <u>Designation of Votes</u>

Class 2B cannot consent to the proposed treatment under the Plan without the support of BDCM.  However, counsel for BDCM expressed that Black Diamond intended to take the "equivalent of a blood oath" to reject the Plan.  (Initial Hr'g Tr. 35: 23-25, May 25, 2011.  *See also* Deckoff Dep. 228: 17-18.)[33]  The Non-Controlling Lenders responded to this statement by arguing that they would designate Black Diamond's vote pursuant to section 1126(e).[34]  In support of their argument for designating Black Diamond's vote, the Non-Controlling Lenders asserted that facts of this case demonstrated numerous instances of bad faith which would have allowed the Court to designate Black Diamond's votes.  (NCL Omni. Resp., ¶ 26.)  In particular, the Non-Controlling Lenders alleged that Black Diamond acted with an ulterior motive, namely with the intent of achieving the upper hand, in a manner inconsistent with its interest as a creditor.  (NCL Omni. Resp., ¶ 26(c)(1)(i).)  The Non-Controlling Lenders claimed Black Diamond's vote against the Plan would have allowed Black Diamond to misappropriate votes for the purpose of taking more value than it deserved, based on what Black Diamond contributed in

---

[31] 11 U.S.C. 101(31)(B)(iii) defines an insider as, *inter alia,* a person in control of the debtor.  A trustee is considered to be someone in control of the debtor and is thus an insider.  *See In re Nat'l Century Fin. Enter., Inc., Inv. Litig.*, 604 F. Supp. 2d 1128, 1137 (S.D. Ohio 2009).

[32] Section § 1129(a)(10) of the Bankruptcy code requires that at least one impaired class of claims accept the plan without including any acceptance of the plan by an insider.  *See In re Baxter & Baxter, Inc.*, 172 B.R. 198, 201 (Bankr. S.D.N.Y. 1994).  *See also Featherworks Corp.*, 25 B.R. 634, 640 (Bankr. E.D.N.Y. 1982), *aff'd sub nom. Matter of Featherworks Corp.*, 36 B.R. 460 (E.D.N.Y. 1984) (finding that Section 101(25) defines an "insider" for purposes of Title 11 as a "person in control of the debtor" and §1129(a)(10) excludes "any acceptance of the plan by any insider.").

[33] The record supported a finding by the Court, and the Court has every reason to believe, that Black Diamond would vote against the Plan.

[34] At the Initial Hearing, the Non-Controlling Lenders asserted that Black Diamond's threat to vote against the Plan would push the Non-Controlling Lenders to designate their votes.  (Initial Hr'g Tr. 20:2-5, May 25, 2011.) (*See also* NCL Omni. Resp., ¶ 22.)

comparison to what the minority lenders contributed.  (NCL Omni. Resp., ¶ 26(b).)  They also

pointed to facts demonstrating that Black Diamond appeared to be closely connected to the

Debtors and was thus acting as an insider.  (NCL Omni. Resp., ¶ 26(c)(4).) [35]

   11 U.S.C. § 1126(e) enables a court to designate a party's vote on request of a party in

interest, and after notice and a hearing, if that entity accepted or rejected the plan "not in good

faith."  Good faith is not defined in the Bankruptcy Code.  Courts have largely interpreted the

meaning of "good faith" in light of the predecessor to section 1126(e), section 203 of the

Bankruptcy Act.  *See, e.g., In re Allegheny Int'l, Inc.*, 118 B.R. 282, 289 (Bankr. W.D. Pa. 1990).

In discussing the standard for good faith, the United States Supreme Court noted that "[t]he

history of this provision makes clear that it was intended to apply to those stockholders whose

selfish purpose was to obstruct a fair and feasible reorganization in the hope that someone would

pay them more than the ratable equivalent of their proportionate part of the bankrupt's assets."

*Young v. Higbee Co.*, 324 U.S. 204, 211 (1945).  Early case law determined that while acting

selfishly is not sufficient to constitute bad faith, acting with an ulterior motive is.  *In re Pine Hill*

*Colleries Co.*, 46 F. Supp. 669, 671 (E.D. Pa. 1942) ("If a selfish motive were sufficient to

condemn reorganization policies of interested parties, very few, if any, would pass muster.  On

the other hand, pure malice, 'strikes' and blackmail, and the purpose to destroy an enterprise in

---

[35] To establish insider status, the Non-Controlling Lenders reference Black Diamond's "acquisition of a substantial equity position in connection with the Option Agreement, a transaction pursuant to which BDCM agreed to pay Mr. Eckert, the Debtors' CEO, $500,000 for an option to purchase for $1.5 million (i) 49% of Mr. Eckert's shares of common stock of AP Inc. and (ii) his $2 million claim against GSC group in respect of his unpaid 2008 bonus." (NCL Omni. Resp., ¶ 23.)  However, since the Option Agreement has not been exercised, Black Diamond has not yet acquired the aforementioned interests.  (West Decl. ¶ 41.)  The Court additionally notes that the Non-Controlling Lenders have not put forth sufficient evidence with respect to Black Diamond's alleged "chokehold over the Debtors and its destructive involvement in the day-to-day management and operations of the Debtors in the months preceding their bankruptcy filings," *see* NCL Omni. Resp., ¶26(c)(4), to enable a finding that Black Diamond was acting as an insider.

38

order to advance the interests of a competing business, all plainly constituting bad faith, are

motives which may be accurately described as ulterior."). Bad faith has most recently been

described as a party acting with "an interest other than an interest as a creditor." *In re DBSD*,

634 F.3d 79, 102 (2d Cir. 2011), *citing In re P–R Holding Corp.*, 147 F.2d 895, 897 (2d Cir.

1945).

Here, the Non-Controlling Lenders could have put forth a *prima facie* case for

designation of Black Diamond's vote based upon the Initial APA following the Auction. The

Non-Controlling Lenders contended that Black Diamond "prefer[red] the New Sale Motion

because the Proposed Sale Transaction allow[ed] BDCM to obtain more than its ratable share of

the Debtors' assets," (NCL Omni. Resp., ¶ 26(b)), and that "BDCM [would have] receive[d]

through its $11 million share of the BD Joint Bid assets of the Debtors worth at least $111

million, which [was] substantially more than 100% of its outstanding claims against the Debtors,

while other Lenders [would have] received, through their share of the Credit Bid Assets, less

than 17% of their outstanding claims." (NCL Prelim. Obj. to Sale Motion, ECF No. 220, p. 4.)

The record contained several allegations against Black Diamond regarding its desire to

consummate a sale in which it could have unfairly taken advantage of its control over the

allocation. (NCL Obj. to Sale Motion, ¶¶ 56, 108-10.) These allegations could, if established to

be the basis of Black Diamond's vote against the Plan, have been found to be done in bad faith

and have constituted reason for designation of Black Diamond's vote. "A bankruptcy court may

. . . designate the vote of a party who votes 'in the hope that someone would pay them more than

the ratable equivalent of their proportionate part of the bankruptcy assets.'" *In re DBSD,* 634 at

102, *citing Young*, 324 U.S. at 211. If Black Diamond did cast its vote "with a purpose of

39

coercing payment to [it] of more than [it] might reasonably perceive as his fair share of the debtor's estate," designation of its vote would be appropriate. *In re Fed. Support Co.* (*In re Insinger Machine Co.*), 859 F.2d 17, 19 (4th Cir. 1988).

However, while courts have held that casting one's vote to gain more than one deserves is evidence of bad faith, evidence of simply a selfish or aggressive attempt to maximize recovery is insufficient to show bad faith. *In re Adelphia Commc'ns Corp.*, 359 B.R. 54, 63-64 (Bankr. S.D.N.Y. 2006). Designating a party's vote is highly fact-intensive and would require a close examination of demeanor, credibility, and the surrounding circumstances. *See, e.g., In re DBSD*, 643 F.3d at 102-05. The burden of proving bad faith lies in the hands of those seeking designation. *Id.* at 102, *citing In re Adelphia*, 359 B.R. 54. To establish that Black Diamond would vote with the motive of receiving more than the ratable equivalent of its proportionate share of the estate, the Non-Controlling Lenders would have to establish that Black Diamond voted against the Plan so it could engage in a joint bid with the Agent for the purpose of misallocating the assets. That determination would have required (i) evidence of Black Diamond's intentions as to the allocation of the assets, and (ii) a valuation of those assets. Although Section 2.6 of the Initial APA divided the assets into Cash Bid Allocable and Credit Bid Allocable Items, that allocation was undone by the Letter Agreements. (Form of Assignment and Assumption Agreement, Ex. B to APA 1; Counterpart, Ex. D-2 to Sale Motion.) There is currently no allocation of the assets under the Proposed Transactions. (Deckoff Dep. 176: 14-24, 177: 12-16.) That allocation will take place after the Sale Hearing and prior to closing. (Deckoff Dep. 167: 22-24, 169: 24.)

40

Even if the Court were to have found that Black Diamond voted against the Plan to allocate the assets as it did in the Initial APA, Black Diamond disputed that the assets were misallocated in the first instance.  Thus, using the initial allocation as a basis for valuing the Credit and Cash Allocable Items would have required a full hearing on the value of those items and of the estate in its entirety, as well as of the value contributed to the Sale for purposes of determining a fair allocation.  A proper assessment of sale value would have to had considered the Proposed Transactions in their entirety.  *See In re Braniff Airways, Inc.*, 700 F.2d 935 (5th Cir. 1983) (considering the transaction as a whole rather than considering each individual component of the transaction).  However, the Credit and Cash Bid Allocable Items would have needed to be valued separately to determine whether each package of contracts was being allocated to the bidders in accordance with the consideration each provided.  Current valuation estimates were preliminary in nature and differed substantially.[36]  Holding a full valuation hearing would have been a lengthy process.

Regardless of whether the Court found that Black Diamond initially desired to distribute the assets in a manner that would have disenfranchised other creditors, the Non-Controlling Lenders would have needed to establish that Black Diamond intended to do so at the time of voting.  The Court found that there was some evidence presented by Black Diamond that would counter the arguments of the Non-Controlling Lenders as to the intentions of Black Diamond.  (*See* Gravenhorst Dep. 45: 5) (explaining that the allocation of assets under the Proposed Transactions had not yet been determined).  Deckoff's statement that allocation will be "done in

---

[36] *See, e.g.,* NCL Trustee Motion, p.4  n.5, *referencing* Deckoff Dep. (Dec. 12, 2010); 20: 11-21: 7; Gooden Decl. (Dec. 2, 2010), ¶ 10; Ex. A to Bodony Decl., ECF No. 312.  *See also id.* at ¶ 33, *referencing* West Decl. (Dec.12, 2010), 205: 5-16.

41

accordance with documents and with the law" (Deckoff Dep. 168: 17-20) indicated that Black
Diamond did *not* intend to disproportionately misallocate the assets.  These statements, if found
credible at a designation hearing, would have refuted some of the evidence presented in support
of designation.

Even if the Non-Controlling Lenders could have succeeded in showing Black Diamond
has an incentive to vote against the Plan by virtue of an improper allocation of assets in their
Proposed Transactions, the Non-Controlling Lenders would have had to further prove that Black
Diamond's *sole* or *primary* goal in rejecting the Plan was to benefit at the expense of other
creditors.  *See In re Save Our Springs,* 388 B.R. 202, 231 (Bankr. W.D. Tex. 2008) (finding the
evidence "insufficient to establish that the primary, or even a major, goal of Sweetwater and
Gunn was to put the Debtor out of existence because of the Debtor's potential role in opposing
other projects of Gunn's."); *In re Landing Assocs., Ltd.*, 157 B.R. 791, 807-08 (W.D. Tex. 1993)
(noting that "creditors act for a variety of motives, only some of which are directly related to
their status as creditors" and evaluating the "admixture of creditor-related and non-creditor-
related motives.").

