**FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11 |
| GSC GROUP, INC., *et al*., | Case No. 10-14653 (SCC) |
| Debtors. | (Jointly Administered) |

---------------------------------------------------------------x

**POST-TRIAL MEMORANDUM DECISION ON (I) MOTION OF UNITED STATES TRUSTEE FOR VACATUR OF RETENTION ORDERS AND DISGORGEMENT OF PROFESSIONAL FEES AND (II) JOINDERS THERETO**

**A P P E A R A N C E S:**

KAYE SCHOLER LLP
*Attorneys for the Debtors*
425 Park Avenue
New York, NY 10022
By: Aaron Rubinstein, Esq.
Jeffrey A. Fuisz, Esq.

UNITED STATES DEPARTMENT OF JUSTICE
*Office of the United States Trustee*
U.S. Federal Office Building
201 Varick Street, Room 1006
New York, NY 10004
By: Tracy Hope Davis, Esq.
Andrea B. Schwartz, Esq.
Carole Ryczek, Esq.

WINSTON & STRAWN LLP
*Attorneys for Black Diamond Capital Management, LLC and GSC Acquisition Holdings, LLC*
35 West Wacker Drive
Chicago, IL 60601
By: Daniel J. McGuire, Esq.
Gregory M. Gartland, Esq.

33 South Grand Avenue
Los Angeles, CA 90071
By: Rolf S. Woolner, Esq.

MILBANK TWEED HADLEY & McCLOY LLP
*Attorneys for Capstone Advisory Group, LLC*
One Chase Manhattan Plaza
New York, NY 10005
By: Andrew M. Leblanc, Esq.
Anne Knight, Esq.

HAHN & HESSEN
*Attorneys for Capstone Advisory Group, LLC*
488 Madison Avenue
New York, NY 10022
By: Steven J. Mandelsberg, Esq.
Jonathan M. Proman, Esq.

RICHARDS KIBBE & ORBE LLP
*Attorneys for Thomas Libassi, Philip Raygorodetsky, Seth Katzenstein, and Nicholas Petrusic*
200 Liberty Street
New York, NY 10281
By: David Daniels, Esq.
Keith Sambur, Esq.

WILLKIE FARR & GALLAGHER LLP
*Attorneys for Robert J. Manzo, RJM, LLC, & RJM I, LLC*
787 Seventh Avenue
New York, NY 10019
By: Joseph T. Baio, Esq.
Paul V. Shalhoub, Esq.

SHEARMAN & STERLING LLP
*Attorneys for Chapter 11 Trustee, James L. Garrity, Jr., and GSC Liquidating Trust*
599 Lexington Avenue
New York, NY 10022
By: Andrew V. Tenzer, Esq.

OTTERBOURG, STEINDLER, HOUSTON & ROSEN P.C.
*Attorneys for Kaye Scholer LLP*
230 Park Avenue
New York, NY 10169
By: Scott L. Hazan, Esq.

**TABLE OF CONTENTS**

BACKGROUND: THE GSC BANKRUPTCY CASES ....... 3

I. The Commencement of the Cases and the Auction ....... 3

II. The Appointment of the Chapter 11 Trustee ....... 5

III. The Trustee's Plan of Reorganization, the Black Diamond Plan of Reorganization, and the Confirmation Stipulation ....... 7

A. The Confirmation Stipulation ....... 9

B. The Controverted "Effective Date" ....... 10

IV. The Liquidating Trust Agreement ....... 12

A. Section 2.7: The Administrative Fund ....... 12

B. Section 2.8: The Replacement of the Liquidating Trustee ....... 16

BACKGROUND: THE RETENTION OF THE PROFESSIONALS AND THE ENSUING CONTROVERSY ....... 17

I. The Retention of Capstone and Capstone's Disclosures with Respect to Mr. Manzo and RJM ....... 17

A. Mr. Manzo's Relationship with Capstone ....... 18

B. The Three Ordway Declarations ....... 21

1. The First Ordway Declaration ....... 21

2. The September 23, 2010 Meeting ....... 22

3. The First Supplemental Ordway Declaration ....... 24

4. The Second Supplemental Ordway Declaration ....... 24

II. The Capstone Performance Fee Motion ....... 27

III. The U.S. Trustee Vacatur and Disgorgement Motion ....... 32

IV. The Ill-Fated Rule 9019 Settlement Motions ....... 38

A. The Capstone Rule 9019 Settlement ....... 40

B. The Kaye Scholer Rule 9019 Settlement ....... 41

C. The Manzo Parties' Rule 9019 Settlement ....................................................... 42

D. The Supplemental Statement of the U.S. Trustee ............................................ 44

V. The Preliminary Kaye Scholer Rule 9019 Settlement Ruling ....................................... 50

VI. The Rule 9011 Sanctions Motions ....................................................................... 51

A. The Motions Seeking Sanctions Against Capstone ............................................. 51

B. The Motion Seeking Sanctions Against Kaye Scholer ........................................ 54

VII. The Final Fee Application Requests ................................................................... 57

VIII. The Trial Proceedings ........................................................................................ 60

A. Kaye Scholer Settles with the U.S. Trustee ......................................................... 60

B. The Manzo Parties Settle with the U.S. Trustee ................................................. 60

C. The Trial ............................................................................................................ 61

DISCUSSION ............................................................................................................... 65

I. Governing Law ........................................................................................................ 65

A. Section 327 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 2014 ............................................................... 65

B. Section 504 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 2016 ............................................................... 74

C. The Interplay Between Section 504(b) and Rule 2016(a) .................................... 80

II. Findings of Fact and Conclusions of Law with Respect to Capstone ........................ 83

A. The Capstone/Manzo Arrangement Does Not Violate Section 504 but Capstone's Failure to Disclose it Violates Rule 2016 ................ 83

B. Capstone's Final Fee Application ......................................................................... 91

1. Governing Law ....................................................................................................... 91

2. The Reasonableness of Capstone's Fees and Expenses ........................................ 95

a. Fees Requested for Services Rendered by Capstone Professionals Other Than Mr. Manzo ............................................................. 96

b. Fees Requested for Services Rendered by RJM Through Mr. Manzo .......98

c. Capstone's Expenses.....................................................................102

d. Summary of Section 330 Reductions to Capstone's Fees and Expenses .................................................104

3. Remedies for the Violation of Rules 2014 and 2016.....................................104

C. The Amended Performance Fee Motion.............................................................106

D. The Rule 9011 Sanctions Motions........................................................................109

III. Findings of Fact and Conclusions of Law with Respect to RJM I and Mr. Manzo.........111

IV. Findings of Fact and Conclusions of Law with Respect to Kaye Scholer......................115

A. Kaye Scholer's Final Fee Application ................................................................117

B. The Rule 9011 Sanctions Motion .........................................................................119

CONCLUSION.........................................................................................................119

**SHELLEY C. CHAPMAN**
**UNITED STATES BANKRUPTCY JUDGE**

Almost twenty years ago, Judge Tina Brozman wrote these words as she undertook the task of rendering a decision in Leslie Fay: "Rarely am I faced with a motion as troubling as this one . . . ."[1] Fortunately, in the twenty years since Leslie Fay, there have been relatively few cases in this Court involving similarly sweeping allegations of misconduct in connection with the retention and compensation of professionals in a large chapter 11 case. And, but for the fact that an estate-retained professional sought a $3.25 million "bonus" in addition to the approximately $6 million in hourly fees it had already accrued,[2] the conduct at issue in these cases would likely not have been discovered. Leslie Fay was remarkable for several reasons, not the least of which was the prominence of the professionals involved. While the case before the Court, at its core, arguably involves disclosure issues that are less troubling than those raised in Leslie Fay, aspects of the conduct of certain of the accused professionals – as well as aspects of the conduct of those leveling the accusations – make this case, in many ways, far more troubling than Leslie Fay. As will be seen, the central and abiding lesson of Leslie Fay – that it is the Bankruptcy Court and not the retained professional who is empowered to police the line between disclosure and non-disclosure – is dispositive of the unfortunate case before the Court.

The basic facts are these. Capstone Advisory Group, LLC ("Capstone") was retained as financial advisor by debtor GSC Group, Inc. and certain of its direct and indirect debtor subsidiaries and affiliates (collectively, "GSC" or the "Debtors"). The Capstone engagement was led by Mr. Robert J. Manzo ("Mr. Manzo"). Capstone made a disclosure to the Court that

[1] In re the Leslie Fay Companies, Inc., et al., 175 B.R. 525, 526 (Bankr. S.D.N.Y. 1994) ("Leslie Fay"). The late Judge Brozman served as a Bankruptcy Judge in Southern District of New York from 1985 to 2000; see also In re Granite Partners, L.P., 219 B.R. 22, 26 (Bankr. S.D.N.Y. 1998) (Bernstein, J.) ("Granite Partners") ("[t]hese questions are always troubling, and their resolution rarely satisfies everyone involved").

[2] These fee requests do not include the amount of fees paid by the Debtors to Capstone (as defined herein) for prepetition services rendered.

Mr. Manzo was an employee of Capstone. This was false. Mr. Manzo was an independent contractor pursuant to a consulting agreement between him and Capstone, a fact that Capstone purposefully did not disclose. In addition, Capstone also stated (i) that it had no agreement with any other entity to share with such entity any compensation received by Capstone in connection with the Debtors' cases and (ii) that Mr. Manzo, through a sole member LLC vehicle, worked exclusively for Capstone. As to the former statement, Capstone purposefully did not disclose the existence of its agreement with Mr. Manzo based on its conclusion that the agreement did not violate section 504 of the Bankruptcy Code. As to the latter statement, while true when initially disclosed, it subsequently became untrue;[3] Capstone never amended its disclosure because it viewed the variation from the truth as "*de minimis*."[4]

"Who knew what when" with respect to the foregoing basic facts is the subject of conflicting testimony and narratives presented by Mr. Manzo, Capstone co-founder Edwin Ordway,[5] various Kaye Scholer attorneys,[6] and the Office of the United States Trustee (the "U.S. Trustee"). In order to place the legal issues in context, it is necessary to delve into the background of the case in some detail. Given the long and contentious history of this case, that is no easy task. Among other things, this case has commanded the attention of four sitting and retired bankruptcy judges and involves conduct that runs the gamut from cavalier to imperious to

---

[3] Mr. Manzo, through RJM I (as defined *infra*) provided services to Schulte Roth & Zabel LLP ("Schulte Roth"), on behalf of its clients Cerberus Series Four Holdings, INK Acquisition LLC, and INK Acquisition II LLC, during the period from September 17, 2011, through October 5, 2011. Mr. Manzo was retained by Schulte Roth to serve as an expert in the adversary proceeding styled Innkeepers USA Trust v. Cerberus Series Four Holdings (Adv. Pro. No. 11-2557), commenced in this Court. The engagement letter from Mr. Adam Harris of Schulte Roth to Mr. Manzo, dated September 23, 2011, is annexed as Exhibit Y to the Schwartz Declaration (as defined at p. 32, *infra*). A copy of an invoice issued by RJM I to Schulte Roth indicates that Mr. Manzo sought approximately $76,000.00 for services provided. See Schwartz Declaration, Exhibit Z.

[4] Discussing Mr. Manzo's Innkeepers engagement in its post-trial brief, Capstone states that "[s]uch a limited engagement is de minimus [sic] and does not affect Manzo's status as a full-time Capstone Executive Director through the relevant period." Docket No. 1747 at p. 7 n.3.

[5] Edwin N. Ordway, Jr. is a member and manager of Capstone. He holds the title of "Executive Director."

[6] Kaye Scholer LLP ("Kaye Scholer") served as counsel to the Debtors in these cases.

outright vindictive. Notwithstanding the overwrought nature of the facts, the legal issues before the Court are relatively straightforward:

1. What is the scope and meaning of section 504 of the Bankruptcy Code?

2. What is the obligation of a retained professional to disclose its utilization and payment of an independent contractor under Rules 2014 and 2016 of the Federal Rules of Bankruptcy Procedure and section 327 of the Bankruptcy Code?

3. What are the appropriate remedies and sanctions for mistakes and misconduct in connection with fulfilling one's obligations under Rules 2014 and 2016 of the Federal Rules of Bankruptcy Procedure and section 327 of the Bankruptcy Code?

## BACKGROUND: THE GSC BANKRUPTCY CASES[7]

### I. The Commencement of the Cases and the Auction

On August 31, 2010 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the "Bankruptcy Code.[8] As appropriately described by one of the parties in these cases, "[f]rom the outset, this was anything but a normal bankruptcy proceeding. The case moved on an accelerated timetable, and beginning even prior to the Petition Date, the parties fought over virtually every issue."[9] The Debtors promptly filed an application to retain Kaye Scholer as Debtors' counsel,[10] which application was approved, *nunc pro tunc* to the Petition Date, by order dated September 22, 2010; the Debtors also promptly filed an application (the

---

[7] The findings of fact and conclusions of law herein shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any finding of fact later shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so deemed.

[8] Additional information regarding the Debtors' businesses, the circumstances leading to their chapter 11 filing, and the Debtors' cases can be found in the July 18, 2011 Opinion Authorizing Hearing on the Sale of Assets, Adjourning Consideration of Disclosure Statement, and Approving Sale of Assets, issued by Chief Judge Gonzalez, Docket No. 684 (the "Sale Opinion").

[9] See Objection of Kaye Scholer LLP to U.S. Trustee Motion and Joinders (each as defined below) [Docket No. 1623], p. 5.

[10] Docket No. 20.

"Capstone Retention Application")[11] to employ Capstone as financial advisor, which retention was approved, *nunc pro tunc* to the Petition Date, by order dated October 7, 2010 (the "Capstone Retention Order").

Prior to the Petition Date, GSC had provided debt-focused investment management of alternative assets. GSC had been engaged in contentious negotiations with its creditors, including Black Diamond Capital Management, L.L.C. ("BDCM," and, together with its affiliates, "Black Diamond"), its largest creditor. During that time, the Debtors had solicited a stalking horse bid from Black Diamond for the sale of their assets. Black Diamond submitted a $5 million bid shortly before the Petition Date, which the Debtors rejected as well below market value and refused to pursue it as part of their bankruptcy filing. Thus, the Debtors and Black Diamond were in conflict on a number of issues at the time of the chapter 11 filing.

The Debtors filed their bankruptcy petitions with the intention of selling their assets under section 363 of the Bankruptcy Code in an expedited fashion so as not to erode their value. After the Petition Date, parties in interest indeed contested just about everything, including issues related to first-day relief, cash collateral, procedures for the anticipated auction of the Debtors' assets, and other issues related to the auction. Moreover, in addition to disputes among the Debtors, the secured creditors, investors, insurers, and other interested parties, there also were contentious disputes within the lender group between Black Diamond, on the one hand, and a group of the Debtors' secured lenders referred to as the "Non-Controlling Lenders," on the other hand. No official committee of unsecured creditors was appointed by the U.S. Trustee.

The postpetition sale process concluded in an auction (the "Auction") that lasted three days and resulted in substantial value to the Debtors' estates beyond any party's expectations.

---

[11] Docket No. 22; Ex. 56. As used herein, "Ex." refers to an exhibit admitted into the record at Trial (as defined below).

The offers for the assets increased from $5 million (Black Diamond's initial offer) to a final bid of $235.7 million (consisting of $5 million in cash, $6.7 million in notes, and a credit bid that was valued at $224 million). The asset purchase agreement (the "APA") was executed by the Debtors and by GSC Acquisition Partners, LLP ("GSCAP"). In December 2010, GSCAP signed a letter agreement providing that the assets allocable to the credit bid and to the cash bid would both be assigned to and assumed by one purchaser, GSC Acquisition Holdings, LLC ("GSCAH"). GSCAH, referred to by the parties as the "Designated Purchaser," is a Black Diamond affiliate which, at closing, would be jointly owned by two Black Diamond entities, BDCM and Black Diamond Commercial Finance, L.L.C.[12]

## II. The Appointment of the Chapter 11 Trustee

The hearing to approve the sale to GSCAP was originally scheduled to be held on December 6, 2010. It never commenced, as the Non-Controlling Lenders requested, and the Court granted, an adjournment to allow discovery regarding an amendment to the APA signed on December 3, 2010.[13] Following such discovery, on December 20, 2010, the Non-Controlling Lenders filed a motion for the appointment of a chapter 11 trustee (the "Trustee Motion"),[14] arguing, among other things, that appointment of a trustee was warranted based on alleged fiduciary conflicts arising from dealings between Black Diamond and two members of the Debtors' senior management, Alfred Eckert and Peter Frank.[15] The Debtors and Black Diamond

---

[12] See Sale Opinion at p. 13.

[13] On or about December 3, 2010, prior to the approval of the sale, Black Diamond and the Debtors signed an amendment to the APA which, among other things, modified the APA to sell additional assets to Black Diamond that were not subject to the Auction and also resolved a dispute regarding earnings to be paid to Black Diamond in connection with the Debtors' management contracts. See Sale Opinion at p. 14.

[14] Docket No. 337.

[15] As will be discussed at p. 27, *infra*, Mr. Eckert and Mr. Frank also submitted a letter, dated November 3, 2010, in support of the Performance Fee Motion. As of the date of the Trial, Mr. Frank was employed by Black Diamond.

each filed an objection to the Trustee Motion disputing its allegations.[16] On December 22, 2010, the Court conducted an evidentiary hearing on the Trustee Motion and took the matter under advisement. Following the hearing, the Debtors stated that they no longer intended to support the proposed sale transaction and sent a notice of termination of the APA to Black Diamond.

On January 5, 2011, in light of its concerns about the conduct of GSC's management, the Court issued a bench ruling in which it found cause under section 1104(a)(2) of the Bankruptcy Code for the immediate appointment of a chapter 11 trustee and directed such appointment. In his ruling, Chief Judge Gonzalez stated that "the efforts of debtors' professionals throughout the process, of which this Court does not find fault, cannot address the underlying issue of a lack of confidence in the Debtors' controlling management."[17]

Thereafter, on January 7, 2011, the U.S. Trustee, by and through its counsel, filed a Notice of Appointment of the Honorable James L. Garrity, Jr. (Ret.) as the chapter 11 trustee, which appointment was approved by the Court. After his appointment, Mr. Garrity (the "Chapter 11 Trustee") assumed control of the Debtors' businesses, which he continued to manage and operate in the ordinary course. The Chapter 11 Trustee also retained his own counsel, Shearman & Sterling LLP ("Shearman"), and began a comprehensive review and analysis of the events leading up to his appointment.

On June 8, 2011, after months of arduous negotiation, the Chapter 11 Trustee filed a motion seeking authorization to sell substantially all of the Debtors' assets to GSCAH (the "Trustee Sale").[18] The Trustee Sale primarily consisted of two asset purchase agreements. "APA 1," which was based upon the results of the Auction, included: (i) a $224 million credit bid by Black Diamond, (ii) a $6.7 million promissory note, (iii) $5 million cash, and (iv) the

---

16 Docket Nos. 341, 346.

17 See Jan. 5, 2011 Hr'g. Tr. at 4:19-22 [Docket No. 401].

18 Docket No. 548.

assumption of certain liabilities. "APA 2" provided for the sale of the remaining assets of the estates not included in APA 1. If both APAs were consummated, all of the Debtors' obligations to secured creditors would be satisfied. In addition, the Trustee Sale included a Tax Indemnification Agreement, a Side Letter, a Services Agreement, and a Transaction Services Agreement. By Order dated July 11, 2011, the Court approved the Trustee Sale.[19] The Trustee Sale closed on July 26, 2011. In connection with the closing of the Trustee Sale, the Debtors transferred substantially all of their management contracts to GSCAH and Black Diamond entered into employment or consulting relationships with certain persons previously employed by the Debtors, including Nicholas Petrusic, Peter Frank, Seth Katzenstein, and Philip Raygorodetsky (collectively, the "Former Employees"). The Former Employees have asserted claims in these cases primarily on account of unpaid compensation and are now beneficiaries of the Liquidating Trust.

## III. The Trustee's Plan of Reorganization, the Black Diamond Plan of Reorganization, and the Confirmation Stipulation

Shortly after the closing of the Trustee Sale, on August 23, 2011, the Chapter 11 Trustee filed a plan of reorganization (the "Trustee Plan") and a related disclosure statement (the "Trustee Disclosure Statement"), which documents were amended on October 4, 2011.[20] The Trustee Plan provided for: (i) distributions to claim holders and the cancellation of equity interests; (ii) the formation and capitalization of a liquidating trust; (iii) the wind-down of the Debtors other than GSC Group and the formation of Reorganized GSC Group; and (iv) the substantive consolidation of the Debtors for the purposes of voting, confirmation, and making distributions to holders of allowed claims. According to the Trustee Disclosure Statement, the Trustee Plan contemplated an approximately 84 percent distribution to general unsecured

---

19 Docket No. 668; see also Sale Opinion, dated July 18, 2011.

20 Docket Nos. 747 and 748; Docket Nos. 800 and 802.

creditors, as such creditors would share in approximately $4.6 million in assets. On October 6, 2011, the Court entered an Order approving the Trustee Disclosure Statement and scheduling confirmation for November 30, 2011.

The very next day, Black Diamond filed its own plan (the "Black Diamond Plan"),[21] which provided for the reorganization of the Debtors, and, according to Black Diamond, a more attractive alternative for unsecured creditors. The related disclosure statement filed by Black Diamond stated as follows:

> BDCM has filed the BDCM Plan because BDCM believes that the BDCM Plan should preserve more of the Debtors' value than does the Trustee's Plan, and will provide more attractive treatment for general unsecured claims than does the Trustee's Plan. The Trustee's Plan contemplates the wind-down and liquidation of the Debtors, with most of the Debtors' assets to be placed in, and distributions made from, a liquidating trust. The BDCM Plan, by contrast, would preserve the Debtors as reorganized going forward entities with ongoing administration, and no liquidating trust.[22]

A battle with respect to the competing plans then ensued. On November 3, 2011, Black Diamond filed a motion (the "Disqualification Motion") seeking to exclude certain claims for voting purposes on the Trustee Plan,[23] to which the Chapter 11 Trustee objected.[24] On

---

[21] Docket No. 815.

[22] Docket No. 820, p. 1. Later versions of the Black Diamond Plan subsequently provided for the creation of a liquidating trust. The amended version of Black Diamond Disclosure Statement, dated January 12, 2012 [Docket No. 1109] stated as follows:

> The Trustee's Plan contemplated the wind-down and liquidation of the Debtors, with most of the Debtors' assets to be placed in, and distributions made from, a liquidating trust. The BDCM Plan, by contrast, would both preserve all of the Debtors as reorganized going forward entities with ongoing administration, and deliver all of the benefits as the Trustee's Plan vis-à-vis liquid assets through the creation of a Liquidating Trust to distribute the proceeds of all assets of the estates that are not related to the going-forward business of the Reorganized Debtors enhanced by additional cash to be provided by BDCM and certain amendments to the Tax Indemnification Agreement that will accelerate cash distributions to Holders of Allowed General Unsecured Claims.

[23] Docket No. 918. A joinder to the Disqualification Motion was also filed by Thomas J. Libassi, through his counsel, Richard Kibbe & Orbe LLP ("Richards Kibbe") [Docket No. 919]. As stated in his joinder, Mr. Libassi was a senior managing director at GSC from 2000 to 2008 and holds an unsecured non-priority claim for unpaid deferred compensation for $1,264,818.00. On June 20, 2011, Richards Kibbe filed a notice of appearance in the Debtors' cases on behalf of Black Diamond (see Docket No. 572), but has not, as of the date of this decision, filed a notice of appearance on behalf of Mr. Libassi. On April 24, 2013, Richards Kibbe did file a Verified Statement

November 23, 2011, the Chapter 11 Trustee filed a motion for an order designating certain votes of Black Diamond and other entities pursuant to sections 1125(b) and 1126(e) of the Bankruptcy Code (the "Designation Motion")[25], to which Black Diamond objected.[26]

**A. The Confirmation Stipulation**

On December 14, 2011, the Court held a hearing on the Disqualification Motion and the Designation Motion; prior to the issuance of any ruling on the motions, the parties reached a settlement that was memorialized in a stipulation dated December 16, 2011 (the "Confirmation Stipulation")[27] which provided that: (i) the Disqualification Motion and the Designation Motion would be withdrawn; (ii) the Chapter 11 Trustee would adjourn the confirmation hearing on the Trustee Plan and support the prosecution of the Black Diamond Plan to confirmation; and (iii) Black Diamond would transfer to the Chapter 11 Trustee: (a) the amount of $1 million to pay certain allowed administrative claims and (b) a cash payment or a letter of credit in the amount of $4 million to be held in escrow on behalf of the Chapter 11 Trustee, which would be reduced, from time to time, based on distributions, as provided in the Confirmation Stipulation.

Of particular significance to the instant dispute is Paragraph 12 of the Confirmation Stipulation, which provided as follows:

> Black Diamond hereby waives any rights to object to any fees and expenses of the Trustee, Shearman & Sterling LLP, Capstone Advisory Group, LLC, Ernst & Young LLP, Togut Segal & Segal LLP, Epiq Bankruptcy Solutions, LLC and any other retained professional of the Trustee or the Debtors whose retention requires court approval; *provided* that Black Diamond may object to allowance of such fees and expenses incurred after July 26, 2011 ("Post-Closing Amounts"), but

---

Pursuant to Bankruptcy Rule 2019(a) stating its appearance on behalf of Seth Katzenstein, Thomas J. Libassi, Nicholas Petrusic, and Philip Raygorodetsky [Docket No. 1394].

[24] Docket No. 933. The Chapter 11 Trustee's objection to the Disqualification Motion was later supplemented. See Docket No. 1038.

[25] Docket No. 971.

[26] Docket No. 1030. An objection to the Designation Motion was also filed by Mr. Libassi. [Docket No. 1023].

[27] The Confirmation Stipulation was "so ordered" on December 20, 2011. See Docket No. 1049.

> only to the extent that allowed Post-Closing Amounts would exceed $8 million in the aggregate if such objections were sustained.

Stipulation, ¶ 12 (emphasis in original).

On December 30, 2011, Black Diamond filed amended versions of the Black Diamond Disclosure Statement and Black Diamond Plan.[28] By order dated January 12, 2012, the Court approved the Black Diamond Disclosure Statement and scheduled confirmation for February 14, 2012.[29]

Prior to the confirmation hearing, on January 30, 2012, Capstone filed the motion that set the stage for the controversy now before the Court – the motion seeking a "performance fee" in the amount of $3.25 million (the "Performance Fee Motion") based on Capstone's significant contributions to the success of the Debtors' cases, and, in particular, the highly successful sale of the Debtors' assets.[30]

On February 14, 2012, the Court held a hearing at which it confirmed the Black Diamond Plan. Three days later, the Court entered a confirmation order which provided that the Court "retain[ed] exclusive jurisdiction over all matters arising out of, or related to, these chapter 11 cases and the [Black Diamond] Plan pursuant to Article XI of the [Black Diamond] Plan."[31]

**B. The Controverted "Effective Date"**

Continuing with the pattern of contentiousness in these cases, even the occurrence of the Effective Date was marred by controversy. On March 9, 2012, counsel for Black Diamond[32] filed a notice stating that March 9, 2012 was the "Effective Date" of the Black Diamond Plan.

---

[28] Docket Nos. 1081 and 1079.

[29] Docket No. 1107. Further amended versions of the Black Diamond Disclosure Statement and the Black Diamond Plan were filed on January 12, 2012. See Docket Nos. 1109 and 1108. The final amended version of the Black Diamond Plan was filed on February 10, 2012. See Docket No. 1190.

[30] Docket No. 1146.

[31] See Findings of Fact and Conclusions of Law, and Order Confirming Black Diamond Capital Management, L.L.C.'s Fourth Amended Joint Chapter 11 Plan for GSC Group, Inc., and its affiliated Debtors [Docket No. 1212].

[32] Kirkland & Ellis LLP served as counsel for Black Diamond at this time. See Notice of Appearance filed December 6, 2011 [Docket No. 1014].

Pursuant to the Black Diamond Plan, on the Effective Date, all of the Debtors' assets were to be transferred to the liquidating trust established pursuant to the Black Diamond Plan (the "Liquidating Trust") and Robert J. Manzo, through RJM I, LLC ("RJM I"), an entity of which he is the sole member, would become the Liquidating Trustee pursuant to the agreement governing the Liquidating Trust (the "Liquidating Trust Agreement"). The Effective Date also relieved the Chapter 11 Trustee of his duties, with the limited exception of his remaining duty to review certain pre-Effective Date professional fees.

On March 12, 2012, however, the parties appeared for a first hearing before this Court[33] and informed the Court that, notwithstanding the filing of the notice of occurrence of the Effective Date, the Liquidating Trust Agreement had not yet been executed, certain other conditions to effectiveness had not been met, and the Liquidating Trustee had not yet assumed his role. Accordingly, it appeared that the premature declaration of the Effective Date had in effect resulted in there being no one with the authority to act as a fiduciary for the Debtors or the Liquidating Trust. The reasons for Black Diamond's actions were, at best, unclear.

Given the pending Performance Fee Motion filed by Capstone, the Court asked counsel for Black Diamond whether Black Diamond had any concern with Mr. Manzo, through RJM I, assuming the role of Liquidating Trustee, in light of the fact that Black Diamond had objected to the Performance Fee Motion and was also the largest beneficiary of the Liquidating Trust. Counsel for Black Diamond indicated that it had no objection to Mr. Manzo (through RJM I) serving as Liquidating Trustee, and that the Liquidating Trust would simply reserve for the potential administrative claim.[34] In order to address the Effective Date issue, the Court "so

[33] Chief Judge Arthur J. Gonzalez presided over the Debtors' cases until his retirement from the bench on March 1, 2012. Effective March 1, 2012, the Debtors' cases were assigned to this Court.

[34] See March 12, 2012 Hr'g. Tr. at 16:2-16:5; 17:7-17:9 ([Nash:] "We have no objection to Bob Manzo and his entity being the liquidating trustee. And we had no objection to confirmation because we have a plan on file like

ordered" the record to indicate that the Effective Date had not yet occurred; that it would not occur until the earlier of (i) the execution of the Liquidating Trust Agreement by the Chapter 11 Trustee or (ii) the occurrence of March 16, 2012 at 5:00 p.m. unless the Court ordered otherwise; and that the Chapter 11 Trustee would not be discharged of his duties until that time. A Corrected Notice of Effective Date was filed on March 16, 2012, declaring the Effective Date.

## IV. The Liquidating Trust Agreement

### A. Section 2.7: The Administrative Fund

Yet more controversy surrounds the completion and execution of the Liquidating Trust Agreement itself. Section 5.1 of the Black Diamond Plan provides that the Liquidating Trust shall be formed on the Effective Date pursuant to the Liquidating Trust Agreement. A draft of the Liquidating Trust Agreement was attached as Exhibit B to the Plan Supplement filed on January 27, 2012 (the "Draft Liquidating Trust Agreement").[35] Section 2.7 of the Draft Liquidating Trust Agreement,[36] as attached to the Plan Supplement, provides as follows:

> **Administrative Fund.** On the Effective Date, the Liquidating Trustee shall establish an administrative fund (the "Administrative Fund"). The initial amount of the Administrative Fund shall be **$[__]**, to be funded from the Residual Estate Assets. The Liquidating Trustee shall pay all costs and expenses related to carrying out its obligations under the Plan and this Liquidating Trust Agreement from the Administrative Fund and, **in the Liquidating Trustee's discretion, may add additional amounts to the Administrative Fund** to prosecute the Causes of Action or for administration and other miscellaneous needs of the Liquidating Trust without further notice or motion in accordance with the terms of this Liquidating Trust Agreement.

---

most plans that provides that administrative claims will be reserved for . . . if Capstone wants a success fee, fair enough, we'll reserve for it; it's either going to be allowed or it isn't."). A little over one month later, however, Black Diamond entirely changed its position with respect to Mr. Manzo, stating in an April 30, 2012 letter to Mr. Manzo that it was "very concerned about the impact that the pending Capstone fee application is having and will continue to have on the effective execution of the Liquidating Trustee's duties" given, among other things, "the obvious conflict of interest." See Ex. 716, Letter from Mounir Nahas of Black Diamond to Robert Manzo.

[35] Docket No. 1138. The cover sheet of Exhibit B states that "[t]he attached represents the most current draft of the form of the Liquidating Trust agreement as of the date hereof and remains subject to further negotiation and revision by applicable parties." The Draft Liquidating Trust Agreement is also Ex. 720.

[36] Docket No. 1138, Ex. B.