However, Black Diamond had already expressed facially valid alternative reasons for
voting against the Plan.[37]  As the majority owner of the collateral, Black Diamond has an interest
in ensuring the estate continues to profit.  Black Diamond believes that to ensure continued
profitability, the manager of an investment portfolio should have an investment in that portfolio.
A manager that also has an investment in the portfolio he manages would recover based upon its
performance and thus would have a greater incentive to succeed than a manager without funds at

---

[37] Deckoff testified at his deposition that Black Diamond has "no interest in a structure that doesn't respect the governance we're entitled to because we own 51 percent."  (Deckoff Dep. 241: 3-6.)

risk.  As Deckoff stated at his deposition, Black Diamond has "no interest in having a manager

manage the assets who has no skin in the game."  (Deckoff Dep. 240: 24-25.)[38]  Since Sankaty

does not have an ownership interest in the assets, Black Diamond would vote against any

transaction, such as the Plan, that would make Sankaty the manager of those assets.[39]  If it were

established that Black Diamond voted against the Plan primarily to protect its interests as the

majority holder of a secured credit facility with a lien over the entirety of the assets of the estate

because it believes the value of its collateral would deteriorate, its votes would not be designated.

*See In re Fighter Ltd.,* 118 F.3d 635, 638 (9th Cir. 1997) (no designation where the voter acted to

protect its interests as a major creditor).  *Accord In re Gilbert,* 104 B.R. 206, 217 (Bankr. W.D.

Mo. 1989) ("As long as a creditor acts to preserve what he reasonably perceives as his fair share

of the debtor's estate, bad faith will not be attributed to his purchase of claims to control a class

vote.").

　　If the Non-Controlling Lenders ultimately succeeded in their case for designation, the

Plan would seem to have been confirmed unless Black Diamond showed the assets lost so much

value that liquidation would have been the preferable alternative in line with the "best interests"

test.[40]  However, in light of the factual issues regarding the motive of Black Diamond, valuation

---

[38] The Court notes regarding the designated portions of the depositions placed into evidence that those portions were referenced by the parties prior to the Court's ruling at the Sale Hearing.  However, prior to its ruling, the Court had not reviewed the actual designated sections of the depositions.  Nonetheless, before the issuance of the Sale Order, the Court reviewed those sections.

[39] As further discussed, *infra,* litigation over whether Sankaty is an appropriate investment manager and whether such a manager should have an interest in the portfolio would increase investor concern and likely lead to an exodus of investors.

[40] Section 1129(a)(7) is known as the "best interests" test and provides for each creditor or interest holder to receive at least as much under the plan as it would in a liquidation of the debtor in a chapter 7 case.  *In re Quigley Co., Inc.,* 437 B.R. 102, 144 (Bankr. S.D.N.Y. 2010).  Section 1129(a)(7)(A)(ii)  provides that the holder of a claim or interest in an impaired class of claims or interests that has not accepted the plan must "receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the

43

issues, interpretation of rights under the Prepetition Credit and Security Agreement, and other potentially valid motives for opposing the Plan, the designation of Black Diamond's vote would have required extensive and protracted litigation.  This process would likely have resulted in an interruption in liquidity and investor confidence, which would have been followed by a rapid decrease in asset values.

       3.  Fair and Equitable Issues

Assuming that Black Diamond's votes were not designated, but the Non-Controlling Lenders met the requirement of section 1129(a)(10) by virtue of a class other than Class 2B voting to accept the Plan, the Non-Controlling Lenders would have still needed to comply with the requirement of section 1129(b)(1) that a plan be "fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."  11 U.S.C. § 1129(b)(1).  The Plan would have needed to provide that the Prepetition Lenders either retain liens on their collateral and receive deferred payments totaling at least the value of their interest in the collateral or receive the indubitable equivalent of their claims.[41]  11 U.S.C. § 1129(b)(2)(A).

---

amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date[.]"  11 U.S.C. §1129(a)(7)(A)(ii).  *See also Kane v. Johns-Manville Corp.,* 843 F.2d 636, 649 (2d Cir. 1988) (finding that in order for a plan to be confirmed, a claimant who has not consented to a debtor's plan of reorganization must not receive less under the plan than he would have received in a chapter 7 liquidation).  In determining whether the "best interests" standard is met, a court must consider the applicable rules of distribution of the estate under chapter 7, as well as any costs incident to such liquidation.  *In re Adelphia*, 368 B.R. at 247.  The comparison between the value of distribution under a plan and distribution under a hypothetical liquidation is a complex process requiring the court to analyze different economic scenarios.  *In re Quigley Co.,* 437 B.R. at 144.

[41] The third subsection of section 1129(b)(2)(A) is not relevant, as the Plan does not contemplate a sale of the Agent's collateral as required under section 1129(b)(2)(A)(ii).

44

The Disclosure Statement provides that the Prepetition Secured Debt will be retained by, *inter alia*, common stock[42] and "New Senior Notes."[43]  As BDCF pointed out, however, it is not clear whether the New Senior Notes under the Plan would be secured, nor is it evident whether the New Senior Notes would have allowed the Prepetition Lenders to realize the full value of the collateral since those notes are subject to the Exit Facility's[44] first priority lien.  (BDCF Obj., ¶ 67.)  The Plan also seems to transfer a portion of the Agent's collateral to Sankaty in the form of senior fees without clarifying whether new collateral would be provided to the Lenders as required by section 1129(b)(2)(A).  (Plan § 1.97; BDCF Obj., ¶ 67.)  Although the Plan does not contemplate the receipt of "indubitable equivalent" under section 1129(b)(2)(A)(iii), the Non-Controlling Lenders stated in the Objection to the Sale that should they need to cram down the Prepetition Lenders, they would provide the Prepetition Lenders with the indubitable equivalent of their claims.  (NCL Obj. to Sale Motion, ¶ 53.)  This scenario would further extend the plan process if designation were not successful.

4.  <u>Non-Controlling Lenders' Standing to Propose a Plan</u>

Although the Non-Controlling Lenders stated that they "never waived [their] right to file a chapter 11 plan," (NCL Obj. to Sale Motion, ¶ 94), if the plan process had continued, Black Diamond likely would have argued that the Non-Controlling Lenders had waived their ability to file a plan by signing the Prepetition Credit Agreement.  When the Non-Controlling Lenders entered into the Prepetition Credit Agreement and Security Agreement, they agreed that the

---

[42] *See Plan § 4.3(b).* Reorganized GSC Group New Common Stock and Reorganized AP Inc. New Common Stock.
[43] *See Plan § 4.3(b).* Reorganized NJLP New Senior Notes.
[44] The "Exit Facility" is defined as "that credit facility comprised of the Tranche A Commitment and the Tranche B Commitment to be provided to Reorganized GSC Group pursuant to the Exit Facility Agreement." (Plan § 1.42.)

Agent had the sole ability to take action on the Collateral and realize upon the security.[45]    The

Lenders further agreed that they would "do nothing to impair the rights of the Collateral Agent in

the Collateral." (Security Agreement, § 2.7.)[46]    Black Diamond argued in its State Court answer

that the Non-Controlling Lenders violated the Security Agreement provision preventing them

from individually enforcing the Agreement or realizing upon the Security by interfering with the

Agent's plan for disposition of the Collateral.    Black Diamond then listed several actions

allegedly taken to interfere with Black Diamond's rightful exercise of its authority under the

Prepetition Credit and Security Agreements, including the Non-Controlling Lenders' Plan.

(Black Diamond Answer, ¶ 25.)

        If this Court had proceeded with the Plan, it would have had to decide whether the Non-

Controlling Lenders had standing to bring a plan.    That decision would have required a review of

the Prepetition Credit and Security Agreements as well as a review of the implied covenant of

good faith and fair dealing.    Even if Black Diamond was correct that the Non-Controlling

Lenders violated the Prepetition Credit Agreement by bringing forth their own plan to dispose of

---

[45] Section 6.1: "By accepting the benefits hereof, the <u>Secured Creditors agree that this Agreement may be enforced only by the action of the Collateral Agent</u> . . . acting upon the instruction of the Required Banks and that <u>no other Secured Creditor shall have any right individually to seek to enforce or to enforce this Agreement or to realize upon the security</u> to be granted hereby, it being understood that such rights and remedies may be exercised by the Collateral Agent or (after such date) the holders of at least a majority of the outstanding Other Obligations, as the case may be, for the benefit of the Secured Creditors upon the terms of this Agreement." (Emphasis added.)

[46] Counsel to BDCF noted at the Interim Hearing that section 12.4 of the Prepetition Credit Agreement provides the Agent with the exclusive right to exercise remedies with respect to the collateral:  "12.4 of the [Prepetition Credit Agreement] provides an express and broad drag along right that any action taken by the [A]gent at the direction of the [R]equired [B]anks is binding upon all of the banks. . . .  In creditor agreements, the drag along rights are usually broad, the idea being that a borrower needs to know when they cut a deal with an agent that that deal is then binding on everyone in the facilities." (Interim Hr'g Tr, 405:6-14.)  Section 12.4 provides, in relevant part, that "[t]he Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Credit Documents in accordance with a request of the Required Banks, and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Banks."  Although the Prepetition Credit Agreement refers to "Required Banks," that definition presupposes that more than one bank will own the majority of the commitments owed to all the banks at that time.  However, since BDCM owns the majority interest, for ease of reference the Court will refer to BDCM as the "Required Bank" in the singular.

the collateral, there would have remained a question about the extent to which those agreements

could have been enforced on a public policy basis.[47]

    The determination of whether the provisions of the Prepetition Credit Agreement would

have prevented the Non-Controlling Lenders from proposing a plan would have been the subject

of "lengthy and thoughtful . . . arguments," *In re Boston Generating,* 440 B.R. at 317

(referencing oral arguments on whether an inter-creditor agreement between lenders holding first

and second liens on substantially all the debtors' assets deprived the second lien lenders of

standing to object to the proposed sale), and thus provided yet another reason why the Plan

would not likely be confirmed in the near future.