Section 2.7 of Draft Liquidating Trust Agreement (emphasis added).

Testimony at trial revealed that there were very few changes made to the agreement between the draft agreement annexed to the Plan Supplement and the final version executed on or about March 15, 2012, the day prior to the "second" Effective Date. As Section 2.7 contained a blank number for the initial amount of the Administrative Fund, the parties needed to agree on a number ($1,000,000) to be inserted prior to execution. The execution version of the Liquidating Trust Agreement, however, contained one other material change to Section 2.7, indicated in bold in the text below. Section 2.7 of the execution version of the Liquidating Trust Agreement[37] provides as follows:

> **Administrative Fund.** On the Effective Date, the Liquidating Trustee shall establish an administrative fund (the "Administrative Fund"). The initial amount of the Administrative Fund shall be $1,000,000, to be funded from the Residual Estate Assets. The Liquidating Trustee shall pay all costs and expenses related to carrying out its obligations under the Plan and this Liquidating Trust Agreement from the Administrative Fund and, in the Liquidating Trustee's discretion **and upon the prior consent of Beneficiaries who held a majority of the total amount of Allowed General Unsecured Claims entitled to distributions of Trust Units under the Plan**, may add additional amounts to the Administrative Fund to prosecute the Causes of Action or for administration and other miscellaneous needs of the Liquidating Trust without further notice or motion in accordance with the terms of this Liquidating Trust Agreement.

Liquidating Trust Agreement, Section 2.7 (emphasis added).

Testimony was given at trial by Andrew Tenzer,[38] Mr. Manzo, and Mr. Garrity that the language in Section 2.7 providing that the initial amount may only be increased "upon the prior

---

[37] Ex. 718.

[38] Mr. Tenzer is a partner at Shearman, which served as counsel to the Chapter 11 Trustee and to the Liquidating Trust. See May 1, 2013 Hr'g. Tr. at 17:1-23. On April 24, 2012, Sherman filed a "Declaration and Disclosure Statement on behalf of RJM1, LLC" which provided, in part, that "Shearman & Sterling represents RJM1, LLC solely in its capacity as liquidating trustee of the Trust, the successor to the Chapter 11 Trustee under the Plan. Shearman & Sterling does not and will not in these cases represent Mr. Manzo in his individual capacity, Capstone, nor any other entity with which RJM1, LLC or the GSC Liquidating Trust may be affiliated. Shearman & Sterling continues to advise the Chapter 11 Trustee in these cases with respect to the allowance of professional fees incurred prior to the effective date of the Plan." [Docket No. 1395]. On January 17, 2013, Willkie Farr & Gallagher

consent of Beneficiaries who held a majority of the total amount of Allowed General Unsecured Claims entitled to distributions of Trust Units under the Plan" (the "Consent Provision") was inserted without their knowledge prior to execution of the Liquidating Trust Agreement.[39] Mr. Tenzer recounted that Black Diamond and its counsel,[40] on the one hand, and Mr. Manzo and his counsel at Shearman, on the other hand, had agreed that a figure of $1,000,000 would be inserted in the blank contained in Section 2.7 of the draft Liquidating Trust Agreement. They had not, however, agreed to (or even discussed) any other changes to the language of Section 2.7.[41] Mr. Manzo and Mr. Garrity gave similar testimony on this point.[42] Black Diamond presented no evidence to the contrary and determined not to present the testimony of any of its principals or counsel on this issue. Mr. Tenzer does not recall any "cap" being requested as to this $1,000,000 amount, and he stated that he was not told by counsel to Black Diamond of the insertion of the Consent Provision, nor of any other pre-execution change to Section 2.7 of the draft Liquidating Trust Agreement beyond the insertion of the $1,000,000 number.[43] He also testified that the associate who worked with him on the matter was not alerted to the change nor did she notice

---

LLP filed an amended notice of appearance which stated that it represents RJM, LLC, RJM I, LLC, and Robert J. Manzo. [Docket No. 1611].

[39] May 1, 2013 Hr'g. Tr. at 19:19-22, 21:7-23:23 (Tenzer); April 30, 2013 Hr'g. Tr. at 283:13-284:25 (Garrity); April 24, 2013 Hr'g. Tr. at 234:12-20 (Manzo).

[40] Kirkland & Ellis LLP served as counsel for Black Diamond at this time. See fn. 32, *supra*.

[41] May 1, 2013 Hr'g. Tr. at 19:10-22, 21:7-23 (Tenzer: "[i]t was an issue that had never been discussed, and when I saw it for the first time months later it was different than (a) what I had understood the parties had agreed to and (b) different than I believe the draft of the liquidating trust agreement or the form of liquidating trust agreement that had been filed with the court as part of the plan supplement."); 46:5-11.

[42] April 30, 2013 Hr'g. Tr. at 283:13-284:25 (Garrity); April 24, 2013 Hr'g. Tr. at 234:12-20 (Manzo).

[43] See Ex. 721 (March 14, 2012 email from Christopher Langbein at Kirkland & Ellis LLP to 11 parties, including Mr. Tenzer, which attaches the execution version of the Liquidating Trust Agreement states that "[t]he $1 million Administrative Fund provision has been included in the attached version of the Liquidating Trust Agreement. With that, we understand that there are no more changes and the document is final. Please return the executed signature pages."). The version of the Liquidating Trust Agreement attached to this email also contained the Consent Provision in section 2.7. No blackline revealing the insertion of this provision was attached to the email, nor was there any other indication from Black Diamond or its counsel that it had unilaterally made this change. See May 1, 2013 Hr'g. Tr. at 19:1-20:7, 24:9-24 ([Tenzer:] "My understanding was that the only issue in Section 2.7 was filling in the blank dollar amount in the first sentence." [Q:] "Did anyone at Black Diamond or Kirkland & Ellis tell you that there was an additional change beyond the enassertion [sic] of the $1 million?" [Tenzer:] "No.").

this change prior to the execution of the Liquidating Trust Agreement by Mr. Manzo and the Chapter 11 Trustee.[44]

Mr. Tenzer testified that it was not until August 14, 2012 that it came to his attention for the first time that the Consent Provision was included in section 2.7 of the Liquidating Trust Agreement.[45] At that point in time, the Liquidating Trust had already incurred (but had not paid) fees and expenses of approximately $1,000,000.[46] Mr. Tenzer stated that, if he had known the Consent Provision was contained in the Liquidating Trust Agreement, he would not have recommended that Mr. Manzo and Mr. Garrity execute it, primarily because it was his view that no party with an interest in the Trust (and Black Diamond in particular) should be given discretion over the expenses of the Trust.[47]

Numerous emails between Mr. Manzo and Sherman were introduced into evidence which reflect Sherman's advice to Mr. Manzo that the Liquidating Trustee could continue to operate the Liquidating Trust after August 2012, notwithstanding the presence of the Consent Provision in the Liquidating Trust Agreement.[48] Mr. Tenzer also testified that, as both Mr. Manzo and Mr. Garrity desired,[49] Shearman prepared a motion to seek relief from the Court on this issue, but the motion was never filed due to the Court's request for parties to refrain from filing motions seeking substantive relief in the Debtors' cases until the "Section 504 issue" was resolved. Mr.

---

44 May 1, 2013 Hr'g. Tr. 51:21-53:9.

45 Id. at 24:21-25:3.

46 Id. at 55:19-56:2; 29:13-14.

47 Id. at 26:4-23. Mr. Garrity gave similar testimony on this point, stating that would not have signed the agreement had he known of the addition of the Consent Provision, as he "did not believe that it was appropriate that there be a cap" because he "wanted to make sure that there was [sic] sufficient funds in the Liquidating Trust for the Trustee to do whatever needed to be done in the case," and he "didn't think [it] appropriate for any creditor to have the ability to dictate that." April 30, 2013 Hr'g. Tr. at 285:2-7.

48 See Exs. 716,719, 724, and 725.

49 See May 1, 2013 Hr'g. Tr. at 80:14-16.

Manzo, in his capacity as Liquidating Trustee, also determined not to make any further payments from the Trust until this issue was resolved.[50]

### B. Section 2.8: The Replacement of the Liquidating Trustee

The Liquidating Trust Agreement contains several provisions regarding the removal and replacement of the Liquidating Trustee. Section 2.8 provides as follows:

> **Replacement of the Liquidating Trustee.**
> (a) The Liquidating Trustee may resign at any time upon 30 days' written notice identifying and appointing a successor Liquidating Trustee delivered to the Bankruptcy Court, the U.S. Trustee and the Beneficiaries.
> (b) The Liquidating Trustee may be removed for gross negligence or willful misconduct by the Bankruptcy Court upon application and after notice and a hearing, which application may be brought by the U.S. Trustee or any Beneficiary. In the event any such application for the removal of the Liquidating Trustee is granted by the Bankruptcy Court, the Beneficiaries may, by majority vote, designate a person to serve as successor Liquidating Trustee. If the Beneficiaries fail to designate a person to serve as successor Liquidating Trustee, the Bankruptcy Court shall appoint a successor Liquidating Trustee upon recommendation from the U.S. Trustee.[51]

Similarly, Sections 2.1 and 10.3 of the Liquidating Trust Agreement both contain a provision that ". . . . [t]he Liquidating Trustee may also be removed by the Bankruptcy Court for gross negligence or willful misconduct upon motion by any Beneficiary or the U.S. Trustee."[52] The Liquidating Trust Agreement contains no provision addressing the gap between the two scenarios covered by the agreement – the voluntary resignation of the Liquidating Trustee and his removal for "gross negligence or willful misconduct," i.e., for cause.[53]

---

[50] See May 1, 2013 Hr'g. Tr. at 34:14-36:13.

[51] See Ex. 718 (Liquidating Trust Agmt.) at § 2.8. The Court has been informed that, in connection with the Manzo Parties' Settlement (as defined below), RJM I intends to resign from its role as Liquidating Trustee pursuant to Section 2.8.

[52] See id. at §§ 2.1, 10.3.

[53] In addition, the Liquidating Trust Agreement provides that the Court retains exclusive jurisdiction over the Liquidating Trust after the Effective Date including, without limitation, any entity's obligations under the Liquidating Trust Agreement and any action against the Liquidating Trustee or any professional retained by the Liquidating Trustee. See id. at § 11.10.

The Liquidating Trust Agreement also provides that Mr. Manzo, through RJM I, is entitled to receive compensation based upon an hourly rate of $895.00 (subject to annual adjustments) for services rendered to the Liquidating Trust, plus reimbursement for out-of-pocket expenses.[54]

## BACKGROUND: THE RETENTION OF THE PROFESSIONALS AND THE ENSUING CONTROVERY

### I. The Retention of Capstone and Capstone's Disclosures with Respect to Mr. Manzo and RJM

The Capstone Retention Application asserted that Capstone's employment by the Debtors was necessary and should be approved because Capstone is "a premier advisory firm, with vast experience in the fields of restructuring and providing financial operational guidance to companies in distressed situations."[55] Annexed to the Capstone Retention Application was an engagement letter, dated August 26, 2010, and executed by Mr. Ordway (the "Capstone Engagement Letter"), which set forth Capstone's proposed compensation schedule. The Capstone Engagement Letter also provided that "Capstone shall be eligible to request a success fee, the amount and conditions of which to be mutually agreed upon and subject to Bankruptcy Court approval." No further detail on this provision was included. Prior to the Court's approval of the Capstone Retention Application and the Capstone Engagement Letter, Mr. Ordway executed three declarations (discussed *infra*) in support of the Capstone Retention Application, which were all filed by Kaye Scholer. No party filed an objection to the "success fee" provision contained in the Capstone Engagement Letter or to any other aspect of the Capstone Retention Application.

---

54 See id. at § 2.4(a), Exhibit 1 (Liquidation Trustee Compensation Schedule).

55 The Capstone Retention Application also states that Capstone had been providing restructuring services to the Debtors since February 2009.

The Capstone Retention Order, signed on October 7, 2010,[56] authorized the Debtors to retain Capstone *nunc pro tunc* to the Petition Date pursuant to section 327(a) of the Bankruptcy Code and Bankruptcy Rule 2014 on the terms and conditions set forth in the Capstone Engagement Letter and the Capstone Retention Application, as modified by the order. The Capstone Retention Order further provided that

> IT IS HEREBY ORDERED THAT: . . .
> 8. No success fee or bonus is being requested at this time or approved in connection with this Order; provided, however, that Capstone retains the right to seek approval of a success fee upon proper application pursuant to sections 330 and 331 of the Bankruptcy Code at any point in these chapter 11 cases and nothing in this Order is intended to prejudice such rights.

Capstone Retention Order, ¶ 8.

### A. Mr. Manzo's Relationship with Capstone

Mr. Manzo is known as one of the leading financial advisers in the area of restructuring. Beginning in 1990, Mr. Manzo was a principal of his own firm, Policano and Manzo, LLC, which was purchased by FTI Consulting in 2000. While at his own firm and after it was purchased by FTI Consulting, Mr. Manzo worked with, among others, Mr. Ordway and Christopher J. Kearns, who together formed Capstone in February 2004.[57]

In late 2005, Mr. Manzo was asked by some of his former colleagues to join them at Capstone. As Mr. Manzo testified at Trial, he was not interested in participating in Capstone's management, but, at the same time, he felt it would be "awkward" to be an employee of people who had previously reported to him. After receiving informal advice from his friend and Kaye Scholer partner Michael Solow that he should conduct his practice through an LLC entity, Mr. Manzo elected to work with Capstone as an independent contractor, through RJM, LLC

[56] Docket No. 150.

[57] Deposition Tr. of E. Ordway at 6:2-10; 140:22-141:4 (stating that Mr. Kearns is the other managing member of Capstone).

(“RJM”), an LLC he created to limit his exposure to Capstone.[58] Mr. Manzo became associated with Capstone in May 2006.[59] Capstone issued a press release announcing that Mr. Manzo had “joined the firm as an Executive Director.”[60]

At the time Mr. Manzo began working at Capstone, he was engaged as an independent contractor through RJM and the terms of his engagement were set forth in an agreement dated February 4, 2006 (the “Capstone/Manzo Agreement”)[61] which was amended from time to time.[62] The iteration of the Capstone/Manzo Agreement in effect as of the Petition Date[63] provided, in pertinent part, that

> The parties intent [sic] that an independent contractor-employee relationship will be created by this arrangement. Contractor is not to be considered an employee of Capstone for any purpose, and the Contractor is not entitled to any of the benefits that Capstone provides for Capstone’s employees. Contractor shall perform services under the direct supervision of Capstone’s managers, Ed Ordway and Chris Kearns (the “Managers”).

Capstone/Manzo Agreement, ¶ 1.

The structure of the fee arrangement in the Capstone/Manzo Agreement at the time of the Petition Date provided that Mr. Manzo, through RJM, would receive:

- a fixed monthly payment in the amount of $125,000.00;
- 80 percent of the fees that Mr. Manzo generated from his work on the GSC cases, calculated by multiplying the hours Mr. Manzo billed times his hourly rate;
- the greater of two incentive payments, including: (a) an incentive payment calculated based upon the growth in Capstone’s total billable staff hours in financial restructuring matters, capped at $2.5 million annually, or (b) an incentive payment called the “Net Revenue Incentive Payment” that essentially represented 15.5 percent of the revenues generated on engagements for which Mr. Manzo was actively

[58] April 24, 2013 Hr’g. Tr. at 312:13-318:12.
[59] Deposition Tr. of E. Ordway at 14:24-15:24.
[60] Ex. 317.
[61] Ex. 5.
[62] The initial Capstone/Manzo Agreement, dated February 4, 2006, was executed by Mr. Ordway and Mr. Nurge on behalf of Capstone, and by Robert Manzo. The subsequent amendments were executed by Mr. Ordway and/or Mr. Kearns on behalf of Capstone and by “RJM, LLC by Robert J. Manzo, Member.”
[63] See Ex. 31 (Capstone/Manzo Agreement, dated February 19, 2009).

involved in managing, as well as engagements that Mr. Manzo was instrumental in obtaining for Capstone;[64] and

- 50 percent of any special or success bonus payment that Capstone and/or Mr. Manzo, through RJM, received as provided for in the Capstone/Manzo Agreement dated as of December 26, 2006, including bonuses in the Refco case, as well as at least 50 percent of other bonuses received from (i) all other assignments in which Mr. Manzo is or was actively involved in managing and (ii) engagements that Mr. Manzo was instrumental in obtaining for Capstone.

On or about November 22, 2010, between the time of the Auction in October 2010 and the appointment of the Chapter 11 Trustee in January 2011, Capstone and RJM amended the Capstone/Manzo Agreement (the "November 2010 Amendment").[65] On or about March 22, 2011, two months after the appointment of the Chapter 11 Trustee, Capstone and Mr. Manzo, through RJM, again amended the Capstone/Manzo Agreement (the "March 2011 Amendment"), extending the Capstone/Manzo Agreement to December 31, 2011. The March 2011 Amendment acknowledged that Mr. Manzo "has or will likely enter into discussions with other consulting firms with the intention of securing employment . . . commencing after March 31, 2011," and it provided, inter alia, that Mr. Manzo was "not . . . limited in any manner from participating in any other business activities which may directly or indirectly compete with Capstone's current business activities," except that, during the term of the March 2011 Amendment, Mr. Manzo was not permitted "to solicit other existing Capstone engagements . . . to provide services similar to that which Capstone currently offers regarding such engagements."[66]

---

64 The Net Revenue Incentive Payment was not capped.

65 Ex. 89. The November 2010 Amendment, which extended the agreement through March 31, 2011, provided, inter alia, that Mr. Manzo would receive 60 percent of any success fee earned in the Debtors' cases and Capstone would receive 40 percent, instead of the previous 50/50 split. A non-compete provision was also included.

66 Ex. 104. The March 2011 Amendment also provided that (i) Mr. Manzo would be paid 100 percent of his hourly compensation on the GSC matter, instead of 80 percent, effective April 1, 2011; (ii) Mr. Manzo no longer would receive the $125,000.00 monthly payment; (iii) the incentive payment (i.e., the Net Revenue Incentive Payment) would now only include fees generated in Refco, GSC, Chrysler, and "a new assignment from Cerberus;" and (iv) the agreed upon 60-percent-Manzo/40-percent-Capstone split of success fees received by either Mr. Manzo or Capstone would survive the expiry of the amendment.

Mr. Manzo was the lead person on the Capstone engagement for GSC.[67] During the course of the GSC engagement, Mr. Manzo indicated to Capstone that he desired to sever or diminish his association with Capstone upon completion of the engagement, which, in fact, he did upon the Effective Date.[68]

**B. The Three Ordway Declarations**

**1. The First Ordway Declaration**

The Debtors, by Kaye Scholer, filed three declarations (collectively, the "Ordway Declarations") signed by Mr. Ordway in support of the Capstone Retention Application. Mr. Ordway's first declaration, dated August 31, 2010 (the "First Ordway Declaration"), was filed together with the Capstone Retention Application.[69] In the First Ordway Declaration, Mr. Ordway made the following representations, to the best of his knowledge:

- [O]ther than in connection with these cases, neither Capstone, nor any of its principals, employees, contractors, agents, or affiliates have any connection with the Debtors, their creditors, the U.S. Trustee, or any other party with an actual or potential interest in these chapter 11 cases or their respective attorneys or accountants, except as set forth herein;
- In connection with the preparation of this Declaration, Capstone conducted a review of the parties identified by the Debtors as being potential parties in interest. Based on the results of that review, Capstone has determined that it does not have any connection with any such parties on matters related to these proceedings and does not have any adverse interest to the estates, except as set forth in Schedule 1; and
- Capstone is involved in numerous cases, proceedings and transactions involving many different professionals, including Kaye Scholer LLP, the Debtors' bankruptcy counsel, and other attorneys, accountants and financial consultants, some of which may represent claimants and parties-in-interest in the Debtors' chapter 11 cases and/or are unsecured creditors. In addition, Capstone has in the past, and may in the future, be working with or against other professionals involved in these cases in matters wholly unrelated to these cases. Based on our current knowledge of the

[67] See Ex. 136 (Deposition Tr. of Robert Manzo) at 9:8-10:11.

[68] Id. at 5:17-6:9.

[69] Ex. 56. At Trial, Mr. Ordway testified that he read the Capstone Retention Application and the supporting declarations thoroughly before they were filed. April 24, 2013 Hr'g. Tr. at 203:10-24; 248:21-249:6; 253:1-5.

> professionals involved, and to the best of my knowledge, none of these business relationships constitute interests materially adverse to the Debtors' estates or their creditors herein in matters upon which Capstone is to be employed, and none are in connection with these cases.[70]

With respect to fee sharing, Mr. Ordway represented that to the best of his knowledge: (a) no commitments had been made or received by Capstone with respect to compensation or payment in connection with the Debtors' cases other than in accordance with applicable provisions of the Bankruptcy Code and the Bankruptcy Rules, and (b) Capstone had no agreement with any other entity to share with such entity any compensation received by Capstone in connection with these chapter 11 cases.[71] Mr. Ordway further represented that if Capstone discovered additional information that required disclosure, Capstone would file a supplemental disclosure with the Court.[72]

**2. The September 23, 2010 Meeting**

After a hearing held before Judge Gonzalez on September 23, 2010, Ms. Andrea Schwartz, counsel for the U.S. Trustee, met with (i) Mr. Manzo, on behalf of Capstone, and (ii) Messrs. Tyler Nurnberg and Matthew Micheli of Kaye Scholer, on behalf of the Debtors, to discuss issues concerning the Capstone Retention Application (the "September 23 Meeting").[73] Mr. Micheli took handwritten notes of the meeting.[74] As the notes reflect, during the September 23 Meeting, Ms. Schwartz raised twenty-three issues. One of those issues (listed as number six in Mr. Micheli's notes) arose from the representations in paragraph seventeen of the Capstone Retention Application and paragraph three of the First Ordway Declaration regarding any connections of Capstone and any of "its principals, employees, contractors, agents, or affiliates"

---

70 First Ordway Decl. at ¶¶ 3, 4, and 5.

71 Id. at ¶ 17.

72 Id. at ¶ 13.

73 April 23, 2013 Hr'g. Tr. at 39:23-40:7; April 30, 2013 Hr'g. Tr. at 72:3-73:4; 160:12-161:3.

74 See Ex. 64.

with parties-in-interest in the Debtors' cases. Mr. Nurnberg and Mr. Micheli testified at trial that, in light of the reference to "contractors" in those paragraphs, Ms. Schwartz inquired as to whether Capstone had retained any contractors to assist with the GSC engagement. Number six in Mr. Micheli's notes from the September 23 Meeting states "Capstone, non employee or 'independent contractors'" and includes a checklist containing the following four items:

> --*do we retain any contractors*
> --*Capstone has to disclose*
> --*include in conflict search*
> --*mark-up on fees*[75]

Both Mr. Nurnberg and Mr. Micheli recalled that Mr. Manzo responded that Capstone had not retained any contractors to assist with the engagement and that he specifically noted his familiarity with contractor issues because of his experience in the Refco bankruptcy case.[76] According to Mr. Micheli, Mr. Manzo stated that he had worked very closely with Mr. Andrew Velez-Rivera who had represented the U.S. Trustee in that matter and together they had obtained a beneficial result for the Refco estate.[77] Mr. Micheli further testified that, as part of the discussion about contractors, Ms. Schwartz had indicated that, to the extent Capstone used contractors in GSC, those contractors would have to be disclosed and included in a conflict search, and their fees could not be marked up.[78]

---

75 Id.

76 See April 30, 2013 Hr'g. Tr. at 75:16-76:20 (Nurnberg); April 30, 2013 Hr'g. Tr. at 164:18-24 (Micheli). In Refco, RJM, in its capacity as Plan Administrator, determined that AP Services, LLP ("Alix"), one of the debtors' professionals, had not adequately disclosed to the court that (i) Alix had employed an independent contractor ("KordaMentha") to work for the Refco estate (and had not disclosed whether KordaMentha had any conflicts) and (ii) Alix had a fee sharing agreement with KordaMentha and had "marked up" the fees charged to Refco for KordaMentha's services. Ultimately, Mr. Manzo and Alix reached a settlement whereby Alix agreed to substantially reduce the fees it sought from the Refco estate. See In re Refco, Case No. 05-60006 (RDD) (Bankr. S.D.N.Y. Aug. 15, 2007) [Dkt. No. 5728]. Kaye Scholer assisted RJM with drafting an objection to Alix's fees in Refco.

77 See April 30, 2013 Hr'g. Tr. at 164:24-165:7.

78 Id. at 165:10-15.

Mr. Manzo testified at trial that he has no recollection of any discussion or questions at the September 23 Meeting regarding independent contractors. He testified that, had he been asked about contractors, he would have said he did not know and he would have to check with Capstone as to what their employment practices are with the rest of the people at Capstone.[79] Ms. Schwartz did not herself provide testimony with respect to her recollections, if any, of these discussions.

### 3. The First Supplemental Ordway Declaration

After the September 23 Meeting, Kaye Scholer prepared a supplemental declaration of Mr. Ordway (the "First Supplemental Declaration") to file in further support of the Capstone Retention Application. The First Supplemental Declaration was filed on October 4, 2010, by Kaye Scholer.[80] By the Supplemental Ordway Declaration, Mr. Ordway made the same representations concerning Capstone's connections to parties-in-interest in these cases. Mr. Ordway also made the same representation that Capstone was not sharing fees in these cases.

### 4. The Second Supplemental Ordway Declaration

On the evening of October 5, 2010, Mr. Nurnberg and Mr. Micheli spoke with Ms. Schwartz regarding Capstone.[81] In that conversation, Ms. Schwartz requested that the First Supplemental Ordway Declaration be further supplemented immediately to explain the relationship among Mr. Manzo, RJM, and Capstone.[82] The hearing on the Capstone Retention Application was scheduled for the next day.

---

[79] April 24, 2013 Hr'g. Tr. at 50:13-25; 52:11-19; 54:12-20.

[80] On October 4, 2010, the Debtors, by Kaye Scholer, filed a Notice of Supplemental Capstone Documents, to which Kaye Scholer annexed: (i) the First Supplemental Ordway Declaration, and (ii) a revised proposed Capstone Retention Order. See Docket No. 142; Ex. 70.

[81] Kaye Scholer and Mr. Solow maintain that Mr. Solow had no involvement with the Capstone Retention Application or with any pleadings filed in support of it.

[82] See April 30, 2013 Hr'g. Tr. at 178:13-179:4. Both Mr. Nurnberg and Mr. Micheli testified at trial that they learned of the involvement of RJM in the Debtors' cases at or around the time of the September 23 Meeting. See id. at 88:9-89:16 (Nurnberg) ("I learned of the RJM entity itself several years prior. In connection with the GSC

Late that evening, Mr. Micheli sent an email to Mr. Manzo and two other members of the Capstone team, Bob Butler and Ron Zaidman, attaching a blacklined copy of a third declaration of Mr. Ordway (the "Second Supplemental Ordway Declaration") and asking specifically that Mr. Manzo review paragraph 15 ("Paragraph 15") to "make sure that [he (Mr. Manzo) was] comfortable with the language [Kaye Scholer] added."[83] Paragraph 15 provided:

> It is my understanding that Robert Manzo, a professional staffed on this engagement, is the sole member of RJM, LLC. Mr. Manzo, through RJM, LLC, is an employee of, and works exclusively for, Capstone. No business is conducted by RJM, LLC except as described herein with respect to its employment by Capstone. None of the other Capstone employees staffed on this engagement has a similar employment structure.[84]

Mr. Ordway and Mr. Manzo gave contradictory accounts of what happened next. When asked at his deposition about how he satisfied himself that Paragraph 15 was accurate, Mr. Ordway testified that he asked Robert Manzo if it was accurate, and Mr. Manzo said it was.[85]

---

case, I was advised that it was involved either at the September 23 meeting or sometime in the week or so following."); id. at 174:20-175:10 (Micheli) ("Again, I had learned of the existence of RJM, LLC at or around the time of the September 23 meeting"), id. at 168:14-18 (Micheli) ("I believe I learned about RJM, LLC from Mr. Manzo, but I don't recall if it was during this meeting or if it occurred after this meeting at some time before, I think, October 1st . . . ."). No party testified as to exactly how Ms. Schwartz became aware of the existence of RJM. Notwithstanding any knowledge of the existence of RJM, however, Kaye Scholer maintains that the attorneys who worked with Capstone on its retention pleadings, Mr. Nurnberg and Mr. Micheli, had no knowledge of the consulting agreements between RJM and Capstone at that time. At Trial, Mr. Nurnberg testified that, on October 6, 2010, he was not aware of the consulting agreements and, had he been, Kaye Scholer neither would have drafted the Second Supplemental Ordway Declaration in the way it did nor would have allowed the declaration to be signed that way. See April 30, 2013 Hr'g. Tr. at 94:7-94:15.

83 Exs. 72 and 74.

84 Mr. Nurnberg testified at Trial that Mr. Micheli and Mr. Kleinman of Kaye Scholer drafted Paragraph 15, and Mr. Nurnberg approved the paragraph (after making a one-word insertion) as being consistent with his understanding at the time. See April 30, 2013 Hr'g. Tr. at 90:24-91:17. In January 2011, the day before Kaye Scholer filed Capstone's first interim fee application [Docket No. 400], Robert Butler, a Capstone Executive Director, asked Mr. Nurnberg via e-mail if Mr. Manzo was permitted to sign Capstone's interim fee applications "given that Bob is an independent contractor and not an employee of Capstone." See Ex. 99. Mr. Nurnberg forwarded Mr. Butler's email to Mr. Solow, who advised that he saw no issue so long as Capstone authorized Mr. Manzo to do so. Notwithstanding this information, Kaye Scholer took no action to update Capstone's disclosures in the Ordway Declarations, which only months before had been prepared and filed by Kaye Scholer with the understanding that Capstone had no contractors.

85 Ordway Dep. 47:3-19. In its objection to the U.S. Trustee Motion, Capstone attempts to "put this answer in context" by stating that much of the information in Paragraph 15 could only have come from Mr. Manzo. According to Capstone, Mr. Ordway did not speak to Mr. Manzo between receiving the draft from Kaye Scholer and executing it – instead, in stating at his deposition that Mr. Manzo confirmed that Paragraph 15 was accurate, Mr.

Mr. Manzo did not corroborate this testimony; rather, Mr. Manzo testified that he never reviewed Mr. Micheli's email or its attachments on October 5, 2010 prior to the filing of the Second Supplemental Ordway Declaration or at any time prior to the litigation.[86] Mr. Manzo reviewed Paragraph 15 for the first time after Mr. Ordway was deposed and, in response to questioning at Trial, he testified that Paragraph 15 is "totally inaccurate."[87] By the Second Supplemental Ordway Declaration, Mr. Ordway also made the same representations he had made in his two prior declarations with respect to Capstone's connections in these cases and the absence of any fee sharing.

The next morning, the Second Supplemental Ordway Declaration[88] was executed by Mr. Ordway, faxed to Kaye Scholer, and filed by Kaye Scholer shortly before the scheduled October 6 hearing, at which the Capstone Retention Application was approved.[89]

Mr. Ordway testified that Capstone did not disclose its independent contractor relationship with Mr. Manzo in the Debtors' cases or in other cases because Capstone had determined that disclosure was not necessary.[90] Mr. Manzo gave very similar testimony; when asked whether he considered disclosing the existence of the Capstone/Manzo Agreement to the U.S. Trustee's Office while the Capstone Retention Application was pending, he responded that

---

Ordway "was referring to generally obtaining the substance of the information from Mr. Manzo, not to a specific discussion with Mr. Manzo." See Objection of Capstone to U.S. Trustee Motion [Docket No. 1631] at p. 15 n.3.

86 April 24, 2013 Hr'g. Tr. at 71:21-72:10; 73:24-77:9.

87 April 24, 2013 Hr'g. Tr. at 82:11-83:1.

88 Ex. 75; Docket No. 148.

89 After the email sent by Mr. Micheli late in the evening on October 5, 2010 (Ex. 72), Mr. Manzo was not included on the subsequent email correspondence between Capstone and Kaye Scholer regarding Mr. Ordway's execution of the Second Supplemental Ordway Declaration prior to the October 6, 2010 hearing. Approximately ten minutes after Mr. Micheli's email was sent out, Mr. Butler of Capstone forwarded the email to Mr. Ordway and Lisa Hirschman of Capstone, with the following message: "Ed / Lisa – please see below and have Ed execute as discussed with Lisa this evening[.] Thanks." See Ex. 713.