    5.  <u>Additional Plan Impediments</u>

    In addition, the parties would have disputed, *inter alia*, the proposed substantive

consolidation of some but not all of the Debtors, the facts and circumstances surrounding the

proposed classification scheme and the reasons justifying the separate classification of

---

[47] "It is generally understood that prebankruptcy [sic] agreements do not override contrary provisions of the
Bankruptcy Code." *Bank of Am. v. North LaSalle St. L.P.* (*In re 203 North LaSalle St. Pshp.*), 246 B.R. 325, 331
(Bankr. N.D. Ill. 2000). *Accord Klingman v. Levinson,* 831 F.2d 1292, 1296 n. 3 (7th Cir. 1987) (noting that it
would be contrary to public policy to allow a debtor to contract away the right to discharge). "It would defeat the
purpose of the Code to allow parties to provide by contract that the provisions of the Code should not apply." *In re
203 North LaSalle St. Pshp,* 246 B.R. at 331. "The Bankruptcy Code guarantees each secured creditor certain rights
… includ[ing] the right to participate in the voting for confirmation or rejection of any plan of reorganization, the
right to object to confirmation, and the right to file a plan where applicable." *Beatrice Foods Co. v. Hart Ski Mfg.
Co.*, 5 B.R. 734, 736 (Bankr. D. Minn. 1980) (upholding a portion of the subordination agreement under which the
seller agreed to subordinate its claims, but refusing to uphold a provision in the agreement preventing the seller from
seeking adequate protection or a lifting of the stay). However, a prepetition waiver of bankruptcy rights is not
invalid per se. *See in re South Atlantic Finance Association,* 212 B.R. 1003, 1005 (Bankr. M.D. Fla. 1997)
(citations omitted). In certain circumstances courts have upheld a creditor's waiver of bankruptcy rights in a pre-
bankruptcy contract. *See, e.g., In re Ion Media Networks, Inc.*, 419 B.R. 585, 594-95 (Bankr. S.D.N.Y. 2009)
(upholding a pre-bankruptcy inter-creditor agreement in which a junior lender agreed to waive its right to dispute the
validity of the lien where the parties were sophisticated parties who entered into the inter-creditor agreement aware
of the implications of that waiver).

creditors,[48] the facts and valuations that support any debtor-in-possession financing, the ability of

the Non-Controlling Lenders to solicit contractual consents from investors in the funds managed

by the Debtors when the Debtors have not authorized communication or consent solicitations,[49]

and potential regulatory impediments to a Sankaty sub-advisory agreement.[50]  (*See, e.g.,* Trustee

Obj., ¶ 28.)  These disputes further supported the Court's finding that the Plan was unlikely to be

confirmed in the near future.

Based upon all of the foregoing, the Court found that the Plan was unlikely to be

confirmed within a reasonable period of time, and during that time, as further discussed *infra,* the

value of the assets of the estate would diminish significantly.

## B. Whether Assets were Increasing or Decreasing in Value

Although the Second Circuit "reject[ed] the requirement that only an emergency permits

the use of § 363(b)," *In re Lionel*, 722 F.2d at 1069, "a sale should be approved when the court is

faced with the situation of a so-called 'melting ice cube,' a sale that would prevent 'further,

---

[48] "[S]ubstantially similar claims [must] be classified together unless there exists some reason, other than gerrymandering, for separating them."  *In re One Times Square Assoc. Ltd. P'ship,* 165 B.R. 773, 776 (Bankr. S.D.N.Y. 1994).  The plan proponent must show that the proposed impairment is necessary for economical or other justifiable reasons and not just to achieve a "cram down." *In re Fur Creations by Varriale, Ltd.,* 188 B.R. 754, 760 (Bankr. S.D.N.Y. 1995).  The Trustee and Black Diamond argued the Plan employs gerrymandering and partial substantive consolidation in an inequitable manner.  (*See, e.g.*, BDCF Obj., ¶ 58-59.)  The Non-Controlling Lenders responded that it would have been unfair to consolidate the SIF classes with other Debtors since the SIF had not pledged any assets and thus was not obligated in any way under the Prepetition Credit Agreement.  (NCL Orig. Resp. to Obj. to Disc. Stmt., ECF No. 520, ¶ 17.)  In the alternative, they argued that because the aggregate value of the assets securing the Prepetition Lenders' claims did not exceed the value of the amount owed to the Prepetition Lenders, the Prepetition Lenders should have been consolidated "otherwise [there would only be] separate groups with the secured creditors voting." (Initial Hr'g Tr. 14: 15, May 25, 2011.)

[49] The Non-Controlling Lenders would have needed to provide the number of investors it expected to refuse consent to management by Sankaty and the impact that would have had on value realized under the Plan.  To date, the Non-Controlling Lenders had not yet solicited such consent.

[50] The Investment Advisers Act of 1940 (15 U.S.C. §§ 80a-1 through 80b-21) provides that the Debtors, who are investment advisors under the applicable definition in 80b-2(11), cannot assign contracts without the consent of the other party, § 80b-5(a)(2), and further must also notify the other party in the event of a change in membership, 80b(a)(3).

unnecessary losses.'" *In re Lehman Bros. Holdings, Inc.*, 445 B.R. 143, 180 (Bankr. S.D.N.Y.

2011), *citing In re Chrysler*, 576 F.3d at 118-19.  *See also In re Boston Generating*, 440 B.R. at

329 ("[I]f the Debtors were to abandon the Sale Transaction . . . there [would be] a material risk

that, although the Debtors may not 'die,' their condition would significantly deteriorate.").  If a

good business opportunity presents itself that might soon disappear, quick action may be justified

to increase or maintain the value of an asset to the estate by a sale of the assets.  *In re Lionel*, 722

F.2d at 1069.  For example, if a purchaser will walk away from the proposed sale if the court

refuses to proceed with a section 363 sale, a good business justification may exist for proceeding

to the sale to prevent that harm.  *See, e.g., In re Chrysler,* 405 B.R. at 96-97 ("[I]f the sale has

not closed by June 15th, Fiat could withdraw its commitment.").  That business justification is

even stronger where the purchaser is providing funding to the estate and that funding would be

placed at risk should the court decline to consider a sale.  *See In re Gen. Motors,* 407 B.R. at

492-93 ("If the 363 Transaction is disproved, GM will lose its funding and its liquidity on July

10, and its only alternative will be liquidation . . . and consumer confidence would plummet . . . .

Preventing this harm serves the core purposes of the Bankruptcy Code and constitutes a strong

business justification under section 363 of the Code to sell the debtors' assets outside of a plan

process.").  *See also In re Chrysler,* 405 B.R. at 96-97.

The Non-Controlling Lenders alleged that appreciation in value of estate assets combined

with the absence of material erosions in the Debtors' operations had undermined the notion that

without an immediate sale, stakeholders would incur a significant loss.  (NCL Opening Stmt.,

ECF No. 621, ¶ 6.)  The Non-Controlling Lenders referenced the fact that the Debtors' assets had

seen a substantial increase in value during the course of the cases.  (NCL Obj. to Sale Motion, ¶

57, referencing Hollander Decl., Ex. G.)  The Debtors' most recent budget variance report

revealed that the Debtors had, as of June 12, 2011, approximately $44 million of cash on hand,

which was nearly $9.5 million more than the forecast.  (NCL Obj. to Sale Motion, ¶ 57,

referencing Hollander Decl., Ex. J.)  Moreover, they pointed out that Manzo admitted at his

deposition that the value of the estate assets had increased 20% since the Petition Date.  (Manzo

Dep. 138: 19-139: 3, June 26, 2011.)

Although at the Interim Hearing on July 6, 2011, Manzo explained that the valuation of

the estate increased by approximately $40 million, or 20%, he later clarified that such analysis

was not the appropriate measure of value, and was certainly not a measure that would be used by

any potential investor.  Rather, the appropriate measure was an "all in costs" analysis, under

which the approximate $40 million appreciation in the value of the estate would have been

consumed by increased operating and professional expenses through September 2011 if a

transaction was not consummated before then.

Further, Manzo testified that the increased valuation of assets described by Frank in his

deposition was incorrect.  After reading the assertion in Frank's deposition that asset values had

increased, Manzo called Frank and questioned the accuracy of Frank's statement because his

assertion did not comport with Manzo's understanding of current trends in the debt and private

equity markets.  Upon Manzo's inquiry, Frank agreed to further investigate the support he had

relied on during his deposition to explain the increase in asset values.  Frank subsequently agreed

that the asset values remained flat and memorialized his new valuation of the assets, which

directly contradicted the testimony he had given in his deposition, in an email dated June 18,

2011.  Accordingly, the appreciations in asset values were not fully substantiated, and clearly not sustainable if the uncertainty as to the direction of the cases continued indefinitely.

The evidence supported the notion that even though the value of the assets seemed to have been stabilized, it was unlikely to have remained stable through the period it would have taken to conclude a contested confirmation process regarding the Plan.  The Trustee testified that while value had increased over the past few months, the funds have a finite value and will eventually be closed.  (Garrity Dep. 35-36.)  The assets are thus "wasting assets" in that the additional income simply means the value is coming out more quickly than it might otherwise.  (Garrity Dep. 36: 8-13.)  The Trustee also concluded that the rise in value of the funds is due to the result of "fees that [were not] projected."  *Id.* at 37.  These fees indicate that the value of the funds is declining quickly and will eventually run "down to zero."  *Id.*  The parties generally agreed that the current stability of the assets is likely a result of the appointment of the Trustee.  Further, the Trustee was of the view that the continued review and negotiation of the Black Diamond transaction contributed to that stability such that if the Sale were postponed for consideration of the Plan, uncertainty regarding the liquidity of the Debtors would have negatively impacted the stability garnered by the Trustee.  The Court concluded that had the Debtors been unable to sustain liquidity, customers subsequently would have left due to concern over the ability of the Debtors to meet their obligations.  Any substantial delay in finalizing the Proposed Transactions would have precipitated an immediate and drastic reduction in value.

The Non-Controlling Lenders also alleged that solicitation would not cause Black Diamond to rescind its offer.  The Trustee stated,[51] and this Court agreed, that while Black Diamond would likely have remained interested in the assets of the estate if the Sale did not go through, Black Diamond would have likely reduced the amount of its offer it decided against pursuit of an alternative strategy such as lifting the stay to foreclose.  Deckoff stated at his deposition that "with respect to terminating the APA 1 and APA 2 . . . one of the facts [he will] take into consideration is whether or not the judge allows the noncontrolling lenders' plan to be solicited[.]"  (Deckoff Dep. 276: 20 – 277: 2.)  Although Black Diamond had historically agreed to extend its offer to complete the Proposed Transactions pending the Court's review of those transactions, this alone was not sufficient to establish that Black Diamond would have continued to extend its offer on comparable terms had the Court proceeded to the Plan.  *See, e.g., In re Chrysler*, 405 B.R. at 97 n.15 (concluding, in response to the Indiana Funds' "intimation . . . that the government was bluffing when it indicated that it would walk away from exploring other options if the Fiat Transaction did not close quickly," that "gambling on the possibility that the government was bluffing, and risking the potential for a lesser recovery in a resulting liquidation, would have been a breach of the Debtors' fiduciary duty."); *In re Gen. Motors*, 407 B.R. at 492 (refusing to "assume that the U.S. Government cares so much about GM's survival that the U.S. Government would never let GM die.").  Even if Black Diamond would not have walked away from the joint bid, the Court found that it was unlikely to continue to offer the same value in the future because, among other things, the administrative costs as well as any loss in value

---

[51] (Trustee Resp. to NCL Obj. to Sale Motion, ECF No. 647, p. 13.)

stemming from a contested confirmation process likely would have impacted any subsequent bid by Black Diamond.

It is also unclear whether Black Diamond would have agreed to extend consensual use of cash collateral, which was set to expire on July 7, 2011, if the Sale was postponed.  Deckoff stated that his determination as to whether or not to extend cash collateral "could be" dependent upon "the judge allowing the plan process to go forward[.]"  (Deckoff Dep. 276: 5-9.)  Although apparently some of the Non-Controlling Lenders had agreed to provide Debtor-in-Possession financing in the event consideration of the Plan resulted in an inability to obtain consensual use of cash collateral,[52] significant concerns remained over the risk of the Trustee's ability to repay any such financing.  A hearing on the non-consensual use of cash collateral would have involved extensive and complex valuation issues[53] that could have placed the assets at risk during that litigation on the way to an even more protracted contested confirmation process, even if the Debtors would have prevailed on the contested use of cash collateral.