90 April 23, 2013 Hr'g. Tr. at 279:19-25 ([Q:] "Mr. Ordway, was the decision not to disclosure Robert Manzo's independent contractor status in the GSC cases a mistake?" [Ordway:] "No." [Q:] "So Capstone just made a decision not to disclose that, correct?" [Ordway:] "There was no reason to disclose it.").

he considered it and "concluded that it wasn't something that had to be disclosed."[91] Neither Mr. Ordway nor Mr. Manzo opined on the existence, applicability, or interpretation of Rule 2016.

## II. The Capstone Performance Fee Motion

Pursuant to the Performance Fee Motion filed on January 30, 2012, Capstone sought a fee of $3.25 million (the "Performance Fee") to be paid in addition to fees and expenses awarded by the Court in connection with Capstone's interim fee applications. The Performance Fee Motion describes Capstone's "remarkable accomplishments" in the Debtors' cases, including, but not limited to, the $275.4 million "Capstone-engineered auction" and asserts that, consistent with applicable precedent regarding bankruptcy court-awarded performance fees of 1% to 2%, the requested Performance Fee is appropriate. The motion also points to the Capstone Engagement Letter and the Capstone Retention Order as each specifically permitting Capstone to apply for a performance fee. Annexed as Exhibit A to the Performance Fee Motion was a letter, dated November 3, 2010, from Alfred C. Eckert III, Chief Executive Officer, and Peter R. Frank, Senior Managing Director, on behalf of GSC to Mr. Manzo at Capstone (the "Eckert/Frank Letter") acknowledging Manzo and his firm's "superb job" and leaving it to Capstone "through appropriate channels in the bankruptcy case to obtain your appropriate reward for this extraordinary result."[92] Annexed as Exhibit B to the Performance Fee Motion was a chart entitled "Summary of Investment Banking / Financial Advisor Performance-Success Fees Approved in Bankruptcy Court" which listed 46 different matters in which investment bankers/financial advisors representing debtors had received fees in bankruptcy cases and

---

[91] April 24, 2013 Hr'g. Tr. at 59:22-60:14 (Manzo) ("In my mind I thought about it and absolutely did not believe, as did Capstone, that this was something that was a 504 issue").

[92] See Docket No. 1146, Exhibit A. Contrary to the allegation of the U.S. Trustee that Kaye Scholer partner Michael Solow wrote the Eckert/Frank Letter (see U.S. Trustee Motion at pp. 86, 92), the evidence revealed that the Eckert/Frank Letter was in fact written by Mr. Manzo, typed by Mr. Solow's secretary, and given to Messrs. Eckert and Frank for approval and signature.

percentage information relating to such fees. The Performance Fee Motion stated that, in seeking a fee of $3.25 million, or 1.2% of the "value" received by the Debtors from the Auction, Capstone's request was at the "low end" of the 1% to 2% range that is consistent with performance fees awarded in other bankruptcy cases.

On February 23, 2012, after confirmation of the Black Diamond Plan,[93] objections to the Performance Fee Motion were filed by (i) Black Diamond and GSCAH, (ii) the U.S. Trustee, and (iii) the Chapter 11 Trustee.[94] Capstone filed a response to each objection,[95] and also submitted the Declaration of Robert J. Manzo and the Declaration of Michael B. Solow in support of the Performance Fee Motion.[96] At an initial hearing held before Chief Judge Gonzalez on February 29, 2012, counsel for the Chapter 11 Trustee announced that an agreement in principle had been reached between Capstone and the Chapter 11 Trustee on the economic terms of a reduced performance fee in the amount of $2.75 million. The objections filed by Black Diamond and the U.S. Trustee remained unresolved, and the U.S. Trustee argued for an evidentiary hearing on the matter. Chief Judge Gonzalez declined to rule on the Performance Fee Motion at that time, and the Debtors' cases were transferred to this Court's docket.

On March 16, 2012, Capstone filed a motion pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019 for order approving a settlement agreement between Capstone and the Chapter 11 Trustee regarding the Performance Fee Motion (the "Performance Fee 9019 Motion").[97] The Performance Fee 9019 Motion sought approval of an

---

[93] Although the Performance Fee Motion was filed over two weeks prior to the confirmation hearing on the Black Diamond Plan, the objections to such motion were not filed until after the Black Diamond Plan was confirmed. Among the many things on which the parties disagreed as to the Performance Fee Motion were the sources from which the Performance Fee, if approved, would be paid.

[94] Docket Nos. 1229, 1230, and 1231, respectively. In its objection, the U.S. Trustee requested an evidentiary hearing on the Performance Fee Motion.

[95] Docket Nos. 1241, 1242, and 1243.

[96] Docket Nos. 1244 and 1245.

[97] Docket No.1310.

allowed administrative claim for Capstone in the amount of up to $2.75 million and outlined the sources from which such claim would be paid. The Libassi Parties,[98] Black Diamond and GSCAH, and the U.S. Trustee each objected to the Performance Fee 9019 Motion,[99] and Capstone responded to the objections.[100] A hearing was held before this Court on April 25, 2012.

At the April 25, 2012 hearing, the U.S. Trustee criticized Capstone's use of Bankruptcy Rule 9019, asserting that "it's absolutely clear that this is an improperly, procedurally improper motion," and described the motion as "an attempt to fit something else into a 9019 motion," which motion can only be brought by the trustee.[101] The Court denied the 9019 Motion on the record,[102] directed the parties to cooperate on discovery requests, and scheduled an evidentiary hearing on an amended Performance Fee Motion to be filed by Capstone.

On May 3, 2012, Capstone filed its amended Performance Fee Motion (the "Amended Performance Fee Motion") pursuant to which it amended its original Performance Fee Motion to seek a performance fee of $2.75 million pursuant to the terms and conditions of the settlement agreement it had reached with the Chapter 11 Trustee.[103] Objections to the Amended

---

98 Thomas Libassi, Nicholas Petrusic, Seth Katzenstein, and Philip Raygorodetsky, four of the Former Employees, will be referred to herein as the "Libassi Parties." As set forth in the Libassi Joinder filed on January 11, 2013, Mr. Libassi is owed approximately $1.2 million by the Debtors, Mr. Raygorodetsky is owed approximately $320,000 by the Debtors, Mr. Katzenstein is owed approximately $612,000 by the Debtors, and Mr. Petrusic is owed approximately $183,000 by the Debtors. All of the Libassi Parties except Mr. Libassi were at the time of the Trial employed by Black Diamond or one of its affiliates. Per the engagement letter admitted into evidence as Exhibit 930 (the "Libassi Engagement Letter"), Mr. Libassi retained Richards Kibbe as counsel on November 3, 2011. In the letter, Richards Kibbe states that it represents Black Diamond in the Debtors' cases but that it agrees to represent Mr. Libassi as well. The Libassi Engagement Letter further recites that Black Diamond has agreed to pay Richard Kibbe's legal fees and expenses during the course of its representation of Mr. Libassi in connection with the GSC matter. Nearly identical engagement letters were executed on February 28, 2012 by and among Richards Kibbe and each of the other Libassi Parties. See Exs. 929, 931, and 932.

99 Docket Nos. 1376, 1382, and 1383, respectively.

100 Docket Nos. 1387, 1388, and 1389, respectively.

101 See April 25, 2012 Hr'g. Transcript at 17:2-17:16.

102 On May 15, 2012, the Court entered an order denying the Performance Fee 9019 Motion. [Docket No. 1427].

103 Docket No. 1412.

Performance Fee Motion were filed by (i) the Libassi Parties[104] and (ii) Black Diamond, GSCAH, and the U.S. Trustee, who filed a joint trial brief.[105] Black Diamond also submitted the Declaration of Gregory M. Gartland, the Declaration of Stephen H. Deckoff, and the Declaration of Mounir Nahas in support of its objection.[106] Capstone filed a brief in support of the Amended Performance Fee Motion, together with the Declarations of Robert J. Manzo and Michael B. Solow.[107]

On June 8, 2012, counsel for Black Diamond and GSCAH filed a letter with the Court to bring to the Court's attention a legal issue that, in the words of counsel, "may materially affect" the hearing scheduled on the Amended Performance Fee Motion.[108] The letter stated that, although Capstone previously represented to the Court that it had no agreement with any other entity to share compensation received in connection with the Debtors' cases, discovery had revealed that Capstone in fact had an "undisclosed fee-sharing agreement" with RJM, an entity owned by Mr. Manzo. Moreover, the letter stated, Capstone had mischaracterized the relationship between RJM and Mr. Manzo in its filings with the Court, as it had represented that Manzo, through RJM, was an "employee" of Capstone and worked exclusively for Capstone. The letter requested a continuation of the evidentiary hearing on the Amended Performance Fee Motion until after the Court heard (i) legal argument on the effect on the motion of Capstone's violation of section 504 of the Bankruptcy Code and (ii) Capstone's final fee application.

Capstone responded with a letter stating that it had not violated section 504 of the Bankruptcy Code.[109] It also asserted that Capstone was under no obligation to disclose the

[104] Docket Nos. 1474 and 1483.
[105] Docket No. 1489.
[106] Docket Nos. 1491, 1492, and 1493.
[107] Docket Nos. 1486, 1487, and 1488.
[108] Docket No. 1481.
[109] Docket No. 1482.

existence of its agreement with Mr. Manzo since Bankruptcy Rule 2016(a) specifically carves out fee sharing agreements with members of a firm of accountants, such as Capstone. Capstone has steadfastly maintained this position throughout the case.

In response to the letters received, the Court adjourned the hearing on the Amended Performance Fee Motion and held status conferences with the parties on June 11 and 13, 2012, at which the parties discussed, among other things, discovery and scheduling.[110] The Court held a further status conference on July 19, 2012. At that conference, counsel for Capstone suggested mediation of the issues, to which counsel for the U.S. Trustee replied unequivocally that "the United States Trustee is not amenable to mediation."[111]

Notwithstanding the U.S. Trustee's position, during a conference on October 12, 2012, the Court directed all parties, including the U.S. Trustee, to participate in confidential settlement discussions to be supervised by the Honorable James M. Peck.[112] On November 16, 2012, Judge Peck informed the parties that his mediation efforts had ended in light of the U.S. Trustee's withdrawal from the negotiations "before the parties have had the opportunity to fully explore the prospects for structuring a workable settlement."[113] On December 3, 2012, the Court held a status conference with all parties to discuss the path forward and related scheduling and discovery. A trial was scheduled for February 11, 13, 14, and 15, 2013 (the "Trial").

---

110 At the status conference held on June 13, 2012, the Court asked Mr. Solow whether, at the time that Kaye Scholer assisted in the preparation of and submitted the Second Supplemental Ordway Declaration, he was aware of the existence of the Capstone/Manzo Agreement. He responded, "No. Actually the first time I saw it was this afternoon sitting waiting for court, Your Honor." See June 13, 2012 Hr'g. Tr. at 38:10-38:19. On October 12, 2012, Mr. Solow subsequently filed a letter with the Court stating that documents produced in connection with the matter have indicated that Mr. Solow was aware of the Capstone/Manzo agreement at the time of the June 13, 2012 status conference and that he had received copies of, reviewed, and commented on drafts of versions of the agreement in prior years. He stated that he had not recalled this at the time of the conference and apologized for his failed memory and resulting misstatements. See Docket No. 1573.

111 July 19, 2012 Hr'g. Tr. at 13:7-13:15 [Docket No. 1527].

112 The Court entered an order to that effect on November 5, 2012 [Docket No. 1584]. The order also noted the Court's request that the parties continue to forbear until November 20, 2012 from filing motions or other papers concerning the matters discussed at the October status conferences, pending the outcome of the supervised settlement discussions.

113 See Declaration of Aaron Rubinstein, dated January 28, 2013 [Docket No. 1624] at Ex. JJ.

## III. The U.S. Trustee Vacatur and Disgorgement Motion

On January 4, 2013, the U. S. Trustee filed its Motion for an Order: (I) Pursuant to Fed. R. Civ. P. 60(b)(6) and 60(d)(3), Made Applicable by Fed. R. Bankr. P. 9024, Vacating the Court's Orders Authorizing the Debtors to Retain Kaye Scholer LLP and Capstone Advisory Group, LLC and Directing Disgorgement of All Compensation Received from the Estates or, in the Alternative, (II) Pursuant to 11 U.S.C. Sec. 327, 328(c), 329, 330(a)(5), 504(a) and 105(a), Fed. R. Bankr. P. 2014, 2016 and 2017, LBR 2014-1 and 2016-1, Administrative Order M-389 and UST Fee Guidelines b(1)(ii) and b(1)(iii), Disallowing the Pending Compensation Requests of Kaye Scholer LLP and Capstone Advisory Group, LLC and Directing Disgorgement of all Compensation Paid from the Estates and (III) Removing RJM1 as Liquidating Trustee and Directing Disgorgement of All Compensation Paid from the Liquidating Trust (the "U.S. Trustee Motion").[114] The U.S. Trustee also filed the Declaration of Andrea B. Schwartz (the "Schwartz Declaration") in support of its motion.[115]

The U.S. Trustee Motion alleges that Kaye Scholer and Capstone made specific material misrepresentations to the Court regarding (i) Mr. Manzo's status as an employee of Capstone when in fact he was an independent contractor and (ii) Capstone's lack of any fee sharing when it fact it had a fee sharing agreement with Mr. Manzo. The U.S. Trustee argues that these professionals knew or should have known the correct information, yet they failed to disclose it to the Court. Consequently, the U.S. Trustee asks that the Court (i) vacate the Capstone and Kaye Scholer retention orders, (ii) order the disgorgement of all compensation received by these firms from the Debtors' estates and deny any pending compensation requests, and (iii) immediately remove Mr. Manzo as Liquidating Trustee.

---

[114] Docket No. 1597.
[115] Docket No. 1598.

On January 11, 2013, joinders to the U.S. Trustee Motion were filed by (i) Black Diamond and GSCAH (the "Black Diamond Joinder")[116] and (ii) the Libassi Parties[117] (the "Libassi Joinder" and, together with the Black Diamond Joinder, the "Joinders"). The Black Diamond Joinder states that "Black Diamond's interests in these cases are multi-faceted, arising from its central role as pre-petition lender, section 363 sale purchaser, unsecured creditor and, ultimately, plan proponent." In joining the U.S. Trustee Motion, Black Diamond emphasizes its belief that the removal of RJM I and the appointment of a new, disinterested liquidating trustee would be in the best interests of all beneficiaries and would provide the most realistic path to a fair resolution of the Debtors' cases. Finally, the Black Diamond Joinder requests that the Court "shift to Kaye Scholer and Capstone" the costs associated with the Performance Fee Motion and the U.S. Trustee Motion by requiring those firms to compensate Black Diamond for its attorneys' fees incurred in connection with these matters.

The Libassi Joinder, while joining in the U.S. Trustee Motion's allegations and requests for relief, also makes additional allegations with respect to purported post-Effective Date wrongdoing on the part of Mr. Manzo in his capacity as Liquidating Trustee. The Libassi Joinder alleges that Mr. Manzo engaged in self-dealing at the expense of the Liquidating Trust by taking an active role in advancing Capstone's fee application and Performance Fee Motion while also serving as a fiduciary of the Liquidating Trust. The Libassi Parties assert that Capstone's fee application and the Performance Fee Motion are self-interested transactions that required full and complete disclosure to the Liquidating Trust in light of Mr. Manzo's potential interest in those filings. Further, the Libassi Parties argue that Mr. Manzo should be removed as Liquidating Trustee because of (i) his failure to correct "numerous" false disclosures to the Court

116 Docket No. 1605.
117 Docket No. 1606.

made in Capstone's retention documents and fee submissions and (ii) his failure to disclose his relationship with Kaye Scholer and Mr. Solow.

The Libassi Parties also allege that Mr. Manzo breached his duties as Liquidating Trustee during the post-Effective Date period by breaching the budget provisions of the Liquidating Trust Agreement. Specifically, they claim that Mr. Manzo spent in excess of $1 million in fees and expenses in his management of the Liquidating Trust without seeking approval from the Trust's beneficiaries to exceed that threshold, as is required under the Liquidating Trust Agreement. Accordingly, the Libassi Parties request that the Court remove RJM I as Liquidating Trustee "as a result of (i) Manzo's breaches of trust, (ii) his lack of full disclosure at the time of his engagement as Liquidating Trustee, and (iii) his resulting conflicts of interest."[118]

On January 28, 2013, objections to the U.S. Trustee Motion and the Joinders (collectively, the "Objections") were filed by (i) Kaye Scholer, together with the Declaration of Aaron Rubinstein in support of its objection,[119] (ii) RJM I, RJM, and Robert J. Manzo (collectively, the "Manzo Parties"), together with the Declaration of Joseph T. Baio in support of their objection,[120] and (iii) Capstone, together with the Declaration of Steven J. Mandelsberg in support of its objection.[121] Each of the objectors argues that the U.S. Trustee is not entitled to the drastic relief sought by the U.S. Trustee Motion.

In its objection, Kaye Scholer clearly concedes that

> Mistakes were made: The disclosures in connection with the Capstone retention application and the Kaye Scholer retention application were not adequate. Disclosures that should have been made were not made and some that were made were inaccurate. But any errors attributable to Kaye Scholer were not intentional.[122]

---

118 Id. at ¶ 15.
119 Docket Nos. 1623 and 1624.
120 Docket Nos. 1629 and 1630.
121 Docket Nos. 1631 and 1632.
122 Objection of Kaye Scholer to U.S. Trustee Motion and Joinders [Docket No. 1623] at p. 1.

Kaye Scholer asserts that the attorneys handing the day-to-day management of the Debtors' cases did not know of the Capstone/Manzo Agreement when the disclosures at issue were made, and Mr. Solow, who had previously seen drafts of the agreement, "did not function" on the Capstone retention papers and the related disclosures. Because the Kaye Scholer attorneys handling the Capstone retention believed that Mr. Manzo was an employee of Capstone, did not know of the Capstone/Manzo Agreement, and relied on Capstone for information necessary to support the Capstone Retention Application, Kaye Scholer states that it had no reason to question the statements in the Ordway Declarations. Had Mr. Manzo's independent contractor status been recognized, Kaye Scholer explains that it would have run a conflicts check and disclosed the firm's relationship with Mr. Manzo, RJM, and RJM I. Kaye Scholer argues that the U.S. Trustee is not entitled to the drastic relief sought because (i) Kaye Scholer's conduct was not intentional, (ii) the inadequate disclosures did not harm the Debtors, and (iii) the services provided by Kaye Scholer and Capstone in the Debtors' cases resulted in a substantial increase in value to the estates.

The central focus of the objection of the Manzo Parties, in addition to incorporating certain of Kaye Scholer's arguments, is that Mr. Manzo "was not trying to hide anything from anyone about the nature of his consultancy arrangement with Capstone."[123] They maintain that, had Mr. Manzo known at any time that his "contractual arrangements" would trigger the current proceedings, he would have used a different term to describe his relationship with Capstone, while leaving the parties in the same economic and substantive position they are now in. The Manzo Parties distinguish this case from the facts in the Refco matter handled by Mr. Manzo, and they assert that there was no violation of section 504 here. Finally, they argue that there is

[123] Docket No. 1629 at p. 6.

no valid basis to remove RJM I as Liquidating Trustee, as the general allegations of untrustworthiness and the specific allegations made in support of RJM I's removal both fail.

In its objection to the U.S. Trustee Motion, Capstone steadfastly maintains that it did not violate section 504 of the Bankruptcy Code, and, because there was no improper sharing of fees, "[t]here was no requirement for any disclosure regarding the structure of Mr. Manzo's relationship with Capstone because such a relationship does not implicate the Section 504 prohibitions."[124] In contrast to Kaye Scholer's *mea culpa*, Capstone barely concedes that it made any mistakes in this case, merely stating that the statement in Paragraph 15 of the Second Supplemental Ordway Declaration was incorrect, in that the declaration should not have used the word "employee" when describing Mr. Manzo's relationship with Capstone. In its preliminary statement, Capstone states that Mr. Manzo worked exclusively for Capstone, [125] despite the fact that, later in its pleading, Capstone describes Manzo's Innkeepers engagement, which engagement was never disclosed. Because RJM did not conduct any activity other than serving as the counterparty to the Capstone/Manzo Agreement, Capstone asserts that, for the purposes of section 504, RJM should "simply be disregarded" and that any argument to the contrary "is a clear example of form over substance."[126] It argues that section 504 has not been violated and that the "draconian remedy" sought by the U.S. Trustee Motion for the disclosure violations should not be granted, as no party can dispute the quality of the worked performed by Capstone and Mr. Manzo on the engagement, and no additional contemporaneous disclosures would have changed anything about the engagement.[127]

---

[124] Docket No. 1631 at p. 4.

[125] Id. at p. 10. Capstone again states in a later footnote that the identification of Mr. Manzo as an employee was erroneous and that RJM "should more accurately been described as a contract counterparty with Capstone," but that "the remainder of the disclosure accurately described Mr. Manzo's relationship with RJM, LLC and the nature of RJM, LLC's relationship with Capstone." Id. at p. 43 n.11.

[126] Id. at p. 31.

[127] Id. at p. 5.

On February 7, 2013, responses to the Objections were filed by (i) the Libassi Parties, together with the Declaration of Keith Sambur in support of their response,[128] (ii) Black Diamond and GSCAH,[129] and (iii) the U.S. Trustee, together with the Declaration of Andrea B. Schwartz in support of its response.[130] In its response, the U.S. Trustee reaffirms that nothing contained in the Objections alters the relief that it seeks in these cases, cases in which the parties "fail to acknowledge the serious nature of their wrongful conduct" and "turned a blind eye to the most fundamental precepts of the law: veracity, accuracy, and disclosure."[131] The U.S. Trustee also points out that even if section 504 was not applicable to the Capstone/Manzo arrangement, the Second Supplemental Ordway Declaration still falsely states that "Capstone has no agreement with any other entity to share with such entity any compensation received by Capstone in connection with these Chapter 11 cases." An accurate declaration, argues the U.S. Trustee, would have disclosed the existence of the Capstone/Manzo Agreement and would have provided information regarding the fee sharing arrangement. Had such disclosure been made, the Court and interested parties could have explored whether the payments to Mr. Manzo were permitted under section 504.[132]

The Libassi Parties filed a response to the objections of Capstone and the Manzo Parties, reiterating their position that Mr. Manzo should be removed as Liquidating Trustee because he breached his responsibilities as a fiduciary, giving rise to irreconcilable conflicts with the interests of the beneficiaries.[133] By their response, Black Diamond and GSCAH focus on the

128 Docket Nos. 1634 and 1637.
129 Docket No. 1635.
130 Docket Nos. 1636 and 1638.
131 Docket No. 1636 at p. 2.
132 Docket No. 1636 at p. 31.
133 In their reply, the Libassi Parties also state that "new evidence confirms that Manzo breached his duties as a fiduciary with respect to his treatment of the Kaye Scholer law firm" and that "[e]vidence shows that Manzo made payments to Kaye Scholer at the same time he was soliciting favorable testimony from Michael Solow, Kaye

arguments raised in the Objections with respect to section 504, and argue that Capstone's arrangement with RJM does not fall within the section 504(b) exceptions. They assert that Capstone and the Manzo Parties have not presented authority suggesting that the Lemonedes case,[134] in which the court held that that a lawyer acting as "of counsel" for a law firm and held out to the public as part of the firm will be regarded as a "member" of the firm for the purposes of section 504(b), extends beyond the historical law firm context so as to be applicable to Mr. Manzo's relationship with Capstone. Moreover, even if the holding of Lemonedes could extend to fee sharing with non-attorney professionals, because the decision dealt with a firm's relationship to an *individual professional*, they assert that it would not avail Capstone, who had a relationship with a corporate entity, RJM. Finally, they allege that the estates were harmed by Capstone's actions because the estates were subjected to a markup of RJM's fees "though the majority of the action portion of the case."[135]

## IV. The Ill-Fated Rule 9019 Settlement Motions

With more than a full year of fighting over fees behind them, the parties prepared to commence the Trial on the U.S. Trustee Motion and the Joinders on February 11, 2013. Literally on the eve of the Trial, on February 10, 2013, the U.S. Trustee filed a notice of adjournment of hearing on the U.S. Trustee Motion, rescheduling the Trial for February 13, 2013. On February 11, 2013, the U.S. Trustee filed a motion pursuant to Bankruptcy Code section 105(a) and Bankruptcy Rule 9019 for approval of settlement agreements between (i) the U.S. Trustee and

---

Scholer's Managing Partner, to support Capstone's fee application." Docket No. 1637 at p. 3. At Trial, the Libassi Parties failed to submit any evidence in support of these allegations.

[134] See Lemonedes v. Balaber-Strauss (In re Coin Phones, Inc.), 226 B.R. 131 (S.D.N.Y. 1998), aff'd, 189 F.3d 460 (2d Cir. 1999).

[135] To support this allegation, Black Diamond and GSCAH allege that, because the Capstone/Manzo Agreement in effect as of the Petition Date provided that RJM would receive 80% of the hourly fees Capstone billed the Debtors for Mr. Manzo's services, the Debtors were subject to a 25% markup of the cost of Mr. Manzo's services until April 1, 2011, when the agreement was amended to provide that Mr. Manzo would receive 100% of the hourly fees Capstone billed the Debtors for Mr. Manzo's services. This argument was not pursued at Trial.

Capstone and (ii) the U.S. Trustee and the Manzo Parties (the "Capstone/Manzo 9019 Motion").[136] The Trial was further adjourned, and, after the parties engaged in several days of additional settlement discussions with Judge Peck, a settlement emerged between Kaye Scholer and the U.S. Trustee. On February 15, 2013, the U.S. Trustee filed a motion pursuant to Bankruptcy Code section 105(a) and Bankruptcy Rule 9019 for approval of a settlement agreement between the U.S. Trustee and Kaye Scholer (the "KS 9019 Motion").[137]

Each of the three settlement agreements was entered into by and among (i) the U.S. Trustee by (a) Tracy Hope Davis, the United States Trustee for Region 2 and (b) Ramona D. Elliott, Deputy Director/General Counsel for the Executive Office for United States Trustees and on behalf of the United States Trustees for Regions 1 through 21 and (ii) the professional (Capstone, the Manzo Parties, or Kaye Scholer, respectively). By including the United States Trustees for all regions, the Office of the United States Trustee entered into and sought this Court's approval of what it has referred to as a "national" settlement agreement.[138] No coherent, let alone compelling, explanation of this extraordinary measure has ever been offered by the U.S. Trustee. It utterly perplexed the Court and went well beyond anything raised in the pleadings.

The lynchpin of the three proposed settlements was the all-encompassing release that the settlements would afford Capstone, the Manzo Parties, and Kaye Scholer. For example, a condition to Capstone's obligations under the UST/Capstone Settlement[139] is that the Court's

---

[136] Docket No. 1645. On February 12, 2013, Black Diamond filed a letter with the Court arguing that the filing of the Capstone/Manzo 9019 Motion did not form a basis to delay the Trial (for the reasons set forth therein) and asking that the Trial proceed on February 13, 2013. [Docket No. 1648],

[137] Docket No. 1652. The U.S. Trustee wasted little time issuing press releases trumpeting the settlements; alas, in light of subsequent events, a more restrained approach might been appropriate.

[138] See Position Statement of U.S. Trustee, dated April 8, 2013 [Docket No. 1705] at ¶ 2 ( . . . "the United State Trustee and Ramona D. Elliott, Deputy Director/General Counsel for the Executive Office for United States Trustees and on behalf of the United States Trustees for Regions 1 through 21, reached the national Settlements with Kaye Scholer, Capstone and the Manzo Parties . . . .").

[139] The settlement agreement by and among (i) Capstone and (ii) the U.S. Trustee by (a) Tracy Hope Davis, the United States Trustee for Region 2 and (b) Ramona D. Elliott, Deputy Director/General Counsel for the

order granting the Capstone/Manzo 9019 Motion "preclude (a) further litigation by *any party* of the allegations made in the [U.S. Trustee] Motion and joinders thereto; (b) further litigation by *any party* over Capstone's Final Fee Application [Docket No. 1431]; and (c) further litigation over Capstone's fees in the [Debtors' bankruptcy cases], including pre- and post-effective date fees."[140] The U.S. Trustee's settlement agreement with Kaye Scholer (the "UST/KS Settlement ")[141] and with the Manzo Parties (the "UST/Manzo Settlement")[142] contained substantially similar third-party release language.[143] Each of the settlement agreements also contained nearly identical mutual release language vis-à-vis the claims of the U.S. Trustee.

**A. The Capstone Rule 9019 Settlement**

The UST/Capstone Settlement was comprised of (i) a monetary component, (ii) a compliance and monitoring component, (iii) the resignation of Capstone from rendering further professional services to the Liquidating Trustee, and (iv) a third-party release condition, as described above.[144]

With respect to the monetary component of the UST/Capstone Settlement, Capstone agreed to remit $1 million to the Debtors' estates by (i) withdrawing its request for fees that it

---

Executive Office for United States Trustees and on behalf of the United States Trustees for Regions 1 through 21 shall be referred to herein as the "UST/Capstone Settlement." See Docket No. 1645, Ex. A.

140 UST/Capstone Settlement, pp. 2-3 (emphasis added).

141 Docket No. 1652, Ex. A.

142 Docket No. 1645, Ex. B.

143 While the release in the UST/KS Settlement is nearly identical to that in the UST/Capstone Settlement except that the fees referred to are those of Kaye Scholer instead of Capstone, the release contained in the UST/Manzo Settlement is broader in scope in that it includes both pre-Effective Date and post-Effective Date fees. The UST/Manzo Settlement provides that a condition to the Manzo Parties' obligations under the UST/Manzo Settlement is that the Court's order granting the Capstone/Manzo 9019 Motion "preclude (a) further litigation by *any party* of the allegations made in the [U.S. Trustee] Motion and joinders thereto insofar as they relate to Capstone and the Manzo Parties; (b) further litigation by *any party* over RJM I, LLC's activities as Liquidating Trustee in the [bankruptcy cases]; and (c) further litigation over the Manzo Parties' fees in the [bankruptcy cases], including pre- and post-effective date fees." UST/Manzo Settlement, p. 3 (emphasis added).

144 In addition, pursuant to the UST/Capstone Settlement, Capstone admitted that the Second Supplemental Ordway Declaration erroneously described Manzo as an employee of Capstone through RJM and should have accurately described RJM as a contract counterparty of Capstone, with Mr. Manzo as its sole member; therefore, Manzo was an independent contractor of Capstone. Capstone denied all other allegations asserted against it by the U.S. Trustee Motion and the Joinders.

has incurred, but has not yet received, in the Debtors' cases, which aggregate $365,507.73 and (ii) disgorging the sum of $634,492.27 that was approved on an interim basis and already has been paid to Capstone.[145] Capstone also agreed to withdraw the Performance Fee Motion.

With respect to the compliance and monitoring component of the UST/Capstone Settlement, Capstone agreed to the appointment of an independent monitor who, at Capstone's expense, would: (i) review Capstone's internal policies and procedures relating to retention applications in bankruptcy cases, including with respect to disclosures, fee applications, and conflict reviews; (ii) make recommendations for improvements to such policies and procedures; (iii) approve such policies and procedures; and (iv) ensure compliance going forward for a period of two years.[146]

Capstone also agreed to resign from rendering professional services to RJM I as the Liquidating Trustee and to provide, at its cost, reasonable assistance to help its successors familiarize themselves with the matter during the sixty (60) day period following its resignation. Finally, Capstone would retain fees previously paid for services rendered to the Liquidating Trust and would be paid for services rendered through February 4, 2013.

**B. The Kaye Scholer Rule 9019 Settlement**

The UST/KS Settlement was comprised of (i) a monetary component, (ii) a policies and procedures component, and (iii) a third-party release condition, as described above. With respect to the monetary component, Kaye Scholer agreed to remit to the Debtors' estates the sum of $1.5 million by (i) withdrawing its request for fees that it has incurred, but has not yet received, in the

---

145 As discussed *infra*, by its final fee application, Capstone seeks allowance and payment of a total of $5,947,270.00 in fees and $254,348.40 of out-of-pocket expenses. In addition, by the Amended Performance Fee Motion, Capstone seeks allowance and payment of $2.75 million as a "Performance Fee." Thus, Capstone's aggregate request for fees is $8,697,270.00.

146 The independent monitor would be selected by both Capstone and the U.S. Trustee, would consult both parties in developing the aforementioned policies and procedures, and would report to the Court in a public filing any instances of Capstone's failure to comply with the policies and procedures approved by the independent monitor.