Further, proceeding to the Plan was accompanied by the risk that investors would have pulled their investments.  The continuing support of investors was crucial to maintaining estate assets where, as here, the estate consists of investment contracts.  Prior to filing, investors in two of the key CLO vehicles managed by the Debtors (GSC European CDO III, Ltd. and GSC European CDO IV, Ltd.) terminated the management rights of the Debtors under those vehicles.  Additionally, an independent board of directors of a registered business development company managed by the Debtors terminated the Debtors' management rights for that company.  (BDCM

---

[52] See NCL Obj. to Sale Motion, ¶ 62.
[53] Namely, the Court would compare the value of estate assets with the value provided to the estate under the Sale to determine whether the Prepetition Lenders are adequately protected.  The Non-Controlling Lenders concede that valuation of these assets would be difficult, if not impossible to determine.  (NCL Obj. to Sale Motion, ¶ 105-07.)

Resp. to NCL Obj., ¶ 4.)  After the Petition Date, GSC Partners Gemini Fund Limited, the

controlling insurer in the Debtors' most significant CLO vehicle (GSC Partners Gemini Fund

Limited), attempted to terminate the Debtors' management rights in that vehicle.  (BDCM Resp.

to NCL Obj., ¶ 4.)

    Implementation of the Plan would have required investor consent.  The "process of

gaining investor consent [is] fraught with risk and uncertainty."  (BDCF Obj. to Disc. Stmt., ¶

32.)  Black Diamond was able to achieve the consent of several investors to the Initial APA only

after "intense and protracted negotiations regarding the nature of BDCM's plans with respect to

managing the Debtors' assets."  (*Id.* at ¶ 34.)  Soliciting investor consent to a Sankaty sub-

advisory agreement would have raised the possibility that investors might decline to authorize

that agreement.  This same risk was not present under the Proposed Transactions since investor

consent had already been achieved with respect to APA 1.[54]  Investor concern regarding Sankaty

likely would have been heightened by the probability that any litigation over designation of

Black Diamond's vote would have necessarily required a review of whether Sankaty would be a

good manager despite the fact that it would not be holding an investment in the portfolio under

the Plan.  Regardless of the outcome of that issue, the very litigation itself likely would, as

mentioned above, have been unsettling to investors.

    There was evidence presented that even before solicitation had begun, investors were

"frustrated by a lack of progress in these cases" and would have viewed the combination of

rejection of the Sale and a protracted confirmation dispute "as evidence that the Debtors will not

---

[54] Counterparties to APA 1 Contracts were provided with assignment and cure notices (the "Assignment and Cure Notices") indicating that their contract would be assumed and assigned absent a timely objection prior to November 30, 2010.  None of the counterparties to the APA 1 contracts have alleged that their prior consent has since been rescinded.

be able to move the assets to a more stable platform and [will] seek leave to terminate the

agreements." (Garrity Decl. ¶ 7.) Some investors had already expressed concern about the status

of the cases, urging that the cases be completed as quickly as possible. (Garrity Dep. 164: 11-22,

June 24, 2011.) According to the Trustee, "the longer [the delay], the greater the likelihood is

that there will be a breakdown among our investors." (Garrity Dep. 257: 10-18.) As discussed,

*supra*, consideration of the Plan would have required substantial and lengthy litigation, during

which the Court believes some investors would have sought to terminate their investment

contracts to the point where values declined. Once that process began, it would have been

unlikely to be reversed and it would have simply continued in a downward spiral.

The Trustee also expressed concern that proceeding to the Plan would increase the risk of

loss of Key Employees. (Garrity Decl. ¶ 7. *See also* Garrity Dep. 173-74.) Prior to the Petition

Date, GSC was operating with between 60 to 65 staff members; the number of employees has

now dropped to the low 30s. (Manzo Dep. 9: 22-25.) As a result of the approximately 50

percent reduction in staff members, GSC is "from an operating point of view . . . not performing

well . . . ." (*Id.* 10: 9-12.) During the last week of June 2011 alone, the Debtors lost two

employees. (Garrity Dep. 193-94.) That loss slowed the reporting process and impacted the

ability of the Debtors to adequately manage their investments and to respond to requests for

producing and reporting materials. (Garrity Dep. 174-83) ("[The investment relations

representative] speaks on a regular basis with a group of the investors, a group of the CDO

investors and the recovery investors . . . [P]eople []are questioning when they're going to be

getting their K-1s and other documents."). The Trustee emphasized specifically that CDO

investors and other recovery investors expressed their frustration with the timing and production of reports.  (*See* Garrity Dep. 174: 18-25.)

The litigation that would have been required under the Plan process would have posed a significant risk to the management contracts and employees who run those investments.  Based upon the foregoing, the Court found the risks regarding a contested confirmation process would have unnecessarily exposed the assets to significant deterioration in value.

### C. <u>Sale Process Provided Highest Valued Offer for Estate Assets</u>

The Trustee's decision of what is best for the estate should be undertaken with the goal of maximizing the value of the estate.  *See In re Integrated Res., Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992), *citing In re Atlanta Packaging Prods., Inc.,* 99 B.R. 124, 130 (N.D. Ga. 1988) ("It is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible *for the estate*.") (emphasis added); *In re Bakalis*, 220 B.R. 525, 532 (Bankr. E.D.N.Y. 1998).  A trustee maximizes value for creditors by selecting the "highest and best bid, and thereby protecting the interests of [the debtor], its creditors, and its equity holders."  *In re Fin. News Networks, Inc.,* 126 B.R. 152, 157 (S.D.N.Y. 1991), *aff'd sub nom.* 980 F.2d 165, 169 (2d Cir. 1991).  *See also In re Integrated Res., Inc.*, 135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992) ("[T]he debtor will need to demonstrate to the bankruptcy court that the proffered purchase price is the highest and best offer."), *aff'd* 147 B.R. 650 (S.D.N.Y. 1992).  This duty is an obligation to the estate as a whole, not to individual creditors.  *See In re Lionel*, 722 F.2d at 1071 ("In fashioning its findings, a bankruptcy judge must not blindly follow the hue and cry of the most vocal special interest groups; rather, he should consider all salient factors pertaining to the

56

proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike.").

The Court appointed a trustee due to a lack of confidence in Debtors' management, specifically Eckert, for the reasons stated on the record on January 5, 2011. The Trustee was appointed with the purpose of acting as an estate fiduciary. He evaluated not only the original sale entered into by Black Diamond and the Debtors, but also the possibility of pursuing multiple transactions other than this sale, including (i) the development of a plan of reorganization, (ii) re-auction of the Debtors' assets, including reaching out to other bidders at the Auction, (iii) dismissal of these cases, and (iv) abandonment of assets to the Prepetition Lenders. (Trustee Opening Stmt., ECF No. 617, ¶ 1.) He made an in-depth explanation of all the viable alternatives and considered the various interests of all the creditor groups. Ultimately, based on his extensive analysis, discussions, and review of the transactions, the Trustee concluded that the Sale represented the "highest and best" option for the assets of the estate.

The Sale will result in "satisfaction in full of the secured claims of at least $256.8 million and [will] leave the estate with approximately $18.6 million in cash and other assets," (Manzo Decl., Ex. C to Sale Motion, ECF No. 548, ¶ 16), thereby satisfying the claims of the Prepetition Lenders in full and providing for recovery for unsecured creditors. The value of the transactions totals not less than $275.4 million, not including the value of the tax indemnity pursuant to the Tax Indemnification Agreement. (Trustee Opening Stmt., ¶ 3.) Specifically, APA 1 "exceeds even the most optimistic early valuation estimates by a wide margin," APA 2 "provides consideration greater than what [the Trustee] believes any other party would be willing to

57

provide,"[55] and both bids resulted in the satisfaction of all the secured claims arising under the

Prepetition Credit Documents while preserving estate assets and providing general unsecured

creditors with a recovery on their claims.  (Garrity Decl. ¶ 4.)

 The Non-Controlling Lenders argued that the Sale could not be in the best interest of the

estate because it would benefit only the purchaser and the general unsecured creditors.  (NCL

Obj. to Sale Motion, ¶ 56.)  They asserted that because they were undersecured creditors with

claims against, and liens on all assets of, the Debtors, with the exception of the SIF, the

unsecured creditors were not entitled to any recovery.  *Id.* at ¶ 1.  Further, they contended that

because the Trustee could not be sure whether the Proposed Transactions will result in any

recovery for the secured lenders, the Sale could not constitute the best recovery to all

constituencies.  However, contrary to what the Non-Controlling Lenders argued, the Trustee has

a fiduciary obligation to the estate as a whole, *not* to secured creditors to ensure their maximum

recovery.

 Although the Non-Controlling Lenders raised the argument at the Sale Hearing that the

"Trustee's disregard for the impact of the Proposed Sale Transaction on the Prepetition Lenders

raises serious questions as to whether the Trustee has discharged the fiduciary duties that he

owes to the Prepetition Lenders," (NCL Obj. to Sale Motion, ¶ 104), they acknowledged at the

Trustee Hearing that not only does the Trustee consider whether the sale is in the best interests of

the *estate,* but also that the Trustee has a duty to review the original Sale and potentially revive

---

[55] The Trustee also reserved the right to solicit or accept superior offers for the APA 2 assets, which do not require any break-up fee or other bid protections. (Garrity Decl. ¶ 4.)

that sale.[56]  (Hr'g. Tr. 411: 17-25; 412: 1-5; 10-16, December 22, 2010.)  The Court found that

the Non-Controlling Lenders could not now argue that his full consideration of the Initial APA

constituted a violation of the Trustee's fiduciary duties, since they had expected a trustee would

review the Initial APA, and following that review, could have decided to go forward with it.[57]

Further, there was no plausible argument presented that the Trustee did not thoroughly review

the Sale and its alternatives.

### D. Trustee Properly Exercised his Business Judgment in Proceeding with Sale

Although the burden was on the Trustee to establish a business justification for

proceeding with the Sale rather than the Plan, the Court made the final determination as to

whether the Trustee should be allowed to proceed with the Sale because of that overriding

business justification.  *See In re Au Natural*, 63 B.R. at 580 ("[The debtor] failed to convince this

court that it should allow the debtor to circumvent the safeguards of chapter 11 because of some

overriding business justification . . . ."); *In re Gen. Motors*, 407 B.R. at 493 ("With the Court

having concluded that the requisite sound business justification exists for a proposed sale of the

type proposed here . . . ."); *In re Borders Group*, No. 11-10614, 2011 WL 217448, at *4 (Bankr.

S.D.N.Y. 2011) ("[T]he Court cannot conclude . . . that a stand-alone reorganization plan would

---

[56] Counsel for the Non-Controlling Lenders:  "The Trustee considers whether [the sale] is in the best interests of the
estate, in his or her judgment . . . .  Fundamentally, there needs to be a go, no-go decision that has to be made and it
may be it – it may be at the end of the day the trustee comes in and says, you know what, I've looked at this, I see
the allocation issues, I hear what people say, we can't fix these allocation issues . . . .  And say you know what, I
think we got to go with this deal, that's the risk [the Non-Controlling Lenders] run in doing this . . . .  So the first
decision is a go, no-go on the sale . . . .  [These are] difficult decisions for a trustee to make, that's why we proposed
the trustee who can make those kind of decisions."  (Hr'g. Tr. 411: 17-25; 412: 1-5; 10-16, Dec. 22, 2010.)
[57] See footnote 53, *supra*.

not be viable."). The ultimate decision of whether a valid business reason exists sufficient to sell the assets of the estate through motion rather than through the Plan was made by the Court.[58]

The Court found that there were substantial risks involved in the confirmation process that called the likelihood of confirmation of the Plan into question, including (i) the Trustee's ability to obtain financing to carry the estates through a confirmation fight, (ii) the unknown duration of that confirmation fight over, *inter alia,* designation, cram down, classification, good faith, valuation, and other matters, (iii) potential damage to the business (investor defections, employee issues, and inability to fund operations), and (iv) the lack of certainty surrounding any solicitation of investor consents for a Sankaty deal. Those risks persuaded the Court that there was little likelihood of the Plan being confirmed within a reasonable period of time.