Debtors' cases, which aggregate $352,005.52 and (ii) disgorging the sum of $1,147,994.48 that was approved on an interim basis and already has been paid to Kaye Scholer.[147]

The "policies and procedures" component of the UST/KS Settlement required Kaye Scholer to: (i) retain, at its own expense, an independent "Policies and Procedures Expert;" (ii) review its internal policies and procedures relating to court-approved retention applications in bankruptcy cases for the purpose of determining whether to make improvements to such policies and procedures; (iii) undertake to improve, if necessary, such policies and procedures in order to ensure compliance with disclosure requirements in any retention as counsel in future bankruptcy cases; and (iv) complete any improved policies and procedures within 120 days after the Court's entry of the final order approving the UST/KS Settlement.[148]

**C. The Manzo Parties' Rule 9019 Settlement**

The UST/Manzo Settlement was comprised of (i) the resignation of RJM I as Liquidating Trustee; (ii) a monetary component; (iii) a conflicts and disclosure protocol component; and (iv) a third-party release condition, as described above. By the UST/Manzo Settlement, RJM I agreed to resign as Liquidating Trustee in the bankruptcy cases, effective as of February 28, 2013 (or such earlier date as a successor trustee was appointed), without admitting fault or liability of any kind. RJM I also agreed to provide, at its own cost, reasonable assistance to help

---

147 As discussed *infra*, by its final fee application, Kaye Scholer seeks allowance and payment of a total of $5,431,512.90 in fees and $286,230.79 in out-of-pocket expenses.

148 The UST/KS Settlement provided that the Policies and Procedures Expert would be selected by Kaye Scholer and the U.S. Trustee to review and approve any revised/improved policies and procedures submitted to him/her by Kaye Scholer. Once finalized, Kaye Scholer would not modify its policies and procedures for a period of two years without prior consultation with and approval by the Policies and Procedures Expert. By the UST/KS Settlement, Kaye Scholer further agreed to conduct training sessions within the firm to instruct and educate Kaye Scholer attorneys and other staff regarding the revised/improved policies and procedures and the need to follow them in all circumstances. Within one year from the date of the completion of the training sessions, Kaye Scholer would submit to the Court a certification under penalty of perjury that the firm materially complied with the policies and procedures since completion of the training sessions. In addition, Kaye Scholer agreed to form a committee to review and approve all retention applications to be filed in bankruptcy cases and to interview the partner responsible for the matter to make certain that all required disclosures have been made.

its successors familiarize themselves with the matter during the sixty (60) day period following its resignation. Following its resignation as Liquidating Trustee, neither RJM I (nor any other Manzo Party) would have any further liability in the Debtors' cases or to the Liquidating Trust (except to provide reasonable assistance to the successor trustee for sixty days).

Pursuant to the monetary component of the UST/Manzo Settlement, RJM I agreed to forgo (i) payment of $175,000 of the $398,500 in Liquidating Trustee fees incurred through January 31, 2013 that were accrued but unpaid, (ii) payment of all fees incurred from February 1, 2013 through its resignation date, and (iii) reimbursement of attorneys' fees and expenses incurred by it as a result of the Debtors' bankruptcy cases and the U.S. Trustee Motion. RJM I would be paid, prior to its resignation, the remaining $223,500 in fees incurred prior to January 31, 2013.

With respect to the conflicts and disclosure protocol component of the UST/Manzo Settlement, the Manzo Parties (and any other limited liability company or similar entity formed or controlled by Mr. Manzo) agreed to comply with the conflicts checking and disclosure procedures adopted by Capstone's independent monitor appointed pursuant to the UST/Capstone Settlement in every bankruptcy case in which they are retained by Capstone.[149]

On March 12, 2013, a Notice of First Amendment to Settlement Agreement Among UST and Manzo Parties was filed by the U.S. Trustee, annexing an amendment to the UST/Manzo

[149] If any of the Manzo Parties is retained by any estate-retained financial advisory firm in a bankruptcy case, the Manzo Parties agreed to either (i) ensure that the financial advisory firm includes the Manzo Parties in its conflicts run and discloses the financial advisory firm's employment, contractor, or other relationship with the Manzo Parties or (ii) prepare a conflicts run and file the proper disclosures with the Bankruptcy Court if the financial advisory firm itself does not prepare such a conflicts check and file such disclosures. The Manzo Parties agreed to review pending bankruptcy cases in which one or more of them is acting as an independent contractor for a retained financial advisory firm and ensure that the financial advisory firm makes any supplemental disclosures as necessary within ninety (90) days of the Bankruptcy Court's approval of the UST/Manzo Settlement (or that the Manzo Parties themselves make the disclosure).

Settlement.[150] The amendment provided that RJM I's resignation as Liquidating Trustee would become effective on the "Effective Date" of the UST/Manzo Settlement, i.e., the date the Capstone/Manzo 9019 Motion was approved by the Court, and not on February 28, 2013. With respect to the monetary component, the UST/Manzo Settlement was amended as follows: RJM I agreed to forgo (i) payment of $175,000 of the $398,500 in accrued but unpaid fees it incurred through January 31, 2013, (ii) payment of all fees incurred by it from February 1, 2013 through February 28, 2013, and (iii) reimbursement of attorneys' fees and expenses incurred by it through February 28, 2013 as a result of the Debtors' bankruptcy cases and the U.S. Trustee Motion. The amendment provided that the Manzo Parties would receive payment for (i) the balance of the accrued but unpaid fees of RJM I – $223,500 – plus any fees incurred by it on or after March 1, 2013 and (ii) reasonable attorneys' fees and expenses incurred by it on or after March 1, 2013 through the resignation date.

### D. The Supplemental Statement of the U.S. Trustee

The parties held a conference with the Court which resulted in the entry of a scheduling order, dated February 15, 2013,[151] which, among other things, modified the Trial agenda to include consideration of (i) the Capstone/Manzo 9019 Motion, (ii) the KS 9019 Motion, (iii) the pending applications for final fees and reimbursement of out-of-pocket expenses of the retained professionals in the Debtors' cases, and (iv) motions for sanctions pursuant to Bankruptcy Rule 9011, if any, and rescheduled the Trial for April 22, 2013.

---

[150] Docket No. 1671.
[151] Docket No. 1651.

On February 27, 2013, the U.S. Trustee filed a supplemental statement in support of the Capstone/Manzo 9019 Motion and the KS 9019 Motion (the "Supplemental Statement").[152] The Supplemental Statement contains the following statement:

> Although it is uncertain whether the law **requires** court approval of the Settlement Agreements, the law certainly does not **prohibit** court approval. The United States Trustee recognizes that neither Rule 9019 nor any other provision of the Bankruptcy Code or Bankruptcy Rules explicitly sets forth procedural requirements or standards for the approval of a settlement between the United States Trustee and an estate professional. In the face of this textual uncertainty, and out of an abundance of caution, the United States Trustee has chosen to err on the side of greater transparency and inclusiveness by requesting approval under the same procedures and standards that typically apply in a Rule 9019 settlement.

Supplemental Statement at p. 2 (emphasis in original).

The Supplemental Statement went on to state:

> Even if this Court concludes that the United States Trustee's citation of Rule 9019 was inapposite, no party has been prejudiced as a result. To the contrary, because Rule 9019 does not affect the Court's substantive power to approve settlements, the only practical consequence of proceeding under Rule 9019 was to provide all creditors with notice and an opportunity to be heard -- procedural rights that nonparties to a non-estate settlement typically do not enjoy. As a result, any objections to alleged procedural defects in the [Capstone/Manzo 9019 Motion and the KS 9019 Motion] do not provide a basis to disapprove the Settlement Agreements.

Supplemental Statement at p. 7.

Regarding the third-party release condition contained in each of the three settlement agreements, the U.S. Trustee, remarkably, stated as follows:

> The Settlement Agreements do not resolve any claims of the bankruptcy estate or affect any rights of non-settling third parties. Although some of the relief provided by the Settlement Agreements is monetary and is paid to the estates, the claims brought and released are the United States Trustee's civil enforcement claims ensuring compliance with the Bankruptcy Code and Rules. Moreover, the releases in the Settlement Agreements expressly state that only the United States

152 Docket No. 1663.

> Trustee is releasing claims and that the releases are not binding on any other party.[153]

Supplemental Statement at pp. 7-8. The Supplemental Statement did not provide any insight into the standards that should be applicable to evaluate the terms of the settlements, nor did it in any way address the fact that the proposed settlements were indeed conditioned on the release of the claims of non-settling third parties, in the form of an order precluding the assertion of any such claims.

On March 1, 2013, Kaye Scholer filed a joinder to the KS 9019 Motion[154] and Capstone and the Manzo Parties filed a "joint statement and joinder" with respect to the Capstone/Manzo 9019 Motion.[155] Kaye Scholer argued that it has "strong defenses" that it believes would have resulted in a small (or no) penalty had a trial gone forward on the U.S. Trustee Motion. Kaye Scholer asserted that the lawyers at Kaye Scholer working on the disclosures believed that Mr. Manzo was a Capstone employee; thus, they did not include him, RJM, or RJM I in the Kaye Scholer conflicts check, a practice consistent with the practices of other major debtor firms. In exercising discretion to determine relief appropriate for alleged disclosure violations, were the Court to consider (i) whether the violation was willful, (ii) whether the violation harmed the estate, and (iii) the value of the services performed by the professional (each as set forth by Judge Bernstein in Granite Partners), Kaye Scholer argued that, on each of those issues, it has strong defenses. Accordingly, Kaye Scholer submitted that the terms of the UST/KS Settlement, which include disgorgement of approximately 28% of Kaye Scholer's total fees in the Debtors'

---

153 Footnote 3 of the Supplemental Statement also stated the following: "Although the effectiveness of the Settlements with the United States Trustee are conditioned upon a court order precluding further litigation by any party of the allegations in the [U.S. Trustee Motion] or over final fee applications, that is not and was not intended to be a release of third-party claims. Rather, it is an express acknowledgement that other parties have joined in the United States Trustee's objections but have not agreed to settle on any terms." What this sentence means is unclear.

154 Docket No. 1665.

155 Docket No. 1668.

cases – more than double the percentage of fees disgorged in more egregious cases – were well within the range of reasonableness.

Capstone and the Manzo Parties echoed Kaye Scholer's statement that the settlements achieved with the U.S. Trustee reflected a reasonable resolution of the issues raised in the U.S. Trustee Motion. In their joint statement, Capstone and the Manzo Parties argued that, as a threshold matter, the objections of Black Diamond and the Libassi Parties should be overruled or such parties should be held in contempt because Black Diamond and its affiliates[156] agreed in the Confirmation Stipulation to waive any objection to Capstone's fees. Were the objections of those parties to be permitted to go forward, Capstone and the Manzo Parties nevertheless maintained that, because the U.S. Trustee Motion and the Joinders "deal solely with matters of public concern, not individualized claims for damages or other relief," the U.S. Trustee has "exclusive authority" to settle the U.S. Trustee Motion.[157] Moreover, they asserted that because Black Diamond and the Libassi Parties are merely parties in interest, they "may only object to—rather than unilaterally veto—the 9019 Motion, and cannot prosecute Motion-related allegations if the 9019 Motion is granted." The parties also attempted to defend their settlements under common law, stating that common law, and not Bankruptcy Rule 9019, provides the substantive basis for approval of the settlements. Finally, as support for the broad third-party release provision in their settlements, they argued that all post-Effective Date allegations against RJM I should be able to be determined and resolved at the hearing on the Capstone/Manzo 9019 Motion, given that the objecting parties will be unable to demonstrate that Mr. Manzo engaged in

[156] Capstone and the Manzo Parties argued that the Libassi Parties should be viewed as "affiliates" of Black Diamond because three of four of them are employed by Black Diamond, and all are acting "in concert" with Black Diamond, who is paying their legal fees.

[157] Capstone and the Manzo Parties also included a quote from the Court in support of their position in this regard. The Court's statement – that it views Black Diamond's role as "quite secondary" – was taken out of context and does not support the parties' assertions.

conduct constituting willful misconduct, gross negligence, fraud, or criminal conduct. For all of these reasons, Capstone and the Manzo Parties requested that the Court grant the relief requested in the Capstone/Manzo 9019 Motion.

On March 15, 2013, objections to the Capstone/Manzo 9019 Motion and the KS 9019 Motion were filed by Black Diamond and the Libassi Parties.[158] By its objections, Black Diamond asserted that the attempt to use Rule 9019 as a predicate for a global settlement of all claims to be asserted by any party against Capstone, the Manzo Parties, or Kaye Scholer is "both a misuse of Rule 9019 . . . and an impermissible infringement of the rights of the non-parties to the settlement."[159] The settlements cannot be used to deprive other parties of their right to a hearing on the merits with respect to the issues raised by the U.S. Trustee Motion, and that aspect of the settlements is not reasonable. Moreover, with respect to Capstone and the Manzo Parties, Black Diamond argued that the settlement agreements are inadequate in relation to the harm done to the estates and to the Liquidating Trust, as Mr. Manzo's appointment as Liquidating Trustee was "a product of [] false disclosures and lack of candor during plan negotiations," and now, as Liquidating Trustee, he has (i) billed the Liquidating Trust for hundreds of hours of time with no visible benefit achieved for creditors and (ii) overspent the $1 million budget by at least $3 million. (No support for the $3 million number was ever offered at Trial.) The Libassi Parties reiterated this concern in their objection to the Capstone/Manzo 9019 Motion, claiming that Rule 9019 cannot be used to prevent a court's review of the merits of a professional's fee application nor can it be used to settle claims that arise after the effective date of a plan. Both the Libassi Parties and Black Diamond submitted that, because the Court lacks the power to enter a Rule 9019 order that precludes any third party from asserting a claim against the settling

[158] Docket Nos. 1675, 1676, and 1681. The Libassi Parties also filed the Declaration of Keith Sambur in support of their objection. See Docket No. 1682.

[159] See ¶1, Docket No. 1676.

parties, the settlements' purported relief – which would be triggered only by entry of such an order – is illusory.

In March and April 2013, the Court held several conferences with the parties in order to discuss matters raised in the morass of pleadings and how such issues would be handled procedurally in advance of the upcoming Trial. After a conference held on April 3, 2013, the Court entered a Modified Scheduling Order[160] which, among other things, ordered that

> . . . Black Diamond shall file and serve a supplemental pleading . . . describing additional claims, if any, based upon pre-effective date conduct that Black Diamond would seek to preserve subsequent to approval of the UST/Kaye Scholer Settlement or resolution of the Kaye Scholer final fee application . . . [and which] should address why the claims would withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), as made applicable by Fed. R. Bankr. P. 7012(b) . . . [and] the Libassi Creditors and Black Diamond shall file and serve a supplemental pleading . . . describing additional claims, if any, based upon post effective date conduct, against the Manzo Parties and Capstone . . . [which] should address why the claims would withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), as made applicable by Fed. R. Bankr. P. 7012(b) . . . [and] the U.S. Trustee shall file and serve a statement of position and/or supplement or amendment to [the U.S. Trustee Motion] and/or the Settlement Motions, if any . . .

The Modified Scheduling Order further provided that, if Kaye Scholer responded to the pleadings described in the order by April 16, 2013, "the Court may advise the parties on April 19, 2013 at 10:00 AM Eastern Time whether it intends to approve the UST/Kaye Scholer Settlement or the Kaye Scholer final fee application." The parties filed a number of additional pleadings in April 2013 in accordance with such order.[161]

---

160 Docket No. 1698.

161 On April 8, 2013, in compliance with the Modified Scheduling Order, the U.S. Trustee filed a position statement [Docket No. 1705], and Black Diamond and the Libassi Parties filed supplemental statements [Docket Nos. 1707 and 1708]. The Libassi Parties also filed the Declaration of Keith Sambur in support of their supplemental statement [Docket No. 1706]. On April 15, 2013, Kaye Scholer filed (a) a response to (i) Black Diamond's limited objection to the KS 9019 Motion and (ii) Black Diamond's supplemental statement regarding the final fee application of Kaye Scholer [Docket No. 1714] and (b) a response to the UST Position Statement [Docket No. 1715]. Supplemental statements were also filed on April 19, 2013 by Capstone [Docket No. 1721] and by the Manzo Parties [Docket No. 1723], who also filed the Declaration of Andrew Tenzer [Docket No. 1720]. Capstone filed the Declaration of Steven J. Mandelsberg in support of its supplemental statement. [Docket No. 1722]. By its

## V. The Preliminary Kaye Scholer Rule 9019 Settlement Ruling

At 10:00 a.m. on April 19, 2013, the final business day before the commencement of the Trial, the Court issued a tentative ruling on the KS 9019 Motion.[162] The Court commenced its ruling by stating that "I am not prepared to grant the motion. Indeed, in light of the procedural infirmities in the motion and the structural and substantive issues presented by the settlement agreement itself, I am not prepared, as a technical matter, to consider the motion on the merits because I do not believe it is properly before me."[163] In the ruling, the Court laid out the infirmities in the KS 9019 Motion and why, in its existing form, the UST/KS Settlement could not be approved. The Court observed, however, that it would not stand in the way of the parties working out and implementing their own contractual settlement agreement.[164] Accordingly, the Court stated that an acceptable path to the resolution of the U.S. Trustee Motion with respect to the relief sought against Kaye Scholer and the joinder of Black Diamond to the request for such relief would include (i) a withdrawal of the U.S. Trustee Motion based on the terms of a contractual settlement between Kaye Scholer and the U.S. Trustee and (ii) the Court's entry of a final fee order containing provisions outlined by the Court in its ruling, including a reduction in the final allowed amount of Kaye Scholer's fees and expenses at least in the amount of $1,500,000, the amount of monetary relief set forth in the UST/KS Settlement. While the Court informed the parties that the final fee order would not contain specific decretal language directing the release of any claims asserted by Black Diamond or other third parties, it found the additional claims asserted by Black Diamond with respect to alleged breach of fiduciary duty to

---

position statement, the U.S. Trustee, among other things, sought to amend the U.S. Trustee Motion to seek "the non-monetary relief achieved in the Settlements" in the event that the Rule 9019 settlements were not approved by the Court.

[162] See April 19, 2013 Hr'g. Tr. [Docket No. 1735].

[163] April 19, 2013 Hr'g. Tr. at 6:16-21.

[164] The Court stated that, should the parties decide to include the non-monetary components of the UST/KS Settlement in any contractual settlement, there should be no inference drawn or statement made that the Court approved such measures or found they were necessary.

be without merit. The Court concluded with a statement that, if the parties wished to pursue the path outlined by the Court, their agreement could be put on the record at the start of the Trial.

Early that evening, without prior notice to the Court, to Capstone, or to the Manzo Parties, and while the motions were *sub judice*, the U.S. Trustee unilaterally filed a Notice of Withdrawal of both the KS 9019 Motion and the Capstone/Manzo 9019 Motion.[165] Kaye Scholer and the U.S. Trustee also informed the Court and the other parties that they had reached an out-of-court settlement of the allegations raised in the U.S. Trustee Motion against Kaye Scholer.

## VI. The Rule 9011 Sanctions Motions

Meanwhile, on March 15, 2013, Black Diamond had filed two Motions for Order Pursuant to Bankruptcy Rule 9011. One was filed against Kaye Scholer and Michael Solow, Esq. (the "KS Sanctions Motion").[166] Motions for sanctions against Capstone pursuant to Bankruptcy Rule 9011 were filed by both Black Diamond[167] and by the Libassi Parties[168] (together, the "Capstone Sanctions Motions"). On March 29, 2013, objections to the KS Sanctions Motion and the Capstone Sanctions Motions were filed by Kaye Scholer and Capstone, respectively.[169] Replies were filed by Black Diamond and the Libassi Parties on April 5, 2013.[170]

### A. The Motions Seeking Sanctions Against Capstone

Pursuant to the BD/Capstone Sanctions Motion, Black Diamond alleges that Capstone, and specifically Mr. Ordway, knowingly executed (i) various versions of the Ordway

165 Docket No. 1719.
166 Docket No. 1678.
167 Docket No. 1677.
168 Docket No. 1683.
169 See Docket Nos. 1691, 1693, and 1694. Capstone also filed the Declaration of Steven J. Mandelsberg in support of its objections to the Capstone Sanctions Motions. See Docket No. 1695.
170 Docket Nos. 1701, 1702, and 1704. Black Diamond also filed the Declaration of Gregory Gartland in support of its reply. See Docket No. 1703.

Declarations in support of the Capstone retention application and (ii) certifications in support of Capstone's interim fee applications, each of which contained false statements regarding the employment of Mr. Manzo by Capstone. Black Diamond maintains that those false statements enabled Capstone to be retained and to seek compensation under false pretenses, as Capstone filed its final fee application and Performance Fee Motion premised on such statements. Black Diamond further asserts that its objection to the Performance Fee Motion was what led to related discovery and caused these matters to come to light. Accordingly, Black Diamond requests that the Court impose sanctions against Capstone and order Capstone to pay to Black Diamond an amount equal to the fees it incurred in objecting to the Performance Fee Motion and in the resulting discovery and litigation.

The Libassi Parties also filed a motion for sanctions under Bankruptcy Rule 9011 against Capstone (the "Libassi/Capstone Sanctions Motion," and, together with the BD/Capstone Sanctions Motion, the "Capstone Sanctions Motions"),[171] which incorporate by reference the arguments contained in the BD/Capstone Sanctions Motion.

On March 29, 2013, Capstone filed objections to the Capstone Sanctions Motions.[172] Capstone asserts the following arguments as to why the BD/Capstone Sanctions Motion should be denied. First, sanctions under Rule 9011 cannot be granted as the "complained-of conduct" has been corrected. Capstone asserts that it has "repeatedly and expressly" acknowledged that the statements made in the Ordway Declarations regarding the employment of Mr. Manzo by Capstone were inaccurate, and it has taken steps to correct the record. Second, sanctions are not appropriate where the party opposing sanctions holds a colorable claim of defense. Here, Capstone argues that its independent contractor relationship with Manzo does not violate section

---

171 Docket No. 1683.

172 See Docket Nos. 1693 and 1694. Capstone also filed the Declaration of Steven J. Mandelsberg in support of its objections to the Capstone Sanctions Motions. See Docket No. 1695.

504 of the Bankruptcy Code. Third, the BD/Capstone Sanctions Motion is untimely; Black Diamond learned of the Manzo/Capstone relationship in May of 2012 but did not bring its motion for sanctions for ten months. Fourth, Black Diamond did not comply with the twenty-one day "safe harbor" rule set forth in Rule 9011. Capstone asserts that, while Black Diamond initially served a copy of its motion on Capstone twenty-one days before its filing, as required by the rule, it then made substantive changes to the motion based on a letter from Capstone explaining how the motion was procedurally deficient. Black Diamond then filed the revised version of the motion without prior notice to Capstone. Fifth, the Court's February 15, 2013 scheduling order required that all motions be filed by January 11, 2013,[173] and the BD/Capstone Sanctions Motion was not filed until March 15, 2013. For all of these reasons, Capstone requests that the BD/Capstone Sanctions Motion be denied, and that sanctions be awarded not against it but against Black Diamond, in the form of Capstone's legal fees, for bringing a frivolous motion.

In its objection to the Libassi/Capstone Sanctions Motion, Capstone asserts that the motion is really nothing more than a joinder that does not lay out any grounds for sanctions against Capstone, and that joinders to Rule 9011 motions are impermissible. Capstone further asserts that the Libassi/Capstone Sanctions Motion was originally titled a "joinder and motion," and when Capstone informed the Libassi Parties that joinders to Rule 9011 motions are impermissible, the pleading was revised to be a "motion." This change was also in violation of the twenty-one (21) day safe harbor rule, as the Libassi parties did not share the revised motion with Capstone prior to its filing. Accordingly, Capstone requests that the Libassi/Capstone Sanctions Motion be denied, and that sanctions be awarded against the Libassi Parties, in the form of Capstone's legal fees, for bringing a frivolous motion.

[173] The Court's February 15, 2013 scheduling order required that any motions for sanctions pursuant to Bankruptcy Rule 9011 be served by February 22, 2013 and filed by March 15, 2013, not filed by January 11, 2013.

On April 5, 2013, Black Diamond and the Libassi Parties filed their replies.[174] In response to the objection filed by Capstone, Black Diamond argues that the failure to correct the false statements contained in the Ordway Declarations and the declarations made in support of Capstone's fee applications warrant sanctions, as the false statement that no fee sharing agreement exists gave no party reason to investigate whether the fee sharing passes muster under section 504. Further, in its reply, Black Diamond asserts that the BD/Capstone Sanctions Motion is timely, as Black Diamond only waited to bring the motion pursuant to the Court's directives regarding when certain types of pleadings should/could be filed. Black Diamond further asserts that the change it made to the BD/Capstone Sanctions Motion prior to filing was non-substantive and did not violate the safe harbor provision of Rule 9011. Black Diamond finally states that Capstone's request for sanctions against Black Diamond highlight the "recalcitrant" attitude of Capstone regarding the harm it caused the Debtors by concealing its arrangement with Mr. Manzo.

In response to the objection filed by Capstone, the Libassi Parties assert that the Libassi/Capstone Sanctions Motion is in fact a motion and not a joinder which incorporates by reference the arguments made in the BD/Capstone Sanctions Motion. The Libassi Parties further assert that the change from a "joinder and motion" to a "motion" was a purely stylistic and non-substantive revision, which did not violate the safe harbor provision of Rule 9011.

**B. The Motion Seeking Sanctions Against Kaye Scholer**

Pursuant to the KS Sanctions Motion, Black Diamond alleges that Kaye Scholer knowingly filed multiple false declarations and certifications in support of the retention and interim fee applications of Kaye Scholer. Black Diamond alleges that Kaye Scholer, and

---

[174] Docket Nos. 1702 and 1704. Black Diamond also filed the Declaration of Gregory Gartland in support of its reply. See Docket No. 1703.

specifically Kaye Scholer partner Michael Solow, Esq., were aware of the independent contractor relationship between Mr. Manzo and Capstone, yet they went ahead with the filing of (i) the Ordway Declarations and (ii) certifications executed in support of Capstone's fee applications, each of which contained affirmatively false statements – in particular, the repeated and false statement that Capstone "ha[d] no agreement with any other entity to share with such entity any compensation received by Capstone in connection with these chapter 11 cases." Black Diamond asserts that if Kaye Scholer and/or Mr. Solow had been forthcoming with their knowledge regarding the contractor relationship between Mr. Manzo and Capstone, the U.S. Trustee Motion and related litigation could have been avoided. Accordingly, because it maintains that Kaye Scholer's misstatements to the Court and its filing of multiple false papers without confirming the truthfulness of their content rise to the level of sanctionable conduct, Black Diamond requests that the Kaye Scholer and Michael Solow be sanctioned by the Court in accordance with Bankruptcy Rule 9011(c) and that Kaye Scholer pay Black Diamond's fees and expenses incurred as a result of such conduct in such amount as the Court deems reasonable.

On March 29, 2013, Kaye Scholer filed its objection to the KS Sanctions Motion.[175] In its objection to the KS Sanctions Motion, Kaye Scholer asserts that Black Diamond does nothing more than restate the same accusations that were made against Kaye Scholer in the U.S. Trustee Motion and request the same relief as was previously requested. Kaye Scholer asserts that, because (i) the U.S. Trustee Motion and the joinders filed thereto were intended to address all pre-Effective Date conduct, (ii) the U.S. Trustee and Black Diamond opted not to bring motions for sanctions in the U.S. Trustee Motion and the joinders filed thereto, and (iii) the claims made against Kaye Scholer in the U.S. Trustee Motion were to be settled pursuant to the UST/KS Settlement, the KS Sanctions Motion is barred by the settlement. Further, Kaye Scholer asserts

175 Docket No. 1691.

that Black Diamond does not cite to any statements that could form a basis for sanctions because (i) the inaccurate statements made in the Ordway Declarations had been "appropriately corrected" prior to the filing of the KS Sanctions Motion, and (ii) sanctions are not appropriate where the party opposing sanctions holds a colorable claim of defense. The issue of whether the Capstone/Manzo Agreement violated section 504 of the Bankruptcy Code is a legal question to be decided by the Court. In addition, Kaye Scholer asserts that the KS Sanctions Motion is untimely, both (a) pursuant to the Court's directive that all motions be brought by January 11, 2013, as discussed above, and (b) under Rule 9011, as it was filed *after* Kaye Scholer admitted that the statements contained in the Ordway Declarations were inaccurate and had been "appropriately corrected." Finally Kaye Scholer suggests that Black Diamond is not and should not be entitled to the sanctions it seeks – payment of its legal fees – as the purpose of Rule 9011 is to deter rather than to compensate parties. Accordingly, Kaye Scholer requests that the Court deny the KS Sanctions Motion and award to Kaye Scholer the fees it incurred in responding to Black Diamond's "frivolous" motion.

A reply was filed by Black Diamond on April 5, 2013.[176] In response to the objection filed by Kaye Scholer, Black Diamond refers to the arguments set forth in its objection to the UST/KS Settlement, and asserts that, as the settlement cannot be approved, the KS Sanctions Motion is not barred by the settlement. Black Diamond next argues that Capstone's admissions regarding its relationship with Mr. Manzo do not "cure" or "appropriately correct" the acts of Kaye Scholer – namely, filing multiple documents with the false assertion that Capstone did not share fees generated from the Debtors with any person or entity. Black Diamond clarifies that, even if the fee sharing agreement with Mr. Manzo does not violate section 504, Kaye Scholer (through Mr. Solow) was aware of the fee sharing arrangement with Mr. Manzo, and was

176 Docket No. 1701.

accordingly aware that the certifications in support of the Capstone fee applications contained false statements. Black Diamond states that its motion is timely, as the Court initially directed the parties not to file papers during discovery when the fee sharing arrangement was first uncovered, then it gave further directives as to when the filing of Rule 9011 motions was appropriate; Black Diamond asserts that it did not file its papers sooner as it did not want violate the Court's directives. Black Diamond further maintains that sanctions against Kaye Scholer are appropriate and that it is bringing its motion in good faith.

## VII. The Final Fee Application Requests

Pursuant to Section 3.3 of the Black Diamond Plan, the Chapter 11 Trustee and professionals requesting compensation for services rendered in connection with the Debtors' cases were required to file applications for allowance of final compensation and reimbursement of expenses on or before the 60th day following the Effective Date. Accordingly, professionals retained in the Debtors' cases filed their final fee applications in May 2012; the hearing on such applications has been adjourned numerous times. This decision will address the fee applications filed by Capstone and Kaye Scholer (together, the "Final Fee Applications").[177] The fees and expenses sought in the Final Fee Applications are as follows:

[177] The hearing on the fee applications filed by the Chapter 11 Trustee, Shearman, and Ernst & Young LLP has been adjourned to a date to be determined.

| Applicant | Period | Fees | Expenses | Hours |
|---|---|---|---|---|
| Kaye Scholer LLP (ECF No. 1436) | August 31, 2010 – February 16, 2012 | $5,431,512.90 | $286,230.79 | 9,851.47 |
| Capstone Advisory Group, LLC (ECF No. 1431) | August 31, 2010 – February 16, 2012 | $8,697,270.00[178] | $254,348.40 | 10,023.10 |
| **TOTALS** | | **$22,354,189.90** | **$725,066.57** | **33,815.57** |

On March 15, 2013, after the 9019 Motions had been filed and prior to the Trial, the U.S. Trustee and RJM I each filed a statement regarding the Final Fee Applications.[179] In its statement, the U.S. Trustee summarized the terms of the settlement agreements reached with Kaye Scholer and Capstone and stated that, subject to the Court's approval of such settlements, the U.S. Trustee has no objection to Kaye Scholer and Capstone's request for allowance and payment of the final fees and expenses in the reduced amounts. In the statement filed by RJM I as Liquidating Trustee, RJM I states that it takes no position with respect to the Fee Applications.[180]

[178] This amount includes the $2.75 million sought by Capstone pursuant to the Amended Performance Fee Motion. By its final fee application, Capstone requests $5,947,270.00 in fees and $254,348.40 in expenses for services rendered in these cases.

[179] Docket No. 1672. On the same date, the U.S. Trustee filed an amended statement regarding the Final Fee Applications. See Docket No.1673. RJM I's statement can be found at Docket No. 1674.

[180] RJM I explains that it takes no position on Capstone's final fee application because, pursuant to Section 5.1 of the Plan, the Chapter 11 Trustee (and not the Liquidating Trustee) has the right to review fees and expenses incurred by Capstone prior to the Effective Date. With respect to Kaye Scholer, RJM I states that it has determined not to take a position on Kaye Scholer's final fee application in order to avoid any suggestion of bias given the allegations that have been made regarding Mr. Manzo's relationship with Mr. Solow and the engagement of Kaye Scholer by RJM and RJM I on two limited engagements. The statements of RJM I with respect to the other final fee applications are not relevant to this decision; the hearing on such applications has been adjourned to a date to be determined.