Further, the Court found the continued prosecution of the Plan would have unnecessarily led to a decline in the value of estate assets. The lack of liquidity provided to the Debtor during that period combined with the deleterious effect on investor confidence a prolonged confirmation dispute would have had caused the Court to conclude quick action was justified to maintain the value of the estate. While the Plan would have taken at least two or three months to confirm, the Sale would be accomplished expediently and would not have caused a decline in asset value.

### E.  Parties' Remedies in State Court were Preserved

As stated previously, the Non-Controlling Lenders argued that they had not given their consent to either the Initial APA or any part of the auction. (NCL Obj. to Sale Motion, ¶ 91.) However, the Non-Controlling Lenders consented to allow the submission of joint bids. (Oct. 27,

---

[58] The Non-Controlling Lenders described this decision as "one of procedure that, by its nature, requires a weighing of business factors against the rights of creditors to participate in the decisions affecting estate property through a plan process and is therefore well within the province of judicial judgment and discretion." (NCL Obj. to Sale Motion, p. 22.)

2010 Letter.) Thus, the Court found that with respect to the APA 1 assets, the Non-Controlling

Lenders gave informed consent to the joint bid. With respect to the APA 2 assets, consent was

not necessary since it provided fair value for the APA 2 assets, the sale was properly noticed, and

no party other than the Non-Controlling Lenders came forward with an objection.[59] Moreover,

the Non-Controlling Lenders expressly reserved "all claims and causes of action . . . against the

Agent and BDCM for the improper use by the Agent of the credit bid to the detriment of the

Non-Controlling Lender Group." (Letter from GSC Group, Inc., Ex. N to Hollander Decl., p. 1.)

APA 1 and APA 2 are part of the same transaction and are the subject of the allocation between

the joint bidders. That issue, therefore, is properly before the State Court.

When the Non-Controlling Lenders entered into the Prepetition Credit Agreement and

Security Agreement, they agreed that the Agent had the sole ability to take action on the

Collateral and realize upon the security.[60] Although the Security Agreement also provides that

the Agent must act for the benefit of the secured creditors, the parties agreed that the remedy for

a violation of this provision would be a complaint in State Court. (NCL Obj. to Sale Motion,

ECF No. 246, p. 7; BDCM Resp. to NCL Obj. to Sale Motion, p. 4; Trustee's Resp. to NCL Obj.

to Sale Motion, ¶ 10.) The Sale does not dictate how proceeds from or equity in the purchased

---

[59] With respect to the APA 2 assets, the Non-Controlling Lenders also argued that they have not consented to the Proposed Transactions. (NCL Obj. to Sale Motion, ¶ ¶ 80, 106.) The Non-Controlling Lenders' argument regarding consent, however, was misplaced. Nothing in section 363(b) requires the consent of creditors. *See In re Boston Generating,* 440 B.R. at 332-33. Furthermore, Since the Agent's consent is binding on all the Prepetition Lenders, *see In re Chrysler,* 405 B.R. at 102, the Trustee did not need the Non-Controlling Lenders' consent to go forward with the Proposed Transactions.

[60] Section 6.1: "By accepting the benefits hereof, the <u>Secured Creditors agree that this Agreement may be enforced only by the action of the Collateral Agent</u> . . . acting upon the instruction of the Required Banks and that <u>no other Secured Creditor shall have any right individually to seek to enforce or to enforce this Agreement or to realize upon the security</u> to be granted hereby, it being understood that such rights and remedies may be exercised by the Collateral Agent or (after such date) the holders of at least a majority of the outstanding Other Obligations, as the case may be, for the benefit of the Secured Creditors upon the terms of this Agreement." (Emphasis added.)

assets will be shared between bidders; issues concerning the distribution of the assets or value

between the bidders was not properly before the Court.

The Non-Controlling Lenders' complaint constitutes a dispute between the Agent, the

Prepetition Term Lenders, and Black Diamond Capital Management, not with the credit bid

itself.  *See In re Metaldyne,* 409 B.R. 671, 675 n.7 (Bankr. S.D.N.Y. 2009), *aff'd* 421 B.R. 620

(S.D.N.Y. 2009).  Approving the Sale will not impair the Non-Controlling Lenders' rights or

remedies in any way.  The Non-Controlling Lenders argued at the hearing that BDCF might not

have the ability to satisfy any judgment the State Court renders in favor of the Non-Controlling

Lenders; however, the Court notes at the outset that not only BDCF, but also BDCM and, *inter*

*alia,* other Black Diamond affiliates, were joined in the State Court Complaint.  (Index No.

651989/2010.)

The Court found the Non-Controlling Lenders' argument that the Agent will not be able

to provide them with any recovery in the State Court to be unpersuasive and irrelevant to the

issues before it.  The Prepetition Credit Agreement expressly provides that the Agent acts at the

direction of the Required Bank.[61]  BDCM had the contractual right to direct the amount of the

credit bid; the Agent had no discretion under the Credit Agreement.  Any claims of improper

allocation between the joint bidders would be made against BDCM.  Even if BDCM were not

found liable, the alleged lack of resources at the Agent level was a risk the Non-Controlling

Lenders took when they willingly entered into an agreement whereby the majority holders of the

---

[61] *See, e.g.,* Prepetition Credit Agreement, §12.5 ("The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Banks . . . .").  "Required Banks" is thereafter defined as "Non-Defaulting Banks . . . representing at least a majority of the sum of all Revolving Exposures, outstanding Term Loans and unused Commitments of all Non-Defaulting Banks at such time." (Prepetition Credit Agreement, p. 75.)

secured debt had the right to control the agent and the agent was not required to provide any

protection in the event it was found liable for its conduct.  Further, the Non-Controlling Lenders

could seek injunctive relief in State Court to prevent what they allege will be an improper

allocation by Black Diamond based upon the same arguments the Non-Controlling Lenders

brought before this Court.  The resolution of the allocation issue in State Court is what was

sought by the Non-Controlling Lenders from the outset of these cases, and that is where it should

be resolved.  Further, simply because the Non-Controlling Lenders may have an inadequate

remedy would not give this Court jurisdiction over their dispute.

## Compliance with Standards for Approval of Section 363 Sales

Having concluded, based upon the foregoing, that the Trustee established a valid business

justification for proceeding with the Sale over the Plan, the Court then determined whether the

requirements for a section 363 sale were satisfied.

### A.  Business Judgment Rule

The overriding consideration for approval of a section 363 sale is whether a good

business reason has been articulated.  *In re Chrysler*, 576 F.3d at 114; *In re Iridium Operating*,

478 F.3d at 466; *In re Lionel*, 722 F.2d at 1071.  The business judgment rule "is a presumption

that in making a business decision the directors of a corporation acted on an informed basis, in

good faith and in the honest belief that the action taken was in the best interests of the company."

*In re Integrated Res.*, 147 B.R. at 656, *citing Smith v. Van Gorkom*, 488 A.2d 858 (Del. 1985)).

Courts give deference to the debtor as long as there is a "reasonable basis for its business

decision."  *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  As discussed,

*supra,* the Trustee acted as an independent Court-appointed fiduciary in pursuing the Proposed

63

Transactions.  Since the Trustee's decision to proceed with the Sale necessitated a thorough

review of the Sale in addition to a review of the alternatives to the Sale, the Trustee has

expressed the requisite business justification and good business reason for proceeding with the

Sale as further set forth above.

In addition to considering whether the Trustee complied with the business judgment rule,

the Court also determined that (i) proper notice was given to all creditors and interested parties,

(ii) the proposed sale price was fair and reasonable, and (iii) the purchaser was proceeding in

good faith.  *See, e.g., In re Boston Gen.,* 440 B.R. at 330.

The Debtors provided appropriate notice of the sale to all interested parties.  In addition,

the proposed purchase price was not only fair and reasonable, but it was the highest offer

received for the assets of the estate.  "[T]he true test of value is the sale process itself."  *In re

Chrysler*, 405 B.R. at 98.  The Debtors conducted a competitive auction process with respect to

the APA 1 assets that resulted in a bid significantly higher than not only the initial pre-petition

offer of $5 million, but also the estimated "best case scenario" value of $140 million.  (Manzo

Decl. ¶ 28.) ("Prior to the auction, the market was suggesting a price for the debt in the range of

$0.15 to $0.20, implying a value of $30 to $45 million for substantially all of GSC's assets . . . .

I believed that the value for all or substantially all of the assets could, in a best case scenario,

potentially reach approximately $140 million.")  The credit bid alone exceeds Manzo's valuation

of estate assets.  Thus, any value added by the cash bid, the APA 2, and the Tax Indemnification,

further increases the consideration beyond what would constitute fair value.  The Debtors are

receiving not just fair value for the assets being sold, but a value substantially higher than any of

the parties anticipated.  Based upon the results of the Auction and the Manzo valuation, there

64

was no doubt that the estate received fair value for its assets. The only value issue in dispute was the allocation of assets between the joint bidders, namely whether the price paid for certain assets constitutes fair value for those assets to be allocated to each bidder. However, since the proper analysis of fair value is the value of the sale in its entirety rather than the value of any individual component of that sale, *see In re Braniff Airways, Inc.*, 700 F.2d 935 (5th Cir. 1983) (considering the transaction as a whole rather than considering each individual component of the transaction), this was an issue that would not impact the value received by the estate.

### B. Sale is Not a *Sub Rosa* Plan

The Non-Controlling Lenders contended the Sale constitutes a *sub rosa* plan because it both "(i) attempt[ed] to accomplish something that could not be accomplished in a chapter 11 plan and (ii) [sought] to dictate the distribution of sale proceeds among classes of creditors, thus providing benefits outside of what chapter 11 contemplates." (NCL Obj. to Sale Motion, ¶ 74.) For the reasons set forth, the Court found neither of these arguments to be availing.

### 1. Proposed Transactions Do Not Violate Best Interests Test[62]

The Trustee cannot enter into a transaction pursuant to section 363 if that transaction would circumvent the chapter 11 reorganization requirements for plan confirmation. *See, e.g., In re Iridium Operating*, 478 F.3d at 466 ("The trustee is prohibited from such use, sale, or lease if it would amount to a *sub rosa* plan of reorganization."); *In re Lionel*, 722 F.2d at 1066. Section 1129(a)(7) provides that for a plan to be confirmed, a claimant who has not consented to a

---

[62] The Non-Controlling Lenders did not sufficiently address the Trustee's view that the Prepetition Lenders would constitute an impaired class, despite the fact that they raised the section 1129(a)(7) argument in the first instance in their Objection to the Sale Motion. (NCL Objection to Sale Motion, ¶75.) With respect to Black Diamond's argument that the claim would be extinguished, counsel to the Non-Controlling Lenders simply stated at the Interim Hearing that "[w]hether a creditor's claim is satisfied or extinguished is not the test." (Initial Hr'g Tr., 390: 13-14.)

debtor's plan of reorganization must receive no less under the plan than he would have received

in a chapter 7 liquidation.  *Kane v. Johns-Manville Corp.,* 843 F.2d at 649.  A sale should not

deny the protections of section 1129(a)(7) where a creditor is entitled to that protection.  *See*

*Westpoint Stevens,* 333 B.R. 30, 51 (S.D.N.Y. 2005).  *See also In Re On-Site Sourcing, Inc.,* 412

B.R. 817 (Bankr. E.D. Va. 2009), *quoting In Re Gulf Coast Oil Corp.*, 404 B.R. 407 (Bankr. S.D.