Thomas Libassi also filed an objection to the Capstone Final Fee Application,[181] in which he further renewed and incorporated (i) his objection to the Performance Fee Motion and (ii) the Libassi Joinder and requested that the Court (a) deny the relief requested in Capstone's final fee application and order disgorgement of all fees previously paid; (b) deny the relief requested in the Amended Performance Fee Motion; and (c) remove Mr. Manzo as Liquidating Trustee, order disgorgement of all fees received by Mr. Manzo, and appoint an independent successor trustee with full power to pursue claims against Capstone and Kaye Scholer. Among other things, Mr. Libassi's objection to Capstone's final fee application asserts that the fees claimed by Capstone are excessive, improper, and predominantly the result of Mr. Manzo's "deceptive billing practices." The objection contains a detailed analysis of Capstone's time records in order to illustrate that (x) Mr. Manzo did not record time contemporaneously, which led to unreliable time records, and (y) a substantial portion of Capstone's time records are replete with lumped entries, vague descriptions, and duplicative entries that do not comply with applicable guidelines.

On March 27, 2013, the Chapter 11 Trustee filed a statement regarding the Final Fee Applications (the "Trustee Statement"),[182] in which he acknowledged the allegations made against Capstone regarding improper staffing, excessive billing by Mr. Manzo, and failure to comply with local rules regarding time recording in the Debtors' cases. By the Trustee Statement, the Chapter 11 Trustee stated that he believes Capstone substantially complied with the local rules, properly staffed the cases, and accurately recorded time commensurate with the services provided. While he questioned the appropriateness of Capstone billing the estate for time spent resolving objections to its interim fee application, the Chapter 11 Trustee stated that he believes that "the adjustments agreed by Capstone [in the UST/Capstone Settlement]

---

[181] Docket No. 1679. Mr. Libassi also filed the Declaration of Keith Sambur in support of his objection. See Docket No. 1680.

[182] Docket No. 1690.

adequately address those matters," and, as a result and subject to the Court's approval of the UST/Capstone Settlement, he had no objections to Capstone's request for allowance and payment of the final fees and expenses requested in the reduced amounts.

**VIII. The Trial Proceedings**

The Trial was held on April 22, 23, 24, 30, and May 1, 2013. Closing arguments were held on May 14, 2013, after which the parties submitted extensive post-trial briefing.[183]

**A. Kaye Scholer Settles with the U.S. Trustee**

At the outset of the Trial, the U.S. Trustee announced that it had reached a settlement with Kaye Scholer that the parties intended to implement without seeking court approval (the "KS Settlement"). The KS Settlement provided, among other things, that (i) the U.S. Trustee would dismiss its motion against Kaye Scholer with prejudice; (ii) Kaye Scholer would pay a monetary settlement amount of $1.5 million through a combination of disgorgement and disallowance of fees; and (iii) Kaye Scholer would undertake an extensive review of its policies and procedures relating to retention applications in bankruptcy cases.[184] In contrast to the UST/KS Settlement, the KS Settlement contained no third-party release language.

**B. The Manzo Parties Settle with the U.S. Trustee**

One more settlement emerged on the first day of Trial when the U.S. Trustee announced that it had reached an agreement with the Manzo Parties that the parties intended to implement without seeking court approval (the "Manzo Parties' Settlement"). The Manzo Parties' Settlement provided, among other things, that (i) RJM I would resign as Liquidating Trustee,

---

183 See Docket Nos. 1745, 1746, 1747, 1748, and 1749.

184 Ms. Schwartz read a full description of the terms of the settlement agreement into the record. See April 22, 2013 Hr'g. Trans. at 16:1-25:14.

effective as of the date a successor trustee is appointed by the Court,[185] without admitting fault or liability of any kind; (ii) RJM I would provide reasonable assistance at its exclusive cost and expense during the 60-day period following its resignation to help its successor familiarize itself with these cases;[186] (iii) RJM I would forego payment of $175,000 of the $541,880 in accrued but unpaid fees it incurred through March 31, 2013;[187] (iv) the U.S. Trustee would dismiss its motion against the Manzo Parties with prejudice; and (v) the Manzo Parties would update their conflicts disclosures in pending bankruptcy cases (to the extent necessary) and follow certain conflicts procedures in future cases in which they are involved, if any.[188] In contrast to the UST/Manzo Settlement, the Manzo Parties' Settlement contained no third-party release language.

**C. The Trial**

After the announcement of the KS Settlement, the Trial commenced with argument regarding the withdrawal of the Capstone/Manzo 9019 Motion, which had been withdrawn by the filing of the U.S. Trustee's Notice of Withdrawal on the last business day before Trial, while the motion was *sub judice*. Counsel for Capstone, who had not been told of the Notice of Withdrawal prior to its filing, argued that such withdrawal was in breach of Capstone's

---

185 The parties agreed with the Court that "effective date of appointment" actually means when the new trustee is "up and running." See April 22, 2013 Hr'g. Trans. at 101:21-102:9.

186 The Court raised with the parties the issue that the fiduciary's obligations to the Trust may extend beyond 60 days. See April 22, 2013 Hr'g. Trans. at 103:13-104:9. Mr. Manzo agreed that RJM I would not charge the Liquidating Trust for services rendered outside of the agreed-upon 60-day period to the extent such services are attributable to transition. See May 1, 2013 Hr'g. Trans. at 115:11-121:24.

187 The parties agreed to modify the Manzo Parties' Agreement to clarify that the U.S. Trustee would not object to RJM I's request for payment of accrued but unpaid fees, reasonable attorneys' fees, and expenses incurred as Liquidating Trustee above the $175,000 that will be foregone pursuant to the settlement agreement; however, the Manzo Parties recognize that there is no guarantee that any such amounts requested "shall" or "will" be paid. See April 22, 2013 Hr'g. Trans. at 123:21-124:25.

188 Ms. Schwartz read a full description of the terms of the settlement agreement into the record. See April 22, 2013 Hr'g. Trans. at 93:7-112:10. On May 1, 2013, Ms. Schwartz presented to the Court a few modifications to the terms of the Manzo Parties' Settlement in order to address the concerns raised by the Court on April 22, 2013. See May 1, 2013 Hr'g. Trans. at 113:13-122:13. The terms described by Ms. Schwartz on May 1, 2013 constitute the final terms of the Manzo Parties' Settlement and are summarized herein.

agreement with the U.S. Trustee and in violation of Bankruptcy Rule 7041. The Court agreed and stated that Capstone's rights on these arguments were reserved to the extent possible.[189]

The Court next heard argument on the scope of the fee objection waiver in the Confirmation Stipulation. Capstone argued that the waiver contained in Paragraph 12 of the Confirmation Stipulation, which provides that "Black Diamond hereby waives any rights to object to any fees and expenses" of retained professional of the Debtors and the Chapter 11 Trustee,[190] covers both (i) objections to Capstone's fee applications and (ii) "section 504 issues," thus precluding Black Diamond from seeking a reduction in Capstone's fees based on either one. In response, Black Diamond asserted that objections pursuant to section 504 are not "fee objections" but are instead akin to objections to a professional's retention and payment from the estate. Moreover, Black Diamond stated that, pursuant to Paragraph 12, it had only waived rights and claims known at the time of execution of the Confirmation Stipulation.

Second, Capstone argued that the waiver contained in Paragraph 12 of the Confirmation Stipulation should apply with equal force to Mr. Libassi because Black Diamond is paying his legal fees.[191] Counsel for Mr. Libassi responded by saying that Mr. Libassi is not employed by Black Diamond, and, despite Black Diamond's payment of his legal fees, the positions he has advocated are his own, which he has standing to pursue.

After hearing these preliminary matters and the parties' opening arguments, the Court heard live testimony from Mr. Ordway, Mr. Manzo, Mr. Nurnberg, Mr. Micheli, Mr. Tenzer, and

---

189 See April 22, 2013 Hr'g. Tr. at 42:3-4.

190 Paragraph 12 provides that Black Diamond may object to allowance of such fees and expenses incurred after July 26, 2011, but only to the extent that such amounts, after allowance, would exceed $8 million in the aggregate if such objections were sustained. No party has disputed the evidence in the record that Capstone's fees after July 26, 2011 remain under the $8 million threshold.

191 In support of its argument, both at Trial and in pleadings, Capstone points to the Libassi Engagement Letter, which states that Black Diamond has agreed to pay Richards Kibbe's legal fees during the course of its representation of Mr. Libassi during the GSC cases. This payment of legal fees, Capstone argues, makes Mr. Libassi Black Diamond's "agent."

Mr. Garrity. Mr. Ordway testified at length about Mr. Manzo's relationship with Capstone and how Capstone elected not to disclose the independent contractor relationship with Mr. Manzo because of its belief that the parties' arrangement is not inconsistent with the Bankruptcy Code.[192] Mr. Ordway also attempted to describe Capstone's conflicts procedures and how he believed Mr. Manzo had been included in any conflicts check conducted at Capstone with respect to GSC, but Capstone was unable to locate any documentary evidence confirming Mr. Ordway's statements in this regard. The lack of documentary evidence substantially undercut the credibility of Mr. Ordway/s testimony on these issues.

The Trial proceeded with lengthy testimony by Mr. Manzo on many matters including, among others: (i) the September 23 Meeting and his lack of recollection of any questions posed to him regarding independent contractors being used by Capstone; (ii) the absence of any review by Mr. Manzo of Paragraph 15 of the Second Supplemental Ordway Declaration and its statement that "Mr. Manzo, through RJM, LLC, is an employee of, and works exclusively for, Capstone;" (iii) the Capstone/Manzo Agreement and its various amendments; (iv) Mr. Manzo's timekeeping methodology; and (v) the insertion of the Consent Provision in the Liquidating Trust Agreement without his knowledge and the actions he took upon learning of such provision. Following Mr. Manzo's testimony, both Mr. Nurnberg and Mr. Micheli gave testimony regarding the limited topic of the September 23 Meeting and their individual recollections of Mr. Manzo's response to Ms. Schwartz's question about contractors – that Mr. Manzo had stated that Capstone had not retained any contractors to assist with the GSC engagement and had specifically noted his sensitivity regarding contractor issues because of his experience in the

192 April 23, 2013 Hr'g. Tr. at 220:13-19 ([Q:] "Did it occur to you that you needed to go back and clarify the record you created with your three declarations?" [Ordway:] "No." [Q:] "You realized the inconsistency but decided –" [Ordway:] "No, I don't think it's inconsistent. I think my arrangements with Bob Manzo are not inconsistent with the Bankruptcy Code.").

Refco bankruptcy case. Their testimony on this issue was nearly identical and dramatically contradicted Mr. Manzo's testimony regarding the September 23 Meeting.

The Court next heard testimony from Mr. Garrity, the Chapter 11 Trustee, who stated that he was not aware of the Capstone/Manzo Agreement (i) at the time he was involved in selecting Mr. Manzo as Liquidating Trustee nor (ii) at the time he engaged in settlement discussions with Mr. Manzo and Capstone regarding the Performance Fee Application, but, as a fiduciary, that was information he would have liked to have known.[193] He thought Mr. Manzo worked for Capstone.[194] In addition, Mr. Garrity testified regarding the Liquidating Trust Agreement and stated, in agreement with Mr. Manzo, that the Consent Provision had been added to the Liquidating Trust Agreement without his knowledge prior to its execution. Had he known that this change had been made, Mr. Garrity testified, he would not have executed the agreement.[195] Mr. Garrity explained that he "wanted to make sure that there was [sic] sufficient funds in the liquidating trust for the trustee to do whatever needed to be done in the case, and [he] didn't think appropriate for any creditor to have the ability to dictate that."[196] Mr. Tenzer also testified at length regarding the insertion of the Consent Provision in the Liquidating Trustee Agreement without the knowledge of the Liquidating Trustee or the Chapter 11 Trustee, recounting that the parties had agreed that a figure of $1,000,000 would be inserted in the blank contained in Section 2.7 of the draft Liquidating Trust Agreement but had not, however, agreed to (or even discussed) any other changes to the language of Section 2.7.[197] Black Diamond presented no evidence

---

[193] See April 30, 2013 Hr'g. Tr. at 249:6-251:23; 279:8-15 (Garrity) ("I think what I said before is that as the trustee, as a fiduciary in overseeing the estate, more information about the relationship between Mr. Manzo and Capstone, I would've welcomed to know that. What I would've done with it once I got it, I don't know. . . . [A]gain, that's along the lines of always wanting to get as much information as I can get.").

[194] Id. at 275:21-23.

[195] Id. at 284:7-25.

[196] Id. at 285:2-7.

[197] May 1, 2013 Hr'g. Tr. at 19:10-22, 21:7-23 (Tenzer) ("It was an issue that had never been discussed, and when I saw it for the first time months later it was different than (a) what I had understood the parties had agreed to

whatsoever to contradict the statements of Mr. Tenzer, Mr. Garrity, or Mr. Manzo regarding the insertion of the Consent Provision.

## DISCUSSION

### I. Governing Law

#### A. Section 327 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 2014

Section 327 of the Bankruptcy Code governs a trustee's or debtor in possession's[198] employment of attorneys, accountants, appraisers, auctioneers, and other professional persons to represent or assist in carrying out duties under the Bankruptcy Code. Section 327(a) authorizes the employment of professional persons only if such persons (i) do not hold or represent an interest adverse to the estate and (ii) are "disinterested persons," as that term is defined in section 101(14) of the Code.[199]

Federal Rule of Bankruptcy Procedure 2014 dictates the manner in which the debtor in possession requests the employment of a professional person under section 327. Bankruptcy Rule 2014(a) requires, in pertinent part, that an order approving the employment of attorneys and other professional persons be made only on application and be accompanied by a "verified statement" of the person to be employed. The application and the verified statement must each include "the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee." See Fed. R. Bankr. P. 2014(a). Bankruptcy Rule 2014(b)

---

and (b) different than I believe the draft of the liquidating trust agreement or the form of liquidating trust agreement that had been filed with the court as part of the plan supplement."); 46:5-11.

198 Section 1107(a) of the Bankruptcy Code gives a debtor in possession the rights and powers of a chapter 11 trustee. 11 U.S.C. § 1107(a).

199 As defined in section 101(14) of the Bankruptcy Code, a "disinterested person" (a) is not a creditor, an equity security holder, or an insider; (b) is not and was not, within two years before the date of the filing of the petition, a director, officer, or employee of the debtor; and (c) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders. See 11 U.S.C. § 101(14).

makes clear that only a person or entity that is a partner, member, or associate of a partnership or corporation hired as attorneys or accountants can perform services or be employed by the debtor without the necessity of a separate application and order. See Fed. R. Bankr. P. 2014(b).

The purpose of Rule 2014 "is to provide the court (and the United States Trustee) with information necessary to determine whether the professional's employment meets the broad tests of being in the best interest of the estate . . . ." In re Source Enters, Inc., et al., 2008 Bankr. LEXIS 940 at *24 (Bankr. S.D.N.Y. March 27, 2008) (citing 9 COLLIER ON BANKRUPTCY ¶ 2014.03 (15th ed. rev. 2007)). One of the policies behind the rule is to ensure that all professionals have run a "conflicts check" and made the resulting appropriate disclosures to the court, which enable the court to determine whether each professional has any adverse interest. See, e.g., In re Bennett Funding Group, Inc., 226 B.R. 331, 335 (Bankr. N.D.N.Y. 1998) (observing that "[t]he question of 'whether a professional [in this case, the Trustee] has "either a meaningful incentive to act contrary to the best interests of the estate and its sundry creditors - an incentive sufficient to place those parties at more than acceptable risk - or the reasonable perception of one'"); Leslie Fay, 175 B.R. at 533 ("a failure to disclose any fact which may influence the court's decision may result in a later determination that disclosure was inaccurate") (citing 8 COLLIER ON BANKRUPTCY, ¶ 2014.3 (15th ed. 1994)).

A professional's duty to disclose is "self-policing."[200] Granite Partners, 219 B.R. at 35 (citation omitted). Although Bankruptcy Rule 2014(a) does not expressly require a professional to supplement its initial disclosure, section 327(a) implies a duty of "continuing disclosure." See Grubin v. Rattet (In re Food Mgmt. Group), 380 B.R. 677, 690 n.7 (Bankr. S.D.N.Y. 2008)

[200] The provisions of Section 586(a)(3) of title 28 of the United States Code set forth the duties of the U.S. Trustee with respect to its oversight of the retention and compensation of professionals. Specifically, the U.S. Trustee is tasked with "monitoring applications filed under section 327 of title 11 and, whenever the United States trustee deems it to be appropriate, filing with the court *comments* with respect to the approval of such applications." 28 U.S.C. § 586(a)(3)(I) (emphasis added).

(citations omitted). A professional's continuing disclosure of conflicts under Rule 2014(a) "is necessary to preserve the integrity of the bankruptcy system and to ensure that professionals remain 'conflict free.'" Id. The adequacy of disclosure also cannot be judged by whether other parties made inquiry. See In re Source Enters., Inc., et al., 2008 Bankr. LEXIS 940 at *25 (citing In re Matco Elecs. Group, Inc., 383 B.R. 848, 853-54 (Bankr. N.D.N.Y. 2008) (denying fees for failure to fully disclose a conflict and noting that Rule "2014 is not intended to condone a game of cat and mouse where the professional seeking appointment provides only enough disclosure to whet the appetite of the UST . . . or [other parties], and then the burden shifts to those entities to make inquiry in an effort to expand the disclosure.")).

All facts that bear on the disinterestedness of a professional must be disclosed. "So important is the duty of disclosure that the failure to disclose relevant connections is an independent basis for the disallowance of fees or even disqualification." Leslie Fay, 175 B.R. at 533. It is the court's decision as to what facts may be relevant to disclose; this decision "should not be left up to the professional, 'whose judgment may be clouded by the benefits of the potential employment.'" In re FiberMark, Inc., 2006 Bankr. LEXIS 4029 at *26 (Bankr. D. Vt. Mar. 11, 2006) (citation omitted).

Professionals retained under section 327 are paid in accordance with the interim and final compensation procedures delineated in sections 330 and 331 of the Bankruptcy Code. Those procedures contemplate court scrutiny of services for which compensation is sought and the discretion to reduce the allowed amount of fees and reimbursable expenses, based upon the court's determination of what is reasonable and necessary under the circumstances.

In the last twenty years, there have been two seminal cases in this District involving serious allegations of misconduct in connection with the retention and compensation of professionals in a large chapter 11 case, Leslie Fay and Granite Partners.[201]

In Leslie Fay, Judge Brozman grappled with the request of the U.S. Trustee to disqualify the law firm of Weil, Gotshal & Manges ("Weil"), a firm of some prominence in the bankruptcy arena. Weil was retained prepetition to represent Leslie Fay's audit committee in investigating accounting irregularities following a disclosure that its controller had made unsupported entries in the company books. When the company filed for bankruptcy nine weeks later in April 1993, Weil was retained as debtors' counsel, and the retention order contemplated that Weil would continue its work for the audit committee as part of its representation of the debtors.[202]

By late September 1993, the audit committee determined that there was no evidence that the targets of the investigation – Leslie Fay's board and certain members of senior management – were involved in the fraud. Around the same time, questions regarding Weil's disinterestedness were raised by the U.S. Trustee and the creditors' committee. In December 1993, at the request of the creditors' committee and Leslie Fay, an examiner was appointed by Judge Brozman to (i) investigate whether Weil (a) was disinterested or held an adverse interest to the debtors and (b) made adequate disclosure; (ii) determine whether there were viable claims that the audit committee did not identify that could be asserted in connection with the accounting irregularities; and (iii) evaluate whether the audit committee's report was acceptable in light of Weil's possible lack of disinterestedness.[203]

The examiner conducted his investigation over the course of the next six months. His report concluded that, while Weil had not represented Leslie Fay prepetition, it maintained

---

201 Leslie Fay, 175 B.R. 525; Granite Partners., 219 B.R. 22.
202 Leslie Fay, 175 B.R. at 527-28.
203 Id. at 528.

professional and personal relationships with parties that had an interest in the outcome of Weil's investigation on behalf of the audit committee, none of which had been disclosed to the court. Specifically, while Weil had disclosed that it represented entities that were "claimants of the [d]ebtors in matters totally unrelated to [d]ebtors' cases," it did not disclose that it had professional relationships with individual members of the audit committee, that it represented the investment firms in which those audit committee members were partners, or that such firms were involved in and/or had members who acquired ownership of Leslie Fay stock through a June 1991 secondary public offering of 2.1 million shares of Leslie Fay stock, well after the accounting irregularities began. Similarly, the report revealed that Weil did not disclose its representation of BDO Seidman ("BDO"), the outside accounting firm that had certified the debtors' false financial statements (and a target of the audit committee's investigation), despite the fact that Weil recognized that the debtors might have claims against BDO.[204]

Based on the failure to disclose these relationships, the examiner determined that Weil had violated the disclosure requirements of Bankruptcy Rule 2014 and was not disinterested when it advised the audit committee in connection with its investigation. However, the examiner also found no evidence that Weil's potential conflicts had affected its representation of Leslie Fay, instead finding that Weil had represented the debtors in an exemplary fashion. Accordingly, the examiner recommended sanctions in the form of disallowance of future fees and payment of some of the cost of the examiner's investigation, but not the disqualification of Weil as counsel to the debtors.[205] Nevertheless, in October 1994, the U.S. Trustee asked Judge

---

[204] Id. at 529-30. The undisclosed relationships included the following: (i) two members of the audit committee were both (a) potential targets of the audit committee's investigation and (b) senior executives at investment firms that were substantial clients of Weil and which Weil would not sue without such clients' consent and (ii) Weil had represented (a) BDO and (b) Forstmann & Co., the debtors' seventh-largest creditor, in unrelated matters. Id. at 529-30.

[205] Id. at 530-31.

Brozman to disqualify Weil and to order disgorgement of a large portion of its fees due to its violations of Bankruptcy Rule 2014 and section 327 of the Bankruptcy Code.[206]

Judge Brozman found that Weil (i) represented interests that were materially adverse to the debtors at the time of its retention and (ii) violated Rule 2014 by not making complete disclosure of its connections, thereby causing actual injury to Leslie Fay. Regarding its relationship with members of the audit committee, Weil did not deny its lack of disinterestedness, but instead asserted that, by the time it was retained as counsel for the debtors, it was clear that no claims existed against such audit committee members. While the Court did not doubt Weil's belief that no claims existed, it found that, pursuant to Rule 2014, Weil was required to have disclosed its connections to the members. The Court stated that "there is 'no merit to the . . . argument that [a party] did not have to disclose its connections . . . because its attorneys did not feel that a conflict existed.' . . . Weil Gotshal had no right to 'make a unilateral determination regarding the relevance of a connection.'"[207] Similarly, with respect to BDO, the court also found that Weil was not disinterested. In commenting on Weil's undisclosed ties to three different targets of the audit committee investigation, Judge Brozman observed that "[i]t was for the Court, and not Weil Gotshal, to determine whether in fact a conflict existed and, if so, what the remedy should be." Id.

In discussing the harm caused to Leslie Fay by Weil's nondisclosure, the court observed that if Weil had revealed its connections at the time it requested court approval of its retention, its might still have been retained, albeit in a narrower role. As the court stated, "[t]he shame in all of this is that the heavy financial and emotional toll in this matter could have been avoided

---

206 Id. at 531.

207 Id. at 536 (citing In re Rusty Jones, Inc., 134 Bankr. 321, 345 (Bankr. N.D. Ill. 1991) and In re Arlan's Dep't Stores, Inc., 615 F.2d 925, 932 (2d Cir. 1979)).

completely."[208] In other words, had Weil not arrogated to itself the decision as to whether it was disinterested, the results could have been different. As will be seen, Judge Brozman's observations, analysis, and wisdom are as compelling now, in the context of this case, as they were twenty years ago.

Four years after Leslie Fay, Judge Bernstein put his imprimatur on the issue of disclosure in his Granite Partners decision.[209] In Granite Partners, the debtors had invested in funds raised by outside investors which held collateralized mortgage obligations created and sold by broker-dealers, including Merrill, Lynch, Pierce, Fenner & Smith, Inc. ("Merrill"). Granite Partners' chapter 11 filings in April 1994 followed the collapse of their business due to margin calls by broker-dealers that could not be met after the value of the debtors' investments dropped and interest rates rose. Upon the motion of the creditors' committee, the court appointed a chapter 11 trustee (the "Trustee") to investigate and report on the events leading to the debtors' collapse and identify possible claims against (i) the broker-dealers, (ii) the debtors' insiders, and (iii) the debtors' professionals, including the debtors' auditor, Price Waterhouse & Co. ("PWC").

In connection with its application to be retained as the Trustee's counsel, the law firm of Willkie Farr & Gallagher ("Willkie") disclosed in general terms that it had "client relationships" with various broker-dealers and creditors unrelated to the debtors' cases but did not specifically disclose that (i) it had represented some of the broker-dealers in unrelated transactions, (ii) it was in the process of bringing in a new partner whose clients included Merrill and other broker-dealers, (iii) it would not sue PWC because (a) PWC was Willkie's auditor and (b) Willkie did not sue accounting firms because of its representation of the American Institute of Certified

---

208 Id. at 537. Ultimately, Judge Brozman found that, because Leslie Fay was at a critical juncture in its reorganization efforts, "it might not be able to withstand" the delay caused by having to retain new counsel. Therefore, she allowed Weil to remain as counsel to the debtors, but ordered it to pay the $800,000 cost of the examiner's report, as well the expenses the creditors incurred in challenging Weil's impartiality. Id. at 539.

209 Granite Partners, 219 B.R. 22.

Public Accountants, (iv) it would need to obtain conflict waivers from former broker-dealer clients before representing the trustee in an action against any such parties,[210] and (v) at the time of its retention, Willkie represented Merrill in five open but unrelated matters. Id. at 27-28.

During the pendency of the Trustee's investigation, Willkie expanded its representation of Merrill (opening over 400 new matters) but did not supplement its disclosure with respect to Merrill. In addition, Merrill had refused to sign a conflicts waiver consenting to Willkie's representation of the trustee, which Willkie also failed to disclose. Id. at 29-30.

The Trustee rendered his final report in April of 1996, concluding that substantial estate claims existed against Merrill, among other broker-dealers. In April 1997, in its final fee application, Willkie first disclosed that Merrill had refused to give Willkie a conflicts waiver.[211] Anticipating an objection, Willkie pointed out that its original retention application had generally disclosed the existence of unrelated client relationships with broker-dealers and that Merrill was not a significant client at the time of Willkie's retention. Id. at 31. In the wake of objections to the allowance of Willkie's fees, the Court appointed an examiner to investigate Willkie's relationship with the broker-dealers who were targets of the trustee's investigation, its initial and subsequent disclosures, and the conflicts waivers that it had requested. Id. The examiner found, among other things, that Willkie had violated the disclosure requirements of the Bankruptcy Code and Rules by making a "'conscious decision to not specifically refer to known connections with potential litigation targets presumably because it did not think it necessary to do so.'" Id. at 31-32.[212]

---

210 These four facts were disclosed to Willkie's client, the Trustee, during his interviews of counsel.

211 The litigation advisory board, the trustee's successor under the plan, approached Willkie in the fall of 1996 about prosecuting claims on behalf of the estate, and Willkie eventually declined because Merrill refused to grant a waiver and consent. See id. at 31.

212 The examiner also found that, with respect to the retention of Willkie to investigate claims against the broker-dealers, although the Merrill representation may have only initially raised the appearance of impropriety, by 1995 or 1996, it constituted a disabling conflict of interest under section 327(a) of the Bankruptcy Code. Id. at 32.

In his opinion, Judge Bernstein undertook a lengthy review and analysis of (i) section 327(a) of the Bankruptcy Code, which requires that retained professionals be "disinterested" and (ii) Bankruptcy 2014(a), which imposes disclosure requirements on trustees and the professionals they seek to retain. Id. at 32-36. Judge Bernstein concluded that "[p]roper disclosure allows the court to decide, in an informed manner, whether the retention should be approved." Id. at 35.

Judge Bernstein found that Willkie represented adverse interests at the time it undertook representation of the Trustee due to its concurrent relationship with Merrill. Id. at 36. Due to its increased representation of Merrill (and the amount of fees generated by its work for Merrill), no matter how thoroughly or fairly Willkie conducted the investigation on behalf of the Trustee, "the question will always linger whether it held back, or failed to bite the hand that feeds it quite as hard as the circumstances warranted." Id. at 38. Judge Bernstein observed that the Trustee's counsel must be above suspicion, as "[b]ankruptcy is concerned as much with appearances as with reality." Id. The court agreed with the examiner's conclusion that Willkie's decision not to disclose its relationship with Merrill was purposeful, commenting that "the nondisclosure was wilful but not evil," as the facts of the case suggest that Willkie "feared the adverse consequences of full disclosure." Id. at 39. The court found that Willkie should have (i) disclosed the existence of five open matters with Merrill at the time of its retention application and (ii) made subsequent disclosures regarding its expanding relationship with Merrill, Willkie's failure to get a conflicts waiver from Merrill, and its position with respect to PWC, observing that:

> The trustee broke the cardinal principle of Rule 2014(a). He arrogated to himself a disclosure decision that the Court must make. Rule 2014(a) required, even in the absence of an investigation, that the trustee disclose Willkie Farr's connections with the debtors' accountants. Here, the need for disclosure went further. The trustee knew that Price Waterhouse was a target of his own investigation. He should have understood the improper perception created by

> Willkie Farr investigating any accountant in light of its association with the AICPA and its policy of not suing accountants. He nevertheless decided, on his own, that the connection was not a conflict, and the refusal to sue was not an obstacle, and he concluded that he did not have to disclose it. He made a decision that was never his to make in the first place, and reached the wrong conclusion when he did.

Id. at 45.[213]

Taken together, Leslie Fay and Granite Partners stand for the straightforward proposition that it is incumbent upon the professional to make full disclosure, after which it is the role of the court, and not the professional, to make the ultimate determination vis-à-vis the information disclosed and compliance with the Bankruptcy Code and Rules.

### B. Section 504 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 2016

Subject to the significant exception set forth in section 504(b), section 504(a) of the Bankruptcy Code prohibits estate-retained professionals and others receiving compensation pursuant to the administrative expense provisions of subsections 503(b)(2) and (503)(b)(4) of the Bankruptcy Code from sharing such compensation with another person.[214] There is virtually no legislative history on section 504 other than citation to its predecessor – Rule 219(a) of the Bankruptcy Act – and published decisions addressing this section of the Bankruptcy Code are scarce. The cases discussing section 504 focus on the evils of fee splitting in bankruptcy cases and the resulting policy behind the enactment of section 504: "Any division of fees or other

---

213 Judge Bernstein also considered the examiner's conclusion that Willkie discharged its investigative duties in a thoroughly professional manner and, in fact, had provided exceptional services which were valuable to the estate. Ultimately, the court held that Willkie was not entitled to any of its fees for investigative services because of the taint caused by its relationships with Merrill, PWC and other broker-dealers – potential targets of the investigation. The court further disallowed 15% of Willkie's fees charged for non-investigative work and ordered it to pay the cost of the examiner's investigation. The court also ordered the Trustee to pay $50,000 to the estate as a sanction for his failure to disclose Willkie's connections. Id. at 41-44.

214 The persons included in this prohibition are trustees, ombudsmen, examiners, attorneys, accountants, and other professional persons compensated pursuant to section 330(a), as well as attorneys and accountants of an entity seeking reimbursement under section 503(b)(3). 4-504 COLLIER ON BANKRUPTCY ¶ 504.01[1] (16th ed. 2013).

compensation represents, above all, an incentive for the applicant to claim a compensation high enough to make his own share in it a worthwhile remuneration."[215] The payment of a forwarding fee or referral fee to the professional who merely secures the employment of another professional without rendering any services to the client was held to be impermissible in bankruptcy cases well before the enactment of section 504. See, e.g., Weil v. Neary, 278 U.S. 160 (1929) (condemning manifest evil of an undisclosed fee sharing arrangement as taking the judicial function from the court).