Tex. 2009) ("Although the bankruptcy court need not turn every 363(b) hearing into a mini-

confirmation hearing, the bankruptcy court must not authorize a 363(b) transaction if the

transaction would effectively evade the 'carefully crafted scheme' of the chapter 11 plan

confirmation process, such as by denying 1125, 1126, 1129(a)(7), and 1129(b)(2) rights.").

The Non-Controlling Lenders argued the sale transaction would not be confirmable under

a plan since the lenders would receive a lower distribution from the sale than they would from a

hypothetical liquidation.  (NCL Obj. to Sale Motion, ¶ 75.)[63]  In support of that argument, they

pointed out that under the Sale, the allocation would not take place until the closing of the

Proposed Transactions.  Therefore, they maintained, the Trustee "has no basis to say that any

secured creditors would receive a dime if the Proposed Sale Transaction is consummated."

(NCL Obj. to Sale Motion, ¶ 76.)  Thus, they contended a Sale could not be approved under a

Plan in which the allocation of assets between joint bidders is not known such that the section

---

[63] The Non-Controlling Lenders distinguished the Proposed Transactions from the sale approved in the *Chrysler* decision by arguing that unlike *Chrysler,* here the full value of the collateral will not be distributed to all Prepetition Lenders.  *Id.* at ¶ 76.  However, unlike *Chrysler,* the Prepetition Lenders' credit bid and claims are satisfied in full. Whatever the allocation is, the Non-Controlling Lenders' claims will still be satisfied.  Since the Proposed Transactions do not provide for the allocation between the joint bidders, the real argument centered around the fact that they do not know what value will be allocated to the Prepetition Lenders, and therefore each lender does not know what it would actually receive under the Sale.  Further, the Court notes that the instant case is not the typical inter-creditor dispute.  Rather, it is a disagreement about the actions of the Agent, at the direction of the Required Bank, and whether that Agent and Black Diamond acted properly regarding the credit bid and the allocation between the joint bidders.

66

1129(a)(7) "best interests" test could be performed.  (*See* Sale Hr'g Tr. 108: 2-11, 129: 13-14
June 7, 2011.)

There are two arguments made in response to the Non-Controlling Lenders' assertion.
First, Black Diamond argued that, assuming the Trustee proposed a plan that incorporated the
Proposed Transactions, the Prepetition Lenders would not constitute an impaired class in the first
instance since the credit bid would satisfy their claim in full.  Second, the Trustee, considering
the Prepetition Lenders as impaired, contended that class could be crammed down with a class of
unsecured creditors as the impaired accepting class under section 1129(b)(2)(A)(ii) since under
the "best interests" test, the Prepetition Lenders would get more under the Proposed Transactions
than they would under liquidation because their claim is satisfied in full.

Section 1124 provides, in relevant part, that a class of claims or interests is impaired
unless the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim
or interest entitles the holder of such claim or interest . . . ."  11 U.S.C. §1124(a)(1).  *See also In
re DBSD,* 634 F.3d at 89 n.4.  The Second Circuit has not yet addressed whether a credit bid to
the full extent of a party's claim would render the claim impaired.  Under Black Diamond's
view, since the Prepetition Lenders' secured claims are deemed satisfied in full by virtue of their
credit bid, the Prepetition Lender class arguably would not be impaired.  *See In re R.I.A.
Melbourne Limited Partnership,* 2006 WL 4458602, at * 2 (Bankr. N.D.Ohio) (finding a credit
bid equal to the full amount of the creditors debt including interest to constitute satisfaction of
the amount owed and thus finding the class unimpaired).  *See also In re 183 Lorraine Street
Associates,* 198 B.R. 16, 29 (E.D.N.Y. 1996) (finding a claim to be unimpaired even though the
claimant was to receive less than the full amount of its claim under a plan that gave an

67

undersecured creditor title to the premises where that creditor's claim was classified as a single,

secured claim (rather than bifurcated under §1111(b)).  The Non-Controlling Lenders conceded

in their State Court Complaint that "[w]here a credit bid is made by a collateral agent holding a

security interest for the benefit of many lenders, as is the case here, the cost of the credit bid is

borne by all the lenders, whose loans are extinguished to the extent of their *pro rata* share of the

credit bid."  (State Court Complaint, ¶ 59.)  Thus, by virtue of the credit bid, the claims are

extinguished and the best interests test is not triggered in the first instance.  (*See* BDCM Resp. to

NCL Obj. to Sale Motion, ¶ 25.)

If the Prepetition Lenders' claims are deemed unimpaired, designation under section

1126(e) would not be at issue since the Prepetition Lenders would not vote in the first instance.

Whether a class is impaired dictates whether the class is entitled to vote for a plan of

reorganization.  *In re Entz-White Lumber and Supply, Inc.*, 850 F.2d 1338, 1340 n.3 (9th Cir.

1988) ("Only impaired parties have the right to vote on the reorganization plan.").

Alternatively, as referenced previously, the Trustee addressed the "best interests" issue

by apparently assuming the Prepetition Lenders would be impaired if the Proposed Transactions

were consummated by way of a plan.  In general, "[t]he [Bankruptcy] Code treats a claim as

impaired unless the plan leaves in place all rights to which the claim entitles its holder, except for

certain rights to accelerate payments after default."  *In re DBSD,* 634 F.3d at 89 n. 4.  *See also In*

*re Taddeo,* 685 F.2d 24, 28 (2d Cir. 1982) ("Congress define[d] impairment in the broadest

possible terms.").  "If the debtor's Chapter 11 reorganization plan does not leave the creditor's

rights entirely 'unaltered,' the creditor's claim will be labeled as impaired under § 1124(1) of the

Bankruptcy Code."  *In re PPI Enterprises (U.S.), Inc.,* 324 F.3d 197, 202 (3d Cir.2003).

68

Any alteration to the claimant's legal, equitable, or contractual rights under a plan would make that claim impaired. *See L & J Anaheim Assoc. v. Kawasaki Leasing International, Inc.,* 995 F.2d, 940, 942 (9th Cir. 1993). For example, a plan that forces a secured creditor to sell its collateral at a public auction prevents the creditor from choosing to exercise its bargained-for "prepetition contract rights, leaving it impaired within the meaning of the code." *L & J Anaheim Assoc. v. Kawasaki Leasing International, Inc.,* 995 F.2d, 940, 943 (9th Cir. 1993) (finding a secured creditor to be impaired where the plan provided for an auction of the debtor's assets regardless of whether the creditors position was enhanced or diminished from that auction since impairment constitutes any change to the creditor's rights) (citations omitted). Under this view, a secured creditor should receive *cash*, not property, to make that creditor's claim unimpaired. *In re Union Meeting Partners,* 160 B.R. 757, 771 (Bankr. E.D.Pa, 1993). *Accord In re Brewery Park Associates, LP*, No. 10–11555, 2011 WL 1980289, at * 9 (Bankr. E.D. Pa 2011) ("[The secured creditor] may receive the realty, rather than cash payment in full on the effective date, plus be required to tender payments to unsecured creditors and pay administrative expenses. Thus [the creditor's claim is] impaired within the broad meaning of section 1124.") (citations omitted). If a creditor is forced to receive property instead of the cash value of its claim, it would be impaired since had it "received the cash value of its claim it would be in a position to turn around and invest again," whereas receiving property in lieu of cash would make it an owner. *In re Atlantic Terrace Apartment Corp.,* 226 B.R. 535, 536 (Bankr. E.D.N.Y., 1998). A creditor is considered impaired even where its position is enhanced. *See, e.g., In re Wabash Valley Power Assoc.*, 72 F.3d 1305, 1321 (7th Cir. 1995), *cert. denied,* 519 U.S. 965 (1996). Thus, since any alteration to a claim, including one that *benefits* the party, makes that claim

69

"impaired," it seems a party would not successfully be able to argue that a class is unimpaired just because they consented to the alteration.

Although the credit bid is for the full amount of the claim, no amount was sought for professional fees or any other expenses that would otherwise be recoverable under the Prepetition Credit Agreement.  (*See* Sale Order, ¶ P.)  A plan that disposes of the secured creditor's claim in full through a credit bid but still excludes certain rights the party would otherwise be entitled to alters the "legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest."  Simply because a secured creditor exercised its right to fully satisfy its claim through a credit bid would not seem to result in a creditor being found to be unimpaired.

Based on the arguments presented by Black Diamond and the Trustee, and based on the Court's research, it seems that the likely result would be that the Prepetition Lenders' claims would be impaired under section 1124 since the concept of "impaired" under section 1124 is viewed as broader than the notion of the claim being satisfied.[64]

Assuming the class of Prepetition Lenders would be considered impaired under section 1124 and their class did not vote in favor of the plan, the Prepetition Lenders could be crammed down under section 1129(b)(2)(A)(ii) if the general unsecured creditors were an impaired accepting class.  The Trustee would then have to satisfy his burden of proof with respect to the "best interests" test.[65]  11 U.S.C. §1129(a)(7) provides that each holder of a claim in an impaired class must either accept the plan or "receive or retain under the plan on account of such claim or

---

[64] *See, e.g., In re Union Meeting Partners,* 160 B.R. 757, 771(Bankr. E.D.Pa, 1993) (finding a creditor's claim would not be unimpaired just because the creditor received the indubitable equivalent of its claim).
[65] The proponents of a plan bear the burden of proof under section 1129(a)(7).  *See, e.g., In re Adelphia,* 361 B.R. 337, 366 (S.D.N.Y. 2007).

70

interest property of a value, as of the effective date of the plan, that is not less than the amount

that such holder would so receive or retain if the debtor were liquidated under chapter 7 title on

such date."[66]   A credit bid for the full extent of the claim is the equivalent of paying the Debtors

the amount needed to satisfy that claim in full, with interest.   *See In re R.I.A. Melbourne Ltd.

Partnership*, No. 05–16086, 2006 WL 4458602, at *2 (Bankr. N.D. Ohio 2006).   Regardless of

what subsequent allocation is made between the joint bidders, as to the assets or interests

allocated, those assets will have a value equal to the credit bid that extinguished the underlying

loan.   Since the Prepetition Lenders are credit bidding their assets, their claims are satisfied to the

extent of that credit bid.   *See Tennenbaum Capital Partners L.L.C. v. Kennedy*, 372 Fed. Appx.