As is true with many provisions of the Bankruptcy Code and Bankruptcy Rules, section 504 is deeply rooted in the history of bankruptcy administration in this country and in England. While current section 504(a) reflects an absolute prohibition on fee sharing without regard to whether services have been provided by both parties to the sharing agreement, its predecessor Bankruptcy Act provisions permitted sharing with "a person who actually and with the court's authorization contributed to the services in question."[216] The Act's focus on the actual provision of services was no doubt an attempt to put an end to certain abuses of the bankruptcy laws.

---

215 In re Futuronics Corp., 5 B.R. 489, 499 n.3 (S.D.N.Y. 1980), aff'd, 655 F.2d 463 (2d Cir. 1981) (citing Advisory Committee's Note to Rule 219) (citing 3A COLLIER ON BANKRUPTCY p. 1637 (1961))). See also In re Winstar Communications, 378 B.R. 756, 760 (Bankr. D. Del. 2007) ("The purpose of §504 also has been described as the preservation of 'the integrity of the bankruptcy process so that the professionals engaged in bankruptcy cases attend to their duty as officers of the bankruptcy court, rather than treat their interest in bankruptcy cases as matters of traffic [i.e., matters of trade or commerce].'") (quoting 4 COLLIER ON BANKRUPTCY, ¶ 504.02[1], pp. 504-5 (15th ed. rev. 2007)); In re Worldwide Direct, Inc., 316 B.R. 637, 649 (Bankr. D. Del. 2004) (explaining that the prohibition on fee sharing was enacted as "[w]henever fees or other compensation are shared among two or more professionals, there is incentive to adjust upward the compensation sought in order to offset any diminution to one's own share."); In re Matis, 73 B.R. 228, 231 (Bankr. N.D.N.Y. 1987) (noting that section 504 is intended to prevent the abuse inherent in fee splitting between unrelated professionals).

216 3A COLLIER ON BANKRUPTCY ¶ 62.38, p. 1642 (14th ed. 1985). Specifically, section 62c of the Bankruptcy Act provided that "[a] custodian, receiver, or trustee or the attorney for any of them, or any other attorney, rendering services in a proceeding under this Act or in connection with such proceeding, shall not in any form or guise share or agree to share his compensation for such services with any person not contributing thereto, or share or agree to share in the compensation of any person rendering services in a proceeding under this Act or in connection with such proceeding, to which services he has not contributed: *Provided*, *however*, That an attorney-at-law may share such compensation with a law partner or a forwarding attorney-at-law, and may share in the compensation of a law partner." Former 11 U.S.C. § 62c (1976), cited in 4-504 COLLIER ON BANKRUPTCY ¶ 504.LH, p. 504-18 (16th ed. 2013). Moreover, section 62d of the Bankruptcy Act provided "that the court shall

Indeed, the history of the enactment of bankruptcy laws in the United States itself reflects widespread concern with the waste and expense generally associated with bankruptcy proceedings, and particularly associated with professional fees. The reprehension of citizens and jurists was perhaps most memorably expressed by Lord Chancellor Eldon in 1801 when he observed that

> [T]he abuse of the bankrupt law is a disgrace to the country, and it would be better at once to repeal all the statutes than to suffer them to be applied to such purposes. There is no mercy to the estate; nothing is less thought of than the object of the commission . . . . they are little more than stock in trade for the commissioners, the assignees, and the solicitor. Instead of solicitors attending to their duty as ministers of the court, for they are so, commissions of bankruptcy are treated as matters of traffic – A taking out the commission, B and C to be his commissioners. They are considered as stock in trade, and calculations are made how many commissioners can be brought into the partnership.

6 Ves. Jr. 1. See also In re Drake, 7 F. Cas. 1046, 1047 (D.N.J. 1876) (discussing Lord Eldon's complaints and referring to the "constant and distasteful struggle on the part of the court to keep down expenses" in bankruptcy cases); Weil v. Neary, 278 U.S. 160 (1929). The more things change, the more they stay the same.

The Second Circuit addressed the prohibition on fee sharing in two leading Bankruptcy Act cases, Arlan's and Futuronics.[217] In Arlan's, the law firm of Ballon Stoll & Itzler ("Ballon"), which was acting as general counsel to the debtor, failed to disclose, among other things, (i) its prior representation of the debtor, (ii) an agreement between Ballon and another firm, acting as Arlan's prepetition general counsel, for the firm to use its best efforts to cause Ballon to be retained by the debtor as bankruptcy counsel and to share fees between them, and (iii) Ballon's receipt of a significant retainer fee from the debtor, which had left the debtor with little cash with

withhold all compensation" if the court concluded that an attorney improperly shared or agreed to share compensation. Id.

[217] See In re Arlan's Dept. Stores, Inc., 615 F.2d 925 (2d Cir. 1979) ("Arlan's"); In re Futuronics Corp., 5 B.R. 489 (S.D.N.Y. 1980) ("Futuronics I"), aff'd, 655 F.2d 463 (2d Cir. 1981) ("Futuronics II").

which to operate. Arlan's, 615 F.2d at 930-36. A second firm acting as special counsel to the debtor, Lappin, Rosen, Goldberg, Slavet, Levenson & Wekstein, Inc. ("Lappin"), had failed to disclose (i) its receipt of retainer fees and other "substantial" subsequent fees and disbursements from the debtor during the case and (ii) its retention of a portion of settlement proceeds belonging to the debtor despite the referee's order to turn over the entire amount to the debtor. Id. at 938-43. Circuit Judge Mulligan affirmed the decision of the District Court denying all fees and disbursements to the Ballon and Lappin firms after finding that the firms had breached their fiduciary duties, stating that "[o]ur opinion, however, is bottomed not simply upon violations of particular bankruptcy statutes or rules but upon the status of counsel to Arlan's as officers of the court and fiduciaries." Id. at 943. The court observed that the position of the Ballon firm that the retainer fee it obtained was an element of the attorney-client relationship about which the court may inquire if it so chooses "reflects the persistent . . . attitude of 'That's for me to know and for you to find out,' which we find totally incompatible with its fiduciary status as an officer of the court.'" Id. at 936-37. The Second Circuit commented that the pattern of conduct displayed by the two firms "betrays a callous disregard of the professional obligations undertaken in these bankruptcy proceedings." Id. at 943.

Another classic example of an illicit fee-splitting arrangement was at issue in Futuronics, in which general bankruptcy counsel retained another firm as special counsel subject to an undisclosed arrangement pursuant to which special counsel would remit one third of the fees it received to general bankruptcy counsel. See Futuronics I, 5 B.R. 489, aff'd, Futuronics II, 655 F.2d 463. The Bankruptcy Court found that the firms had breached their fiduciary duties both to the debtor and as officers of the court and had violated Federal Rules of Bankruptcy Procedure

215 and 219[218] by participating in and failing to disclose their impermissible fee sharing agreement. Despite recognizing the firms' "abysmal conduct," the Bankruptcy Court found that both firms were entitled to a reasonable fee because of the successful outcome of the bankruptcy case. Futuronics I, 5 BR at 498.

On appeal, the District Court affirmed the Bankruptcy Court's findings but reversed as to its award of fees to the firms, finding that the sanctions imposed were "overly lenient" and that both firms' requests for compensation should be denied in their entirety in light of the "simply inexcusable" conduct. Id. at 492, 499. The District Court also specifically noted that, despite the serious nature of the breaches of the professionals' duties, both firms "demonstrated . . . a cavalier attitude toward these breaches" and "label[ed] them 'technical breaches' at best." Id. at 499.

In his decision, District Judge Duffy discussed the long-standing public policy reasons behind the prohibition against undisclosed fee sharing and quoted Chief Justice Taft's 1929 statement that arrangements for division of compensation are contrary to public policy not only because of "actual evil results but their tendency to evil in other cases."[219] The court also focused on the Advisory Committee's Note to Bankruptcy Rule 219, which considered the dangers of fee sharing, in that it (i) acts as an incentive for "extravagance of expenditure," (ii) subjects the professional to "outside influences" over which the court has no control and which may "[deprive] the court's functionaries of their requisite independence of judgment," and

---

218 Federal Rule of Bankruptcy Procedure 219, a precursor of Federal Rule of Bankruptcy Procedure 2016, requires an attorney seeking compensation to disclose whether an agreement or understanding exists between the applicant and any other person for the sharing of compensation received or to be received for services rendered in connection with the case. Subsection (d) of Rule 219 states that "[e]xcept as herein provided, a person rendering services in a bankruptcy case or in connection with such a case shall not in any form or guise share or agree to share the compensation paid or allowed him from the estate for such services with any other person. . . . This rule does not prohibit an attorney or accountant from sharing his compensation . . . with a member or regular association of his firm." Fed R. Bankr. P. 219.

219 Id. at 499 n.3 (citing Weil v. Neary, 278 U.S. 160, 173 (1929)).

(iii) results in a transfer away from the court of judicial power over expenditures and allowances to persons who have a lesser degree of public responsibilities. Id. at 499 n.3 (citing Advisory Committee's Note to Bankruptcy Rule 219).

The Second Circuit affirmed the District Court's decision.[220] In its decision, the Second Circuit reiterated the policy reasons behind the prohibition on fee sharing in bankruptcy cases, stating that such arrangements "have long been acknowledged as anathematic enterprises because of their natural tendency to cause an attorney to inflate his fees in order to offset the diminution in compensation caused by the agreement." Futuronics II, 655 F.2d at 470.[221] One member of the Second Circuit panel, Judge Oakes, dissented in part, solely with respect to the portion of the decision denying all fees to the firm acting as special counsel. Judge Oakes noted that, although there was a breach of duty in this case, the work done by the special counsel firm enabled the debtor to pay its creditors 100 cents on the dollar, and it appeared that the firm's efforts "were totally dedicated to the best interests of the debtor and its creditors." Id. at 473. Consequently, "on the basis of the principle that the punishment should fit the crime," Judge Oakes observed that to deprive the firm of all compensation and to require them to return sums received "is somewhat equivalent to chopping off an arm for stealing a basket of olives." Id. Instead, Judge Oakes explained, he would use the bankruptcy court's fee calculations as a starting point and then cut the fee in half from there, since a $320,000 punishment "would better fit the crime." Id.

---

220 Futuronics II, 655 F.2d at 471.

221 In a footnote, the Second Circuit observed that Rule 219 restated the "long-standing" prohibition against illicit fee-sharing arrangements and also eliminated an exemption for forwarding fees which was formerly countenanced under section 62 of the Bankruptcy Act. The court noted that this change was made so that Rule 219 "comported with Canon 34 of the Canons of Professional Ethics and Disciplinary Rule 2-107 of the Code of Professional Responsibility." See id. at 469 n.12 (citing to Advisory Committee Note to Rule 219).

### C. The Interplay Between Section 504(b) and Rule 2016(a)

Subsection (b) of section 504 provides limited exceptions to subsection (a) with respect to professional associations, corporations, and partnerships. One such exception is set forth in section 504(b)(1), which provides that

> A member, partner, or regular associate in a professional association, corporation, or partnership may share compensation or reimbursement received under section 503(b)(2) or 504(b)(4) of this title with another member, partner, or regular associate in such association, corporation, or partnership.

11 U.S.C. § 504(b)(1).[222] Thus, section 504(b) permits a professional firm to apply as a single entity for fees to be divided among firm members, partners, and regular associates. Federal Rule of Bankruptcy Procedure 9001(10) defines "regular associate" as "any attorney regularly employed by, associated with, or counsel to an individual or firm." Fed. R. Bankr. P. 9001(10). The Code, however, does not define the term "regular associate."

The few cases analyzing section 504(b) have looked to the function of the individual in question rather than his or its title or legal relationship to the firm. In Lemonedes v. Balaber-Strauss (In re Coin Phones, Inc.), 226 B.R. 131 (S.D.N.Y. 1998) ("Lemonedes"), aff'd, 189 F.3d 460 (2d Cir. 1999), the District Court affirmed a decision of the Bankruptcy Court permitting a firm to share its fees with an "of counsel" attorney who was not an employee of the firm but who participated on an *ad hoc* basis in the firm's caseload. While the attorney was "of counsel" for more than one law firm at the same time, he was active on more than twenty-five cases for the firm over a five-year period, and he held himself out (and was held out by the firm) as acting on behalf of and affiliated in some manner with the firm. In its decision, the District Court stated that "[a] lawyer who is acting 'of counsel' for a law firm and held out to the public will be regarded as a 'member' within 11 U.S.C. § 504, so as to be free from statutory limitations on fee

---

[222] Subsection (2) of section 504(b) provides a second limited exception to 504(a) which is not applicable in this case.

sharing arrangements." Lemonedes, 226 B.R. at 132 (citations omitted); see also In re Sheehan Memorial Hosp., 380 B.R. 299, 303 (Bankr. W.D.N.Y. 2007) (holding that when attorneys were acting as members of the firm with respect to the case in question, section 504(b)(1) applies to "allow[] fee sharing with any 'member,' whether that membership is regular or sporadic"); but see In re Bradley, 495 B.R. 747, 767 n. 11 (Bankr. S.D. Tex. 2013) (holding that regular relationship between "appearance attorney" and consumer bankruptcy firm does not fit section 504(b) exception). The facts of Lemonedes contrast sharply with "classic" fee sharing cases in which parties retain third-party professionals without court approval and seek to pay such parties out of their fees. See, e.g., In re Codesco, 15 B.R. 351, 353 (Bankr. S.D.N.Y. 1981) (noting that appraiser retained by the debtor had retained a consultant, had failed to disclose is fee sharing agreement with the consultant, and had reimbursed his expenses without court approval, all in violation of section 504).

Courts in the Third Circuit have construed section 504 in a manner consistent with the Lemonedes decision, looking at the function of the professionals in question when deciding whether they constitute "regular associates." In In re Worldwide Direct, Inc., counsel for the debtors, Hennigan Bennett & Dorman ("HBD"), employed temporary attorneys and paralegals to conduct document review and analysis. The post-confirmation liquidating trustee objected to a number of aspects of HBD's final fee application, including the allowance of fees for these temporary personnel, asserting that because they were not employees of HBD, payment of their fees to HBD constituted fee sharing prohibited under section 504. 316 B.R. 637, 645 (Bankr. D. Del. 2004).

Judge Walrath overruled the liquidating trustee's objection, finding that although the temporary personnel were employees of an employment agency and not of HBD, "they

essentially acted like associates of the firm."[223] They were provided with workspace in the HBD offices, enjoyed the fringe benefits of HBD associates, and were assigned to HBD on a long term basis, with several temporary employees ultimately hired by HBD. In addition, the direct supervision of these individuals by HBD attorneys supported a finding that the temporary personnel must be considered "regular associates" pursuant to section 504.[224] After discussing the history of section 504, Judge Walrath stated that "[t]his case does not present the circumstances which the Code meant to address. HBD was not referring a case to another professional in order to receive a referral fee. There was no trafficking in bankruptcy cases or services."[225] Finally, the court emphasized that HBD had presented evidence that the temporary associates and paralegals were screened for conflicts and were expected to preserve confidentiality in the same manner as HBD associates. Accordingly, HBD was permitted to bill the debtors for the services of the temporary personnel.[226] Worldwide Direct supports a functional interpretation[227] of section 504(b)(1) and the term "regular associate" contained

[223] Id. at 648.

[224] Id.

[225] Id. at 649.

[226] HBD also sought to bill the temporary personnel at rates higher than it paid to the employment agency for their services, attempting to show that HBD marked-up fees to account for the "extra overhead" that the temporary personnel cost the firm. As the court was presented with little concrete evidence regarding these additional costs incurred by HBD, it would not allow this overcharge to be borne by the debtors. The court disallowed the difference in fees between (i) the total amount sought by HBD for the temporary personnel and (ii) the sum of the invoices of the temporary employment agency. Id. at 651-52.

[227] Much has changed in the way law firms are organized since the founding of the earliest American firms in New York in the late eighteenth century. The complex, multinational structures of today's law firms would hardly be recognizable to the general partners of these early firms. Law firms today, as well as accounting and financial advisory firms, are comprised of partnerships, limited liability partnerships, professional corporations, limited liability companies – and combinations thereof. Large multinational firms also employ the Swiss verein structure in which many offices of the "firm" are linked via an association but are separate legal entities with separate revenue pools. See, e.g., In re Project Orange Assocs., LLC, 431 B.R. 363, 371 n.3 (Bankr. S.D.N.Y. 2010) (treating law firm offices as a "single entity" with respect to section 327(a) inquiry despite recognizing that firm's offices were separate legal entities using the verein structure). Moreover, the titles and status afforded lawyers who practice in such firms have also evolved, along with the perquisites associated therewith; twenty-first century law firms include equity partners, non-equity partners, contract partners, shareholders, associates, contract associates, counsel, of counsel, senior counsel, and the list goes on; so too with the accountants, bankers, and financial advisors that comprise twenty-first century "advisory" firms. Gone are the days of the professional universe being neatly divided into members and associates – and lawyers and accountants – as contemplated by the Code and the Rules.

therein, assuming such individual is treated as a " regular associate" and runs a conflicts check in the same manner as the firm's employees.

While an individual serving as a "regular associate" of a firm may receive compensation in a bankruptcy case through that firm, Federal Rule of Bankruptcy Procedure 2016(a) nonetheless imposes a duty to disclose the existence of such fee sharing, even if the "details of any agreement" are not required to be disclosed. Rule 2016(a) describes the disclosure required of an entity seeking interim or final compensation for services or reimbursement of expenses and specifically addresses the sharing of fees. It provides, in pertinent part:

> **(a) Application for compensation or reimbursement.** An entity seeking interim or final compensation for services, or reimbursement of necessary expenses, from the estate shall file an application setting forth a detailed statement of (1) the services rendered, time expended and expenses incurred, and (2) the amounts requested. An application for compensation shall include a statement as to what payments have theretofore been made or promised to the applicant for services rendered or to be rendered in any capacity whatsoever in connection with the case, the source of the compensation so paid or promised, whether any compensation previously received has been shared and **whether an agreement or understanding exists between the applicant and any other entity for the sharing of compensation received or to be received for services rendered in or in connection with the case, and the particulars of any sharing of compensation or agreement or understanding therefor, except that details of any agreement by the applicant for the sharing of compensation as a member or regular associate of a firm of lawyers or accountants shall not be required** . . . .

Fed. R. Bankr. P. 2016(a) (emphasis added). No cases interpreting Rule 2016(a) have been cited to the Court.

## II. Findings of Fact and Conclusions of Law with Respect to Capstone

### A. The Capstone/Manzo Arrangement Does Not Violate Section 504 but Capstone's Failure to Disclose it Violates Rule 2016

As Mr. Manzo was functionally acting as part of the Capstone firm vis-à-vis the Debtors, the Court finds that he can be considered a "regular associate" or "member" of Capstone for the purposes of section 504(b) of the Bankruptcy Code. Like the "of counsel" attorney in the

Lemonedes case, Mr. Manzo held himself out (and was held out by Capstone) as acting on behalf of and affiliated with the firm; there even was a press release announcing that Mr. Manzo had joined Capstone as an Executive Director. The prohibition on fee sharing reflected in section 504 does not preclude this type of professional relationship. As articulated by Judge Walrath in Worldwide Direct, the relationship between Mr. Manzo and Capstone "is much more than the tenuous relationships of the professionals in those cases where courts concluded there was improper fee sharing."[228] The Court finds persuasive Judge Walrath's analysis in Worldwide Direct on this issue, which examined the function of the individuals in question in analyzing whether, notwithstanding section 504(a), the firm was permitted to bill the bankruptcy estate for their hours. Here, Mr. Manzo worked for Capstone for over five years, often as the lead professional on significant Capstone engagements. He served the function of a full-time member of Capstone and was listed on its website as an Executive Director. Mr. Manzo was not an outsider to the firm participating in a one-off assignment from Capstone. Moreover, this is not a case where a professional referred a case to another professional in order to receive a referral fee, or otherwise implicating the prohibition on "trafficking in bankruptcy services."

Thus, while the Court agrees that the Capstone/Manzo arrangement does not run afoul of the letter or spirit of section 504, the Court strongly disagrees with Capstone's further conclusion that it had no obligation to disclose the existence (if not the details) of the arrangement. Simply put, Capstone's analysis of the interplay between section 504 and Rule 2016 is incorrect. Putting aside the implicit and untenable suggestion that anyone at Capstone, including Mr. Ordway or Mr. Manzo, affirmatively conducted such a nuanced analysis at the time of its retention, Capstone argues that the language of Rule 2016 "is intended . . . to track section 504," and that Rule 2016 requires a party "to disclose a 504 issue" but says "you don't have to disclose fee

---

228 In re Worldwide Direct. Inc., 316 B.R. at 649.

sharing that is not bad fee sharing."[229] Thus, argues Capstone, since the fee sharing arrangement between Capstone and Mr. Manzo was not "bad" fee sharing, there was no need to disclose it pursuant to Rule 2016. This legal determination was made entirely by Capstone, who, in the words of Judge Bernstein, "arrogated to [itself] a disclosure decision that the Court must make."[230] Here, as in Granite Partners, not only did Capstone reach its own conclusion on the issue of disclosure, but it "made a decision that was never [its] to make in the first place, and reached the wrong conclusion when [it] did."[231]

Capstone's analysis and reading of Rule 2016 ignore the plain language of several provisions of Rule 2016 and effectively write such provisions out of existence. According to Capstone, the provision of Rule 2016(a) that requires a fee applicant to state "whether an agreement or understanding exists between the applicant and any other entity for the sharing of compensation" would only apply to an agreement that violates section 504 and thus renders the applicant ineligible to be compensated. This is nonsensical.

Capstone's myriad arguments and excuses as to why it neither disclosed nor needed to disclose the existence of the Capstone/Manzo Agreement are all unavailing:

- Kaye Scholer handled the retention process for Capstone, and Capstone had little involvement;[232]

---

229 May 14, 2013 Hr'g. Tr. at 147:5-8; 149:20-21; 163:24-164:2.

230 Granite Partners, 219 B.R. at 45. Mr. Ordway's testimony at Trial is indicative of Capstone's decision in this regard. See April 23, 2013 Hr'g. Tr. at 279:19-25 ([Q:] "Mr. Ordway, was the decision not to disclosure Robert Manzo's independent contractor status in the GSC cases a mistake?" [Ordway:] "No." [Q:] "So Capstone just made a decision not to disclose that, correct?" [Ordway:] "There was no reason to disclose it.").

231 Granite Partners, 219 B.R. at 45.

232 When asked at Trial about the Ordway Declarations and if he knew what inquiries of the U.S. Trustee led to the need for Capstone to file further declaration in support of its retention, Mr. Ordway stated that he did not know; he was "just aware that we had to file a supplement – a supplement of the supplement, and you know, that I had to take a look at it and sign it." When questioned about whether anyone at Kaye Scholer had spoken to anyone at Capstone about the October 5, 2010 discussion between Ms. Schwartz and lawyers at Kaye Scholer which led to the filing of the Second Supplemental Ordway Declaration, Mr. Ordway stated that he had not been told the content of such discussion, nor was he aware of anyone at Capstone having been told of it. See April 23, 2013 Hr'g. Tr. at 312:15-313:22.

- Mr. Ordway thought Mr. Manzo reviewed the RJM disclosure in Paragraph 15 of the Second Supplemental Ordway Declaration;[233]
- Hundreds of attorneys knew of Mr. Manzo's contractor relationship with Capstone;[234]
- No one told Capstone the arrangement needed to be disclosed;[235]
- Capstone has never disclosed any such arrangement;[236] and
- No case says independent contractors need to be disclosed.

As reflected in its multiple pleadings, arguments, and testimony, Capstone's attitude toward its duty of disclosure falls somewhere on the continuum between lackadaisical and arrogant, and its conduct violated the fundamental teaching of Leslie Fay and Granite Partners that it is up to the court, and not the professionals, to decide such disclosure issues. Capstone's dismissive attitude was clearly portrayed to the Court through Mr. Ordway's testimony at Trial, where he told the Court, "[y]ou know, I really think this is a lot of form over substance."[237] This statement is reminiscent of the attitude of the professionals in Futuronics, in which the District Court reversed the Bankruptcy Court's award of compensation to the firms in light of their "simply inexcusable" conduct, specifically highlighting the "cavalier" attitude of the professionals and their labeling of the breaches of duty as "technical" at best.[238]

233 See Ordway Dep. 47:3-19; see also fn 85, *supra*.

234 Id. at 316:7-20 (Ordway) ("I'm sure it's literally hundreds of attorneys [that] know that Bob is a contractor with me.").

235 See April 23, 2013 Hr'g. Tr. at 315:12-19 ([Q]: "At any point in time did anyone ever suggest to you that the relationship between you and Mr. Manzo implicated Section 504" [Mr. Ordway]: "No.")

236 Id. at 183:8-16 ([Q] "Does Capstone typically disclose whether professionals working in bankruptcy cases are employees or contractors?" [Ordway]: "Let me make this distinction. When I have folks who are contractors for me, and are working regularly full time for me, and have titles and are involved in bankruptcy cases, we're not doing a special disclosure. On the other hand, if it's a contractor from a firm and he's part-time, and he's solely brought in for a discreet [sic] purpose . . . , then there's disclosure.").

237 April 23, 2013 Hr'g. Tr. at 291:17-18. When asked about the accuracy of the language in Paragraph 15 of the Second Supplemental Ordway Declaration stating that Mr. Manzo "works exclusively for Capstone," Mr. Ordway again responded "[s]ubstance over form, I mean we were working together. Or form over substance, beg your pardon." Id. at 230:25-231:7.

238 Futuronics I, 5 B.R. at 499.

One purpose of the requirement found in Rule 2016 to disclose the existence of fee sharing, even if the "details of any agreement" are not required to be disclosed, is to ensure that no disclosure of connections falls through the cracks. In Worldwide Direct,[239] Judge Walrath focused on the fact that the firm in question had presented evidence that non-firm employees for whom it sought fee reimbursement were screened for conflicts in the same manner as the firm's employees. The court found this fact persuasive as to whether such persons should be considered "regular associates," and it ultimately approved their fees. In order to put decisions regarding professional retention and compensation squarely in the hands of the bankruptcy court, professionals are required to be retained separately and are required to submit separate disclosures.

Here, Capstone was unable to demonstrate conclusively that it conducted a thorough conflicts search for connections of its own employees to parties in the Debtors' cases, let alone that it broadened the search to include Mr. Manzo and thereby had a basis to be excused from the requirement that Mr. Manzo be retained separate and apart from the retention of Capstone. The testimony elicited at Trial with respect to whether Mr. Manzo was included in Capstone's "conflicts check" with respect to the Debtors' cases or whether Capstone in fact conducted a formal "conflicts check" at all is murky at best. At Trial, Mr. Ordway testified that there are two parts to Capstone's conflicts process: (i) a search through the firm's conflicts database for the names of key parties involved[240] and (ii) an email sent out to all executive directors and managing directors which identifies the major parties in the engagement and asks if the

---

239 316 B.R. at 650.

240 Mr. Ordway described Capstone's conflicts database as a "contacts systems where we have a list of engagements, parties that we worked with in the past, et cetera." He stated that, as part of Capstone's conflicts process, the list of identified parties from the current engagement is compared with the names in that system, and any overlap is "review[ed] . . . and determine[d] which ones might be relationships that should be disclosed or not as the case may be." See April 23, 2013 Hr'g. Tr. at 261:14-21.

recipients of the email are aware of any connections with such parties that Capstone should consider as potentially being a conflict or something that Capstone should disclose.[241] While Mr. Ordway testified that such an email was sent out with respect to the GSC engagement, and that Mr. Manzo was in fact included on this email,[242] the email in question could not be located.[243] Counsel for Capstone subsequently informed the Court that, while these two components are part of Capstone's conflicts procedures today, and Mr. Ordway believes that a conflicts email had been sent out for the GSC engagement, "[i]t does not appear to have been the case as of the time of the GSC case."[244] Resisting a suggested comparison to procedures at his own firm, counsel attempted to excuse Capstone's lax conflicts procedures, arguing that "it cannot be a one size fits all approach to this," given that "Capstone is a firm of a hundred people, only a hundred people. It has ten members, not . . . anything approaching the size of a [large law firm]."[245] The Court rejects the suggestion that Capstone should somehow be held to a lesser standard merely because of its size.

Moreover, even assuming Capstone actually conducted a satisfactory conflicts search in these cases and included Mr. Manzo, Capstone has argued that Mr. Manzo did not have to be retained separately by the Debtors or submit a separate disclosure affidavit because he was "part of" Capstone's conflicts process. Capstone points out that, pursuant to the Capstone/Manzo Agreement, Mr. Manzo was made subject to Capstone's employee handbook, which required Capstone employees to comply with conflicts check procedures. Capstone also attempts to

---

241 See id. at 261:22-262:4.

242 See id. at 262:5-7. Mr. Ordway also testified that Capstone asks its contractors "verbally" if they have any connections that Capstone "need[s] to know about." He could not recall, however, whether he had actually asked Mr. Manzo about any interested parties in the Debtors' cases. Id. at 260:21-261:2.

243 See id. at 261:7-11 ([Q]: "My question was, Mr. Ordway, you don't have any written documents, any writings confirming that you made that inquiry to Robert Manzo in connection with the GSC cases, correct?" [Mr. Ordway]: "No").

244 April 24, 2013 Hr'g. Tr. at 14:24-15:2.

245 May 14, 2013 Hr'g. Tr. at 154:21-155:2.

advance other arguments why Mr. Manzo was in fact "covered" by Capstone's conflicts process, including by arguing that, due to his "exclusive" relationship with Capstone, Mr. Manzo had no clients other than Capstone clients. This argument fails, first because Mr. Manzo took on another engagement during his time with Capstone and, second, because it does not answer the central question of a conflicts search, the question of whether Mr. Manzo himself had any connections to the Debtors' cases. Additionally, when asked at Trial about his Innkeepers retention and whether he believed he needed to make a separate disclosure on that matter, Mr. Manzo's response revealed the finger-pointing attitude that has permeated this case; he answered that "Mr. Ordway was aware that I was taking the matter, Capstone was the retained professional in the GSC matter, and in my mind if there were obligations to that regard then it ought to be by Capstone."[246]

Accordingly, while the Court finds that Mr. Manzo's arrangement with Capstone is permissible under section 504(b), the existence of the arrangement was nevertheless required to be disclosed pursuant to Rule 2016. Had that occurred, the Court would have been able inquire as to whether Mr. Manzo had disclosed any connections to parties in interest in the Debtors' cases, a fact which remains unclear, as the Court was presented with no tangible evidence that Mr. Manzo was incorporated in any conflicts search conducted by Capstone with respect to the Debtors' cases. Moreover, had disclosure been made pursuant to Rule 2016, the Court would have been afforded the opportunity to make inquiry as to the details of the arrangement to determine whether it was, in all respects, an appropriate compensation arrangement for such a key estate fiduciary.

One additional observation with respect to Capstone's inappropriate usurpation of the Court's role is in order. In March of 2011, Capstone and Mr. Manzo modified the

---

[246] April 24, 2013 Hr'g. Tr. at 92:12-93:1.

Capstone/Manzo Agreement and their "exclusive" working relationship in order to allow Mr. Manzo to work on non-Capstone engagements, even those "which may directly or indirectly compete with Capstone's current business activities."[247] Yet, despite Capstone's clear focus on amending the agreement in a timely manner to reflect changes to both the exclusivity of the parties' relationship and the terms of compensation, Capstone made no supplemental disclosure to the Court at the time of this amendment or any prior amendment to the Capstone/Manzo Agreement.[248] Capstone's failure to make additional disclosure of the parties' post-March 2011 non-exclusive relationship or to amend its prior disclosure in Paragraph 15 of the Second Supplemental Ordway Declaration[249] is now justified, entirely in hindsight, by the fact that a non-Capstone engagement of Mr. Manzo after the March 2011 Amendment – the 75 hours Mr. Manzo worked on the Innkeepers engagement – reflects a *de minimis* amount of time.[250] Capstone is not entitled to decide what qualifies for any such *de minimis* exception and, in any event, there is no exception in the Bankruptcy Code and Rules for *de minimis* falsehoods.

[247] March 2011 Amendment, Ex. 104. The March 2011 Amendment, among other things, acknowledged that Mr. Manzo "has or will likely enter into discussions with other consulting firms with the intention of securing employment . . . commencing after March 31, 2011," and it provided, inter alia, that Mr. Manzo was "not . . . limited in any manner from participating in any other business activities which may directly or indirectly compete with Capstone's current business activities," except that, during the term of the March 2011 Amendment, Mr. Manzo was not permitted "to solicit other existing Capstone engagements . . . to provide services similar to that which Capstone currently offers regarding such engagements." See fn 65, *supra*.