180, 180 (2d Cir. 2010) ("As the district court correctly noted, because Tennenbaum received the

assets pursuant to the credit bid procedure rather than as collateral in satisfaction of Radnor's

debts, the amount of Tennenbaum's secured claim that was satisfied is appropriately determined

by reference to the sale price.   Evidence pertaining to the alleged post-sale value of Radnor's

assets, therefore, is immaterial as a matter of law.").   *Accord In re Spillman Development Group*,

2009 WL 2916919, at *1 (Bankr. W.D. Tex) ("[T]he Senior Debt had been paid in full as a result

of [the] §363(k) credit bid and, as such, it had no claim . . . .").   Attributing the credit bid to the

whatever portion of the assets or interests that are allocated under the joint bid to the Prepetition

Lenders is consistent with the principle that the credit bid is treated as cash at an auction, as well

as the principle that the amount of the credit bid reduces the secured creditor's claim on a dollar

---

[66] Although "property" is not defined in the Bankruptcy Code, "property" is not limited to cash.   *See Till v. SCS Credit Corp.*, 541 U.S. 465, 488 (2004).   Anything of value may be considered property for the purposes of the Bankruptcy Code.   *Id., citing* 7 Collier on Bankruptcy ¶ 1129.03[7][b][i] (Alan N. Resnick & Henry J. Summer eds., 15th ed. rev.).

71

for dollar basis.[67]  Regarding section 1129(a)(7), the amount of the credit bid, then, having fully

satisfied the claims, would be by definition always equal to, or greater than, any recovery under a

hypothetical Chapter 7 liquidation.  Therefore, the "best interests" test would have been satisfied.

Further, in analyzing the issue, one must not lose sight of the fact that a credit bid by a secured

creditor is a voluntary act.  No one can compel a secured creditor to submit a credit bid.  The fact

that the members of a secured creditor facility agreed to allow an agent, directed by the majority

owner of the facility, to determine the amount of the facility's credit bid does not alter the

consequence of the bid.  Such disagreement is an intra-creditor facility matter and should be of

no moment to the bankruptcy process.

    Having satisfied the "best interests" test, the Trustee would still need to meet the

requirement that the plan be "fair and equitable, with respect to each class of claims or interests

that is impaired under, and has not accepted, the plan."  11 U.S.C. §1129(b)(1).  The condition

that a plan be fair and equitable with respect to a class of secured claims may be met if the plan

provides "for the sale, subject to section 363(k) of this title, of any property that is subject to the

liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds

of the sale . . . ." 11 U.S.C. §1129(b)(2)(A)(ii).  As discussed, the result of this credit bid under

section 363(k) is that no claim remains and the Prepetition Lenders' claims are extinguished.

Abandonment of collateral to the class would satisfy the indubitable equivalent requirement.  *In

re Pacific Lumber Co,* 584 F.3d 229, 246 (5th Cir., 2009).

---

[67] *See* State Court Complaint, ¶ 59 ("Where a credit bid is made by a collateral agent holding a security interest for
the benefit of many lenders, as is the case here, the cost of the credit bid is borne by all the lenders, whose loans are
extinguished to the extent of their *pro rata* share of the credit bid.").

Based on the evidence and the arguments presented to the Court, the Court found that although the Proposed Transactions could be accomplished under a plan, no plan could be confirmed within a reasonable period of time.[68]  Any such plan would have to involve extensive litigation and complex legal issues, during which time value would diminish.  Therefore, the contested plan process would present significant risk of asset value deterioration.

2.  Proposed Transactions Do Not Dictate Distribution of Sale Proceeds

The Non-Controlling Lenders additionally argued that the Proposed Transactions seek to dictate the distribution of sale proceeds among classes of creditors.  (NCL Obj. to Sale Motion, ¶ 77.)  The Proposed Transactions would distribute a projected $4.6 million of cash to unsecured creditors.  The terms of the Tax Indemnification Agreement provide that where indemnification payments exceed the amount of indemnified losses, payments may be made to unsecured creditors up to, but may not exceed, $4.6 million.  The Non-Controlling Lenders argued that this cap constitutes a prohibited *sub rosa* plan because "the allocation of sale proceeds is firmly dictated."  *Id.* at ¶ 79.

A section 363 sale may also be "objectionable as a *sub rosa* plan if the sale itself seeks to allocate or dictate the distribution of sale proceeds among different classes of creditors."  *In re Gen. Motors,* 407 B.R. at 495, *citing Westpoint Stevens,* 333 B.R. at 51.  *See also In re Braniff Airways*, 700 F.2d at 940 (denying approval of a transfer agreement that attempted to "dictat[e] some of the terms of [a] future reorganization plan.  The [subsequent] reorganization plan would have to allocate the [proceeds of the sale] according to the terms of the [transfer] agreement or

---

[68] Although "the party seeking approval of the sale bears the burden to satisfy the standard under §363(b), a party objecting to the sale 'is required to produce some evidence respecting its objections.'"  *In re CPJFK, LLC,* 2011 WL 1257208, at *11 (Bankr. E.D.N.Y.), *citing In re Lionel,* 722 F.2d at 1071.

forfeit a valuable asset.").  However, so long as the proceeds from the sale are distributed in lien

priority, the plan is not one that violates the confirmation process in the *Braniff* sense.  *In re*

*Chrysler*, 405 BR at 97-98.  *See also In re Motors Liquidation*, 430 B.R. at 84 (finding the sale

was not a *sub rosa* plan where it did not "specifically dictate, or arrange ex ante, by contract, the

terms of any subsequent plan."); *In re Chrysler*, 405 BR at 96 (finding the sale did not violate the

plan process where the proceeds of the sale were used first to completely satisfy the remainder of

the claims of the secured lenders).

The Sale is expressly designed to be a precursor to a plan.  (Trustee Resp. to NCL Obj. to

Sale Motion, ¶ 29.)  Nothing in the Proposed Transactions or the Sale Order provide that the

proceeds from the Sale will be distributed inconsistent with the absolute priority rule.  Under the

Sale, the Non-Controlling Lenders' claims will be satisfied in full.  Administrative and priority

claimants will be satisfied in full as well.  Further, the payment to unsecured creditors is coming

directly from the Purchaser, and any value over the $4.6 million cap will be returned to the

Purchaser.  The provision of the Tax Indemnification Agreement that makes available payment

to unsecured creditors constitutes part of the purchase price and will be distributed in accordance

with a plan.

### C.  Purchaser Met Requirements of Sections 363(m) and 363(n)

The Trustee sought a finding that the Purchaser is entitled to all of the benefits and

protections of section 363(m) of the Bankruptcy Code.  Section 363(m) provides that:

> [t]he reversal or modification on appeal of an authorization under subsection (b)
> or (c) of this section of a sale or lease of property does not affect the validity of a
> sale or lease under such authorization to an entity that purchased or leased such
> property in good faith, whether or not such entity knew of the pendency of the

> appeal, unless such authorization and such sale or lease were stayed pending
> appeal.

11 U.S.C. § 363(m)

The purpose of section 363(m) is to maximize the sale price of estate assets by providing assurances to the purchaser of the finality of the sale by eliminating the prospect of litigation concerning claims to the property. *Licensing by Paolo, Inc. v. Sinatra* (*In re Gucci*), 126 F.3d 380, 385 (2d Cir. 1997).

A "good-faith purchaser" is "one who purchases the assets for value, in good faith and without notice of adverse claims." *Id*. at 390 (citations omitted). A purchaser's good faith is shown "by the integrity of his conduct during the course of the sale proceedings." *Id*. The absence of good faith is shown by "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *Id*.

The focus of the good-faith analysis is on "the purchaser's conduct in the course of the bankruptcy proceedings[,] . . . [which includes] the purchaser's actions in preparation for and during the sale itself." *Id*. The purchaser is prohibited from engaging in any fraudulent or collusive actions that are "specifically intended to affect the sale price or control the outcome of the sale." *Id*. Thus, notwithstanding the timing of the questionable conduct, "the relevant inquiry [remains] whether that conduct was intended to control the sale price or take unfair advantage of prospective bidders." *Id.*

To complete its analysis of section 363(m), the *Gucci* court reviewed its earlier interpretation of section 363(n)[69] in *Lone Star Indus., Inc. v. Compania Naviera Perez Companc,*

---

[69] Section 363(n) of the Bankruptcy Code provides, in relevant part, that, "The trustee may avoid a sale under this section if the sale price was controlled by an agreement among potential bidders at such sale, or may recover from a

*S.A.C.F.I.M.F.A. (In re New York Trap Rock Corp.)*, 42 F.3d 747 (2d Cir. 1994).  The *Gucci* court noted that section 363(n) provided a more direct prohibition on the purchaser's conduct because it allows a trustee to avoid a sale resulting from collusion by bidders, while section 363(m) protects the purchaser from having a sale reversed.  *In re Gucci*, 126 F.3d at 391.

 In *In re New York Trap Rock Corp.*, the Second Circuit concluded that for an agreement among potential bidders to come within the ambit of the prohibition of section 363(n), there had to be an agreement among the bidders to influence the sale price.  *In re Trap Rock*, at 752.  The *Trap Rock* court determined that it was not sufficient that the influence on the sale price be a "by-product or unintended consequence" of the agreement.  *Id*.

The Non-Controlling Lenders argued that the Purchaser is not entitled to a finding of good faith because BDCM and the Agent colluded with each other, and BDCM took grossly unfair advantage of the Agent, as bidder, as well as the other bidders at the auction.

Further, the Non-Controlling Lenders argued that BDCM and the Agent colluded at the Auction by structuring the BD Joint Bid to lock-out other bidders by not allowing them to join with the Agent's credit bids, thereby allegedly depressing prices.  Also, the Non-Controlling Lenders argued that by barring the Agent from joining its credit bid with any bidder other than BDCM, BDCM took unfair advantage of the Agent and other bidders.  The Non-Controlling Lenders also argued that BDCM, in its capacity as a purchaser, took advantage of the Agent by directing the Agent to submit grossly excessive credit bids for assets of little value in order to enhance BDCM's chances of acquiring assets in its individual capacity for a nominal sum.

---

party to such agreement any amount by which the value of the property sold exceeds the price at which such sale was consummated . . . ."

The Court did not agree that there was collusion in the conduct of the auction.  The joint bidding procedures were authorized by the Debtors and consented to by the Non-Controlling Lenders.  The sale of the assets was done in accordance with the bidding procedures and modifications thereto consented to by the Non-Controlling Lenders.  Moreover, the submitted joint bid increased the price of the sale.  The joint bid was between $40-50 million more than the next highest bid.  Further, no one has presented any legal theory pursuant to which the Agent had any obligation under the Bankruptcy Code, the Bidding Procedures Order (or any modifications thereto) to pair with anyone else to bid.[70]  Therefore, this Court saw no basis upon which it could compel the Agent to join with any other party or deem refusal to do so an inappropriate.  It was simply a dispute between the Non-Controlling Lenders and the Agent.  Nor was the procedure unfair to other bidders.  No bidder had complained about the joint bid process.  In fact, the only objection to the joint bid itself was by the Non-Controlling Lenders, and they did not bid.  Moreover, even if other bidders had complained, there would be no privity between the other bidders and the Agent to afford such bidders standing to object to the Agent's conduct.

Nor was the fact that BDCM directed the action of the Agent an indicator of collusive activity.  Pursuant to the Credit Agreement, the Agent was appointed by the Required Bank and obligated to act under their instruction.  BDCM was the Required Bank and had the contractual right to direct the Agent with respect to the collateral under the Prepetition Credit Agreement and the Security Agreement.  As such, it had the right to direct the amount of the credit bid, and with whom the Agent could join in a credit bid.  Collusion requires an agreement or understanding of two independent parties to act in concert.  Here, the Agent had no discretion to act

---

[70] The issue of whether the Agent's conduct in this regard was inconsistent with its obligations under the Credit Agreement was not before this Court.

independently, but simply was obligated to act in accordance with the instructions of BDCM as the Required Bank.