[248] As discussed at pp. 19-20, *supra*, the Capstone/Manzo Agreement, originally executed in February 2006, was amended at least three times – in February 2009, November 2010, and March 2011.

[249] Paragraph 15 of the Second Supplemental Ordway Declaration, states, in pertinent part, that "Mr. Manzo, through RJM, LLC, is an employee of, and works exclusively for, Capstone. No business is conducted by RJM, LLC except as described herein with respect to its employment by Capstone." See Ex. 75; Docket No. 148.

[250] Discussing Mr. Manzo's Innkeepers engagement in its post-trial brief, Capstone states that "Such a limited engagement is de minimus [sic] and does not affect Manzo's status as a full-time Capstone Executive Director through the relevant period." [Docket No. 1747] at p. 7 n.3. At Trial, when asked whether Capstone needed to supplement its GSC disclosures at the time of Mr. Manzo's Innkeepers engagement to indicate that Mr. Manzo was no longer working "exclusively" for Capstone, Mr. Ordway first testified that he did not think Capstone needed to do that. Upon further questioning by the Court, he stated that he wasn't aware of the inconsistency with what had previously been disclosed and therefore "didn't connect that [Capstone] needed to make an additional filing." April 23, 2013 Hr'g. Tr. at 300:4-300:18.

## B. Capstone's Final Fee Application

The Court now turns to the difficult task of determining the allowable amount of Capstone's fees and expenses. The determination has three components: (i) the reasonableness of the requested fees and expenses under the standards found in section 330 of the Bankruptcy Code and this Court's Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases (the "Amended Guidelines");[251] (ii) Capstone's entitlement to a Performance Fee in the amount of $2.75 million, reduced from its initial request for $3.25 million; and (iii) the amount of the remedy to be imposed for Capstone's failure to comply with the disclosure requirements of Rule 2014 and Rule 2016.

### 1. Governing Law

Section 330 of the Bankruptcy Code authorizes a bankruptcy court to award reasonable compensation to a fee applicant based on actual, necessary services rendered, and to reimburse him for his actual, necessary expenses. 11 U.S.C. § 330(a)(1). Section 330 provides that, in determining the amount of reasonable compensation to be awarded, the court shall consider "the nature, the extent, and the value of such services," taking into account the following:

(A) the time spent on such services;
(B) the rates charged for such services;
(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;
(E) whether the professional is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

---

[251] Local Rule 2016-1(a) of the Local Bankruptcy Rules for the Southern District of New York requires that "[a] person requesting an award of compensation or reimbursement of expenses for a professional shall comply with the Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases promulgated by the Court, which shall be available on the Court's website http://www.nysb.uscourts.gov/sites/default/files/2016-1-b-order.docx." The Amended Guidelines were first adopted as General Order M-447 (Bankr. S.D.N.Y. January 20, 2013), and they apply to fee applications filed on or after February 5, 2013. The Amended Guidelines are not materially different from the fee guidelines that were in effect at the time of the filing of the fee applications in these cases, which guidelines were contained in General Order M-389 (Bankr. S.D.N.Y. Nov. 25, 2009).

(F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in non-bankruptcy matters.

See 11 U.S.C. § 330(a)(3); see also In re West End Fin. Advisors, LLC, et al., 2012 Bankr. LEXIS 3045 at *8 (Bankr. S.D.N.Y. July 2, 2012), In re Quigley Company, Inc., Case No. 04-15739 (Bankr. S.D.N.Y. Oct. 25, 2013), at pp. 11-12. The Bankruptcy Code imposes upon the court "a supervisory obligation," not only to approve the employment of professionals, but also to ensure that the fees sought by those professionals in a bankruptcy case are reasonable, and that the services and expenses were necessarily incurred. In re Fibermark, Inc., 349 B.R. 385, 394 (Bankr. D. Vt. 2006) (holding that "this Court has an independent judicial responsibility to evaluate the appropriateness of the fees and expenses requested"). "Even in the absence of an objection, the bankruptcy court has an independent duty to review fee applications to protect the estate 'lest overreaching . . . professionals drain it of wealth which by right should inure to the benefit of unsecured creditors.'" In re Keene Corp., 205 B.R. 690, 695 (Bankr. S.D.N.Y. 1997) (citations omitted).

The fee applicant bears the burden of proof on its claim for compensation.[252] Through its submission of contemporaneous time records that, *inter alia*, contain sufficient detail, the applicant carries the burden of demonstrating that its services were reasonable and necessary. In re Quigley Company, Inc., Case No. 04-15739 (Bankr. S.D.N.Y. Oct. 25, 2013), at p. 13 (citing Amended Guidelines at ¶ A ("All applications should include sufficient detail to demonstrate compliance with the standards set forth in 11 U.S.C. § 330.")). Under the fee-shifting statutes, there is "[a] strong presumption that the lodestar figure – the product of reasonable hours times a reasonable rate – represents a 'reasonable' fee." Id. at 12 (citations omitted).

---

[252] In re West End Fin. Advisors, LLC, et al., 2012 Bankr. LEXIS 3045 at *8 (citations omitted).

Detailed guidelines for timekeeping by professionals are set forth in the Amended Guidelines and in the Guidelines for Reviewing Applications for Compensation issued by the U.S. Trustee (the "Fee Guidelines").[253] Among other things, the Fee Guidelines require time entries to be broken down into project categories and provide that "[t]ime entries should be kept contemporaneously with the services rendered in time periods of tenths of an hour. Services should be noted in detail and not combined or 'lumped' together, with each service showing a separate time entry . . . ."[254] The fee applicant's contemporaneously created time records submitted with its request for fees awarded should specify, for each professional, the date, the hours expended, and the nature of the work done. Kirsch v. Fleet St., Ltd., 148 F.3d 149, 173 (2d Cir. 1998). This Court has emphasized that "proper time record keeping is necessary to enable the court to determine the reasonableness of the work that has been performed." In re West End Fin. Advisors, LLC, et al., 2012 Bankr. LEXIS 3045 at *9. Courts have routinely disallowed fees when multiple tasks are aggregated into one billing entry, typically referred to as "block billing" or "lumping," as it makes it exceedingly difficult to determine the reasonableness of the time spent on each of the individual tasks performed. See In re Baker, 374 B.R. 489, 494 (Bankr. E.D.N.Y. 2007). Further, any uncertainties due to poor record keeping are resolved against the fee applicant. In re 415 W. 150 LLC, 2013 Bankr. LEXIS 3552 (Bankr. S.D.N.Y. Aug. 28, 2013) at *9 (citation omitted).

---

[253] 28 C.F.R., Pt. 58, Appendix. General Order M-389 (Bankr. S.D.N.Y. Nov. 25, 2009), which was in effect at the time of the filing of the fee applications in these cases in May 2012, states that the Court's guidelines "are consistent with, and supplemental to, the requirements contained in the [Fee] Guidelines and shall be followed by each applicant for allowance of compensation and reimbursement of expenses."

[254] See 28 C.F.R., Pt. 58, Appendix, at (b)(4)(v). The Fee Guidelines further provide that "[t]ime entries should be kept contemporaneously with the services rendered in time periods of tenths of an hour. . . . Time entries for telephone calls, letters, and other communications should give sufficient detail to identify the parties to and the nature of the communication. . . ." Id.

With respect to time records for services rendered, vague descriptions which lack the details necessary to permit the court to assess the reasonableness of the applicant's work are also not permitted. See, e.g., Cosgrove v. Sears, Roebuck & Co., 1996 U.S. Dist. LEXIS 2653 (S.D.N.Y. Mar. 7, 1996) at *7-8 ("[M]any of the descriptions of the work performed are vague, including entries such as 'review of file,' 'review of documents' and 'review of [adversary's] letter.' There can be no meaningful review of time records where the entries are too vague to determine whether the hours were reasonably expended.") (citations omitted). Courts have endorsed cutting a professional's fees by a percentage "as a practical means of trimming fat from a fee application," particularly to address problems like lumping, duplication of effort, and vague time entries.[255] In addition, interim fee awards remain "subject to re-examination and readjustment," as section 330(a)(5) of the Code specifically permits a court to order disgorgement of interim payments awarded pursuant to section 331, to the extent they exceed the ultimate amount of fees and expenses approved by the Court under section 330.[256]

The Fee Guidelines also address reimbursement for actual, necessary expenses. Courts have found that expenses are "necessary" if they were "required accomplish the proper representation of the client."[257] The Fee Guidelines list factors relevant to a determination that an expense is proper, including: (i) whether the expense is reasonable and economical, (ii) whether the applicant has provided a detailed itemization of expenses, (iii) whether the expenses

[255] See In re West End Fin. Advisors, LLC, et al., 2012 Bankr. LEXIS 3045 at *14 (quoting New York State Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1146 (2d Cir. 1983)); see also United States Football League v. Nat'l Football League, 887 F.2d 408, 415 (2d Cir. 1989) (affirming across the board reduction for vague time entries); Klimbach v. Spherion Corp., 467 F. Supp. 2d 323, 332 (W.D.N.Y. 2006) (applying a 10 percent across the board reduction for vague billing entries); In re Baker, 374 B.R. 489, 496 (Bankr. E.D.N.Y. 2007) (reducing fees by 20 percent for block billing and stating that "[a]cross the board percentage cuts in the fees claimed are routinely utilized so that courts do not misuse their time 'set[ting] forth item-by-item findings concerning what be countless objections to individual billing items', when the billing records are voluminous, as they are in this dispute.") (citations omitted).

[256] In re Rockaway Bedding, Inc., 454 B.R. 592, 596 (Bankr. D.N.J. 2011) (citations omitted).

[257] In re American Preferred Prescription, Inc., 218 B.R. 680, 686-87 (Bankr. E.D.N.Y. 1998) (citations omitted).

appear to be in the nature of non-reimbursable overhead, and (iv) whether the applicant has adhered to allowable rates for expenses as fixed by local rule or order of the Court.[258]

**2. The Reasonableness of Capstone's Fees and Expenses**

Pursuant to its Third Interim and Final Fee Application, Capstone requests allowance and payment of $5,947,270.00 in fees and $254,348.40 in expenses for services rendered in these cases from August 31, 2010 through February 16, 2012.[259] Relying on its proposed Rule 9019 settlement agreement with Capstone, which contemplated disallowance of $1,000,000 in fees, the U.S. Trustee elected not to perform a review of Capstone's requested fees and expenses for reasonableness and compliance with applicable fee guidelines. This reflects one of many flaws of the failed Capstone settlement.[260] Without having conducted a complete analysis of whether Capstone's requested fees are otherwise reasonable and thus allowable, there is no way to determine the extent to which the $1 million reduction contemplated by the UST/Capstone Settlement would have constituted a sanction or would have merely reflected a reasonableness reduction that was otherwise necessary. Perhaps because of the U.S. Trustee's focus on other aspects of the settlement, including its so-called national scope and its installation of a monitor to revamp Capstone's internal procedures, there was no line-item analysis of Capstone's second or

---

[258] See 28 C.F.R., Pt 58, Appendix, at (b)(5). General Order M-389 also provides detailed expense guidelines. See, e.g., General Order M-389 at (E)(6)(expense for the meal of an individual working after 8:00 p.m. may not exceed $20.00).

[259] Docket No. 1431. The fee application does not include Capstone's request for the $2.75 million Amended Performance Fee, which has been sought separately by the filing of the Amended Performance Fee Motion, nor does it include any fees or expenses incurred by Capstone for services rendered to the Liquidating Trust.

[260] Section 586(a)(3) of title 28 of the United States Code specifically instructs the U.S. Trustee to supervise and monitor certain areas of a case under chapter 11 while the case is being administered. Indeed, the *only* matter for which Section 586 affirmatively tasks the U.S. Trustee with filing an objection (if appropriate) is with respect to applications for compensation and reimbursement pursuant to section 330 of title 11. Section 586(a)(3)(A)(ii) provides, in pertinent part, that after reviewing such applications, the U.S. Trustee shall file with the court "comments with respect to such application and, if the United States Trustee considers it to be appropriate, objections to such application." See 28 U.S.C. § 586(a)(3)(A)(ii).

third interim fee applications and no reasonableness review of its final fee application.[261] Be that as it may, and consistent with the Court's independent obligation to review fee applications, the Court has conducted its own thorough review of Capstone's second interim fee application and third interim and final fee application.

**a. Fees Requested for Services Rendered by Capstone Professionals Other Than Mr. Manzo**

While Thomas Libassi[262] has objected to the allowance of Capstone's fees in their entirety, he requests, in the alternative, that $2,543,846.50 in fees and $121,738.22 in expenses be disallowed as not meeting the standards of section 330.[263] In support of his objection, Mr. Libassi has submitted annotated copies of Capstone's time-billing detail and has also objected

---

[261] With respect to Capstone's first interim fee application, filed January 28, 2011 [Docket No. 400], the U.S. Trustee filed an objection to the allowance of a portion of the requested fees and expenses [Docket No. 439]. In response, Capstone provided the Debtors with a $150,000 fee reduction. See Order Granting First Interim Application of Capstone, dated January 26, 2012 [Docket No. 1140]. With respect to Capstone's second interim fee application, dated October 21, 2011 [Docket No. 842], the U.S. Trustee filed a response stating that it did not object to an award of reasonable interim fees at that time, but it reserved all of its rights to object to the requested interim fees and expenses through the time of final allowance. See Docket No. 934. Capstone's second interim fee application was approved by order dated January 30, 2012, which order awarded Capstone the full amount of fees and expenses sought for the second interim period, $2,906,408.00 in fees and $55,438.26 in expenses. [Docket No. 1141].

[262] Capstone has argued that, as a preliminary matter, the waiver contained in Paragraph 12 of the Confirmation Stipulation – in which Black Diamond waived its right to object to any fees and expenses of retained professionals of the Debtors prior to July 26, 2011 and in amounts below $8 million – should apply with equal force to the Libassi Parties. In support of its argument, Capstone points to the Libassi Engagement Letter, which states that Black Diamond has agreed to pay Richards Kibbe's legal fees during the course of its representation of Mr. Libassi during the GSC cases. This payment of legal fees, Capstone argues, makes the Libassi Parties Black Diamond's agent. While, given the facts of these cases, the Court questions the propriety of such an arrangement, it declines to extend Paragraph 12 of the Confirmation Stipulation to the Libassi Parties, who remain unsecured creditors in these cases. The Court observes, however, that, with respect to the objection to Capstone's fees, such objection was filed by Mr. Libassi only, not the Libassi Parties. A footnote to the objection states that because the other Libassi Parties are now employed by Black Diamond, those individuals did not join in the objection "out of an abundance of caution in complying with this Court's orders."

With respect to the "so-called 504 issues" and Capstone's argument that Black Diamond should not be permitted to raise such issues as a result of Paragraph 12, the Court finds that the issue of the interpretation of section 504 of the Bankruptcy Code is qualitatively different from objections "to any fees and expenses" as stated in Paragraph 12 of the Confirmation Stipulation. Accordingly, the Court declines to extend the waiver contained in Paragraph 12 to these issues, and neither Black Diamond nor the Libassi Parties is barred from raising them.

Notwithstanding the Court's rulings on these issues, the Court observes that, at bottom, they are academic, as the Court has an independent duty to review fee applications whether or not an objection has been filed. See, e.g., In re Keene Corp., 205 B.R. 690, 695 (Bankr. S.D.N.Y. 1997) (citations omitted).

[263] Objection of Thomas Libassi to the Fee Requests of The [sic] Capstone Advisory Group, LLC and Renewed Request for Order to Disgorge Fees and to Remove Liquidating Trustee [Docket No. 1679]. Mr. Libassi also filed the Declaration of Keith Sambur in support of this objection [Docket No. 1680].

more broadly to certain aspects of Capstone's fee application as well as Capstone's timekeeping practices. Specifically, Mr. Libassi has focused on the manner in which Mr. Manzo kept his time records and has alleged that he failed to keep his time contemporaneously; rather, alleges Mr. Libassi, Mr. Manzo, with the assistance of his Capstone colleagues, reconstructed his time entries after the fact by comparing his daily totals with the billing descriptions of his Capstone colleagues and the attorneys at Kaye Scholer with whom he worked. The annotated time detail annexed as an exhibit to Mr. Libassi's objection bolsters his argument that a substantial portion of Capstone's time records are replete with lumped entries, vague descriptions, and duplicative entries that do not comply with this Court's guidelines.

Having reviewed all of the Capstone billing records for the second and third interim fee periods,[264] the Court agrees with Mr. Libassi that many of the Capstone time entries noted by Mr. Libassi in his objection are vague. For example, on November 21, 2011, Mr. Zaidman "[a]nalyzed deposition transcripts received from Counsel – re: 2004 motion" for 1.7 hours; the next day, he conducted the same "analysis" for 1.1 hours.[265] On five days during the beginning of December 2010, both Mr. Butler and Mr. Randall "[p]repared and delivered various information at the request of non-controlling lenders' counsel."[266] Entries such as these as well as dozens of other entries are lacking in sufficient detail and thus prevent meaningful review for reasonableness. When multiple timekeepers "review" and "analyze" generic categories of documents for many days, it is incumbent upon them to demonstrate, through sufficient specific

264 The second interim fee period includes fee and expenses incurred from December 1, 2010 through and including August 31, 2011. As set forth in fn 261, *supra*, Capstone's second interim fee application was approved by order dated January 30, 2012, which order awarded Capstone the full amount of fees and expenses sought for the second interim period, $2,906,408.00 in fees and $55,438.26 in expenses. [Docket No. 1141]. The third interim fee period includes fees and expenses incurred from September 1, 2011 through and including February 16, 2012. The Court has not yet entered an order addressing this fee period.

265 See Third Interim and Final Fee Application of Capstone [Docket No. 1431] at Ex. E, p. 76.

266 See Second Interim Fee Application of Capstone [Docket No. 842] at Ex. E, p. 180.

descriptions, what each timekeeper is reviewing and why.[267] While the Court appreciates the difficulty of keeping detailed contemporaneous time records during the course of a complex case, a modest reduction is nonetheless in order to remove the specter of overbilling by such timekeepers.

With respect to the issue of the reasonableness of the fees billed by Capstone professionals other than Mr. Manzo, the Court finds that there are indeed infirmities with respect to approximately $360,000 of the fees requested for the second and third interim periods for Capstone timekeepers other than Mr. Manzo. Based on the Court's review of the time billing detail for those periods, the Court finds these fees should be reduced by 10 percent on account of the vagueness of such entries, the lumping of time, and the duplication of effort by multiple timekeepers. Accordingly, such fees shall be reduced by $36,000.

**b. Fees Requested for Services Rendered by RJM Through Mr. Manzo**

With respect to the broader question of the fees requested for time billed by Mr. Manzo, which total approximately $2.6 million over the entire duration of the case, it is necessary to reflect upon the testimony and documentary evidence offered by the parties with respect to Mr. Manzo's time sheets and his timekeeping methodology. Mr. Manzo testified at some length on this subject, as follows.

Mr. Manzo did not use the Capstone time-keeping system because he does not use a computer. Instead, he maintained handwritten notes of his time entries in a "daytimer" or

---

267 This Court has previously articulated its concern with vague time descriptions such as "reviewing" documents. As Judge Bernstein stated in West End Fin. Advisors, "Conducting a reasonable review of specific documents for a necessary purpose is ordinarily compensable. Here the document being 'reviewed' is sometimes described with specificity, but more often, timekeepers are 'reviewing' generic categories of documents, such as 'schedules,' 'claims' and the like, for no apparent purpose. [The firm] has failed to satisfy its burden of showing the reasonableness or necessity for so many people 'reviewing' so many documents, many of which are described in such general terms that it is impossible to discern what the timekeeper is reviewing or why. This form of record keeping justifies a 20% across the board reduction on this category of entries, and $56,508.34 in fees is disallowed." In re West End Fin. Advisors, LLC, et al., 2012 Bankr. LEXIS 3045 at *33.

calendar.[268] At the end of each year, as he has done for the past 28 years, Mr. Manzo threw his daytimer away; consequently, he was unable to produce copies of any of his daytimers.[269] Mr. Manzo testified that, using the daytimer, he would record his time on a daily basis in 6-minute intervals for each of the matters on which he worked that day, with "an ample enough description to be compensatory [sic], so it would be quite detailed often."[270] When questioned as to whether he was able to record contemporaneous time in tenths of an hour even on his busiest days, Mr. Manzo answered that he was always able to do so, stating that "you have to do it that way because you lose the day . . . [in] my experience, you can't recollect it."[271] The size of the daytimer he used was approximately four inches by seven inches, and every two pages of the daytimer held approximately five business days.[272] When asked how he could fit a full day's worth of time descriptions[273] into such a small spot (roughly 2 ¼ inches by 2 inches), Mr. Manzo responded that he writes very small and sometimes uses the margin and/or the space above if he runs out of room.[274]

Mr. Manzo testified that, at the end of the month, he would aggregate his hours for each day and send the daily totals to Capstone, without the "detailed" time descriptions he had recorded in the small daily boxes in the daytimer.[275] As a second step, shortly before Capstone needed to send out its invoices, Mr. Manzo would send Capstone handwritten time descriptions on a "grid" numbered 1-31 to correspond to the days of the month, as was his practice for 27-28

---

268 See April 24, 2013 Hr'g. Tr. at 325:8-10 (Mr. Manzo: "It's a Day Timer, it's a calendar, I've used over the years all different types. There's [sic] many of them").

269 See id. at 97:11-103:12.

270 Id. at 281:15-18.

271 Id. at 290:23-25.

272 See Ex. 346 (sheet of paper folded by Mr. Manzo at Trial to demonstrate the approximate size of his daytimer).

273 Mr. Manzo also testified that, in addition to recording his billable hours in his daytimer, he would also write scheduled meetings and other things in his daytimer. Id. at 281:19-23.

274 Id. at 348:22-351:15. This testimony was particularly remarkable as a description of how Mr. Manzo managed to record time for multiple engagements, as he did, for example, during the months in which he was engaged in both the GSC cases and the Chrysler cases.

275 Id. at 111:5-11.

years.[276] Rather than ask an administrative assistant to type up detailed descriptions of his time using his daytimer, Mr. Manzo explained at Trial that it was his practice to rewrite his time entries on the grid using the descriptions from his daytimer. When asked by the Court why it was necessary to go through the additional step of re-copying his time records before someone else inputted them electronically (rather than just giving him or her the daytimer), Mr. Manzo explained "[i]t was just the way that I've done it, Your Honor, from 25 years ago," and also added that his penmanship is "not great."[277]

While creating the grid for the prior month, Mr. Manzo testified that he would contemporaneously review the time records of Capstone employees on his team, thus enabling him "to perform the quality control check that needs to be performed when you're running a case" to ensure the billings of the staff are appropriate billings to the client.[278] At Trial, Mr. Manzo explained that, "so as not to have ambiguity in the descriptions when we're talking about the exact same task" and to have "consistency of the tasks that [were] being performed or the description of the analysis," he would use his own hours for his grid but sometimes "adopt" a colleague's description of a task they had both worked on.[279] For example, a time description written by Mr. Manzo on his grid may read "see Zaidman 2.8 on 1/7," referring the typist to Ron Zaidman's description of the 2.8 hours he billed on January 7.[280]

The record at Trial reflects that not only did Mr. Manzo bolster and/or reconstruct his time descriptions using other Capstone timekeepers' descriptions, he also used time descriptions

---

276 Id. at 280:12-285:3.

277 See id. at 109:22-110-21. When questioned further on this point, Mr. Manzo added that the additional step of rewriting his time detail was necessary because when he sent in his lump sum time to Capstone, he added up the hours in the daytimer without the use of a calculator, as he knew later on he was going do the time descriptions specifically and make sure they actually added up. See id. at 169:25-170-22.

278 Id. at 288:6-7.

279 Id. at 159:15-19.

280 Id. at 292:22-293:10; 328:7-15; 158:14-160:24.

from Kaye Scholer attorneys with whom he worked on the Debtors' cases.[281] When questioned about whether he added and subtracted time in his grid entries to figure out how much time to accord to each day's descriptions, Mr. Manzo explained this as "a quality control check to make sure that the time that I've told Capstone earlier in the month corresponds to the time I'm billing on my sheets to make sure that my calendar is accurately added up."[282] After the grid was prepared, Mr. Manzo would then fax or overnight mail the grid back to Capstone, who would then have an administrative assistant input his time entries electronically.[283] None of the explanations given by Mr. Manzo regarding the rationale for his multi-step process or his incorporation of others' billing descriptions was credible.

Based on the entirety of the record, the Court must conclude that, at best, such timekeeping practices are non-standard and do not reflect best practices for a professional as prominent and highly paid as Mr. Manzo; at worst, such practices reflect an utter failure, by both Mr. Manzo and Capstone, to respect the requirement that accurate detailed time records be kept contemporaneously. Simply put, time records kept in the manner described by Mr. Manzo are unreliable. In addition, dozens of Mr. Manzo's time-billing entries for the second and third interim periods reflect impermissible "lumped" descriptions of multiple tasks.[284]

---

[281] Id. at 112:19-113114:20 ([Q:] "[Y]ou have no recollection that Capstone was preparing a sheet for you based on Kaye Scholer prebills . . . for you to incorporate into your time records?" [Manzo:] "I don't have a recollection of it, but, certainly, that – that could have occurred"). Mr. Manzo later testified that he remembers receiving the Kaye Scholer sheet of descriptions and incorporating them into his descriptions. See id. at 146:14-20. He also testified that he may have asked a Capstone junior analyst to compare Mr. Manzo's recollection of hours to Kaye Scholer's time entries, but that only he, Mr. Manzo, could have prepared a time description for his hours. See id. at 149:14-152:25; Ex. 247.

[282] Id. at 168:18-169:21.

[283] At least one month's time records for Mr. Manzo were sent to Capstone via fax by Mr. Solow from a golf course in Chicago. See id. at 170:25-172:21; Ex. 261.

[284] Notably, Mr. Manzo billed 426 hours to GSC during the month of December 2010, a month in which he also billed an additional 30 hours to other matters, including Chrysler and Refco. See Decl. of Keith Sambur [Docket No. 1680] at Ex. J. This reflects an average of over 14 billable hours per day, including holidays and weekends.

It would be well within the Court's discretion to disallow entirely Capstone's fee request with respect to services rendered by Mr. Manzo, particularly in light of the troubling lack of credibility of portions of his testimony. However, it is important to recognize that Mr. Manzo indeed performed substantial services which benefited the creditors of the Debtors.[285] Accordingly, the Court will reduce the fees requested for services rendered by Mr. Manzo by 20 percent, or $520,000. See, e.g., In re West End Fin. Advisors, LLC, et al., 2012 Bankr. LEXIS 3045 at *43-44 (applying percentage reduction to professional's fees awarded after finding "after-the-fact efforts to 'unblock' the time entries," lumped entries, and "woefully vague descriptions").

**c. Capstone's Expenses**

Capstone's requested expense reimbursements are also problematic. It would appear that Capstone personnel utilized Capstone's retention in these cases to charge everything from their daily cups of coffee at Dunkin' Donuts to lavish meals at the Ritz Carlton, as well as tens of thousands of dollars of travel expenses and hotels. This practice is unfortunately consistent with what Mr. Ordway confirmed was Capstone's overall approach to billing. When asked at Trial whether, in connection with his review of Capstone's fee applications in these cases, he recalled exercising any billing discretion and writing off any time, Mr. Ordway testified, "No. . . . I never wrote off any time on GSC. . . . The time that was incurred looked reasonable to me."[286] In other words, every single tenth of an hour of the 10,023 hours of time recorded by Capstone personnel in the GSC cases were, in Mr. Ordway's opinion, compensable. As noted by Judge Gonzalez in Angelika Films 57th, Inc., "[t]he court bears responsibility for seeing that attorneys do not

---

285 See, e.g., Granite Partners, 219 B.R. at 43-44 (sanctioning Willkie for disclosure violations but recognizing and compensating Willkie "for the many unquestionably exceptional services that it performed in connection with the non-investigative work" after noting that "equitable considerations weigh in favor of compensating . . . substantial and valuable services which were not affected by the tainted investigation").

286 See April 23, 2013 Hr'g. Tr. at 310:9-311:14.

overreach in their attempt to be paid fees from the estate." 227 B.R. 29, 42 (Bankr. S.D.N.Y. 1998) (citing Allied Computer Repair, 202 B.R. 877, 886 (Bankr. W.D. Ky. 1996) ("Simply put, billable hours do not necessarily translate into compensable hours.")). There is no doubt in the Court's mind that Mr. Ordway's conclusion is not the result of a painstaking review of Capstone's time detail but a reflection of the fact that no such review was conducted at all. It would appear that the same approach was utilized with respect to expenses.

This is unacceptable. While professionals are certainly entitled to reimbursement for expenses reasonably incurred in connection with a bankruptcy case (e.g., late night meals while working in the office on matters requiring urgent attention), retention as an estate professional is not a license to eat lavish dinners at the expense of creditors.[287] Professionals who decline to consider that their fees and expenses will be paid from a *bankruptcy estate* and who refuse to exercise any billing discretion in that regard may "drain [the estate] of wealth which by right should inure to the benefit of unsecured creditors." In re Keene Corp., 205 B.R. at 695 (citations omitted). Not every hour billed is compensable; so too with respect to expenses. Capstone is of course free to reimburse its personnel as it sees fit out of its own pockets, instead of those of the creditors. Accordingly, the following reductions in Capstone's approximately $254,000 request for expense reimbursement are required: (i) $6,400, on account of excessive charges for meals eaten in or ordered from restaurants; (ii) $32,000, reflecting fifty percent of charges for airfare and hotels incurred by out-of-town Capstone personnel "commuting" to New York and New Jersey; and (iii) $5,000, on account of excessive and insufficiently documented cell phone and telephone charges.

---

287 In fact, the Court's guidelines include detailed provisions in order to ensure such professional expenses are reasonable and economical, including limiting "working dinners" to an amount of $20.00. See General Order M-389 at (E)(6)(expense for the meal of an individual working after 8:00 p.m. may not exceed $20.00).

**d. Summary of Section 330 Reductions to Capstone's Fees and Expenses**

The total reductions to Capstone's second interim fee application and third interim and final fee application pursuant to the standards of section 330 are: (a) $556,000 in fees ($36,000 for timekeepers other than Mr. Manzo and $520,000 for time billed by Mr. Manzo) and (b) $43,400 in expenses.

**3. Remedies for the Violation of Rules 2014 and 2016**

Before turning to the imposition of a remedy for Capstone's violation of Rules 2014 and 2016, it is significant to note that, based on the foregoing analysis of the reasonableness of Capstone's fees and expenses, it emerges that the $1 million Capstone fee reduction contemplated by the failed 9019 settlement with the U.S. Trustee would not have constituted a $1 million monetary sanction. Because the Court has found that Capstone's fees are to be reduced by $556,000 to approximately $5.4 million on reasonableness grounds, it is $5.4 million that provides the starting number against which additional reductions should be assessed.

Crafting an appropriate remedy for a violation of the disclosure requirements of the Code and the Rules is no easy task. Decisions in this area are fact-specific and have run the gamut from nominal reductions to complete disallowance. As Judge Oakes observed in his dissent in Futuronics II, when exercising its discretion in crafting a remedy, the court should not go too far to "punish" a firm whose services did provide a benefit to the estate. Futuronics II, 655 F.2d at 473. "[O]n the basis of the principle that the punishment should fit the crime," Judge Oakes noted that to deprive the firm of all compensation and to require them to return sums received "is somewhat equivalent to chopping off an arm for stealing a basket of olives." Id. Courts struggle to do the right thing, mindful of the enormous discretion they are afforded to fashion remedies and sanctions.

Here, the Court's exercise of its discretion is informed in part by Capstone's lack of any second thoughts, let alone remorse, at what has here transpired.[288] From the earliest days of this controversy, when counsel referred pejoratively to the U.S. Trustees' fee sharing concerns,[289] through the testimony at Trial in which Mr. Ordway opined that the questions presented were really just "form over substance,"[290] there has never been any acknowledgement by Capstone that it made any mistake other than calling Mr. Manzo an employee. Simply put, Capstone arrogated to itself the decision to not disclose the existence of Mr. Manzo's independent contractor and compensation arrangement and has to this day never looked back. It lays blame on Kaye Scholer; it points to Refco and says it was not hiding anything; it plays the "cat and mouse" game of disclosure that courts have repeatedly frowned upon.[291]

Accordingly, in addition to the section 330 reductions detailed above, Capstone shall be required to (a) forego the $367,000 in fees it has not yet been paid and (b) disgorge an additional $600,000 in fees, which taken together reflect an approximately 18 percent reduction of the $5.4 million reduced allowable amount of its total fee request. Substantial but not onerous, these reductions in the aggregate reduce Capstone's fees from a requested $5.9 million

---

288 It is also worth noting once again that Capstone took no voluntary reductions in its fees or expenses during the entirety of the GSC cases. Professionals in this district routinely exercise billing discretion. See, e.g., Fourth Application of Milbank, Tweed, Hadley & McCloy LLP, Counsel to Debtors and Debtors in Possession, for Interim Approval and Allowance of Compensation for Services Rendered and Reimbursement of Expenses During Period from May 1, 2013 Through and Including August 31, 2013, In re LightSquared Inc., et al., Case No. 12-12080 (Bankr. S.D.N.Y. October 18, 2013) at ¶ 16 n.3 (requesting approval of $6,235,080.75 in fees for legal services rendered during the interim period, which amount reflected a $414,338.00 voluntary reduction in fees incurred).