The Trustee, the fiduciary of the estate appointed by the Court, asserted that BDCM and the Agent, the representatives of the Designated Purchaser, negotiated in good faith with him.  In addition, the Trustee had reviewed the documents relevant to the Auction and concluded that the auction was conducted in accordance with the Bidding Procedures Order and the modifications thereto.  The procedures were fully disclosed, including the risks inherent in the joint bid procedure, and the Non-Controlling Lenders consented to the procedure.

The Trustee had considered all of the Non-Controlling Lenders' allegations and had determined that there was no collusion at the Auction or in the bid submission, and that there is no indication that BDCM was seeking to control bidding or depress values.  The Trustee noted that the joint bid was submitted to compete with sealed bids from other bidders.  The Trustee concluded that this process increased the value obtained by the estates, and there was no evidence that value to estates could have been any higher.

With respect to the Non-Controlling Lenders' allegations, the Trustee concluded that all of those allegations relate to their complaint concerning the allocation amongst the parties to the Prepetition Credit Agreement.  After reviewing the relevant documents related to the Auction, the Trustee was comfortable with the process and, as such, the Trustee concluded that the good faith finding was warranted.  The Trustee contended that the Purchaser, its affiliates, and their respective representatives had proceeded in good faith in all respects in connection with this proceeding.

The Court found that the bidding procedures and modifications were fully disclosed and consented to by the Non-Controlling Lenders, including the provision concerning joint bidding. Those modifications were implemented to serve the estate, and the Non-Controlling Lenders did not object at the auction. Further, there was no evidence that BDCM was seeking to control or depress the sale price. The Court further found that the bidding was in compliance with the implemented procedures and there was no collusion. Based upon the record, the Court concluded that the Purchaser, its affiliates and their respective representatives proceeded in good faith in connection with the sale of the estate's assets. In addition, the Court concluded that the Purchaser purchased the assets for value, in good faith and without notice of adverse claims. Therefore, the Purchaser was a good-faith purchaser entitled to the benefits and protections of section 363(m) of the Bankruptcy Code.

The Non-Controlling Lenders' allegations all related to their grievances concerning the allocation of assets under the Proposed Transactions. In that regard, as has been stated repeatedly, nothing in this process impairs their right to continue to adjudicate their dispute over the allocation of assets in the action that they have commenced in State Court.

**D.  Sale of Assets Free and Clear Pursuant to Section 363(f)**

To authorize a sale free and clear of all liens, claims, interests, and encumbrances, a court must find that at least one of the elements listed in 363(f) is satisfied. A trustee may sell property under section 363(b) of the code only if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
> (2) such entity consents;
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

79

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding to accept a money satisfaction of such interest.

11 U.S.C. §363(f).

Consent pursuant to section 363(f)(2) may be satisfied where an entity has not objected to a sale. *In re Enron Corp.*, 2004 WL 5361245, at * 2 (S.D.N.Y. 2004) ("Those parties who did not object, or who withdrew their objections, to the Motion concerning the sale of the ECTRIC Claim are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code."). *See also FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285 (7th Cir. 2002). The Debtors provided, with respect to the Initial APA, and the Trustee provided, with respect to APA 1 and the remainder of the Proposed Transactions, interested parties with notice and an opportunity to object. Any party in interest in this case who has failed to object to the Sale is deemed to have consented to the Sale under section 363(f)(2).

Consent under section 363(f)(2) is also established where an agent for a group of lenders properly consents on behalf of all lenders. In *Chrysler,* this Court concluded that the minority lenders in a first lien credit agreement were bound by their administrative agent's direction to the collateral trustee to consent to the sale of its collateral free and clear of liens and other interests. *In re Chrysler*, 405 BR at 103. *See also In re Metaldyne Corp.,* 409 B.R. 671 (S.D.N.Y. 2009) (allowing the agent of a prepetition term loan facility directed by the holder of a majority of the secured debt under that facility to make a bid for substantially all of the debtors' assets); *In re GWLS Holdings, Inc.,* 2009 WL 453110 (Bankr. D. Del. 2009) (finding that because the lien agent had the authority to "dispose of or deliver collateral" pursuant to a pre-petition credit

80

agreement, the lien agent also had authority to credit bid the claims of all members of the agreement).

In entering into the Prepetition Credit Agreement, the Non-Controlling Lenders agreed to have the Agent act on their behalf with respect to third parties.  Specifically, the Agreement authorizes the Agent, after an event of default, including the borrower's bankruptcy filing, upon written request of the Required Bank, to take certain action with respect to the collateral. (Prepetition Credit Agreement, § 10.13.)  Subsequently, BDCM and affiliated entities signed a letter directing the Agent to credit bid all the assets under the existing Credit Agreement.  (*See* Credit Bid Direction Letter, Ex. F to Asset Purchase Agreement, ECF No. 206.)  Pursuant to the Credit Bid Direction Letter, the Agent has received the needed support of the required lenders to consent to the Sale under section 363(f)(2).

## CONCLUSION

Regarding the threshold issue of whether the Sale was properly brought before the Court, the Court found that the offer always remained outstanding, and the Trustee validly accepted that offer and sought Court approval of it.  The Non-Controlling Lenders gave informed consent to the modification of the bidding procedures to allow joint bidding, while preserving their rights in State Court, where the parties agreed the allocation is best heard, and where, in fact, the Non-Controlling Lenders commenced an action.  Their consent was valid, and the BD Joint Bid was authorized under the modification.

After consideration of the relevant *Lionel* factors, the Court determined that a good

business reason for proceeding with the Sale as opposed to the Plan existed.[71]  There was little

likelihood of the Plan being confirmed within a reasonable period of time.  Proceeding to

solicitation and confirmation would have been an extended and highly contentious process.

Litigation would have ensued over, *inter alia,* whether the SIF constituted a valid class, whether

designation of Black Diamond's vote would have been appropriate, whether the Non-Controlling

Lenders had standing to propose their Plan, and whether investor consent could have been

obtained.  Designation of votes would have been extensively litigated and would have involved

factual issues regarding the motive of Black Diamond, complex valuation issues, and

interpretation of rights under the Prepetition Credit and Security Agreements.  The Court also

found that such contentious litigation would have a deleterious effect on asset values.  Although

the assets, not considering the administrative costs of the process and other costs, have recently

appreciated in value, the ability of the estate to sustain itself would have been severely

compromised if there were an interruption in the liquidity of the business.  Such interruption in

liquidity and the protracted and extensive litigation would necessarily be followed by a loss in

investor confidence, resulting in an overall diminution in value of the assets.  Further, the use of

cash collateral, if not consented to, would have involved extensive and complex valuation issues

which could have placed the assets at risk during that litigation.  Moreover, it appeared to the

Court that any debtor-in-possession financing would not have been able to be repaid upon a

---

[71] The Court stated in its bench ruling on July 6, 2011 that there was little likelihood of any plan being confirmed involving the disposition of the collateral either by reorganization or a sale under a plan.  Upon reflection, this was an overstatement.  There is a possibility that a plan could be confirmed.  However, confirmation of any plan could not be completed in sufficient time to avoid a deterioration of estate value due to, *inter alia,* investor concern.

failed plan and thus, the Trustee properly exercised his business judgment in choosing not to

pursue a transaction that incorporated that risk of repayment.

 Moreover, the Plan provided no benefit to the estate, and it effectively would have moved

the State Court litigation between the Non-Controlling Lenders and Black Diamond into the

confirmation process in the form of designation of vote litigation.  The dispute over allocation of

the Sale assets was found to be better heard in State Court, where, since the inception of this

case, the parties had agreed it would be best heard, and where that dispute is currently pending.

Hearing that dispute, among other issues in the context of a contested confirmation, would not

only have placed the Sale at risk, but it would also have placed the Debtors' liquidity, *inter alia*,

at risk, without which the Debtors ultimately would have been unable to survive.

 The Court also found the Non-Controlling Lenders' argument that the Agent would be

unable to provide them with recovery in State Court to be unpersuasive and irrelevant.  The

Prepetition Credit Agreement expressly provides that the Agent is obligated to act at the

direction of the "Required Banks."[72]  BDCM is the Required Bank and has the contractual right

to direct the Agent with respect to the collateral under the Credit Documents.  The Agent has no

discretion under the Prepetition Credit Agreement and Security Agreement with respect to any of

its obligations under the agreements.  If the Agent improperly allocates the assets wrongfully

under State Law at the direction of Black Diamond, the Non-Controlling Lenders may proceed

with the relief they have already sought in State Court.  The Non-Controlling Lenders can

---

[72] The Court also stated in its bench ruling at the Interim Hearing that the agreement expressly provides that the Agent acts at the direction of the "Principal."  Although there is no defined "Principal" in the Prepetition Credit Agreement or Security Agreement, the Prepetition Lenders are apparently a principal since the Agent acts at the direction of the Required Banks, who are designated under the Prepetition Credit Agreement to do so.  Therefore, the Required Banks then would be acting on behalf of the principal in providing direction to the Agent.

additionally raise the issue of the adequacy of a damage remedy in that forum. The resolution of these issues in State Court is what was sought by the Non-Controlling Lenders from the outset of these cases, and that is where it should be resolved.

Therefore, the record fully supported the Court's conclusion that the only plausible exit strategy in this case was to proceed with the sale process as proposed by the Trustee. The Trustee properly exercised his business judgment and found the pursuit of the sale process to be in the best interests of the estate. Upon the granting of the request for the Sale Hearing to proceed, the Disclosure Statement was adjourned and the Sale Hearing was commenced the next day, July 7, 2011.

Regarding the Sale Hearing, this Court appointed a Trustee due to a lack of confidence in the Debtors' management for the reasons stated on the record on January 5, 2011. The Trustee as an independent fiduciary evaluated the Proposed Transactions, including the negotiation between the Debtors and the Purchaser under the Initial APA, and found those transactions to be made at arms-length and in good faith. The Trustee's duty is to maximize the return to the estate. Contrary to what the Non-Controlling Lenders argued, the Trustee has a fiduciary obligation to the estate as a whole, *not* to secured creditors to ensure their maximum recovery on their collateral. Based upon the evidence presented at the Sale Hearing, the Court further found that (i) the Proposed Transactions are consistent with the Bankruptcy Code, (ii) the protections of a good faith purchaser pursuant to section 363(m) apply to the Purchaser, (iii) the Proposed Transactions do not constitute a *sub rosa* plan, and (iv) the assets may be sold free and clear of liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code.

The record supported the granting of the Sale Motion in its entirety.  All objections other than those of the Non-Controlling Lenders and AI had been withdrawn, waived, or settled as announced at the Sale Hearing and as reflected in the Sale Order.  (Sale Order, ¶ 2.)  In the event the parties do not reach an agreement regarding AI's objection, a hearing will ensue to determine the cure amount owed.  The objections of the Non-Controlling Lenders to the Trustee's decision to pursue the Sale rather than the Plan, to adjourn the Disclosure Statement until the conclusion of the Sale Proceeding, and their objections to the Sale itself were overruled.  The Court's findings of fact and conclusions of law and the relief granted as set forth in the Minute Order and the Sale Order were fully supported by the record and relevant case law.

Dated:  New York, New York
        July 18, 2011

        __/s/ Arthur J. Gonzalez_____
        ARTHUR J. GONZALEZ
        CHIEF UNITED STATES BANKRUPTCY JUDGE