289 See, e.g., June 11, 2012 Hr'g. Tr. at 10:3-4 (counsel for Capstone referring to the 504 issue as "this so-called gaiting [sic] objection").

290 April 23, 2013 Hr'g. Tr. at 291:17-18 ([Ordway:] "You know, I really think this is a lot of form over substance."); see also Capstone Objection to U.S. Trustee Motion [Docket No. 1631] at p. 10 (Asserting that, because RJM did not conduct any activity other than serving as the counterparty to the Capstone/Manzo Agreement, for the purposes of section 504, RJM should "simply be disregarded" and any argument to the contrary "is a clear example of form over substance").

291 See In re Matco Elecs. Group, Inc., 383 B.R. 848, 853-54 (Bankr. N.D.N.Y. 2008) (denying fees for failure to fully disclose a conflict and noting that Rule "2014 is not intended to condone a game of cat and mouse where the professional seeking appointment provides only enough disclosure to whet the appetite of the UST . . . or [other parties], and then the burden shifts to those entities to make inquiry in an effort to expand the disclosure.").

to an allowed amount of approximately $4.4 million. Measured against the original requested amount, the section 330 reductions and the disclosure-related reductions, in the aggregate, reflect a 25 percent overall reduction in Capstone's fees.[292]

As for the non-monetary relief urged by the U.S. Trustee and Mr. Libassi – the installation of a "monitor" to overhaul Capstone's internal conflicts checking procedures, among other intrusive measures – the Court declines to order such relief, although it would without question be within the Court's authority and discretion to do so. Capstone is a professional firm capable of getting its own house in order – how it elects to do so is its business, not Mr. Libassi's, and not the U.S. Trustee's. As and when Capstone next seeks to be retained in a case in this District or elsewhere, its conflicts check, retention, and billing practices will come under scrutiny by the case constituents, the U.S. Trustee, and the presiding court, and they will have to pass muster. The Court has no doubt that Capstone is up to the task. The Court is confident that the U.S. Trustee will approach its task at that time as an even-handed party-in-interest working towards the common goal of making the bankruptcy process work with integrity and for the benefit of all stakeholders.

**C. The Amended Performance Fee Motion**

As discussed at p. 17, *supra*, Capstone had originally included in the Capstone Engagement Letter a provision stating that it "shall be eligible to request a success fee, the amount and conditions of which to be mutually agreed upon and subject to Bankruptcy Court approval." The letter included no metric or standard pursuant to which a potential Capstone success fee would be sought, nor did the Capstone Retention Application or any other pleading

---

[292] Upon information and belief, based upon the statements in the Capstone/Manzo 9019 Motion, approximately $230,000 in fees and expenses charged by Capstone to the Liquidating Trust for post-Effective Date services rendered remains unpaid. Such amounts will be scrutinized by the Successor Trustee, as discussed at pp. 114-15, *infra*.

provide any further clarification or detail. No party-in-interest, including the U.S. Trustee, appears to have focused on this portion of Capstone's retention papers, and no objections were filed. The Capstone Retention Order contained a provision regarding the potential success fee; while no success fee was being approved at that time, the order stated that Capstone retained the right to seek approval of such a fee upon proper application to the Court. Because both the Capstone Engagement Letter and the Capstone Retention Order were lacking in metrics and standards with respect to the award of any potential success fee, the seeds of subsequent controversy were sowed at the time of Capstone's retention.

Over two years later, and several weeks prior to the confirmation hearing, Capstone filed its Performance Fee Motion, initially requesting a performance fee in the amount of $3.25 million,[293] a bonus of over 50 percent of the fees it billed in these cases.[294] How Capstone arrived at this amount is unclear, but the motion states that the requested Performance Fee is 1.2% of the value received by the Debtors from the Auction, which is at the "low end" of the 1% to 2% range for performance fees awarded in other bankruptcy cases. Alternatively, as the Confirmation Stipulation provided that up to $8 million in fees and expenses incurred after July 26, 2011 would not be subject to an objection by Black Diamond, it is also possible that the Performance Fee was simply calculated to reflect the highest possible amount that would fall below that limit.

While investment bankers retained by debtors often seek pre-approval of a success fee at the outset of a case pursuant to section 328 of the Code, most commonly relying on a measure of the percentage of total prepetition debt being refinanced to demonstrate "reasonableness" of their

[293] Capstone later amended its request for the Performance Fee and now seeks a $2.75M Amended Performance Fee. See Amended Performance Fee Motion [Dkt. No. 1412].

[294] By its final fee application, Capstone requests $5,947,270.00 in fees and $254,348.40 in expenses for services rendered in these cases.

proposed fee under section 328,[295] this is distinguishable from the fee enhancement sought by Capstone not at the outset of the Debtors' cases but at the conclusion.[296] Capstone's request for the Amended Performance Fee is analyzed pursuant to the factors set forth in section 330(a)(3) of the Code and calls for the Court to consider whether an upward adjustment to the lodestar amount[297] is appropriate under the circumstances of the case. This Court has articulated that "an upward adjustment may be justified 'only in the rare case where the fee applicant offers specific evidence to show that the quality of service rendered was superior to that one reasonably should expect in light of the hourly rates charged and that the success was 'exceptional.'" [298]

And why exactly was Capstone entitled to a 50 percent bonus? According to the November 3, 2010 Eckert/Frank Letter, signed by Messrs. Eckert and Frank but ghost-written by Mr. Manzo, Mr. Manzo and his firm did a "superb job" in the GSC cases, helping GSC to achieve an "extraordinary result" at the Auction, thereby positioning the company for a sale in an amount that "is well beyond any expectation or valuation done by any party to this situation." The letter stated that, while Messrs. Eckert and Frank were not completely familiar with the manner in which compensation decisions are made in a chapter 11 case, in the business world outside of bankruptcy, Capstone would be entitled to a bonus. Accordingly, the letter stated that they would leave it to Mr. Manzo and Capstone "through appropriate channels in the bankruptcy

---

[295] See, e.g., In re XO Communs., Inc., 398 B.R. 109-110 (Bankr. S.D.N.Y. 2008).

[296] The Court also observes that investment bankers are typically retained solely pursuant to section 328 of the Bankruptcy Code and compensated through a monthly fee; in the GSC cases, Capstone was retained pursuant to both sections 327(a) and section 328 of the Code and was compensated on an hourly basis.

[297] The "lodestar approach" refers to the practice employed by courts of calculating a reasonable fee amount by multiplying the number of hours worked by a reasonable billing rate to determine what aggregate fee amount is reasonable under the circumstances. See In re Kohl, 421 B.R. 115, 131 (Bankr. S.D.N.Y. 2009).

[298] Dec. 21, 2004 Hr'g. Tr. at 17:17-17:24, annexed to Order Denying Request by Akin Gump Strauss Hauer & Feld LLP for Award of a Premium [Docket No. 14734], In re Worldcom, Inc., Case No. 02-13533 (Bankr. S.D.N.Y. Dec. 28, 2004).

case to obtain your appropriate reward for this extraordinary result."[299] Ironically, the disclosure issues regarding the Capstone/Manzo Agreement first surfaced in the context of the mushrooming litigation over the Performance Fee Motion, instigated by Black Diamond despite its employment of Mr. Frank, the signatory of the letter submitted on behalf of the Debtors supporting the Performance Fee Motion.

In the context of the now-withdrawn UST/Capstone Settlement, Capstone had agreed to withdraw the Amended Performance Fee Motion seeking $2.75 million. But it otherwise has never budged on its position that it was entitled to receive this enormous bonus on top of the hourly fees it had billed as a retained professional in these cases. If anything is clear in this case, it is that Capstone is not entitled to a bonus simply for doing its job, let alone having engaged in conduct that fell far short of best practices and violated the Federal Rules of Bankruptcy Procedure. Based on all of the foregoing findings, the Amended Performance Fee Motion is denied.

**D. The Rule 9011 Sanctions Motions**

Both Black Diamond and the Libassi Parties have filed motions seeking sanctions against Capstone pursuant to Bankruptcy Rule 9011. Pursuant to the Capstone Sanctions Motions, Black Diamond and the Libassi Parties allege that Capstone knowingly filed documents containing false statements regarding the employment of Mr. Manzo by Capstone, which enabled Capstone to be retained and to seek compensation under false pretenses. Capstone objects, arguing that the "complained-of conduct" has been corrected and that sanctions are not appropriate where the party opposing sanctions holds a colorable claim of defense; here, that Capstone's independent contractor relationship with Mr. Manzo does not violate section 504 of

[299] See Docket No. 1146, Exhibit A. The Eckert/Frank Letter was annexed as Exhibit A to the Performance Fee Motion.

the Bankruptcy Code. Black Diamond and the Libassi Parties, and Capstone, in turn, each ask the Court to award sanctions against the other side and require payment of their legal fees.

Federal Rule of Bankruptcy Procedure 9011(b) provides in relevant part:

> **Representations to the Court**. By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances –
> ...
> (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and
> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

Fed. R. Bank. P. 9011(b). The Court may impose sanctions under Bankruptcy Rule 9011(c), if after "notice and a reasonable opportunity to respond," it determines that Rule 9011(b) has been violated. Fed. R. Bankr. P. 9011(c). The United States Court of Appeals for the Second Circuit, in interpreting Federal Rule 11,[300] held in Eastway Construction Corp. v. New York that "sanctions shall be imposed against an attorney and/or his client when it appears that a pleading has been interposed for any improper purpose, *or where*, after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law."[301] Rule 11 was revised in 1993 to include the language that "the court *may* impose an appropriate sanction," and it made clear that sanctions under Rule 11 are discretionary, not mandatory.[302] Further, a sanction imposed for a violation of Bankruptcy Rule 9011 should be limited to what is sufficient to prevent or deter similar conduct. Fed. R. Bank. P. 9011(c)(2).

---

[300] Bankruptcy Rule 9011 "parallels Federal Rule of Civil Procedure 11, containing 'only such modifications as are appropriate in bankruptcy matters.'" Baker v. Latham Sparrowbush Assocs. (In re Cohoes Indus. Terminal, Inc.), 931 F.2d 222, 227 (2d Cir. 1991) (citations omitted).

[301] 762 F.2d 243, 254 (2d Cir. 1985) (emphasis in original).

[302] Fed. R. Civ. P. 11(c)(1) (emphasis added). See also Ipcon Collections LLC v. Costco Wholesale Corp., 698 F.3d 58, 63 (2d Cir. 2012).

Before a motion for sanctions under Bankruptcy Rule 9011 can be filed, the party against which sanctions are sought must be provided with the opportunity to correct or withdraw the offending statement. The rule provides a 21-day "safe harbor" period during which time relevant corrections or withdrawals may be made. Fed. R. Bank. P. 9011(c)(1)(A).

Accordingly, even if the Court were to determine that Rule 9011(b) was violated, in the exercise of its discretion, the Court need not impose a sanction. While the Court agrees with the statement of Black Diamond in its reply that Capstone exhibited a "recalcitrant" attitude regarding the harm it caused by concealing its arrangement with Mr. Manzo,[303] the Court need not rule on Capstone's alleged violations of Rule 9011(b), as it declines to sanction Capstone for its conduct in these cases. The monetary remedy for Capstone's actions has already been imposed in the form of substantial fee reductions, as discussed *supra*.

## III. Findings of Fact and Conclusions of Law with Respect to RJM I and Mr. Manzo

As discussed at pages 33-34 *supra*, the Libassi Parties and Black Diamond assert that Mr. Manzo's alleged misconduct, both pre-Effective Date and post-Effective Date, mandate his removal as Liquidating Trustee. Although Mr. Manzo has in fact "agreed" to resign as Liquidating Trustee pursuant to his contractual settlement with the U.S. Trustee, it nonetheless falls within the purview of this Court to determine whether his conduct warrants removal for gross negligence or willful misconduct.[304] This is far from a mere academic exercise inasmuch the provisions of the Liquidating Trust Agreement that address resignation and succession issues

---

[303] Docket No. 1702.

[304] The provisions in the Liquidating Trust Agreement affording the U.S. Trustee the post-Effective Date right (i) to make a motion seeking replacement of the Liquidating Trustee for gross negligence or willful misconduct and (ii) to recommend a successor trustee to the Court if a successor trustee cannot be designated by the beneficiaries of the Liquidating Trust are noteworthy inasmuch as they are not based on any powers granted to the U.S. Trustee by statute or otherwise. See, e.g., 28 U.S.C. § 586(a). Section 586(a)(3) specifically instructs the U.S. Trustee to supervise and monitor certain areas of a case under chapter 11 while the case is being administered. There is no mention in this section, however, of any role for the U.S. Trustee once a debtor's plan has been confirmed and has become effective, nor is there any other statutory provision providing the U.S. Trustee with general supervisory authority over the post-effective date affairs of a debtor.

turn on whether the Liquidating Trustee resigns voluntarily or is removed involuntarily. If Mr. Manzo resigns voluntarily, he may designate his successor; if he is removed for gross negligence or willful misconduct, the "Beneficiaries" may, by majority vote, designate a person to serve as successor Liquidating Trustee.[305] Unfortunately, the Liquidating Trust Agreement does not address what occurs where, as here, the Liquidating Trustee must be removed involuntarily for conduct that constitutes "cause" but does not rise to the level of gross negligence or willful misconduct.

The allegations of Black Diamond and the Libassi Parties with respect to Mr. Manzo's alleged breach of fiduciary duty for ignoring the $1 million budgetary "cap" rank among the most specious of any allegations in this case. Black Diamond – by all accounts the mastermind and instigator of much of the turmoil that beset these cases from the outset – now not only has changed its mind about Mr. Manzo serving as the Liquidating Trustee (despite its prior explicit support) but now seeks to hold Mr. Manzo accountable for not having noticed that Black Diamond and/or its counsel stealthily changed the terms of the Liquidating Trust Agreement at the eleventh hour to impose a cap on fees and expenses incurred by the Liquidating Trustee. The uncontroverted testimony regarding the amendment of this key provision reflects that neither Black Diamond nor its counsel ever gave any indication to Mr. Manzo, Mr. Garrity, or the Shearman attorneys that this change was in the offing. Black Diamond's stunningly sharp tactics are in many ways far more unbecoming than anything done or not done by Mr. Manzo, the Capstone professionals, or Kaye Scholer. Mr. Manzo's alleged disregard of the $1 million "cap" reflects his ignorance of its existence; his alleged accrual of fees and expenses exceeding such cap does not constitute gross negligence or willful misconduct.

---

[305] The term "Beneficiaries" is defined in the Liquidating Trust Agreement as the Holders of Trust Units. It appears that Black Diamond holds a majority of the Trust Units.

Straining to find another argument that brings the removal of Mr. Manzo within the purview of Section 2.8 of the Liquidating Trust Agreement, the Libassi Parties and Black Diamond argue that Mr. Manzo's *pre*-Effective Date conduct constitutes gross negligence or willful misconduct. This argument is meritless; there is absolutely nothing in the Liquidating Trust Agreement that contemplates removal of the trustee for conduct that occurred before such agreement took effect. Even if the agreement could be so read, Mr. Manzo's pre-Effective conduct, while far from exemplary, does not rise to the level of gross negligence or willful misconduct.

Black Diamond and the Libassi Parties, in urging the Court to find gross negligence or willful misconduct, clearly wish to bring the removal of the Liquidating Trustee within the purview of Section 2.8 in order to be able to appoint their own designee as Successor Trustee. This is not to be. Unfortunately, Section 2.8 does not address the circumstances that have arisen here – the existence of "cause" to remove Mr. Manzo which falls short of gross negligence or willful misconduct. Applicable state law provides guidance as to how the Court should deal with this gap in the Liquidating Trust Agreement. New York law permits the court "to suspend or remove a trustee who has violated or threatens to violate [such] trust . . . or who for any reason is a person unsuitable to execute the trust." N.Y. Est. Powers & Trusts Law § 7-2.6(a)(2). The Court finds, based on the totality of the circumstances, that Mr. Manzo is unsuitable to continue to execute the trust in this case. Moreover, in the case of removal of a trustee, if no other provision is made for the appointment of a successor trustee, the court may "appoint a successor trustee and, if there is no acting trustee, to cause the trust to be executed by a receiver or other officer under its direction." Id. at § 7-2.6(a)(3). Alternatively, even if the Court were to give effect to Mr. Manzo's voluntary resignation pursuant to his contractual settlement with the U.S.

Trustee, the Court would not permit Mr. Manzo to appoint his own successor. What is required here is a neutral, independent party who will step into this morass and move the trust forward. The Court will appoint a successor trustee (the "Successor Trustee") and advise the parties of such appointment within 21 days of the date of entry of this decision.[306]

Having had the opportunity to make allegations against Mr. Manzo relating to his tenure as Liquidating Trustee[307] and having failed to establish any basis for such claims, the Libassi Parties and Black Diamond are thus precluded from asserting any such claims;[308] the Successor Trustee, however, will have the authority to examine the books and records of the Liquidating Trust and the conduct of the Liquidating Trustee to determine whether there are post-Effective Date causes of action that should be asserted on behalf of the Liquidating Trust and its beneficiaries other than the Libassi Parties and Black Diamond. This is necessary because the Liquidating Trust has effectively been disabled by the involvement of Mr. Manzo in these proceedings and, thus, the Liquidating Trust and its beneficiaries (other than the Libassi Parties and Black Diamond) have not been able to participate in these proceedings.[309] In addition, the Successor Trustee shall undertake a review of the fees and expenses incurred by Mr. Manzo,

---

306 The Supreme Court has noted the inherent power of a federal court to regulate the parties appearing before it and the discretionary ability it possesses "to fashion an appropriate sanction for conduct which abuses the judicial process." Chambers v. NASCO, 501 U.S. 32, 44-45 (1991); In re Rainbow Magazine, Inc., 77 F.3d 278, 284 (9th Cir. 1996) (stating that "[b]y providing that bankruptcy courts could issue orders necessary 'to prevent an abuse of process,' Congress impliedly recognized that bankruptcy courts have the inherent power to sanction that Chambers recognized exists within Article III courts").

307 See Supplemental Statement by Thomas Libassi, Philip Raygorodetsky, Seth Katzenstein and Nicholas Petrusic Describing Post-Effective Date Claims, dated April 8, 2013 [Docket No. 1708].

308 See, e.g., D.A. Elia Constr. Corp. v. Damon & Morey, LLP, 389 B.R. 314, 320 (W.D.N.Y. 2008) (finding that allegations of misconduct asserted after entry of a final order approving fees pursuant to section 330 of the Bankruptcy Code were barred by *res judicata* and stating that "[t]he present action is nothing more than an attempt by Elia to relitigate issues that were previously decided against it by the bankruptcy court, this Court and the Second Circuit. Such conduct represents the very essence of what the *res judicata* doctrine was designed to foreclose – the relitigation of previously decided issues in a subsequent action"); see also Allen v. McCurry, 449 U.S. 90, 94 (1980) ("[u]nder res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action").

309 See, e.g., Allen v. McCurry, 449 U.S. 90, 101 (1980) ("Collateral estoppel does not apply where the party against whom an earlier court decision is asserted did not have a full and fair opportunity to litigate the claim or issue decided by the first court.").

Capstone, and Shearman for services rendered to the Liquidating Trust in connection with his or her determination of the amounts of such compensation to be paid.[310] In no event shall such amounts include any fees or expenses incurred by Capstone or Mr. Manzo in connection with either (a) approval of the Performance Fee or (b) the defense of the U.S. Trustee Motion and the matters raised therein, from June 11, 2012 through May 14, 2013.

**IV. Findings of Fact and Conclusions of Law with Respect to Kaye Scholer**

As a result of the U.S. Trustee's last-minute decision to withdraw the U.S. Trustee Motion to the extent it sought relief against Kaye Scholer, only a few issues with respect to Kaye Scholer remain unresolved. To recap briefly, the gravamen of the U.S. Trustee's allegations with respect to Kaye Scholer were that (i) it had violated its disclosure obligations by failing to disclose that it had previously represented the two LLC entities owned by Mr. Manzo and (ii) it had, in essence, aided and abetted Capstone's violation of section 504. The U.S. Trustee also took issue with the firm's failure to disclose that Mr. Solow and Mr. Manzo were good friends, and (erroneously) claimed that Mr. Solow was the actual author of the Eckert/Frank Letter. (He was not; in fact, it was written by Mr. Manzo). There were no allegations of actual harm to the estate or the creditors; there were no allegations that Kaye Scholer would not have been retained had there been disclosure of its prior representation of RJM and RJM I or of the Solow/Manzo

[310] On March 18, 2013, Shearman filed a Notice of Presentment of Order Approving Shearman & Sterling LLP's Withdrawal as Counsel to the GSC Liquidating Trust, which annexed a proposed order (the "Shearman Withdrawal Order") [Docket No. 1684]. At a status conference on March 20, 2013, the other parties in the case, including the Liquidating Trustee, indicated that they had first become aware of the Shearman Withdrawal Order at the time it was filed on the docket. Shearman explained that, as a result of negotiations with the U.S. Trustee and its counsel regarding a supposed conflict between its acting as counsel to the Chapter 11 Trustee and as counsel to the Liquidating Trust, and motivated by a desire to "maintain a good relationship with the United States Trustee's Office," Shearman had agreed to (i) reduce its Trust-related fees by an aggregate amount of $500,000, to resolve objections to its fee application that the U.S. United States Trustee's counsel had raised informally with Shearman and (ii) withdraw as counsel to the Liquidating Trust. In light of unresolved questions regarding the propriety of the U.S. Trustee's actions with respect to Shearman, the Shearman Withdrawal Order and Shearman's final fee application both remain pending. See March 20, 2013 Hr'g. Tr.

friendship;[311] there were no allegations that Kaye Scholer had in any way mishandled the Debtors' cases; and there were no Leslie Fay-type allegations whatsoever. Nonetheless, the U.S. Trustee sought vacatur of the Kaye Scholer retention order and complete disgorgement of all of Kaye Scholer's fees. After two rounds of settlement discussions and mediation with Judge Peck, some 45,000 pages of document production, hundreds of pages of briefing, and many weeks of depositions and trial preparation, the U.S. Trustee and Kaye Scholer arrived at a settlement.

However, for the reasons outlined by the Court on April 19, 2013,[312] the settlement agreement that was the subject of the KS 9019 Motion was not approved. Although the settlement clearly reflected Kaye Scholer's fervent desire to extricate itself from the GSC quagmire, as evidenced by its agreement to an almost thirty percent reduction in fees and an undertaking to employ a "policies and procedure" expert to help it review its conflicts and disclosure regime, it was procedurally and substantively flawed. Perhaps most striking was the inclusion in the settlement of a condition that all claims by third parties (e.g., Black Diamond) be barred – a provision that the U.S. Trustee would have found entirely unacceptable had the tables been turned and Black Diamond, for example, sought approval of a settlement conditioned on release of the U.S. Trustee's claims. Equally striking and unacceptable was the U.S. Trustee's inclusion in the UST/KS Settlement of United States Trustees from all regions and its description of the settlement as a "national settlement."[313]

---

[311] The notion of "disclosable" friendships is a thorny one. How would one determine when there needs to be disclosure? The U. S. Trustee never articulated a standard or test for the disclosure of friendships. The reality is that restructuring professionals do work long hours together and, as a result, form personal as well as professional friendships. Indeed, such relationships may help establish a beneficial platform of trust and cooperation.

[312] See April 19, 2013 Hr'g. Tr. [Docket No. 1735].

[313] See May 14, 2013 Hr'g. Tr. at 222:20-235:24 (detailing numerous instances of questionable conduct of U.S. Trustee).

Ultimately, the parties elected to follow the blueprint laid out in the Court's preliminary ruling on April 19, 2013. The U.S. Trustee and Kaye Scholer agreed on a contractual settlement that would not be court-approved, and the U.S. Trustee withdrew its motion. Consistent with the blueprint, the Court must address (i) Kaye Scholer's final fee application, as modified by the agreed disgorgement amount reflected in its settlement with the U.S. Trustee; (ii) Black Diamond's argument that it is not precluded from maintaining an action against Kaye Scholer for malpractice and breach of fiduciary duty; and (iii) Black Diamond's motion for Rule 9011 sanctions.

**A. Kaye Scholer's Final Fee Application**

In its final fee application, which the Court has now reviewed in detail, Kaye Scholer seeks total compensation in the amount of $5,717,743.69 reflecting $5,431,512.90 in fees and $286,230.79 in expenses.[314] Pursuant to its settlement with the U.S. Trustee, Kaye Scholer has effectively reduced its fee request by $1.5 million, a 28 percent reduction. By any standard, Kaye Scholer's reduced fee request is reasonable and shall be approved pursuant to section 330. There has never been any suggestion that Kaye Scholer's substantive work in these miserably contentious cases was anything but stellar. And the Court so finds.

Indeed, Kaye Scholer ultimately acknowledged that "mistakes were made" by its professionals in these cases. And they were: Mr. Solow failed to recall that he had rendered advice to RJM; he also regretted his submission of a declaration in support of the Performance Fee, admitting that his friendship with Mr. Manzo may have influenced his judgment. In addition, Kaye Scholer fell victim to what can best be described as "big firm-itis" – the particular

---

[314] With respect to the first interim application of Kaye Scholer for the period of August 31, 2010 through November 30, 2010, then-presiding Judge Gonzalez took the matter under advisement following a bitterly contested hearing on December 21, 2011. By his opinion, dated February 29, 2012, Judge Gonzalez reduced Kaye Scholer's fee and expenses for the first interim period by $316,456.81 in the aggregate. See Docket No. 1254.

affliction that befalls big law firms when their partners and associates hand responsibility off to one another.[315] When this happens, process fails and details fall through the cracks. That is what appears to have happened here with respect to Kaye Scholer's role in the Capstone retention process, rather than the purposeful disregard of the rules of this Court. Indeed, the record reflects that Mr. Micheli, who acted as the notetaker during the September 23 Meeting among Ms. Schwartz, Mr, Manzo, Mr. Nurnberg, and himself, attempted in earnest to track down the facts relating to RJM and Mr. Manzo's status at Capstone.[316] He asked questions of Mr. Solow, prepared a draft of the Second Supplemental Ordway Declaration, and asked Capstone and Mr. Manzo to review it to confirm its accuracy. Obviously, neither Mr. Ordway nor Mr. Manzo did so, although Mr. Ordway did execute it and ask Kaye Scholer to file it. The blame for this missed connection lies with Capstone, not Kaye Scholer. One of the countless unfortunate aspects of this case is the emotional toll it undoubtedly visited upon Mr. Micheli.

Accordingly, Kaye Scholer's final fee application is approved in the reduced amount of $3,931,512.90 in fees and $286,230.79 in expenses and, at least in this Court's view, the order which shall be entered approving such fees is entitled to preclusive effect in any subsequent litigation that may be brought against Kaye Scholer on causes of action sounding in malpractice

---

[315] Technology also played a role in the parties' missed connections, as the parties in this matter, and, indeed, in most matters today, communicated primarily by email instead of by telephone or face-to-face meetings. For example, despite the fact that Mr. Micheli drafted at least one of the Ordway Declarations, and Kaye Scholer requested review and signature before filing all of Capstone's retention documents, Mr. Micheli testified at Trial that he had never met Mr. Ordway in person until this dispute arose. See April 30, 2013 Hr'g. Tr. at 230:17-21.

[316] Mr. Micheli testified at Trial that, sometime between September 23, 2010 and October 1, 2010, after he learned of the existence of RJM but before the filing of the First Supplemental Ordway Declaration, he "was trying to find out more information about [RJM]," and he went to Mr. Solow's office to ask him "what RJM, LLC was." Mr. Solow explained to him that RJM was "a liability pass through shield," and the discussion ended because Mr. Solow received a phone call at that time. See April 30, 2013 Hr'g. Tr. at 175:14-176:17; 192:23-193:1; 193:11-13. After that conversation, Mr. Micheli continued to believe that Mr. Manzo was an executive director and employee of Capstone and that the relationship between RJM and Capstone was one of employer/employee. See id. at 178:15-179:23. Mr. Micheli also testified that both he and Mr. Kleinman of Kaye Scholer did additional "research" as to (i) whether any disclosure had been made by Capstone in the Chrysler case regarding Capstone's relationship with the pass –through entity of RJM and (ii) what firms like Kirkland & Ellis disclose, if anything, with respect to pass-through entities. See id. at 219:3-22.

or otherwise.[317] Black Diamond's allegations of malpractice by Kaye Scholer should thus be added to the waste bin of frivolous and mean-spirited pleadings that are the legacy of these cases. Such allegations, even if their assertion were not precluded, would clearly not survive a motion to dismiss[318] and indeed might well run afoul of Rule 11. Enough is enough.

**B. The Rule 9011 Sanctions Motion**

Finally, Black Diamond's motion seeking the imposition of Rule 11 sanctions against Kaye Scholer is denied. There is no basis in the record for awarding such sanctions. The Court has no doubt that Kaye Scholer's experience in these cases is itself, to quote Rule 9011(c)(2), "sufficient to deter repetition of such conduct or comparable conduct . . . ."

**CONCLUSION**

Despite the enormous changes in the world in which bankruptcy professionals function, this much remains unchanged: professionals must hold themselves to the very highest standards and conduct themselves in a manner that reflects well upon themselves, their firms, and the profession – and that demonstrates, beyond peradventure, that they add value commensurate with the handsome fees they ask to be paid. Professionals must continue to follow the guidance and guidelines outlined by Judge Brozman in Leslie Fay and ensure that they do not take decisions regarding disclosure out of the court's hands. And they must strive to avoid finding themselves in the position of having to say (or, as in this case, being forced to admit), "in retrospect, we

---

[317] See fn 308, *supra*; see also Grausz v. Englander, 321 F.3d 467, 472-75 (4th Cir. 2003) (approval of fees under section 330 barred subsequent malpractice action against debtor's counsel in chapter 11 case).

[318] Black Diamond's claim for Kaye Scholer's alleged breach of fiduciary duty cannot survive a motion to dismiss because, among other things, Kaye Scholer owed a fiduciary duty to the Debtors and not to Black Diamond. See ICM Notes, Ltd. v. Andrews & Kurth, L.L.P., 278 B.R. 117, 126 (Bankr. S.D. Tex. 2002) (debtor's counsel does not owe fiduciary duties to any individual creditor and is not subject to creditor cause of action for breach of fiduciary duty); In re Dieringer, 132 B.R. 34, 37 (Bankr. N.D. Cal. 1991) ("debtor's attorney is not liable to creditors for mishandling a bankruptcy except to the extent that his conduct was fraudulent or otherwise intentionally wrongful."). Moreover, "[i]f a claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action." St. Paul Fire & Marine Ins. Co. v. Pepsico, Inc., 884 F.2d 688, 701 (2d Cir. 1989).

should have disclosed . . . ." That being said, it is equally essential to the smooth functioning and integrity of the bankruptcy system that the U.S. Trustee engage with professionals in a constructive and cooperative endeavor to achieve the goals of section 327 and Rule 2014, focusing on form to be sure, but working above all to address matters of substance, and to accommodate the practical changes in the structure of the professional firms that are themselves a vital part of the bankruptcy landscape.

The real culprit in this case was not any particular individual or party; rather, it was complacency. Hopefully, the GSC saga will serve as a reminder to professionals of the need to be painstakingly vigilant and diligent when screening for conflicts, preparing disclosures, and recording time. Hopefully, too, the bankruptcy professional retention process will continue to function at least as well for the next twenty years as it has in the twenty years since Leslie Fay.

The parties shall settle orders consistent with this Decision.

IT IS SO ORDERED.

Dated: December 12, 2013
New York, New York

/s/ Shelley C. Chapman
United States Bankruptcy Judge